# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN DOE,[1]                                      :
                                                  :
                              Plaintiff,          :
                                                  :          CIVIL ACTION NO.
            v.                                    :          18-cv-2044
                                                  :
SAINT JOSEPH'S UNIVERSITY, et al.                 :
                                                  :
                              Defendants.         :

## ORDER

AND NOW on this _____ day of _____, 2018, upon consideration of defendant

Saint Joseph's University's Motion for Summary Judgment and Memorandum in Support and

any response hereto, it is hereby **ORDERED**

Defendant's Motion is GRANTED;


And it is hereby further **ORDERED**

Plaintiff's causes of action against Saint Joseph's University are DISMISSED with

prejudice.


_____
                                                                                        J.

---

[1] The parties have stipulated that "John Doe" and "Jane Roe" will substitute for the actual names of the individual parties involved, in order to protect their privacy.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE,[1] | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 18-cv-2044 |
| | : | |
| SAINT JOSEPH'S UNIVERSITY, et al. | : | |
| | : | |
| Defendants. | : | |

**MOTION OF SAINT JOSEPH'S UNIVERSITY
FOR SUMMARY JUDGMENT,
AND MEMORANDUM IN SUPPORT**

This is Saint Joseph's University's ["SJU"] Motion for Summary Judgment and Memorandum in Support, pursuant to F.R.C.P. 56, as to all claims against it.  There are many,[2] and this motion will deal with them serially, beginning with the Title IX claim.

This case arises from the student discipline process at SJU as it was applied in John Doe's ["John"] case.  He was found responsible for violating the SJU Sexual Misconduct Policy ["SMP"] for having choked and bruised a fellow student, Jane Roe ["Jane"] – being too rough with her – while "making out."  Jane had not consented to John's rough actions involving squeezing her neck and bruising her.  John was sanctioned with a one-year probation, set to expire at the end of the Spring 2019 semester.  Both John and Jane remain SJU students.

Under Title IX the issue here is whether the judgments by and on behalf of SJU were fair – this private university is not subject to due process standards, per se – AND whether those

---

[1] The parties have stipulated that "John Doe" and "Jane Roe" will substitute for the actual names of the individual parties involved, in order to protect their privacy.

[2] Violation of Title IX, Breach of Contract, Intentional and Negligent Infliction of Emotional Distress, Unfair Trade Practices and Consumer Protection, Defamation, and claims against Jane Roe personally.

1

judgments were free of gender bias.  It is not for this Court to decide, de novo, whether John

violated the SJU's SMP.[3]  Rather, in order to prevail, John must establish both gender bias and a

lack of fairness by SJU.  If no gender bias or discrimination is established, then his Title IX

claim fails.  Here, there is no evidence of gender bias or discrimination either institutionally or

on the part of the independent investigator whose factual conclusions were the basis for the

sanction imposed.  That is only the first reason why the Court should grant this motion.  There

are other reasons that follow.

## I.    THE UNDISPUTED FACTS

It is important to begin with a narrative of facts that are not in dispute, so that this Court

can better focus on what is and what is not at issue here.  The 407 paragraph complaint, much of

which has been contradicted by John's deposition testimony on important issues, is daunting in

its blunderbuss approach, but this Court need not attempt to parse it all.  It is John's testimony

and the other evidence that is not contradicted which controls.

In essence, John was found responsible under the SMP for a non-consensual touching in

the course of otherwise consensual kissing.  According to Jane, he squeezed her neck forcefully

during an initially consensual "make out" session sufficiently hard to frighten, choke, hurt her,

and leave bruises.[4]  According to both John and Jane, they were alone in a room in an SJU

dormitory when this happened.  Thus, there were no other witnesses to the occurrence. John was

---

[3] The entire SMP is Exhibit 2. The most relevant sections are at pages 28-38 of the Exhibit.

[4] Jane's deposition testimony is consistent with Malloy's conclusions in the SJU proceedings:
Exhibit 9, Jane Roe Deposition, at 170:4-10.
Q. At what point does he start to squeeze your neck? Is it as soon as he sits down? A. It was like a short time after. He sat down, like the next thing I know his one hand is just around my neck, I can't breathe and, you know.

*Id.*, at 192:3-8 [relating what Jane told her friend immediately after the incident:
Q. And what did you tell her? A. I told her everything was fine one minute and the next thing I

2

found responsible and sanctioned with a one-year probation expiring at the end of the 2019 Spring semester, as well as other requirements.  Because he was on probation (i.e., not in disciplinary good standing) at the time he was scheduled to take part in a Study/Tour class trip to Ireland immediately following the end of the 2018 Spring semester, he was not eligible to go on that trip. He was given an alternate assignment to complete the course for credit, and, assuming he successfully did so, was able to stay on track educationally.

