**LAW OFFICES OF JOHN MIRABELLA**
*Attorneys at Law*

August 16, 2018

The Honorable Paul S. Diamond
U.S. District Court, Eastern District of PA
601 Market Street, Room 14614
Philadelphia, PA 19106

   **RE:**  **John Doe v. St. Joseph University and Jane Roe**
       **Civil Action No: 18-CV-2044**

Dear Judge Diamond:

  In accordance with the Court's Order of August 15, 2018, Plaintiff hereby submits its motion to take additional discovery, the details of which are discussed below, and resubmits its request to compel the deposition of Marianne Schimelfenig, Esq., or, in the alternative order the SJU personnel Mary-Elaine Perry and Kiersten White be redeposed regarding an October 2, 2017 meeting as to which SJU has claimed attorney-client privilege.

### I. Plaintiff requests the Opportunity to Complete Roe's Interrupted Deposition

  On Monday, July 9, 2018, a date and time mutually agreed upon by all parties, Plaintiff attempted to take Roe's complete deposition. Early in that deposition, Roe's counsel explained that Roe would have to leave early to go to a previously undisclosed doctor's appointment. Plaintiff got through approximately half of Roe's deposition before she left, and all parties envisioned that she would return to complete the deposition at a later date. Due to scheduling conflicts, that has not yet occurred. Plaintiff requests that the Court order Roe to complete her deposition at the earliest possible date.

### II. Plaintiff requests a Full and Complete Copy of Defendant, Roe's, Text Messages from Friday, February 23, 2017 through Monday, February 26, 2017

  On August 8, 2017, the Court ordered Roe to produce her "phone records," which all parties understood to include a complete copy of her text messages from Friday, February 23, 2017 through Monday, February 26, 2017. On August 15, 2017, in an apparent attempt to satisfy that Order, Roe provided to Plaintiff a series of text messages which were (1) unverified and (2) appear to be incomplete and are, at times, inconsistent with text messages she provided to Malloy during her Investigation of the Incident.

The Honorable Paul S. Diamond
August 16, 2018
Page Two

The text messages provided by Roe appear to be screenshots of her phone, so portions of text are apparently cut off or missing. This becomes obvious when the texts provided in response to the Court's Order are compared to those Roe provided to Elizabeth Malloy ("Malloy") in the course of SJU's Investigation into her claim of sexual assault. For example, Roe provided a copy of a text message to Malloy in which Roe, at a party with Doe shortly before the alleged sexual assault (hereinafter referred to as the "Incident") is tempted to purchase cocaine. Roe told Malloy she did not do so, and provided a text message to Malloy as follows:

| Roe: | Guys there's coke he here I want it |
| Unidentified friend: | WHERE |
| Roe: | Outside meet me? In the back |

That is the end of the text exchange provided to Malloy, with Roe's last statement at the bottom of the page produced. See SJU 372. In the current document production, Roe provides what is an expanded form of the same text exchange:

| Roe: | Guys there's coke he here I want it |
| NFC: | WHERE |
| Roe: | outside meet me? In the back |
| NFC: | yea coming |
| Roe: | irk if I can do this's I |

Again, "irk if I can do this's I" is at the bottom of the page, suggesting that there are subsequent texts which have not been provided. Also, this second copy of text messages, intimating that Roe did not think she could do something with regard to the cocaine (whether resist it or take it is unclear) is exchanged less than an hour before the alleged Incident, making it relevant to both her state of mind and her credibility. Further, the text itself, which is at the very bottom of the page, appears incomplete.

There is another discrepancy between the texts Roe presented to Malloy and those she has now divulged. On the night of the Incident, allegedly immediately after Roe was choked so violently that she froze in terror, Roe texted her friends, RS and NFC. She provided a copy of those texts to Malloy during the investigation and they are obviously central to her credibility. In the texts she provided to Malloy, at the very top of the page, and partially cut off so as to appear incomplete, Roe says "I miss Francis." See SJU 373. If that text is complete, Roe's first message to her friends, almost contemporaneous with the alleged assault, is "I miss Francis." In her initial report to Perry, Roe claimed that "I miss Francis" was a "safe word," a kind of code she shared with her friends that would tell them she needed help. See SJU 335. Later, at her deposition, Roe admitted that she and her friends did not have a "safe word" at the time of the Incident; Francis

The Honorable Paul S. Diamond
August 16, 2018
Page Three

was a boy with whom she had been "hanging out," but with whom things had ended badly. In the instant document production, the line "I miss Francis" is omitted entirely. Additionally, Roe completely omits any text messages with Doe as well as an entire string of texts between herself and her friend, NFC, just minutes after the alleged assault. See SJU 369-370. These omissions suggest that other text messages, all occurring within days of the Incident, have been omitted or deleted.

