## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO: 18-cv-2044 |
| | : | |
| SAINT JOSEPH'S UNIVERSITY | : | |
| | : | |
| And | : | |
| | : | |
| JANE ROE | : | |
| Defendants. | : | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT ON DEFENDANT SAINT JOSEPH UNIVERSITY'S COUNTERCLAIM

Plaintiff's claims against Defendant Saint Joseph's University ("SJU") arise out of its gender-biased investigation and adjudication of sexual assault charges made by Defendant Jane Roe ("Roe") against Plaintiff John Doe's ("Doe"). Plaintiff sued SJU on multiple grounds, including violating Plaintiff's rights under Title IX of the Education Act Amendment of 1972, 20 U.S.C. §1682 *et seq.* SJU filed a Counterclaim against Plaintiff seeking Attorney's Fees Pursuant to 42 U.S.C. 1988(b).[1] Plaintiff asks the Court to dismiss SJU's Counterclaim on the grounds that there are not genuine issues of material fact and that Plaintiff is entitled to judgment as a matter of law.

### I.     UNDISPUTED FACTS

As an initial matter, SJU's Counterclaim misstates the claims in Plaintiff's Complaint. SJU tells the Court that it is entitled to attorney's fees because Plaintiff's claims "are frivolous,

---

[1] See Defendant Saint Joseph's University's Answer and Counterclaim, paragraphs 9 through 12. Exhibit A.

without foundation and lack any objectionable reasonable basis."[2]  It specifically asserts that "plaintiff's complaint contains frivolous and unreasonable allegations that SJU intentionally withheld information from plaintiff during its investigation *in an attempt to embarrass, humiliate and otherwise punish him*" (emphasis added) and that Plaintiff "knows these allegations are unfounded."[3]  SJU fundamentally misstates Plaintiff's Complaint; there is no allegation in Plaintiff's Complaint that SJU acted "in an attempt to embarrass, humiliate and otherwise punish him."

Plaintiff certainly alleges that SJU withheld from him information which was available to Roe, SJU employees and the investigator.  He alleges that the withholding was knowing and intentional.[4]  He alleges that, as a result of that conduct, he suffered, among other things, humiliation, embarrassment and anxiety.  But Plaintiff does *not* allege that SJU's conduct was motivated by an "attempt to embarrass, humiliate, and otherwise punish him."[5]  To the contrary, the premise of Plaintiff's Title IX action is that SJU was motivated by gender bias *not* personal animus.

Furthermore, the testimony of SJU's own employees, and its investigator, have established that SJU *did* intentionally withhold information from Plaintiff during its investigation of Roe's sexual assault allegations, so the facts on that point are undisputed.  Before 2015, allegations of sexual misconduct at SJU were handled much the same as other allegations of student misconduct; they were investigated and ultimately resolved under a process employed by SJU's Community Standards Office ("CSO").[6]  The typical process at that time was that claims

---

[2] See SJU's Answer and Counterclaim, ¶ 9.
[3] See SJU's Answer and Counterclaim, ¶ 9.
[4] See Plaintiff's Complaint ¶¶ 57, 79, 83, 84, 85, 190.  Exhibit B.
[5] See SJU's Answer and Counterclaim, ¶ 10.
[6] For ease of reference, the disciplinary process used by the CSO to handle non-sexual misconduct cases will be referred to as the "CSO process."

of sexual misconduct were investigated by the University *before* charges were filed against an accused student. Under the CSO process, accused students were then notified in a written notice of process letter what specific provisions of the student handbook they were alleged to have violated. (Bordak, 293-294 – Exhibit C).  Before any assessment of responsibility was made, the accused student was entitled to see both the specific claims against them in the "incident report." (Bordak, 295).  A student accused of sexual misconduct was entitled to see any evidence against him, again, before any determination of responsibility was made. (Bordak, 295).

