# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN DOE, | : | |
| Plaintiff, | : | CIVIL ACTION NO.**18  2044** |
| | : | |
| | : | |
| St. Joseph's University, ~~et. al.~~ | : | JURY TRIAL DEMANDED |
| and Jane Roe | : | |
| Defendants | : | |

## CIVIL ACTION COMPLAINT

1.     Plaintiff, John Doe, is an adult individual residing in Pennsylvania, who is and at all times material hereto was a matriculated student at St. Joseph's University.

2.     Defendant, St. Joseph's University ("SJU"), is a Pennsylvania University with its main campus located at 5600 City Avenue, Philadelphia, Pennsylvania 19131.

3.     Defendant, SJU, at all times material hereto, acted by and through its agents, apparent agents, ostensible agents, servants, employees, workmen and/or representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of SJU's business, mission and/or affairs, including, but not limited to Mary-Elaine Perry, Ph.D., Title IX Coordinator for SJU ("Perry"), William S. Bordak ("Bordak"), SJU's Director of Community Standards, Emily Forte ("Forte") SJU's Assistant Director of Community Standards, and Elizabeth Malloy, Esq. ("Malloy"), an attorney retained by SJU to investigate the alleged incident involving Doe and Defendant, Jane Roe.

4.      Defendant, Jane Roe ("Roe"), is an adult individual who is and was at all times material hereto a matriculated student at SJU and resides in Pennsylvania.

## JURISDICTION

5.      Plaintiff invokes this Court's jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. §1681 et seq.   Jurisdiction is also claimed over the related common law state claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. §1367.

6.      Venue primarily lies in this district pursuant to 28 U.S.C. §1391(a) inasmuch as this is the district in which the instant claims arise.

## FACTS

7.      At all times material hereto, Doe, a sophomore, resided in an SJU residential hall known as St. Mary's Hall ("St. Mary's").

8.      At all times material hereto, Roe resided in an SJU residential hall known as "Villiger."

9.      Before Friday, February 23, 2018, Doe had never met Roe, and knew nothing about her.

10.      On the evening of Friday, February 23, 2018, Doe and several of his friends attended a party in Philadelphia near the campus of LaSalle University.

11.      At that party, Doe met Roe met for the first time.

12.     Roe approached Doe, and the two began talking. Roe seemed interested in Doe and, while they talked, began flirting with him.

13.     Roe initially told Doe that she was not an SJU student, but later admitted that she actually was enrolled at SJU.

14.     In the course of their conversation, Doe asked Roe where she went to high school. Roe told Doe that she had been in treatment for drug and alcohol addiction in high school – specifically for treatment of cocaine and heroin addiction - but was now "sober."

15.     Despite her claim to be "sober," Doe noticed that Roe was drinking alcohol at the party.

16.     Throughout their time together at the party, Roe continued to demonstrate romantic interest in Doe by flirting with him, kissing him and giving him her cell phone number.

17.     At some point, Doe and his friends decided to leave the party, and Roe decided to accompany Doe and his friends back to SJU's campus.

18.     Doe and Roe walked outside to get some air, where Roe noticed a man selling cocaine.

19.     Roe expressed an interest in buying cocaine and inquired about the price.

20.     Concerned for her well-being, Doe discouraged Roe from purchasing the cocaine, reminding her that she said she had been "sober" for some time and that taking cocaine would destroy her sobriety.

21.     At Doe's urging, Roe decided not to purchase cocaine at that time, and left the party with Doe and several of his friends in one of Doe's friend's car.

22.     There is no suggestion that either Doe nor Roe was intoxicated when they left the party on LaSalle's campus.

23.     When the group arrived back on SJU's campus, rather than returning to her own dorm, Roe decided to accompany Doe to his residence hall, St. Mary's.

24.     Doe and Roe went to the kitchen in St. Mary's, drank water and kissed some more.

25.     Doe suggested that, because his roommates were asleep, he and Roe should go up to a common room on the third floor of St. Mary's. Roe agreed.

26.     Upstairs at St. Mary's, the two kissed more, their hands on each other's faces, arms and necks.  At some point while they were kissing, Doe stopped kissing her to go to the bathroom.  When Doe returned a short time later he and Roe kissed more, before Roe got a phone call.

27.     Roe told Doe that her friend was sick and that she needed to go to McShane, another residential hall on campus, to help her friend.

28.     Doe and Roe left the room to walk toward the stairs. Before they reached the stairs, the two kissed again for approximately a minute, again with Roe's consent.  Roe laughed and said she really had to go help her friend.

30.     Doe escorted Roe to the front door of St. Mary's and, when he opened the door, he saw a woman who he assumed to be Roe's friend waiting outside.  Roe kissed Doe goodbye, in front of her friend, then Doe watched her go over to her friend.

31.     Doe closed the door and texted Roe to say "Im goin to bed but u guys need anything my phone will b on I hope ur friends ok." A true and correct copy of the complete text exchange between Doe and Roe is attached hereto as Exhibit A.  Roe responded to Doe's text, saying "Thanks man." See Exhibit A.  Doe then went to bed.

32.     At all times, all of the kissing, touching and contact between Doe and Roe was voluntary and consensual without force, suggestion, and/or intimidation.

33.     At no time did Roe ask Doe to stop kissing or touching her in any way.

34.     On Saturday, February 24, 2018, Doe texted Roe, "Hey." Roe did not respond to that text. See Exhibit A.

35.     Doe and Roe have had no further communication with one another via text or otherwise.

36.     On Thursday, March 1, 2018, nearly a week after Doe's encounter with Roe, Doe received a phone call from Forte, Assistant Director of Community Standards at SJU, advising Doe that he had been accused of sexual misconduct.

37.     Doe was utterly shaken and confused. He asked Forte who had accused him and what the accusations were.  Forte identified Roe as the accuser and told Doe only that she had accused him of "being rough" with her.

38.     Doe was shocked, horrified and humiliated because nothing untoward at all had happened with Roe. Doe innocently assumed the complaint must be based in some sort of misunderstanding and that once he had the chance to speak with someone at the Community Standards Office ("CSO"), he would understand what this was all about and would be able to clear it up.

39.     On Thursday, March 1, 2018, Forte emailed Doe advising him that, pursuant to SJU's Sexual Misconduct Policy ("SMP"), a Pre-Investigation Meeting had been scheduled for Monday, March 5, 2018 at 10:00 a.m. in SJU's CSO. A true and correct copy of the March email exchange between Doe and Forte is attached hereto as Exhibit B.

40.     On March 5, 2015, Forte notified Doe that the University had imposed a no-contact restriction between Doe and Roe, which Doe honored.

41.     Doe emailed Forte to ask if it was possible to reschedule their March 5, 2018 meeting, advising her that "I am taking a midterm and due to the fact that I receive extra time on tests, I am starting the midterm earlier than 11:15 and it would not allow sufficient time for our meeting." See Exhibit B.

42.     On Tuesday, March 6, 2018, Forte conducted a Pre-Investigation Meeting with Doe, at which he was instructed to initial each paragraph of and sign a Sexual Misconduct Policy: Pre-Investigation Meeting Checklist ("Checklist"). A true and correct copy of the Checklist is attached hereto as Exhibit C.

43.     SJU's SMP is nearly fifty pages long and only one of a number of different disciplinary tracks identified in the SJU Student Handbook (each of which has different procedures and definitions). A true and correct copy of SJU's Student Handbook is attached hereto as Exhibit D.

44.     Although the Student Handbook purports to set forth SJU's SMP, the actual, current SMP has recently been revised and is accessible only by link from the Student Handbook. A true and correct copy of SJU's SMP is attached hereto as Exhibit E.

45.     Throughout the course of Doe's Investigation, SJU's current SMP has been difficult to access, due to the fact that the link is and has been frequently broken, making it difficult for Doe to familiarize himself with the SMP. A true and correct copy of an April 16, 2018 email from Bordak to Doe notifying him that "there was a change in the website link for the Sexual Misconduct Policy," and provided him with the new link. A true and correct copy of Bordak's email of April 16, 2018 is attached hereto as Exhibit F.

46.     The four-page Checklist provided to Doe by Forte on March 6, 2018 was presumably intended to provide the individual accused of sexual misconduct, the "Respondent," some sort of guidance and assistance in understanding and navigating SJU's complicated, difficult to access policies and figure out what, if any support or resources accused students might need to prepare an appropriate defense to the claims against them.

47.     In fact, Paragraph 18 of the Checklist recognizes the importance of such support in stating that "[r]easonable accommodations with respect to the Community Standards process shall be provided to students who are registered with the Office of Student Disability Services." See Exhibit C.

48.     Paragraph 18 of the Checklist directs students with disabilities to "contact the Office of Student Disability Services for assistance." See Exhibit C.

49.     Doe is registered with the Office of Student Disability Services at SJU for his documented learning disability, ADHD.

50.     Doe's ADHD, of which SJU is well aware, causes him to have difficulty, not only with attention and organization, but also with processing information, a difficulty which – understandably - becomes significantly worse when he is upset.

51.     Doe receives accommodations for his ADHD at SJU, including designated note-takers, recorded lectures and extended time on tests. A true and correct copy of the accommodations granted to Doe by SJU are attached hereto as Exhibit G.

52.     As a young man with ADHD, just finding out that he has been wrongfully accused of sexual misconduct, and that he was now embroiled in a complicated labyrinth of policies and procedures, all while trying to manage his ongoing coursework and deep concern and anxiety over having to defend himself against unspecified charges, Doe could have had no

way of knowing whether he would need "accommodations" to navigate this process, let alone what those "accommodations" might be.

53.     But Bordak, Director of SJU's CSO, Forte, Assistant Director of CSO, and Malloy, the attorney SJU would retain to "Investigate" Doe's case knew or should have known that Doe would need assistance and accommodations in order to defend himself.

54.     Unlike an accused SJU student, Bordak, Forte and Malloy are all intimately familiar and have extensive experience with the policies, procedures and practices SJU uses to investigate charges of sexual misconduct as well as the frequency with which accused students are found "responsible."

55.     Throughout the course of the Doe's "Investigation," SJU, Bordak, Forte and Malloy not only failed to make provisions or accommodations for Doe's ADHD and slower processing speed, they failed to advise him that accommodations would be necessary and what, if any, accommodations might be available to him.

56.     Further, as will be set forth in detail, Bordak, Forte and Malloy actively concealed from Doe not only relevant evidence, but also information about the allegedly "neutral" investigator SJU had retained to interview him, and even the nature and extent of the claims against him. SJU's refusal to give Doe even the most basic information about the "investigator" and the case against him, dramatically increased his confusion and anxiety and effectively crippled him from presenting any meaningful defense.

57.     SJU did this knowingly and intentionally. As will be detailed later in the complaint, in November of 2017, just months before Roe's specious accusation against Doe, SJU had been awarded a sizeable federal grant expressly dedicated to strengthening SJU's response to

sexual assault allegations. A true and correct copy of a Nov. 30, 2017 Press Release regarding

SJU's grant is attached hereto as Exhibit H.

58.     Receipt of the grant was contingent on SJU submitting quarterly reports to the

federal government outlining its "progress" in eliciting sexual assault allegations and holding the

accused responsible. See Exhibit H.

59.     In a December 2017 interview with the school paper, Mary-Elaine Perry, Ph.D.,

Title IX Coordinator for SJU ("Perry"), bemoaned the fact that her office only received 10-15

allegations of sexual misconduct a year despite the fact that she believed many, many more

instances of sexual misconduct happened to women every year on SJU's campus. A true and

correct copy of the December 2017 Hawk article is attached hereto as Exhibit I.

60.     In that same article, Perry expressed her expectation and hope that, as a result of

this grant, the school would soon see more reports from women of sexual misconduct. See

Exhibit I.  The article went on to remind women that sexual assault doesn't have to be violent or

brutal; it can be any unwanted sexual act. See Exhibit I.

61.     The award of this federal grant and the concomitant pressure it brought to show

"progress" by way of "strengthening" SJU's response to allegations of sexual misconduct

exacerbated an already toxic environment on SJU's campus, one in which students and

administrators are on high alert, looking for anything that might remotely be considered sexual

misconduct and Title IX zealots in cash-strapped administrative offices re-imagine sham

disciplinary procedures as the just deserts of prejudged men.

62.     Against this backdrop, Forte held a Pre-Investigation Meeting with Doe on March

6, 2018. Doe again asked Forte what the charges against him were and whether he would be

given an opportunity to see what Roe was claiming he had done.

63.     Forte told Doe that he would be given an opportunity to read an "incident report" laying out the charges against him at the "Investigation" by the individual SJU had selected to investigate Roe's allegations. Contrary to Forte's representation, Doe was never shown an incident report.

64.     Doe did not realize at that time that, pursuant to SJU's SMP, the "Investigation" was not an investigation at all, but rather served the purpose of a trial. See Exhibit E.

65.     Neither did Doe realize at that time that, pursuant to SJU's SMP, the "Investigator" was not an investigator as one would normally understand that term, but rather a judge and sole juror whose decision about guilt or innocence was final and would be basically rubber-stamped by other SJU employees and agents through a hollow and essentially meaningless "appeal" process provided by the SMP.

66.     Paragraph 13 of the Checklist, entitled "The Investigation" identified "Elizabeth A. Malloy Member/Cozen O'Connor" as the individual SJU had designated to investigate Roe's allegations against Doe.

67.     Malloy is an attorney at the law firm of Cozen O'Connor whose practice centers around representing the interests of employers and educational institutions. She has defended her institutional clients against claims of discrimination, retaliation and harassment and, in the educational sector, she has defended schools and universities against student complaints. Malloy devotes a substantial part of her practice to serving as an "investigator" for schools investigating student complaints.

68.     Upon information and belief, in her professional capacity as an attorney, Malloy does not represent the interests of students in complaints against their schools and universities.

69.     Paragraph 13 of the Checklist advised Doe that he may object to the Malloy's appointment as Investigator "for cause in writing no more than 24 hours after each party has been informed of the name of the Investigator:

(a)     However, Doe was given no meaningful information about Malloy, nor sufficient time to investigate her suitability as an unbiased "Investigator."

(b)     Doe was not told, and was not given adequate time to discover, that Malloy is an attorney with extensive experience representing the interests of schools - in general and in disciplinary "investigations"- *against* students.

(c)     Doe was not told, and would have had no way to know, whether Malloy had any connection with Roe

(d)     Doe was not told, and would have no way to know, the outcomes of Malloy's many school-sponsored "investigations" to determine whether she had ever found a Respondent "not responsible." SJU, however, would have access to that information before they even selected Malloy to "investigate" the allegations against Doe.

70.     Since Malloy's client base is educational institutions, and it is educational institutions who solicit and hire her, there certainly would have been reason for Doe to question Malloy's "bias." But Doe was not made aware of these facts.