On February 26, 2018, Jane filed her complaint with Dr. Mary-Elaine Perry, SJU's Title IX Coordinator.[5]  Dr. Perry forwarded the complaint to William Bordak, Director of SJU's Office of Community Standards.[6]  Dr. Perry determined that Jane's complaint against John should proceed as a possible violation of SJU's SMP, and Bordak agreed.[7]

Soon after, Emily Forte, Assistant Director of the Office of Community Standards, contacted John to notify him of the complaint against him under the SMP.[8]  By Notice of Process letter, dated March 1, 2018, he was advised in writing that Jane was the complainant, that the incident was alleged to have occurred on February 23, 2018 at Saint Mary's Hall (John's dormitory), and that he was charged with a possible violation of the SMP.[9]  Forte told him that Jane's complaint was that he had been "rough" with her during their time together, alone, in a

---

know his hand is around my neck and he's choking me and I couldn't breathe and it was the scariest moment of my life.

The photos of Jane's neck bruising are Exhibit 1.

[5] Exhibit 11, Deposition of Mary-Elaine Perry, at 301:15-23.

[6] *Id.*, at 332:13-21.

[7] *Id.*, at 333:4-13; *See* Exh. 2 at 26, Para. V.A.

[8] Exhibit 10, John Doe Deposition, at 15:2-10.

[9] Exhibit 16, March 1, 2018 Notice of Process letter.

separate room in his dormitory.[10] Although Forte told him that the independent investigator would have a copy of the complaint,[11] he never asked to see it during the investigation.[12]

Forte held separate pre-investigation meetings with both John and Jane.[13] At each, Forte read and reviewed the identical pre-investigation checklist, a document that advised both John and Jane of their rights, paragraph by paragraph.[14] In advance of his meeting with Forte, John had already read both the student code of conduct and SMP.[15]

At her meeting with John, Forte advised John that Jane's complaint was that he had been "rough" with her during their time together, alone, in a separate room in his dormitory.[16] And, following their review of the pre-investigation checklist, she asked John if he had any questions. He initialed each paragraph of the checklist during this review.[17]

Importantly, through review of the checklist, John was advised of and he acknowledged, among other things, (1) his right to a reasonable accommodation if requested and appropriate, (2) his right to an advisor of his choosing, which could be a lawyer, (3) his right to object to Malloy as the designated investigator, (4) that Malloy would make her determination based on a "preponderance of information" described as "more likely than not," (5) that Malloy's report would include a conclusion as to whether, under that standard, an SMP violation had occurred, (6) that any sanction would be imposed by SJU's Office of Community Standards and that a

---

[10] Exh. 10, at 50:12-51:3; Exhibit 12, Deposition of Emily Forte, at 355:3-15.

[11] Exh. 12, at 298:4-299:6.

[12] Exh. 10, at 109:16-110:19.

[13] Exh. 12, at 335:10-15.; Exh. 2; Exhibit 3, Sexual Misconduct Policy Pre-Investigation Meeting Checklist.

[14] Exh. 12, at 267:4-21.

[15] Exh. 10, at 13:19-15:10.

[16] *Id.*, at 50:12-51:3.

[17] Exh. 3.

sanction up to expulsion was possible, and (7) that there was an appeal process available to him.[18]   Forte gave John a copy of SJU's Sexual Misconduct Policy and the completed pre-investigation checklist.  She advised him that he should contact her or Bordak if he had any questions.[19]   Subsequently, John was afforded all of the rights to which he was entitled under the SMP.

SJU designated a qualified Investigator – Elizabeth Malloy – whose objectivity of judgment and independence of purpose was not compromised by any previously-existing relationship with any party.[20]

John did not object to her appointment; the simplest Google search – which he did not perform – would have given him access to her professional biography.[21]   Even though he was encouraged to do so,[22] he never consulted with any lawyer, including his parents, both of whom are lawyers.[23]   His reason was that it would have been "an uncomfortable conversation."[24]

Malloy performed the required prompt and thorough investigation, which included interviews, documents and evidence.[25]   She issued an appropriate Report, which met all the

---

[18] Exh. 3.

[19] Exh. 12, at 295:10-297:4

[20] Exhibit 15, Deposition of William Bordak, at 54:13-19, 384:5-385:5; Exh. 2, at 30, Para. B.1.