Plaintiff's concerns about missing text messages are exacerbated by the fact that Roe did not submit a verification or certification that the texts are, in fact, complete and unaltered. She did not submit a log of texts which had been deleted or were not produced for any other reason. Having a full and complete copy of statements Roe made to friends in the days immediately surrounding this Incident is important to Plaintiff's case. In light of the fact that some texts are obviously missing, and that Roe has not offered any assurance that the ones produced are complete and accurate, Plaintiff asks this Court for leave to subpoena a complete copy of Roe's text messages from her phone service provider.

### III. Plaintiff requests the Depositions of RS and JG

RS, JG and NFC are all friends with Roe. On the night of the Incident, RS and NFC accompanied Roe to the party. RS was the one who met Roe outside when she told them there was cocaine and she wanted it. After the party, when Roe was in a car with Doe and others on their way back to Doe's residence hall, RS was the one Roe told about her plan for the rest of the evening:

| | |
|---|---|
| Roe: | I'm going to his house |
| RS: | Are u staying over? |
| Roe: | yeah probably |

Immediately after she was allegedly assaulted by Doe, Roe texted RS and NFC in a three on three-person chat:

| | |
|---|---|
| Roe: | I miss Frances |
| RS: | Want to call? Leave then It's okay I'll meet u He will understand |
| Roe: | Can you call me Says NFC's really drunk |
| NFC: | HAHAGAGA YEA wantmetocneet u outside st mary's im back in mcshain I can meet u [Roe] |
| Roe: | can you call me |

The Honorable Paul S. Diamond
August 16, 2018
Page Four

      Roe, RS and NFC and JG were all together on the evening of Saturday, February 24, 2017, the day after the alleged Incident and two days before Roe would go to SJU's Title IX Office with bruises on her neck. That Saturday, Roe testified that she drank "a lot." NFC drank so much that Roe, RS and JG ended up in the emergency room. While Roe was apparently in the hospital room with NFC, JG was apparently in a waiting room with RS. JG told Roe:

> JG: RS is freaking out Like panic attack in the bathroom She won't let me help her This brought up her fear of you *choking* her on Halloween. Idk what to do She's so upset and locked herself in the bathroom She said that she was so afraid of you and that you had a choice and you chose to choke her and that's why she pushed you down the stairs because she was afraid of you She blames you and Ashley for her getting in trouble with pub safety because she remembers that all she wanted to do was go to her bed
>
> Roe: Jesus Christ Dude I'm dealing with NFC rn

On Tuesday, February 27, 2017, Roe texted NFC and RS:

> Roe: Not broken (thumbs up emogi) just a bone bruise

      These texts are disturbing to say the least. The undermine Roe's credibility, make no mention whatsoever of being afraid, hurt or scared while she was with Doe, and suggest that Roe was involved in some sort of drunken altercation the day after she was allegedly assaulted by Doe and the day before she reported that "assault," with accompanying bruises, to SJU. Significantly, Roe never mentioned any of this to either Katie Bean, the SJU employee she first reported the Incident to, Mary-Elaine Perry, the Title IX Coordinator, or Malloy: not the fact that she had been drinking heavily the day after the Incident, not the fact that she had ended up in the emergency room with a drunk friend, and certainly not the fact that there had been any sort of altercation (if, in fact, the push down the stairs referred to in JG's text happened that weekend). Most disturbingly, JG's texts make it clear that RS is afraid of Roe, that RS has accused Roe of choking *her*, making her "so afraid." This story is so suspiciously close to the one Roe told about Doe that Plaintiff believes it must be explored. Plaintiff therefore asks this Court to Order the depositions of RS and JG, as it is clear that they have important, relevant information to offer about the events surrounding the alleged assault and days immediately after.