The rights of students accused of sexual misconduct changed radically in 2015, when SJU adopted the policy which would ultimately become its Sexual Misconduct Policy "SMP." (Bordak, 296).[7]  The SMP intentionally carved sexually based allegations out of the CSO process, applying an entirely distinct investigative process – known as the "single investigator" model - to sexual misconduct claims; one which essentially stripped accused students of a meaningful opportunity to defend themselves and their reputations.  Investigations conducted pursuant to the SMP deny students accused of sexual misconduct access to the records, evidence and proof in advance of the "investigation" conducted by SJU's investigator. (White, 48-49 – Exhibit D).  Counterintuitively, an accused student's "meeting with the investigator" actually serves as a hearing. (White, 178).  Accused students are never told that the "meeting with the investigator" is actually the equivalent of a hearing. (Bordak, 361 3-14).  "We don't call it a hearing, but it is through its nature a hearing." (Bordak, 361 3-14).

---

[7] In 2015, SJU actually adopted an Interim Sexual Misconduct Policy ("ISMP"), which, in 2017 morphed into the current SMP. For purposes of this litigation, there appears to be no meaningful difference between the provisions of the ISMP and the SMP, so they will be referred to collectively as the SMP.

Under the SMP an accused student is given access to only with two pieces of information prior to his hearing: a "Notice of Process Letter" and a "Pre-investigation Checklist."[8] (White, 144-145). The Notice of Process Letter states the date, time and identity of the complainant as well as an allegation that the accused has violated SJU's SMP. (White, 146). The SJU's SMP is a fifty odd page document addressing six different categories of misconduct which includes sexual assault, sexual harassment, domestic violence, dating violence, sexual exploitation, stalking, retaliation, and intimidation. (White, 169; Bordak, 348, 9-13). The accused student is not told which category or categories are at issue; he is simply directed to the policy as a whole. (White, 169; Bordak, 277). The second piece of information provided to the accused, the Checklist, provides no factual information and no additional information as to the specific provisions of the SMP that the accused is alleged to have violated. (White 152). Other than those two documents, no additional factual information is to be provided to an accused student prior to his meeting with an SJU-selected "investigator." (White, 146, 12-14; 151). SJU does not share information about the specific allegations against the accused respondent prior to the hearing. (White, 171). The Office of Community Standards does not share the details of the charges against him with the accused student either prior to or during the pre-investigation meeting. (Bordak, 354-355, 20-4). The initial complaint, prepared by the Title IX coordinator and the claimant, is not provided to the accused respondent prior to the hearing. (White, 154-155, 163, 265-266). Photographs or other evidence provided by the complainant are not provided to the accused before his hearing. (White, 163-164).

In fact, all of the testimony given in this case establishes that it is the deliberate policy of SJU that a student accused of sexual misconduct *not* be given access to any of those materials

---

[8] The checklist is a form document which also includes information about what support is available to the student. (White, 146).

prior to his "hearing" before an investigator.  (White, 49-50).  Dr. Kiersten White, Assistant to

the Vice President for Student Life, testified to those facts clearly:

| | |
|---|---|
| Mirabella: | I want to talk about what information is provided either directly to the Respondent or that the Respondent is provided access to prior to the first meeting with the investigator. |
| White: | Right. |
| Mirabella: | So is there any other written information that's provided other than the Checklist and the Notice Letter? |
| White: | As I said, there may be some communication. It could be in the form of various support and resources as well. |
| Mirabella: | But nothing further in writing about the allegations against the Respondent? |
| White: | Correct. |
| Mirabella: | Not a copy of the Incident Report; correct? |
| White: | Correct. . . . |
| Mirabella: | Not a copy of the report taken by the Title IX Coordinator, first report; correct? |
| White: | Correct. |

(White, 148-149).

This was SJU's policy: to deny the accused student nearly all information about the

charges against him until his "hearing" with an investigator so as "not to compromise the

investigation." (Bordak, 297).  Students were never advised of this policy, however; it was not

written down anywhere.[9]  (Bordak, 297).  But it was SJU policy nonetheless. Other than the

information the investigator provides, students are not told the specifics of the charges against

them under the SMP; "that's our process.  That's our policy." (Bordak, 299-300, 24-1).  As

---

[9] "There is policy and there is practice and so we don't have in writing all of our practice, but our practice is in line with what we are required to do by policy." (Bordak, 302, 4-8).