71.     Neither was Doe told that, over the same period of time that she was investigating Roe's claims against Doe, Malloy was actively engaged with issues raised by the "MeToo" movement, preparing to be the key speaker at an upcoming Philadelphia Bar Association event entitled, "MeToo for Legal Practitioners: A Chancellor's Forum on Sexual Harassment," one in

"a series of programs addressing the #MeToo movement," focusing on "sexual harassment prevention policies in the legal workplace, anti-harassment training, and the obligation to and process of promptly addressing allegations of sexual harassment at work."

72.     Had Doe been aware of any of these facts, he would certainly have objected to Malloy's appointment as the "Investigator" in his case on the grounds of bias.

73.     Upon information and belief, Malloy's professional obligations required her to stay current on legal decisions and official directives and policy changes relating to Title IX, including "Dear Colleague Letters" issued by the Office of Civil Rights.

74.     On Thursday, March 8, 2018, Malloy contacted Doe to schedule a time to meet for the "Investigation." A true and correct copy of the entire email exchange between Doe and Malloy is attached hereto as Exhibit I.

75.     Doe had been told that he was entitled to an Advisor, but he had also been told that, pursuant to SJU policy, an "Advisor may not speak for [the Respondent] or otherwise direct questions to or address others present in any Disciplinary Process meeting (e.g., the opposing party, witnesses, and/or the person conducting the meeting (university official and/or investigator.))" Exhibit E, V(b)(2). He was aware that "[a]n Advisor may take notes, but is not permitted to inspect, read, copy, photograph, or transcribe any documents or data at any stage of the Disciplinary Process." Exhibit E, V(b)(2).

76.     Realizing that SJU policy effectively prohibited an "Advisor" from giving him any meaningful help, and knowing that he had done nothing wrong, that this entire incident must be the result of a misunderstanding, and that contacting an Advisor would only unnecessarily embarrass Doe, Doe did not seek an Advisor.

77.     Had Doe understood the nature and/or extent of the claims against him, he certainly would have invoked his right to an Advisor. In fact, he would have immediately sought legal counsel.

78.     Neither Malloy nor anyone else at SJU told Doe what the allegations against him were or what the possible consequences of this investigation were: that he might be found responsible for "sexual assault."

79.     Quite the contrary. Malloy not only concealed the details of the allegations against Doe from him, she kept her communications with Doe light and friendly, nurturing Doe's belief that this must all be some sort of misunderstanding.

80.     On Friday, March 9, 2018, as Doe and Malloy were working out the details for the "Investigation" meeting, Doe asked "if there is anything I should do to prepare for this meeting." See Exhibit I.

81.     Malloy did not respond to Doe's email.  Ten days later, on Monday, March 19, 2018, three hours before their scheduled meeting, Malloy e-mailed Doe telling him "[i]f you have any documents or text messages or emails that may relate to the complaint, I would like to see them." Exhibit I.

82.     Doe had only two text messages with Roe, and his own recollections of his brief time with Roe certainly gave him no reason to think he had done anything wrong. Malloy's breezy manor only confirmed Doe's naïve thoughts that, once he knew what was going on, this would all be cleared up.

83.     Malloy did not tell Doe that this was a very serious matter or that he should think about and identify any witnesses, evidence or information which might have bearing on the claims against him or shed light on the circumstances surrounding those claims.  Even if Malloy

had, though, Doe was not in a position to identify any such witnesses or information because,

prior to the "Investigation" meeting, Doe was never told what the exact claims against him were.

84.     Before meeting with Malloy, Doe was never given any sort of "incident report"

stating the claims against him:

     (a)     Doe was never told what, if any, evidence there was against him;

     (b)     Doe  was never given an opportunity to identify or produce potential

            witnesses or evidence in his own defense;

     (c)     Doe was never given a chance to question his accuser or any witnesses she

            identified in her accusations;

     (d)     Doe was never permitted to examine any evidence against him; and

     (e)     Doe was never made aware that he, a college sophomore, who was

            panicked and perplexed that anyone would accuse him of anything at all,

            would be questioned and ultimately judged by a seasoned litigator hired

            by SJU with extensive experience in "investigating" young men accused

            of sexual assault.

85.     On Monday, March 19, 2018, Doe met with Malloy for the "Investigation." Once

again, Doe asked what the allegations against him were.  Despite Forte's promise that Doe would

be given a chance to learn the charges against him at the "Investigation," Malloy never showed a

copy of the promised "incident report" to Doe, nor did she show him any documents, evidence,

or statements.

86.     Instead, Malloy told Doe only that Roe claimed he "squeezed her neck" while

they were kissing and that it "scared her." This was the first time Doe had been told anything

about claims he squeezed Roe's neck.

87.     Doe was stunned. He knew, of course, and readily admitted, that he and Roe had been kissing, which had been – by all accounts – consensual. He knew, too, that while they were kissing, he and Roe had been touching each other's necks, faces and arms, which had also been consensual. But he had never knowingly "squeezed" her anywhere. He also felt terrible that anything he might have done, however inadvertently, might have "scared" anyone.

88.     Still innocently assuming this to be some sort of misunderstanding or accident, and not wanting to be disrespectful to Roe, Doe said something to the effect of, "I don't want to call her a liar, but I don't remember anything like that happening."

89.     On Wednesday, April 4, 2018, Malloy presented her thoughts on preventing sexual harassment in the workplace at the Philadelphia Bar Association event entitled, "Me Too for Legal Practitioners: A Chancellor's Forum on Sexual Harassment."

90.     On Friday, April 6, 2018, Bordak advised Doe that the "Investigation" had concluded, a determination had been made, and that he was expected to attend a meeting on Wednesday, April 11, 2018 to learn the outcome of the "Investigation." A true and correct copy of the email exchange between Bordak and Doe is attached hereto as Exhibit K.

91.     At this point, Doe still believed, reasonably, that the allegations against him arose out of some sort of accident or misunderstanding and would be dismissed because he knew, and had explained to Malloy, that he had never knowingly or intentionally squeezed Roe's neck or scared her.

92.     But, now aware that Roe was claiming he had squeezed her and scared her, Doe asked Bordak if his SJU academic advisor, Joseph Corabi, Ph.D. ("Corabi"), could serve as his Advisor in this and be included in the meeting via phone. Bordak agreed. See Exhibit K.

93.     On Wednesday, April 11, 2018, Doe met with Bordak to discuss the outcome of

the "Investigation" and learned, to his shock, that "[a]fter consideration of the accounts of all

parties, and documents, and my assessments of the credibility of the witnesses, I [Malloy] find

based on a preponderance of the evidence that it is more likely than not that [Doe] is

RESPONSIBLE for sexual assault by squeezing [Roe's] neck area." A true and correct copy of

the April 11, 2018 Disciplinary Letter to Doe, including Rationale and Outcome prepared by the

Investigator, Malloy, ("Outcome Letter") is attached hereto as Exhibit L.

94.     In a two paragraph Rationale, Malloy acknowledged that Section D(1)(a)(ii) of

SJU's SMP defines sexual assault as "any non-consensual sexual contact, including any

improper touching of intimate body parts." Exhibit L.

95.     Malloy also acknowledged, as she must, that "a person's neck/throat area is not an

'intimate body part." See Exhibit L.

96.     Nonetheless, Malloy concluded, because they were kissing when Doe touched

Roe's neck, the touching of Roe's neck was "sexual contact." See Exhibit L.

97.     Malloy went on to conclude that the "sexual contact," was consensual because

"[c]onsent to kissing also understandably includes some contact by [Doe's] hands on the neck

and throat area." See Exhibit L.

98.     However, Malloy determined that "because [Roe's] complaint is that [Doe]

squeezed her neck, to the point where it left bruises, I find that this is a singular, separate act

which required her consent." See Exhibit L.

99.     In essence, Malloy concluded that Roe's neck was not an "intimate body part,"

that Doe had consent to touch Roe's neck (a non-intimate body part), but that Doe needed

separate consent for the degree of firmness with which he touched this non-intimate body part and that the failure to get that consent constituted "Sexual Assault" as that term is defined in SJU's SMP.

100.    Doe was not only stunned by Malloy's tortured logic and erroneous reading of the definition of "sexual assault," but also by the nature and extent of the claims against him - that he was being accused of bruising Roe, that there were pictures of alleged bruises, and that what was, at most, an accident could be deemed "sexual assault."

101.    It was at this April 11th meeting with Bordak that Doe was permitted, for the first time, to see all of the evidence, witness reports and documentation Malloy had seen in the course of her "Investigation" and to read Malloy's full report, only a fraction of which is reproduced in the April 11th Outcome Letter attached hereto as Exhibit L.

102.    Malloy's full report, which contains at least seven additional sections and, presumably, the evidence she relied upon in coming to her conclusions, is not attached hereto because, pursuant to SJU's SM, Doe is not permitted to have a copy of Malloy's full report. See Exhibit E.

103.    However, in reviewing Malloy's full report, Doe saw that Malloy specifically found that Doe was credible and that he never had any intent to harm Roe.

104.    As to the claims and evidence against him, it was only at the April 11th meeting with Bordak that Doe first learned the following:

      (a)    That Roe admitted that all of the kissing between Roe and Doe, at the party and afterward, including touching her face and neck, had been consensual;

      (b)    That, while at the party, Roe and her friends had excitedly texted one another that there was cocaine;

(c)     That, rather than discouraging her from using cocaine, Roe's friends had only

laughed when she told them that she "wanted some;"

(d)     That Roe accused Doe of "flirting with other girls" in the car on the way back

from the party to SJU;

(e)     That Roe claimed that, when she and Doe went upstairs at St. Mary's, Doe sat on

top of her and squeezed her neck so hard she couldn't breathe;

(f)     That Roe had been previously involved in an abusive relationship;

(g)     That she claimed her abusive ex-boyfriend used to do "the exact same thing to

her;"

(h)     That when she looked into Doe's eyes when they were kissing, he had the same

look in his eyes that her abusive ex-boyfriend had, and that was what scared her;

(i)     That she had some sort of "flashback" while she and Doe were kissing;

(j)     That, according to Roe, two days after their encounter, Roe's friend noticed

"bruises" on her neck;

(k)     That Roe's friend allegedly took pictures of those bruises that day on her cell

phone and encouraged Roe to file an assault claim against Doe with SJU; and

(l)     That those pictures - allegedly of bruises, allegedly on Roe's neck, allegedly taken

two days after her encounter with Doe – were in SJU's possession, throughout the

course of the "Investigation" and were a key factor in Malloy's decision to find

Doe "Responsible."

105.    It was at this meeting that Doe first learned even of the existence of cell phone

photos purportedly showing bruises on Roe's neck and it was at this meeting that Doe was first

permitted to see those photos.

106.     These photos are not attached hereto as exhibits because, pursuant to SJU's SMP, Doe was not permitted to reproduce them or make them available to his attorney or Advisor. See Exhibit E.

107.     The photos were of poor quality, but, from what Doe could discern, do not match up at all with how he and Roe were touching one another. However, Doe never had any opportunity to mention that during the "Investigation" because he never saw them during the "Investigation."

108.     Plaintiff states unequivocally that: Roe's statement that Doe flirted with other girls on the car ride back to SJU is false; Roe's statement that Doe sat on top of her is false; and Roe's statement that Doe squeezed her neck is false.

109.     Doe never, at any time squeezed Roe's neck and vehemently denies Roe's statement to the contrary.

110.     At the April 11, 2018 meeting, Doe also noticed the evidence which was conspicuously *absent* from SJU's and Malloy's "Investigation," including:

(a)     Evidence about any conditions Roe might have or medications or other substances which she might have ingested (before or after her encounter with Doe) which could have caused her to bruise easily, such as alcohol, aspirin, antibiotics, ibuprofen, Naproxen, birth control pills, anti-depressants, or cocaine;

(b)     Evidence that Roe ever told Doe that he was holding her too tightly or making her uncomfortable or hurting her in any way;

(c)     Evidence that Roe ever told Doe to stop kissing her, touching her, or to change what he was doing at all;

(d)     Evidence that Roe sought any medical attention or treatment after her encounter with Doe;

(e)     Evidence that Roe ever told Doe she was scared;

(f)     Evidence verifying the identity of the individual whose neck is portrayed in the cell phone photos on which Malloy based her "Responsible" decision;

(g)     Evidence verifying the date on which the cell phone pictures were taken;

(h)     Evidence documenting the chain of custody of those cell phone pictures;

(i)     Evidence verifying that those cell phone pictures depicted bruises at all, given the poor quality of the pictures;

(j)     Evidence that anyone from the CSO or from the Title IX Office, who had interviewed Roe when she filed her complaint against Doe, had asked to see the alleged bruises on Roe's neck to verify that they even existed or had taken any pictures of the "bruises;"

(k)     Evidence about Roe's mental state or current psychiatric or psychological condition, especially given her self-reported history of substance abuse and reference to a "flashback;"

(l)     Evidence regarding Roe's activities after she left St. Mary's on February 23rd, during the early morning, afternoon and evening of February 24th, and during the day of February 25th;

(m)     Evidence from Roe's friend who, on the night of February 23rd, saw Roe kiss Doe goodnight at the front door of St. Mary's;

(n)     Evidence or statements from the three friends who Roe accompanied to the party about her actions, decisions and state of mind on the evening of February 23rd;

(o)     Transcriptions, tape recordings or videos of statements from Roe, Doe or any

        witness; or

(p)     Any evidence whatsoever that might tend to exculpate Doe, such as statements

        from witnesses at the party or Doe's friends who were in the car on the night of

        February 23rd driving Doe and Roe from the party to SJU's campus.

111.    Corabi, Doe's Advisor, participated in the April 11th meeting between Bordak and

Doe by phone. However, SJU's SMP prohibit an accused student's Advisor from seeing any of

the documents, photos or the full Investigation Report prepared and/or generated in the course of

the "Investigation."

112.    Consequently, Doe's Advisor had no effective way to assist *or advise* Doe during

this process as he was never given access to the photos, statements or full Investigation Report

prepared by Malloy.

113.    Doe was completely devastated by the outcome of the "Investigation." He was

shaking, crying and clearly struggling to understand what had happened. In an effort to help him,

Doe's mother called Bordak. Doe's mother had never spoken with Bordak before and was

surprised by his intense reaction to her questions. Almost immediately, he raised his voice to

Doe's mother, telling her that *"this was really really aggressive kissing!"* Doe's mother was

stunned and understood her son's confusion. The kissing – the "Investigator" had found – was

consensual.

114.    Realizing that Bordak was obviously biased and unable – or unwilling – to give

her any information or guidance on how to best proceed, Doe's mother reached out to another

faculty member at SJU.

115.    That faculty member told Doe's mother and, later, Doe, that the SMP discipline
process was essentially a railroad, that SJU was so afraid of being sued that it accepted any
woman's allegations as valid.  The faculty member said that it was widely believed among the
faculty that any man accused of sexual misconduct on SJU's campus is found guilty.