[21] Exh. 10, at 20:23-21:9, 22:17-23:20, 68:12-21.

[22] *Id.*, at 32:2-15.

[23] *Id.*, at 58:7-13.

[24] *Id.*, at 30:15-31:7.

[25] Exh. 2, at 30, Para. B.1.

SMP requirements.[26]  Sanctions were imposed by the appropriate Officer.[27]  John appealed unsuccessfully.[28]

John's complaint challenges virtually every aspect of the SJU disciplinary process under its SMP.  Although his complaint raises the issue that SJU did not accommodate John's learning disabilities – ADHD and processing issues – he admits that he never sought any accommodation from either SJU[29] or Malloy in connection with this process.[30]  Presumably, that issue is not being pressed at this time.

John selected an advisor from the faculty, but did not ask the advisor to accompany him to his meeting with Malloy ("Why?"  "I don't know.").[31]

Malloy met with both Jane and John separately and interviewed them about the incident. The information obtained during those meetings – because neither chose to provide additional materials or witnesses, or suggest further inquiry – form the basis of Malloy's findings and conclusions which are Exhibits 4 and 5.

For the meeting with Malloy, and prior to it, John prepared a narrative, on his phone, which he gave to Malloy.[32] In it, he wrote:

> I wonder if I was holding her in some way that felt forceful or aggressive because, although that was not my intent, it clearly made her uncomfortable.[33]

---

[26] *Id.*, at 33, Para. 5.  *See* Exhibit 4, Summary of Investigation by Elizabeth Malloy, and Exhibit 5, Summary of Findings of Fact, Determinations of Credibility, Rationale and Outcome by Elizabeth Malloy.

[27] Exh. 2, at 34, Para. 6.

[28] *Id.*, at 35, Para. 8.

[29] Exh. 10, at 33:9-23.

[30] *Id.*, at 34:5-11.

[31] *Id.*, at 49:6-21.

[32] Exhibit 6, Text Message from John Doe to Elizabeth Malloy.

He admits that he identified no other witness or evidence that he wanted to produce or make available, even though he knew he could provide such material to Malloy even after his meeting with her.[34]

> Q      Okay.  Do you remember her telling you if you have other things you want me to see, get them to me?
>> A      Yes.
>
> Q      Okay.  And did you ever get her anything else?
>> A      No.
>
> Q      Okay.  And, in fact, before the meeting -- and this is Exhibit-10.  The very first line on the last email before says if you have any documents, et cetera, I would like to see them.  "If you are not able to bring them this afternoon, you can send them to me later."  Right, that was the morning that you met with her?
>> A      Yes.
>
> Q      Okay.  And you never sent her anything later?
>> A      No.

Exh. 10, at 45:5-22.

John also acknowledged to Malloy that it wasn't ok if he had done it ("that's the kind of thing I would say").[35]  And, when confronted with the allegation directly by Malloy, he admitted to her that "I take full responsibility."[36]  According to Malloy's contemporaneous notes John told her:

---

[33] *Id.*

[34] Exh. 10, at 45:5-11, 45:23-46:1.

[35] *Id.*, at 77:5-6.

[36] *Id.*, at 79:9-80:1.

7

I don't remember squeezing her neck. *I don't think she is lying*...It wasn't ok if I did it...I never meant to do it. I don't recall specifically.  I would say she was not lying... Hand on neck while kissing... *I take full respons. I take this as a learning opportunity.*[37] *(Emphasis added)*

Malloy's findings track the interview.  When Malloy told John that Jane claimed that he "squeezed her neck" he did not ask for more time or later provide any evidence contrary to the allegation.[38]  Later, after being sanctioned, he changed his story, but his responses to Malloy were:

Q. ... Now, is it clear that Doe said to you he did not recall or remember ever squeezing her neck area and does not think he did that?
A. When I specifically asked him that. So he was overwhelmingly, "I am not going to call her a liar. If she said I did it, I did it. I am going to take responsibility. I am going to learn from this," continuously said things like that.
When I said, "Do you recall" or "Did you squeeze her neck area," he said he didn't remember and does not think that he did that.

Q. Okay. So he denied it, at least when you had him focus on that, right?
MS. ENGLE: Object to the form.
MR. MYERS: Object to the form of the question.

BY MR. SCHWABENLAND:
Q. Did he deny it?
A. I would not consider that a denial in the context of the whole interview.[39]

In his SJU appeal he wrote "I had not been rough...when asked about having my hands on her neck...[h]ad I known [about the bruises], I would have been very adamant that I could not have done that to her...  I was hesitant to call [her] a liar.[40]

---

[37] Exhibit 8, Notes of Elizabeth Malloy, at 6-7.