### IV.    Plaintiff requests Leave of Court to Issue a Subpoena for Roe's Medical Records from Wednesday, February 21, 2017 through Thursday, February 27, 2017

      The text messages Roe produced on August 15th reveal, for the first time, that she may have been involved in some sort of physical altercation right around the time she accuses Doe of

The Honorable Paul S. Diamond
August 16, 2018
Page Five

assaulting her. They also reveal that she sought medical treatment for something which turned out to be "Not broken just a bone bruise." Given that the only evidence Roe can point to to suggest that Doe did *anything* to her - a claim Doe adamantly denies - is a bruise. Plaintiff respectfully submits that he be allowed to investigate any medical treatment Roe sought in the days immediately before and immediately after the Incident in the event they might explain her bruises.

### V. Plaintiff requests the Court to Order the Deposition of Marianne Schimelfenig, Esq. or, in the Alternative, to Order the Redeposition of SJU employees, Ms. White, Ms. Perry and Mr. Bordak regarding a Meeting which Occurred on October 2, 2017

On August 3, 2018, in response to Plaintiff's motion to compel the deposition of Marianne Schimelfenig, Esq. in connection with a meeting she attended with SJU personnel on October 2, 2017, the Court ordered SJU to provide Plaintiff with "a privilege log listing each withheld statement or communication" made at that meeting, as well as "the basis for claiming privilege."[1] SJU has failed to do so, apparently relying instead on Ms. Schimelfenig's representation that "[t]he entirety of the meeting was an attorney-client meeting for the purpose of providing legal advice and guidance. There was no business to the meeting." See Certification of Marianne Schimelfenig, General Counsel for Saint Joseph's University. In the absence of any privilege log or adequate assertion of the privilege by SJU, and in light of the testimony of SJU employees suggesting that the purpose of this meeting was not to obtain legal advice, but rather to discuss SJU policy, Plaintiff hereby resubmits its request to (1) compel the deposition of Marianne Schimelfenig, Esquire, General Counsel and Corporate Secretary of Saint Joseph's University("SJU") or, in the alternative, (2) order the SJU personnel instructed not to answer at their depositions to appear again and answer questions about the October 2, 2017 meeting.

#### A.     Facts surrounding the October 2, 2017 meeting at SJU

SJU's current SMP was originally drafted in response to guidance issued by the Department of Education Office of Civil Rights ("OCR") in 2014 advising educational institutions on how to comply with Title IX (White, 45).[2] In response to overwhelming criticism of the impact and unfairness of that guidance on those (almost exclusively men) accused of sexual misconduct, on September 22, 2017, the OCR rescinded its 2011 guidance (and 2014 Q&A) and issued a new Dear Colleague Letter, accompanied by a Q&A offering

---

[1] The Court's Order refers to a September 2017 meeting, but Ms. Schimelfenig's Certification makes it clear that the meeting in question was actually held on October 2, 2017. There is no suggestion that there was more than one meeting regarding the issue at hand.

[2] The OCR issued a Q&A in 2014 clarifying its Dear Colleague Letter of 2011.

The Honorable Paul S. Diamond
August 16, 2018
Page Six

educational institutions clear, straightforward information about how they should comply with the requirements of Title IX (collectively referred to herein as "2017 DCL").

The 2017 DCL was a dramatic shift on the part of OCR. It did not change the law, *per se*. The OCR had longstanding requirements that schools conduct "adequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence" in recognition of the fact that "according due process to both parties involved will lead to sound supportable decisions."[3] OCR's 2001 Guidance at 20, 22. But its previous DCL, issued in 2011, had come under stunning criticism for allowing schools to establish procedures which "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." See 2017 DCL. The 2017 DCL sought to correct that injustice. It made it clear that the burden is on is on the school – not on the parties – to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct had occurred; that investigations into sexual misconduct must be made by an investigator trained to collect, analyze, synthesize and document all available evidence, inculpatory and exculpatory; that schools must provide written notice to the accused of the specific charges against him, including the specific section of the policy allegedly violated and the precise conduct allegedly committed; that this information must be provided in a timely manner; and that both parties, accused and accuser, must have timely and equal access to any information (evidence) used in disciplinary meetings. See 2017 DCL. SJU's policy offered accused students none of these protections.

SJU's response to the new guidance was immediate. On the very day the 2017 DCL was issued, Kirstin White, Assistant Vice President for Student Life, who was home from work on maternity leave, emailed Mary-Elaine Perry, SJU's Title IX coordinator, Cary Anderson, Associate Provost and Vice President of Student Life, and William Bordak, Director of Community Standards, saying

> I just read the new Title IX Dear Colleague Letter and Q&A. At a quick glance, there may be some changes we need to make to our process (i.e., allowing students to read reports before a decision is made).
> If a meeting is called to discuss, let me know when it is. No promises but if I can call in, I will.