William Bordak, Director of Community Standards at SJU testified: "It wasn't an arbitrary decision of mine to just not share documents. That was part of our meetings to operationalize the interim sexual misconduct policy at that time." (Bordak, 98, 1-5).

In keeping with SJU policy and practice, Doe was not given any specific information or evidence before his hearing before SJU's investigator, Elizabeth Malloy, Esq. ("Malloy") Doe was not given the complaint that Dr. Perry had prepared against him before his hearing. (Bordak, 412). In fact, SJU in paragraph 84 of its Answer admits that before meeting with Malloy, Plaintiff was not given an incident report document or given a chance to question Roe.[10] He was not given access to photographs that Roe had taken or any of her text messages exchanged contemporaneous to the alleged assault. (Bordak, 412). All of that information was available to Roe well before she attended the hearing with Malloy; yet Doe was denied access to any of it, even the specific allegations against him. (Bordak, 413).

On March 19, 2018, still ignorant of the actual charges and evidence against him, Doe attended his hearing before Malloy.[11] But to the extent Doe believed he might be belatedly advised of that information at the hearing, he was mislead. SJU has no practice or policy requiring an investigator to provide accused students with the Incident Report, statements, claims or evidence *before or during* the hearing. (White, 43-44, 153, 265). Rather, "what is shared by the investigator at the [hearing] . . . is something determined only by the investigator" who has all of the relevant information. (White, 144, 266, 5-8; Bordak, 355-356, 16-3). Malloy confirmed that no one at SJU instructed her about what information or evidence she should show

---

[10] SJU admits that Doe was never given an incident report or a chance to question Roe before his hearing with Malloy. See ¶ 84 of Defendant SJU's Answer and Counterclaim.

[11] See ¶ 85 of Defendant SJU's Answer and Counterclaim.

an accused student during his hearing; sharing was completely within her discretion. (Malloy, 96-97 – Exhibit E).  And Malloy decided *not* to share any information with Doe.

When Malloy conducted her hearing with Doe, all that he knew about Roe's claim against him was that he had been "rough" with her.  (Malloy, 95).  Malloy knew Dr. Perry had likely shown the complainant the complaint, but not the respondent.  (Malloy, 111).  In Malloy's experience, she had never seen a case at SJU "where the respondent had the ability to review the complaint prior to the meeting with" the investigator.  (Malloy, 112, 5-14).[12]  At the hearing, Malloy had a copy of the complaint against Doe (Malloy, 90), and she may have shown it to Roe, but she "definitely" did not show it to Doe." (Malloy, 142-143, 19-6).  Instead, Malloy only told Doe what she thought would help her in her "investigation:"

| Schwabenland: | And you told him that the claim was that -- the claim by Ms. Roe was that he squeezed her neck, right? |
|---|---|
| Malloy: | Yes. |
| Schwabenland: | Did you tell him that Ms. Roe was claiming that she felt he wanted to harm her? |
| Malloy: | I don't think so. |
| Engle: | Objection. |
| Schwabenland: | Did you tell him that Ms. Roe was claiming he choked her to the extent that she couldn't breathe? |
| Malloy: | I told him that she said -- that she said that it hurt and that she was scared and that's why she texted her friend. I don't think I said "couldn't breathe." |
| Schwabenland: | Okay. So you didn't mention anything that she was claiming he choked her or that she couldn't breathe because of that? |

---

[12] Malloy doesn't know of any reason that she could not disclose the Complaint if a student asks for it. (Malloy, 96)Malloy admits that there are occasions on which she, as an investigator meeting with a student for the first time would show them the complaint. (Malloy, 110).