116.    In fact, the faculty member said that the climate on campus was so anti-male (at
least with regard to claims of sexual misconduct) that the penalties SJU had imposed against Doe
were basically a slap on the wrist compared to how harshly they typically treat male
"Respondents."

117.    The faculty member also told Doe's mother that other faculty members had
discussed with him the fact that the "Investigators" SJU used in investigating SMP claims were
"wolves in sheep's clothing."

118.    Doe was devastated about the outcome of the "Investigation," and humiliated. He
did share his circumstances with one other student, though, a young woman who works with
people in the CSO. She was outraged. She said that no one would consider the charges against
Doe to be sexual assault. But, she said, she was not surprised that Bordak had taken this
ridiculous position or that he had been aggressive with Doe's mother. Bordak, she said, is a
"zealot."

119.    On April 16, 2018, two days before Doe was to file his appeal, Bordak advised
Doe that "there was a change in the website link for the Sexual Misconduct Policy," and
provided him with the new link and a copy of the correct SMP. See Exhibit F.  This is a different
website link then the link for the SMP Policy noted on the checklist Doe was given in March.

120.    On April 18, 2018, Doe filed a timely appeal from the April 11th decision finding
him responsible for "Sexual Assault" on the following grounds:

(a)    That the conduct he was accused of, even if true, did not fall within the definition
of "Sexual Assault" in the SMP;

(b)    That Malloy's reasoning made no sense in that, according to Malloy's reasoning,
a man who accidentally squeezed someone's hand a little too hard while kissing
them, or hugged them a little too tight without realizing it, or even massaged their
shoulders, is guilty of "Sexual Assault;"

(c)    That he was never advised of the charges against him until after he had been
found "Responsible" for "Sexual Assault;"

(d)    That he was never given any information about Malloy to determine whether she
was an unbiased "Investigator," or whether she was appropriately trained or had
any conflicts of interest;

(e)    That he had no intent whatsoever to hurt Roe, and that Malloy found that to be
true, yet he had been found guilty of "Sexual Assault;"

(f)    That the entire process is biased against the accused and in favor of the accuser;

(g)    That he was not permitted to see the evidence against him until after he was
convicted;

(h)    That he was not given a chance to gather or present evidence in his own defense;

(i)    That Malloy had apparently incorrectly taken Doe's comments that he "didn't
want to call Roe a liar" as some sort of admission, which it was not;

(j)    That he was not permitted to have an attorney or advisor who was able to help
him in any meaningful way;

(k)     That, as a student with ADHD, he was never given any help in reviewing, digesting or understanding the claims, evidence and findings against him;

(l)     That he had never had any sort of hearing;

(m)     That there was another disciplinary track which entitled a Respondent to a hearing and that the claims against him should have proceeded, if at all, under that track;

(n)     That he was essentially presumed guilty;

(o)     That there was not a sufficient investigation and that there is additional evidence which should be examined;

(p)     That Doe's story of an abusive ex-boyfriend who "did the exact same thing" as what she's accused Doe of doing, her "flashback" and her behavior on the night of February 23, 2018 undermine her credibility;

(q)     That Roe's psychological state should have been examined; and

(r)     That, without Roe telling him, Doe could have no idea that Roe was uncomfortable in any way and could not possibly have known that she was having a "flashback" to a previous boyfriend.

A true and correct copy of Doe's Appeal is attached hereto as Exhibit M.

121.     The CSO advised Doe that, as she was permitted to do under SJU's Sexual Misconduct Policy, Roe had filed a response to his appeal and that he would be permitted to view her response by appointment in the CSO.

122.     On April 24, 2018, Doe informed the CSO that, as they had agreed the time was mutually acceptable, Doe and his attorney/Advisor would come to the CSO the following day, April 26, 2018, to review Roe's response to Doe's appeal and any attendant documents. A true

and correct copy of the email exchange between the CSO and Doe is attached hereto as Exhibit N.

123.    By copy of that email, Doe invoked his right to all accommodations to which he is entitled in reviewing the appeal documents, and asked Dr. Mecke of the Office of Student Disability Services to let him know what accommodations would be afforded to him. See Exhibit N.

124.    On Wednesday, April 25, 2018, Kiersten White of the CSO advised Doe that she was postponing the meeting to review the appeal documents until Doe "had an opportunity to speak with Dr. Mecke." See Exhibit N.

125.    Unbeknownst to Doe, the CSO did nothing to postpone the appeal board's decision until after Doe had had an opportunity to secure his accommodations.

126.    On Monday, April 30, 2018, in the middle of preparation for final exams and papers at SJU and before Doe had had an opportunity to review Roe's appeal, Doe received an email from the Office of Student Life at SJU informing him that "[b]ased on a review of all available information pertaining directly to the appeal, the appeals panel affirms the outcome reached by the Investigator, which means all sanctions imposed as a result of the outcome also remain in place. The matter is concluded. No other appeal is permitted. Please see your original outcome letter for more information." A true and correct copy of the April 30, 2018 letter from the Office of Student Life at SJU to Doe denying his appeal is attached hereto as Exhibit N.

127.    Upon information and belief, the CSO postponed Doe's review of the documents to be presented to the appeal board until after the board had rendered its decision because, unlike Doe, Bordak, Forte and Malloy knew there were impermissible statements from each of them contained in the appeal, statements not authorized by the SMP.

128.    Nonetheless, Doe continued his efforts to see Roe's response to his appeal. On Tuesday, May 1, 2018 Doe contacted the CSO advising them that he would be in to review the appeal documents and that he would be accompanied by an attorney.

129.    Doe also advised the CSO that, pursuant to his conversations with Dr. Christine Mecke, Director of Student Disability Services at SJU, Doe was entitled to have extended time for this document review as well as a note taker. A true and correct copy of Doe's May 1, 2018 email to the CSO is attached hereto as Exhibit P.

130.    That same day, several hours after Doe contacted the CSO, Bordak emailed Doe advising that he had spoken with Dr. Mecke and learned "that you are not granted a note taker accommodation for the review of documents." A true and correct copy of that May 1, 2018 email from Bordak to Doe is attached hereto as Exhibit P.

131.    On Wednesday, May 2, 2018, Doe and his attorney (acting as an Advisor pursuant to SJU's SMP) arrived at the CSO to inspect Roe's response to Doe's appeal.

132.    Pursuant to SJU's SMP, Doe's Advisor was not permitted any access to the records or evidence generated during the course of the Investigation or appeal, once again effectively denying Doe any meaningful assistance from his Advisor. See Exhibit E.

133.    SJU's SMP provides that only the Complainant and/or Respondent may appeal the Investigator's Outcome, that their responses must be in writing and that no additional responses are accepted as appeal documentation. See Exhibit E, SMP V(b)(8).

134.    Given that, Doe expected the appeal file to contain the documents and evidence collected and generated in the course of the investigation: Malloy's full report, Burdak's April 11, 2018 Outcome Letter, Doe's Appeal and Roe's Response.

135.    However, Doe was once again shocked to find that, in addition to the response Roe had filed – which was expressly permitted by SJU's SMP – three additional responses had been filed urging the Office of Student Life to dismiss the appeal. Specifically, Forte had filed a response to Doe's Appeal, Bordak had filed a response to Doe's Appeal and Malloy had filed a response to Does' Appeal.

136.    SJU's SMP has no provision which would allow any SJU employee to submit testimony, explanations, arguments, evidence or any other documents to the Office of Student Life to be considered as part of an appeal, let alone authorize them to make those submissions spontaneously and without notice to the actual parties to the appeal. See Exhibit E.

137.    Neither Doe nor either of his Advisors (one of whom is a SJU employee) were permitted to submit testimony, explanations, arguments evidence or any other documents to advance or support Doe's position on Appeal.

138.    In permitting certain SJU employees to submit evidence and arguments to the appeal board of the Office of Student Life in support of Roe and against Doe, SJU violated the provisions of its own SMP.

139.    Nonetheless, it was obvious from the appeal documents that Forte, Bordak and Malloy had all been given a copy of Doe's appeal to review and respond to.

140.    In her response to Doe's Appeal, Forte claims that, at the time of the March 6, 2108 Pre-Investigation Checklist meeting, Forte was unaware that Doe had a disability for which he was entitled to accommodations.

141.    Forte's full statement, including any additional representations or arguments she made to the appeal board, is not attached hereto because, pursuant to SJU's SMP, Doe is not permitted to have a copy of Forte's full report.  See Exhibit E.

142.    In fact, Doe was registered with SJU's Student Disabilities Office, so the university was well aware both that he had ADHD and that he was guaranteed accommodations for those disabilities.  Further, Doe had expressly advised Forte that he was a student who received extended time in an email before the March 06, 2018 Checklist meeting. See Exhibit B.

143.    Bordak also improperly weighed in on the appeal by submitting a statement to the appeal board. In his statement, Bordak argues that:

(a)    Perry, as the Title IX officer at SJU, and Malloy determined this claim meets the definition of "Sexual Assault" under the SMP, so the appeal board should accept their conclusions;

(b)    It is totally appropriate that SJU's SMP does not provide Doe with a hearing because an Investigator (in this case, Malloy) determines the Respondent's responsibility and a Sanctioning Officer (in this case, Bordak) determines the appropriate sanctions;

(c)    Doe's claim that the entire process is unfair and biased should be disregarded because Bordak claims that the process administered was equitable, fundamentally fair, and included equal protections for both Doe and Roe.

144.    Bordak's full statement, including any additional representations or arguments he made to the appeal board, is not attached hereto because, pursuant to SJU's SMP, Doe is not permitted to have a copy of Bordak's full statement.  See Exhibit E.

145.    In addition to the statements of Forte and Bordak, Malloy filed a statement urging the appeal board to dismiss Doe's appeal.  Apparently, Malloy was troubled by Doe's claims that she had based her decision on evidence that had never been disclosed to Doe – the alleged

bruises on Roe's neck – despite the fact that Malloy expressly admits to that being the basis for her decision in her Rationale and Outcome attached to Doe's Outcome Letter. See Exhibit L.

146.    To remedy that, Malloy now provided alternate grounds to justify her conclusion about Doe's responsibility. Specifically, Malloy argued that:

(a)    The fact that Roe had a bruise on her neck was not the deciding factor in finding Doe responsible for sexually assaulting Roe;

(b)    She informed Doe that Roe's allegation was that Doe squeezed her neck during consensual kissing and that was sufficient information for Doe to defend himself;

(c)    She did not show Doe the photos because telling him Roe's allegation was sufficient for him to understand the charges against him and to defend himself;

(d)    Doe's appeal should be dismissed because he "disagrees with my conclusions," which is not grounds for appeal under SJU's SMP;

(e)    It is irrelevant that Doe had no intent to hurt Roe;

(f)    SJU's SMP does not require intent to hurt the complainant in order to violate the policy; and

(g)    Malloy was unaware that Doe had any disabilities and was entitled to accommodations.

147.    The fact that Malloy - an attorney who served as the sole investigator, judge and jury in Doe's case - submitted a supplemental statement to the appeal board, in addition to the Investigation Report she had already prepared finding Doe responsible for sexual assault, is especially troubling for two reasons.

148.    First, Malloy is an attorney, practicing and experienced in representing schools and employers rather than students and employees, offering her legal opinion about whether

SJU's SMP requires intent, whether photos of the alleged injuries sustained by Doe were evidence necessary to Doe's preparation of a defense, and whether Doe's arguments are appropriate grounds for appeal pursuant to the policy.

149.    None of the members of the appeal board appear to be attorneys, giving Malloy's opinions significant disproportionate weight. See Exhibit N.

150.    Further, Doe was never given the opportunity to have an attorney express a legal opinion at any point during this process, including to the appeal board.  In fact, Doe and, ultimately, his parents, were repeatedly told that Doe must handle this *himself*, that he must prepare the appeal *himself*, without the assistance of an attorney or anyone else.

151.    SJU's SMP expressly prohibits an Advisor – even an Advisor who is an attorney – from speaking on behalf of the accused, reviewing documents that might explain or exonerate the accused, and presenting any sort of statement, evidence, argument or legal explanation in favor of or on behalf of the accused at any point in the process, from accusation through appeal. See Exhibit E.

152.    Yet Malloy was permitted to offer a legal opinion in support of Roe and against Doe, in a document not authorized by SJU's SMP, while Doe was denied any access to legal representation.

153.    The fact that Malloy submitted a statement to the appeal board is troubling for a second reason. In her Rational and Outcome, Malloy clearly states that "because [Roe's] complaint is that [Doe] squeezed her neck, to the point where it left bruises, I find that this is a singular, separate act which required her consent." See Exhibit L.

154.    On appeal, Doe argued that, because Malloy based her conclusion on the fact that Roe had "bruises," Doe should have been shown pictures, *or at least been made aware of the*

*fact that Roe was claiming he caused her bruises.* Doe should have been shown where the
alleged bruises were, how bad they were, whether they indicated strangulation (they did not) or
an accidental bump.

155.    Confronted with this basic fairness argument, Malloy completely changed the
basis of her finding of responsibility on the part of Doe.  In her response to the appeal board,
Malloy now argued that the fact that Roe had a bruise was *not* a deciding factor in finding Doe
responsible for "Sexual Assault."  Instead, she seems to rely on a suggestion that Doe somehow
admitted that he had sexually assaulted Roe because he had not denied it vehemently enough.

156.    Unaware that there was any bruising, any claim of injury whatsoever, and
honestly believing this entire situation to be some sort of mistake or misunderstanding, Doe said
he didn't want to call Roe a liar, but he didn't remember anything like that happening.

157.    That is not, by any contorted logic or stretch of the imagination, an admission of
sexual assault.  Again, Malloy's full statement, including any additional representations or
arguments she made to the appeal board, is not attached hereto because, pursuant to SJU's SMP,
Doe is not permitted to have a copy of Malloy's full report or any documentation she filed with
the appeal board.  See Exhibit E.

158.    It is uncontroverted, though, that Doe was never told that anyone other than Doe
and Roe were permitted to weigh in on the appeal under SJU's SMP.  Doe never even knew that
two SJU employees and the attorney who served as the "Investigator" in his case had submitted
supplemental statements to the appeal board until *after* the appeal board had rendered its
decision.

159.    Had Doe not exercised his right to go to the OCS and review the appeal
documentation, even *after* the decision had been handed down, he would still have no idea that

two SJU employees and the "Investigator" they retained had interjected their thoughts and opinions on Roe's behalf.

160.   On April 30, 2018, when the appeal board affirmed the outcome reached by the Investigator, Doe was told that the sanctions previously imposed by the Sanctioning Officer, Bordak, in the April 11, 2018 Outcome Letter were still in place. See Exhibit O.