[38] Exh. 10, at 108:3-17.

[39] Exhibit 14, Elizabeth Malloy deposition, at 197:17–198:14.

[40] Exhibit 13, April 18, 2018 Appeal letter of John Doe to Vice President for Student Life, at 1-2.

In contrast, in his complaint, John claims that "nothing untoward at all happened." Complaint, Para. 38.  But even at the time of his deposition he had no explanation for how the bruises appeared on Jane's neck.[41]

After meeting with Malloy, John knew that he could have told her of any other witnesses or could have given her "anything that [he] thought related do the incident."  But he offered nothing at all.[42]  The result of offering no additional evidence or witness was that there was nothing further for Malloy to consider as evidence.

Virtually all the facts about what happened were agreed to by both John and Jane in their separate interviews.  The only difference of note – both in their interviews with Malloy and in their depositions here – was on the issue of whether he could have caused her to be squeezed, hurt, frightened and bruised.

According to Malloy, she asked John directly about the claim that Jane recoiled when he squeezed her neck, John's response was:

"I have been told I was strong."[43]

That is not a response that caused Malloy to doubt the veracity of what Jane had told her.[44] Neither did his acceptance of "full responsibility."[45]

## II.    ARGUMENT

### A.    The Standard for Summary Judgment

---

[41] Exh. 10, at 11:6-16.

[42] *Id.*, at 117:10-118:4.

[43] Exh. 14, at 209:10-17.

[44] *See* the photographs of Jane's neck bruises, Exh. 1,  taken less than 48 hours after the incident plainly show the bruising; no alternative explanation for the bruises has ever been offered, and Jane was clear in her testimony: they resulted from John have squeezed her on the night of the incident.

[45] Exh. 10, at 79:9-80:6.

This Court is familiar with the standard for Summary judgment: when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). Summary judgment should be granted where disputes are neither material nor genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). Although all justifiable inferences must be drawn in favor of the non-moving party, the "moving party is entitled to summary judgment where no reasonable resolution of conflicting evidence and inferences therefrom could result in a judgment for the non-moving party." *Schwartz v. Hospital of Univ. of Pa.*, 1993 WL 153810 at *2 (E.D. Pa. May 7, 1993) citing *Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assoc.*, 595 F. Supp. 800, 802 (E.D. Pa. 1986).

**B.**   **The SJU SMP process was fair and unbiased, and on this basis alone, John's Title IX claim must be dismissed.**

    **1.**   **Despite what is alleged in John's complaint, there is no  evidence of gender bias either on the part of SJU or Malloy; nor is there evidence that the process was not fundamentally fair.**

As a private university, SJU is not subject to due process requirements; rather, its relationship with John is contractual in nature. *Harris v. Saint Joseph's Univ.*, No. 13-3937, 2014 WL 1910242, at *2 (E.D. Pa. May 13, 2014); *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007). There is

> …no principled basis for reviewing a breach of contract action that involves private conduct according to principles that arise out of the Fourteenth Amendment, and which govern state action.

10

*Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001). Accordingly, the question before this Court is whether SJU's process is "fundamentally fair." *Clayton v. Tr. of Princeton Univ.*, 608 F.2d 413, 415 (D.N.J. 1985); *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 573 A.2d 575, 579 (Pa. Super. Ct. 1990).

John alleges four separate bases for SJU's violation of Title IX – erroneous outcome; selective enforcement; deliberate indifference; and archaic assumptions. There is no evidence of selective enforcement; the other three claims will be addressed in turn. Each must be dismissed.

### a.   Erroneous Outcome and Selective Enforcement

John's current disagreement with the outcome alone does not establish a dispute of material fact and is not relevant to his erroneous outcome claim. If it were otherwise, no such claim could be decided at the pleadings or summary judgment phase. John has failed to identify any defects in the investigation, procedural or otherwise, that resulted from any alleged gender bias *and caused* the allegedly erroneous outcome. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (noting there must be causal connection between the outcome and underlying bias). Instead, all John provides as "proof" of an erroneous outcome is his own tepid response of "I couldn't have done this" and his own personal belief that there was discrimination. There has not been a shred of evidence developed to show any gender bias or discrimination – NONE. And, affirmatively, it is clear that neither SJU nor Malloy is biased: the SMP applies equally to males, females and individuals who do not identify with the gender binary. There is no presumption in favor of a complainant or against a respondent. Both parties have the same rights as to evidence and witnesses, and the ability to respond as requested.