---

[3] In 2001, the OCR promulgated regulations pursuant to notice-and-comment rulemaking in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001Guidance"). Available at https//www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf (last viewed September 18, 2016). Title IX's regulations, including the 2001 Guidance, have the force and effect of law, because they affect individual rights and obligations and were the product of notice-and-comment rulemaking.

The Honorable Paul S. Diamond
August 16, 2018
Page Seven

See SJU 1979.[4] Mr. Anderson responded:
> Will do. I'll look it over this afternoon.

See SJU 1980. Ms. Perry added

> Thanks. Before I read this I did a quick read of the OCR documents and noted some items that will need our attention. I'm going to ask Bill and Emily to begin reviewing our procedures against this guidance and hope to get a meeting together on the 5th or 6th of October.

See SJU 1981. No one thought to include Ms. Schimelfenig in these discussions, no one suggested that her counsel was necessary, and there is no evidence that Ms. Perry asked Bill (Bordak) or Emily (Forte) to solicit Ms. Schimelfenig's counsel in their review of SJU's procedures against the new guidance.

In late September, likely within days of the issuance of the 2017 DCL, SJU was notified that it had been awarded the OVW $300,000 three-year grant which it had sought for two years. (White, 100). Ms. White was the lead author for that grant application. (White, 100).

On October 2, 2017, from 10:00 a.m. to 11:00 a.m., several SJU employees,[5] including Mr. Anderson, Ms. White (via telephone), Ms. Perry, Mr. Bordak and Ms. Schimelfenig attended a meeting to review the 2017 DCL. At 10:06 a.m. on the morning of the October 2nd meeting, Mr. Anderson texted Ms. White asking about her participation, to which she responded that she would be calling in momentarily.[6] See SJU 1983. At 11:09, Ms. White texted Mr. Anderson, apparently in reference to the discussions at the meeting:

> Couldn't hear all the comments . . . but I think we need to be a bit more transparent w those two points in the process. Happy to talk more/connect via phone at some point if u have time.

---

[4] These emails and text messages were only recently produced to Plaintiff in response to the Court's August 3rd Order.

[5] SJU advised the Court that Sharon Eisenmann, Vice President for Human Resources and Deputy Title IX Coordinator, Maureen Shields, Associate Athletic Director and Deputy Title IX Coordinator and Nancy DuBoise, Director of Employee Relations and Deputy Title IX Coordinator were also in attendance at that meeting.

[6] The text messages provided by SJU do not explicitly identify Ms. White as the recipient of these texts, but the language and circumstances make it clear the recipient was Ms. White. See SJU 1980-1986.

See SJU 1983. Mr. Anderson suggested that he and Ms. White speak with one another via telephone at 2:00 p.m. that afternoon. See SJU 1983. Ms. Schimelfenig does not appear to have been involved in that text exchange, and there is nothing to suggest that she was involved in the call later that afternoon between Ms. White and Mr. Anderson. At 2:47 that afternoon, apparently just after her call with Ms. Anderson, Ms. White texted Mr. Bordak to say

> Let's connect at some point about today's call. Shoot me a text w some times u can talk on the phone this wk.

See SJU 1985. Two weeks later, on October 18, 2017, Ms. White circled back to Mr. Bordak, saying

> Not sure if u got my last text msg in early Oct. . . . Wanted to touch base about our mtg with MS about TIX changes a few wks ago. Talked to Cary immediately following call so he might have spoken w u already but I told him I'd try to connect with u.

See SJU 1985-1986.

It is the content of this October 2nd meeting that SJU now seeks to shield with attorney-client privilege. But the records and testimony elicited so far do not remotely suggest that, as Ms. Schimelfenig now contends, the "entirety of the meeting was . . . providing legal advice and guidance." See Ms. Schimelfenig's Certification, paragraph 7. In fact, they suggest just the opposite.