7

| | |
|---|---|
| Malloy: | I told you what I told him. |
| Schwabenland: | And it doesn't include those two statements? |
| Malloy: | I didn't use the word "choked." |
| Schwabenland: | Did you use the words that because of whatever she complained about she could not breathe? |
| Malloy: | No. |

(Malloy, 265-266, 4-7). Malloy claims that she told Doe that Roe had bruises (a fact which Doe vigorously denies) but admits that she only told him they were somewhere on her neck and that she did not describe them. (Malloy, 216).

Malloy testified that Roe gave her the pictures of her neck either at her meeting with Malloy, which immediately preceded Malloy's meeting with Doe, or shortly thereafter. (Malloy, 276). In either event, she never contacted Doe or showed those pictures so that he could comment on them. (Malloy, 276). When asked if she ever showed Doe any pictures, Malloy testified, "I did not." (Malloy, 213, 4-6). When asked if she made the determination not to show him any pictures, Malloy said, "Yes." (Malloy, 214, 5-7).[13]

| | |
|---|---|
| Schwabenland: | So you made the determination not to show him any pictures? |
| Malloy: | Yes. |
| Schwabenland: | Did you also make – |
| Malloy: | That it was not necessary to show him any pictures. |
| Schwabenland: | Well, you ultimately made a finding of responsibility against him, right? |
| Malloy: | I did. |

---

[13] Interetingly, Malloy admitted that if *she* were the respondent, she would want to know the specific charges against her and would want that information before any determination of guilt was made. (Malloy, 266 - 267).

| Schwabenland: | So it's not necessary for your purpose, but don't you think the guy charged with the offense has a right to see what the evidence is against him? |
| --- | --- |
| Malloy: | I did not feel that it was necessary for my purposes of doing the investigation. |
| Schwabenland: | I didn't ask you that. |
| Malloy: | You're just arguing with me. |
| Schwabenland: | No, I am not. Did you think that a person charged has a right to see what the evidence is against him? |
| Malloy: | I don't think it's a right. |

(Malloy, 214- 215, 5-2).

Malloy testified that Roe likely sent her copies of the text messages she exchanged with her friends shortly after the hearing. (Malloy, 287).  But again, she never provided those text messages – several of which flatly contradict Roe's story – to Doe for comment. (Malloy, 287). Malloy repeatedly decided to withhold information, charges and evidence from Doe. She did so as an agent of SJU, an "investigator" acting on behalf of the University, with the burden to review all of the evidence and complete the investigation. (White, 271),

After this shoddy and biased investigation, in which Doe had no meaningful information about the charges or the evidence against him, Malloy decided that Doe was guilty.  Doe immediately appealed Malloy's decision. But, once again, SJU had silently stacked the deck against accused students.  The SMP explicitly allows the claimant and the respondent to appeal an investigator's decision. It makes no provision for additional parties to weigh on the outcome of the appeal.  Yet, unbeknownst to students, once a student files an appeal seeking to overturn a wrongful conviction under the SMP, SJU routinely solicits written statements from select SJU

employees as part of the appeal packet. (White, 236; Bordak, 362).[14]  It is particularly
noteworthy that the investigator (who rendered the decision from which the student is appealing)
is asked to respond to the appeal in writing.  (White, 236)  Students are not made aware of this
fact. (White, 228, 12-15; 246).  So, unless an accused student reviews the appeal file *after* the
appeal is concluded – as Doe happened to do in this case -  he will never know that SJU
employees (in Doe's case, two) and the Investigator have filed supplemental statements with the
appeal panel in support of the Investigator's decision.  (White, 231).  Not surprisingly, Malloy's
findings and conclusions have never been overturned by SJU on appeal. (Malloy, 277-278).

At that point, after the appeal is decided, "there is no mechanism for the Respondent to
bring to the University's attention or have considered new evidence" (White, 243, 19-23).

Doe sued SJU alleging, in pertinent part, that SJU had conducted an "investigation" into
Roe's claims in which it withheld from him the details of those claims against him as well as the
evidence against him. SJU filed a Counterclaim, alleging that Doe's complaint "contained
frivolous and unreasonable allegations that SJU intentionally withheld information from plaintiff
during its investigation in an attempt to embarrass, humiliate and otherwise punish him."