161.   That Outcome Letter imposed four sanctions as well as a contact restriction:

(a)   Doe is on Disciplinary probation for a year, during which time Doe's behavior will be scrutinized, and "[a]ny further violation during this period may result in more severe disciplinary action, including, but not limited to, removal from the University." See Exhibit L.

(b)   Doe must watch three Online Educational Courses, including one entitled "Think About it: Rape Myths and Realities." See Exhibit L.

(c)   Doe must reflect on the Think About It courses and write a Research/Reflection Paper outlining "an action plan to avoid another violation in the future." Although this sanction purports to be an honest "reflection" paper, Doe is not permitted "to express any disagreement with the outcome in this matter." See Exhibit L.

(d)   Doe must have a follow up conversation, once his paper is submitted, with Bordak. See Exhibit L.

(e)   For the remainder of his time at SJU, Doe must avoid all contact with Roe; "failure to abide by this restriction may result in disciplinary action." See Exhibit L.

162.   The severity of these sanctions imposed on Doe – videos, a reflection paper, and avoidance - is completely incongruent with the determination that he has committed "Sexual

Assault," the worst offense identified in SJU's SMP and one which ordinarily carries with it a sanction of expulsion.

163.    The nature of these sanctions suggests that even SJU does not believe that Doe's conduct actually falls within the definition of "Sexual Assault" set forth in the SMP, as does SJU's efforts on appeal to shore up its findings against Doe.

164.    When one considers the pressure SJU is under to increase its sexual assault convictions, as a result of the sizeable federal grant it had been awarded to do just that, and the concurrent inapposite pressure it faces to solicit and retain tuition-paying students, SJU's disproportionately mild response to a charge of "Sexual Assault" makes sense.

165.    Being mild, however, does not mean that the sanctions are reasonable. The sanctions SJU has imposed on Doe set him up for further disciplinary action and effectively deny him many of the benefits of an SJU education to which he is entitled by virtue of his contract with and enrollment in SJU and label him in his school record as a perpetrator of "sexual assault."

166.    First, Doe is prohibited from having any contact with Roe. Obviously, Doe is anxious to comply with this restriction. However, SJU's campus is spread over only 113 acres; it has only one dining hall, one chapel, one sports arena, one theater, one gallery, one Honors study hall, one Starbucks, one student lounge and one recreation center.

167.    Access to all of these buildings and the amenities associated with them is included in the tuition Doe pays to the University.  As a result of this no-contact sanction, Doe is unable to take advantage of any of these amenities, including going to the dining hall - for which he has a meal plan - without fear of inadvertently incurring additional sanctions from Bordak.

168.    Further, the Contact and Area Restrictions imposed on Doe "will remain in place until one of the parties involved is no longer enrolled as a student at SJU. At that time, the University is unable to enforce such restrictions." See Exhibit L.  This means that, for the remainder of his tenure at SJU, through graduation, Doe will not be able to make full use of the buildings, facilities and amenities to which his tuition entitles him.

169.    The Contact and Area Restrictions make no mention of or provision for the very real possibility that Doe and Roe might matriculate in the same class, want to join the same organizations or attend the same on-campus events.  The scope and duration of the Contact and Area Restrictions is patently unreasonable and can only have the effect of chilling Doe's right to participate fully in the educational opportunities afforded him at SJU.

170.    Doe has also been sanctioned to watch videos about rape and write a paper addressing how he can avoid "another violation" of the Sexual Misconduct Policy in the future. See Exhibit L.

171.    In that paper, Bordak has advised Doe that he may not disagree with the finding made against him, putting him in the position of having to write a paper either openly or tacitly admitting that he has committed some sort of sexual assault, which he vehemently denies. See Exhibit L.  It is fundamentally unfair to impose a sanction on Doe which essentially asks Doe to confess to sexual assault, or risk further sanction.

172.    SJU's decision to place Doe on Disciplinary Probation for one year has already had the effect of denying Doe access to the very education for which he has paid and worked so hard.

173.    Specifically, the Disciplinary Probation states that "[t]his disciplinary probation period *may* be considered in determining your eligibility to study abroad, participate in student

clubs/organizations, and assume other campus leadership roles." See Exhibit L (emphasis added).

174.    By using the word "may," SJU acknowledges that it has discretion in considering Disciplinary Probation as a factor in determining eligibility to study abroad.

175.    In early fall of 2017, at the encouragement of Dr. Ann Green, Doe had applied for and was accepted into a selective English course entitled *Identities in Conflict, Northern Ireland: Violence, Reconciliation and Community.*

176.    This course examines violence and reconciliation, with considerations for race, class and gender in the context of Northern Ireland and in the context of contemporary U.S. culture. It places particular emphasis on how writing can act as a vehicle for social change.

177.    The culmination of the class is a ten-day study tour to Northern Ireland, after which students are expected to generate a paper analyzing and reflecting on their experiences in Northern Ireland and the people they met and interacted with there.

178.    This culminating paper is worth 30% of the students' grade in the class.

179.    Since January 2018, Doe has been enrolled in this class, doing all class work, homework, papers and study necessary to do well in the course.

180.    Doe has already paid for this course and all of the fees associated with the trip to Northern Ireland.

181.    He has spent the past five months learning, studying and planning for this trip with Dr. Green and the other students in the class.

182.    Doe and his class are scheduled to leave for Northern Ireland on May 21, 2018 and scheduled to return to on May 31, 2018. It is an exciting and utterly unique educational experience.

183.     On May 3, 2018, Tom Kesaris, Director, Center for International Programs,

informed Doe that "[t]he Office of Community Standards has informed us that you are no longer

in good disciplinary standing with SJU due to recent violation of the Sexual Misconduct Policy"

and "no longer have institutional approval to study abroad as part of the Northern Ireland Study

Tour in May of 2018." Doe was further advised that "you will be financially responsible for any

non-recoverable payments made by SJU on your behalf." A true and correct copy of Kesaris'

email to Doe is attached hereto as Exhibit R.  Kesaris copied Bordak on this email to Doe.

184.     This additional sanction, imposed after Doe sought an appeal from the CSO's

determination that he had committed sexual assault and immediately after Doe had evinced his

intent to clear his name by bringing an attorney to the review of appeal documents, is irreparably

harmful to Doe and, upon information and belief, constitutes an act of retaliation against Doe for

pursuing an appeal of the CSO's finding that that he had committed "Sexual Assault" and

asserting his right to receive accommodations in the pursuit of this matter.

185.     After counsel was retained, SJU informally offered alternatives for plaintiff to

complete his class work in lieu of traveling to Northern Ireland.  As noted above, the additional

sanction of removing Doe from his study tour was completely inconsistent with the other

sanctions which in no way restricted Doe from attending classes, campus events, or living in

campus housing, and given the timing appear to be strictly punitive and retaltiory. Importantly,

the alternative SJU has now offered to complete his course work cannot and does not in any way

remediate the educational experience plaintiff will lose by not completing his study tour to

Northern Ireland.  An experience plaintiff, a student in the honors program, had been working

toward all semester.

186.    SJU's refusal to allow Doe to complete his *Identities in Conflict* course will harm Doe in the following, irreparable ways:

(a)    Doe will miss out on an amazing, absolutely unique once-in-a-lifetime educational experience;

(b)    Doe will not be able to pass the course which he has worked so hard on this entire semester due to the fact that the trip to Ireland, and the resulting paper, constitutes 30% of his grade;

(c)    Doe's academic transcript (in addition to the "Sexual Assault" label on his SJU record) will reflect a failure, suggesting that he failed to complete the course through some fault of his own, casting further false and misleading aspersions against his character and work ethic;

(d)    Doe will be humiliated in front of Dr. Green, a professor who he greatly admires and who recommended him to be a writing tutor in SJU's writing lab;

(e)    Doe will be humiliated in front of his classmates;

(f)    There is no guarantee that this course will be offered in the future;

(g)    Even if the course is offered in the future, the Center for International Program's position is that students on Disciplinary Probation may neither participate in *nor apply for* study abroad during the pendency of that probation. This means that, the earliest Doe could apply for the course is fall of 2019, which is fall of his senior year. As the course generally travels to Ireland at the end of May, this means that, if accepted, Doe will not be able to complete the course before his expected graduation from SJU in mid-May, 2020.

187.    By far, the most egregious and libelous sanction imposed on Doe is not even
mentioned in the Outcome Letter; it is the defamatory misrepresentation on his record that Doe
has committed "Sexual Assault."

188.    At all times material to this matter, Roe knew that the claims she was making
against Doe were false, knew that he had never knowingly or intentionally hurt her, and knew
that he had not committed sexual assault against her.

189.    At all times material to this matter, Bordak, Forte and Malloy knew that the
claims Roe made against Doe did not constitute "Sexual Assault" as that term is defined in SJU's
SMP and as that term is commonly understood in the world.

190.    At all times material to this matter, Bordak, Forte and Malloy knowingly,
deliberately and intentionally denied Doe accommodations to which he was entitled, information
to which he was entitled and advice to which he was entitled to formulate an accurate and
appropriate defense to the charges against him.

191.    Doe never, at any time, assaulted or sexually assaulted Roe and vigorously denies
that allegation.  Allowing an untrue and specious charge of sexual assault to be placed on Doe's
record will permanently and irreparably damage his reputation, prospects and opportunities in
ways too numerous to foresee, including:

    (a)    Causing humiliation, embarrassment and anxiety;

    (b)    Denying him the opportunity to transfer to another university as few if any
        schools will accept a student with a record of sexual assault;

    (c)    Forcing him to remain a student at SJU, because no other university would accept
        him;

(d)     While enrolled at SJU, denying him the benefits of the enrollment contract he has with SJU by denying him access to programs, leadership positions, membership in clubs and activities;

(e)     making him fearful to use buildings and facilities in which Roe might be present;

(f)     making him fearful to take classes in which Roe might be a student;

(g)     making him fearful to participate in campus or SJU events which Roe might attend;

(h)     denying him opportunities ordinarily afforded to SJU students, such as the opportunity to study abroad;

(i)     limiting his post-graduate opportunities for seven years after graduation, since few if any graduate schools will admit a student with a sexual assault on their record;

(j)     limiting or eliminating his opportunity to attend law school since few if any law schools will admit a student with a sexual assault on their record;

(k)     limiting his job prospects, since any employers who become aware that he has "sexual assault" on his record will be unlikely to offer him employment; and

(l)     limiting or eliminating his access to any job, service opportunity or educational opportunity that requires any sort of clearance.

192.     As a result of the untrue and specious charges brought against him, Doe has suffered, and continues to suffer:

(a) extreme anxiety and depression;

(b) intense feelings of hopeless and sadness;

(c) his ADHD symptoms have been exacerbated causing him great difficulty concentrating, focusing and organizing his thoughts;

(d) his grades and class work have suffered;

(e) his position in the Honors Program is threatened;

(f) he has been unable to sleep and unable to talk to friends about what is happening because it is too humiliating, causing distance between him and friends;

(g) He is humiliated, exhausted and horrified to have been wrongly accused and convicted.

**COUNT I**

**PLAINTIFF V. SJU**
**<u>BREACH OF CONTRACT</u>**

193.    Plaintiff incorporates each and every one of the other paragraphs of this Complaint as if fully set forth herein.

194.    At all times relevant hereto, a contractual relationship existed between SJU and Doe through SJU's policies and procedures governing the student disciplinary system, including but not limited to the provisions of SJU's Student Handbook and its SMP. See Exhibits C and D.

195.    SJU's policies and procedures are not a product of negotiation, but are ones of adhesion, unilaterally drafted and imposed upon its student body by SJU and provided to SJU students after acceptance by SJU.

196.    Through the documents it publishes and provides to students, SJU makes express contractual commitments to students involved in a disciplinary process.

197.    Further, SJU's Handbook also states that the university is "committed to a policy of equal opportunity in every aspect of its operations." See Exhibit D, SJU Student Handbook, pg. 46.

198.    SJU promises that its students will not be discriminated against "on the basis of sex/gender . . . [or] any other status protected by law in the administration of its admission, educational, financial aid, employment, athletic, or recreational policies or programs." See Exhibit D, SJU Student Handbook, pg. 46.

199.    In the SMP portion of SJU's contract with Doe, SJU explicitly promises students a "prompt, fair and impartial disciplinary process (from the initial report to the final result) conducted by officials who are annually trained on the issues related to sexual assault . . . as well as how to conduct a process that protects the safety of victims and promotes accountability." See Exhibit E, SMP IV(a).

200.    SJU, through its employees, agents and investigators, was required to act in accordance with its policies and procedures in directing Roe's allegations against Doe to the appropriate procedures; in conducting its investigation; in applying the provisions and definitions of the SMP accurately; in making the decision whether to file charges against Doe; in adjudicating the charges; and in deciding on sanctions.

201.    For all the reasons set forth in this complaint, SJU has materially breached its contracts with Doe by failing to abide by its own definitions, by failing to abide by its own policies and procedures, by failing to give adequate notice, by failing to perform a fair, thorough, and unbiased investigation, and by failing to design and provide a disciplinary a process that is fundamentally fair.

**A.**   **SJU breached its contractual obligations to Plaintiff in that the conduct he is alleged to have committed does not fall within the definition of "sexual assault."**

202.   In this case, Doe is accused of squeezing Roe's neck while they were consensually kissing her and "scaring" her.

203.   SJU's SMP defines "Sexual Assault" as "having intercourse or sexual physical contact with another individual by the use or threat of force or coercion, without consent or where the individual is incapacitated." See Exhibit E, SMP D(1)(a).  No one is claiming Doe did anything that would fall within this definition of "Sexual Assault."

204.   As a subset of this definition, the SMP states that:

> For purposes of this Policy, Sexual Assault also includes: Non-consensual sexual contact. Non-consensual sexual contact means any sexual touching, with any object, by a person upon another person without consent, or forcing any person to touch you or the individual in a sexual manner. It is defined as engaging in any sexual contact other than intercourse with another person without that person's consent and/or cognizance. It includes any non-consensual sexual contact, including any improper touching of intimate body parts. It also includes the non-consensual removal of another's clothing, indecent contact (i.e. the unwanted touching of intimate body parts including, but not limited to, genitals, buttocks, groin, or breasts) or causing another to have indecent contact with those intimate body parts.

See Exhibit E, SMP III(d)(1)(a)(ii).

205.   The plain language of this section makes its scope clear: it is intended to prohibit "non-consensual touching" of "intimate body parts."  Neither of those things happened here.

206.   As previously detailed, Malloy admitted in her findings that "a person's neck/throat area is not an 'intimate body part." See Exhibit L.  That determination alone should place Doe's actions outside SJU's definition of "Sexual Assault."