An erroneous outcome claim under Title IX must show the existence of a defect, procedural or otherwise, in the investigation that led to the erroneous outcome and gender bias

11

motivated. *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1070 (S.D. Ohio 2017); *see also Doe v. Boston Coll.*, No. 16-2290, 2018 WL 2752608, at *16 (D. Mass. Jun 8, 2018) (citing *Yusuf*, 35 F.3d at 715) (gender bias must be a motivating factor for erroneous outcome). The plaintiff must show that gender bias <u>caused</u> the procedural defect and <u>led</u> to the improper finding of responsibility. In other words, the *plaintiff* must articulate enough material facts to cast doubt on the disciplinary process and outcome ***and*** show a causal connection between an underlying gender bias and the improper outcome. *Yusuf*, 35 F. 3d at 715 (emphasis added); *see also Doe v. Univ. of Pa.*, 299 F. Supp. 2d 799, 822-23 (E. D. Pa. 2017) (plaintiff must prove his innocence as to the charge against him, in order to prevail on an erroneous outcome claim). The plaintiff must be able to point to *particular* errors in the process led to an improper outcome that was motivated by bias and cannot rely on general conclusions or subjective beliefs. *Doe v. Univ. of Pa.*, 299 F. Supp. 2d at 823 (citing *Harris*, 2014 WL 1910242, at *4).

Nor is Malloy biased – and, in fact, she is truly independent. No one from SJU ever talked with her or suggested any outcome with respect to the investigation here. In fact, there was no communication with SJU about the investigation other than the transmittal and assignment of the matter, until after John filed this lawsuit.[46] Malloy is a well-experienced lawyer who concentrates her practice in the area of employment law and serves as a neutral investigator of employment-related claims, as well as student complaints in the educational sector. She has, for more than 30 years, represented management in labor and employment matters; never employees. She has been SJU's independent investigator since approximately 2015, and this is the first time that anyone has lodged a complaint that she is biased. The absence of any such previous accusation is no doubt due to the fact that the results of her

---

[46] Exh. 14, at 229:15-20.

investigations have been mixed. She has not always concluded that a person charged under the SMP is responsible. There is a nearly even split between SMP respondents she has found responsible and not responsible. [47] This is affirmative undisputed evidence that she has never exhibited bias based on gender, or any other factor, in favor of complainants or against respondents.

Courts have recognized two separate grounds for alleging an erroneous outcome claim under Title IX. The plaintiff must either allege (1) in his or her own particular case the outcome was improperly decided or (2) that the disciplinary procedures themselves lead to incorrect outcomes. *Faparusi v. Case Western Reserve Univ.*, No. 1:16 CV 1586, 2016 WL 8794464, at *4 (N.D. Ohio Nov. 30, 2016). There is no evidence whatsoever to the second, so the only potential issue remaining is whether John has established that the charge against him was "improperly decided."

John's responses to Malloy during her investigation – his acceptance of responsibility, and his acknowledgment that this is a "learning experience" – do not support a claim of gender bias or suggest either an erroneous outcome or a genuine dispute of material facts. John is simply upset with the result. Malloy found, based on her interview with John, that

> [he] does not specifically recall squeezing [Jane's] neck, but he does not deny it and says that they both had their hands on each other's neck area. He agrees that he did not obtain [Jane's] consent to touch her neck[48].

This finding, plainly based on active questioning of John, cannot be attacked. It led to a key Malloy conclusion:

---

[47] Exhibit 7, Respondents in Sexual Misconduct, indicates, with EM, Malloy's cases in the time frame, and outcomes. The Tally of Malloy's outcomes is 12 respondents NOT responsible, 9 respondents responsible.

[48] Exh. 4, at 9.

13

> However, because [Jane's] complaint is that [John] squeezed her neck, to the point where it left bruises, I find that this is a singular, separate act which required her consent… After consideration of the accounts of all parties, and documents, and my assessments of the credibility of the witnesses, I find based on a preponderance of the evidence that it is more likely than not that [John]is RESPONSIBLE for sexual assault by squeezing [Jane's] neck area.[49]

To this, John has only proffered his displeasure with the outcome, and, after he was found responsible, a somewhat more direct denial. Not only have his own explanations and responses evolved throughout the SMP investigation, appeal, and present litigation – from "if [Jane] said so, he would not say she that was lying"[50] to his current denial that he could have caused such injuries – but his denial alone is insufficient, and actually not a direct denial. He admits having his hands on her neck; and, during the investigative process, admitted much more. In any event John's modification of his explanation after the disciplinary process concluded is not sufficient to create a genuine issue of a material fact, where the SMP decision was based, in part, on John's own statements to Malloy, the independent investigator.