Mr. Anderson has repeatedly testified that he – not Ms. Schimelfenig - headed the meeting, which he states was attended by Ms. White, Mr. Bordak, Ms. Perry, and possibly "others." (Anderson, 159).[7] Mr. Anderson testified that the purpose of that meeting was to examine, with a group of SJU employees, whether SJU's existing SMP conformed with the recommendations made in the 2017 DCL and whether any changes needed to be made. (Anderson, 160, 162, 166). Mr. Anderson apparently did not recall that Ms. Schimelfenig was even present at this meeting, let alone that she was offering substantial amounts of legal advice. He did not mention soliciting, obtaining or discussing legal advice from Ms. Schimelfenig at any

---

[7] Mr. Anderson testified that he attended only one meeting discussing the 2017 DCL, and that it was in September or October of 2017. (Anderson, 164). Ms. Schimelfenig's Certification makes it clear that the meeting to which Mr. Anderson was referring was the October 2, 2017 meeting over which SJU seeks to assert privilege. See Certification of Marianne Schimelfenig, General Counsel for Saint Joseph's University, submitted in Response to Paragraph 1 of Court Order Entered August 3, 2018.

The Honorable Paul S. Diamond
August 16, 2018
Page Nine

time with regard to the 2017 DCL.[8] Ms. White also testified that, while she was in the meeting in question (telephonically), she has no recollection of whether she asked legal questions of Ms. Schimelfenig. (White, 2014). Significantly, Mr. Anderson discussed his recollections of that meeting freely during his deposition, in the presence of both SJU's counsel in this litigation and Ms. Schimelfenig, without ever asserting that any attorney-client privilege attached to that meeting in any way. Clearly, he did not recall this meeting to have been one suffused with legal advice and guidance.

Ms. White, Ms. Perry and Mr. Bordak were deposed after Mr. Anderson. When Plaintiff's counsel asked why SJU had chosen to adhere to now-outdated OCR guidance rather than change its policies to comport with the 2017 DCL, each testified that she/he had not made that decision, but had attended a meeting – the October 2nd meeting - with their colleagues to discuss the implications of the new guidance on the SMP. Ms. Perry and Ms. White testified that the purpose of that meeting was to "discuss the Q&A" (Perry, 256, 259) and to review the policy in existence at SJU. (Perry, 261-261; White, 211, 212). The witnesses all agree that there was only one such meeting, and that, as a result of that meeting, no changes made to the SMP. (Anderson, 165, 160. Perry, 262).

Obviously, SJU made a decision not to change the SMP, yet none of the SJU employees deposed has taken ownership of that decision; it seems to have welled up out of the October 2nd meeting. When Plaintiff's counsel tried to probe the content of that meeting with Ms. White and Ms. Perry, SJU did what it had not done before: it claimed that the entire meeting was subject to attorney-client privilege because Ms. Schimelfenig was in attendance. SJU offered nothing to support its claim. SJU's counsel refused to allow witnesses to testify as to whether anyone had asked legal questions of Ms. Schimelfenig (White, 214), whether counsel had provided legal opinions at that meeting (White, 212) or whether anyone other than counsel "made a decision about whether or not the existing policy complied or didn't comply." (White, 213). These were all appropriate, non-privileged questions aimed at discerning whether legal advice was sought or obtained at the October 2, 2107 meeting. In the absence of any evidence that such advice was sought or obtained, and especially in light of Ms. Schimelfenig's failure to comply with this Court's order to provide a privilege log specifically identifying the statements and communications over which the privilege is asserted, the privilege cannot stand.

The simple reality is that a meeting was held at which a number of employees, including Marianne Schimelfenig, came together for the purpose of determining if its present policy was in

---

[8] This makes perfect sense. Dear Colleague Letters, as their name suggests, are letters from the Department of Education to other educators. The 2017 DCL is easy to read and understand, and gives concrete, specific examples of the procedures it recommends schools adopt. Legal interpretation is not necessary to understand the 2017 DCL.

The Honorable Paul S. Diamond
August 16, 2018
Page Ten

compliance with the recommendations of the 2017 DCL or whether, as Ms. White indicated, changes should have been made in order to provide fairness to the process. That subject matter, that meeting, is not protected by the attorney-client privilege and Ms. Schimelfenig's presence does not change that fact.