## II.   LEGAL ARGUMENT

## A.   STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a
matter of law." Fed R. Civ. P. 56(c).  An issue of fact is "material" if it might affect the outcome

---

[14] Bordak admits that it is SJU's practice to invite specific individuals to respond to an appeal, but this practice of
inviting responses to the appeal is not memorialized anywhere or set forth anywhere in the SMP policy or
elsewhere." (Bordak, 324, 12-18)

of the case under governing law; it is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Alpha Pro Tech, Inc. v. VWR Int'l, LLC*, 2017 U.S. DIST LEXIS 135507, * 12-14, 2017 WL 3671264, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact." *Alpha Pro*, *12-14, citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, where the non-moving party bears the burden of proof on a particular issue, the moving party's burden is met by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.*, quoting *Celotex Corp.* at 325. Summary judgment is then appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*, quoting *Celotex Corp.* at 322.

In this case, SJU has filed a Counterclaim for "Attorney's Fees Pursuant to 42 U.S.C. §1988(b)." Plaintiff submits that SJU's counterclaim must be dismissed because 42 U.S.C. §1988 is essentially a procedural statute and does not create an independent federal cause of action for the violation of federal civil rights. Secondarily, SJU's claim rests on its assertion that Plaintiff has made "frivolous, unfounded and unreasonable" allegations that the University intentionally withheld information from Plaintiff during its investigation of Roe's sexual assault allegations.[15] However, the testimony of SJU's employees, as well as that of its investigator, establish that the University did, in fact, knowingly and deliberately withhold information from

---

[15] See SJU's Answer and Counterclaim, ¶¶ 9-12.

the Plaintiff during its investigation. It was actually the University's policy to do so. So, even if §1988 did create an independent cause of action, SJU's Counterclaim should be dismissed on the grounds that it has no factual basis.

### B.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW

42 USCS § 1988(b) authorizes the Court to award reasonable attorney's fees to a prevailing party "[i]n any action or proceeding to enforce . . . title IX of Public Law 92-318 [20 USCS §§ 1681 et seq.] . . . ." Courts which have considered the question have overwhelmingly concluded that 42 U.S.C. §1988 does not create an independent cause of action for the violation of federal civil rights. See *Stagemeyer v. County of Dawson,* 192 F. Supp. 2d 998, 1006, 2002 U.S. Dist. LEXIS 4727, *13-14, citing *Moor v. County of Alameda*, 411 U.S. 693, 702-03 & 704 n.17, 36 L. Ed. 2d 596, 93 S. Ct. 1785 (1973) (collecting cases holding that § 1988 does not independently create federal cause of action for violation of federal civil rights); *Sarmiento v. Texas Bd. of Veterinary Med. Examiners*, 939 F.2d 1242, 1245 n.4 (5th Cir. 1991) (§ 1988 does not create independent federal cause of action, but is essentially procedural statute); *Schroder v. Volcker*, 864 F.2d 97, 99 (10th Cir. 1988) (§ 1988 defines procedures pursuant to which remedies may be sought in civil rights actions; it does not create independent cause of action); *McLaughlin v. City of LaGrange*, 662 F.2d 1385, 1388 n.1 (11th Cir. 1981) (same), *cert. denied*, 456 U.S. 979 (1982).

Rather, these courts have consistently concluded that §1988 "relates to the question of damages once the substance of a civil rights violation has been established." *Johnson v. Marton*, 55 F.R.D. 282, 282, 1972 U.S. Dist. LEXIS 15490, *1, citing *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 235-36, 24 L. Ed. 2d 386, 90 S. Ct. 400 (1969); Basista v. Weir, 340 F.2d 74, 84-88 (3d Cir. 1965); *Pierre v. Jordan*, 333 F.2d 951, 958 (9th Cir. 1964); Brazier v. Cherry, 293

F.2d 401, 405-10 (5th Cir. 1961); *Pritchard v. Smith,* 289 F.2d 153, 157-59 (8th Cir. 1961); *Ammlung v. City of Chester*, 355 F. Supp. 1300, 1304 (E.D. Pa. 1973).