207.   Malloy, without justification, expands the definition of "Sexual Assault" to include non-intimate body parts touched while kissing – which is obviously not addressed in the SMP definition of "Sexual Assault." She finds such touching to be "sexual contact." See Exhibit

L.  But the SMP by its express language only prohibits "*Non-consensual sexual contact*."
Malloy specifically finds that the "sexual contact" alleged here *was* consensual because
"[c]onsent to kissing also understandably includes some contact by [Doe's] hands on the neck
and throat area." See Exhibit L.

208.    Inexplicably, Malloy expands the definition of "Sexual Assault" again. She finds
that "because [Roe's] complaint is that [Doe] squeezed her neck, to the point where it left
bruises, I find that this is a singular, separate act which required her consent." See Exhibit L.

209.    By Malloy's twisted interpretation, SJU's definition of "Sexual Assault" now
includes non-intimate body parts, consensually touched, but touched to a certain degree of
firmness.  That interpretation is completely unsubstantiated by the plain language, context and
intent of the SMP.

210.    SJU violated its contract with Doe by misinterpreting and expanding the
definition of "Sexual Assault" found in the SMP.

**B.      SJU breached its contractual obligations to Plaintiff by shunting Roe's claim into
the Sexual Misconduct disciplinary process rather than addressing it through the
Community Standards disciplinary process**

211.    Doe did absolutely nothing to knowingly hurt or frighten Roe.  However, to the
extent Roe has alleged he *did* hurt or frighten her, that allegation should have been processed
through the SJU CS disciplinary process, which affords respondents substantially more
protections than does SJU's SMP.

212.    The SJU Student Handbook, II. University Policies, Regulations and Guidelines,
page 6, identifies several types of conduct which, if proven, would violate the Community
Standards of the University. Two types of prohibited conduct are relevant in this case:

"1. Physically abusing or threatening another person or engaging in any other conduct that threatens or endangers the health or safety of another person.

2. Violating the Sexual Misconduct Policy: Policy Regarding Sexual Assault, Sexual Harassment, Sexual Exploitation, Domestic Violence, Dating Violence or Stalking (*See Sexual Misconduct Policy, which includes the disciplinary process for alleged violations of this policy.*)" See Exhibit D, SJU Student Handbook, pgs. 6-7.

213.    In general, conduct prohibited by the SJU Student Handbook is addressed and, if necessary, disciplined through SJU's Community Standards Process.  See Exhibit D, SJU Student Handbook, pgs. 9-20.

214.    Conduct which falls within the purview of the SMP (or several other policies, not implicated here), however, are handled through a separate disciplinary process which offers significantly fewer safeguards to the accused. See Exhibits C and D.  The wrongful conduct alleged against Doe – that he squeezed Roe's neck – is not sexual in nature and was not in and of itself alleged to have been sexual in any way.

215.    Because it was alleged to have happened while the two were kissing (consensually), SJU decided to inappropriately shunt Roe's complaint into the SMP process rather than to address the claim under its CS Process.

216.    A complaint filed through the CS process follows the following procedures:

(a)     an incident report is generated;

(b)     the report/complaint is assigned to an administrator within the Division of Student Life, who has numerous options available for case resolution, one of which includes an Alternative Resolution Meeting. The remaining options for case resolution all guarantee the respondent a hearing;

(c)     for more serious matters, a pre-hearing meeting is scheduled;

(d)     evidence and witnesses will be considered at the hearing;

(e)     if, as a result of the hearing, a determination is made that the respondent is

"responsible," the range of possible sanctions, from warning to expulsion, are

clearly laid out;

(f)     the respondent is notified in writing of the outcome of the hearing and the

University does not disclose the results of that hearing other than the respondent

except in specific situations;

(g)     The respondent has the right to appeal the outcome and;

(h)     The Office of Community Standards may reopen a closed report for further

review when new information becomes available, which may result in a new

outcome.

See Exhibit D, Student Handbook, pgs. 9-19.

217.    The CS process also emphasizes that it is designed to encourage "open discussion among participants that promotes the understanding of the facts, the individuals involved, the circumstances under which the incident occurred, and the nature of the conduct."

See Exhibit D, Student Handbook, pg. 10.

218.    In matters involving sexual harassment, the CS process explicitly ensures that "the respondent and complainant are entitled to equal process."

See Exhibit D, Student Handbook, pg. 13.

219.    By way of contrast, SJU's SMP, which carries likely the most damaging and long-lasting consequences a university can mete out to a student – expulsion and a mark of "sexual assault" on the student's record – offers no meaningful protection to the Respondent.

220.    If a claimant presents a Title IX coordinator with any claim – sexual or not – SJU promises to:

(a)    provide a claimant with a written explanation of their rights and options (SMP III.E.);

(b)    Provide interim remedial measures, keeping "personally identifiable information about the victim as confidential" (SMP III.F.2.);

(c)    Conduct an initial review to determine whether any sort of discipline is warranted and, if so, which disciplinary process should be invoked. In making this decision, the Title IX officer should consider "the Complainant's expressed preference for resolution" (SMP V.A.).

See Exhibit E.

221.    Once a claim has been shunted away from the CS process into the SMP process, any protections afforded to the Respondent are stripped away. Rather than guaranteeing the respondent a written incident report (which would notify the respondent of the charges against him) and a hearing (which would afford him the opportunity to call, confront and question witnesses and produce, review and challenge evidence), the SMP implements the following procedures:

(a)    SJU "may" schedule a pre-investigation meeting to explain the Disciplinary Process (SMP V.B.1.);

(b)    SJU "may designate a qualified Investigator(s) of its choosing to conduct the investigation" (SMP V.B.1.);

(c)    The Investigator conducts an investigation of the allegations against the Respondent (SMP V.B.1.);

(d)    The investigation includes interviews with the parties and witnesses and review of any documents or other evidence the Investigator deems relevant (SMP V.B.1.);

(e)    The respondent has the right to be assisted by an Advisor during the Disciplinary Process, and the Advisor may advise the respondent, but the Advisor "may not speak for that individual or otherwise direct questions to or address others present in any Disciplinary Process meeting" (e.g., the opposing party, witnesses, and/or the person conducting the meeting) (SMP V.B.2.);

(f)    An Advisor may take notes, but is not permitted to inspect, read, copy, photograph, or transcribe any documents or data at any stage of the Disciplinary Process (SMP V(b)(2);

(g)    Upon completion of the investigation, the Investigator shall report the outcome to SJU, finding, based on a preponderance of the information, that it is more likely that the alleged policy violation occurred (a finding of "Responsible"), did not occur (a finding of "Not Responsible") or a finding of "Undetermined" SMP V(b)(5);

(h)    An appeal of the outcome is available on two grounds only: procedural error or previously unknown evidence (SMP V(b)(8);

(i)    The Respondent has one appeal only. (SMP V(b)(8)(a).

222.    By inappropriately and incorrectly forcing Roe's allegations into the SMP disciplinary process rather than the CS disciplinary process, SJU denied Doe the much more substantial protections afforded there, including:

(a)    The opportunity to have an "open discussion" among the participants to have an "understanding of the facts;"

    (b)    The opportunity to have an incident report prepared;

    (c)    The opportunity to know the exact nature of the charges against him;

    (d)    The opportunity to have a pre-hearing meeting;

    (e)    The opportunity to prepare a defense;

    (f)    The opportunity to have a hearing or Alternative Resolution Meeting;

    (g)    The opportunity to identify and present witnesses at that hearing;

    (h)    The opportunity to identify and present evidence at that hearing;

    (i)    The opportunity to examine and question Roe's witnesses at that hearing;

    (j)    The opportunity to examine and question Roe's evidence at that hearing; and

    (k)    The opportunity to confront and question Roe herself at that hearing.

See Exhibit D, Student Handbook, pgs. 9-19.

    223.    By inappropriately and incorrectly forcing Roe's allegations into the SMP

disciplinary process rather than the CS disciplinary process, SJU violated its contract with Doe.

**C.    SJU breached its contractual obligations to Doe by failing to follow its own appeals procedure**

    224.    The SMP details very specifically its own appeal process, specifying that:

    (a)    the Complainant and/or Respondent – and only the Complainant and/or Respondent - may appeal the Outcome of the case;

    (b)    the appeal must be filed within five business days of receiving notice of the Outcome;

    (c)    the appeal must be in writing and is limited to the following grounds: material procedural error, bias in the process (which may not include disagreement with the outcome), failure to disclose a conflict of interest, and the existence of previously unknown evidence;

(d)     the non-appellant – and only the non-appellant – is provided an opportunity to inspect and respond to the appeal and prepare a written response;

(e)     the appellant may inspect, but not respond to, the non-appellant's response;

(f)     "No additional responses are accepted as appeal documentation at that point from either party;"

(g)     A panel of three trained Appeal Board members, facilitated by a Moderator, considers the appeal;

(h)     The panel may meet (or not), determine if additional fact-finding is warranted (or not), then the panel has two options: it may either (1) affirm the Outcome reached by the Investigator or (2) remand the case to the Investigator or a new Investigator for further investigation;

(i)     If the panel chooses to remand the case to an Investigator, the Investigator has two options: she may either (a) affirm the initial Outcome or (b) modify the initial Outcome;

(j)     Once the Investigator has reached a decision on remand, she must share her decision with the Sanctioning Officer, who must impose sanctions;

(k)     The Complainant and Respondent both receive written notice of the appeal outcome;

(l)     No further appeal is permitted.

See Exhibit E, SMP V(b)(8).

225.    Throughout this detailed, carefully laid-out appeal procedure, SMP makes no provision for anyone *other* than the Claimant and/or Respondent to initiate an appeal or submit written documents, opinions, statements or legal arguments to the appeal panel.

226.     There is no provision allowing an SJU employee or agent to spontaneously, or by invitation of the panel, offer, explain, justify, sure up, bolster or change their position on the appeal.

227.     Yet, in this case, three select individuals – Bordak, Forte and Malloy - were permitted to submit written statements, opinions and legal arguments to the appeal panel:

    (a)     All three argued in favor of affirmation;

    (b)     All three argued in favor of Roe and against Doe; and

    (c)     All three added facts and arguments that they felt supported affirmation.

228.     Doe was never made aware that Bordak, Forte and Malloy intended to file statements, opinions or arguments to the panel and was never shown those documents until after the panel had rendered its decision.

229.     Doe was never offered the option of having anyone file statements, opinions or arguments with the panel, either on his own behalf, or in favor of remand.  Neither Doe's Advisor, Corabi, an SJU employee, nor anyone else was ever offered the option to submit anything to the panel on Doe's behalf or in favor of remand.

230.     SJU violated its own appeals procedure, carefully set forth in the SMP and, in doing so, breached its contract with Doe.

**D.      SJU breached its contractual obligations to Doe by failing to provide him, a student with a documented learning disability, access to appropriate accommodations**

231.     SJUs Student Handbook states that SJU complies with all requirements of the Americans with Disabilities Act of 190 (ADA) to provide equal educational opportunities to all students. See Exhibit D, SJU Student Handbook, pg. 47.  SJU's Handbook also states that the university is "committed to a policy of equal opportunity in every aspect of its operations." See Exhibit D, SJU Student Handbook, pg. 46.

232.    The Handbook further provides that "[r]easonable accommodations with respect to the Community Standards process shall be provided to students who are registered with the Office of Student Disability Services and who submit sufficient and appropriate documentation of their disability to the University." See Exhibit D, SJU Student Handbook, pg. 11. SJU also promised to afford Doe necessary accommodations throughout the SMP disciplinary process. See Exhibit E.

233.    As an SJU student registered with the Student Disabilities Office, Doe is entitled to extra time, note-takers and recorded lectures to accommodate his ADHD and slow processing speed. SJU was fully and formally aware throughout this "investigation" and disciplinary process that Doe was entitled to accommodations.

234.    SJU knowingly failed to provide Doe with the accommodations necessary for him to participate in this process or in his own defense, including:

(a)    failing to allow him copies of the statements and evidence against him so that he could have adequate time to process that material and information;

(b)    failing to afford him a "note taker;"

(c)    failing to allow him to record meetings and interviews so that he would have adequate time and appropriate recall;

(d)    failing to conduct those meetings with an awareness of Doe's learning disabilities and slow processing speed; and

(e)    failing to afford him the meaningful help of an Advisor throughout this process who could have helped him take notes and/or examine documents and to understand the nature of the claims and possible sanctions against him.

235.   Furthermore, SJU's agents and employees – namely, Bordak, Forte and Malloy –

failed to inform Doe that the accommodations to which he is entitled would be needed

throughout the course of this investigation, as they knew or should have known that Doe would

need those accommodations.

236.   In so doing, SJU breached its contractual obligations to Doe, meaningfully and

substantially impairing his ability to defend himself in the disciplinary action against him.

**E.   SJU breached its contractual obligations to Doe by failing to provide a fair and impartial disciplinary process for Doe**

237.   In the SMP portion of SJU's contract with Doe, SJU explicitly promises students

a "prompt, fair and impartial disciplinary process (from the initial report to the final result)

conducted by officials who are annually trained on the issues related to sexual assault . . . as well

as how to conduct a process that protects the safety of victims and promotes accountability." See

Exhibit E, SMP IV.A.

238.   Furthermore, inherent in SJU's contractual relationship with Doe is a duty of good

faith, fair dealing and fundamental fairness.

239.   In the words of a federal court that recently denied a university's motion to dismiss

certain claims filed by a student (a different John Doe) whom the university branded a sexual

predator: "Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process,

not an assumption to be made at the beginning. Each case must be decided on its own merits,

according to its own facts. If *a college student is to be marked for life as a sexual predator, it is

reasonable to require that he be provided a fair opportunity to defend himself and an impartial

arbiter to make that decision." Doe v. Brandeis Univ.,* No. 15-11557, 2016 U.S. Dist. LEXIS

43499, *15 (D. Mass. Mar. 31, 2016) (emphasis added).