Instead of presenting evidence of gender bias, John seeks to re-litigate Jane's claim against him. No case law or regulation requires or even allows this. John is asking this Court to conduct a de novo review, ignoring the undisputed facts: that a fair SJU process led to John having been found to be responsible under the SMP.

### b.   Deliberate Indifference

John additionally attempts to characterize SJU as deliberately indifferent to alleged flaws and biases in the SMP. However, deliberate indifference requires the plaintiff to show the school's response to the alleged gender bias must be "clearly unreasonable in light of the known circumstances." *Doe v. Univ. of Pa.*, 270 F. Supp. 3d 799, 825 (E.D. Pa. 2017) (internal

---

[49] Exh. 4, at 9.

[50] Exh. 8, at 7; Exh. 4, at 6.

quotations omitted).[51]   John has failed to proffer any evidence to support this claim other than

his own post-investigative/post-outcome subjective belief.  Again, John's argument is

bootstrapped to his disagreement with the outcome and not on the basis of any other evidence.

Furthermore, deliberate indifference claims under Title IX have almost exclusively been

applied in cases where the plaintiff was alleging a school or university had been deliberately

indifferent to complaints of *sexual harassment* – not to a university's sexual misconduct policies

or the results of any one investigation.  *Id.* (citing *Doe v. Baum*, 227 F. Supp. 3d 784, 820 (E.D.

Mich. 2017)).  What John is actually arguing here is that SJU should have been deliberately

indifferent to Jane's complaint.  Instead of ignoring Jane's complaint, SJU followed its own

internal policies and procedures through Malloy's investigation and responded reasonably to

Malloy's conclusion that John was responsible for the non-consensual touching.  Nowhere in the

volumes of depositions and discovery is there any indication that SJU ever acted unreasonably

toward John.

### c.   Archaic Assumptions

Finally, John argues that SJU engaged in "institutionalized gender bias against males

accused of sexual assault" based on archaic assumptions about gender roles.  Compl. at ¶ 336.

There is no evidence to support this.  The SMP creates a patently fair process requiring findings

by a preponderance of the evidence by an independent investigator, and is not based on any

"archaic assumptions."  Not only has John failed to provide any evidence to support this claim,

but he completely misses the point of the archaic assumption theory.  In fact, the archaic

---

[51] Plaintiff's single passing reference to deliberate indifference is in paragraph 283 of the Complaint, which reads in full "SJU was on notice of and was deliberately indifferent to the serious flaws in the investigation, the lack of equity and fairness, and the gender bias that infused the process."  This paragraph is almost verbatim as the same passing allegation in *Doe v. University of Pennsylvania*, 270 F. Supp. 3d 799 (E.D. Pa. 2017) which this very Court determined was wholly insufficient to meet the threshold of a deliberate indifference claim.  *Id.* at 826 (dismissing claim when paragraph 293 of plaintiff's Complaint pleaded the university was "on notice of, and was deliberately indifferent to, the serious flaws in the investigation and the hearing process, the lack of equity and fairness, and the gender bias that infused the process").

assumption theory "is applicable only in cases alleging that a public school entity has denied equal opportunities to participate in athletic programs based on unfounded and antiquated historical notions about the physical capabilities of girls and boys." *Saravanan v. Drexel Univ.*, No. 17-3409, 2017 WL 5659821, at *7 (E.D. Pa. Nov. 24, 2017) (internal quotations omitted). That theory has no relevance to this matter.

### 2.   SJU's Followed Its Own Policies and Procedures

SJU followed its own policies and procedures, embodied in the SMP.  Those policies and procedures are fundamentally fair; therefore SJU satisfied its contractual obligations to John. *Reardon*, 926 A. 2d at 480; *Clayton*, 608 F. 2d at 415.  The undisputed facts – as opposed to the pleadings in the Complaint – make clear John was afforded all of the rights promised him not just under the SMP, but under Title IX as well.  The SMP provides clear guidelines for handling complaints, which are fair, and were followed here.