**B. SJU cannot assert Attorney-Client Privilege without designating specific, privileged communications**

Ms. Schimelfenig claims that "the entirety of the [October 2nd] meeting was an attorney-client meeting for the purpose of providing legal advice and guidance. There was no business to the meeting." Such a sweeping, unsubstantiated assertion is insufficient to invoke attorney-client privilege. *Craig v. Rite Aid Corp.,* 2012 U.S. Dist. LEXIS 1418, *32- 33, 2012 WL 426275 (M.D. PA. February 9, 2012) (party asserting the privilege should provide declarations addressing in a particularized way the application of the privilege to a specific communication)(reconsideration granted in part, *Craig v. Rite Aid Corp*, 2012 U.S. Dist. LEXIS 46274 (M.D. Pa., Mar. 30, 2012); *See Sandra T.E. v. S. Berwyn Sch. Dist. 100, 600 F.3d 612, 623 (7th Cir. 2010); RBS Citizens, N.A. v. Husain, 291 F.R.D. 209, 218 (N.D. Ill. June 4, 2013) (finding that privilege log's "vague and generic description" for hundreds of documents did not allow the court to assess claim of privilege). SJU has not provided plaintiff with a log or affidavit identifying the specific communications as to which it asserts privilege for that meeting. Its failure to do so violates not only F.R.C.P. 26(b)(5) but also this Court's Order of August 3, 2018.*

Contrary to SJU's apparent position, counsel's presence does not shroud a meeting or conversation in privilege. It is well-settled that "the mere fact that an attorney attended a meeting does not render everything said or done at that meeting privileged." *Cottillion v. United Ref. Co.,* 279 F.R.D. 290, 311, 2011 U.S. Dist. LEXIS 151519, *51, 81 Fed. R. Serv. 3d (Callaghan) 404, 53 Employee Benefits Cas. (BNA) 1275, citing *Pownell v. Credo Petroleum Corp., 2011 U.S. Dist. LEXIS 35869, 2011 WL 1045418, *3 (D. Colo. 2011)(quoting Miner v. Kendall, 1997 U.S. Dist. LEXIS 17786, 1997 WL 695587, *1 (D. Kan. 1997)).*[9] "Business communications are not protected merely because they are directed to an attorney, and communications at meetings attended or directed by attorneys are not automatically privileged as a result of the attorney's presence." *Kramer v. Raymond Corp.,* 1992 U.S. Dist. LEXIS 7418, *2-4, 1992 WL 122856 (E.D. Pa. May 26, 1992). The privilege is narrowly construed to protect "only those disclosures — necessary to obtain informed legal advice — which might not have been made absent the privilege." *FTC v. AbbVie,* 216 U.S. Dist. LEXIS 113731 (E.D. Pa. 2016) at *8, citing *Westinghouse Elec. Corp. v. Republic of Philippines,* 951 F.2d 1414, 1423-24 (3d Cir. 1991); see also *In re Chevron Corp.,* 633 F.3d 153, 165 (3d Cir. 2011). Consequently, SJU bears the

---

[9] As the Court properly noted, federal law controls the questions of privilege arising in this case.

The Honorable Paul S. Diamond
August 16, 2018
Page Eleven

burden, not only of demonstrating the existence of the attorney client privilege, but also of identifying the specific communications to which it contends the privilege attaches. *Federal Trade Commission v. Shaffner, 626 F.2d 32 (7th Cir. 1980)*. SJU has done neither; it has failed to provide a privilege log and it has failed to establish that any communications with Ms. Schimelfenig at the October 2nd meeting were made in her capacity as an attorney rather than in her capacity as an employee.

Courts are mindful that "in-house counsel may play a dual role of legal advisor and business advisor" *Kramer v. Raymond Corp.*, 1992 U.S. Dist. LEXIS 7418, *2-4, 1992 WL 122856 (E.D. Pa. May 26, 1992). For that reason, they are especially cautious when the privilege is invoked to protect communications to in-house counsel. *Kramer*, *2-4; *Aamco Transmissions, Inc.*, 1991 U.S. Dist. LEXIS 13326 at *9 (E.D. Pa. Sept. 24, 1991)(to successfully invoke the privilege as to in house counsel, corporations "must clearly demonstrate that the communication in question was made for the express purpose of securing legal not business advice.") These precautions are necessary to "prevent corporate attorneys from abusing the privilege." *FTC v. AbbVie Inc.*, 2016 U.S. Dist. LEXIS 113731, *23 (E.D. Pa., 2016).