Because it does not support an independent cause of action, courts regularly dismiss claims and counterclaims based on §1988, properly postponing any decision about attorney's fees until after a "prevailing party" has been identified. See cases cited above; see also *Black v. Allegheny County,* 2014 U.S. Dist. LEXIS 125241, *4-7, adopted by, motion granted by, claim dismissed by *Black v. Allegheny County,* 2014 U.S. Dist. LEXIS 124643 (W.D. Pa., Sept. 8, 2014)(dismissing defendant's counterclaim under §1988(b) in light of "the vast amount of authority from other jurisdictions cited by Plaintiffs recognizing that §1988 does not provide for a separate cause of action"); *Mazzeo v. Gibbons,* 649 F. Supp. 2d 1182, 1199, 2009 U.S. Dist. LEXIS 54986 (dismissing plaintiff's §1988 claim for attorney's fees with the express understanding that plaintiff may assert her right to those fees should she become a prevailing party); *Russo v. City of Atl. City,* 2016 U.S. Dist. LEXIS 50056, *24-25 (dismissing defendant's counterclaim under §1988 on the grounds that it is not a separate federal claim).

Given that SJU does not state a legally cognizable claim, Plaintiff asks this Court to dismiss SJU's Counterclaim.

## C.    THE FACTS ESTABLISH THAT SJU WITHHELD INFORMATION DURING ITS INVESTIGATION

SJU claims that it is entitled to attorney's fees because Plaintiff's claims "are frivolous, without foundation and lack any objectionable reasonable basis."[16]   It specifically asserts that "plaintiff's complaint contains frivolous and unreasonable allegations that SJU intentionally withheld information from plaintiff during its investigation in an attempt to embarrass, humiliate

---

[16] See SJU's Complaint and Counterclaim, ¶ 9.

and otherwise punish him" and that Plaintiff "knows these allegations are unfounded." The undisputed facts of this case plainly lay out three truths: First, that Plaintiff has never alleged SJU acted "in an attempt to embarrass, humiliate and otherwise punish him." To the contrary, Plaintiff's Complaint consistently alleges that SJU's conduct – which certainly caused Plaintiff, embarrassment and humiliation – was motivated by gender bias. Hence the Title IX claim.

Second, the testimony establishes that SJU absolutely *did* withhold important and relevant (and exculpatory) information from Doe. It withheld the actual claims against him. It withheld text messages. It withheld photographs. It withheld Roe's disciplinary record.[17] It withheld information about its own policies and procedures. Far from being "frivolous, without foundation and lack[ing] and objectionable [sic] basis," SJU's own employees establish that Doe's assertions that SJU withheld this information is true.

And, third, the evidence shows that SJU withheld this information knowingly and deliberately. It was their policy. It was their practice. And it was never disclosed to their students.

### III.    CONCLUSION

For the reasons set forth above, plaintiff respectfully requests this Court to dismiss SJU's counterclaim.

Respectfully submitted,

Dated:   September 24, 2018          BY:    */s/ John Mirabella*
                                     John Mirabella, Esquire
                                     john@mirabellalawfirm.com
                                     Law Offices of John Mirabella
                                     1600 Market Street, Suite 1810
                                     Philadelphia, PA  19103
                                     (215) 422-4991

---

[17] SJU did not produce Roe's disciplinary records until well after the depositions of its own employees, so they could not be questioned on that front. But there is no question that this information was withheld from Doe.

Edward J. Schwabenland, Esquire
Schwabenland & Ryan
995 Old Eagle School Road, #306
Wayne, PA  19087
(610) 971-9200

Gregory A. Smith, Esquire
The Law Offices of Gregory A. Smith, LLC
1600 Market Street, Suite 1810
Philadelphia, PA 19103
(215) 422-4100

Attorneys for Plaintiff