240.    As detailed in this Complaint, SJU failed to provide a fair and impartial disciplinary process for Doe in that it:

(a)    Failed to notify him of the need for and failed to implement accommodations to which he was entitled as a learning-disabled student registered with the Office of Student Disability Services at SJU;

(b)    Adopted and implemented a SMP disciplinary process entirely biased toward the University and the Claimant, that fails to afford accused students sufficient information, advice and procedures to defend themselves;

(c)    Adopted and implemented a SMP disciplinary process under which Doe was not entitled to know the charges against him until after a decision against him had been rendered;

(d)    Adopted and implemented a SMP disciplinary process in which Doe was effectively denied any advice or counsel;

(e)    Adopted and implemented a SMP disciplinary process in which Doe's "Advisor" was not permitted to review any documentation, evidence or statements in order to assist Doe in his defense;

(f)    Adopted and implemented a SMP disciplinary process in which Doe was not entitled to receive an "incident report" stating the claims against him;

(g)    Adopted and implemented a SMP disciplinary process in which Doe was not entitled to know what, if any evidence there was against him before a decision against him had been rendered;

(h)     Adopted and implemented a SMP disciplinary process in which Doe was not

entitled to know what, if any, witnesses there were who might have information

relevant to the charges against him;

(i)     Adopted and implemented a SMP disciplinary process in which Doe was not

entitled to identify or produce potential witnesses or evidence in his own defense;

(j)     Adopted and implemented a SMP disciplinary process in which he was not

entitled to confront or question his accuser;

(k)     Adopted and implemented a SMP disciplinary process in which Doe was not

entitled to have copies of the evidence against him examined or questioned by

independent sources;

(l)     Failed to follow the definitions, specifically the definition of "Sexual Assault" in

its own Sexual Misconduct Policy;

(m)    Adopted and implemented a SMP disciplinary process in which Doe was not

entitled to know anything about his accuser, including her psychological state and

what, if any, substances she had taken and/or activities she had participated in that

might have a bearing on the outcome of this matter;

(n)     Adopted and implemented a SMP disciplinary process in which Doe is not

entitled to a hearing;

(o)     Failed to give Doe adequate time and information to determine whether the

Investigator and or appeal board members were biased or had any sort of conflict

of interest which would make them unsuitable to serve in this case;

(p)     Retained an "Investigator," Malloy, who was not a disinterested fact finder but
        was, instead, biased in favor of finding a Respondent "responsible" for sexual
        misconduct;

(q)     Retained an "Investigator" who did not inquire into necessary and relevant facts,
        including facts about Roe's psychological state and what, if any, substances she
        had taken and/or activities she had participated in that might have a bearing on the
        outcome of this matter;

(r)     Retained an "Investigator" who did not inquire into the identity of necessary and
        relevant witnesses.

241.    SJU also failed to provide a fair and impartial disciplinary process for Doe at the
appellate level in that it:

(a)     Failed to abide by the terms of its own appeals procedure, by permitting Bordak
        to file a written statement, opinion or legal argument to the appeal panel;

(b)     Failed to abide by the terms of its own appeals procedure, by permitting Forte to
        file a written statement, opinion or legal argument to the appeal panel;

(c)     Failed to abide by the terms of its own appeals procedure, by permitting Malloy to
        file a written statement, opinion or legal argument to the appeal panel;

(d)     Allowed Malloy to re-argue her Investigative Report to assert new basis for her
        decision other than those provided to Doe;

(e)     Failed to notify Doe of that "new basis" for Malloy's decision in time for him to
        prepare a response;

(f)     Made copies of a supposedly "confidential" appeal available to Bordak, Forte and
        Doe for their review and comment;

(g)     Adopted and implemented an appeals procedure in which Doe was not entitled to

have full access to the findings against him in order to prepare an appeal, either

before or during the course of that appeal;

(h)     Adopted and implemented an appeals procedure in which Doe was not entitled to

know about or respond to additional materials or documentation presented to the

appeal board of which he had not been previously aware;

(i).    Adopted and implemented an appeals process which permitted only two narrow

grounds for appeal, neither of which authorized Doe to argue that the charges

against him fell well outside the language of the SMP.

242.    SJU further failed to provide a fair and impartial disciplinary process for Doe by

adopting and implementing an appeals process which does not authorize the appeal board, under

any circumstances, to overturn the decision of the Investigator.

243.    SJU's SMP specifies that the appeal panel may either (1) affirm the Outcome

reached by the Investigator (in which case the case is over, and no further appeal is permitted) or

(2) remand the case either back to the same Investigator or to a new Investigator for further

investigation. See Exhibit E, SMP V(b)(8)(e).

244.    If the case is remanded to the Investigator, the Investigator "may" conduct

additional investigation and "may" either (a) affirm her original outcome or (b) modify her

original outcome. In either event, there is no additional appeal. See Exhibit E, SMP V(b)(8)(e).

245.    SJU's SMP only permits its appeal panel to affirm the Outcome or remand it to an

Investigator who may do whatever she wishes with it, after which there is no additional appeal.

246.    This effectively denies Doe, and similarly situated students, any right to appeal.

247.    SJU's SMP disciplinary process and its investigative model, both as conceived and as implemented, violated SJU's promise to provide a fair and impartial disciplinary process for Doe.

**F.      SJU breached its contractual obligations to Doe of good faith and fair dealing**

248.    In addition to the explicit, contractual obligations between SJU and Doe referred to throughout this Complaint, there is an implied duty of good faith and fair dealing in the contracts between them, which was violated repeatedly as a result of the acts and omissions described herein.

249.    The foregoing and subsequent facts establish that in addition to breaching its express contractual obligation to provide Doe a "fair and impartial disciplinary process (from the initial report to the final result)," SJU breached implied duty of good faith and fair dealing inherent in its contract with Doe.

250.    As a direct, proximate and foreseeable consequence of the University's numerous material breaches of contract, Doe has suffered monetary damages and other direct and consequential damages.

251.    Doe is entitled to recover damages for the University's breach of its contractual obligations and duties.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against Saint Joseph's University and requests this Court as follows:

a.      Order SJU to set aside the investigative team's finding that Doe violated SJU's Sexual Misconduct Policy and all sanctions as well as the notation on his records that he is responsible for "sexual assault";

b.      Order SJU not to use any information or materials generated by the investigative team, including the Reports and the interview summaries and notes, in any disciplinary process regarding John, and to destroy all such materials;

c.      Order SJU, its agents and employees, to immediately cease and desist from making any statements, representations, suggestions and/or intimations to any person, institution or business that Doe has committed, been charged with or found responsible for any sort of sexual misconduct, including, but not limited to, sexual assault;

d.      Award Doe compensatory and consequential damages in an amount to be determined at trial, without limitation;

e.      Award prejudgment interest; and

f.      Grant such other and further relief that the Court deems just and proper.

## COUNT II

### PLAINTIFF V. SJU
### VIOLATION OF TITLE IX

252.    Plaintiff incorporates each and every one of the other paragraphs of this Complaint as if fully set forth herein.

253.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. §1681 *et seq.* ("Title IX") provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a).

254.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. Upon information and belief, SJU receives federal funding in various manners, including, without limitation, student loans given to students either directly by the federal government or by SJU with funds furnished by the federal government and, therefore, is bound by Title IX and its regulations.

255.   Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

256.   Under Title IX, schools must "[a]dopt and publish grievance procedures providing for the *prompt and equitable resolution of student . . . complaints* alleging any action which would be prohibited by [Title IX or its regulations]." 34 C.F.R. § 106.8(b) (emphasis added). Both the Department of Education and Department of Justice have set forth this requirement by way of regulation. See 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. §54.135(b) (Dep't of Justice).

257.   In 2001, the Office for Civil Rights ("OCR") of the Department of Education, the office that administratively enforces Title IX, promulgated regulations pursuant to notice-and-comment rulemaking in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance"). Available at https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf (last viewed September 18, 2016). Title IX's regulations, including the 2001 Guidance, have the force and effect of law, because they affect individual rights and obligations and were the product of notice-and-comment rulemaking.

258.   OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable. . . ." *Id.* at 20. These elements apply to private and public colleges and universities and include: *"Notice to students...of the [school's] procedure"* and *"Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence." id.* (emphasis added).

259.   OCR's 2001 Guidance further stated that *"according due process to both parties involved, will lead to sound and supportable decisions." Id.* at 22 (emphasis added).

260.   In 2011, the OCR issued a Dear Colleague Letter on Sexual Violence, offering schools and universities guidance on how to handle sexual misconduct complaints under Title IX.

261.   SJU's SMP was drafted, adopted and revised under the guidance of that 2011 Dear Colleague Letter.

262.   However, the guidance offered in that 2011 Dear Colleague Letter has since been the source of considerable criticism for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." A true and correct copy of U.S. Dept. of Education Office for Civil Rights Dear Colleague Letter dated 09/22/2017 is attached hereto as Exhibit S.

263.   The OCR became deeply concerned that the 2011 letter had allowed many schools to establish procedures for resolving sexual misconduct allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." See Exhibit S.

264.   On September 22, 2017, in response those concerns, the OCR withdrew its 2011 Dear Colleague letter stating that it "may have been well-intentioned, but those documents have led to the deprivation of rights for many students – both accused students denied fair process and victims denied an adequate resolution of their complaints." See Exhibit S.

265.   Contemporaneous with that letter, the OCR issued a Q&A on Campus Sexual Misconduct intended to guide schools and universities on how to properly comply with Title IX when investigating sexual misconduct complaints. A true and correct U.S. Dept. of Education Office for Civil Rights September 2017 Q&A on Campus Sexual Misconduct is attached hereto as Exhibit T.

266.   In that Q&A, the OCR instructs universities on what constitutes an "equitable" investigation, directing that "[i]n every investigation conducted under the school's grievance procedures, *the burden is on the school – not on the parties – to gather sufficient evidence to reach a fair, impartial determination* as to whether sexual misconduct has occurred." See Exhibit T, Question 6 (emphasis added).

267.   The Q&A instructs universities that, in order to ensure an equitable investigation – as they are mandated to do under Title IX – they must ensure:

(a)   That the investigator of the alleged conduct be "free of *actual or reasonably perceived conflicts of interest and biases*;"

(b)   That the schools "*institutional interests* do not interfere with the impartiality of the investigation;"

(c)   That a trained investigator "analyze *and document* the available evidence;"

(d)   That the investigator "objectively evaluate the credibility of parties and witnesses" and "synthesize *all available evidence* – including both inculpatory *and exculpatory* evidence;"

(e)   "Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide *written notice to the responding party* of the allegations constituting a potential violation of the school's sexual misconduct policy, *including sufficient details* and *with sufficient time* to prepare a response *before any initial interview*;"

(f)   "Sufficient details include the identities of the parties involved, the *specific section of the code of conduct* allegedly violated, the *precise conduct allegedly*

*constituting the potential violation* and the date and location of the alleged incident;"

(g)   "Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation;"

(h)   "The investigation should result in a written report summarizing the relevant *exculpatory and inculpatory* evidence."

(i)   "The reporting and *responding parties* and appropriate officials must have *timely and equal access* to *any information* that will be used during informal and formal disciplinary meetings and hearings."

See Exhibit T, Question 6 (emphasis added).

268.   Clearly, *none* of the guidelines which the OCR specifies would have constituted an "equitable" investigation were implemented here.

269.   Given what Doe now knows about Malloy's practice and client base, Malloy, the "Investigator," has at least a "reasonably perceived" conflict of interest or bias.

270.   SJU's acceptance of a large federal grant tied to increased reporting and *convictions* for sexual assault claims establish that SJU's "institutional interests" conflicted with the impartiality of the investigation.

271.   SJU certainly did not take on the burden to gather sufficient evidence to reach a fair, impartial decision since Malloy did not speak with any witnesses nor seek any evidence tending to exculpate Doe, did not sufficiently question Roe's injuries, credibility or psychological state and does not appear to have carefully documented the evidence she did consider. While she does appear to have "synthesized" the evidence she reviewed, it was by no

means "*all* available evidence" and obviously did not include "inculpatory *and exculpatory* evidence."

272.    In perhaps its most blatant disregard of the OCR's guidance, SJU did not provide Doe with "written notice" detailing the allegations against him:

(a)    SJU did not provide that information "before any initial interview."

(b)    SJU did not provide that information *during* the interview.

273.    Instead, Bordak, Forte and Malloy actively *concealed* the nature of the claims against Doe until after a decision had been reached against him.

274.    Bordak, Forte and Malloy then proceeded to argue to the appeal board - quite disingenuously – that Doe was not *entitled* to know the exact charges against him and that the investigative process they had employed – the exact opposite of that which the OCR identifies as "equitable," is, in fact, "equitable" under Title IX.

275.    Needless to say, Doe went into his "Interview" with Malloy never having received "[s]ufficient details . . . [of the] *specific section of the code of conduct* [he had] allegedly violated" and even left the "Interview" never having been told "the *precise conduct allegedly constituting the potential violation*" he had been accused of.

276.    There were, allegedly, *pictures*, pictures which Roe and Bordak and Forte and Malloy had access to, but which Doe never even knew existed.

277.    Obviously, Doe was not afforded "timely and equal access to any information" used during the informal and formal disciplinary meetings.  Armed with exactly none of this information, let alone written information, Doe was shuffled through this entire investigation reasonably believing that this was some sort of misunderstanding or accident. He was utterly denied any opportunity "to prepare for meaningful participation" in the "Investigation."

278.    The OCR also addressed the question of what procedures a school should follow to adjudicate a finding of responsibility for sexual misconduct and, once again, SJU failed to comply with those recommended procedures. See Exhibit T, Question 8.

279.    Specifically, the OCR directs universities to ensure that "meaningful access" to "*any information*" that will be used during formal or informal disciplinary meetings be provided to each party, "including the *investigation report*." See Exhibit T, Question 8 (emphasis added).

280.    The OCR also instructs universities that "the parties should have the opportunity to *respond to the report in writing in advance of the decision of responsibility*." SJU made no effort to comply with these instructions from the OCR, so Doe received none of these procedural protections.

281.    Both on its face and as applied in this case, SJU's SMP violates Title IX. The violations include, but are not limited to, engaging in selective enforcement and reaching an erroneous outcome. SJU's SMP also violates Title IX in that it laces fundamental fairness.

282.    The outcome of SJU's flawed proceeding against Doe was clearly erroneous and was motivated on the basis of sex.

283.    SJU was on notice of and was deliberately indifferent to the serious flaws in the investigation, the lack of equity and fairness, and the gender bias that infused the process.

284.    The implementation of SJU's SMP was motivated by and premised on archaic assumptions and stereotypical notions of the sexual behavior of male and female students-*i.e.*, male students are perceived as sexual aggressors and perpetrators and female students are perceived as sexual victims.

285.   The SMP was developed in an effort to appear tough on the so-called campus rape culture and its entire disciplinary structure as conceived and implemented by SJU is deliberately designed to favor the female accuser and disfavor the male accused by, among other things, eliminating from the process the most fundamental procedural safeguards for the accused.

286.   The SMP's deficient process is deliberately designed to subject male students as a group to less favorable treatment than female students, because accused students in sexual assault cases are overwhelmingly, if not always, male, and the SMP on its face and as implemented by SJU intentionally accorded unequal treatment to them.

287.   Throughout the disciplinary process, SJU treated Doe unfairly because of his sex, including, among other things, by failing to give Doe proper notice of the charges against him; failing to give him even the most basic due process protections such as the right to know and understand the charges against him, the right to confront his accuser, to receive copies of relevant evidence, and to present witnesses and other evidence on his own behalf; and by conducting an inadequate, unreliable, and biased investigation of the complaint against him.

288.   The investigative team's one-sided investigation demonstrated pervasive gender bias against Doe and in favor of Roe.

289.   In the context of sexual assault claims, SJU has created an atmosphere on campus which is infused with gender bias.