There was an initial review by the Title IX Coordinator in consultation with the Director of the Office of Community Standards to determine whether Jane's complaint should go forward under the SMP.[52]  SJU designated a qualified Investigator – Malloy – whose objectivity was not compromised by any previously-existing relationship with any party.[53]

Separate pre-investigation meetings were held with both John and Jane.[54]  John was advised of the charges, broadly in writing and orally both by Forte and Malloy.  There was a prompt investigation which included interviews, documents and evidence.[55]  John was advised of

---

[52] Exh. 2. *See* at 26, Para. V.A.

[53] *Id.*, at 30, B.1.

[54] *Id.*

[55] *Id.*

his right to an advisor of his choosing.[56] John was advised that he could propose additional evidence or witnesses to Malloy even after their meeting.[57] The appropriate Report was issued, meeting all the SMP requirements.[58] Sanctions were imposed by the appropriate sanctioning officer.[59] John appealed unsuccessfully.[60]

John was given proper notice of the nature of the allegations against him in the written notice of process letter sent to him in advance of his Pre-Investigation meeting with Forte, orally by Forte during that meeting, and orally by Malloy who confronted him directly with Jane's allegations.  As John acknowledged, the notice contained in the Pre-Investigation Checklist was supplemented orally by Forte, who informed him that Jane was accusing him of being "rough" with her when they were making out.[61]

John appears to rely heavily on the fact that, while he was aware of the nature of the accusation against him, he never saw the actual "complaint."  First, there is no right in the SMP to see it.[62]  Second, in this very simple factual case, no concept of fairness demands it such that the proceedings would be invalid without him seeing it. Third, he never asked Malloy to see it:

> Did you ask her to see an incident report?
> A      I don't believe so.
>
> Q      Did you ask her to see the written complaint
> of the -- [Jane's] written complaint?
> A      No.

---

[56] *Id.*, at 31, Para. 2.

[57] Exh. 10, at 117:10-118:4.

[58] Exh. 2, at 33, Para. 5.  *See* Exh. 4 and 5.

[59] *Id.*, at 34, Para. 6.

[60] *Id.*, at 35, Para. 8.

[61] Exh. 10, at 51:17-20.

[62] Exh. 2.

17

> Q   Why?
>    A    I didn't think to.  I was just answering her
>        questions.

Exh. 10, at 109:18-23.  Fourth, having now seen Jane's complaint, he has offered no additional

relevant or necessary evidence or witness to date; he has only altered his response to be close to,

but not quite, a denial.

Forte informed John during his Pre-Investigation meeting with her he could confer with

any advisor – including an attorney or parent – throughout the entirety of the proceedings.  It was

John's decision, even after being told of the nature of the allegations, not to have an advisor

present when he met with Malloy and only later asked Dr. Joseph Corabi to serve as his advisor

when he met with William Bordak, of SJU to hear the outcome.

Furthermore, the Pre-Investigation checklist specifically addressed how to make a request

for accommodations with Student Disability Services.[63]  Specifically, the document directs the

student to confer with Student Disability Services for accommodation requests.  John has

admitted that he never sought accommodations during the meeting with Forte, nor did he raise

such an issue with anyone else during the investigation.[64]

Fundamentally, Forte informed John about the nature of the investigation and provided

him with ample notice of the process.  He was advised that he was able to present any witnesses

during the course of the investigation.  Putting aside John's admission that he could not think of

anyone he would have called,[65] Malloy told John that he was entitled to bring with him any texts,

pictures, or other documents he considered helpful and that he should identify any witnesses who

---

[63] Exh. 3, at 4.

[64] John's accommodations argument is a red-herring anyway because he never established any right to accommodations for his meetings with Forte or Malloy.

[65] Exh. 10, at 42:24-43:13.

18

might have helpful information.  In fact, he did just that, giving Malloy a written explanation of the events in question.[66]  John had every opportunity to present support witnesses, and even had the opportunity to address any previously unknown information in his appeal, which he did not do.  John was told Malloy was the assigned Investigator.  John could have easily conducted a review to determine if there was any reason to object to her, but failed to do so.

To that end, John offers only his gender to support his claim of gender bias; that is not enough.  Malloy was deposed for a full day.  Yet there is no evidence that she – a management side employment lawyer for more than 30 years – was biased in favor of complainants and against respondents. To the contrary, there is affirmative evidence of her neutrality, based on the outcomes of her other investigations at SJU.  Nor is there evidence that she was biased here or failed to consider John's information. Nor is there any evidence that anyone at SJU influenced the investigation or the outcome, or attempted to do so.  Malloy's unrebutted testimony is that no one from SJU spoke with her about the investigation or outcome until after she presented her findings and conclusions. Simply put, Malloy approached the investigation of this case as an independent investigator and experienced lawyer, and determined the facts, by a preponderance of the evidence, as best she could.  The uncontroverted fact is that John's conduct – squeezing the neck of the woman with whom he was "making out" so hard as to leave bruises – falls within SJU's definition of sexual assault in SJU's SMP, as Malloy found in her report.