In this case, SJU's employees have testified that, immediately after the OCR handed down its 2017 DCL, key employees responsible for drafting, interpreting and implementing SJU's disciplinary policies met to discuss those policies. Ms. Schimelfenig - Corporate Secretary for the school, President's Cabinet member, someone in a position to influence and direct policy[10] - was among that group. Faced with the fact that its SMP clearly no longer complied with OCR guidance, the fact that the OCR had concluded its prior guidance was actually *unfair*, the fact that the OCR believed its prior guidance had led to erroneous outcomes, SJU's key employees decided to do nothing. The evidence suggests that they made this decision in large part at a meeting on the morning of October 2, 2017, just days after having learned that SJU had been awarded a $300,000 grant to strengthen its response to sexual misconduct on campus. It strains belief that these issues weren't discussed at that meeting. And the question of why SJU

---

[10] This is significant in that depositions of SJU employees has revealed that they employ multiple unwritten disciplinary "policies" which are not communicated to the students, such as whether and when respondents are, or should be, advised of the claims against them; whether the respondents are or should be shown evidence against them or told of the existence of witnesses; what documents are presented to the appeal board; policies governing the imposition of sanctions; what training, supervision and qualifications SJU investigators are expected to have; and what SJU considers a thorough, or even adequate, investigation. It is reasonable to assume that, beyond legal ramifications, the real-life implications of changing these policies would have been discussed, including what impact such changes might have on existing or pending grant applications and public perception of the University.

The Honorable Paul S. Diamond
August 16, 2018
Page Twelve

chose not to alter its SMP in the face of such compelling reasons to change it is not legal; it is factual. And it is intimately tied to the question of SJU's bias in handling SMP investigations, an issue central to Plaintiff's Title IX claim.

### C. Any Arguable Privilege has been Waived

Further, even if privileged communications were made in the October 2, 2107 meeting, Plaintiff respectfully submits that the privilege has been waived, in whole or in part. At Mr. Anderson's deposition, he freely discussed the purpose and content of that meeting, to the best of his recollection, as well as its outcome, without objection from counsel. Mr. Anderson testified that the purpose of the meeting was to go through the 2017 DCL to see how SJU's existing SMP compared to the new guidelines. He testified that he went through the DCL with the entire group at that meeting and that the SJU employees present concluded that the SMP did comply with the new guidelines, (Anderson, 158-166). Plaintiff submits that Mr. Anderson's disclosure of the substance and content of that meeting waived any attorney client privilege there might have been. *In re: Chevron,* 650 F.3d 276 (3rd Cir. 2011) (disclosure in presence of non-privileged person destroyed privilege); *Westinghouse Electric Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1424 (3d Cir.1991) ("once a client has revealed privileged information to a third party, the basic justification for the privilege no longer applies.").[11]

Moreover, SJU, somewhat cryptically, attached an article to its August 8, 2017 Certification to the Court apparently cautioning schools that compliance with the 2017 DCL might put them in jeopardy of violating the Violence Against Women Act and the Clery Act. To the extent SJU intends to rely on this contention as a defense in this case, an advice of counsel defense, it cannot rely on privilege to shield that advice from discovery. *Tetris Holding, LLC v. Xio Interactive*, 2011 U.S. Dist. LEXIS 160871 (D.N.J. 2011) (privilege may not be used both as a sword and a shield).

### D. At Deposition, the Privilege can be Protected once a Privilege Log is Produced

With an appropriate privilege log, SJU's privileged communications with its attorney, to the extent there were any such communications, can remain privileged. Plaintiff again directs this Court's attention to the court's reasoning in *Dewitt v. Walgreen Co.*, 2012 U.S. Dist. LEXIS 125493, *1, 115 Fair Empl. Prac. Cas. (BNA) 1716, 2012 WL 3837764 (D. Idaho September 4,

---

[11] Ms. White may have also waived the privilege. She participated in the meeting via telephone. She did not testify that she was in a private setting when she engaged participated in the meeting and, if not, the privilege may not be successfully asserted.

The Honorable Paul S. Diamond
August 16, 2018
Page Thirteen


2012). SJU employees, including Ms. Schimelfenig, are able to address business-related questions without fear of violating the privilege including:

> What business and economic factors did [SJU] discuss in formulating and revising the policy? What exceptions were discussed? What were the business and financial factors, if any, that [the SJU deponent] and other corporate personnel considered in formulating the exceptions to the policy?

*Dewitt v. Walgreen Co.,* *8-9. Such information is discoverable and is very relevant to the question of SJU's bias and Plaintiff's Title IX claim. Therefore, Plaintiff respectfully asks this court to compel SJU to provide Ms. Schimelfenig for deposition or to order the redeposition of any previously deposed SJU employees instructed not to answer questions about the October 2, 2017 meeting.

              Very truly yours,

              */s/ John Mirabella*

              JOHN MIRABELLA, ESQUIRE
              Co-Counsel for Plaintiff, John Doe

JM/hl