290.   In the tone and tenor, it sets on campus, in the information it promulgates, the policies it adopts, the manner in which it approaches the investigation, adjudication and appeal of

allegations of sexual misconduct, SJU creates an atmosphere in which a male accused of any sort of sexual misconduct is presumed guilty and denied any meaningful means to defend himself.

291.   This gender bias was a motivating factor in the fact that charges were brought against Doe at all, as well as the characterization of those charges and the disciplinary track through which they were "investigated" and was a motivating factor behind the obvious erroneous findings against Doe.

292.   SJU's gender bias is longstanding and is illustrated by a pattern of decision-making that evinces a clear anti-male sentiment.

293.   Plaintiff contends that SJU's gender bias is plain and pervasive in the SMP which, on its face, favors accusers (almost exclusively females) and nearly denies all procedural protections to the accused (almost exclusively males).

294.   The OCR agreed that the protections afforded to respondents in disciplinary policies such as the one SJU has adopted are fundamentally unfair and offer no meaningful protection to the accused.

295.   As discussed above, in September of 2017, the OCR issued a Dear Colleague Letter in which it makes that position clear and instructs universities how they can amend their policies to properly comport with Title IX. See Exhibit T.

296.   Yet SJU decided to do nothing.

297.   SJU has a dedicated Title IX Officer, Perry, who was, or certainly should have been, aware of the September 2017 Dear Colleague Letter.

298.    Yet Perry decided to do nothing.

299.    Five months passed, the bulk of the school year, before Roe asserted her claims against Doe and still SJU had decided to do nothing to comply with the recommendations made in the September 2017 Dear Colleague Letter.

300.    It's important to notice that SJU needn't have immediately changed all their SMP policies to have afforded Doe at least some measure of procedural protection in this case.

301.    There's nothing in SJU's current SMP that gives Doe the right to know the charges against him, to see the evidence against him, to know the potential penalties he was facing; but there's nothing in the SMP to *prohibit* SJU from giving him that information, either.

302.    Perry, Bordak, Forte or Malloy *could* have told Doe exactly what he was being accused of, *could* have shown him the pictures, *could* have alerted him to the potential penalties awaiting him – all without violating the SMP, but they decided not to.

303.    That is a clear pattern of anti-respondent, anti-male decision-making.

304.    Moreover, SJU has been taken to court over these very same issues before. The facts of those cases further illustrate a pattern of decision-making that seems to fall into a "men are inevitably guilty of something" mindset.

305.    Including the instant litigation, SJU has been sued at least three times over the past four years by male students claiming that SJU violated their Title IX rights by erroneously finding them responsible for spurious sexual assault claims.

306.    According to allegations of the Complaint referenced by the Court in its opinion in *Powell v. St. Joseph's University,* 2018 U.S. Dist. LEXIS 27145x1, in 2015, three female students accused Powell, an SJU sophomore, of confronting them outside their shared seminar classroom about their "feminist" beliefs. They also claimed that Powell had "stared at them

during the seminar" and had drawn a picture which depicted one of the female students as an "evil feminist vampire" and a "blood sucking leech" biting off the head of a man. SJU charged Powel with Sexual Misconduct. Ultimately, the SJU investigator found that Powell's conduct did not violate SJU's Sexual Misconduct Policy but decided he could look to other SJU policies to see if maybe Powell had violated any of them. Without previous notification to Powell that he was now being investigated under a different policy, the investigator concluded that Powell had violated an SJU policy prohibiting discrimination, harassment and retaliation. Powell was expelled and ultimately sued SJU for its failure follow its own disciplinary procedures and to even notify him what policy he was accused of violating.

307.    In *Harris v. St. Joseph's University* 2014 U.S. Dist. LEXIS 65452 #2614, according to the allegation of the Second Amended Complaint filed in that action, the plaintiff was accused of rape after what he claims to have been a consensual encounter. Harris had a series of text messages clearly suggesting that the encounter had, in fact, been initiated and arranged by his accuser and was consensual. Harris claims that SJU refused to consider the text messages, as a result of which, he was suspended (Exhibit U).

308.    In his Title IX complaint against SJU, Harris relates that the chairman of SJU's ethics department, who is also a member of the Community Standards Board, told Harris' father that, out of concern for being in sued in a lawsuit similar to that filed against Penn State University, SJU had adopted sexual misconduct policies intended "to err on the side of, and favor the female accusers to avoid exposure to Title IX claims by female accusers." See Complaint, Paragraph 105, *Harris v. St. Joseph's University* 2014 U.S. Dist. LEXIS 65452 #2614 (Exhibit U).

309.   Other members of SJU's staff have exhibited or acknowledged the existence of an anti-respondent bias.

310.   When Doe's mother questioned Bordak, head of SJU's CSO about the circumstances surrounding Doe's conviction, Bordak raised his voice to Doe's mother, telling her that *"this was really really aggressive kissing!"* Yet the "Investigator" had found that the kissing was consensual. Bordak's reaction suggested to Doe's mother that Doe must have done something wrong, even if it wasn't completely clear what.

311.   When Doe shared the charges against him with a fellow student at SJU who works with members of the CSO and knows Bordak, she was outraged that anyone would think that the conduct Doe is alleged to have committed was "Sexual Assault." But she was not surprised at the outcome, that Bordak had taken this ridiculous position, or that he had been so aggressive with Doe's mother. Bordak, the student said, is a "zealot."

312.   Another faculty member told Doe's mother and, later, Doe, that the SMP discipline process was essentially a railroad, that SJU was so afraid of being sued that it accepted any woman's allegations as valid. He said that it was widely known among the faculty that any man accused of sexual misconduct on SJU's campus is found guilty. In fact, he said that the climate on campus was so anti-male (at least with regard to claims of sexual misconduct) that the penalties SJU had imposed against Doe were basically a slap on the wrist compared to how harshly they typically treat male "Respondents."

313.   SJU's pattern of conduct – in the SMP policies and procedures it selected, in the way it chose to implement those policies to the detriment of respondents, and in its failure to take any steps to amend those policies even after the OCR advised schools to do so – illustrates anti-male decision-making going back at least several years.

314.   In November of 2017, a mere three months before Doe was accused, SJU suddenly had a big incentive to encourage women to make more sexual assault claims and to hold more men "responsible."

315.   In November of 2017, SJU was awarded a three-year $300,000 federal grant from the Department of Justice's Office on Violence Against Women ("OVW"). The goal of the OVW is to reduce sexual assault on college campuses, as well as strengthen those institutions' response to sexual assault allegations.  See Exhibit H.

316.   In a SJU press release, the university admits that, as a condition of the grant, it will "submit quarterly reports to the OVW to insure the campus' progress." See Nov. 30, 2017 Press Release from SJU. See Exhibit H.

317.   In furtherance of the purposes of the grant to "strengthen the University's response to sexual misconduct on campus," SJU has also committed to:

(a)   Create a "community response team" which will include SJU faculty and staff, police, staff of the Philadelphia Sexual Assault Response Center, Victims Services Center of Montgomery County and Clergy, as well as police and District Attorneys.

(b)   Arrange for the Community Response Team to meet quarterly;

(c)   Allocate funds to educating students about consent and sexual assault;

(d)   Fund ongoing sexual assault awareness training for staff from SJU's Student Outreach and Support, Public Safety and Community Standards Offices; and

(e)   Send SJU staff to OVW meetings twice a year to collaborate with other participating universities to learn promising practices.

Exhibit H.

318.    SJU's university newspaper, The Hawk, is circulated throughout the campus and widely read by students, staff and faculty alike as a source of information about the events and tone on campus.

319.    In December of 2017, SJU's newspaper, The Hawk, published an article touting the award of the grant and advising students about an increased focus on reporting incidents of sexual misconduct. See Exhibit I.

320.    The article indicated that SJU had acquired the grant by shifting its focus to the students on campus, stating "[t]he university applied unsuccessfully for this grant last year. However, on this attempt they tried a different approach, directly addressing issues of sexual assault on St. Joe's campus." See Exhibit I.

321.    In an interview for the article, Mary-Elaine Perry, Ph.D., Title IX Coordinator for SJU ("Perry") expressed her enthusiasm that the grant would provide her department with more resources. See Exhibit I.  Perry lamented that, in her belief "approximately 700 women at St. Joe's will have been sexually assaulted during their college career," but she "only gets 10-15 reports a year." See Exhibit I.  It is important to note that Perry did not say "700 people" will be sexually assaulted. She said "700 *women*."

322.    Perry openly expressed her hope and expectation that the award of this grant would result in more sexual misconduct claims, saying "[o]ur expectation is that initially, we will have more reports of sexual misconduct because students will be aware of what it is and options they have for reporting." See Exhibit I.

323.    In conjunction with Perry's statements, the article also reported that as "part of the effort to encourage awareness of sexual assault," a student-based organization had hosted a panel discussion to have sexual assault survivors share their stories. See Exhibit I.

324.   The article quoted one of the panelists in the event, saying "a lot of us think that sexual assault has to be this really violent brutal crime to be called sexual assault or to be called rape, but in reality, it's really just an unwanted sexual act, it's non-consensual." See Exhibit I.

325.   The event organizer said that "[t]he more *women* we have coming forward and the more *women* who feel comfortable coming forward, the safer our world will be as a whole, *especially for women.*" See Exhibit I (emphasis added).

326.   Notably, although the ostensible thrust of any sexual assault program is *preventing* sexual assault, Perry's comments, as well as those of the other panelists and the event organizer, focus almost exclusively on *increased reporting by women* and, presumably, increased conviction of sexual assault.

327.   The grant posed a strong financial incentive for SJU to encourage more women to file claims of sexual misconduct (as opposed to other types of misconduct, to which the grant did not apply) and to have more respondents found guilty. For SJU, this would appear to be "progress" insofar as its grant is concerned.

328.   Significantly, Perry is the individual who made the determination in February of 2018 that Doe should be charged with "Sexual Assault" and disciplined under the SMP, fulfilling her stated hope and expectation that SJU would have "more reports of sexual misconduct."

329.   SJU's gender bias was pervasive, directly implicated in the decision to label Doe's conduct "Sexual Assault" and handle the matter through the SMP and was a motivating factor and cause of the erroneous finding that Doe had committed "Sexual Assault."

330.   In addition to his erroneous outcome theory, Plaintiff contends that SJU has violated Title IX under a theory of selective enforcement.

331.    The allegations in this complaint establish that Doe's gender was a motivating

factor in the decision to initiate the SMP claim against him.

332.    Upon information and belief, similarly situated females who had left a bruise

on a non-intimate body part during consensual touching would not have been subjected to

the same disciplinary proceedings Doe was subjected to.

333.    Furthermore, due to his gender, SJU imposed sanctions on Doe which were

excessively severe including, but not limited to, placing a notation on his record that he had

committed "Sexual Assault," denying him access to the full benefits of his contract with SJU,

placing him on probation for a year and refusing to allow him to travel with his class to Ireland

to complete a course he has prepared for all semester.

334.    Information concerning the outcome of disciplinary proceedings involving

male students as compared to female is in the exclusive possession and control of SJU.

335.    Upon information and belief, statistics within SJU's exclusive possession and

control will show a pattern of intentional discriminatory conduct and selective enforcement.

336.    SJU's institutionalized gender bias against males accused of sexual assault

results from classifications based on archaic assumptions.

337.    SJU treats female complainants differently than male respondents based on

the University's outdated attitudes about females and overbroad generalizations about male

and female sexual traits and behaviors.

338.    SJU's conduct was so severe, pervasive, and objectively offensive that it

denied Doe the equal access to education that Title IX is designed to protect.

339.    SJU has specifically decided to punish Doe by denying him access to important

aspects of his education, including denying him the right to complete a course he has worked on

all semester, the final and pivotal component of which involves a trip to Ireland, placed him on

probation, imposed a no-contact restriction on him which, given the size and amenities offered

on SJU's campus, denies him the freedom of access afforded to other SJU students and, most

impactfully, a permanent record of the alleged violation- with little evidence and as a result

of a process that contains virtually no procedural safeguards for accused students and is

permeated with gender bias.

     340.   As a direct, proximate, and foreseeable consequence of SJU's

aforementioned Title IX violations, D o e has sustained and will continue to sustain

significant damages, including, but not limited to, severe emotional distress, damages to

his physical well- being, emotional and psychological damages, damages to reputation,

past and future economic losses, loss of educational and professional opportunities, loss of

future career prospects, and other direct and consequential damages.

     WHEREFORE, Plaintiff John Doe, requests this Court to enter judgement against St.

Joseph's University as follows:

a.     Order SJU to set aside the investigative team's finding that Doe violated SJU's Sexual Misconduct Policy and all sanctions as well as the notation on his records that he is responsible for "sexual assault";

b.     Order SJU not to use any information or materials generated by the investigative team, including the Reports and the interview summaries and notes, in any disciplinary process regarding John, and to destroy all such materials;

c.     Order SJU, its agents and employees, to immediately cease and desist from making any statements, representations, suggestions and/or intimations to any person, institution or business that Doe has committed, been charged with or found responsible for any sort of sexual misconduct, including, but not limited to, sexual assault;

d.     Require SJU to change the disciplinary procedures under its Sexual Misconduct Policy to be consistent with current law, including case law and documents promulgated by the Department of Justice interpreting SJU's obligations under Title IV, as well as provide fundamental fairness to both claimants and respondents;

e.      Award Doe compensatory damages in an amount to be determined at trial;

f.      Award punitive damages;

g.      Award prejudgment interest;

h.      Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award; and

i.      Grant such other and further relief that the Court deems just and proper.

## COUNT III

### PLAINTIFF v. SJU
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

341.    Plaintiff incorporates each and every one of the other paragraphs of this Complaint as if fully set forth herein.

342.    The acts and omissions of SJU at all times acting through its agents, servants, ostensible agents, employees and investigators (hereinafter collectively referred to as "investigators") were willful and intentional.

343.    SJU knew or should have known that its investigators' systematically improper acts and omissions set forth above would cause Doe severe emotional distress.

344.    SJU's conduct and that of its investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

345.    SJU's conduct and that of its investigators was the direct and proximate cause of Doe's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

WHEREFORE, Plaintiff John Doe, requests this Court to enter judgement against St. Joseph's University as follows:

a.    Compensatory and consequential damages;

b.    Award punitive damages;

c.    Award prejudgment interest;

d.    Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award; and

e.    Grant such other and further relief that the Court deems just and proper.

## COUNT IV

### PLAINTIFF v. SJU
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

346.    Plaintiff incorporates each and every one of the other paragraphs of this Complaint as if fully set forth herein.

347.    SJU's disciplinary policies and procedures are not a product of negotiation, but are ones of adhesion, unilaterally drafted and imposed upon its student body by SJU and provided to SJU students after acceptance by SJU.

348.    SJU creates, interprets and implements its disciplinary policies unilaterally, exercising complete control over processes which, if mishandled, would inevitably cause deep emotional harm so devastating that a reasonable person could not be expected to bear it.