Finally, the sanction imposed – one-year probation – is based entirely on the facts of the investigation and the finding of responsibility.  It was appropriate in this circumstance.

C.      **Summary Judgment should likewise be granted on the remaining non-Title IX claims against SJU.**

---

[66] Exh. 6.

In addition to his Title IX claim, John asserts claims for Breach of Contract, Intentional and Negligent Infliction of Emotional Distress, Unfair Trade Practices and Consumer Protection, and Defamation. The undisputed facts, reviewed above, do not change for the different legal theories.

The contract, UTP and consumer protection claims arise from the allegations that the SMP process followed in this case was somehow violated – that is, "breached" – the contract between John and SJU and did not deliver to him a fair process under the SMP. As argued above, the SMP is the contract. The SMP was followed, the process accorded John was fair and led to a conclusion that was fully-supported by Malloy's findings of fact and determinations of credibility, and an appropriate sanction was imposed by SJU. Because the undisputed evidence is that John was accorded his rights under the SMP, and because the investigation was not biased, his contract claim fails just as the Title IX claim does.

Since SMP process was followed, and was fair, there is no basis for either an intentional or negligent emotional distress claim. First, there is no evidence of any intentional conduct designed to cause emotional distress to John. Second, the undisputed evidence is that SJU's SMP process was followed here; that the result obtained was from a fair, unbiased investigator with ample information to support her conclusions; and that the probation sanction imposed was neither outside the SMP parameters or unduly draconian – in fact, it allows John to continue his education without interruption. There is no evidence of negligence; only uncontroverted evidence of a fair process to which SJU and its investigator adhered.

Finally, John claims defamation. The only public broadcast of this matter has arisen from John's decision to take his complaint public in this Court. SJU took pains to keep the matter as confidential as possible, and the record is clear that even interested faculty was not told of the

nature of the discipline, only of the disqualifying probation.  There has been no publication, as is required for defamation.  And, of course, there has been no untrue communication: within those responsible for the SMP administration, publication has been limited to the actual fact that John was found responsible and sanctioned for violating the SMP.  This is certainly true, and thus cannot be defamatory as a matter of law.  *See e.g., Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 768-69 (1986) (plaintiff cannot prevail on defamation claim if there is no false statement).

For these reasons, there is no genuine issue of material fact with respect to any of the non-Title IX claims that John has asserted against SJU.  Thus, John's claims for breach of contract, intentional and negligent infliction of emotional distress, unfair trade practices, consumer protection, and defamation must be dismissed.

## III.   <u>CONCLUSION</u>

For the reasons stated above, summary judgment should be entered in favor of SJU on all of John Doe's claims against the University.

MONTGOMERY McCRACKEN
WALKER & RHOADS LLP
1735 Market Street
Philadelphia, PA  19103
215-772-1500
*Attorneys for Defendant*
*Saint Joseph's University*

Dated: July 30, 2018                    By: _____
                                           John M. Myers
                                           jmyers@mmwr.com
                                           215-772-7535 (direct dial)

                                           Albert L. Piccerilli
                                           apiccerilli@mmwr.com
                                           215-772-7590

                                           Robert H. Bender, Jr.
                                           rbender@mmwr.com
                                           215-772-7595 (direct dial)

22

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing is being served the below date in the manner set forth below.

*Via:  ECF and Electronic Mail*
Edward J. Schwabenland, Esq.
Schwabenland & Ryan, PC
995 Old Eagle School Road #306
Wayne, PA 19087
*Attorney for plaintiff John Doe*

John Mirabella, Esq.
Mirabella Law Firm
1600 Market Street, Suite 1810
Philadelphia, PA 19103
*Attorney for plaintiff John Doe*

Susan R. Engle, Esq.
Mintzer Sarowitz Zeris Ledva & Meyers LLP
Centre Square, West Tower
1500 Market Street, Suite 4100
Philadelphia, PA 19102
*Attorney for co-defendant Jane Roe*

Dated: July 30, 2018

John M. Myers
Albert L. Piccerilli
Robert Henry Bender, Jr.
Montgomery, McCracken,
     Walker & Rhoads, LLP
1735 Market Street
Philadelphia, PA 19103
215-772-1500

*Attorneys for Defendant*
*Saint Joseph's University*

23