349.    Throughout the course of its "Investigation," SJU had a special relationship with Doe which imposed on it a duty to care for Doe's emotional well-being, particularly throughout a disciplinary process. *Tuney v. Chester County Hospital*, 614 Pa.98 (Pa. 2011).

350.    SJU implicitly acknowledges the extreme emotional vulnerability of students

involved in its disciplinary process – particularly its SMP – by repeatedly and formally offering

to afford those students, claimants and respondents, psychological and emotional care and

support throughout the process. See Exhibits C, D and E.

351.    Yet, as the facts of this case illustrate, SJU did mishandle its disciplinary

procedures against Doe and that negligence has caused deep emotional harm to Doe, so

devastating that a reasonable person could not be expected to bear it.

352.    The acts and omissions of SJU and its investigators were negligent.

353.    SJU knew or should have known that the investigators' systematically improper

acts and omissions set forth above would cause Doe severe emotional distress.

354.    SJU's conduct and that of the investigators was extreme and outrageous, beyond

the bounds of decency, and utterly intolerable in a civilized community.

355.    SJU's conduct and that of the investigators was the direct and proximate cause of

Doe's severe emotional distress, which includes but is not limited to symptoms of depression,

extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness,

and the inability to sleep through the night.

356.    As a direct, proximate, and foreseeable consequence of the aforementioned

conduct, Doe sustained significant damages, including but not limited to, severe emotional

distress, damages to physical well-being, emotional and psychological damages, damages to

reputation, and other direct and consequential damages.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and

against SJU for compensatory and punitive damages, in addition to prejudgment interest,

attorneys' fees, expenses, costs and any other appropriate relief.

**COUNT V**

**PLAINTIFF v. SJU**
**UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW,**
**73 Pa.C.S. §201-1, *et seq.***

357.   Plaintiff incorporates each and every one of the other paragraphs of this
Complaint as if fully set forth herein.

358.   At all relevant times, Doe was a purchaser of educational goods or services for
personal, family or household purposes.

359.   In connection with the sale of its educational goods and services and collection of
tuition, fees and costs related thereto, SJU committed various unfair and deceptive acts
and practices in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection
Law, 73 Pa. C.S. § 201-1, et seq. ("UTPCPL"), including, but not limited to the following acts,
omissions, warranties, and misrepresentations:

(a)   Representing to Doe in its written policies and procedures that SJU is "committed
to a policy of equal opportunity in every aspect of its operations" when in fact
SJU did not embrace a policy of equality in its disciplinary procedures;

(b)   Representing to Doe in its written policies and procedures that SJU would not
discriminate against students "on the basis of sex/gender . . . [or] any other status
protected by law in the administration of its admission, educational, financial aid,
employment, athletic, or recreational policies or programs" when in fact SJU
would and did do so;

(c)   Representing to Doe in its written policies and procedures that it would provide
Doe with a "prompt, fair and impartial disciplinary process (from the initial report

to the final result)" when in fact SJU would not and did not do so;

(d)    Representing to Doe in its written policies and procedures that SJU would follow the rules associated with its student disciplinary system, when in fact SJU would not and did not do so;

(e)    Representing to Doe in its written policies and procedures that University leadership would provide appropriate oversight over investigators and the student disciplinary process overall, when in fact SJU would not and did not do so;

(f)    Not informing Doe in its written policies and procedures that SJU would conceal, misrepresent, or exaggerate evidence relevant to its student disciplinary system and SMP, when in fact SJU would and did do so;

(g)    Representing to Doe that he would not be discriminated against, treated unequally compared to female students, or mistreated as a result of his male gender, when in fact SJU would and did do so.

360.    Doe relied upon the various acts, omissions, warranties and misrepresentations of SJU in entering into a contractual agreement with SJU upon his matriculation and continuing to make tuition and other payments to the University while a student.

361.    SJU's unfair and deceptive conduct constituted false representations of the characteristics and benefits of the university's educational goods and services; constituted false representations that the university's educational goods and services were of a particular standard or quality; constituted a failure to comply with the terms of a written guarantee or listed educational goods and services with the intent not to sell them as advertised; and was fraudulent and deceptive conduct which created a likelihood of confusion and misunderstanding- all within

the meaning of § 201-2 (4)(v), (vii), (xiv), and (xxi) and § 3 of the UTPCPL, and each of which

was the proximate cause of damages and physical, emotional, and financial harm to Doe.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and

against Saint Joseph's University as follows:

(a)   Find, determine and declare that the University's business practices violate the UTPCPL;

(b)   Award actual and statutory damages, including restitution, treble damages, attorney fees and costs; and

(c)   Grant any other appropriate relief.

## COUNT VI

### PLAINTIFF V. SJU
### DEFAMATION

362.   Plaintiff incorporates each and every one of the other paragraphs of this Complaint as if fully set forth herein.

363.   SJU, acting by and through its employees and designated agents, made several communications about Doe which were defamatory in nature.

364.   Specifically, SJU referred to Doe as the perpetrator of a sexual assault, knowing the allegations to be false, or with reckless indifference to the truth or falsity of said allegations.

365.   The defamatory communications tended to and did harm Doe's reputation so as to lower him in the estimation of the community and to deter third persons from associating with him.

366.   The defamatory communications were intended to, and did, convey Doe's guilt of alleged misconduct involving moral turpitude.

367.    SJU intended not only to deprive Doe of his good name, and to bring him into

scandal and disrepute amongst his classmates, teachers, co-workers and peers, but also to limit

Doe's future educational and employment prospects by charging him with sexual assault, an

allegation that ultimately led to his conviction under SJU's SMP and a note on his record stating

that he had been found guilty of "sexual assault."

368.    The defamatory communications tended to, and did, blacken Doe's reputation and

exposed him to public hatred, contempt and ridicule.

369.    The allegations against Doe, even had they been true, could never have amounted

to "Sexual Assault" under SJU's own definition set forth in its SMP, so even accusing Doe of

"Sexual Assault" was defamatory and untrue.

370.    Because Doe's conduct did not constitute "Sexual Assault" even within SJU's

own definition, SJU's representations to others that Doe had committed "Sexual Assault",

including Roe and her friends, Doe's teachers and Advisor, SJU employees, members of the

appeal panel and others, was defamatory and untrue.

371.    Because Doe's conduct did not constitute "Sexual Assault" even within SJU's

own definition, SJU's decision to place a notation on Doe's record, which will remain in place

for seven years after he leaves SJU will falsely inform others that Doe has been found guilty of

"Sexual Assault," thereby injuring him, his reputation and his educational and employment

prospects indefinitely.

372.    The defamatory communications set forth infra and supra were not statements of

opinion.

373.    The defamatory communications set forth infra and supra were published in that

they were made to third parties.

374.    The defamatory communications set forth infra and supra included, without limitation, the following:

(a)    On or about February 25, 2018, SJU employees, Perry told Roe – falsely - that the incident she described of Doe intentionally causing a bruise on Roe's neck while kissing her did, in fact, constituted "Sexual Assault" as that term is defined in SJU's SMP;

(b)    Perry informed other SJU employees that Doe had committed a sexual assault against Roe and should be disciplined through SJU's SMP;

(c)    Thereafter, Perry, Bordak and/or Forte told Malloy, who SJU had retained to investigate Roe's claims of sexual assault, that Roe's allegations against Doe fit within the definition of "Sexual Assault" set forth in SJU's SMP;

(d)    After interviewing Doe and Roe, Malloy, at least twice, advised the appeal panel at SJU, constituting two professors and one student that Doe had committed sexual assault against Roe; and

(e)    SJU has caused a notation to be made on Doe's record that he has been found guilty of "Sexual Assault," which will remain on his record from seven years from the time Doe leaves SJU and will defame him to anyone who ultimately has access to or learns or hears about that notation.

375.    These defamatory communications were malicious, reckless and intentionally or negligently made.

376.    The defamatory communications were not justifiably published by any privilege.

377.    The defamatory communications referenced and continue to reference Doe by

name to ensure those who received the communications know they are about Doe.

378.    All persons receiving the communications understood and will understand the defamatory meaning of the communications.  Doe was and will be specially harmed by the publication of these defamatory communications.

379.    Doe has suffered and will continue to suffer actual loss to his reputation and personal humiliation.

380.    The defamatory communications have led and will lead anyone who has already learned about them, and anyone who learns about them in the future, to conclude that Doe is a sexual predator, lacks honor, respect and integrity, and have grievously fractured his standing in the community and in respectable society.

381.    SJU's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the rights and interests of Doe, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff John Doe respectfully requests that this Honorable Court:

a.   Order SJU not to use any information or materials generated by the investigative team, including the Reports and the interview summaries and notes, in any disciplinary process regarding John, and to destroy all such materials;

b.   Order SJU, its agents and employees, to immediately cease and desist from making any statements, representations, suggestions and/or intimations to any person, institution or business that Doe has committed, been charged with or found responsible for any sort of sexual misconduct, including, but not limited to, sexual assault;

c.   Award Doe compensatory damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of education and professional opportunities, loss of future career prospects, and other direct and consequential damages;

d.    Award punitive damages;

e.    Award prejudgment interest;

f.    Award attorney fees and costs pursuant to statutory or common law doctrines
providing for such award;

g.    Grant such other and further relief that the Court deems just and proper.

## COUNT VII

## PLAINTIFF V. ROE
## DEFAMATION

382.   Plaintiff incorporates each and every one of the other paragraphs of this
Complaint as if fully set forth herein.

383.   Roe made several communications about Doe which were defamatory in nature.

384.   Specifically, Roe referred to Doe as the perpetrator of a sexual assault, knowing
those allegations were false, or with reckless indifference to the truth or falsity of said
allegations.

385.   The defamatory communications tended to and did harm Doe's reputation so as to
lower him in the estimation of the community and to deter third persons from associating with
him.

386.   The defamatory communications were intended to, and did, convey Doe's guilt of
alleged misconduct involving moral turpitude.

387.   Roe intended not only to deprive Doe of his good name, and to bring him into
scandal and disrepute amongst his classmates, teachers, co-workers and peers, but also to limit
Doe's future educational and employment prospects by charging him with sexual assault, an

allegation that ultimately led to his conviction under SJU's SMP and a note on his record stating

that he had been found guilty of "sexual assault."

388.    The defamatory communications tended to, and did, blacken Doe's reputation and

exposed him to public hatred, contempt and ridicule.

389.    The defamatory communications were not statements of opinion.

390.    The defamatory communications were published in that they were made to third

parties.

391.    Roe's defamatory and false communications included, without limitation, the

following:

    (a)    On February 25, 2018, Roe told a friend who had noticed a mark on her neck that

           Doe had intentionally made that mark, that he had hurt her, sat on top of her and

           intentionally squeezed her neck and frightened her;

    (b)    In so doing, Roe induced her friend to conclude that Doe had committed a sexual

           assault against Roe;

    (c)    Thereafter, Roe reported Doe's alleged conduct to Perry, who determined that it

           was, in fact, an allegation of "Sexual Assault" against Doe;

    (d)    Roe allowed and/or encouraged Perry to believe that Doe had committed sexual

           assault against her;

    (e)    Thereafter, Roe told Malloy, who SJU had retained to investigate Roe's claims of

           sexual assault, that Doe sat on top of Roe and intentionally squeezed her neck,

           tried to choke her and intentionally frightened her;

(f)     Roe sent a letter to the appeal panel stating that Doe had committed sexual assault

against her by squeezing her neck and frightening her; and

(g)     Roe's false and defamatory statements induced SJU to make a notation on Doe's

record that he has been found guilty of "Sexual Assault," which will remain on

his record for seven years from the time Doe leaves SJU and will defame him to

anyone who ultimately has access to or learns or hears about that notation.

392.   These defamatory communications were malicious, reckless and intentionally and/or negligently made.

393.   The defamatory communications were not justifiably published by any privilege.

394.   The defamatory communications referenced Doe by name to ensure those who received the communications knew they were about Doe.

395.   All persons receiving the communications understood and will understand the defamatory meaning of the communications.

396.   Doe was and will be specially harmed by the publication of these defamatory communications.

397.   Doe has suffered and will continue to suffer actual loss to his reputation and personal humiliation.

398.   The defamatory communications have led and will lead anyone who has already learned about them, and anyone who learns about them in the future, to conclude that Doe is a sexual predator, lacks honor, respect and integrity, and have grievously fractured his standing in the community and in respectable society.

399.    Roe's conduct was wanton, reckless, willful, malicious and oppressive, demonstrating reckless indifference to the right and interests of Doe, so as to warrant an award of punitive damages.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against Roe for compensatory and consequential damages and:

a.    Order Roe to immediately cease and desist from making any statements, representations, suggestions and/or intimations to any person, institution or business that Doe has committed, been charged with or found responsible for any sort of sexual misconduct, including, but not limited to, sexual assault;

b.    Award prejudgment interest; and

c.    Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award

## COUNT VIII

### PLAINTIFF V. ROE
### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

400.    Plaintiff incorporates each and every one of the other paragraphs of this Complaint as if fully set forth herein.

401.    At all times relevant hereto, Doe was in a contractual relationship with SJU.

402.    Doe has the right to pursue his contractual relationships free from interference on the part of other persons.

403.    By repeatedly making false and defamatory allegations against Doe to SJU agents and/or employees, Roe did willfully, maliciously and improperly interfere with an existing contract between Doe and SJU, resulting in Doe being unable to take full advantage of the benefits of his contract with SJU.

404.    Roe had no privilege, justification or legitimate interest for interfering with the contract between Doe and SJU.

405.    By intentionally and improperly interfering with the performance of this contract, Roe is subject to liability.

406.    In intentionally accusing Doe of sexual assault, Roe was giving false information to SJU which Roe knew to be false.

407.    As a direct and proximate result of Roe's intentional interference with this contract, Doe has been denied access to the benefits of his contract with SJU, including but not limited to being denied access to an international class trip to which he was entitled and being excluded from all future international travel with SJU and his classmates, as well as suffered physical, emotional and academic distress and harm.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against Roe for compensatory damages and consequential damages and grant such other and further relief that the Court deems just and proper.

**Demand for Jury Trial**

John Doe respectfully requests and demands a jury trial on all issues so triable.

Respectfully submitted,

Dated:  05/15/18

BY:

Edward J. Schwabenland, Esquire
Schwabenland & Ryan
995 Old Eagle School Road, #306
Wayne, PA  19087
(610) 971-9200

John Mirabella, Esquire
john@mirabellalawfirm.com
Law Offices of John Mirabella
1600 Market Street, Suite 1810
Philadelphia, PA  19103
(215) 422-4991

Attorneys for Plaintiff

## VERIFICATION

I, John Doe, hereby verify that I have read the foregoing Complaint and verify that all of the facts set forth therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

John Doe

John Doe

Dated May 14, 2018