# EXHIBIT C

CONFIDENTIAL

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
                         - - -
 3
    JOHN DOE,                   :
 4                             :
            Plaintiff,          :
 5                             :
          vs.                  :
 6                             :
    ST. JOSEPH'S UNIVERSITY :
 7                             :
            and               :
 8                             :
    JANE ROE,                  :
 9          Defendants.   :   NO. 18-2044
10                         - - -
11              FRIDAY, JULY 6, 2018
12                         - - -
13                    CONFIDENTIAL
14                         - - -
15          Videotaped deposition of WILLIAM
    BORDAK, taken at the law offices of
16  Schwabenland and Ryan, PC, 955 Old Eagle
    School Road, Suite 306, Wayne, Pennsylvania,
17  commencing at 10:11 a.m., before Kimberly A.
    Wornczyk, a Registered Professional Reporter,
18  New Jersey Certified Court Reporter
    (Certificate No. 30X100223500), and Notary
19  Public in and for the Commonwealth of
    Pennsylvania.
20
21
                         - - -
22
              VERITEXT LEGAL SOLUTIONS
23              MID-ATLANTIC REGION
          1801 Market Street - Suite 1800
24          Philadelphia, Pennsylvania 19103
```

CONFIDENTIAL

Page 2

1 APPEARANCES:
2
    SCHWABENLAND AND RYAN, PC
3   BY: EDWARD J. SCHWABENLAND, ESQUIRE
    955 Old Eagle School Road
4   Suite 306
    Wayne, Pennsylvania 19087
5   610-971-9200
    eschwab@sandrlaw.com
6   Representing the Plaintiff, John Doe
7
    LAW OFFICES OF JOHN MIRABELLA
8   BY: JOHN MIRABELLA, ESQUIRE
    1600 Market Street
9   Suite 1810
    Philadelphia, Pennsylvania 19103
10  215-422-4991
11  Representing the Plaintiff, John Doe
12
13  MINTZER SAROWITZ ZERIS LEDVA &
    MEYERS, LLP
14  BY: HOLLY MCREYNOLDS, ESQUIRE
    1500 Market Street
15  Suite 4100
    Philadelphia, Pennsylvania 19102
16  215-735-7200
    hreynolds@defensecounsel.com
17  Representing the Defendant, Jane Roe
18
19
    MONTGOMERY MCCRACKEN
20  BY: ALBERT L. PICCERILLI, ESQUIRE
    1735 Market Street
21  Philadelphia, Pennsylvania 19103
    215-772-7590
22  apiccerilli@mmwr.com
    Representing the Defendant, St.
23  Joseph's University
24

Page 4

1           INDEX
2           - - -
3 WITNESS                    PAGE
4 WILLIAM BORDAK
5 By Mr. Schwabenland          5
6
7 TELEPHONE CONFERENCE WITH JUDGE DIAMOND 172
8
9           - - -
        EXHIBITS
10          - - -
11 NUMBER        DESCRIPTION      PAGE
12 1     Respondents in sexual      151
        misconduct (ISMP/SMP),
13      SJU001331 through 001334
14
15
16
17
18
19
20
21
22
23
24

Page 3

1 ALSO PRESENT:
2   Marianne Schimelfenig, Esquire
    (St. Joseph's University)
3
    Rick Kanzinger, Jr., Videographer
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1        DEPOSITION SUPPORT INDEX
2           - - -
3 INSTRUCTION NOT TO ANSWER:
4 Page      Line
5 165       17
6
7
8 REQUEST FOR PRODUCTION OF DOCUMENTS:
9 Page      Line      Description
10 (None)
11
12
13 STIPULATIONS:
14 Page      Line
15 6         1
16
17 QUESTIONS MARKED:
18 Page      Line
19  (None)
20
21
22
23
24

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1    (It is agreed by and among
2    counsel for the respective parties
3    that the sealing, filing, and
4    certification are hereby waived, and
5    that all objections, except as to the
6    form of the question, be reserved
7    until the time of trial.)
8    - - -
9    MR. PICCERILLI:  Counsel for
10   plaintiff and I, as counsel for St.
11   Joe's University, and counsel for Jane
12   Roe stipulate that all objections,
13   except as to the form of the question,
14   are reserved until the time of trial
15   and, also, we don't waive
16   certification and the witness reserves
17   the right to read and sign.  Now, on
18   objections, you want to go off the
19   video record even for form of the
20   question or how do you want to do
21   this?
22   MR. SCHWABENLAND:  Well, if
23   you're going to object to the form and
24   it's a simple statement, "I object to

Page 7

1    the form," you don't have to go off.
2    If you want to --
3    MR. PICCERILLI:  If it is going
4    to be more extended, we'll go off and
5    we'll just be on the transcript.
6    MR. SCHWABENLAND:  If you want
7    to put reasons, then we'll go off
8    camera.  Just say, "Let's go off
9    camera."  Before we begin, we should
10   reemphasize again, as we've done in
11   all these depositions, that all
12   counsel have agreed to maintain the
13   confidentiality of these depositions
14   and this deposition and the court has
15   approved an order maintaining
16   confidentiality.  That applies not
17   only to the testimony but to any
18   exhibits and the contents of those
19   exhibits that will be used.  So we
20   just have to have each deposition
21   reflect that.  That's it.  Do you want
22   to say anything else?
23   THE VIDEOGRAPHER:  On the
24   record.  The following is a videotape

Page 8

1    deposition.  My name is Rick
2    Kanzinger, Jr. and I am with J.C.
3    Video Productions.  This deposition is
4    being taken on Friday, July 6, 2018.
5    The time is 10:13 a.m.  We're located
6    at 955 Old Eagle School Road, Suite
7    306, in Wayne, Pennsylvania.  Today's
8    case is John Doe versus St. Joseph's
9    University and Jane Roe, Case Number
10   18-2004, filed in the United States
11   District Court for the Eastern
12   District of Pennsylvania.  Present for
13   the taking of this videotape
14   deposition are the witness, William
15   Bordak.  All counsel will be denoted
16   on the stenographic record.  The court
17   reporter is Kimberly Wornczyk of
18   Veritext Legal Solutions.  Will the
19   court reporter please swear in the
20   witness.
21   - - -
22   WILLIAM BORDAK, having been
23   duly sworn, was examined and testified
24   under oath as follows:

Page 9

1    - - -
2    EXAMINATION
3    - - -
4    BY MR. SCHWABENLAND:
5    Q.    Could you state your full name
6    for the record?
7    A.    Sure.  William Steven Bordak.
8    Q.    Mr. Bordak, my name is Ed
9    Schwabenland.  We met not too long ago, but we
10   are meeting again today.  I will be asking you
11   questions.  Have you ever given a deposition
12   before?
13   A.    No.
14   Q.    Okay.  Let me just give you a
15   couple of guidelines if we could.  If I ask
16   you a question that doesn't make sense in some
17   way, let me know and I'll try to rephrase it.
18   Fair enough?
19   A.    Fair.
20   Q.    I only want you to answer the
21   question if you feel you understood it and if
22   you answer the question I will assume that
23   you're answering truthfully, to the best of
24   your ability.  Is that acceptable?

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1      A.   Yes.
2      Q.   I'll also ask you to do the
3  very thing you've been doing, waiting for me
4  to either get done making a statement or
5  asking a question and then you respond
6  verbally.  So if one person talks at a time it
7  makes this young lady's life a lot easier.
8  Okay?
9      A.   Understood.
10     Q.   Finally, this is a deposition,
11 so if you need to take a break, stretch your
12 legs for whatever reason, then feel free to
13 exercise those options.  Don't feel you have
14 to sit there the whole time.  Okay?  We'll
15 take breaks as we go along here.  Do you have
16 any questions before I begin asking you?
17     A.   May I have a glass of water
18 before we begin?
19     Q.   Sure.
20          MR. SCHWABENLAND:  Let's go off
21 camera for a second.
22          THE VIDEOGRAPHER:  Off the
23 record, 10:16.
24              _ _ _

Page 11

1          (Off the record)
2              _ _ _
3          THE VIDEOGRAPHER:  Back on the
4  record, 10:16.
5  BY MR. SCHWABENLAND:
6      Q.   Okay.  Let me ask you some
7  questions about your background, if I could.
8  What is your present age?
9      A.   Thirty-six.
10     Q.   Okay.  And where did you
11 originally grow up?
12     A.   Connecticut.
13     Q.   And did you go to high school
14 in Connecticut?
15     A.   Yes.
16     Q.   Where did you do your
17 undergrad?
18     A.   Siena College.
19     Q.   Where is that located?
20     A.   Loudonville, New York.
21     Q.   And what year did you graduate?
22     A.   2003.
23     Q.   And what was your major?
24     A.   Psychology.

Page 12

1      Q.   And did you go to -- did you go
2  on for other schooling or work or both?
3      A.   Both.
4      Q.   Okay.  And so what was the next
5  thing you did after Siena?
6      A.   I went to graduate school.
7      Q.   And graduate school where?
8      A.   Fairfield University.
9      Q.   And what years were you at
10 Fairfield?
11     A.   2003 to 2005.
12     Q.   And what did you -- I take it
13 you pursued a master's degree?
14     A.   Correct.
15     Q.   And master's in what?
16     A.   Industrial organizational
17 psychology.
18     Q.   I'm sorry.  Say that again.
19     A.   Industrial organizational
20 psychology.
21     Q.   Okay.  And just basically, what
22 is that?
23     A.   It's organizational psychology.
24     Q.   Pertaining to businesses?

Page 13

1      A.   Businesses, nonprofits,
2  education.
3      Q.   Okay.  And did you also work
4  there at school?
5      A.   Yes.
6      Q.   And in what capacity?
7      A.   I was a graduate assistant in
8  the student activities office.
9      Q.   And what were your duties as a
10 graduate assistant?
11     A.   I advised student groups,
12 mostly programming groups, advised the student
13 senate, worked with orientation, varied sort
14 of activities-related things, evening
15 programs, late night programs, weekend
16 programming.
17     Q.   Did you do anything with
18 handling of discipline cases involving
19 students?
20     A.   No.
21     Q.   Did you do anything -- I think
22 I know the answer.  Did you do anything with
23 regard to taking courses or anything on Title
24 IX issues?

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1    A.    No.
2    Q.    After Fairfield where did you
3 go?
4    A.    I went back to Siena College
5 and worked professionally.
6    Q.    And how long were you working
7 at Siena College?
8    A.    For three years.
9    Q.    And in what capacity?
10    A.    I worked in the office of
11 residence life and the office of campus
12 programs.
13    Q.    And what was the last one?
14    A.    Office of campus programs.
15    Q.    And what year were you there?
16    A.    2005 to 2008.
17    Q.    Did you have a title?
18    A.    I was a residence director.  I
19 was in two different positions during that
20 three years.  I was a residence director and
21 an assistant director of campus programs.
22    Q.    Now, when you were residence
23 director I take it that was through the office
24 of resident life?

Page 15

1    A.    Yes.
2    Q.    And when you became assistant
3 director of campus programs that was through
4 campus programming, I imagine?
5    A.    Correct.
6    Q.    So how long were you a
7 residence director, then, if you can
8 approximate for me?
9    A.    Two and a half of those three
10 years.
11    Q.    Okay.  What were your roles and
12 duties as a residence director, then?
13    A.    I was the master's level
14 professional staff member in charge of a
15 residential community, so a residence hall or
16 area in which residential on-campus students
17 lived.
18    Q.    As part of your duties did that
19 entail handling or being involved with
20 disciplinary matters?
21    A.    Yes.
22    Q.    What type of disciplinary
23 matters were you involved with?
24    A.    Violations of the student code

Page 16

1 of conduct that arise within the residents'
2 area involving the students that lived in that
3 area.
4    Q.    Now, you indicated that -- it
5 said violation of student code of conduct that
6 arises in the resident area?
7    A.    Right.  I was responsible for
8 the students in that area and so the
9 violations of policy that took place or
10 involved the students in that area.
11    Q.    Okay.  But if the violation
12 took place in another part of campus or just
13 off campus, would you still be involved in
14 those cases if the resident lived in that
15 area?
16    A.    It would be up to the dean of
17 students to assign the case, but, generally
18 speaking, yes.
19    Q.    Okay.  Now, the types of cases
20 you were involved with, are you able to tell
21 me -- some are more serious than others -- are
22 you able to tell me what type of cases you
23 were involved with?
24        MR. PICCERILLI:  Objection to

Page 17

1    form.
2        THE WITNESS:  So I was a
3    residence director and so -- there was
4    a residence director in the dean of
5    students office and so the dean of
6    students office handled the more
7    serious cases, those that could impact
8    the student's status at the
9    institution.  So, generally, it was
10    lower level, although not truly low
11    level.  They were more serious cases,
12    alcohol or drug cases, noise
13    violations, community impact, major
14    personal conflicts, those things.
15 BY MR. SCHWABENLAND:
16    Q.    If the cases involved or might
17 cause a student to either be expelled or
18 suspended, would that be considered, like, a
19 more serious case?
20    A.    It would.
21    Q.    And you would not have handled
22 them then?
23    A.    Not at that time, no.
24    Q.    And did you handle any assault

5 (Pages 14 - 17)

CONFIDENTIAL

1 cases when you were there that you can recall?
2     A.   Not that I can recall.
3     Q.   And did you handle any sexual
4 assault cases?
5     A.   No.
6     Q.   When you say handle -- well,
7 I'm sorry. I've been saying handling them.
8 I'm not sure if that's the correct
9 terminology. What role would you play in
10 these types of -- in the cases that you did --
11 you were involved with there?
12     A.   I was the hearing officer and
13 so I met with the students and determined an
14 outcome of a violation.
15     Q.   Okay. And I take it sometimes
16 you could work out an agreement and at other
17 times a hearing would have to be had and then
18 you'd have to make your own determination?
19          MR. PICCERILLI: Object to
20          form.
21          THE WITNESS: They were all
22          hearings. There was no agreements
23          beforehand.
24

1 BY MR. SCHWABENLAND:
2     Q.   And would you also be the
3 person, as a hearing officer, to impose the --
4 I call them sanctions. Would you also make
5 that decision too in that role?
6     A.   Yes.
7     Q.   Would you have -- would your
8 decision have been reviewed by anybody above
9 you, then?
10     A.   My recollection is reviewed by
11 the dean of students office for process
12 appropriateness, but not for outcome.
13     Q.   Okay. Now, after -- I take it,
14 then, towards the latter part of your stay at
15 Siena College you changed from being a
16 residence director to associate director of
17 campus program? Did I say that correct?
18     A.   Assistant director.
19     Q.   Assistant director. I'm sorry.
20 So what did that role entail?
21     A.   That was -- so my third year --
22 so the first semester of my third year I was
23 in a split position, where I was both a
24 residence director and assistant director of

1 campus programs. The institution at that time
2 had a combined position. Those positions
3 resplit and I stayed with the campus programs.
4 That was very similar to my graduate work, in
5 providing programming opportunities on campus,
6 advising student clubs, advising the senior
7 class counsel.
8     Q.   Okay. And so could you explain
9 that in a little bit more detail? What do you
10 advise them on?
11     A.   The planning of events, working
12 with student groups that maybe want to plan an
13 evening program of -- we had a series called
14 Late Night Sarazen, which was our student
15 union -- and so working with the students to
16 develop ideas and contracting and budgeting
17 and marketing of the events.
18     Q.   Okay. In that role, I take it
19 you were not working or you were not involved
20 with the disciplining of any students?
21     A.   Correct. I was not.
22     Q.   Were you involved in any
23 educational programs involving violations of
24 student conduct?

1     A.   Can you repeat or rephrase?
2     Q.   Sure. If a student violates --
3 I'm sorry. There is a code of student conduct
4 for the students, right?
5     A.   Yes.
6     Q.   And if a student violates that,
7 as you say, when you were residence director
8 you would be involved sometimes as the hearing
9 officer, right?
10     A.   Yes.
11     Q.   Now, when you became the
12 assistant director of campus program, you
13 weren't involved anymore in the disciplining
14 of students should they be charged with
15 breaking the student code?
16     A.   Correct.
17     Q.   But were you involved in any
18 way in educating groups throughout the campus
19 about issues concerning either sexual assault,
20 assaults, or violating student code?
21     A.   I can't recall with any
22 specificity.
23     Q.   Okay. Did you pursue any other
24 schooling while you were there?

CONFIDENTIAL

1    A.    While I was at Siena?
2    Q.    Yes.
3    A.    No.
4    Q.    And so when you left Siena
5 College in 2008, where did you go?
6    A.    St. Joseph's.
7    Q.    And you joined them in what
8 capacity?
9    A.    Coordinator of community
10 standards.
11    Q.    I'm sorry?
12    A.    Coordinator of community
13 standards.
14    Q.    Okay.  We'll get into what
15 community standards is or what the purpose of
16 it is, but it's my understanding since joining
17 them -- what, in 2008?
18    A.    Right.
19    Q.    -- you have been with St. Joe's
20 University up to the present, right?
21    A.    Correct.
22    Q.    And you have been associated
23 with the office of community standards since
24 joining St. Joe's University?

1    A.    Yes.
2    Q.    But your title has changed
3 along with, I take it, your responsibilities?
4    A.    Yes.
5    Q.    Now, how long -- if I can, how
6 long were you a coordinator of community
7 standards?
8    A.    I can't recall specifically.  I
9 think a year, but --
10    Q.    Okay.
11    A.    -- I don't know the specific
12 time.
13    Q.    I am not going to hold you to
14 an exact date.  So that's an approximation?
15    A.    Approximation of a year.
16    Q.    And so then what title did you
17 assume then?
18    A.    Assistant director.
19    Q.    And how long did you stay
20 assistant director, if you know?
21    A.    Approximately, again, three
22 years.
23    Q.    And then your title was changed
24 to what?

1    A.    Associate director.
2    Q.    And how long were you associate
3 director?
4    A.    Approximately a year.
5    Q.    Okay.  And that was changed,
6 what, to director?
7    A.    I served in an interim director
8 capacity for about five months.
9    Q.    Okay.
10    A.    And then a director.
11    Q.    And when did you assume the
12 interim directorship?
13    A.    I believe it's about five years
14 ago.
15    Q.    So at least by 2013 you would
16 have been acting in a capacity of either an
17 interim director and then later on as
18 director, right?
19    A.    I believe so.  I believe that
20 2013 is correct.
21    Q.    Okay.  And, again, I am not
22 going to hold you to the exact date.
23    A.    Thank you.
24    Q.    Tell me, if you could, let's --

1 I want to get to your duties as a director,
2 but I would like to work up to that.  Tell me
3 what your duties were as coordinator and then
4 we'll go through each one, if they changed
5 much.  So coordinator, when you first joined
6 them?
7    A.    It's what the title would
8 suggest.  I coordinated the operations of the
9 office.  It was much more administrative.  It
10 was kind of report, reviewing case
11 assignments, working with the hearing officers
12 across campus for procedural issues.  I was a
13 hearing officer, I did meet with students, but
14 the primary function was coordination.
15    Q.    When you assumed the role of
16 assistant director, how did your duties
17 change?
18    A.    To my recollection, my duties
19 did not change.  The change from coordinator
20 to assistant director was that -- human
21 resource's decision -- the title changed.
22 They were phasing out the title of coordinator
23 across campus.  So my job responsibilities
24 didn't change with that title change.

CONFIDENTIAL

Page 26

1    Q.    So your title was simply
2  changed from coordinator to assistant
3  director?
4    A.    Correct.
5    Q.    How about associate director,
6  did your responsibilities change at all?
7    A.    They did.  In that capacity, I
8  was seen more and utilized more as a hearing
9  officer and less in the administrative
10  capacity.
11    Q.    Okay.  And once assuming the
12  role of interim director and then director,
13  how did your roles change?
14    A.    I then was director of the
15  office, with oversight over the process as
16  well as the mission and vision of the office
17  on campus.
18    Q.    And as we talk here, the office
19  of community standards, sometimes it might
20  be easier if I refer to OCS.  Would that be
21  acceptable to you?
22    A.    Yes.
23    Q.    Well, you mentioned that the --
24  oh, we'll come back to that in a second.  I

Page 27

1  forgot to ask you this:  When you were at
2  Siena as a residence director and you were
3  handling discipline cases as a hearing
4  officer, were all matters, including sexual
5  violations, handled the same way at Siena; in
6  other words, or was there a separate track in
7  existence at Siena then for the handling of
8  sexual misconduct cases?
9      MR. PICCERILLI:  Objection to
10      form.
11  BY MR. SCHWABENLAND:
12    Q.    If you want me to repeat it, I
13  will.
14    A.    I don't know the answer.
15    Q.    Okay.
16    A.    I don't recall the procedural
17  model that was used at Siena at that time.
18    Q.    Okay.  When you first joined
19  St. Joe's University working at OCS, were all
20  matters involving any type of student --
21  violation of a student code, including sexual
22  violations, perhaps, were they all handled the
23  same way?
24      MR. PICCERILLI:  Objection to

Page 28

1  the form.
2      THE WITNESS:  Every case is
3  handled differently.  You're saying
4  the same way --
5  BY MR. SCHWABENLAND:
6    Q.    I am talking about
7  procedurally.
8    A.    Okay.
9    Q.    Let me articulate this, if I
10  could.  If a student is charged with violation
11  of -- a specific action, he's notified of
12  that; is that correct?
13    A.    Can you repeat that?
14      MR. PICCERILLI:  Let's go off
15  the record.
16      THE VIDEOGRAPHER:  Off the
17  video record, 10:34.
18      MR. PICCERILLI:  I think when
19  you first started your line of
20  questioning you were asking him about
21  when he started at St. Joe's?
22      MR. SCHWABENLAND:  Yes.
23      MR. PICCERILLI:  But now it
24  seems that you're focusing when a

Page 29

1  student is as opposed to when a
2  student was at that time.
3      MR. SCHWABENLAND:  I will
4  rephrase it.
5      MR. PICCERILLI:  I just wanted
6  to clarify with you --
7      MR. SCHWABENLAND:  I will
8  rephrase it.
9      THE VIDEOGRAPHER:  We are back
10  on the record, 10:35.
11  BY MR. SCHWABENLAND:
12    Q.    We had a discussion off the
13  record, so let me try to rephrase the
14  question, just so it's clear.  I am trying to
15  determine, when you first joined St. Joe's
16  were all matters of student violations handled
17  procedurally through the OCS?
18    A.    Yes.
19    Q.    And was there a separate track
20  for sexual misconduct allegations or charges?
21    A.    No.
22    Q.    And so at some point during
23  your stay at St. Joe's or your employment at
24  St. Joe's, I take it that St. Joe's instituted

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1  a separate sexual misconduct policy from the
2  other types of charges that could be handled
3  by community standards; am I correct there?
4      A.   I'm not sure I understand the
5  phrasing of it.  I want to be sure.
6      Q.   Let me rephrase.  In the
7  student handbook, the student handbook has
8  down statements about, if there are charges
9  brought against a student the handbook tells
10 you that they would be advised of the charges
11 against them; is that correct?
12     A.   Yes.
13     Q.   And once you're advised of the
14 charges against you, the student normally -- I
15 am talking about then, before you had a sexual
16 misconduct policy -- the student would then be
17 afforded a hearing before either a hearing
18 officer or a panel of three, something like
19 that?
20         MR. PICCERILLI:  Objection to
21     form.
22         THE WITNESS:  You're talking
23     about when I first started at St.
24     Joseph's?

Page 31

1  BY MR. SCHWABENLAND:
2      Q.   Yes.
3      A.   Yes.
4      Q.   Okay.  And that would be
5  afforded to all students of any type of
6  violation, whether sexual or nonsexual?
7      A.   At that time, yes.
8      Q.   Okay.  And so at some point it
9  changed, right?
10     A.   Yes.
11     Q.   And it changed while you
12 were -- well, you tell me when it changed.
13 When was the sexual misconduct policy formed?
14     A.   The interim sexual misconduct
15 policy took effect in January of 2015.
16     Q.   Okay.  And then, as I
17 understand it, it was revised in 2017
18 sometime?
19     A.   I can't recall the date.
20     Q.   Okay.  When it became
21 effective -- let me start over again without
22 stuttering.  When it became effective you were
23 in the role of a director of OCS?
24     A.   Correct.

Page 32

1      Q.   And were you on any committee
2  to make a decision about formulating the
3  sexual misconduct policy?
4      A.   No.
5      Q.   Did you have any input in the
6  formulation of any sexual misconduct policy?
7      A.   Not formally.  My supervisor
8  was on the committee and she would share with
9  me kind of some of the conversations, but I
10 did not have a formal line to the committee.
11 It was not part of any decision making.
12     Q.   Who was your supervisor?
13     A.   Kiersten White.
14     Q.   And Ms. White is still there,
15 right?
16     A.   Dr. White, yes.
17     Q.   Dr. White.  And Dr. White is
18 in -- is she with OCS or another?
19     A.   She is not technically within
20 the community standards office.  I report to
21 her.  She is an assistant vice president.
22     Q.   And she oversees what besides
23 OCS?
24     A.   The technology operations

Page 33

1  within the division, student health, student
2  outreach and support, counseling center.  I
3  may be missing something.
4      Q.   And in 2015 she was the person
5  you reported to; is that correct?
6      A.   Correct.
7      Q.   And she has still been the
8  person you report to up to the present?
9      A.   Yes.
10         MR. PICCERILLI:  Let him ask
11     the full question, please.
12         THE WITNESS:  I apologize.
13 BY MR. SCHWABENLAND:
14     Q.   Mr. Anderson was here not too
15 long ago for a deposition.  What does he do in
16 relation to what you do?  That's a bad
17 question.
18     A.   Yeah.
19     Q.   Do you do any reporting to
20 Anderson?
21     A.   My supervisor reports to Dr.
22 Anderson.
23     Q.   Dr. Anderson.
24     A.   I report to Dr. White who

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1 reports to Dr. Anderson. So there's a layer
2 in between.
3     Q.    And so is he responsible in his
4 capacity for the operations of OCS?
5     A.    That's a difficult question to
6 answer. He's responsible for all of student
7 life as the vice president of student life. I
8 am responsible for the administrative
9 operation of community standards.
10     Q.    And Kiersten White again would
11 be responsible for what?
12     A.    Responsible for ensuring that
13 my responsibility in the office of community
14 standards has been met.
15     Q.    Okay. But in terms of primary
16 responsibility, that would lie with -- I'm
17 sorry. Primary responsibility for the
18 operation of OCS, that would lie with you, as
19 the director?
20     A.    Correct.
21         MR. PICCERILLI: Objection to
22     form.
23 BY MR. SCHWABENLAND:
24     Q.    Now, you said that your role as

Page 35

1 director, if I understand correctly -- and I'm
2 paraphrasing what I think you just said -- to
3 ensure that the mission and the vision of OCS
4 is properly performed?
5     A.    Right.
6     Q.    Okay. Tell us now, what does
7 OCS do and what is its mission and vision
8 within the university complex? If that's a
9 complex question, I will be glad to boil it
10 down to one. I just want to know, what does
11 OCS do?
12     A.    Right. So we are -- we are
13 very intentional with our name, as the office
14 of community standards, and not student
15 conduct or policy enforcement, because we do a
16 lot more than that. The way we frame it to
17 students is that there are standards for our
18 community that are agreed upon, that are
19 important in sustaining our community. So at
20 its core the office of community standards
21 sustains the community by enforcing the
22 standards for that community.
23     Q.    And do those standards apply
24 only to the standards of students, student

Page 36

1 conduct, or does it apply to faculty, staff,
2 and anybody within the university?
3     A.    My office is only responsible
4 for student conduct.
5     Q.    Okay. What office would be
6 responsible for any misconduct or alleged
7 misconduct on the part of staff or faculty?
8     A.    I can't answer that.
9     Q.    And the community standards for
10 students would be, again, within --
11 articulated in the code of conduct in the
12 handbook; is that correct?
13     A.    Yes.
14     Q.    And it would also be, as of
15 2015, articulated in the sexual misconduct
16 policy?
17     A.    Correct.
18     Q.    Would community standards
19 include anything else other than the two
20 things I just indicated?
21     A.    Well, community standards
22 includes a lot of policies, one of which is
23 the sexual misconduct policy. So it would
24 include various other policies.

Page 37

1     Q.    And can you identify them for
2 me?
3     A.    I can't exhaustively.
4     Q.    Well, I am not asking for
5 exhaustive. Tell me what you can recall now
6 as you sit here.
7     A.    Violation of the alcohol
8 policy, violation of drug policy. Those are
9 the only two that I right now with confidence
10 can give you the policy names without
11 reference.
12     Q.    Those policies are articulated,
13 as I understand it, in the student handbook,
14 right?
15     A.    Yes.
16     Q.    Are there any additional
17 policies that are not articulated in the
18 student handbook that you can recall that
19 would apply?
20     A.    Not that I can recall.
21     Q.    Okay. Is there a manual at OCS
22 for the handling of misconduct charges?
23     A.    What do you mean? Can I ask
24 what you mean by a manual?

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1   Q.   Sure. There are different
2 people that come in and out of OCS. Is there
3 a manual there that instructs as to how
4 charges should be handled, what are the
5 procedural steps to dealing with this?
6        MR. PICCERILLI:  Objection to
7        form.
8        THE WITNESS:  The procedural
9        steps are outlined in the handbook.
10       The handbook is our process. So that
11       outlines the process. We do have a
12       manual that speaks more theoretically
13       about how to engage in conversations
14       with students and we use that as a
15       training document and that is a
16       document heavily modeled off of the
17       association of student conduct
18       administration's model manual.
19 BY MR. SCHWABENLAND:
20   Q.   Okay. And could you say that
21 again?
22   A.   Association of student conduct
23 administration.
24   Q.   And is that an outside source?

Page 39

1 Is the association of student conduct
2 administration part of the university or is
3 that an outside source?
4   A.   That is a professional --
5 outside source. It's a professional
6 association, nationwide association.
7   Q.   You mentioned training in the
8 sense of how to, what, approach students or
9 what?
10   A.   How to engage in the
11 conversation when meeting with students.
12   Q.   And so this would be within
13 your office?
14   A.   Correct.
15   Q.   And is it a big book? It's not
16 a multi-volume book or anything like that, I
17 take it?
18   A.   No. It's about -- and I would
19 be guessing -- a 20- to 30-page Word document.
20   Q.   Other than recalling that it
21 refers to instructing a person from OCS on how
22 to engage with the student, can you recall any
23 other instructions that it provides?
24   A.   The appendix of that document

Page 40

1 provides the mechanics of our system, what to
2 click and where to save things and so purely
3 from an operational standpoint it provides
4 those guidelines for hearing officers.
5   Q.   And is there a name given to
6 this -- I will either call it a manual or a
7 pamphlet, whatever we've been talking about
8 here?
9   A.   We call it a manual.
10   Q.   Manual?
11   A.   Hearing officer manual.
12   Q.   Does that manual also apply to
13 now that -- let me start over again. Now that
14 the university has a sexual misconduct policy
15 where -- and it's my understanding that the
16 sexual misconduct policy does not assign a
17 hearing officer to a student's case; am I
18 correct?
19        MR. PICCERILLI:  Objection to
20        form.
21        THE WITNESS:  We assign an
22        investigator, which is the hearing,
23        and so they are a hearing officer
24        investigator. So same concept, we

Page 41

1        assign an investigator.
2 BY MR. SCHWABENLAND:
3   Q.   I understand that. So you are
4 saying that the investigator conducts his or
5 her own hearing?
6   A.   The investigator conducts the
7 investigation, which is the hearing.
8   Q.   Okay. What is your definition
9 of a hearing? I guess I need to know that.
10        MR. PICCERILLI:  Objection to
11        the form.
12        THE WITNESS:  Where an
13        opportunity for a student to respond,
14        to understand -- to respond to the
15        situation and we do that in an
16        administrative hearing, a board
17        hearing, and an investigative hearing.
18 BY MR. SCHWABENLAND:
19   Q.   Let me just pursue that a
20 little bit more, if I could.
21   A.   Sure.
22   Q.   I am talking about a nonsexual
23 thing, such as assault. An assault can be
24 nonsexual; is that correct?

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1      A.    Correct.
2      Q.    So if it is nonsexual it
3  doesn't fall within the sexual misconduct
4  policy, right?
5      A.    Right.
6      Q.    And if an assault took place on
7  campus where one student is accusing another
8  student of, I will say, beating him up, that
9  happens on occasions, right?
10     A.    Yes.
11     Q.    The student being charged, I
12  will call him the -- he would be called the
13  respondent; is that correct?
14     A.    Yes.
15     Q.    And the student making the
16  claim against the respondent would be the
17  complainant, right?
18     A.    Yes.
19     Q.    And would both receive notice
20  of the charge of assault against the
21  respondent?
22     A.    Yes.
23     Q.    And would that identify --
24  would that -- I will call it a charge letter.

Page 43

1  Would that --
2      A.    Charge notice, charge letter.
3      Q.    A charge notice would be issued
4  from OCS, right?
5      A.    Yes.
6      Q.    And the student would be
7  told -- I'm sorry.  Would be that charge
8  notice, since this deals with an assault,
9  advise of some type of prehearing meeting?
10     A.    It would depend.  That's not an
11  automatic.  In the handbook we say that for
12  more serious cases a prehearing meeting shall
13  be scheduled and so if we saw it as a more
14  serious incident we would schedule a
15  prehearing meeting.
16     Q.    And the more serious incident
17  would be things -- charges or violations that
18  would subject to -- a respondent, if found to
19  be responsible, subject that respondent to
20  either suspension, termination, or, you know,
21  suspension or termination?
22         MR. PICCERILLI:  Objection to
23     form.
24         THE WITNESS:  Yes.  Not

Page 44

1  exclusively.  If we saw an incident as
2  more serious, because of the nature of
3  that we might schedule a prehearing
4  meeting as well.
5  BY MR. SCHWABENLAND:
6      Q.    If it's a drinking charge for
7  beer or maybe smoking marijuana, that would
8  not be in the serious category, I take it?
9  That by itself would not place it in the
10  serious category?
11         MR. PICCERILLI:  Objection to
12     form.
13         THE WITNESS:  If a student had
14     a concerning disciplinary history, it
15     may.
16  BY MR. SCHWABENLAND:
17     Q.    I'm sorry?
18     A.    If a student had a concerning
19  disciplinary history, it may.  If we are
20  talking about the first alcohol violation or
21  are we talking about the sixth alcohol
22  violation?  The sixth, we might treat that as
23  more serious of an isolation, though, in the
24  context of a disciplinary history maybe.

Page 45

1      Q.    Well, let's assume it's the
2  first or the second in that type of context.
3  Normally, you wouldn't schedule a prehearing
4  meeting with him?
5      A.    Right.
6      Q.    So let's talk, if it's a
7  serious thing would a prehearing meeting be
8  scheduled?
9      A.    Yes.
10     Q.    What would be the purpose of a
11  prehearing meeting?
12     A.    To discuss the process and so
13  that the student understood fully the process
14  before entering that hearing.
15     Q.    Okay.  And the process -- is
16  there a form that the student -- that is
17  reviewed with the student in discussing the
18  process and you ask the student to sign off on
19  a checklist?
20     A.    Yes.
21     Q.    And there's also a checklist
22  used for -- in a context of an alleged
23  violation of sexual misconduct policy; is that
24  correct?

12 (Pages 42 - 45)

Page 46

1    A.   Yes.
2    Q.   Is the checklist in a nonsexual
3 but serious offense similar to the type of
4 checklist that is used in a sexual misconduct
5 policy?
6        MR. PICCERILLI:  Objection to
7    form.
8        THE WITNESS:  It is similar in
9    the purpose, but the language is
10   different, because the sexual
11   misconduct policy form for the
12   pre-investigation meetings pulls
13   language from the sexual misconduct
14   policy.
15 BY MR. SCHWABENLAND:
16   Q.   And they talk about an
17 investigator in that policy?
18   A.   Right.
19   Q.   But does the form -- again, in
20 a nonsexual context of a fairly serious
21 offense like an assault, would that talk about
22 the scheduling of a hearing before a hearing
23 officer?
24   A.   Yes.  It would talk about the

Page 47

1 process for that alleged conduct.
2    Q.   And would you, in addition to
3 advising that student -- and, again, I'm just
4 in the context of a nonsexual serious offense
5 and dealing with the process -- in addition to
6 advising the student of the specific charge
7 against him or her, what that student can do
8 to prepare for the hearing?
9        MR. PICCERILLI:  Object to the
10   form.
11       THE WITNESS:  I can't recall
12   with specificity everything that's on
13   that checklist.
14 BY MR. SCHWABENLAND:
15   Q.   When was the last time you
16 presented a checklist to a student?
17       MR. PICCERILLI:  Objection to
18   form.
19       THE WITNESS:  I can't recall.
20 BY MR. SCHWABENLAND:
21   Q.   Would it have been this year?
22   A.   Yes.
23   Q.   And would it have been this
24 year that you would have presented a checklist

Page 48

1 for both nonsexual as well as sexual matters?
2    A.   Yes.
3    Q.   So -- and I forgot to ask you
4 this.  Today -- I am jumping forward here.  I
5 will try to keep it clear.  In 2018, I
6 understand that you were the director -- I'm
7 sorry -- for the school year 2017 into 2018,
8 which just ended in May of this year?
9    A.   Right.
10   Q.   You're the director of OCS,
11 right?
12   A.   Yes.
13   Q.   It's my understanding that
14 Emily Forte was with OCS but she just
15 transferred over to someplace else.
16   A.   Yes.
17   Q.   So did she remain with OCS up
18 until the end of the school year?
19   A.   No.
20   Q.   Did she switch over to another
21 job assignment or office sometime in April of
22 2018?
23   A.   I don't recall the date, but
24 April sounds right.

Page 49

1    Q.   So sometime during this last
2 semester she switched over?
3    A.   Yes.
4    Q.   And what does she do now?
5    A.   She's the assistant director of
6 student success.
7    Q.   I'm sorry.  Student --
8    A.   Student success.
9    Q.   And who heads up that office?
10   A.   Daniel McDevitt is the director
11 of student success.
12   Q.   And how long has that office
13 been around?
14   A.   I can't answer that.
15   Q.   Has it been around for several
16 years or just formulated?
17   A.   Several years.
18   Q.   What is the role of office of
19 student success?
20   A.   I can't tell you exhaustively.
21   Q.   I don't want that.
22   A.   I can tell you as I interact
23 with them what they're -- because I can't
24 pretend to know all that they do.  But they do

13 (Pages 46 - 49)

CONFIDENTIAL

1 what exactly their office purports to do and
2 it's work with students on their success. So
3 if a student is not doing well in the
4 classroom and maybe it's flagged by a faculty
5 member, they may facilitate a follow-up with
6 that student. If the student is not adjusting
7 well, if a student did poorly their first
8 semester, they have a program to sort of
9 rebound into the second semester. So it's
10 truly about the student's success inside and
11 outside the classroom.
12        Q.    And does that office of student
13 success, if you know, does that interact with
14 the office of student disabilities? I am not
15 sure I am saying that office correctly.
16        MR. PICCERILLI: Objection to
17    form.
18        THE WITNESS: I think it's
19    student disability services. I don't
20    know. I can't answer how they
21    interact.
22 BY MR. SCHWABENLAND:
23        Q.    Okay. Your office, OCS, you
24 sometimes interact with the office of student

1 disabilities; is that correct?
2        MR. PICCERILLI: Object to the
3    form.
4        THE WITNESS: Yes.
5 BY MR. SCHWABENLAND:
6        Q.    And would that be primarily to
7 see what accommodations might be necessary for
8 a student with a disability?
9        A.    I'm never in a position to
10 determine what accommodation might be needed
11 or necessary or appropriate. If a student is
12 registered with the office and they go to the
13 office, we are notified by the office that
14 these accommodations are being offered or put
15 in place. I'm not in a position to do that.
16        Q.    I'm jumping ahead. In
17 Mr. Doe's case --
18        MR. SCHWABENLAND: And, by the
19    way, I have to do one thing off the
20    record, if I may.
21        THE VIDEOGRAPHER: Off the
22    record, 10:57.
23        MR. SCHWABENLAND: I need this
24    on the steno. I didn't want to ask

1 you this on the camera here. We've
2 said this with the other witnesses
3 too. In order to protect the names of
4 the plaintiff here and the individual
5 defendant, the plaintiff is John Doe
6 we'll be referring to and the
7 individual defendant is Jane Roe.
8 When I say those names you know who I
9 am referring to; is that correct?
10        THE WITNESS: Yes.
11        MR. SCHWABENLAND: So that's
12    acceptable, that you won't feel
13    confused as to who these two people
14    are, then?
15        THE WITNESS: That's
16    acceptable.
17        MR. SCHWABENLAND: Thank you.
18    Go back on the camera here.
19        THE VIDEOGRAPHER: Back on the
20    record, 10:58.
21 BY MR. SCHWABENLAND:
22        Q.    In this present case, John Doe,
23 did you learn at some point that he was
24 registered with the office of student

1 disabilities?
2        A.    I don't know that I learned
3 that he was registered. I can't recall the
4 specifics.
5        Q.    Okay. And that's all I am
6 asking you. Do you have any knowledge that he
7 was registered with the office of student
8 disabilities?
9        MR. PICCERILLI: Objection to
10    form.
11        THE WITNESS: At some point
12    after the outcome I engaged in a
13    conversation with our director of
14    student disability services about an
15    accommodation request to review
16    documents. So in that sense I did
17    learn that he was engaged with the
18    disabilities office.
19 BY MR. SCHWABENLAND:
20        Q.    Okay.
21        A.    I don't know whether
22 technically I would say I knew that he was
23 registered or not registered. I knew that he
24 was engaged at that point with the office.

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1     Q.     Who is the director of that
2  office?
3     A.     Christine Mecke.
4     Q.     I'm sorry.  What's her first
5  name?
6     A.     Christine.
7     Q.     Just so it's clear, your
8  conversation with her would have been after
9  the investigation, the findings, and the
10 outcome meeting that -- you were present at
11 the outcome meeting, right?
12    A.     I was.
13    Q.     And I take it you did not do
14 the investigation on this claim involving John
15 Doe, right?
16    A.     Right.
17    Q.     And that was done by
18 Ms. Malloy, an outside counsel?
19    A.     Correct.
20    Q.     So sometime after the outcome
21 meeting the student was afforded an
22 opportunity to what, to review documents?
23    A.     Right.
24    Q.     Okay.

Page 55

1     A.     Right.
2     Q.     And he asked -- if I understand
3  correctly, he asked for some type of
4  accommodation and that's when you would
5  have -- in the reviewing of those documents
6  and that's when you had a conversation with
7  the director of student disability?
8     A.     Right.  Right.
9     Q.     And what accommodation did you
10 provide him with?
11    A.     Extended time.  And so when he
12 came in to review the documents, I cleared my
13 calendar for the day and made sure that there
14 was no rush and that there was an extended
15 time to review.
16    Q.     And I was there with him.  Is
17 that when I first met you?
18    A.     Yes.
19    Q.     And I was acting in the
20 position of what the university would term
21 adviser to John Doe; is that correct?
22           MR. PICCERILLI:  Objection to
23    form.
24           THE WITNESS:  Yes.

Page 56

1  BY MR. SCHWABENLAND:
2     Q.     And, if I can, I just want to
3  complete that thought.  I take it the policy
4  is that the student can only review documents
5  at that point, right?
6           MR. PICCERILLI:  Objection to
7     form.
8           THE WITNESS:  In that meeting,
9     yes.
10 BY MR. SCHWABENLAND:
11    Q.     Okay.  And I could accompany
12 Mr. Doe as an adviser, but I was not permitted
13 to review the documents as an adviser, right?
14    A.     Correct.
15    Q.     Although we could take breaks
16 and I could walk out with him and talk outside
17 the room; is that correct?
18    A.     Yes.
19    Q.     And in order for you to
20 maintain the integrity of those documents,
21 that's why you had to sit in that room; is
22 that right?
23    A.     Yes.
24    Q.     But the accommodation that you

Page 57

1  afforded him was that he could have whatever
2  time he needed to review these documents and
3  if he needed to come back again he would
4  certainly be permitted to come back?
5     A.     Yes.
6     Q.     So that's -- just before that
7  meeting, I take it, that would be around the
8  same time that you, what, spoke with the
9  director of student disability just to confirm
10 that some accommodation would be necessary?
11    A.     Right.
12    Q.     Did the director of student
13 disability indicate that he had been afforded
14 accommodations academically?
15           MR. PICCERILLI:  Objection to
16    form.
17           THE WITNESS:  No, that was not
18    pertinent to what we needed to
19    discuss, which was accommodations for
20    the record inspection.
21 BY MR. SCHWABENLAND:
22    Q.     So even with that discussion,
23 you didn't learn that he had signed up or
24 registered with that -- with the office of

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1  student disability --
2       MR. PICCERILLI:  Objection to
3  form.
4  BY MR. SCHWABENLAND:
5       Q.    -- for accommodations early on?
6       MR. PICCERILLI:  Objection to
7  form.
8       THE WITNESS:  No.
9  BY MR. SCHWABENLAND:
10      Q.    Okay.  Do you know what
11 disability or learning difference Mr. Doe was
12 claiming to the office of student disability?
13      A.    I don't from the office of
14 student disability.  I know that he put it in
15 some of the appeal communications to the
16 office, but I don't recall what those were.
17 That was not any formal notice from disability
18 office of any -- nor would we.  We would just
19 be told that this student is afforded this
20 accommodation for this purpose, but not the
21 disability that resulted in that
22 accommodation.
23      Q.    I am jumping around here.  Has
24 OCS in the last five years, I'll say, given

Page 59

1  students accommodations who have learning
2  disabilities?
3       MR. PICCERILLI:  Objection to
4       the form.
5       THE WITNESS:  I can't recall a
6       time, but I don't want to say that we
7       haven't.
8  BY MR. SCHWABENLAND:
9       Q.    Okay.  If a student is advised,
10 say, at a pre-investigation meeting, whether
11 it be a sexual misconduct charge or a
12 nonsexual misconduct charge but serious in
13 nature to have a pre-investigation meeting, is
14 the student advised on that checklist that
15 accommodations can be given?
16      (Cell phone ringing)
17      MR. PICCERILLI:  Excuse me.
18      THE VIDEOGRAPHER:  Off the
19      record, 11:05.
20                     - - -
21      (Whereupon, the court reporter
22      read back from the record.)
23                     - - -
24      MR. PICCERILLI:  Just note my

Page 60

1  objection to the form of the question.
2       THE VIDEOGRAPHER:  We're back
3  on the record, 11:15.
4  BY MR. SCHWABENLAND:
5       Q.    We are back on the record.
6       A.    I wasn't sure.
7       Q.    We read the question I just
8  posed before we broke.  So go ahead.
9       A.    Yes.
10      Q.    And what are they told?
11      A.    I don't know the exact language
12 without referencing the document.
13      Q.    What would you tell them?
14      A.    I don't go off of the checklist
15 script and so we actually go through the
16 language that's in the checklist.  We read the
17 language that's in the checklist with the
18 student.  So I don't editorialize on that
19 checklist.
20      Q.    And I take it if the student
21 has any questions of you then you would answer
22 those questions?
23      A.    Yes.
24      Q.    Okay.  So in the checklist, for

Page 61

1  the accommodation, does that tell the student
2  what he or she has to do to get that
3  accommodation?
4       A.    Yes.
5       Q.    And so what -- if they want it,
6  what do they do?
7       A.    They need to contact or they
8  should contact the director of student
9  disability services.
10      Q.    And then, what, student
11 disability services gets in touch with OCS?
12      A.    Right.
13      Q.    Okay.  So if the student said
14 to you or somebody conducting the
15 pre-investigation that, "Oh, yeah, I need some
16 accommodation, I need some help," you
17 wouldn't -- by you, I'm sorry -- OCS wouldn't
18 take it upon themselves to get in touch with
19 the director -- get in touch with the office
20 of student disability, right?
21      A.    Right.
22      Q.    Okay.  And in that vein has, if
23 you know, has any student ever asked for an
24 accommodation of OCS to allow assistance from

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1 someone in taking notes, note taking?
2     A.    Not that I can recall.
3     Q.    Okay.
4     A.    Outside of this instance where
5 the request was for a note taker.
6     Q.    And did John Doe ask for a note
7 taker?
8     A.    For the review of the documents
9 after the outcome.
10     Q.    Okay.  And was that provided to
11 him?
12     A.    It was not.
13     Q.    And do you know why -- and did
14 you make the decision on that?
15     A.    I did not.
16     Q.    Who made the decision on that?
17     A.    The director of disability
18 services.
19     Q.    And what did she say as to her
20 reason why this was not afforded him?
21     A.    She did not.  She just said,
22 "Here are the accommodations that are
23 afforded" --
24     Q.    So --

Page 63

1     A.    -- and wouldn't answer or
2 articulate reasons why others were not.
3     Q.    Okay.  So what do you recall
4 her saying were the accommodations?
5     A.    Extended time.
6     Q.    But if she had said yes, an
7 adviser could take notes for him, would that
8 have been an accommodation then you would have
9 provided?  By you I mean OCS.
10        MR. PICCERILLI:  Object to the
11        form.
12        THE WITNESS:  I don't see why
13        we would not, as long as it was
14        something that was from the
15        disabilities office.
16 BY MR. SCHWABENLAND:
17     Q.    But then the adviser in that
18 role or -- I'm using the term adviser as a
19 person who accompanies -- who would accompany
20 him to take notes, would be the person, then,
21 to review the documents with the student; is
22 that correct?
23        MR. PICCERILLI:  Objection to
24        form.

Page 64

1        THE WITNESS:  Right.  But this
2 is hypothetical.  We would have to at
3 that instance see whether that
4 accommodation was appropriate for our
5 process, it was appropriate to be
6 offered.  Like, institutionally we
7 would have to make the decision on
8 whether that was a reasonable
9 accommodation in our process, that
10 didn't substantively change our
11 process.
12 BY MR. SCHWABENLAND:
13     Q.    So the first decision to see,
14 then, again, if one was made -- let me speak
15 English.  If a request for a note taker was
16 made, the first decision would be to determine
17 if that is reasonable or necessary in light of
18 the student's, I will call it a disability or
19 a learning difference, right?
20        MR. PICCERILLI:  Objection.
21        Objection to form.
22 BY MR. SCHWABENLAND:
23     Q.    Right?
24     A.    Right.  Yes.

Page 65

1     Q.    But then there's a second
2 aspect that would have to be decided.
3 Assuming that the director at student
4 disabilities would say yes -- he -- I will use
5 the term he, generically -- he should be
6 entitled -- he should be afforded the
7 opportunity to have a note taker with him,
8 then you have to -- then OCS would have to
9 decide, well, are you at liberty, because of
10 your protocol that were set up, to allow this
11 to happen?
12     A.    Right.  I think at that point
13 we would engage in conversation with our
14 general counsel to see the application of that
15 accommodation within our process, so as not to
16 change our process substantively.
17     Q.    So I take it from our
18 discussion that you don't recall as you sit
19 here ever having to make that decision whether
20 or not to afford -- to permit a note taker to
21 be involved with a student?
22     A.    Right.  Yes.
23     Q.    Okay.  We were at the point of
24 the example of a nonsexual but serious

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1 offense.
2          MR. PICCERILLI:  Can we go
3 off the video record and off the
4 record?
5          THE VIDEOGRAPHER:  Off the
6 record, 11:21.
7               _ _ _
8          (Off the record)
9               _ _ _
10         THE VIDEOGRAPHER:  Back on the
11 record, 11:25.
12 BY MR. SCHWABENLAND:
13     Q.     Again, we are in a setting -- I
14 will get back to that setting.  I forgot to
15 ask you something.  Since coming to St. Joe's
16 University, I know your work schedule, but
17 have you gone on to any additional educational
18 pursuits?
19     A.     Yes.
20     Q.     Okay.  And when did you do that
21 and what area have you pursued?
22     A.     So understanding your question
23 of what you mean by educational pursuits.
24     Q.     Yes.  In other words, you have

Page 67

1 gone from having a master's?  Are you pursuing
2 any other certification, doctorate, anything
3 like that?
4     A.     Yes.  Yes, I am currently in
5 the educational leadership doctoral program
6 and I started that in the fall of 2016.
7     Q.     And how long a course -- well,
8 I'm sorry.  How long is that program?
9     A.     It's three years straight of
10 coursework and then additional time after
11 that, that can range.
12     Q.     And where are you taking that,
13 at the university?
14     A.     At St. Joseph's University.
15     Q.     And is that a continuous three
16 years, if you know?
17     A.     Yes.
18     Q.     Okay.  And you said after the
19 three years what happens?
20     A.     It's not a prescribed time.
21 After that three years of coursework there is
22 dissertation preparation and defense, which
23 can take a range of time.
24     Q.     You haven't started your

Page 68

1 dissertation yet, have you?
2     A.     No.
3     Q.     Do you have any idea what
4 subject you are going to pursue?
5     A.     Not concretely.
6     Q.     Okay.  What is -- tell me, how
7 would you describe this educational leadership
8 doctoral program?
9     A.     It's a blend -- it's
10 interdisciplinarian.  So there are classmates
11 of mine working in higher education,
12 classmates working in nonprofit, and
13 classmates working in K/12 education systems.
14 So it's not exclusively higher education.  And
15 it's administrative.  It's leadership.  There
16 is classes on financing and budgeting and
17 planning.
18     Q.     Regardless of what department
19 you're in or where you work?
20     A.     Right.
21     Q.     Okay.  Does the program have
22 anything to do with the disciplining of
23 students or the handling of discipline cases?
24     A.     There is a course on law and

Page 69

1 policy.
2     Q.     On what?
3     A.     Law and policy, with at least
4 one class within that course on student
5 discipline on a theoretical level.
6     Q.     And have you taken that course?
7     A.     Yes.
8     Q.     And does that course include
9 applications of Title IX?
10     A.     Yes.
11     Q.     So it would include the
12 handling or the -- the handling of sexual
13 misconduct claims?
14     A.     It was a really high-level
15 review of federal statutes and so it was more
16 about what Title IX is and what Title IX
17 requires of institutions, but not specifics of
18 disciplinary grievance procedures.
19     Q.     So when you say high level, who
20 presented it?  Do you know?
21     A.     The faculty.
22     Q.     I'm sorry?
23     A.     The professor of the course.
24     Q.     But who is the professor?

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1     A.     Dr. Anderson, Cary Anderson.
2     Q.     Dr. Anderson?
3     A.     Yes.
4     Q.     So he presented issues on Title
5  IX, then?
6     A.     Yes.
7     Q.     And then you said it was
8  presented as to this is what Title IX is?
9     A.     Along with other --
10    Q.     Statutes?
11    A.     -- statutes and constitutional
12 rights afforded.  It was a very high-level
13 review of federal statutes in one course.
14    Q.     I am not sure what you mean by
15 high level.  Can you explain?
16    A.     Not in depth, right.  It was --
17    Q.     An overview?
18    A.     An overview of statutes.
19    Q.     And at the time that this was
20 done, I take it, at least at the university,
21 the sexual misconduct policy was in place; is
22 that correct?
23    A.     Yes.
24    Q.     Did Dr. Anderson do any

Page 71

1  discussions or presentation on the sexual
2  misconduct policy at the university?
3     A.     No.
4     Q.     And that particular course was
5  how long?
6     A.     Six weeks.
7     Q.     In the process of that being
8  presented, do you recall -- I'm sorry.  Let me
9  go back.  For that course were you given any
10 pamphlets concerning the curriculum?
11    A.     We received a course syllabus
12 and two texts that went along with the course.
13    Q.     So would you still have that,
14 in terms of what was presented at that
15 particular course?
16    A.     It didn't go into specifics of
17 what was presented at that course.  It was
18 what day what content would be presented, was
19 the syllabus.
20    Q.     Okay.  Were you handed out any
21 papers concerning applicable laws?
22    A.     Not that I can recall.
23    Q.     Okay.  Did you get an A?
24    A.     I did.

Page 72

1     Q.     Good.  Okay.  And so you're
2  pursuing your doctorate.  Have you gotten any
3  additional certifications since your master's?
4     A.     Testing my memory here.
5  There's a couple that I do.  I don't know if
6  I'd call them certifications in a traditional
7  sense.  It's not that it comes with any
8  licensure.  But I did work with the
9  Anti-Defamation League for facilitating
10 diversity dialogues on campus and that was a
11 full, I think, two weeks of training for that.
12 More recently, I received a certificate in the
13 application of restorative justice in Catholic
14 colleges and universities, focusing on
15 community and community impact.
16    Q.     Focusing on what?
17    A.     Community and community
18 impacts.
19    Q.     The Anti-Defamation League, for
20 your participation you received a thank you
21 and a certificate of --
22    A.     Yes.
23    Q.     -- participation, I would
24 imagine?

Page 73

1     A.     Yes.
2     Q.     And was it a one-time
3  presentation?
4     A.     It was a week-long, almost
5  train-the-trainer program.
6     Q.     Okay.
7     A.     There was a group of us that
8  were trained to facilitate these dialogues on
9  our campus.
10    Q.     And so have you gone on to use
11 that at all, that training?
12    A.     I did.  This was years ago and
13 at that time, in the years following the
14 training I did.
15    Q.     The Anti-Defamation League --
16 I'm sorry -- would be any type of defamation,
17 because of sex, religion, color, things like
18 that?
19    A.     It was more about understanding
20 our own identities and identities of others
21 and creating a welcoming community, but not
22 specific on prohibited or protected
23 categories.
24    Q.     And I am not sure what you mean

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1  by application of restorative justice.  What
2  is that?
3     A.    Sure.  That is a principle of
4  understanding -- and even outside.  It wasn't
5  a specifically community standards training.
6  There were folks from across student
7  affairs --
8     Q.    Okay.
9     A.    -- outside of the university.
10 And it's more about understanding what makes
11 up a community, and when something happens
12 that disrupts the community the importance of
13 having the community be a part of that
14 response and understanding the harm and what
15 the follow-up would be.
16    Q.    Did any of that have to deal
17 with sexual misconduct offenses within a
18 community?
19    A.    A small portion of it, yes.
20    Q.    Any other types of
21 certifications that you may have received?
22 And, again, I know you said, "I'm not sure" --
23    A.    No.  I am not sure.  And I
24 would note that the restorative justice

Page 75

1  happened this summer, so it was after the
2  matter in question.
3     Q.    Okay.  Let me ask you this:
4  Did you ever receive any type of, I will call
5  it certification or licensing or anything in
6  counseling?
7     A.    No.
8     Q.    Do you hold -- do you consider
9  yourself to be a Title IX authority or
10 coordinator?
11    A.    I am not a coordinator.
12    Q.    Okay.
13    A.    I am well-versed in Title IX as
14 it pertains to my job.  I wouldn't call myself
15 an authority.
16    Q.    Okay.  And you say you are
17 well-versed.  How did you become well-versed?
18    A.    Through experience, through
19 working in the office for over ten years,
20 taking advantage of my professional
21 development, ASCAs, resources, and I have gone
22 to conferences.
23    Q.    I'm sorry.  AS --
24    A.    ASCA.

Page 76

1     Q.    What is that?
2     A.    Association of Student Conduct
3  Administrators.  I have gone to conferences
4  and sessions and took advantage of those
5  professional development opportunities that
6  were afforded to me.
7     Q.    Okay?
8     A.    And truly relying on my
9  colleagues to help me understand as it
10 pertains to community standards, including
11 general counsel.
12    Q.    Okay.  And so your colleagues
13 would be whom?
14    A.    Dr. Anderson and Dr. White, Dr.
15 Perry, Mary-Elaine Perry, who is our Title IX
16 coordinator.
17    Q.    Now, she is leaving, I'm told.
18 Is that your understanding?
19    A.    I don't know the specifics.
20    Q.    Okay.  But right now she's
21 there?
22    A.    She is.
23    Q.    Okay.  And she's the Title IX
24 coordinator?

Page 77

1     A.    Yes.
2     Q.    I know you said -- we spoke
3  about one of the courses in your doctoral
4  program you had on the law and that involved
5  some aspect of Title IX; is that correct?
6     A.    Yes.
7     Q.    But I take it you've taken
8  other conferences or attended other
9  conferences where the issue concerning Title
10 IX or the handling of sexual misconduct has
11 been an issue discussed?
12          MR. PICCERILLI:  Objection to
13    form.
14          THE WITNESS:  Yes.
15 BY MR. SCHWABENLAND:
16    Q.    And would you be able to tell
17 me -- I'm sorry.  Would you have a list -- let
18 me start over again.  Do you have a resumé?
19    A.    Yes.
20    Q.    And would this resumé talk
21 about not only your educational background and
22 work history but it would also talk about the
23 courses that you have attended at least over
24 the last ten years or so?

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1    A.    No.
2    Q.    Do you have a list of what
3  courses you have attended over the last ten
4  years or five years?
5    A.    No.
6    Q.    If you wanted to find out what
7  courses you took involving Title IX, would you
8  be able to find out?
9    A.    No.
10   Q.    Are you able to tell me how
11 many courses you took involving Title IX?
12   A.    You're using the word courses.
13 I would use the word sessions at a conference.
14   Q.    Okay.
15   A.    And so it's much -- in higher
16 education it's in that vein, right, and so I
17 go to a conference and there is breakouts and
18 this one happens to be on Title IX or this one
19 happens to be on getting students to attend
20 programs, right.  I mean, it's a breakout.  So
21 I don't know over the course of over a decade
22 what sessions I've gone to about what.  That's
23 not something that's cataloged in my resumé.
24   Q.    So what you're talking about

Page 79

1  is, you would attend a day conference or maybe
2  a two-day conference?
3    A.    Yes.
4    Q.    And you would see what sessions
5  are being offered and then you pick and choose
6  which ones you would like to go to, right?
7    A.    Yes.
8    Q.    Would you have a list someplace
9  at least of what conferences you have
10 attended, say, each year?
11   A.    I don't have a list.
12   Q.    Is there any requirement with
13 regard to your position or your job that you
14 have to attend so many continuing education
15 courses or conferences?
16   A.    No.
17   Q.    So I guess my question to you
18 is:  What training have you received in Title
19 IX over the years?
20   A.    There's been these conference
21 sessions, attending pretty frequent webinars
22 through our association, that association of
23 student conduct administrators, those
24 webinars, the Clery Center hosts webinars, so

Page 80

1  I've sat through those, conversations with
2  colleagues that I would consider training,
3  when we are discussing policy and practice
4  implementation, best practices.
5    Q.    And that conversation, the
6  colleagues you identified were Dr. Anderson,
7  Dr. White, Dr. Perry, counsel for the
8  university?
9    A.    Counsel.
10   Q.    Anybody else who would be
11 included in that?
12   A.    Not that I can name now.
13   Q.    And what do you mean by best
14 practices?  What does that mean?
15   A.    What other institutions might
16 be doing.  You know, if you look at, even
17 outside of Title IX, if there is something
18 that other institutions or many institutions
19 are doing or interpreting things a certain
20 way, I guess, generally speaking that's best
21 practice.  That's kind of a loaded term, but
22 it's used in every industry of what's the best
23 practice, what are folks doing out there that
24 are facing the same challenges.

Page 81

1    Q.    Okay.  Have you yourself
2  written any articles or memos about procedural
3  best practices?
4    A.    No.
5        MR. PICCERILLI:  Let me just
6    object to the form.  I am not so sure
7    what areas you were referring to.
8        MR. SCHWABENLAND:  Okay.
9  BY MR. SCHWABENLAND:
10   Q.    Have you yourself done any
11 studies on what practices have been at other
12 teaching institutions of higher learning?
13       MR. PICCERILLI:  Objection to
14   form.
15       THE WITNESS:  With regards to?
16 BY MR. SCHWABENLAND:
17   Q.    Well, with regard to either the
18 handling of -- well, I will do it one at a
19 time.  With regards to sexual misconduct
20 charges.
21   A.    Can you repeat what the
22 question was?
23   Q.    Sure.  I wish I could, but I'll
24 try.  Have you yourself done any research

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1 yourself on what the practices at any other
2 institution of higher learning involving
3 sexual misconduct charges?
4     A.    No.
5     Q.    How about involving Title IX
6 violations?
7     A.    Not that I can recall.
8     Q.    Okay.  How about involving any
9 type of student misconduct, whether sexual or
10 nonsexual?
11     A.    Yes, but I would explain what I
12 mean by my understanding of your use of the
13 word "research."  This is not institutional
14 review board research.  This might be an email
15 out to colleagues regionally to see what are
16 folks doing about hoverboards and should they
17 been in the residence halls, right.  I
18 consider that to be research into what is best
19 practice, but it's not research in a
20 traditional sense of research.  But nothing in
21 the Title IX or -- on sexual misconduct, but
22 certainly within the application of codes on
23 campuses.
24     Q.    The sexual misconduct policy

Page 83

1 that came into existence at St. Joseph's, I
2 had started to ask you questions concerning
3 that.  Were you yourself, as the director then
4 of OCS, were you involved in any of the
5 wording within that policy or the formulation
6 of any wording, such as you review drafts and
7 make recommendations, anything like that?
8     A.    No.
9     Q.    When did you first learn of the
10 policy, when it became effective, I mean, when
11 it was finalized and saying, "This is what we
12 are going to do.  It's going to be effective"?
13     MR. PICCERILLI:  Object to the
14     form.
15     THE WITNESS:  I don't recall
16     exactly, but it would not have been
17     the day that it became effective.
18     There was notification.  I was
19     involved prior to effective in terms
20     of operationalizing the policy into
21     our practice.
22 BY MR. SCHWABENLAND:
23     Q.    So once the wording of the
24 policy was finalized but not made effective

Page 84

1 then you had to become involved as to how you
2 are to apply this in your department at OCS?
3     A.    Yes.
4     Q.    And how did that go about?  Who
5 taught you and what was taught?
6     A.    I can't recall the specifics.
7     Q.    Can you recall anything?
8     A.    No.  We're talking over three
9 years ago for policy implementation.  I don't
10 remember the specific meetings regarding the
11 implementation.
12     Q.    Do you recall any meetings
13 concerning going from a hearing officer to now
14 a single investigator model?
15     MR. PICCERILLI:  Objection to
16     form.
17     THE WITNESS:  I don't recall
18     specific meetings.  I don't recall
19     specific meetings, but that's not to
20     say that they did not take place.
21 BY MR. SCHWABENLAND:
22     Q.    Take away the meeting, do you
23 recall discussions with anyone else?
24     A.    Yes.  I mean, there had to have

Page 85

1 been discussions about putting this into
2 practice.  This wasn't where it was a document
3 on my desk that it was now I needed to move
4 forward.  There were discussions.
5     Q.    Prior to the implementation of
6 that -- when it became effective, the sexual
7 misconduct policy, were you acquainted with
8 the single investigator model?
9     A.    Yes.
10     Q.    And how did you become
11 acquainted with that?
12     A.    That was gaining popularity, if
13 you will, within the sort of best practices
14 and so attending at conferences or seeing on
15 various listserves that institutions were
16 moving towards or thinking about an
17 investigative model.
18     Q.    And in becoming acquainted with
19 these issues of Title IX were you acquainted
20 with Dear Colleague letters?
21     A.    Yes.
22     Q.    And that would be from the
23 Office of Civil Rights; is that correct?
24     A.    Right.

22 (Pages 82 - 85)

CONFIDENTIAL

1  Q.  And were you aware of the Q&As
2  put out by the Office of Civil Rights with
3  those Dear Colleague letters?
4  A.  I'm aware of it.
5  Q.  And is this something that you
6  would routinely review over the years?
7  A.  I am having trouble with your
8  wording, routinely.
9  Q.  Okay.  Well, it's not issued
10  every year, right?  Do you know when the last
11  one was issued, the Dear Colleague letter and
12  the question and answer?
13  A.  There was an issuance in 2017,
14  I do know that.
15  Q.  And did you review that
16  material?
17  A.  I did.
18  Q.  And did you review it -- did
19  you talk with anybody at the university about
20  the recommendations of that Dear Colleague
21  letter?
22  A.  I can't recall specific
23  meetings, but I imagine I did talk with my
24  supervisor about it or Title IX coordinator

1  about it.
2  Q.  Your supervisor would have been
3  Dr. White?
4  A.  Yes.
5  Q.  And your Title IX coordinator
6  would have been Dr. Perry?
7  A.  Dr. Perry.
8  Q.  Do you know if any studies were
9  made -- I'm sorry.  Do you know if anybody at
10  the university assumed responsibility to
11  review the recommendations made by that Dear
12  Colleague letter and the questions and answers
13  in 2017 and compare it to what was going on at
14  the university then?
15  MR. PICCERILLI:  Can I hear
16  that question back, please?
17  - - -
18  (Whereupon, the court reporter
19  read back from the record.)
20  - - -
21  THE WITNESS:  I don't want to
22  speak to what others were responsible
23  for.
24

1  BY MR. SCHWABENLAND:
2  Q.  I'm just asking what you know.
3  A.  What I know is that I didn't
4  have any reason to suspect that we were -- to
5  make any changes based on the 2017 Q and A's
6  or documents.  Our Title IX coordinator, our
7  general counsel, and my supervisor, I trust,
8  were more engaging in those conversations.  I
9  was not a part of.
10  Q.  So you didn't participate in
11  any such conversations?
12  A.  Not formal conversations, no.
13  Q.  Or how about informal?
14  A.  We are -- we care about our
15  work and so when something comes out we are
16  going to talk about it.  So I don't want to
17  minimize a two-minute conversation about,
18  "Hey, this new document, did you see it" kind
19  of thing.  But there were no substantive,
20  "Let's talk about what we should be doing or
21  aren't doing."  Like I said, I have no reason
22  to think that we are not -- that changes
23  should have been made and that we weren't in
24  compliance with what we should have been.

1  Q.  I will tell you, the sexual
2  misconduct policy, a copy that I have -- and I
3  can show it to you later on -- but the -- that
4  is -- it became effective as of 2015, I think
5  June -- I think June -- and then it was
6  revised in 2017.  Is that your understanding
7  or you don't --
8  A.  Yes.
9  Q.  Okay.  Do you know what the
10  revisions were in 2017?
11  A.  I can't give you an exhaustive
12  account.  One thing that I do know was an
13  intention within the policy was to provide for
14  more gender-inclusive language.  So I know
15  that there was review of many of our policies
16  at that time to make sure they were inclusive
17  for gender.
18  Q.  What do you mean by gender -- I
19  think I know what you mean, but since I am
20  asking you the question, what do you mean by
21  gender inclusive?
22  A.  Really removing the binary
23  "he/she" and changing it to "theirs" to be
24  welcoming to our students that don't identify

23 (Pages 86 - 89)

CONFIDENTIAL

1 on a binary of male/female.
2      Q.     Okay.  So anything else that
3 you can recall about the revision?
4      A.     I can't recall any other
5 specifics.
6      Q.     But what sticks in your mind is
7 that you wanted to make it more gender
8 inclusive?
9      A.     Right, and that sticks in my
10 mind because we were doing that with other
11 policies and that was taking place at other
12 institutions, sort of taking a look at all the
13 policies.  We did the same thing within our
14 community standards process in the handbooks,
15 so that's why I remember that piece.
16      Q.     Let's go back to the example.
17 I am jumping back now.  The example of
18 nonsexual charges against a student of a
19 serious nature that would warrant a
20 pre-investigative meeting -- I'm sorry -- a
21 prehearing meeting, what would be the next
22 step that that student would be told --
23           MR. SCHWABENLAND:  Objection.
24

1 BY MR. SCHWABENLAND:
2      Q.     -- after the prehearing
3 meeting?
4      A.     At the prehearing meeting?
5      Q.     Yes.
6      A.     They would be -- through that
7 prehearing meeting they would be told about
8 the process and what to expect and that they
9 are scheduled for an administrative or board
10 hearing.
11      Q.     Okay.
12      A.     That will be the next piece.
13      Q.     Now, the person who does the
14 checkoff list, can that person still be -- can
15 that person also be the hearing officer?
16      A.     Yes.
17      Q.     And so how is the hearing
18 officer selected, then?
19      A.     It's assigned by the community
20 standards office.
21      Q.     Okay.  Do you have a list of
22 qualified people?
23      A.     We do.
24      Q.     And what makes them qualified?

1      A.     It is part of their job
2 responsibilities.  It is all of the
3 professional staff members who work in the
4 office of residence life and the staff members
5 in community standards.  So this isn't where
6 we put a notice out -- it's not that we put an
7 open invitation for somebody to volunteer to
8 be it.  It's part of their responsibilities to
9 serve as an administrative hearing officer.
10      Q.     Do they need any special
11 certification to act as the hearing officer or
12 is this internal training?
13      A.     Internal training.
14      Q.     So is there a course -- I'm
15 sorry.  Is there training courses or meetings
16 set up that someone who is willing to be a
17 hearing officer must complete before he or she
18 can be a hearing officer?
19      A.     Yes.
20      Q.     And would that be in that
21 manual?  I'm sorry.  The manual we talked
22 about was instructions on how to engage
23 students, right?
24      A.     Correct.

1      Q.     Would there be a training
2 manual for hearing officers?
3      A.     It's essentially the same
4 manuals.  So we'll pull out pieces of that
5 manual over the course of the training
6 workshops and over the course of the year.
7 It's not a one-time training.
8      Q.     Have you yourself conducted the
9 training courses?
10      A.     Yes.
11      Q.     And who else conducts the
12 training courses?
13      A.     Well, the assistant director in
14 the office of community standards, so this
15 past year Emily was a part of those trainings
16 for the hearing officers; the director of
17 residence life; we invite the Title IX
18 coordinator to come in and share perspective
19 on Title IX.  But, again, these folks aren't
20 hearing anything sexual misconduct.  It's more
21 for their professional understanding of Title
22 IX.  We might invite other campus partners to
23 come in our counseling center to talk about,
24 you know, kind of considerations through a

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 hearing.
2      Q.    Okay.  But before the sexual
3 misconduct policy became effective in 2015
4 hearing officers would also hear sexual
5 misconduct charges?
6      A.    Those hearing officers would
7 not, because we did not -- we are talking
8 again about some of them being what I was when
9 I was at Siena College hearing lower-level
10 community cases.  So those folks who were
11 assigned sexual misconduct cases before the
12 investigation model were very well trained
13 within community standards, maybe the director
14 of residence life, so not everyone, because we
15 saw that as the needing of additional
16 training.
17      Q.    Let's get back to this
18 nonsexual serious offense after the checklist
19 is done.  By that time the student would know
20 what he or she is charged with, right?
21      A.    Could you repeat that?
22      Q.    Sure.  By that time, after he
23 got the notice letter, had the
24 pre-investigative -- I'm sorry -- prehearing

Page 95

1 meeting where a checklist is reviewed, by that
2 time the student would know what he or she is
3 charged with, right?
4      A.    They would know the policies
5 implicated, right.
6      Q.    Would they know the offenses
7 that they are charged with?  I am talking
8 about the nonsexual offenses.
9      A.    Yeah, they would know the
10 policies implicated, which is the offense.  So
11 they would know they are charged with
12 violating the drug policy.
13      Q.    And if it is an assault they
14 would be charged with an assault, right?
15      A.    That's not what we call it.
16      Q.    What do you call it?
17      A.    There is an expectation, call
18 it abusing, threatening, or endangering
19 others, is what we call it.  So we are not
20 charging with assault.  Assault is a legal
21 definition.
22      Q.    Would the student also know
23 that he or she can bring witnesses to the
24 hearing?

Page 96

1      A.    Yes.
2      Q.    Would the student also know
3 that in the event that he or she does not want
4 to appear you can write something out and hand
5 it in and ask that it be considered?
6      A.    Yes.
7      Q.    Sometimes the complainant
8 doesn't want to show up, so the complainant
9 would ask to submit a statement; is that
10 correct?
11      A.    Yes.
12      Q.    And the same would be true for
13 the respondent, right?
14      A.    Right.
15      Q.    And would the student, whether
16 a complainant or a respondent, be entitled to
17 see any physical evidence, such as pictures or
18 any statements prior to the hearing?
19      A.    They would be able to see what
20 we had at that time.
21      Q.    So if you had a statement from
22 the other side, if you had pictures, if you
23 had an incident report, either student could
24 avail themselves -- either could avail himself

Page 97

1 or herself of reviewing that in order to
2 prepare for the hearing?
3           MR. PICCERILLI:  Objection to
4 form.
5           THE WITNESS:  They could.
6 BY MR. SCHWABENLAND:
7      Q.    Okay.  Do they usually do that?
8      A.    I don't want to say usually or
9 not usually.  Some did.  Some didn't.
10      Q.    Okay.  But, nevertheless, they
11 had that opportunity in order to prepare for
12 their presentation at the hearing?
13      A.    Yes, if they wished.
14      Q.    Let's stick with the procedure
15 now.  At the hearing each person can bring,
16 what, one adviser?
17      A.    Right.
18      Q.    Can the adviser take notes at
19 that hearing?
20      A.    Yes.
21      Q.    Would the adviser be able to
22 see the physical evidence or is that something
23 only the party can see?
24      A.    Only the students can see that.

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1  The advisers cannot.
2      Q.    Okay.  You used the term
3  hearing officer.  Is it always only one
4  hearing officer or sometimes can it be, like,
5  a panel of three or something?
6      A.    We have two boards that can be
7  utilized.
8      Q.    And who would be on these
9  boards?
10      A.    We have one board for a lower
11  level, low- to mid-level incidents.  That's a
12  peer review board and it's all students.  It's
13  a pretty competitive, high selection interview
14  process for them.  Then we have what's called
15  a community standards board.  It's students,
16  faculty, and staff.  The students on that
17  board are drawn from the peer review board and
18  the faculty and staff are -- they are
19  voluntary.  They are choosing to be on that
20  board.
21      Q.    Okay.  Before getting to the
22  hearing is there an opportunity for the
23  students if they want to have something
24  alternative to actually going to a hearing, if

Page 99

1  they can work out an alternative -- I'll
2  phrase it as -- I don't know if you have
3  anything like this -- an alternative
4  resolution of a dispute?
5          MR. PICCERILLI:  Objection to
6      form.
7          THE WITNESS:  That's not a
8      choice of the students.  We have
9      alternative resolutions where we
10      institutionally are choosing to
11      resolve it without formal charges.
12      But a student can't come in and say "I
13      want to do this this way."  Once we
14      proceed with a hearing, the hearing
15      will take place.
16  BY MR. SCHWABENLAND:
17      Q.    So is that decision -- is that
18  possibility of alternative resolution really
19  only available up until the time that a formal
20  notice of charge goes out?
21      A.    Right.  It's not even an
22  opportunity to students.  It is one of the
23  assignment options for the office of community
24  standards.  So an alternative resolution could

Page 100

1  be, you know, a conflict between two students
2  that was loud and they were swearing at each
3  other in the lobby and institutionally we are
4  saying that it's not in the students' -- it is
5  in the students' interest that we resolve this
6  without formal charges and so we would resolve
7  that alternatively that way.  But if it's a --
8      Q.    If it's a serious nonsexual
9  offense --
10      A.    Yes.  We are not going to
11  have an alternative --
12          MR. PICCERILLI:  Let him finish
13      the question.
14          MR. SCHWABENLAND:  I was
15      finished.
16          THE WITNESS:  Does that make
17      sense?
18  BY MR. SCHWABENLAND:
19      Q.    It does.
20      A.    It's not an option for the
21  students to choose, "I want this to be
22  resolved alternatively."
23      Q.    So, depending on the
24  seriousness of the offense, whether it's a

Page 101

1  first time or repeated, there is a number of
2  factors for, I will say, OCS or the hearing
3  officer -- I'm sorry -- OCS to decide if this
4  would qualify for some type of alternative
5  handling?
6      A.    Right.
7      Q.    I take it at the hearing
8  usually both the complainant and the
9  respondent shows up, the complainant and the
10  respondent shows up?
11          MR. PICCERILLI:  Objection to
12      form.
13  BY MR. SCHWABENLAND:
14      Q.    Again, I'm in the nonsexual
15  offenses of a serious nature.
16      A.    That's not the case and, in
17  fact, that's rarely the case.
18      Q.    That's rarely the case?
19      A.    Where they are both in the same
20  room.
21      Q.    Could you conduct a hearing
22  with one in one room and one in the other and
23  go back and forth?
24      A.    We could.  We also are not

26 (Pages 98 - 101)

CONFIDENTIAL

1 confined by it taking place at the same time.
2 The hearing officer might meet with the
3 complainant on Tuesday and the respondent on
4 Thursday and we'll consider that a
5 continuation of the hearing.
6     Q.    And when you pick a hearing
7 officer -- by you I mean your office -- I know
8 you said you have a list of people, is there
9 any guidelines that you follow to first -- I'm
10 sorry. Let me start over again without
11 stuttering. Is there any guidelines that you
12 follow to make sure that a prospective hearing
13 officer doesn't really know one party as
14 opposed to another party, you know, not to
15 have any bias or anything?
16     A.    We don't out of process, like,
17 review every student and every hearing officer
18 for every case. We couldn't do that. We rely
19 on the student to -- the student's notified
20 who that hearing officer is going to be in
21 their notice and if the student had an issue
22 with that hearing officer then they can voice
23 that to community standards and we would
24 review that concern. When it's more serious,

1 right, there is the obvious -- I mean, we
2 expect our hearing officers and we actually go
3 through in our training of, don't go down that
4 path by scheduling the hearing with a student
5 if you do have that connection with one. And
6 so we talk about what the appearance of --
7     Q.    Impropriety?
8     A.    -- impropriety could be, even
9 if there was absolutely no impropriety,
10 appearance of such. And so if a hearing
11 officer was advising a student group and the
12 student was a president of the student group,
13 that's not a situation currently, but we would
14 just not have that hearing officer hear that
15 case.
16     Q.    Okay. So, if I understand
17 correctly, you advise each student who the
18 hearing officer is and you want to hear from
19 them if they have any objection, right?
20     A.    Right.
21     Q.    And what do they do, have, like
22 have 24 hours to object?
23     A.    I don't know specifically what
24 we say in the handbook. But we have had

1 students who have, you know, contacted the
2 office of community standards and said, "I
3 prefer not to meet with this person."
4     Q.    Said what?
5     A.    Said, "I prefer not meet with
6 this person." It rarely comes up. And we
7 rely on our professional staff, and they are
8 solid professionals, to say "I'd rather not
9 meet with this person based on the connection
10 that I have with him or her."
11     Q.    And then you honor that?
12     A.    And we honor that.
13     Q.    And if somebody on that list
14 would indicate that he or she might feel
15 uncomfortable in dealing with one of those
16 students or the situation, then you would
17 honor that also?
18     A.    We would.
19     Q.    Have you in the last five
20 years, has -- and, again, nonsexual serious
21 offenses, in the last five years have you
22 had any -- have you had students object to the
23 hearing officer that's been assigned, that you
24 can recall as you sit here?

1     A.    Not that I can recall as I sit
2 here.
3     Q.    So any objection, assuming that
4 it took place in the last five years, would
5 have been a rare occasion, as far as you can
6 remember?
7     A.    Yes.
8     Q.    Then after the finding is made
9 on these nonsexual serious cases, have you had
10 students appeal, claiming that the hearing
11 officer was biased in some way?
12     A.    Yes.
13     Q.    And how often does that occur?
14     A.    Frequently with an appeal
15 students frame it as a bias when it's really a
16 disagreement with the decision and they have
17 not articulated a true bias. But that is a
18 place where we find students say, "I am not
19 happy with this outcome. There was bias by
20 this person, this person, this process." So
21 we do see that in appeals.
22     Q.    Have you ever had occasion in
23 the last five years that you can recall where
24 on appeal a claim of bias is made and for any

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1 reason the appeal board agreed with them and
2 gave a new hearing?
3        MR. PICCERILLI:  Objection.
4        THE WITNESS:  Yes.
5 BY MR. SCHWABENLAND:
6    Q.    How often has that happened?
7    A.    I am recalling one instance,
8 but that doesn't mean there's only been one.
9    Q.    And the one that you recall,
10 can you tell me when that occurred and what
11 the circumstances of that were?  I don't want
12 you to name names, but --
13    A.    So when it occurred -- I am
14 doing the math in my head -- probably four
15 years ago.
16    Q.    Okay.  That's your best
17 estimate?
18    A.    Best estimate.  And it was,
19 again, what I was talking about, I actually
20 don't remember the nature of the case, but I
21 do remember it was a conflict between two
22 parties.  And, to my example earlier, there
23 was a student who was advised by the hearing
24 officer at the time and that was learned

Page 107

1 through the appeal and the appeal panel said,
2 "You know what, we are better off.  Let's have
3 a new hearing officer take a look at that
4 outcome."  I don't know the specifics of it,
5 but I do recall there was one instance -- and
6 the board did not determine that there was a
7 bias.  They determined that there was
8 sufficient information raised to warrant
9 another hearing officer take a look at things.
10    Q.    In all fairness, right?
11    A.    In that instance.
12    Q.    I forgot to ask you one thing.
13 Again, I'm looking at the protocol or
14 procedure for nonsexual claims that are
15 serious enough to warrant some type of pre--
16 I'm sorry -- prehearing meeting, fair enough?
17    A.    Yes.
18    Q.    When a claim is made in these
19 circumstances but before the formal notice of
20 charge against them comes out, is anybody in
21 OCS or at the university assigned to
22 investigate the matter to see what really went
23 on here and see maybe whether you want to go
24 forward to a notice or handle it some other

Page 108

1 way?
2    A.    Sometimes.
3    Q.    And who then would be assigned
4 to investigate that matter, somebody in OCS?
5    A.    No -- well, it could be.  We
6 have a public safety and security investigator
7 who serves a formal investigative role.  But
8 if you are looking at a broad definition of
9 investigation, we might -- OCS or a hearing
10 officer or somebody in residence life might
11 follow up with a student for some clarifying
12 points or follow up with an RA who wrote a
13 report for some clarifying points.  You could
14 see that within the spirit of investigation,
15 but we don't call that -- them investigating
16 per se, but we have a public safety
17 investigator who might truly in a traditional
18 investigative approach.
19    Q.    You said public safety.  Do
20 they write reports?
21    A.    They do.
22    Q.    And these would be submitted to
23 OCS, then?
24    A.    Yes.

Page 109

1    Q.    But after the formal notice of
2 a charge or charges come out then starts the
3 process to go to a hearing, right?
4    A.    Right.
5    Q.    Once a hearing is conducted, if
6 you as the hearing officer -- again, in this
7 scenario, again, nonsexual serious offenses --
8 if you as a hearing officer felt that
9 additional investigation or testimony was
10 necessary, would you have that freedom?
11    A.    Yes.
12    Q.    And then I take it a hearing
13 officer then has to write a report?
14    A.    No.
15    Q.    I'm sorry.  After the hearing
16 takes place does the hearing officer render
17 findings?
18    A.    Yes.
19    Q.    And, again, I think you would
20 apply the preponderance of evidence and more
21 likely than not to have either occurred or not
22 occurred or you can't determine, right?
23    A.    Yes.
24    Q.    So it's a possibility of three

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1 decisions, either responsible, undetermined,
2 or nonresponsible, right?
3      A.   Yes.
4      Q.   Do you then have an outcome
5 meeting with -- does the hearing officer then
6 have an outcome meeting with both the
7 complainant and respondent at different times?
8      A.   Not always.
9      Q.   Okay.  If it's favorable, that
10 the respondent is culpable in some way, what
11 is the next step then?
12           MR. PICCERILLI:  Objection to
13      form.
14           THE WITNESS:  Right.  I
15      wouldn't call it favorable --
16 BY MR. SCHWABENLAND:
17      Q.   I'm sorry.
18      A.   -- in any sense.
19      Q.   I meant responsible.  Thank
20 you.  I wouldn't call it favorable either.
21      A.   Can you repeat that question?
22      Q.   Sure.  Let's start over again.
23 If the findings are -- if the hearing officer
24 concludes that the respondent is

Page 111

1 responsible -- I think I said that right --
2 what is the next step?
3      A.   Well, a hearing officer would
4 enter a private deliberation to determine what
5 the appropriate sanctions are and then deliver
6 those sanctions and that outcome to the
7 respondent.
8      Q.   Would the hearing officer be
9 the decider of responsibility as well as --
10 and if the respondent is responsible then
11 appropriate sanctions?
12      A.   Yes.
13      Q.   Is that reviewed by anybody in
14 OCS if you're not the hearing officer?
15      A.   We review it not in terms of
16 approving outcome or decision.  We review
17 every case that's been closed by a hearing
18 officer for procedural review, to make sure
19 that the process was followed and the
20 appropriate letters were sent to the students,
21 but we don't review for approval.
22      Q.   So once the hearing officer
23 makes the decision, then, as to responsibility
24 and in the case of responsibility then

Page 112

1 appropriate sanctions, then that's not
2 reversed, then, by anybody in OCS?
3           MR. PICCERILLI:  Hold on a
4      second.  Can I hear that question
5      back, please?
6           - - -
7           (Whereupon, the court reporter
8      read back from the record.)
9           - - -
10           MR. PICCERILLI:  Objection to
11      form.
12 BY MR. SCHWABENLAND:
13      Q.   Can you answer that or do you
14 want me to rephrase it?
15      A.   Yes.  We would not reverse any
16 decision made by another hearing officer.
17      Q.   And then the appeal process,
18 assuming that you find responsibility, what
19 would be the grounds that that student would
20 have to appeal in that type of case?
21      A.   I don't want to misstate them.
22 I don't have the appeal process committed to
23 memory.
24      Q.   Okay.

Page 113

1      A.   But there are grounds outlined
2 within the handbook of an appeal submission.
3      Q.   It's my understanding there's
4 two grounds.
5      A.   Again, I don't have them
6 committed to memory.
7      Q.   Okay.  Do any of those grounds
8 consist that -- of the fact that the
9 respondent if found responsible cannot appeal
10 on the grounds that there was insufficient
11 evidence to support that finding, or it can?
12      A.   Again, I don't want to --
13 without reviewing it -- if you have the
14 appeals process, I am happy to look at it, but
15 I don't have it committed to memory.
16      Q.   Fair enough.  I will show it to
17 you.  I am not trying to hold it back.
18      A.   Okay.
19           MR. SCHWABENLAND:  Why don't we
20      take a break?
21           THE VIDEOGRAPHER:  This
22      completes DVD number one.  The time is
23      12:15.  We're going off the record.
24           - - -

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1           (Off the record)
2      _ _ _
3           THE VIDEOGRAPHER:  On the
4   record.  Beginning of DVD number two.
5   The time is 12:32.  Beginning the
6   questioning.
7   BY MR. SCHWABENLAND:
8      Q.   Mr. Bordak, I just have a
9   couple of follow-ups here.  You mentioned that
10  sometimes there is a single hearing officer,
11  other times there is a panel of three, whether
12  it's board or faculty and -- I'm sorry --
13  whether it's student -- I'm sorry -- whether
14  it's peer, board, or whether it's composed of
15  faculty and students.  Did I say that
16  correctly?
17     A.   Yes.
18     Q.   In the case of three people
19  hearing it, hearing the evidence and then
20  making a decision, does the decision have to
21  be unanimous or can it be a split two-to-one
22  vote, if you know?
23     A.   I don't want to misspeak, so I
24  don't know with certainty.

Page 115

1      Q.   Okay.  But that would be in the
2   manual for --
3      A.   That would be in the manual or
4   the handbook.
5      Q.   Okay.  Let me ask you this:
6   Have you known in a panel of three one to
7   dissent?
8      A.   Yes.
9      Q.   Okay.
10     A.   But there is -- so on the peer
11  review -- I don't want to misspeak what the
12  community standards were, but the peer review
13  board I do know that it's not unanimous.  They
14  are a three-person board, so a two-to-one
15  would be an outcome.
16     Q.   Okay.  You said with regard to
17  the sexual misconduct policy, the formation of
18  it, you weren't involved in putting that
19  together, right?
20     A.   Correct.
21     Q.   Do you know who was involved in
22  putting that together?
23     A.   I know for certain that my
24  boss, Dr. White, was.

Page 116

1      Q.   Okay.
2      A.   Beyond that, I don't know.
3      Q.   Do you know if she spearheaded
4   it or she was just the person involved in
5   that?
6           MR. PICCERILLI:  Objection to
7       the form.
8           THE WITNESS:  She was just a
9       person involved.  She did not
10      spearhead it.
11  BY MR. SCHWABENLAND:
12     Q.   And do you know if Dr. Perry
13  was?
14          MR. PICCERILLI:  Was what?
15          MR. SCHWABENLAND:  Involved in
16      putting that together.
17          THE WITNESS:  I can't say with
18      certainty.
19  BY MR. SCHWABENLAND:
20     Q.   Okay.  Do you have any belief
21  one way or another?
22          MR. SCHWABENLAND:  Objection to
23      form.
24          THE WITNESS:  I believe that

Page 117

1       she would be in her capacity as Title
2       IX coordinator.
3   BY MR. SCHWABENLAND:
4      Q.   And Dr. Anderson, would he have
5   been involved in that capacity?
6      A.   I'm not sure.
7      Q.   And then there is counsel for
8   the university.  Would she have been involved?
9      A.   I do not know.
10     Q.   Okay.  So, other than Dr.
11  White, you can't state anybody else was?
12     A.   Not with certainty.
13     Q.   Okay.  Can you tell me when it
14  started to be discussed about either the need
15  or the decision to formulate a sexual
16  misconduct policy, how that arose?
17     A.   I can't answer that.
18     Q.   Okay.  Let me ask you some
19  cases here, if I can.  Are you familiar with
20  the Harris case?
21     A.   I am.
22     Q.   And Harris, that was in suit --
23  that's my phone going off.  I apologize to
24  everybody.  Let me turn that off here.  Do you

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1 recall what year that was?
2     A.    I do not.
3     Q.    And that was in suit.  Do you
4 know if it is still in suit or you don't know?
5     A.    I don't know.
6     Q.    I take it you weren't involved
7 in giving any testimony in that suit?
8     A.    I was not.
9     Q.    Okay.  The Harris case, how are
10 you familiar with it?
11     A.    I knew that it happened.  I
12 knew that there was a matter that was sexual
13 in nature, sexual -- it was not sexual
14 misconduct policy.  That's really all.  I was
15 not an administrative hearing officer
16 investigator for that.
17     Q.    Did you say it was or it wasn't
18 under the sexual misconduct policy?
19     A.    It was not under the sexual
20 misconduct policy as an investigator.
21     Q.    Do you know what the offense
22 was claimed?
23     A.    I don't.
24     Q.    You weren't involved with the

Page 119

1 investigation of it, were you?
2     A.    I was not.
3     Q.    Do you know if it went to a
4 hearing?
5     A.    I believe that it went to a
6 hearing.
7     Q.    And do you know who the hearing
8 officer was on the case?
9     A.    I do not know.
10     Q.    Did you have any part to play
11 in reviewing the decision of the hearing
12 officer?
13     A.    No.
14     Q.    Do you know if the office of
15 community standards was involved with that
16 case at all?
17     A.    I can't say with certainty.
18     Q.    Do you know what the claim was
19 by Harris in the lawsuit?
20     A.    I do not know.
21     Q.    Do you know that Harris made an
22 investigation -- I'm sorry -- do you know what
23 the finding was against Harris, whether it was
24 for or against him?

Page 120

1         MR. PICCERILLI:  Objection to
2     form.
3         THE WITNESS:  In terms of the
4     institutional --
5 BY MR. SCHWABENLAND:
6     Q.    Responsible, not responsible?
7     A.    I know that he was found
8 responsible.
9     Q.    Do you know what -- he was
10 found responsible for what?
11     A.    I do not know.
12     Q.    Did the Harris case cause your
13 office or you or your office to review the
14 procedures which were carried out?
15     A.    No.
16         MR. PICCERILLI:  Can we go off
17     the video record for one moment?
18         THE VIDEOGRAPHER:  Off the
19     video record, 12:38.
20         MR. PICCERILLI:  I know that
21     this to some extent is a matter of
22     public record.  There are FERPA
23     concerns here.  You are using the name
24     and we know that the name has been

Page 121

1     used in litigation.  But I just wanted
2     to alert you to the fact that we are
3     not waiving any FERPA-related type of
4     issue that might apply here.
5         MR. SCHWABENLAND:  That's fine.
6     Let me say this, that I am acting
7     under our agreement of all counsel as
8     well as the court-approved order that
9     everything is to be kept confidential,
10     so --
11         MS. SCHIMELFENIG:  I am going
12     to speak on behalf of the university
13     here, not Bill Bordak.  My client, the
14     university, has an obligation under
15     FERPA.  The only reason that the
16     university is not objecting to the use
17     of the name of the student in this
18     matter is, A, because it's a matter of
19     public record to the extent that
20     matters are addressed in the federally
21     filed complaint and, B, to the extent
22     they relate to that complaint there
23     will be no objection.  But, as counsel
24     in this case has said, that if there

31 (Pages 118 - 121)

CONFIDENTIAL

1   is any kind of FERPA morph over, if
2   you will, to areas that are not a
3   matter of public record the university
4   will ask its outside counsel to assert
5   an objection to that area of inquiry,
6   regardless of the confidentiality of
7   this record.  That is not the
8   determinative factor.  The
9   determinative factor is the prior
10  written consent of the student whose
11  name is being used.  The university
12  cannot waive that.  You cannot waive
13  that.  Mr. Bordak cannot waive that.
14  I just want to be clear on that.
15       MR. SCHWABENLAND:  Except
16  Harris gave his own name.
17       MS. SCHIMELFENIG:  We agree.  I
18  mean, both outside counsel agrees.  I,
19  as general counsel for my client, the
20  university, agrees.  But we just
21  thought it was important as a matter
22  of record that you understand where we
23  won't agree.
24       MR. SCHWABENLAND:  Okay.  And

1   if need be we can just call the judge.
2       MS. SCHIMELFENIG:  I certainly
3   hope not.  It's pretty
4   straightforward.  Thank you.
5       THE VIDEOGRAPHER:  Back on
6   video record, 12:40.
7   BY MR. SCHWABENLAND:
8       Q.   If the office of community
9   standards didn't do the investigation, who
10  did, then?
11      A.   I am not saying that the office
12  of community standards didn't.  I was not
13  director at the time.  I was not involved with
14  it.  So I can't speak to the specifics.
15      Q.   Okay.  And I am jumping ahead
16  here.  I had asked you earlier that for the
17  2017 up until April of 2018, it was you and
18  Emily Forte in the office of community
19  standards, right?
20      A.   Can you repeat the dates that
21  you said?
22      Q.   Sure.  For the school year 2017
23  to around April of 2018, when Emily left, it
24  was you and Emily Forte in the office of

1   community standards?
2       A.   Correct.
3       Q.   Has anybody since come into the
4   office of community standards?
5       A.   Yes.
6       Q.   And who has come in?
7       A.   Her name is Courtney Laganke.
8       Q.   How do you spell her --
9       A.   L-A-G-A-N-K-E.
10      Q.   And has she assumed Emily's
11  role?
12      A.   It's a revised role.
13      Q.   And what's her title?
14      A.   The community standards
15  manager.
16      Q.   And what does she do as
17  community standards manager?
18      A.   It's more operational.  So
19  she's a hearing officer, but she manages the
20  operations of the office.  It's a split
21  position, where she also works for residence
22  life.
23      Q.   Is there anyone else involved
24  with -- or has there been anybody else

1   involved with community standards since 2017
2   school year?
3       A.   Our administrative assistant,
4   on the secretarial level.
5       Q.   Clerical?
6       A.   Clerical, yes.
7       Q.   And I think I may have asked
8   you this.  I need to know.  As a result of the
9   claim or the Harris case and the subsequent
10  lawsuit, do you know if anybody investigated
11  the procedures to see if things were done
12  right or wrong?
13      MR. PICCERILLI:  I am going to
14      object to that to the extent it might
15      be attorney/client privilege or
16      attorney work product.
17  BY MR. SCHWABENLAND:
18      Q.   I don't want what the attorney
19  said to you or anything else.  I just want to
20  know if there's been any evaluation at the
21  university that you're aware of to evaluate
22  whether or not there was some basis to that
23  claim or whether certain standards should be
24  changed at all?

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1      A.      Not that I am aware of.
2      Q.      Did anybody say to you at the
3  university that they needed -- that the school
4  needed to look at the activities in the Harris
5  case to determine if any changes need to be
6  made?
7      A.      Not to my knowledge.
8      Q.      Powell, are you familiar with
9  the Powell case?
10     A.      Yes.
11     Q.      And how are you familiar with
12  that?
13     A.      I am director of the office of
14  community standards, so I'm familiar with that
15  case.
16     Q.      Okay.  And so you're familiar
17  with it.  What about that case are you
18  familiar with?
19     A.      I'm familiar with him having
20  matters before the office of community
21  standards as violations of policy and the
22  ultimate outcome of the most recent case was
23  an expulsion from the university.
24     Q.      Expulsion.  He was expelled?

Page 127

1      A.      Right.
2      Q.      And were you the hearing
3  officer on the case?
4      A.      I was not.
5      Q.      Do you know who was?
6      A.      Yes.
7      Q.      And who was it?
8      A.      The assistant director at the
9  time, Lori Egan.
10     Q.      Lori what?
11     A.      Egan, E-G-A-N.
12     Q.      Assistant director --
13     A.      Of community standards.
14     Q.      I'm sorry?
15     A.      Of community standards.
16     Q.      Okay.  And when about was this?
17     A.      A few years ago.  I don't know
18  exactly when.
19     Q.      Was --
20          MR. PICCERILLI:  Let's go off
21  the record.
22          THE VIDEOGRAPHER:  Off the
23  video record, 12:44.
24          MR. PICCERILLI:  Just repeating

Page 128

1  what we said before regarding the
2  Harris case, that applies as well to
3  the Powell case.  We can go back on.
4          THE VIDEOGRAPHER:  Back on the
5  video, 12:45.
6  BY MR. SCHWABENLAND:
7      Q.      Were you involved with the
8  Powell case at any stage, either to
9  investigate it -- I know you weren't the
10  hearing officer, the evaluation of the
11  findings or the outcome or any appeal process?
12     A.      Administratively, as the
13  director of community standards, I ensured
14  that we were true with process on those
15  pieces, but I was -- the assistant director --
16  there was an investigator who investigated the
17  conduct and the assistant director, Ms. Egan,
18  issued the sanction.  The assistant director,
19  Ms. Egan, issued the sanctions.  So I didn't
20  play those roles, but administratively I was
21  involved in it.
22     Q.      What was he found responsible
23  for, what violation?
24     A.      I can't recall specifically.

Page 129

1      Q.      Was it a sexual misconduct
2  charge?
3      A.      Again, I can't recall
4  specifically.
5      Q.      Is Ms. Egan still there at the
6  school?
7      A.      She is not.
8      Q.      And do you know whereabouts she
9  lives?
10     A.      I do not know.
11     Q.      When did Ms. Egan leave?
12     A.      I can't recall specifically.
13  Two years ago, three years ago, maybe.
14     Q.      If I wanted to find out or see
15  the documentation pertaining to the procedure
16  that was followed, the findings, how would I
17  go about finding that information?
18     A.      You would not have access to
19  that information, as it's part of a student
20  record.  The student would, so --
21     Q.      But I have subpoena power.
22     A.      I would advise anyone looking
23  for that to contact our general counsel about
24  access to it.

33 (Pages 126 - 129)

CONFIDENTIAL

1    Q.    But the documents themselves,
2  would they be on file in the office of
3  community standard?
4    A.    Within the student record.  We
5  maintain the student disciplinary records.
6    Q.    Okay.  Do you know if that case
7  was handled as a sexual misconduct policy?
8    A.    Yes.  Yes, it was investigated.
9    Q.    But do you have any
10 understanding that he wasn't found responsible
11 under the sexual misconduct policy but it was
12 under some type of anti-harassment policy?
13   A.    Again, I can't speak to the
14 specifics.
15   Q.    Okay.  As a result of that case
16 and ultimate matter now in trial, now in
17 litigation, did your office seek to evaluate
18 or examine or review the procedures that were
19 followed in that case?
20   A.    No, not directly related to
21 that matter.
22   Q.    Are you familiar with claims
23 made about the girls' softball team, claims
24 made against the girls' softball team at St.

1  Joe's University?
2    A.    Can you be more specific?
3    Q.    Sure.  There was a claim of
4  improper activity going on among the girls'
5  softball team, perhaps involving the coaches,
6  perhaps not involving the coaches, but claims
7  of sexual activity and/or harassment?
8    A.    Yes.  I am aware.
9    Q.    Okay.  So when did you become
10 aware of that?
11   A.    I can't recall specifics.  We
12 are talking a couple of years ago.
13   Q.    Okay.  Is that during the time
14 period that the sexual misconduct policy has
15 been in effect?
16   A.    That was, as I recall, during
17 the time that the interim sexual misconduct
18 policy was in effect.
19   Q.    So who was making those claims
20 against the girls' softball team?
21   A.    Again, I can't recall specifics
22 years later.
23   Q.    Can you recall anything?
24   MR. PICCERILLI:  Let me just

1  caution -- under FERPA let me just
2  caution the witness that the names of
3  those complainants have not been
4  revealed, even in the litigation,
5  so -- or if there was litigation and
6  so he should respect that and not
7  disclose their names if he should
8  know.
9    MR. SCHWABENLAND:  Okay.
10 BY MR. SCHWABENLAND:
11   Q.    I'll represent to you that
12 there is a Jane Doe 1 and a Jane Doe 2 against
13 the university.  So we'll call them Jane Doe 1
14 and Jane Doe 2.  Are you familiar with the
15 fact that there were several complaints
16 made -- there were complaints made by several
17 of the girls on the softball team about the
18 actions of its coaching staff as well as its
19 girls, players?
20   A.    I was not specifically aware of
21 allegations against coaching staff, that's not
22 under the purview of my office, but against
23 other students, yes.
24   Q.    Okay.  So did you or anybody

1  else from your office investigate this matter?
2    A.    Yes.
3    Q.    Who investigated it?
4    A.    Again, this is a couple of
5  years ago and I want you to understand that
6  it's hard to remember details with specificity
7  years later.  As I recall, there was an
8  investigation by our public safety
9  investigator and then there was a subsequent
10 investigation for conduct implicated by the
11 sexual misconduct policy, really the
12 recollection I have in terms of the
13 investigation.
14   Q.    Who was the public safety
15 investigator who investigated?
16   A.    I don't recall.
17   Q.    Did the public safety
18 investigator report his or her findings to
19 your office?
20   A.    Yes.
21   Q.    And so there would be an
22 incident report?
23   A.    Yes.
24   Q.    And would there be more than

34 (Pages 130 - 133)

CONFIDENTIAL

1 one incident report?
2     A.    I can't recall.
3     Q.    Do you know if that was based
4 upon interviews of the various girls on the
5 team?
6     A.    Yes.
7     Q.    Do you know how many girls were
8 interviewed?
9     A.    I do not know.
10    Q.    But the incident report would
11 reflect whatever interviews were conducted?
12    A.    Yes.
13    Q.    Do you know if any of the
14 coaching staff was interviewed by the public
15 safety?
16    A.    I do not know.
17    Q.    And as you sit here you don't
18 know, if there's a claim against an employee
19 of the school or somebody on staff, you don't
20 know how that's handled?
21    A.    No, not specifically.
22    Q.    How about not specifically?
23    A.    No.  I mean --
24    Q.    Generally?

1     A.    There's a range of conduct and
2 some might be handled at the department level,
3 some might be handled at the divisional level,
4 some might be through the human resources.
5 It's not my responsibility to manage that
6 process, so I'm not totally familiar with what
7 it is.
8     Q.    Okay.  The name of the coaching
9 staff or the coaches at the time, what were
10 they?  What were those names?  They are not
11 students, so you can reveal them.
12    A.    So the only one that I know was
13 the head coach, Terri Adams, and I only know
14 her name from knowing the head coaches of the
15 teams on campus.
16    Q.    Did you ever meet Ms. Adams?
17    A.    I did.
18    Q.    Do you know if Ms. Adams is
19 still there?
20    A.    She is not.
21    Q.    And do you know when she left?
22    A.    I do not.
23    Q.    Do you know why she left?
24    A.    I do not.

1     Q.    Do you know if it was in
2 connection with the claims that were being
3 made and her management or not management of
4 the team?
5     A.    I do not.
6     Q.    So you don't know if she was
7 penalized?  You just know that at some point,
8 what, she either resigned or was discharged?
9         MR. PICCERILLI:  Objection.
10        THE WITNESS:  I just know that
11    she's not ...
12 BY MR. SCHWABENLAND:
13    Q.    So let's get back to -- you
14 know you have a public safety report.  Do you
15 know if you have more than one or just one?
16    A.    I do not know.
17    Q.    Okay.  But all this would be on
18 file at the office of -- at your office,
19 right?
20    A.    Yes.
21    Q.    And who, then, investigated it
22 from your office?
23    A.    Nobody in our office
24 investigated it.

1     Q.    Okay.  So who followed up with
2 the investigation after public safety issued
3 the report?
4     A.    As I recall, there was an
5 administrative hearing for nonsexual
6 misconduct policy violations that I was the
7 hearing officer for.  I don't recall specifics
8 on that.
9     Q.    Okay.  So you were the hearing
10 officer and it was placed into the
11 nonsexual --
12    A.    There were two simultaneous
13 tracks.  One was -- because there was multiple
14 conduct, as I recall, that was complained.  So
15 the sexual misconduct related conduct was
16 addressed through the sexual misconduct policy
17 and the nonsexual misconduct policy violations
18 were addressed through an administrative
19 hearing officer, which was myself.  So we had
20 concurrent processes, very independent,
21 separate processes happening at once.
22    Q.    So who was the investigator on
23 the sexual misconduct policy charges?
24    A.    I don't want to misspeak, so

35 (Pages 134 - 137)

CONFIDENTIAL

1  I'm not sure.
2      Q.   Who do you think it is?
3          MR. PICCERILLI:  Objection.
4  That's asking for a guess.
5  BY MR. SCHWABENLAND:
6      Q.   I don't want you to guess.
7      A.   I can't say with certainty, so
8  I prefer not to say.
9      Q.   How many people form that
10 possibility?
11     A.   Three or four at the time.
12     Q.   Was Emily Malloy involved with
13 the investigation of that?
14     A.   At that time, Elizabeth Malloy
15 was.
16     Q.   I'm sorry.  I said Emily.  I
17 apologize.
18     A.   I can't say with certainty on
19 the spot right here, two years later, having
20 not looked at these files who the investigator
21 was.
22     Q.   Okay.  What things fell within
23 the category of sexual misconduct policy?
24     A.   Again, I can't --

1          MR. PICCERILLI:  I'm sorry.
2  Objection to form.
3          THE WITNESS:  Again, I can't
4  say with certainty what those
5  violations were and I don't want to
6  speak on the record.
7  BY MR. SCHWABENLAND:
8      Q.   Well, there is -- sexual
9  misconduct policy has certain violations that
10 falls within that umbrella, right?
11     A.   Yes.
12     Q.   One would be sexual abuse?
13     A.   I don't know that we define it
14 that way.  I'd have to look at the actual
15 policy.  Again, I don't have these documents
16 committed to memory, so I don't know exactly
17 what the language is.
18     Q.   But you're the only one I can
19 find out these documents from, so --
20     A.   Right.  But I don't have them
21 committed to memory.  I'd be happy to --
22          MR. SCHWABENLAND:  Counsel, do
23 we have an agreement that you will
24 turn over these documents?  You can

1  redact any names of students, but --
2  do you want to go ahead and talk to
3  counsel?
4          MR. PICCERILLI:  I don't know
5  that we have an agreement today, but
6  we will get back to you on this.  I
7  mean, we don't have them here today,
8  in any event, so --
9          MR. SCHWABENLAND:  I know, but
10 they have been asked for.
11         MR. PICCERILLI:  I don't know
12 what there is.
13         MR. SCHWABENLAND:  Do you want
14 to go talk to counsel?  Go ahead.
15         MR. PICCERILLI:  Are we on the
16 video record?  We shouldn't be.
17         THE VIDEOGRAPHER:  Off the
18 record, 12:56.
19         MR. PICCERILLI:  Let me go talk
20 to counsel.
21         _ _ _
22         (Whereupon, a recess was held
23 from 12:56 p.m. to 1:01 p.m.)
24         _ _ _

1          MR. PICCERILLI:  I am not
2  prepared to enter into some sort of
3  agreement as we sit here today, Ed.  I
4  will consider this.  I will determine
5  whether or not we can produce anything
6  further.  You have to understand that
7  we are talking here about a very
8  defined group of female students who
9  have not waived in any respect
10 anything that FERPA may protect as
11 private.  So I will consider this and
12 I will get back to you on it.
13         MR. SCHWABENLAND:  Do you know
14 when, because --
15         MR. PICCERILLI:  When what?
16         MR. SCHWABENLAND:  -- we have
17 asked for this material from the very
18 beginning.
19         MR. PICCERILLI:  And we
20 objected.
21         MR. SCHWABENLAND:  And we
22 talked about this.
23         MR. PICCERILLI:  We talked
24 about --

36 (Pages 138 - 141)

CONFIDENTIAL

1    MR. SCHWABENLAND: Let me
2  finish.
3    MR. PICCERILLI: Okay.
4    MR. SCHWABENLAND: And it's
5  very clear it goes to how these
6  investigations were handled and so we
7  need to know that. There's also a
8  list that your office gave me, a list
9  of cases, without identifying the
10  specific students, handled from 2015
11  to 2018, just with the results, but we
12  don't know the underlying information
13  about what was the claim about. Now,
14  we asked for information on that also,
15  to say just identify each student case
16  by numerical number, don't identify
17  the student, and that way we get to
18  know what the investigation was about
19  and the underlying circumstances
20  without identifying anybody. We've
21  asked for that. Mr. Bordak is very
22  kind for coming here today, but he
23  doesn't have too much information
24  about that and this can only be gotten

1  in the files. So I need to -- it's
2  one thing to say, "Well, we'll
3  consider it," but when are you going
4  to get back to me on that? Is it,
5  like, Monday, is it --
6    MR. PICCERILLI: It could be.
7  I'm not sure. I have to consult with
8  counsel about that. I also have to
9  determine what's in the documents and
10  whether or not the documents could be
11  appropriately redacted to protect
12  identifying information. Another
13  thing, not only are there FERPA
14  protections here, but there are also
15  issues here of relevancy. I mean,
16  you're talking about the statistics --
17  let me finish, I let you finish -- the
18  statistics list that we had provided
19  to you, because we provided that in
20  terms of, you know, which students
21  were investigated, which
22  investigations were handled by
23  Elizabeth Malloy, and what the
24  outcomes were and we gave that to you

1  for those reasons. I don't know that
2  every particular circumstance that was
3  involved in those cases is in any way
4  relevant here. In fact, this is a
5  litigation of this case, not of those
6  cases. And you may think that it's
7  appropriate to go back to analyze all
8  of the facts in those cases to try to
9  litigate this case, but I have to
10  disagree with that conclusion.
11    MR. SCHWABENLAND: Well, it's
12  pretty hard for you to disagree with
13  it, with all due respect, since you
14  have no idea what's in these files or
15  what they show. And you can't just
16  object on the grounds of irrelevant
17  because you have no idea whether or
18  not it's relevant or not relevant
19  until you look at these documents and
20  also I've had a chance to examine
21  these documents. That's why it's
22  producible in discovery. That's why
23  it's under a promise of
24  confidentiality. That's why I said

1  you don't have to identify them by
2  name. But at least we have an
3  opportunity to review the underlying
4  facts concerning those cases and how
5  it was handled and compare to it
6  what's been going on. So I am going
7  to ask you this. I am going to ask
8  for -- I've asked for a number of
9  things. I'm going to ask you to let
10  me know Monday sometime about these
11  documents. I would like to see them,
12  because, as you know, I have
13  depositions of Ms. Malloy and
14  Ms. Perry and some other depositions
15  next week after we depose Ms. Roe on
16  Monday and sooner or later I have got
17  to have these documents. If not, then
18  we'll call the judge on Monday about
19  this. And that's the only way I can
20  see how to proceed. I can't just rely
21  upon you to say, "Yeah, I'll get back
22  to you," in all fairness.
23    MR. PICCERILLI: You have
24  stated what you have to say. I still

CONFIDENTIAL

Page 146

1   don't see what the relevance of all of
2   these other matters are -- is, excuse
3   me.  And I also want to restate what
4   has been stated before, that
5   regardless of the confidentiality
6   agreement in this case, that does not
7   override FERPA and its protections.
8         MR. SCHWABENLAND:  Just so it's
9   clear, FERPA protects -- allows
10  confidentiality with regard to student
11  identification and information, right?
12  Or you'd rather not say?
13        MR. PICCERILLI:  I would rather
14  not say right now.
15        MR. SCHWABENLAND:  Fair enough.
16        MR. PICCERILLI:  Plus, the
17  other thing is that, in
18  circumstances -- if there's going to
19  be a question of a disclosure of
20  student information, you have to have
21  consent from the student or at least
22  they have to be consulted at the
23  get-go.
24        MR. SCHWABENLAND:  Okay.  Let's

Page 147

1   go back on.
2         THE VIDEOGRAPHER:  Back on the
3   record, 1:07.
4   BY MR. SCHWABENLAND:
5      Q.   I think I was about to show you
6   the sexual misconduct policy.  I don't have to
7   identify it by exhibit.  But the sexual
8   misconduct policy --
9         MR. PICCERILLI:  You don't have
10  the Bates stamped copy?
11        MR. SCHWABENLAND:  I can find
12  it.
13        MR. PICCERILLI:  Well, I would
14  rather have the Bates, because it
15  would be easier to refer to certain
16  pages.  I'm sorry.  Are we off the
17  video record?
18        MR. SCHWABENLAND:  Let's go off
19  the camera.
20        THE VIDEOGRAPHER:  Off the
21  record, 1:08.
22              - - -
23        (Off the record)
24              - - -

Page 148

1         THE VIDEOGRAPHER:  Back on the
2   record at 1:20.
3   BY MR. SCHWABENLAND:
4      Q.   Mr. Bordak, we took a break.
5   And I started to say we'll take a look at the
6   SMP, we will call it.  And the sexual
7   misconduct policy has a list of potential
8   violations.  I will read it for the record:
9   Sexual assault, sexual harassment, sexual
10  exploitation, domestic violence, dating
11  violence, or stalking.  Did I read that
12  correctly?
13     A.   Yes.
14     Q.   Is there any other type of
15  sexual offense that would be included in that
16  sexual misconduct policy that you're aware
17  that is not on there?
18     A.   I think -- I don't know that
19  the title is meant to be exhaustive.  There's
20  conduct defined within the policy.
21     Q.   Okay.  So then we get back to
22  the girls' softball team at the university.
23  You said it took two tracks.  One was the SMP
24  and the other was the nonsexual offenses that

Page 149

1   you handled as a hearing officer?
2      A.   Yes.
3      Q.   Okay.  So I had asked you who
4   did the investigation for the SMP and you
5   indicated you weren't sure or you didn't know?
6      A.   Correct.
7      Q.   Can you boil down to one of two
8   or three people at that time?
9      A.   It's my recollection we were
10  working with Elizabeth Malloy, Andrew Shapren,
11  and somebody named Rose, I forget her last
12  name.
13     Q.   And Andrew and Rose, were they
14  in the same firm as Ms. Malloy?
15     A.   They were.
16     Q.   Do you know what firm they were
17  associated with at the time in 2015?
18     A.   Buchanan Ingersoll.
19     Q.   Did you know Ms. Malloy?
20     A.   Professionally, yes.
21     Q.   That's what I meant.
22     A.   Yes.
23     Q.   I'm sorry.  Had she reviewed
24  cases -- when did she start reviewing cases

38 (Pages 146 - 149)

CONFIDENTIAL

1  for the university, if you know?
2       A.   I don't know the first, but it
3  would have been shortly after the
4  implementation of the policy in January of
5  2015.
6       Q.   Okay.  So was she the primary
7  one to do this work as an investigator on
8  behalf of the university?
9            MR. PICCERILLI:  Objection to
10  form.
11           THE WITNESS:  I don't know that
12  I would use the word "primary."  She
13  was the -- our primary contact.  I
14  don't know that I'd call -- we
15  certainly don't call her the primary
16  investigator.  She is one of them.
17  She's the one that we contact to see
18  which investigator will investigate a
19  matter.
20  BY MR. SCHWABENLAND:
21       Q.   Had you played any part in
22  selecting Ms. Malloy?
23       A.   I did not.
24       Q.   Do you know who selected

1  Ms. Malloy?
2       A.   I do not.
3            MR. SCHWABENLAND:  Let's go off
4  camera one second.
5            THE VIDEOGRAPHER:  Off the
6  video record, 1:24.
7            _ _ _
8            (Off the record)
9            _ _ _
10           MR. SCHWABENLAND:  I will have
11  this marked.
12           _ _ _
13           (Whereupon, Exhibit Bordak-1
14  was marked for purposes of
15  identification.)
16           _ _ _
17           THE VIDEOGRAPHER:  Back on the
18  record, 1:25.
19           MR. SCHWABENLAND:  We have just
20  marked as Bordak-1 four pages with
21  Bates stamp from the university 131,
22  132, and then 133 and 134 is the exact
23  same thing as 131 and 132 except it
24  has handwriting of "EM" on the side,

1  which, as I understand it, refers to
2  cases managed by Elizabeth Malloy.
3  Fair enough?
4            MR. PICCERILLI:  I just want to
5  correct you.  I think you have the
6  document numbers wrong.  You said 131.
7  The first one is 1331, the second one
8  is 1332, the third one is 1333, and
9  the fourth one is 1334.
10           MR. SCHWABENLAND:  I did
11  misstate it.  Thank you.
12           MR. PICCERILLI:  You're
13  welcome.
14  BY MR. SCHWABENLAND:
15       Q.   Let me deal with -- if we can,
16  let's use 1333 and 1334.  Okay.  That has "EM"
17  on the side of it.  That goes from the --
18  first of all, at the very top it has
19  "Respondents in sexual misconduct" and then in
20  parentheses it has "ISMP/SMP."  I take it the
21  "I" stands for interim sexual misconduct
22  policy?
23       A.   Yes.
24       Q.   The effectiveness of the

1  policy, it became effective June 15, 2015; is
2  that correct?  If you look at -- if you look
3  at the one marked 1175 Bates stamp.  So -- but
4  the -- while it is being finalized and
5  becoming effective as of June 2015, would that
6  ISMP, the interim, essentially mean that
7  sexual misconduct cases as of the beginning of
8  2015 were under a sexual misconduct policy?
9       A.   Yes.
10       Q.   Okay.  Now, the names of the
11  students, student respondents are not on
12  there, but it does indicate their gender.  Do
13  you see that column?
14       A.   Yes.
15       Q.   And am I correct that the only
16  two cases involving a female respondent are on
17  the first page, 1333, and is number six and
18  seven in that list.  Do you see it there?
19       A.   Yes.
20       Q.   Okay.  And the rest are all
21  males.  Take your time and look that over and
22  see if you can confirm that.
23       A.   Yes.
24       Q.   All right.  The female ones

CONFIDENTIAL

Page 154

1  were handled by Ms. Malloy in May of 2015 and
2  they were found not responsible under her
3  investigation; am I correct there?
4      A.    Yes.
5      Q.    And do you know if these
6  females are the same females that were charged
7  in the girls' softball team under a sexual
8  misconduct policy?
9      A.    I don't know for certain.
10     Q.    Do you know of any other
11 females that have been charged under a sexual
12 misconduct policy other than the matters
13 involving the girls' softball team?
14     A.    Prior to the interim sexual
15 misconduct policy, yes. After the interim
16 sexual misconduct policy, no, as I reference
17 this document.
18     Q.    Okay. Do you know when you
19 would have handled the hearing as a hearing
20 officer handling the matter involving
21 violations with regard to the girls' softball
22 team?
23     A.    Like I said, it's a couple of
24 years ago. It very well could have been

Page 155

1  spring of 2015. I don't recall specifics.
2      Q.    Okay. Prior to -- and I think
3  you may have stated that, but I am not sure
4  what you just said. Prior to the enactment of
5  the sexual misconduct policy or any matters in
6  2015, prior to January 2015 if there were any
7  claims of sexual misconduct that would be
8  handled as any other violation under the
9  policies affording students a right to a
10 hearing and -- under a hearing officer; am I
11 correct?
12         MR. PICCERILLI: Objection to
13     form.
14         THE WITNESS: They would be
15     addressed as all other violations,
16     yes.
17 BY MR. SCHWABENLAND:
18     Q.    As all the others. Okay. And
19 did you say you recall females being charged
20 with sexual misconduct prior to 2015?
21     A.    Yes.
22     Q.    And do you know how many?
23     A.    I don't.
24     Q.    Did you act as a hearing

Page 156

1  officer in any of them?
2      A.    I don't recall.
3      Q.    Are there -- in the time that
4  you have been there can you tell whether or
5  not there has been -- and, again, up until
6  January of 2015 do you know if there have been
7  more than five women charged or less than five
8  women charged, if you know? And I don't want
9  you to guess.
10     A.    That's difficult to answer.
11     Q.    Would you have that information
12 available should counsel want it, counsel for
13 the university?
14     A.    If it is within the student
15 record, yes.
16     Q.    Okay. So how far do your
17 student records go back, then? By your I mean
18 OCS.
19     A.    It depends on the students. So
20 records are maintained -- we have a record
21 retention policy that's student driven. So
22 when the student is no longer at the
23 institution for seven years that record is
24 expunged, except for expulsion records, which

Page 157

1  we keep permanently. So it's not consistent
2  across situations. It's student driven.
3      Q.    So by "student driven" you mean
4  from the date the student is no longer
5  associated with the university then you go
6  seven years forward?
7      A.    Correct.
8      Q.    And if a student were to come
9  back for a master's, would that record be
10 maintained then?
11     A.    Yes.
12     Q.    So what happens if you -- I am
13 just making this up -- if you graduate from
14 undergrad and then ten years later you come
15 back for your master's, your previous record
16 is no longer there?
17     A.    If there's been seven years
18 since you've last attended, yes, it's
19 expunged.
20     Q.    But information regarding
21 whether or not there were other females prior
22 to January of 2015 who were charged with
23 sexual violation and what those findings would
24 be, that would best be looked for in OCS,

40 (Pages 154 - 157)

CONFIDENTIAL

1 assuming that they haven't been destroyed or
2 done away with?
3     A.    Yes.
4     Q.    Let's get to the girls'
5 softball team. Do you know what the claims --
6 do you know what the charges of
7 sexual misconduct were against -- first of
8 all, do you know how many girls were charged
9 with sexual misconduct?
10    A.    I don't recall.
11    Q.    How about, do you know how many
12 girls were charged with violation of nonsexual
13 things that you acted as hearing officer?
14    A.    I don't recall. Again, this is
15 asking for details of a matter that was a few
16 years ago, so I really don't recall.
17    Q.    But on the girls' softball team
18 issue created a serious accusation against the
19 university around that time period, right?
20         MR. PICCERILLI:  Objection to
21    form.
22         THE WITNESS:  Perhaps. I mean,
23    I handled my process. I was
24    independent of that in the community

1     standards office and so the complaint
2     against the university was totally
3     separate from --
4 BY MR. SCHWABENLAND:
5     Q.    I understand.
6     A.    So I really -- I don't know, to
7 be honest, what the complaint against the
8 university --
9     Q.    So what did you do, then, as a
10 hearing officer?
11    A.    I had a hearing for students
12 who were potentially or allegedly in violation
13 of nonsexual misconduct policy violations.
14    Q.    More than one student?
15    A.    More than one, yes.
16    Q.    More than ten?
17    A.    No.
18    Q.    More than five?
19    A.    No.
20    Q.    So more than one but less than
21 five?
22    A.    Yeah. I mean, it's just really
23 hard for me to remember details from a
24 situation a couple years ago when I feel like

1 I am continually being asked for details of a
2 situation a couple of years ago and I don't
3 know the answer.
4     Q.    So what did you find, either
5 responsible or not responsible?
6     A.    I really can't recall. We have
7 a lot of cases and to understand the details
8 of a case from a few years ago that hasn't
9 been revisited in my mind, I really don't
10 remember.
11    Q.    How many cases a year do you
12 handle?
13    A.    My office handles quite a few.
14    Q.    So what's quite a few?
15    A.    Again, I would be making up the
16 number, but it's enough that when a case and a
17 matter is concluded we move on to the next and
18 we are not caught up with remembering the
19 details of every case.
20    Q.    But don't you have to submit
21 statistics every year?
22    A.    We do. I don't have those
23 committed to memory.
24    Q.    Okay. And where would I find

1 those statistics?
2     A.    We report in an annual security
3 report what's required by Clery.
4     Q.    That's under the Clery Act?
5     A.    Yes.
6     Q.    But the Clery Act statistics
7 don't always gel with the statistics from your
8 office for sexual misconduct or other things,
9 right?
10         MR. PICCERILLI:  Objection to
11    form.
12         THE WITNESS:  Potentially.
13 BY MR. SCHWABENLAND:
14    Q.    I am not criticizing it. It's
15 just a different purpose, right?
16    A.    Sorry. I wouldn't say that
17 it's a different purpose, but the parameters
18 with which we are required to report
19 information under Clery does not capture all
20 violations, you're correct.
21    Q.    That's what I meant to say.
22 You said it much better than I could ever say.
23 So where do you keep these statistics? I
24 mean, is it a report each year that you keep

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1  on file?
2       A.    For some data points we
3  maintain longitudinal documents.  For others
4  it's a report drawn from our system when
5  asked.
6       Q.    I am jumping around here.  Did
7  you ever give a speech about -- let me back
8  up.  Did you or, to your knowledge, anybody
9  else at the university ever give a speech to
10  students, other faculty members claiming that
11  the opinion was that sexual misconduct charges
12  are underreported?
13      A.    I can only speak for myself.  I
14  can't speak for others.  And I have given
15  presentations and shared the national trend of
16  underreporting of sexual assaults, yes.
17      Q.    What is the national trend?
18      A.    That it is an underreported
19  crime.
20      Q.    Are you able to say to what
21  degree, what percentage?
22      A.    No.
23      Q.    Do you know what that is based
24  upon?  You said nation trend.  I take it there

Page 163

1  is some report or something?
2       A.    I've presented material
3  prepared by our student outreach and support
4  office, which had that information.  So I
5  can't cite here today where that is drawn
6  from.  But it is something that I hear
7  regularly at conferences and sessions that I
8  might attend that sexual assault is
9  underreported.
10      Q.    I'm just wondering how people
11  come up with that criteria to determine that.
12  If it's underreported that means it hasn't
13  been reported, so --
14          MR. PICCERILLI:  Objection to
15      form.  I don't think that's a
16      question.
17          MR. SCHWABENLAND:  I know.
18  BY MR. SCHWABENLAND:
19      Q.    So can you help me out on that?
20      A.    No.
21      Q.    Okay.  So let's get back to the
22  case against the -- or cases against the
23  girls' softball team.  Your focus was as a
24  hearing officer on nonsexual charges against

Page 164

1  students on the softball team, right?
2       A.    Correct, as well as the team
3  itself.  We did address the team itself as
4  potentially in violation of policy.
5       Q.    So did you hear -- did you hear
6  decisions against the team?
7       A.    I did.
8       Q.    And so did you make a ruling on
9  that against the team?
10          MR. PICCERILLI:  Hold on a
11      second.  I'm going to object to this
12      to the extent it's protected by FERPA.
13      Let's go off the video record.
14          THE VIDEOGRAPHER:  Off the
15      video record, 1:39.
16          MS. SCHIMELFENIG:  So I am
17      going to step in as the counsel for
18      the university, apart from this case
19      but responsible for its compliance
20      with FERPA.  Because the softball team
21      is a discrete identifiable group of
22      students who are entitled to privacy
23      under FERPA regarding their education
24      records of which this kind of

Page 165

1  proceeding is part of, I am not going
2  to on behalf of the university --
3  well, let me put it this way:  I am
4  going to ask outside counsel for the
5  university to preclude further inquiry
6  that goes into personally identifiable
7  information which relates to a team
8  which is an identifiable unit in this
9  deposition without the prior written
10  consent or a court order that says
11  that the interest of justice requires
12  regarding the team aspect of this
13  matter.  That's an objection that the
14  university is asking to be endorsed or
15  put on the record by counsel in this
16  matter.
17          MR. PICCERILLI:  So I do put it
18  on the record.  And that, to the
19  extent you're asking him questions
20  about the team, that is, persons that
21  is identifiable, we have to under
22  FERPA object to the disclosure of that
23  information and we will instruct the
24  witness not to answer those types of

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1   questions.
2       MR. SCHWABENLAND:  Let's call
3   the judge.
4       MS. SCHIMELFENIG:  As to the
5   team.
6       MR. SCHWABENLAND:  Let's call
7   the judge.
8           _  _  _
9       (Off the record.  Time noted,
10  1:40 p.m. to 2:14 p.m.)
11          _  _  _
12      MR. SCHWABENLAND:  We just had
13  a discussion with the judge's law
14  clerk, who may be attempting to speak
15  with the judge.  Whether or not we get
16  a callback on a Friday afternoon is
17  unclear.  Depends on the judge's
18  availability.  So the real objection,
19  which we explained to the judge's
20  chambers, was the university's
21  instruction of the witness not to
22  answer any questions concerning any
23  inquiries as to the softball team or
24  the investigation against the softball

Page 167

1   team as a unit, as I understand it.
2   So with that in mind, since it's
3   pending and we are waiting to hear
4   back from the judge, I am not going to
5   ask any questions about the softball
6   team as a unit.  I will ask questions
7   about individuals and I assume that's
8   okay and I don't waive my right to ask
9   questions about the softball team
10  until we hear from the judge.
11      MR. PICCERILLI:  Let's proceed
12  and we will take it step by step, but
13  as a general principle I think we are
14  in agreement.
15      MR. SCHWABENLAND:  Okay.  Thank
16  you.  Let's go back, if we could.
17      THE VIDEOGRAPHER:  Back on the
18  record, 2:18.
19  BY MR. SCHWABENLAND:
20      Q.   In your handling of the case
21  involving -- I will say involving the softball
22  team but individuals here and yourself acting
23  as a hearing officer and, again, your best
24  estimate, it was -- you acted as the hearing

Page 168

1   officer against more than one player from the
2   team and less than five players from the team?
3   Is that your best estimate?
4       A.   Yes.
5       Q.   Okay.  Did you hear the claims
6   against them all at once or separately?
7       A.   I am not sure what you mean by
8   "all at once or separately."
9       Q.   Sure.  You scheduled a hearing
10  for them to come in and at which time they can
11  hear the evidence against them and present
12  evidence; is that correct?
13      A.   Correct.
14      Q.   And so were they -- did they
15  have a hearing all one hearing or was each
16  afforded a separate hearing where only one
17  respondent shows up at a time?
18      A.   They were individual hearings.
19      Q.   So, essentially, if -- I am
20  just saying, if there were three players that
21  you were a hearing officer on, you would have
22  had three hearings; is that correct?
23      A.   Yes.
24      Q.   Do you know if the person or

Page 169

1   persons complaining against these individuals,
2   if they appeared at the hearing?
3       A.   I can't recall.
4       Q.   Do you know what your findings
5   were against those individuals?
6       A.   I can't recall.
7       Q.   So as you sit here you don't
8   even know if you found them to be responsible
9   or not responsible or it was undetermined?
10      A.   Truly, I can't recall.
11      Q.   Do you ever recall talking with
12  the investigator who was handling the sexual
13  misconduct claims?
14      A.   I don't recall.
15      Q.   How many times have you put
16  something like this on a co-equal tracks, that
17  is, you act as hearing officer or somebody
18  acts as a hearing officer for the nonsexual
19  and an investigator handles the sexual
20  misconduct?
21      A.   I can't give you an exact
22  number of how many times that's happened, but
23  it has happened more than this occasion.
24      Q.   But when you say -- I don't

43 (Pages 166 - 169)

CONFIDENTIAL

**Page 170**

1 want an exact number, because I know you can't
2 do it.
3    A.    Right.
4    Q.    Is it less than five, more than
5 five?
6    A.    I am not sure. I am not
7 comfortable putting an exact number on it, but
8 I know there is more than this matter.
9    Q.    In the last three years do you
10 know how many?
11    A.    I don't know.
12    Q.    But since 2015, when this was
13 on a multiple -- two tracks, parallel tracks,
14 have there been any other that have taken the
15 parallel tracks?
16    A.    I can't recall.
17    Q.    But you would have this
18 information available in your office?
19    A.    I would, as long -- presuming
20 it's in the student files.
21    Q.    What was the nature of the
22 nonsexual charges that you were addressing
23 against each of the three individuals or one
24 or more -- I'm sorry, I said each of the

**Page 171**

1 three, that's not right -- against those
2 individual players?
3    A.    Again, I don't know with
4 specificity, so I hesitate to share a charge
5 if that, in fact, wasn't --
6    Q.    But don't you have a general
7 idea? Was it harassment? Was it assault?
8 Was it -- there is an allegation that girls
9 may have been forced to simulate manual sex
10 over their clothes or things like that or to
11 simulate oral sex with a wine bottle, at least
12 that's on the complaint. Were any of those
13 allegations handled by you or is that sexual
14 in nature?
15    A.    If it were conduct implicated
16 by the SMP, it would not be addressed by me,
17 it would be addressed by the investigator.
18    Q.    So I'm trying to determine, so
19 were you handling harassment? Were you
20 handling -- what were you handling?
21    A.    As I recall, again, this is
22 not -- I don't have full memory, but I think
23 at least one occasion there was alcohol
24 present, so there could be a violation of the

**Page 172**

1 alcohol policy. There could be general
2 disrespect or hazing or something like that.
3 Again, I don't know with specificity the
4 charges at that time.
5    Q.    Well, the bulk of the
6 complaints, at least in -- on the -- at least
7 on the complaint would indicate ongoing
8 hazing.
9       THE VIDEOGRAPHER: Off the
10 record, 2:24.
11          _ _ _
12    (Off the record)
13          _ _ _
14    MR. SCHWABENLAND: The court
15 reporter is now ready, your Honor.
16    JUDGE DIAMOND: Would the
17 lawyers please identify themselves and
18 their clients?
19    MR. SCHWABENLAND: Yes. Ed
20 Schwabenland on behalf of the
21 Plaintiff, John Doe.
22    MR. MIRABELLA: John Mirabella,
23 also on behalf of the Plaintiff, John
24 Doe.

**Page 173**

1    MR. PICCERILLI: Albert
2 Piccerilli, on behalf of St. Joseph's
3 University and William Bordak.
4    MS. SCHIMELFENIG: Marianne
5 Schimelfenig, general counsel, St.
6 Joseph's University.
7    MS. MCREYNOLDS: Holly
8 McReynolds on behalf of Defendant,
9 Jane Roe.
10    JUDGE DIAMOND: Okay. As my
11 clerk has explained it to me -- who is
12 the deponent, by the way?
13    MR. PICCERILLI: The deponent
14 is William Bordak, who is the director
15 of community standards, the office of
16 community standards at St. Joseph's
17 University.
18    JUDGE DIAMOND: As my clerk has
19 explained it to me, the plaintiff is
20 seeking to inquire of the deponent as
21 to the university's investigation of
22 charges made against certain members
23 of the women's -- is it the softball
24 team?

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1    MR. SCHWABENLAND: Yes.
2        MR. PICCERILLI: Your Honor, if
3    I might?
4        JUDGE DIAMOND: Hold on.
5    Charges made by members of the
6    softball team against other members of
7    the softball team; is that right?
8        MR. SCHWABENLAND: Yes, sir.
9        JUDGE DIAMOND: And how recent
10   was this?
11       MR. SCHWABENLAND: 2015.
12       JUDGE DIAMOND: And how many
13   members of the softball team were
14   accused -- the misconduct is both
15   sexual and nonsexual in nature, the
16   alleged misconduct; is that right?
17       MR. SCHWABENLAND: Yes. It was
18   placed on a parallel track --
19       JUDGE DIAMOND: Just answer my
20   questions, please. Sexual and
21   nonsexual in nature; is that right?
22       MR. SCHWABENLAND: That's
23   correct.
24       JUDGE DIAMOND: And Ms. Malloy

Page 175

1    did the investigation for the
2    university; is that correct?
3        MR. SCHWABENLAND: Yes.
4        JUDGE DIAMOND: And how many
5    members of the team were accused?
6        MR. SCHWABENLAND: Mr. Bordak
7    does not know. His end of it, it was
8    more than one but less than five. We
9    don't know about Ms. Malloy --
10       JUDGE DIAMOND: Wait. More
11   than one but less than five. And how
12   many members of the softball team were
13   there in 2015?
14       MR. PICCERILLI: Probably
15   between 12 and 16.
16       JUDGE DIAMOND: 12 and 16.
17       MR. PICCERILLI: Not sure, but
18   probably in that range.
19       JUDGE DIAMOND: In that range.
20   So no more than a third of the -- top
21   edges of a third of the 15 or if it
22   was a smaller team, five out of the
23   12?
24       MR. SCHWABENLAND: Yes, sir.

Page 176

1    MR. PICCERILLI: But, Your
2    Honor, if I may, what the issue is --
3        JUDGE DIAMOND: No, you may
4    not. Just let me ask my questions
5    then you can say what you want. St.
6    Joe's is objecting on certain grounds
7    because the members of the team might
8    otherwise be identifiable even if they
9    are not named and, indeed, even if, as
10   we now hear from the deponent, he
11   doesn't even know how many there were,
12   but there were no more than five? Is
13   that the objection, that you ask it to
14   remain confidential and the identities
15   of the accused might be -- might
16   somehow be revealed through some
17   investigation?
18       MR. PICCERILLI: Your Honor,
19   this is Albert Piccerilli. The
20   objection is that plaintiff's counsel
21   is asking regarding the team as a
22   whole. We are not objecting as to
23   specific unidentifiable people, women
24   on the people.

Page 177

1    JUDGE DIAMOND: I don't
2    understand. What do you mean, asking
3    as a whole? As I understand it, he
4    wants to ask about steps of the
5    investigation, the nature of the
6    investigation and so forth.
7        MS. SCHIMELFENIG: Your Honor,
8    this Marianne -- I'm sorry. Pardon
9    me.
10       JUDGE DIAMOND: Wait. I really
11   wish people would stop interrupting
12   me. Mr. Schwabenland, what do you
13   want to know?
14       MR. SCHWABENLAND: Two things.
15   One is -- and counsel does not object
16   to that -- that I can ask questions
17   about individual players as long as we
18   don't identify them and what happened
19   to them and that's fine. And what
20   prompted my telephone call to your
21   chambers -- and I apologize for having
22   to bother you on Friday afternoon --
23   but Mr. Bordak said he was the hearing
24   officer as to those individuals

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1   charged nonsexually and there was more
2   than one, less than five, but he was
3   also the hearing officer with regard
4   to whether any sanctions should be
5   imposed against the girls' softball
6   team. We get didn't get into that
7   because he was then instructed not to
8   answer any questions about what he did
9   as a hearing officer concerning the
10  softball team itself.
11      JUDGE DIAMOND: So the question
12  is whether or not he imposed sanctions
13  on the whole team?
14      MR. SCHWABENLAND: Yes, because
15  he raised that. He said it was not
16  only those girls but he was the
17  hearing officer as to what sanctions
18  should be imposed, if any, as to the
19  team, such as you suspended them or do
20  whatever.
21      MS. SCHIMELFENIG: There were
22  charges --
23      JUDGE DIAMOND: Wait, please.
24  If a sanction was imposed wouldn't it

Page 179

1   be public knowledge?
2       MS. SCHIMELFENIG: No.
3       JUDGE DIAMOND: If the team was
4   suspended from play, that wouldn't be
5   public knowledge?
6       MS. SCHIMELFENIG: Your Honor,
7   this is Marianne Schimelfenig. The
8   entire team was not suspended from
9   play.
10      JUDGE DIAMOND: Well, you're
11  telling me what the sanction was,
12  aren't you? You're telling me what
13  the sanction was not. I'm sorry. Is
14  he going to have to guess? This to me
15  seems to be a frivolous objection,
16  unless you can put more meat on it. I
17  think the team as whole -- individuals
18  are not being singled out in any way.
19  I don't see how the statute protects
20  it. And, in any event, if I order you
21  to do it the statute protects the
22  university. What am I missing?
23      MR. PICCERILLI: Your Honor,
24  the line of questioning that we are

Page 180

1   objecting to are the inquiries
2   regarding the team as a whole. The
3   team as a whole --
4       JUDGE DIAMOND: I know that.
5   How does that trigger the statutory
6   protections as to individuals?
7       MR. PICCERILLI: It invokes it
8   because the team as a whole is an
9   identifiable group of female students
10  who were on the team at the time.
11      JUDGE DIAMOND: Your objection
12  is overruled. I am directing the
13  witness to answer --
14      MS. SCHIMELFENIG: Your
15  Honor --
16      JUDGE DIAMOND: -- unless you
17  have another ground to object.
18      MS. SCHIMELFENIG: Well, your
19  Honor, this is Marianne Schimelfenig.
20  I deal with FERPA pretty regularly, as
21  you might imagine, in my job. But the
22  law under FERPA is that if the Court
23  orders a university, as you are doing
24  here, to disclose education records

Page 181

1   without the prior written consent of
2   the students whose identity will
3   become known that the Court has to
4   include in its order, to protect the
5   university, that the interest of
6   justice requires that the disclosure
7   be made without the prior written
8   consent of the students whose identity
9   will be disclosed.
10      JUDGE DIAMOND: I am certainly
11  prepared to order that, although it
12  seems to me this -- just what I knew
13  about this dispute yesterday, it seems
14  to me the university was on notice
15  that this could well have been an area
16  of inquiry and could have contacted
17  the students or their parents,
18  whatever the statute requires, but no
19  matter. I so find. There will be a
20  written order issued. I am in Vermont
21  right now, but I will ask a colleague
22  of mine to sign on my behalf. My
23  written order will make such a
24  finding. Is there anything else?

46 (Pages 178 - 181)

CONFIDENTIAL

1    MR. SCHWABENLAND:  No, sir.
2    JUDGE DIAMOND:  Thank you.
3    MR. PICCERILLI:  Nothing else,
4  Your Honor.
5    MR. SCHWABENLAND:  Thank how
6  Your Honor.
7        _  _  _
8  (End of telephone conference)
9        _  _  _
10    MR. PICCERILLI:  We have just
11  had a conference, as the court
12  reporter has taken down, a conference
13  with Judge Diamond regarding the
14  objection, the FERPA objection to
15  questions about the softball team as a
16  whole.  We all stated our positions.
17  The judge has ordered and he has
18  indicated that he would order or sign
19  a written order that in the interest
20  of justice no prior notice to be given
21  by the university to students
22  regarding this particular matter,
23  students who were on the softball
24  team.  Off the record.

1        _  _  _
2      (Off the record)
3        _  _  _
4    MR. PICCERILLI:  Let me add
5  this:  Even to the extent that the
6  information that may be inquired about
7  constitutes education records under
8  FERPA or personally identifiable
9  information is involved.
10        _  _  _
11    (Whereupon, a recess was held
12  from 2:37 p.m. to 2:42 p.m.)
13        _  _  _
14    THE VIDEOGRAPHER:  Back on the
15  record, 2:42.
16  BY MR. SCHWABENLAND:
17    Q.   Mr. Bordak, thanks.  You've
18  been patient.  We had some matters to clear up
19  with the Court.  So it's now resolved.  Can
20  you -- let me go back.  You indicated that you
21  not only acted as hearing officer with regard
22  to evaluating nonsexual charges against some
23  members of the softball team, which was
24  perhaps more than one member but less than

1  five, right?
2    A.   Yes.
3    Q.   But you also acted as hearing
4  officer in evaluating the charge against the
5  whole softball team?
6    A.   As an entity, yes.
7    Q.   Okay.  And what did you
8  conclude?
9    A.   I don't recall.
10    Q.   Have you acted as a hearing
11  officer since being at -- since being at the
12  university, at St. Joe's, where you evaluated
13  a sports group as an entity?
14    A.   Yes.
15    Q.   And this would be as to
16  nonsexual claims of misconduct?
17    A.   Yes.
18    Q.   And are you able to tell me in
19  your association in your time with the
20  university how many times that occurred?
21    A.   Not with exactness.
22    Q.   I don't want exactness, but can
23  you approximate for me?
24    A.   At least a few times every

1  year.
2    Q.   Okay.  And the nature of these
3  would be what, acting up or --
4    A.   It could be a range of conduct,
5  from hazing to violations of the alcohol
6  policy.
7    Q.   Have you ever imposed sanctions
8  against a sports team at the university
9  whereby you either suspend their activity or
10  restrict their activity?
11    A.   I can't recall.
12    Q.   Have you ever imposed sanctions
13  against a sports team where you would impose a
14  requirement that they have to do some
15  additional studies or to learn how to behave
16  correctly or something?
17    A.   Yes.
18    Q.   Have you ever suspended the
19  activities of a sports team because of a
20  finding of misconduct?
21    A.   I can't recall.
22    Q.   It seems to me that that would
23  be something you should recall.
24    A.   I truly, honestly cannot

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1 recall. I have -- whether it's restriction of
2 individual members of the team or the team as
3 an entity, like, I can't remember whether --
4 that would be a higher end of the sanction, so
5 that's not something that's regular. I can't
6 recall whether I have done that.
7    Q.    You don't recall your findings
8 when you acted as hearing officer against the
9 softball team, the girls' softball team,
10 findings against them, whether it was
11 responsible, not responsible, or undetermined?
12    A.    I really can't remember.
13    Q.    So you don't know if you
14 imposed any sanctions whatsoever?
15    A.    I know that there were
16 sanctions imposed. I don't know whether they
17 were team sanctions, individual sanctions, and
18 what individual students those related to.
19    Q.    Do you know what sanctions were
20 imposed?
21    A.    I know that at some level there
22 was restriction in performance, in
23 competition. Again, I don't know whether that
24 was the specific individuals or whether it was

Page 187

1 team related. We are talking a couple of
2 years ago, three years ago, and a lot has
3 happened since then. I can't remember.
4    Q.    Can we agree that there were at
5 least some restrictions imposed as to
6 individual team members at least?
7    A.    I don't know that there was
8 restrictions imposed on individual team
9 members.
10    Q.    But if you impose restrictions
11 on a whole team then that would also be
12 imposed on individuals, right?
13    A.    Said that way, I would agree,
14 that by nature of being on a team a
15 restriction on the team would restrict
16 individual people.
17    Q.    Ms. -- I forget the young
18 lady's name who was just deposed on Tuesday.
19 Do you recall?
20    MR. PICCERILLI: Yes, I do.
21    MR. SCHWABENLAND: Would you
22 share that with me?
23    MR. PICCERILLI: I think you're
24 talking about Katie Bean.

Page 188

1    MR. SCHWABENLAND: Katie Bean.
2 BY MR. SCHWABENLAND:
3    Q.    Ms. Bean was just deposed
4 Tuesday and she indicated that she would
5 normally in years past talk to sport teams
6 about alcohol and drugs and to stay away from
7 it, but she was specifically asked after the
8 incident with the softball team to go and talk
9 to them about hazing. Do you recall that at
10 all?
11    MR. PICCERILLI: Objection to
12    form.
13    THE WITNESS: I don't recall
14    that.
15 BY MR. SCHWABENLAND:
16    Q.    Do you recall Ms. Bermey going
17 and talking with the softball team about
18 harassment?
19    A.    I don't recall that.
20    Q.    But the information concerning
21 the handling of this would be, again,
22 available in the file in your office, right?
23    A.    Yes.
24    Q.    Do you know how many --

Page 189

1 Exhibit-1 just identifies those individuals
2 who were charged with sexual misconduct; is
3 that correct?
4    A.    Or interim sexual misconduct.
5    Q.    Or interim?
6    A.    Correct.
7    Q.    But starting as of January of
8 2015?
9    A.    Yes.
10    Q.    Interim just means that the
11 softball team policy became effective as of
12 June, but for those months prior to June 2015
13 it was still handled under sexual misconduct,
14 right?
15    A.    The interim sexual misconduct
16 policy, as I understand it, was in
17 place because it did not -- the difference
18 between the interim sexual -- one of the major
19 differences between the interim sexual
20 misconduct policy and the sexual misconduct
21 policy is that the interim did not cover
22 nonstudent respondents, yet that was still
23 going through, as I understood it, in
24 conversations with university council, since

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1 it was a campus-wide involving nonstudents,
2 the sexual misconduct policy then, when it
3 became effective in June, covered nonstudents.
4    Q.   Okay.
5        MR. PICCERILLI:  If I just
6    might state, council is spelled
7    C-O-U-N-C-I-L.
8 BY MR. SCHWABENLAND:
9    Q.   As a result of you acting as
10 hearing officer on the matters involving the
11 allegations against the girls' softball team
12 or some of the players on the team, did you --
13 did your office change anything to do with the
14 procedure or protocol either in investigating,
15 charging, conducting hearings, anything?
16   A.   Not in response to anything
17 involving the softball matter, no.
18   Q.   And how about on the other
19 parallel track of the sexual misconduct?  You
20 know what the results were on that, right?  I
21 mean, you did know what the results were on
22 that?
23   A.   At the time.  I can't recall
24 the results now.

Page 191

1    Q.   Okay.  Well, assuming that the
2 only women were the two found not responsible,
3 those two would have been the investigator's
4 finding of nonresponsibility, right?
5        MR. PICCERILLI:  Objection to
6    form.
7        THE WITNESS:  Well, I don't
8    know with certainty that the two
9    mentioned here are the two in question
10   for the softball.
11 BY MR. SCHWABENLAND:
12   Q.   No.  I understand.  But there
13 is no other -- again, sexual misconduct track
14 would be by an investigator, right?
15   A.   Right.
16   Q.   This was around 2015 and in
17 2015 the only two women on this were found not
18 responsible in May of 2015.  Did I read that
19 correctly?
20   A.   It was March.
21   Q.   I'm sorry.  March is the date
22 of the incident, right?
23   A.   Right.
24   Q.   Oh.  I'm sorry.  The date of

Page 192

1 the incident was March 24, 2015, right?
2    A.   Right.
3    Q.   And what's the date where it
4 says created, 5/21/15?
5    A.   That's when the report was
6 created on our end, like, within our system.
7    Q.   Okay.  So that the findings
8 would have been concluded by then; is that
9 correct?
10   A.   Presumably.  I don't know when
11 the outcome was reached.
12   Q.   I don't see any other women
13 there.  So the -- would it be fair to assume
14 that those two were probably from the girls'
15 softball team?
16   A.   Yes, but it would be an
17 assumption.
18   Q.   I understand.
19   A.   Yes.
20   Q.   Can you recall anything that
21 Elizabeth Malloy said to you about her
22 investigation about the girls' softball team?
23   A.   I cannot recall.
24   Q.   But at some point would you

Page 193

1 have known what the findings were?
2    A.   Yes.
3    Q.   And if this says the findings
4 of the two girls on the sexual misconduct
5 thing was not responsible, then the sexual
6 charges against them was found to be not
7 responsible, right?
8        MR. PICCERILLI:  Objection to
9    form.
10       THE WITNESS:  Yes.
11 BY MR. SCHWABENLAND:
12   Q.   Okay.  Have you been involved
13 with any investigations involving -- and I
14 don't need to know the student's name --
15 charges of impropriety or violations of
16 student conduct who's related to either
17 anybody on staff or the board of trustees or
18 anybody associated -- employed by the
19 university?
20       MR. PICCERILLI:  Can we hear
21   that question back?
22           - - -
23       (Whereupon, the court reporter
24   read back from the record.)

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

```
 1                 - - -
 2          MR. PICCERILLI:  Note my
 3   objection to the form of the question.
 4   BY MR. SCHWABENLAND:
 5      Q.    Can you answer that?
 6      A.    Yes.
 7      Q.    Okay.
 8          MS. SCHIMELFENIG:  I want to --
 9   can we go off the record?
10          THE VIDEOGRAPHER:  Off the
11   video record, 2:53.
12                 - - -
13          (Off the record)
14                 - - -
15          THE VIDEOGRAPHER:  Back on the
16   record, 2:55.
17   BY MR. SCHWABENLAND:
18      Q.    We are at the point where you
19   just said yes, you have known of a case or
20   cases involving discipline proceedings against
21   a student who may be related to someone at the
22   university, whether trustees or whatever; is
23   that correct?
24          MR. PICCERILLI:  Read the
```

Page 195

```
 1   question again.  And, also, what were
 2   the categories, because "whatever"
 3   makes it -- I object to the form of
 4   "whatever."  I object to the form of
 5   the question.
 6          MR. SCHWABENLAND:  Do you want
 7   to go off the camera?
 8          MR. PICCERILLI:  Yes.
 9          THE VIDEOGRAPHER:  Off the
10   record, 2:55.
11          MR. PICCERILLI:  I know you are
12   trying to get this done, but I object
13   to the form of the question.  You said
14   trustees, whatever.  So I think you
15   need to state who is in the broad
16   category.
17          MR. SCHWABENLAND:  Fair enough.
18   What he said yes to, read that
19   question.
20                 - - -
21          (Whereupon, the court reporter
22   read back from the record.)
23                 - - -
24          MR. PICCERILLI:  If you can
```

Page 196

```
 1   reframe your question so that it
 2   reflects those broad categories, that
 3   would make it better, that would make
 4   your question better.
 5          MR. SCHWABENLAND:  Okay.  Let's
 6   go back on the record and I'll try.
 7          THE VIDEOGRAPHER:  Back on
 8   record 2:57.
 9   BY MR. SCHWABENLAND:
10      Q.    Okay.  Let me try to rephrase
11   the question, if I can.  I am not sure I will
12   be doing it justice, but let me try.  I
13   believe you said you've had occasion to -- by
14   you I mean OCS -- had occasion to deal in
15   disciplinary proceedings involving students
16   who were in some way either related to a
17   member of the university, faculty, staff, or
18   board of trustees; is that correct?
19      A.    Yes.
20      Q.    And how often have you had that
21   responsibility?
22      A.    I don't want to give a number,
23   but it's somewhere between -- sometimes in
24   regular there is faculty that have students on
```

Page 197

```
 1   campus -- their children on campus, staff
 2   members have children on campus and they're a
 3   student like any other student that come
 4   through our office.  Sometimes I know there is
 5   a connection.  Sometimes I don't.
 6      Q.    And would these all have been
 7   nonsexual related offenses?
 8      A.    Both.
 9      Q.    And have those -- and who
10   decides whether it's placed into the sexual
11   offense category, under the sexual misconduct
12   policy, or the nonsexual, under the community
13   standards policy?
14      A.    Right.  According to the policy
15   there is an initial review where the Title IX
16   coordinator or deputy Title IX coordinator
17   will make that determination in consultation
18   with community standards.
19      Q.    So are all decisions made by
20   the Title IX coordinator, Dr. Perry?
21      A.    Correct, in consultation with
22   community standards.
23      Q.    And you would be the one she
24   consults with?
```

50 (Pages 194 - 197)

CONFIDENTIAL

1      A.    Most often, yes.
2      Q.    Okay.  And if you're not
3  available she would consult with whom?
4      A.    The assistant director.
5      Q.    Okay.  But more often than not
6  this was in consultation with you?
7      A.    Correct.
8      Q.    And so what criteria is used as
9  to whether or not it should be placed into
10  which category?
11     A.    The definitions of conduct
12  precluded by the policy.  So we're looking at
13  the sexual misconduct to see what conduct is
14  covered and whether the allegation or
15  complaint met the definitions or approached
16  those definitions of conduct, then it would go
17  to the sexual misconduct policy.
18     Q.    Now, have you had other cases
19  involving claims of sexual misconduct where
20  the couple is, I am going to use the word
21  "just," but just kissing?
22     A.    Yes.
23     Q.    And how many of those have you
24  had in the last year or two?

1      A.    I can't put a number on it.
2      Q.    Can you give me a range, an
3  approximation?
4      A.    There have been some in the
5  past, but I can't give you a range.
6      Q.    Are we talking less than five,
7  more than five?
8      A.    Over the course of -- what was
9  the time frame?
10     Q.    Well, I will go with three,
11  four years.
12     A.    I would say less than five, but
13  that would be an answer based on my current
14  recollection, which is not -- I'm not saying
15  that it's the specific number.
16     Q.    And would that be handled by
17  the investigator, then?
18     A.    Yeah.  Any conduct that's
19  covered by the SMP would be handled by the
20  investigator.
21     Q.    Have you ever had occasion
22  where you're uncertain which category to place
23  it in?
24     A.    No.

1      Q.    Okay.  Do you know John Doe?
2      A.    In this matter?
3      Q.    Yes.
4      A.    Yes.
5      Q.    And did you know him before the
6  matter came up -- was raised by Jane Roe about
7  him?
8      A.    No.
9      Q.    So that's the first time you
10  came to know him, his involvement in this
11  matter, right?
12     A.    Yes.
13     Q.    And when did you first meet
14  him?
15     A.    I believe it was the outcome
16  meeting.
17     Q.    You were not involved in the
18  investigation or the findings; is that
19  correct?
20     A.    Correct.
21     Q.    Would you have been involved in
22  the initial referral by Dr. Perry?
23     A.    The initial review?
24     Q.    Yes.

1      A.    Yes.
2      Q.    And the initial review would be
3  where -- when?
4      A.    Well, I don't have a date, but
5  between the complaint being filed and the
6  assignment to the investigator was the initial
7  review.
8      Q.    Okay.  And did you know Jane
9  Roe or do you know Jane Roe?
10     A.    I don't recall meeting her
11  prior to this matter either.
12     Q.    So when you first met her it
13  would have been when, at the outcome?
14     A.    I believe so.
15     Q.    So did you have a separate
16  outcome meeting to advise Jane Roe?
17     A.    Yes.
18     Q.    And did you ever meet Jane Roe
19  before that?
20     A.    I don't believe so.
21     Q.    Okay.  Because she works in
22  that office with Ms. Bean.
23     A.    So now -- I may have met her in
24  terms of a worker within the building, but

51 (Pages 198 - 201)

CONFIDENTIAL

1 there are many workers within the building and
2 so I don't have any preexisting relationship
3 or have -- knew her much before.
4       Q.    Okay. Jane Roe was a freshman
5 in September 2016 and she worked on a
6 part-time basis in the office with Ms. Bean in
7 the same building where you're at, right?
8       A.    Yes.
9       Q.    But you have no recollection of
10 having met her or having any conversation that
11 sticks out in your mind?
12      A.    Now that you mention that, as
13 an employee in another office I probably met
14 her, knew who she was, just like the other 20
15 employees within the office.
16      Q.    Okay.
17      A.    But I don't know that I have,
18 like, met her or had prolonged conversation
19 with her outside of her context of an
20 employee.
21      Q.    Okay. Your role in the
22 accusation -- the investigation of the
23 accusation was -- as I understand it, it came
24 into -- the complaint came into your office

1 through Dr. Perry; is that correct?
2       A.    Correct.
3       Q.    And she would have generated a
4 report?
5       A.    Correct.
6       Q.    And was a report also generated
7 by public safety?
8       A.    I believe so, yes.
9       Q.    And so those two items would
10 have come into your office, right?
11      A.    I did not receive the public
12 safety report.
13      Q.    Okay. Well, assuming that it
14 came into your office, how would it come in?
15      MR. PICCERILLI: I am going to
16      object to the form of the question.
17      He has testified about that report.
18      Had no recollection of it, but ...
19      MR. SCHWABENLAND: Okay.
20 BY MR. SCHWABENLAND:
21      Q.    But assuming that public safety
22 would send a report, how would it come in?
23 Would it come in hand delivered, by computer?
24      A.    Through email.

1       Q.    Now, we know in this case here
2 Emily Forte conducted the pre-investigation
3 meeting. Is that your understanding?
4       A.    Yes.
5       Q.    And what was your involvement
6 up until then?
7       A.    Assisting Emily procedurally
8 with the -- it may have been, and I don't have
9 specific recollection, but when these matters
10 take place I would help the assistant director
11 with either coordinating the scheduling or
12 creating the documents for the meeting. We do
13 that collaboratively, so I don't recall who in
14 this instance did that.
15      Q.    Okay. What documents need to
16 be prepared for the meeting?
17      A.    The checklist and the letter,
18 which is the notice and invitation to the
19 meeting.
20      Q.    So the notice and invitation to
21 meet would have been the first letter to go
22 out; is that correct?
23      A.    Correct.
24      Q.    And that's basically a standard

1 letter that's sent out, just changing the
2 name -- just changing the place and the date
3 as to where the action occurred, right?
4       MR. PICCERILLI: Objection to
5      form.
6      THE WITNESS: There is -- it's
7      a template, but it may be more than
8      just that. It's a case by case.
9 BY MR. SCHWABENLAND:
10      Q.    So when you said you assisted
11 her, that's a two-page letter, right?
12      A.    About that. I don't know the
13 specifics.
14      Q.    And so when you say you would
15 have assisted her in preparing this, is this,
16 what, you would have reviewed it after she
17 worked it up?
18      A.    Or did it for her and on her
19 behalf created it. I mean, this is -- it's a
20 two-person office, that we do things
21 collaboratively. So I would have -- I could
22 have helped with her in this instance in the
23 administrative pieces.
24      Q.    Did you make any determination

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1  as to whether or not this case should be
2  placed into the sexual misconduct track or the
3  other track?
4        A.    It was not my determination to
5  make, but through the initial review and
6  consultation I agreed with the decision to go
7  sexual misconduct policy.
8        Q.    So did you -- so do you
9  actually recall making that determination?
10       A.    The determination was not mine
11  to make, but I --
12       Q.    I know --
13             MS. SCHIMELFENIG:  He wasn't
14       finished.
15             MR. PICCERILLI:  Let him
16       finish.
17             THE WITNESS:  You're asking if
18       I remember making the determination.
19       I am saying, the determination was not
20       mine to make.
21  BY MR. SCHWABENLAND:
22       Q.    So you didn't make any
23  determination, then, or you did?
24       A.    I did not.  I shared in

Page 207

1  consultation my thoughts with the Title IX
2  coordinator.
3        Q.    The Title IX -- Dr. Perry?
4        A.    Dr. Perry, correct.
5        Q.    So you told her you agreed with
6  her?
7        A.    Yes, my recollection.
8        Q.    Did she ask your opinion?
9        A.    I don't know that it was a
10  conversation like that, asking my opinion.  It
11  was a review of the complaint in terms of the
12  policy and the conduct.
13       Q.    And so the complaint would be
14  what?
15       A.    The initial complaint, so what
16  was the --
17       Q.    Dr. Perry's report?
18       A.    Dr. Perry's report.
19       Q.    Okay.  I am jumping back a
20  second.  There are certain documents that --
21  bear with me a second here.  I'll represent to
22  you -- and we have the documents -- there is a
23  thing called Memorandum of Understanding with
24  Community Partners dated February 23, 2017.

Page 208

1  For the record, they are Bates stamped 1056 to
2  1064.  Then there is the Memorandum of
3  Understanding with Campus Partners, the same
4  date, February 23, 2017 and for the record
5  I'll represent that they are Bates stamped
6  1065 to 1085.  Now, you don't have them in
7  front of you.  I will pull them out.  First of
8  all, do you remember those two memorandums of
9  understanding?
10       A.    I member them being shared with
11  me, but I was not a part of any composition or
12  creation of them.
13       Q.    Do you recall being a signatory
14  to those documents, though?
15       A.    Yes.
16       Q.    And so when they were shared
17  with you when were they shared with you, on
18  the date you signed them or before?
19       A.    I can't recall.
20       Q.    Who shared them with you?
21       A.    I can't recall specifically.
22       Q.    Is this -- is this, like, at a
23  specific meeting to say, "Let's review this
24  Memorandum of Understanding" or either one or

Page 209

1  is this, "Hey, we finished these Memorandums
2  of Understanding, just so you know.  Here's a
3  copy.  Take a look at it"?  Do you recall
4  anything like that?
5        A.    I don't recall a specific
6  meeting, but I also don't recall it being as
7  casual as "Here's the document."  I don't know
8  specifically.
9        Q.    Now, in those memorandum OCS is
10  identified here; is that correct?
11       A.    I am not sure.  I don't have
12  the documents committed to memory.
13       Q.    I will go through that.  I was
14  trying to speed this along here.  What was
15  your understanding as to the purpose of those
16  two documents?  Again, this is February of
17  2017.
18       A.    I actually don't know.  So I
19  would like to see the documents and form that
20  response.
21       Q.    Okay.
22             MR. PICCERILLI:  Let's go off
23       the video record, please.
24             THE VIDEOGRAPHER:  Off the

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1    video record, 3:11.
2                    _ _ _
3            (Off the record)
4                    _ _ _
5        MR. SCHWABENLAND:  We had a
6    discussion off the record.  All
7    counsel have agreed to continue this
8    deposition.  Counsel for the
9    university has to leave at 3:15, now.
10   Counsel for Ms. Roe has to leave at
11   4:00.  Counsel for the university has
12   agreed to reproduce Mr. Bordak,
13   hopefully at a soon time --
14   soon-to-be-scheduled time, because we
15   are on a short time schedule.
16       THE VIDEOGRAPHER:  We're back
17   on the record, 3:15.
18       MR. SCHWABENLAND:  Mr. Bordak,
19   we have taken a lot of breaks because
20   there's been some logistical issues
21   that all counsel had to work out and
22   so we were not able to get your
23   deposition done today and certain
24   counsel have to leave at 3:15 and 4:00

Page 211

1    and it's now 3:15.  So all counsel
2    have agreed to conclude your
3    deposition for today, with the
4    understanding that we are going to try
5    to reschedule this as soon as possible
6    and we'll bring you back in and
7    conclude your deposition.  So I thank
8    you for your patience and that's fine.
9    Do you --
10       MR. PICCERILLI:  The only other
11   thing I wanted to note is that we
12   started this deposition at about 10:00
13   today and it's now 3:15.  The witness
14   has not had an opportunity for lunch.
15   We have had some breaks, mainly, and
16   the longest break was to consult with
17   the judge on a particular issue.  So
18   it was certainly no doing of the
19   witness's that we had those breaks.
20       MR. SCHWABENLAND:  No, not at
21   all.  He's been very patient.
22       THE VIDEOGRAPHER:  The time is
23   3:16.  We're now going off the video
24   record.

Page 212

1                    _ _ _
2        (Deposition adjourned.  Time
3    noted, 3:16 p.m.)
4                    _ _ _

Page 213

1
2        C E R T I F I C A T E
3                _ _ _
4
5
6        I do hereby certify that I am a
     Notary Public in good standing, that
     the aforesaid testimony was taken
7    before me, pursuant to notice, at the
     time and place indicated; that said
8    deponent was by me duly sworn to tell
     the truth, the whole truth, and
9    nothing but the truth; that the
     testimony of said deponent was
10   correctly recorded in machine
     shorthand by me and thereafter
11   transcribed under my supervision with
     computer-aided transcription; that the
12   deposition is a true and correct
     record of the testimony given by the
13   witness; and that I am neither of
     counsel nor kin to any party in said
14   action, nor interested in the outcome
     thereof.
15       WITNESS my hand and official
16   seal this 11th day of July 2018.
17
18
19       *Kimberly A. Wornczyk*
20
21
22       _____
         Kimberly A. Wornczyk
23       Notary Public
24

CONFIDENTIAL

Page 214

```
1                 - - -
2      INSTRUCTIONS TO WITNESS
3                 - - -
4
5      Please read your deposition over
6  carefully and make any necessary corrections.
7  You should state the reason in the appropriate
8  space on the errata sheet for any corrections
9  that are made.
10     After doing so, please sign the
11 errata sheet and date it.
12     You are signing same subject to the
13 changes you have noted on the errata sheet,
14 which will be attached to your deposition.
15     It is imperative that you return the
16 original errata sheet to the deposing attorney
17 within thirty (30) days of receipt of the
18 deposition transcript by you.  If you fail to
19 do so, the deposition transcript may be deemed
20 to be accurate and may be used in court.
21
22
23
24
```

Page 216

```
1                 - - -
2      ACKNOWLEDGMENT OF DEPONENT
3                 - - -
4      I, WILLIAM BORDAK, do hereby certify
5  that I have read the foregoing pages  1 to 212
6  and that the same is a correct transcription
7  of the answers given by me to the questions
8  therein propounded, except for the corrections
9  or changes in form or substance, if any, noted
10 on the attached Errata Sheet.
11 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
12 DATE
13 SIGNATURE
14
15     Subscribed and sworn to
16 before me this _ _ _ _ _ _ day of _ _ _ _ _ _
17 _ _ _, 20_ _.
18
19     My commission expires:
20 _ _ _ _ _ _ _ _ _ _
21
22 _ _ _ _ _ _ _ _ _ _
23 Notary Public
24
```

Page 215

```
1          E R R A T A
2                 - - -
3 PAGE     LINE          CHANGE
4 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _
5 Reason for
6 Change:   _ _ _   _ _ _ _ _ _ _ _ _ _
7 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _
8 Reason for
9 Change:   _ _ _   _ _ _ _ _ _ _ _ _ _
10 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _
11 Reason for
12 Change:   _ _ _   _ _ _ _ _ _ _ _ _ _
13 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _
14 Reason for
15 Change:   _ _ _   _ _ _ _ _ _ _ _ _ _
16 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _
17 Reason for
18 Change:   _ _ _   _ _ _ _ _ _ _ _ _ _
19 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _
20 Reason for
21 Change:   _ _ _   _ _ _ _ _ _ _ _ _ _
22 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _
23 Reason for
   Job No. PA2957467
24 Change   _ _ _   _ _ _ _ _ _ _ _ _ _
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

217

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                      - - -
 4   JOHN DOE,                 :
 5        Plaintiff,    :
 6   vs.                       :
 7   ST. JOSEPH'S UNIVERSITY :
 8    and         :
 9   JANE ROE,                 :
10        Defendants.   : NO. 18-2044
11                      - - -
12             FRIDAY, JULY 13, 2018
13                      - - -
14
15               CONFIDENTIAL
16                    _ _ _
17        Continued videotaped deposition of
18   WILLIAM BORDAK, taken at the law offices of
19   Schwabenland and Ryan, PC, 955 Old Eagle
20   School Road, Suite 306, Wayne, Pennsylvania,
21   commencing at 8:28 a.m., before Kimberly A.
22   Wornczyk, a Registered Professional Reporter,
23   New Jersey Certified Court Reporter,
24   (Certificate No. 30X100225500), and Notary
     Public in and for the Commonwealth of
     Pennsylvania.

                       - - -
             VERITEXT LEGAL SOLUTIONS
              MID-ATLANTIC REGION
         1801 Market Street - Suite 1800
          Philadelphia, Pennsylvania 19103
```

218

```
 1   APPEARANCES:
 2
 3        LAW OFFICES OF JOHN MIRABELLA
 4        BY: JOHN MIRABELLA, ESQUIRE
 5        1600 Market Street
 6        Suite 1810
 7        Philadelphia, Pennsylvania 19103
 8        215-422-4991
 9        Representing the Plaintiff, John Doe
10
11        MINTZER SAROWITZ ZERIS LEDVA &
12        MEYERS, LLP
13        BY: RICHARD E. CHESNEY, JR., ESQUIRE
14        1500 Market Street
15        Suite 4100
16        Philadelphia, Pennsylvania 19102
17        215-735-7200
18        rchesney@defensecounsel.com
19        Representing the Defendant, Jane Roe
20
21
22        MONTGOMERY MCCRACKEN
23        BY: ALBERT L. PICCERILLI, ESQUIRE
24        1735 Market Street
          Philadelphia, Pennsylvania 19103
          215-772-7590
          apiccerilli@mmwr.com
          Representing the Defendant, St.
          Joseph's University
```

ALSO PRESENT:

```
          Marianne Schimelfenig, Esquire
          (St. Joseph's University)

          Robert Foulk, Jr.
          (Videographer)
```

219

```
 1                  INDEX
 2                   - - -
 3   WITNESS                        PAGE
 4   WILLIAM BORDAK
 5   By Mr. Mirabella               223
 6
 7
 8                   _ _ _
 9                 EXHIBITS
10                   _ _ _
11   NUMBER      DESCRIPTION       PAGE
```

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 2 | Cover page Division of Student Life, Summary Report 2016-2017, By the Numbers 2016-2017 | 240 |
| 3 | Sexual Misconduct Policy, Community Standards Summary, SJU000332-000333 | 243 |
| 4 | Documents Re: Incident Occurrence Date February 23, 2018, Notice of Process, SJU000338-000440 | 273 |
| 5 | Documents Re: Incident Occurrence Date February 23, 2018, Respondent - Pre-Investigation Meeting Checklist, SJU000441-000446 | 306 |
| 6 | Interim Sexual Misconduct Policy, Pre-Investigation Meeting, | 306 |
| 7 | Documents Re: Incident Occurrence Date February 23, 2018 Responses to Appeal Submission, SJU000582-000589 | 313 |

220

```
 1                   _ _ _
 2                 EXHIBITS
 3                   _ _ _
 4   NUMBER      DESCRIPTION       PAGE
```

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 8 | September 2017, Q&A on Campus Sexual Misconduct | 401 |
| 9 | 9/22/17 Dear Colleague Letter | 401 |
| 10 | Prohibited Conduct, SJU001180-001181 | 426 |
| 11 | Report, SJU000335 | 426 |

221

```
 1          DEPOSITION SUPPORT INDEX
 2                  - - -
 3     INSTRUCTION NOT TO ANSWER:
 4     Page        Line
 5       (None)
 6
 7
 8     REQUEST FOR PRODUCTION OF DOCUMENTS:
 9     Page       Line    Description
10     291    19    Changes to Notice
11                  of Process letter
                    template
12     292    20    Changes to
13                  Pre-Investigation Meeting
                    Checklist template
14     367    5     Coursebook information
15
16     STIPULATIONS:
17     Page        Line
18     222    1
19
20     QUESTIONS MARKED:
21     Page        Line
22       (None)
23
24
```

222

```
 1                 (It is agreed by and among
 2     counsel for the respective parties
 3     that sealing, filing, and
 4     certification are hereby waived, and
 5     that all objections, except as to the
 6     form of the question, be reserved
 7     until the time of trial.)
 8                  - - -
 9              THE VIDEOGRAPHER:   This is the
10     continuation of the videotaped
11     deposition of William Bordak taken on
12     Friday, July 13th, 2018 and at this
13     time the court reporter will swear in
14     the witness.
15                  _ _ _
16              WILLIAM BORDAK, having been
17     duly sworn, was examined and testified
18     under oath as follows:
19                  _ _ _
20              THE VIDEOGRAPHER:   You may
21     begin the questioning.  We are on the
22     record at 8:28.
23                  _ _ _
24                  EXAMINATION
```

223

```
 1                  _ _ _
 2     BY MR. MIRABELLA:
 3          Q.     Mr. Bordak, this is the
 4     continuation of your deposition that was
 5     started last week.  I think Mr. Schwabenland
 6     did the questioning.  In fact, I am certain he
 7     did, because I sat next to him.  I am going to
 8     be doing the questioning today.  I understand,
 9     speaking with your counsel off the record, you
10     wanted to clarify an answer or testimony you
11     gave in that deposition.
12          A.     Yes.
13          Q.     And I will say that you're free
14     to do so.  You're also free to do so in
15     response to answers you give me up until the
16     time we close the record as well.  Anyway,
17     please proceed.
18          A.     Okay.  I can clarify it now.
19          Q.     Oh.  As to the earlier matter,
20     I would prefer you do that now, since I don't
21     know what it is.
22          A.     Yes.  Sorry.  I misunderstood.
23     So, as I recall, a question last Friday came
24     up during the first deposition about allowance
```

224

```
 1     for advisers to review documents and whether
 2     it was my recollection that that had ever
 3     happened.  At that time on Friday it was true,
 4     my recollection that it had not, but through
 5     the production of documents requested by you
 6     all that I've produced those documents and in
 7     preparation of those documents I did see that
 8     there was one instance where there was an
 9     allowance for an adviser to review documents.
10          Q.     And that would be in the
11     documents that were produced in connection
12     with some of the other SMP documentation of
13     investigations that was produced?
14          A.     Correct.  Correct.
15          Q.     And was that an
16     investigation -- can you identify that
17     particular case in any general way so I can --
18          A.     It was --
19              MR. PICCERILLI:  Do you know
20          the number --
21     BY MR. MIRABELLA:
22          Q.     I certainly don't mean the
23     name.  I meant in terms of either the
24     allegations --
```

225

1      A.      I would be guessing, but if I
2  took a look at that list I might narrow it
3  down in terms of a year or time frame.  It
4  certainly wasn't this academic year.  I know
5  with certainty that it wasn't this academic
6  year.  We have already looked at that list.
7      Q.      Sure.
8          MR. MIRABELLA:   Now, do you
9      have the Bates label?  The list is
10     331, I think, 332, or 361, 362?
11         MR. PICCERILLI:   I don't have
12     it, no.  I don't have any documents
13     with me.
14         MR. MIRABELLA:   I may have
15     some.  Bear with me just a second.  I
16     will pull up that list for you.
17         MR. PICCERILLI:   Can we go off
18     the video record?
19         MR. MIRABELLA:   I am optimistic
20     that we can get to it quickly.  See if
21     I'm proven right or wrong.  Good
22     suggestion.  Let's go off the video.
23         THE VIDEOGRAPHER:   Off the
24     record, 8:31.

226

1              _ _ _
2          (Off the record)
3              _ _ _
4          THE VIDEOGRAPHER:   We are on
5      the record, 8:32.
6  BY MR. MIRABELLA:
7      Q.      If need be, we can attach and
8  mark this as an exhibit, but I'm going to give
9  you pages 1361 and 1326 of SJU's production,
10 which I think has the list.  Just take a peek
11 at that and let me know which one you believe
12 it is.
13     A.      I believe -- and I'm going to
14 clarify it with, I am not certain, but I
15 believe -- you wanted the number or --
16     Q.      Yes.
17     A.      68252.
18     Q.      That's the StarRez number?
19     A.      Yes, the StarRez number, what
20 we call our incident report number.  I believe
21 based on this, but I can't be certain without
22 names.
23     Q.      Understood.  Now, you mentioned
24 that that came as a result of reviewing

227

1  documents.  Can you tell me what documents you
2  looked at following the deposition and before
3  you arrived today other than that particular
4  document?
5      A.      That particular document, so I
6  looked at the summary of findings of fact,
7  determinations of outcome -- I'm not recalling
8  the title correctly -- but those documents
9  that were produced, those are the ones that I
10 looked at.
11     Q.      Did you look at any other
12 documents?
13     A.      No.
14     Q.      Did you review your deposition
15 testimony?
16     A.      No.
17     Q.      Did you do any research?
18     A.      No.
19     Q.      Having seen that in the
20 documentation it refreshes your recollection
21 that there was a circumstance where an adviser
22 was permitted -- what was the adviser
23 permitted to see in that case?
24     A.      As I recall, it was the

228

1  investigative report.
2      Q.      And at what point in the
3  proceedings?
4      A.      It was -- I believe -- I am not
5  certain at what point, but it was after an
6  outcome, because there was an investigative
7  report, and it may even have been after the
8  appeal period concluded, but I can't be
9  certain.
10     Q.      And do you know why in that
11 instance the adviser was permitted to see it?
12     A.      I do not.
13     Q.      Was the adviser affiliated
14 directly with SJU or not?
15     A.      No.
16     Q.      Who gave the adviser authority,
17 consent, permission or whatever to access to
18 the investigative report?
19     A.      It was through a conversation
20 with counsel that the decision was reached.
21 With our general counsel the decision was
22 reached to afford the opportunity for the
23 adviser to see the documents.
24     Q.      All right.  So it was at the

229

1  direction of general counsel?
2          A.      I don't know if it was at the
3  direction of or through consultation with.
4          Q.      Did you believe you had
5  authority to give that access without -- with
6  the approval of general counsel?
7          A.      No.
8          Q.      The questioning left off at
9  your last deposition one area which I probably
10  will eventually get back to, but I am going to
11  move into some other areas and I am going to
12  try to when possible tell you when I'm
13  changing either topics or areas of questioning
14  in advance so that it is not so jarring or you
15  can understand the questions in context.
16          As I understood it from earlier
17  testimony and other depositions, Roe changed
18  her residential housing during her freshman
19  year.  I don't know if you're familiar with
20  that testimony or not.
21          MR. PICCERILLI:   Objection to
22          form.
23  BY MR. MIRABELLA:
24          Q.      Outside of the testimony are

230

1  you aware that Roe changed her residential
2  housing?
3          A.      Yes.
4          Q.      All right.  Roe also testified,
5  I will represent to you, that she had a very
6  difficult -- I shouldn't paraphrase.  I think
7  that bullying was the word that she used in
8  connection with her original housing and her
9  suite mates.  Did Roe file a complaint or
10  articulate a complaint or communicate a
11  complaint to Community Standards about her
12  suite mates or about her housing or about any
13  issue other than the one she brought about
14  concerning John Doe?
15          MR. PICCERILLI:   Objection to
16          form.
17          THE WITNESS:   Are you asking
18          about -- that's a pretty broad range.
19  BY MR. MIRABELLA:
20          Q.      It's a very broad question.  It
21  is a broad question.  I was trying to actually
22  make it less broad.  Are you aware that Roe
23  has articulated or communicated any complaints
24  about other students other than John Doe to

231

1  Community Standards?
2          A.      Yes.
3          Q.      Do you know on how many
4  occasions?
5          A.      I do not.
6          Q.      Do you know if it's been more
7  than one?
8          A.      There's been more than one
9  report shared.  I don't know that I would
10  characterize that as complaining about another
11  student.
12          Q.      All right.  There has been more
13  than one report.  What do you mean?
14          A.      There's been --
15          Q.      And so it's perfectly clear, I
16  don't want to hear anything identifying the
17  other student.
18          A.      Sure.  Yes.
19          Q.      So just tell me what you can
20  share about any other communications from Roe
21  that you're aware of to Community Standards.
22          A.      As you mentioned, there was a
23  history with roommates in first housing.  I
24  don't know the specifics of that.  I don't

232

1  know how that initially came to the
2  university's attention.  A lot of that is
3  addressed through residence life as proxies
4  for Community Standards process.  So I don't
5  know the particulars, but I know that there
6  was that instance.  And there was another
7  instance where a student entered her room with
8  the door locked and that was reported to the
9  institution for follow-up -- with the door
10  unlocked, I should say.  I misspoke.
11          Q.      Are both those in the StarRez
12  database?
13          A.      Yes, they are.
14          Q.      Can the StarRez database, can
15  you run a query identifying with Roe's student
16  I.D. number as to any other complaints or
17  issues that she has been either the
18  complainant in or respondent in?
19          A.      Yes.
20          Q.      Has Roe been the respondent of
21  any matters in the Office of Community
22  Standards?
23          A.      Yes.
24          Q.      Can you tell me how many?

233

```
1            A.      No.
2            Q.      Because you can't tell me or
3  you don't know?
4            A.      I do not know.
5            Q.      But at least one?
6            A.      Yes.
7            Q.      Can you tell me, without
8  identifying anything about the complainant,
9  the nature of the Community Standards issue?
10           A.      The only issues --
11                   MR. CHESNEY:   Object to form.
12                   THE WITNESS:   The only one that
13           I recall was drug related, marijuana
14           related, but I couldn't speak to
15           specifics about that incident or other
16           incidents.
17 BY MR. MIRABELLA:
18           Q.      Roe testified that she was on
19 probation for using marijuana at St. Joe's.
20 Did that probation come from an investigation
21 that happened through Community Standards?
22                   MR. CHESNEY:   Object to form.
23                   THE WITNESS:   I couldn't answer
24           that.
```

234

```
1  BY MR. MIRABELLA:
2            Q.      Because it's a poorly phrased
3  question or because you don't know?
4            A.      I don't know the particulars
5  about the incident.
6            Q.      So let me ask it a different
7  way.  If a student is on probation -- and I'm
8  just going to say for smoking marijuana -- is
9  there any other office at the school that
10 would investigate and impose a sanction for
11 doing that outside of Community Standards?
12           A.      No.
13           Q.      Tell me a little bit about how
14 the StarRez database -- first off, when was it
15 started?
16           A.      January 2015 -- 2011.  Sorry.
17 I misspoke.  January of 2011 we started using
18 StarRez as our tracking software.
19           Q.      What had you used before that,
20 if anything?
21           A.      An in-house system through
22 what's called Banner.
23           Q.      Who was responsible for getting
24 StarRez up and running?
```

235

```
1            A.      I don't know who ultimately
2  was -- it was a shared project with residence
3  life, because it's also used for housing
4  assignments.  StarRez, the Rez part of it is
5  residential.  The primary focus of the product
6  is for housing assignments.
7            Q.      You are not directly involved
8  with residential life, correct?
9            A.      Correct.
10           Q.      Can you explain your
11 understanding of how residential life uses the
12 database?
13           A.      For the housing assignments.
14 So that is where you live -- where a student
15 lives, that's recorded within StarRez.  That's
16 where the billing, check-in, checkout, that's
17 what determines the cost of room for the
18 student that's billed.
19           Q.      The StarRez numbers that are
20 assigned to the SMP investigations, where do
21 they come from or how are they generated?
22           A.      It's sequential, so whatever
23 report that's generated it's one more StarRez
24 number.
```

236

```
1            Q.      What if it's not a complaint
2  involving sexual misconduct?  Does it still
3  get a StarRez number?
4            A.      Yes.
5            Q.      What if it is an anonymous
6  complaint, does it still get a StarRez number?
7            A.      If it is communicated to
8  Community Standards, yes.  If it is reported
9  to the Title IX coordinator that may not be
10 within our system.  That's a separate tracking
11 that the Title IX coordinator maintains.
12           Q.      Does the Title IX coordinator
13 always share Title IX complaints with
14 Community Standards?
15           A.      Not always.
16           Q.      Can you explain how that works,
17 because there's some overlap, I would assume,
18 but I don't work in Title IX or in your
19 office.  If you can just explain how the
20 parallel systems work?
21           A.      Yeah.  They are not really
22 parallel systems.  So if a complaint goes to
23 the Title IX coordinator and not anyone else,
24 so a student goes to the Title IX coordinator
```

237

1   and shares or discloses an incident, if there
2   is no known respondent, so there would be no
3   Community Standards process, it would not be
4   shared with my office, because there would be
5   no Community Standard or disciplinary process
6   to address the complaint. All right. Or if
7   it's a non-student complainant it would not be
8   shared with my office, because there's no
9   student respondent to be addressed through a
10  disciplinary process. So those complaints may
11  not be in our StarRez system if reported
12  directly and exclusively to Dr. Perry, the
13  Title IX coordinator.
14          Q.      And could there be other
15  circumstances that you're unaware of where the
16  Title IX coordinator doesn't share a
17  complaint with your office?
18          A.      Yes.
19          Q.      To your knowledge, does the
20  Title IX coordinator have a way of cataloging
21  or tracking or identifying all of the
22  complaints that are shared with her office
23  that are not shared with Community Standards?
24          A.      Yes.

238

1           Q.      Do you know how that system is
2   organized or --
3           A.      Not specifically.
4           Q.      Is it some sort of computer
5   software?
6           A.      I am not sure.
7           Q.      But you know some system
8   exists?
9           A.      Yes.
10          Q.      The StarRez system started
11  in -- was started in 2011, correct?
12          A.      January of 2011.
13          Q.      The numbers on each incident
14  are handled sequentially. How many StarRez
15  numbers are generated roughly per year, just
16  by way of estimate, through Community
17  Standards?
18          A.      So the StarRez -- it's
19  important to note that the StarRez software
20  also houses reports that are not handled
21  through Community Standards. So our residence
22  life office uses it as a warehouse for other
23  reports that might come through, whether it's
24  facility related or residence hall related.

239

1   So a pipe bursts and there's a report
2   generated on that, that's in StarRez as well.
3           Q.      Fire code violations, which
4   one --
5           A.      Oh, it would be Community
6   Standards. Anything that would have a
7   Community Standards follow-up would be going
8   through Community Standards. We use StarRez
9   as a warehouse for all incident reports that
10  involve students or student residence halls.
11  So if there is a -- like I said, a pipe bursts
12  or a broken window, like, accidental, ceiling
13  tile broken, accidental, those are all in
14  StarRez as well. So that's part of the
15  numbering.
16          Q.      I didn't intend to get into
17  this in much detail, so I wasn't planning on
18  marking it as an exhibit. The division of
19  student life puts out an annual report. I
20  guess annually. Are you familiar with that?
21          A.      Yes.
22          Q.      You're welcome to see it to
23  review it. I want to ask you just one
24  question about one of the entries and then you

240

1   can take as much time with it as you want. So
2   it has a Community Standards by the numbers
3   that says, "16442 incident reports addressed
4   through Community Standards process (7 percent
5   decrease from last academic year)."
6           MR. PICCERILLI:   Can we have an
7   identification of the document?
8           MR. MIRABELLA:   Yes. We may
9   have to mark that whole thing as an
10  exhibit just so --
11          MR. PICCERILLI:   Can we mark it
12  before you ask him questions about it?
13          MR. MIRABELLA:   We'll mark that
14  as Exhibit-1 -- I'm sorry -- whatever
15  sequential number we are up to from
16  the other deposition.
17                  _ _ _
18          (Whereupon, Exhibit Bordak-2
19  was marked for purposes of
20  identification.)
21                  _ _ _
22  BY MR. MIRABELLA:
23          Q.      Mr. Bordak, did you have a
24  chance to look at that statistic or data

241

```
 1  point?
 2      A.      It closed.  I want to make
 3  sure -- this is the page you're looking at?
 4      Q.      Yes.
 5      A.      I just want to make sure.  It
 6  would be Page 4 of that document.
 7      Q.      Can you just read into the
 8  record the Community Standards paragraph so I
 9  can ask you about it in a little bit of
10  context?
11      A.      Sure.  The header is "Community
12  Standards," the first bullet, "16442 Incident
13  Reports Addressed Through Community Standards
14  Process (7 percent decrease from last academic
15  year)."  The second bullet, "757 Unique
16  Undergraduate Day Students  Addressed Through
17  the Community Standards Process (8 percent
18  decrease from last academic year, 15 percent
19  of undergraduate day enrollment)."  And the
20  third bullet, "336 Violations of The Alcohol
21  and Drug Policies (23 percent decrease from
22  last academic year)."
23      Q.      The first number, is that
24  16,000?
```

242

```
 1      A.      No.  I think that's a typo on
 2  this document.  I think 442 sounds like a more
 3  appropriate number.  I wonder if that is 16,
 4  17 in the production of this document, that
 5  there was an error in this.  I can't say for
 6  certain, but we would not have 16,000 reports
 7  in an academic year.
 8      Q.      Right.  And that also seemed to
 9  reconcile with the StarRez sequential
10  numbering system.
11      A.      I am inclined to say that the
12  442 is more in line with what we would see in
13  a year.
14      Q.      And to be fair, you already
15  said, the best you can tell, it appears to be
16  some type of typo, you're confident that
17  the 16,000 is not reflective of --
18      A.      Yes.
19      Q.      We'll leave that.  I am
20  finished with questioning on that for a
21  moment.  Just leave that with the court
22  reporter.
23          MR. MIRABELLA:   So let's mark
24          his as Exhibit-3.
```

243

```
 1              _ _ _
 2              (Whereupon, Exhibit Bordak-3
 3          was marked for purposes of
 4          identification.)
 5
 6  BY MR. MIRABELLA:
 7      Q.      Mr. Bordak, we are on the video
 8  and I don't want to rush you, but I know we
 9  have some time constraints.  Do you need time
10  to review this before I ask you some questions
11  about it?
12          MR. PICCERILLI:   He should
13          review it at least briefly.
14          MR. MIRABELLA:   Sure.
15          THE VIDEOGRAPHER:   Off the
16          record, 8:51.
17              _ _ _
18          (Off the record)
19              _ _ _
20          THE VIDEOGRAPHER:   On the
21          record, 8:53.
22  BY MR. MIRABELLA:
23      Q.      Mr. Bordak, you had an
24  opportunity for a few minutes to review these
```

244

```
 1  two pieces of paper marked as Exhibit-3.  Can
 2  you identify for the record what they are?
 3      A.      The first page is a summary
 4  document that we create for sexual misconduct
 5  investigations to kind of have in one place
 6  all of the dates and information regarding an
 7  incident more easily accessible.  And the
 8  second page is where we log when the
 9  respondent and complainant review the
10  investigative reports just for our recording.
11      Q.      Let's start with the top sheet,
12  the Community Standards summary.  Are these
13  prepared for every matter that Community
14  Standards investigates or that there is a
15  matter looked into by Community Standards?
16      A.      As the title would suggest,
17  it's for sexual misconduct policy
18  investigations.  So all sexual misconduct
19  policy investigations have these documents
20  created.
21      Q.      Were these documents created
22  before the interim sexual misconduct policy
23  was put in place in 2015?
24      A.      No.
```

245

1          Q.      Was there a similar or some
2  sort of analogous record created for sexual
3  misconduct before 2015?
4          A.      No.
5          Q.      Is there a Community Standards
6  summary sheet for investigations of Community
7  Standards violations that don't involve sexual
8  misconduct?
9          A.      No.
10         Q.      I am going to ask you some
11 questions about the information. Who prepared
12 this document Bates labeled 332?
13         A.      I did.
14         Q.      Do you prepare all the
15 Community Standards summaries for sexual
16 misconduct policy investigations?
17         A.      I do.
18         Q.      So I am going to ask you about
19 the interim measures box, even though that's
20 just the first thing listed. Do you see where
21 I'm referring to? It's sort of the upper
22 left.
23         A.      Yes.
24         Q.      What's the "Sent to banned"

246

1  refer to?
2          A.      So bannedalias@sju.edu is an
3  email alias created by security and that is an
4  email alias distribution list that any contact
5  restrictions or area restrictions or interim
6  measures that public safety would need to be
7  aware of that we send it to.
8          Q.      All right. And what is sent to
9  public safety, what information?
10         A.      If it's a contact restriction
11 it would be student name. There are contact
12 restrictions in place between student name and
13 student name.
14         Q.      Anything further?
15         A.      No.
16         Q.      And beneath that it says,
17 "Recorded in StarRez." That just means that
18 the contact restrictions being communicated to
19 the safety office was sent?
20         A.      We also record it in StarRez as
21 an interim measure so that if something were
22 to happen, a violation of that contact
23 restriction or an area restriction, we would
24 have a record that it was in place.

247

1          Q.      All right. Moving down the
2  document a little bit, it has incident date,
3  report date, and then a 60-day date. Do you
4  see that?
5          A.      Yes.
6          Q.      And then beneath that it has
7  outcome final date. Can you explain to me
8  what that means?
9          A.      The incident date is the date
10 of the incident. The reported date is the
11 date that it was reported to the university.
12 The 60 day is 60 day from reported date. The
13 outcome final date is when, if there is no
14 appeal -- well, even if -- so when the outcome
15 is final. So at the conclusion of an appeal
16 period if there was an appeal and an outcome
17 wasn't changed or an appeal and there was an
18 amendment and -- so when the outcome is final
19 we record that date.
20         Q.      There is Title IX guidance
21 about the importance of timely investigations
22 and the term 60 days is frequently used. Is
23 it your understanding that the 60 days
24 includes the appeal period or does not include

248

1  the appeal period under Title IX?
2          A.      Includes the appeal period.
3          Q.      Moving down in that same side
4  of the document, it says "Complainant PIM
5  Notice." Do you see that?
6          A.      Yes.
7          Q.      And then "Respondent PIM
8  Notice," what does that refer to?
9          A.      Pre-investigation meeting
10 notice. So it would be the communication to
11 the student scheduling the pre-investigation
12 meeting.
13         Q.      Is that communication in
14 writing?
15         A.      Yes.
16         Q.      And is that also referred to as
17 notice of process?
18         A.      Yes.
19         Q.      Is any other communication in
20 writing done, given to the respondent, other
21 than the Notice of Process Letter?
22         A.      When the contact restriction is
23 put in place that's in writing.
24         Q.      So at the time of the

249

1  pre-investigation meeting the only
2  documentation from the school other than a
3  contact restriction would be the information
4  that's set forth in the notice of process?
5        A.      Can you repeat that, please?
6        Q.      Sure.  As of the time the
7  respondent appears at the pre-investigation
8  meeting the only thing in writing from the
9  school that the student has — the respondent
10  has received is the information in writing
11  that's set forth in the Notice of Process
12  Letter?
13        A.      Yes, unless there was
14  additional email communication with the
15  student that was more.
16        Q.      In this case the Notice of
17  Process Letter was prepared or signed by you?
18        A.      I don't recall.
19        Q.      Would that be uncommon?
20        A.      No.
21        Q.      If it is signed by you does
22  that mean necessarily that you prepared it?
23        A.      Yes.
24        Q.      How do you prepare the Notice

250

1  of Process Letter?
2        A.      We have a template that we —
3  when I say we, in Community Standards, and so
4  if it was from me I would take the template
5  and add any other relevant information for
6  this complaint and any additional information
7  that might need to be included that's specific
8  to the specific complaint.
9        Q.      All right.  We'll mark as
10  Exhibit-4 the Notice of Process Letter.  I
11  want to ask you some questions about it, but I
12  think it's probably smarter to get through
13  this document first so that we can set it
14  aside and then change the general area of
15  questioning.
16        Continuing on with the
17  Community Standards summary document, is it
18  reasonable to infer or does SJU consider that
19  in this instance the outcome date was outside
20  of the 60-day period required by Title IX?
21        A.      I don't believe the 60 days is
22  required by Title IX.
23        Q.      And just explain what you mean.
24        A.      Sixty days is not required by

251

1  Title IX.
2        Q.      What is the significance, if
3  any, of 60 days?
4        A.      In our policy we say that in
5  most cases matters would be concluded within
6  60 days and we do that to provide some notice
7  to students about what we anticipate at a
8  maximum that process might look like, but
9  there is always — not always, but there is
10  certainly times when that process concludes
11  outside of the 60 day.  So this one is three
12  days outside of the 60 day.
13        Q.      And to your understanding, is
14  there any direct either regulation or guidance
15  in Title IX that says the investigation should
16  be concluded within 60 days?
17        A.      I am not sure the exact
18  language, but I know it's not must be
19  concluded.
20        Q.      Along that same track, there
21  was an appeal in this case, correct?
22        A.      Correct.
23        Q.      All right.  And the appeal was
24  decided prior to the time the respondent had

252

1  an opportunity to review the investigative
2  file.  Is that also common practice at
3  Community Standards?
4        A.      That would be up to the
5  student.  So I wouldn't say it's common
6  practice.  We are going to proceed with our
7  process.  If the student — when the student
8  comes in to review the investigative report is
9  up to the student.
10        Q.      Well, it's not entirely up to
11  the student because he has to give Community
12  Standards notice, correct?
13        A.      He has to schedule a time.  And
14  we do that mostly so that both students
15  involved in the matter aren't in the office at
16  the same time.
17        Q.      And if he's bringing an adviser
18  he has to give advance notice?
19        A.      Unless circumstances call for
20  an expedited, which — if a student said that,
21  "I really need the adviser tomorrow," we would
22  consider that in terms of whether it's
23  expedited.
24        Q.      There were communications in

253

1  this case about John Doe scheduling the
2  meeting and seeking accommodations and the
3  exchange of emails, correct?
4      A.   Yes.
5      Q.   Was he ever advised that the
6  appeal would be decided regardless of when he
7  reviewed the investigative documents?
8      A.   He was advised of what the
9  appeal process is and the appeal process is
10  outlined in the policy. So he wasn't advised
11  that it would proceed, but he was also not
12  advised that it would be stopped.
13      Q.   There is a time limitation
14  after the outcome meeting set forth in the
15  policy as to when the complainant or
16  respondent can review the file?
17      A.   I believe, yes.
18      Q.   All right. And that's five
19  days? Is that the time limitation?
20      A.   I believe so. I don't want to
21  misspeak. If you have a policy, I can
22  reference.
23      Q.   I don't have it handy. But
24  there is some set time limit, correct?

254

1      A.   Yes.
2      Q.   Was is the purpose of that?
3      A.   So that the process doesn't
4  prolong even further.
5      Q.   But in this case John Doe asked
6  or required additional time beyond the five
7  days because of the issue with accommodations
8  and his adviser, correct?
9          MR. PICCERILLI:   Objection to
10      form.
11          THE WITNESS:   Can you repeat
12      that again?
13  BY MR. MIRABELLA:
14      Q.   Sure. In this case John Doe
15  was communicating that he wanted
16  accommodations in connection with his review
17  and he had a request and he, in fact, received
18  an additional time window to go review the
19  file, correct?
20      A.   Correct.
21      Q.   And in that process was he ever
22  advised that although he was being granted
23  additional time to review the file it would
24  not affect the timing of how it went and how

255

1  the appeal was decided?
2      A.   At that point he wasn't —
3  neither student were able to submit anything
4  additional in writing to be heard at the
5  appeal or reviewed during the appeal and so
6  whether he reviewed the documents on a Tuesday
7  or a Saturday, it wouldn't have changed the
8  fact that he would not have been able to
9  provide additional documentation. So, as we
10  saw it, we didn't feel we needed to tell him
11  that it was proceeding. He wouldn't have had
12  an opportunity to share after the review
13  anyways.
14      Q.   So I am correct he was notified
15  that the appeal would continue regardless of
16  when he saw the file?
17          MR. PICCERILLI:   Objection to
18      form.
19          THE WITNESS:   Yes. Can I
20      clarify?
21  BY MR. MIRABELLA:
22      Q.   Yes.
23      A.   He wasn't notified by me, but I
24  can't speak -- I am not aware of notification

256

1  from others, but he was not notified by me.
2      Q.   In the bottom of that same page
3  where it says, "Witnesses added as
4  participants in StarRez," do you see that box?
5      A.   Yes.
6      Q.   What does that mean?
7      A.   That was really put on the
8  document as a reminder to add as witnesses in
9  StarRez those that came through the
10  investigative report. We didn't — we in our
11  system record all of the people, all of the
12  students involved and indicate participant
13  types. And so in an investigative report it
14  might outline two or three students who are
15  interviewed by the investigator as a witness
16  and we want to add them into our system,
17  identifying them as witnesses in the matter.
18  And so that is just a reminder. Really, this
19  sheet is a compilation of important dates. If
20  people, you know, had questions on dates it's
21  in one place and that's also a reminder for
22  some of our housekeeping things, to make sure
23  that they are squared away in StarRez.
24      Q.   All right. Back to the

257

1  question for a second. Who may or may not
2  constitute a witness as far as this document
3  is concerned?
4             MR. PICCERILLI:  I'm sorry.
5  Could I hear that question back again?
6             - - -
7             (Whereupon, the court reporter
8  read back from the record.)
9             - - -
10            MR. PICCERILLI:  Thank you.
11            THE WITNESS:  They would be
12  identified in the investigative report
13  in a section called "Witnesses
14  Interviewed."
15 BY MR. MIRABELLA:
16      Q.      In the Doe case the only
17 witnesses were the complainant and the
18 respondent, correct?
19      A.      I don't recall specifically.
20      Q.      But a complainant and
21 respondent are also considered witnesses?
22      A.      They are considered
23 complainants and respondents in terms of
24 coding in our system. A student might share

258

1  something as if they witnessed it, but if
2  they're the complainant in the matter or the
3  respondent in the matter they are called the
4  complainant and the respondent.
5       Q.      All right. So I am back to,
6  can you tell me who the witnesses were that
7  were added?
8       A.      I am telling you, I can't
9  recall in this matter whether there were any
10 witnesses. Okay. I think I see what
11 you're -- by checking this box does not mean
12 affirmatively that witnesses were added. It
13 was that that consideration was taken care of
14 in this document. I recognize that that
15 wording might be speaking to an affirmative
16 that I added witnesses. That may not be the
17 case. It may just be that that consideration
18 of adding witnesses was taken care of and that
19 there could have been none added.
20      Q.      Correct. If there were
21 witnesses, they were added. If there were
22 none, they weren't added because there weren't
23 any?
24      A.      Right.

259

1       Q.      But that checklist item was
2  taken care of?
3       A.      Yes.
4       Q.      I think I understand the
5  answer.
6       A.      Yes.
7       Q.      All right. Same document,
8  right side. StarRez number, we talked about
9  that earlier?
10      A.      Yes.
11      Q.      All right. And, again, that's
12 the sequential numbering system we were
13 discussing, correct?
14      A.      Correct.
15      Q.      When does the StarRez number
16 come to life, when they go to the Title IX
17 officer, when it comes to your office? How
18 does that happen?
19      A.      When it comes to my office. If
20 the initial report for a matter is to an RA,
21 for example, and the RA creates their report
22 on that information shared with them, that
23 creates a StarRez number right there. If it
24 does not go to an RA who creates a report but

260

1  goes to the Title IX coordinator or to public
2  safety, we would create that StarRez report
3  and assign it a number when we put it into our
4  system.
5       Q.      When do you put it into your
6  system if it comes from Title IX?
7       A.      Within the day that we received
8  it.
9       Q.      Can you tell from this document
10 when you received any information about this
11 investigation or about this complaint?
12      A.      I can't.
13      Q.      Can you tell from this
14 document, given all the dates and timing, a
15 time frame? For example, it seems safe to
16 assume that it was before the notice — it was
17 on or before the notice went out as to the
18 pre-investigation meeting?
19      A.      Yes. It would be safe to -- it
20 is on or just before the initial review date,
21 because out of practice our initial review
22 takes place right — unless the notice was on
23 a Sunday and our initial review was Monday
24 morning, then the date is different. So it is

261

1  around February 26, 2018.
2       Q.       I missed that.  Thank you.  So
3  the initial review date in that box, back to
4  the left side of the document, that refers to
5  the initial review at the Office of Community
6  Standards?
7       A.       With the Title IX coordinator.
8       Q.       Correct.  But there is --
9  someone in the Office of Community Standards
10  is aware of the incident?
11      A.       Right.
12      Q.       Can you tell from this document
13  when the Title IX coordinator's report was
14  received by your office?
15      A.       I can't.
16      Q.       What is the -- how does that
17  work?
18      A.       It is --
19           MR. PICCERILLI:   Objection to
20  form.
21           THE WITNESS:   In most cases
22  it's an email.  It's a report from the
23  Title IX coordinator that's emailed to
24  Community Standards, to me,

262

1  accompanied with a conversation with
2  the Title IX coordinator about the
3  report she is sending.
4  BY MR. MIRABELLA:
5       Q.       So if a complainant goes to the
6  Title IX coordinator and the Title IX
7  coordinator prepares a first report and then
8  that's then communicated or emailed to you,
9  along with a telephone conversation normally?
10      A.       Yes.
11      Q.       So is it reasonable to infer
12  that as of the date of the initial review you
13  had the Title IX coordinator's written
14  complaint of the incident?
15      A.       Yes.
16      Q.       Do you communicate -- do you do
17  anything with that outside of your office?
18      A.       Anything with what?
19      Q.       Let me rephrase the question
20  for you.  Title IX coordinator gets a
21  complaint.  She does whatever she does with
22  it, but one of the things she does with it is
23  email it to your office and discuss it with
24  you, correct?

263

1       A.       Yes.
2       Q.       Do you take that information
3  and communicate or send it to anyone outside
4  your office, assuming there is no contact
5  restrictions issue?
6       A.       There are times when I might
7  share that with public safety to create a
8  public safety report and a public safety
9  tracking of a complaint.  There are times when
10  Mary-Elaine, as Title IX coordinator,
11  communicates that with security.  In this
12  instance I did not communicate the report with
13  anyone outside.
14      Q.       How come in some instances it's
15  sent to security and some instances it's not?
16      A.       In all instances it's sent to
17  security.  In some instances Mary-Elaine does
18  it.  In some instances I do it.
19      Q.       All right.  And when and why in
20  the process is security notified?
21      A.       They are -- shortly after the
22  complaint and the why is for Clery reporting
23  purposes.  And there are some times that
24  security might get a report -- I don't know in

264

1  this instance -- with very vague information,
2  not -- the security doesn't know everything,
3  but they know enough to meet Clery obligations
4  of whether a timely warning would need to go
5  out or -- so that they know that a complaint
6  has been filed.  So it's important -- as our
7  public safety and security is our Clery
8  compliance office it is important that they
9  know of all complaints under our sexual
10  misconduct policy, so it reported to them.
11      Q.       Do they generate an incident
12  report?
13      A.       They do.
14      Q.       Do they generate -- are all
15  complaints sent to public security or just
16  the ones -- I mean security office -- or just
17  the ones under the SMP?
18      A.       I can't speak to the others.
19  That would be a process that -- because I
20  don't know of those -- I don't know of those
21  when they happened.  I don't know what Dr.
22  Perry does with those reports as far as
23  reporting to security.
24      Q.       I meant it slightly

265

1  differently.  If a complaint comes into
2  Community Standards that doesn't involve
3  sexual misconduct are those always sent to
4  security?
5          A.       If it involves something that
6  would be a potentially Clery-reportable crime,
7  yes.
8          Q.       Does Community Standards get
9  the incident report generated by the security
10 office after the complaint is sent to them?
11         A.       We do.
12         Q.       When do you receive it?
13         A.       We should receive it right
14 afterwards, right after it's generated.  In
15 this instance Community Standards did not
16 receive the security report.
17         Q.       Do you know why?
18         A.       I don't.
19         Q.       Why is it sent back to
20 Community Standards from security as a general
21 matter?
22         A.       Because it's a document that is
23 related to the matter that we are saving
24 reports on.  And typically these reports --

266

1  not typically -- they are a copy and paste of
2  Dr. Perry's complaint.  There is no further
3  investigation.  There is no further
4  information.  It's really a -- it's really a
5  reporting matter, a tracking matter that
6  public safety also has on their end and it's
7  in a report generated and a number generated
8  for potentially Clery-reportable crimes.
9          Q.       Do you know where else security
10 sends the incident report?
11         A.       I don't know.
12         Q.       I know it's not your area.  You
13 are not working in security.  You mentioned
14 Clery reporting.  Are you aware of any other
15 internal SJU offices that would get the
16 incident report directly from security?
17         A.       Not specifically for Title IX
18 and sexual misconduct, because I do know that
19 they are treated a little differently, in that
20 the broad -- the people that would get an
21 alcohol violation, that's confronted by
22 security, which would be a Clery-reportable
23 disciplinary referral.  It's a violation of
24 liquor law.  A different group of people might

267

1  get the report for sexual misconduct or Title
2  IX than the alcohol.  I don't know
3  specifically.
4          Q.       A large group or a smaller
5  group?
6          A.       Smaller, smaller group.
7          Q.       Have you seen -- you've seen
8  over the years in your position the reports
9  that come back from the security office for
10 sexual misconduct complaints, correct?
11         A.       Yes.
12         Q.       In this instance — and I can
13 show it to you if you haven't reviewed it --
14 it indicates that a sexual assault was
15 committed, not that there was an allegation or
16 a complaint.  Is that typically the way the
17 incident reports read or are generated?
18         A.       My understanding is that it is
19 exactly as reported to the Title IX officer,
20 included in the security report.  So if the
21 complaint was X happened, the security report
22 would include that a complaint was X happened.
23         Q.       And who is, to your knowledge,
24 responsible in the security officer presently

268

1  for the Clery reporting?
2          A.       Ultimately, the director of
3  public safety and security.
4          Q.       Who is that?
5          A.       Arthur Grover.
6          Q.       Can I move your attention to --
7  direct your attention to the bottom right of
8  the document, that box, "File saved to
9  StarRez."
10         A.       Yes.
11         Q.       The investigation packet sent
12 to an investigator, generally speaking, what's
13 comprised of that?
14         A.       The initial complaint and
15 student contact information.  The investigator
16 doesn't have access to our system to get email
17 addresses or phone numbers for students, so
18 out of process we share that information as
19 well as the initial complaint.
20         Q.       So the initial complaint, in
21 this instance Dr. Perry prepared it as a
22 result of an interview with the respondent,
23 correct?
24         A.       Correct.

269

1    Q.    What else would have been sent
2  to the investigator?
3    A.    Whatever was a part of the
4  initial complaint. I don't know specifically
5  in this case, but sometimes it could be an RA
6  report if the RA is involved. It can be other
7  documents that would kind of collectively be
8  called the complaint.
9    Q.    All right. What about, is the
10 notice letter sent to the investigator?
11   A.    Yes.
12   Q.    Is the PIM checklist?
13   A.    Yes.
14        MR. PICCERILLI:   Let him ask
15     the whole question.
16        THE WITNESS:   Sorry.
17 BY MR. MIRABELLA:
18   Q.    As a general matter, are any
19 other of those documents, types of documents
20 sent to the investigator?
21   A.    Yes. As you're asking that I
22 am recalling specifically — and if you have
23 the specifics for this case I'm happy to look
24 at them -- the complaint, student contact

270

1  information, and we share procedural documents
2  with the investigator, for his knowledge, so
3  that pre-investigation meeting notice, the
4  checklist, blank adviser forms, because if a
5  student came with an adviser the investigator
6  would need to complete that form. I believe
7  that's it.
8    Q.    The next box,
9  "Banned/Restriction email sent to banned email
10 alias," can you explain what that means?
11   A.    That's what we were talking
12 about earlier, that the contact restriction
13 email that was sent to the alias saying "X
14 student has a contact restriction with X
15 student," that that notice is saved to the
16 file.
17   Q.    The next box is "All documents
18 received from investigator." Do you see that?
19   A.    Yes.
20   Q.    What if there's things that are
21 pieces of evidence that are not documents?
22 Are those retained and, if so, how are they
23 identified?
24        A.    I don't know that I know what

271

1  you mean by something that's not a document.
2    Q.    A photograph.
3    A.    That would be considered a
4  document.
5    Q.    What about a piece of physical
6  evidence, like, you know, a broken door lock?
7    A.    We've never, in my experience
8  in over ten years in the office, have had any
9  physical evidence like that, so I don't know
10 what we would do in that instance. But,
11 clearly, we can't save that to an electronic
12 software.
13   Q.    Correct. I guess -- so my next
14 question was, is there a way to identify that
15 in the electronic inventory that such a thing
16 exists?
17   A.    Oh, sure. I am sure we would
18 have it referenced somewhere. Where we would
19 actually store that artifact, I am not sure.
20   Q.    Were you involved in working
21 with counsel to produce the documents for the
22 investigation in this case that were produced
23 in litigation?
24   A.    Yes.

272

1    Q.    Is it fair to assume that
2  everything that's in this bottom right box is
3  part of the documentation that was produced?
4        A.    I don't want to say yes or no
5  without looking at what I had produced, but
6  yeah.
7    Q.    I don't want to spend the time
8  going through 1,000 pages.
9        A.    So, for instance, the email
10 sent to the banned email alias, I think that
11 might be included, but -- those pieces -- so,
12 clearly, the investigative packet, the
13 documents received from the investigator, the
14 appeals, the responses, the summary document
15 that we are looking at, the notices.
16   Q.    So other than the
17 banned/restriction category, it looks as
18 though, to the best of your understanding,
19 everything else has been produced?
20   A.    Yes.
21   Q.    Briefly, the next page.
22   A.    Yes.
23   Q.    Is this part of the StarRez
24 system information?

273

1        A.      These are both separate Word
2    documents that are saved.
3        Q.      All right.  And the fact that
4    they were produced sequentially is not
5    relevant to their use in any way?
6        A.      No.
7                _ _ _
8                (Whereupon, Exhibit Bordak-4
9                was marked for purposes of
10               identification.)
11               _ _ _
12   BY MR. MIRABELLA:
13       Q.      Mr. Bordak, before I ask you
14   about the Notice of Process Letter I just
15   wanted to go back to an area I touched on.  To
16   your knowledge, has Jane Roe made complaints
17   of sexual misconduct against any other student
18   besides John Doe?
19       A.      Not to my knowledge.
20       Q.      And that, as I understand the
21   way the StarRez system is set up, would not
22   be -- should not be cumbersome to confirm,
23   correct?
24       A.      As far as our records would be.

274

1    So, again, if there was a complaint to the
2    Title IX coordinator that was not shared with
3    Community Standards I would have no record of
4    it in StarRez.
5        Q.      Correct.  But -- and I
6    understand that answer.  But if you were --
7    you could run a query in StarRez and it
8    wouldn't take hours to do?
9        A.      Correct.
10       Q.      Okay.  And if it was determined
11   to be discoverable and relevant -- I don't
12   know if your counsel would agree or not -- if
13   you ran a query in StarRez as to any
14   complaints in Community Standards by Jane Roe,
15   again, that would not be difficult to do?
16       A.      Right.
17       Q.      All right.  Notice of process
18   letter marked as Exhibit-4, I am going to ask
19   you some questions about it.  Do you want us
20   to turn off the videotape so you can review it
21   first or do you think you're okay with going
22   forward?
23       A.      I am fine.
24       Q.      All right.  On your -- on the

275

1    actual exhibit, Exhibit-4, do you think with a
2    pen you could identify the areas that are not
3    part of the template quickly or is that
4    difficult to do?
5        A.      I could.
6        Q.      So starting in -- and I don't
7    mean with the respondent's name or I.D.
8    number.  Starting with the first paragraph,
9    what part of that is not part of the template?
10       A.      Like I said, the name, the
11   occurrence date, and the location.
12       Q.      So the name is not in the first
13   paragraph, I hope?
14       A.      The name of the complainant is.
15       Q.      Oh.  Got it.  Okay.
16               MR. PICCERILLI:   That's been
17       redacted.
18               MR. MIRABELLA:   It has been
19       redacted.
20   BY MR. MIRABELLA:
21       Q.      So the redacted name of the
22   complainant, the date, and the location is not
23   part of the template?
24       A.      Correct.

276

1        Q.      Next paragraph, same question.
2        A.      That's template.
3        Q.      Next paragraph, that starts
4    with pre-investigation meeting, same question.
5        A.      The name.
6        Q.      All right.  And beneath that is
7    a little sort of bullet box with the date of
8    the meeting, correct?
9        A.      Right.  So that information,
10   the date of the meeting, the location, and who
11   it's with would be -- would be adjusted for
12   the matter.
13       Q.      Correct.  The next section is a
14   section called "Advisers" and there is two
15   paragraphs.  Is any of that not part of the
16   template?
17       A.      No.
18       Q.      And then the next section,
19   there's two paragraphs.  It's still in the
20   same page.  "Restrictions and Retaliation," is
21   any of that not part of the template?
22       A.      No.
23       Q.      And the second page, it starts
24   with "Support and Resources," is anything on

277

1  this page not part of the template?
2      A.    No.
3      Q.    Is the template that you used
4  to send the Notice of Process Letter the same
5  used in all sexual misconduct cases?
6      A.    The template is, yes.
7      Q.    So whether it's sent by you or
8  Emily Forte or somebody else in your office,
9  they use the same template?
10     A.    Yes.
11     Q.    Is there anyplace in the
12  template to put in the information about the
13  specific provisions of the SMP that have been
14  violated or alleged to have been violated?
15     A.    We don't do that.  I mean —
16     Q.    Why?
17     A.    Because we are providing notice
18  that conduct is implicating the specific code,
19  being the sexual misconduct policy, our
20  expectation is that once the investigation
21  begins the investigator is sharing more
22  specific conduct for a response.
23     Q.    The sexual misconduct policy
24  includes sexual assault, correct?

278

1      A.    Yes.
2      Q.    It includes -- do you know the
3  four categories off the top of your head?
4  There's four broad categories that fall within
5  the SMP, correct?
6      A.    Well, if you're looking at the
7  title, yes, sexual assault, sexual harassment,
8  sexual exploitation, domestic violence, dating
9  violence, or stalking.
10     Q.    So I guess that -- now, do each
11  of those categories have their own definition
12  sections, sexual assault?
13     A.    Yes.
14     Q.    And sexual harassment as well,
15  correct?
16     A.    Yes.
17     Q.    I heard your answer.  I am
18  going to go back to it and I don't like to
19  repeat my own questions, but I just want to
20  see if I can clarify it a little bit.  Is
21  there any reason why when the notice is sent
22  out to the student, process notice, that your
23  office doesn't tell them which of the five
24  policies this is falling under?

279

1      A.    We don't see that as our role
2  within the process.  We don't want to
3  compromise the investigation by sharing more
4  information.  We leave that to the
5  investigator to provide that notice.
6      Q.    When does the investigator
7  provide that notice?
8      A.    It's our expectation, when the
9  adviser, when he or she is meeting with the
10  students, that that notice takes place.
11     Q.    Now, Ms. Forte identified that
12  meeting as a hearing.
13     A.    Yes.
14     Q.    So it's your understanding that
15  the specific provision of the sexual
16  misconduct policy that's being violated, that
17  information is provided to the respondent at
18  the time of the hearing?
19     A.    The investigation is the
20  hearing, but it's also pretty fluid, where the
21  student has the opportunity to share
22  additional information, follow-up, come back.
23  And so there's notice, but it's not the only
24  time that the student has the opportunity or

280

1  is expected to respond to the information, is
2  that moment.  Where in a hearing it's more,
3  "Here's your hearing.  Here's your time.
4  Hearing concludes."  Where the investigation
5  is more kind of continuations of hearings.
6      Q.    All right.  Have you reviewed
7  Ms. Malloy's findings?
8      A.    Yes.
9      Q.    Can you tell me where in her
10  findings she indicates that she informed the
11  respondent that the violation was under the
12  category of sexual assault?
13     A.    I can't.  I don't have it
14  committed to memory.  I've read the report,
15  but I can't speak to it.
16     Q.    Do you believe it's in there?
17     A.    I can't speak to that.
18     Q.    Would it be your expectation
19  that she would inform the respondent that the
20  specific category he's accused of being
21  violated is sexual assault?
22     A.    It would be my expectation that
23  the investigator share the conduct for
24  response through the investigation process,

281

1   what the complaint is, sharing the complaint,
2   and have the student have an opportunity to
3   respond to the complaint and share
4   information.
5          Q.      What about the complaint is
6   your expectation that the investigator will
7   share?
8          A.      The complaint, the specifics
9   that he or she, as the investigator, feels is
10  important for the student to respond to. We
11  don't micromanage the investigation. We have
12  no reason to doubt or suspect that they are
13  not providing students an opportunity to
14  respond to the complaint. We don't share that
15  initially.
16         Q.      You have no reason to think
17  that?
18         A.      I have no reason to think that.
19         Q.      So in other cases has the
20  investigator shared the specific allegations
21  with -- that you're aware of -- with the
22  respondent as a matter of course?
23         A.      Again, without looking at the
24  specific investigative reports -- I don't have

282

1   these committed to memory. I read them. We
2   conclude a matter. These are -- they're
3   longer documents. We have a number of them I
4   produced for the weekend. I don't have them,
5   so I can't answer with any certainty whether
6   she has or she hasn't.
7          Q.      All right. So in this case the
8   sexual misconduct policy is what, about 60
9   pages, give or take?
10         A.      Give or take. I would say
11  take. I think it's about 52, 50.
12         Q.      And in those 52 pages is the
13  definitions on explanation of the five
14  categories listed here in this letter,
15  correct?
16         A.      Within the policy, correct,
17  yes.
18         Q.      And that information is shared
19  with the respondent not before the meeting
20  with the investigator, the specifics, correct?
21         A.      The specifics of the complaint,
22  no. We leave that to the investigator to
23  share the specifics of the complaint.
24         Q.      At the time of the first

283

1   meeting?
2          A.      During the investigation.
3          Q.      No. Is it your expectation or
4   policy that the investigator provide it in
5   advance of the first meeting with the
6   respondent?
7                  MR. PICCERILLI:   Can I hear
8          that question back, please?
9                        - - -
10                 (Whereupon, the court reporter
11         read back from the record.)
12                       - - -
13  BY MR. MIRABELLA:
14         Q.      What was the answer, then?
15         A.      Can you read back the answer?
16         Q.      Sure. How about I just
17  rephrase the question so we can move on?
18                 Is there any expectation in the
19  Community Standards office that the
20  investigator is expected to provide the
21  specific violation section of the sexual
22  misconduct code in advance of the first
23  meeting?
24         A.      It's our expectation that it's

284

1   covered over the course of the investigation.
2   We don't say at the start, "You do this, next
3   you do this, next you do this" for the
4   investigator. They are the trained
5   investigator, so we do -- they know our policy
6   they know the process, and we have the
7   expectation -- I have the expectation that
8   they are providing adequate notice and I have
9   no reason to suspect or think that they are
10  not.
11         Q.      Well, in this case do you
12  believe they provided adequate notice to John
13  Doe?
14         A.      I believe notice was provided
15  for his response.
16         Q.      No. I said, do you believe
17  adequate notice was provided to John Doe?
18                 MR. PICCERILLI:   Objection to
19         form.
20                 THE WITNESS:   Yes.
21  BY MR. MIRABELLA:
22         Q.      What notice was provided to
23  John Doe in advance of the meeting with the
24  investigator?

285

1          A.       We provided notice that there
2    is conduct that implicates the policy and then
3    Ms. Malloy would have to answer about her
4    notice. Again, my expectation and my
5    understanding -- and I have no reason to doubt
6    that -- is that over the course of the
7    investigation there was information shared
8    with both parties for their response.
9          Q.       Not over the course of the
10   investigation. At any time -- is it your
11   understanding that at any time prior to her
12   interview with Mr. Doe or during her interview
13   with Mr. Doe she provided to him the specific
14   factual allegations that Mrs. Roe asserted
15   against him?
16              MR. PICCERILLI:   Objection.
17              THE WITNESS:   Without the
18       investigative report in front of me —
19       I don't have it committed to memory.
20       So the investigative report would
21       outline what Liz did as the
22       investigator.
23   BY MR. MIRABELLA:
24       Q.       Here is SJU0331. It's your

286

1    checklist. This way you can identify for me
2    which document or documents you believe you
3    would need to answer the question.
4          A.       Documents 6 and 7 on here,
5    Pages 13 and 23, it's a summary of the
6    investigation prepared by the investigator and
7    summary of findings of fact, determinations of
8    credibility, rationale and outcome prepared by
9    the investigator.
10         Q.       Document 6 and 7?
11         A.       Document 6 and 7. Do you want
12   me to repeat? Document 6 is summary of
13   investigation prepared by investigator and
14   Document 7 is summary of findings of fact,
15   determinations of credibility, rationale and
16   outcome prepared by investigator.
17         Q.       So what pages are those?
18         A.       Thirteen and 23.
19         Q.       So I'm going to hand you what's
20   been Bates labeled previously SJU334
21   sequentially through 360. If need be, we'll
22   make a copy and have it marked as an exhibit.
23   And, first, just to confirm if you believe
24   this is 6 and 7 as you understand it.

287

1          A.       That was the back end. That's
2    not part of 7.
3          Q.       So the question was: You were
4    the sanctioning officer in this case, correct?
5          A.       Correct.
6          Q.       All right. And so you reviewed
7    the investigative findings, correct?
8          A.       I did.
9          Q.       Did you ever discuss the
10   investigation with Ms. Malloy?
11         A.       Can you -- with?
12         Q.       Ms. Malloy?
13         A.       Oh. Sorry. I didn't hear at
14   the end. No.
15         Q.       So my question to you is: Did
16   Ms. Malloy, to your knowledge, ever inform
17   Mr. Doe of the specific section of the sexual
18   misconduct policy under which he was accused?
19              MR. PICCERILLI:   Objection to
20       form.
21              MR. MIRABELLA:   I would be
22       happy to try to correct that, Al.
23              MR. PICCERILLI:   Well, the
24       point is, I think he can read the

288

1    report, but I think it's a question
2    for Ms. Malloy to answer as opposed to
3    this particular witness.
4              MR. MIRABELLA:   This particular
5    witness was the sanctioning officer
6    and he's already testified about his
7    expectations of what the investigator
8    does and should do. I think it's an
9    appropriate question.
10             THE WITNESS:   Right. Well, I
11   think it's appropriate for me to read
12   the 28 pages, because I have not read
13   this in some time and so for me to try
14   to pull a sentence out that speaks to
15   it, I think it would be hard.
16             MR. MIRABELLA:   All right. I
17   think that's perfectly reasonable.
18   We'll go off the video and you can
19   read through it.
20             THE VIDEOGRAPHER:   Off the
21   record, 9:39.
22              _ _ _
23       (Off the record)
24              _ _ _

289

1          THE VIDEOGRAPHER:   We are on
2      the record, 9:48.
3  BY MR. MIRABELLA:
4      Q.      Mr. Bordak, can you answer the
5  question?
6      A.      Can I have that repeated,
7  please?
8          MR. PICCERILLI:   Also, before
9      you do that, I don't know if you put
10     it on the record already, you may
11     have, the Bates stamp numbers?
12         MR. MIRABELLA:   Sure. I think
13     I did, but we can do it again.
14 BY MR. MIRABELLA:
15     Q.      Mr. Bordak, just indicate what
16 documents you have in front of you based on
17 the number. It's sequential, so the first one
18 and the last one.
19     A.      It's 344 through 359.
20     Q.      And that's SJU?
21     A.      SJU.
22          - - -
23         (Whereupon, the court reporter
24     read back from the record the pending

290

1      question asked prior to going off the
2      record at 9:39 a.m.)
3          - - -
4          THE WITNESS:   According to the
5      investigative report -- so it's not
6      included in the investigative report,
7      so I can't speak to what Ms. Malloy
8      might have done or not done that's not
9      represented in the report.
10 BY MR. MIRABELLA:
11     Q.      All right. Let's turn our
12 attention to a different topic for a few
13 minutes. Oh, the charge letter, which we've
14 started off the discussion that led us into
15 the investigative report —
16         MR. PICCERILLI:   That's
17     Bordak-4?
18         MR. MIRABELLA:   Yes.
19 BY MR. MIRABELLA:
20     Q.      Charge letter — it's really
21 the Notice of Process Letter. Has that letter
22 changed from March 1, 2018 until the present,
23 the template?
24     A.      I do not know.

291

1      Q.      Do you recall making any
2  changes to it?
3      A.      I recall making changes to the
4  templates. We have many templates and I
5  recall making changes to templates as we move
6  through the semester. I don't know whether
7  there's been changes to the template since
8  this matter.
9      Q.      Template for the Notice of
10 Process Letter?
11     A.      Right.
12     Q.      Do you know — how hard is it
13 for you to determine that? I don't mean right
14 here. I mean at your office.
15     A.      Sure. I could see what —
16         MR. PICCERILLI:   I'm sorry.
17     THE WITNESS:   I could determine
18     whether there has been updates since.
19         MR. MIRABELLA:   Just a request
20     on the record for the template of the
21     current Notice of Process Letter, if
22     there have been any changes, or a
23     confirmation that the template hasn't
24     changed.

292

1  BY MR. MIRABELLA:
2      Q.      All right. So the
3  pre-investigation meeting, I wanted to talk to
4  you about that for a little bit. I know this
5  was covered. I was present and I had reviewed
6  your testimony. I don't intend and don't want
7  to cover the questions that were already asked
8  and answered and I apologize if there is a
9  little bit of overlap. The pre-investigation
10 meeting also has a document called the
11 "Pre-investigation Meeting Checklist,"
12 correct?
13     A.      Yes.
14     Q.      That document, is that document
15 also a template?
16     A.      Yes.
17     Q.      All right. Has that template
18 changed since this incident occurred?
19     A.      I can't recall. Same answer.
20     Q.      Could you check and advise
21 counsel as well?
22     A.      Yes.
23     Q.      Before the interim sexual
24 misconduct policy came into effect, was there

293

1 any formal process for pre-investigation
2 meetings of complaints involving sexual
3 misconduct?
4         A.     Yes.
5         Q.     All right. And can you
6 describe, was there a checklist utilized?
7         A.     Yes.
8         Q.     And was there a Notice of
9 Process Letter sent out?
10        A.     Yes.
11        Q.     All right. Did the Notice of
12 Process Letter have any information additional
13 to the information that's contained that we
14 just went through in this Notice of Process
15 Letter?
16        A.     That would be already answered.
17 It's different information. It's a procedural
18 checklist and so the pre-investigation meeting
19 checklist pulls language from the sexual
20 misconduct policy. With that not in place,
21 the checklist then would have pulled from the
22 processes outlined in the student handbook.
23 So it's different.
24        Q.     Were the specific provisions of

294

1 the sexual misconduct or the student handbook
2 alleged to have been violated set forth in the
3 Notice of Process Letter?
4         A.     Yes.
5         Q.     Were any of the factual
6 allegations, the specific factual allegations
7 against the respondent set forth or contained
8 in the Notice of Process Letter?
9         A.     No.
10        Q.     Was that information provided
11 to the respondent prior to an administrative
12 hearing?
13        A.     Not in specific terms.
14        Q.     What about in general terms?
15        A.     We would share with a student
16 that they have alleged to have violated the
17 alcohol policy, but not all of the different
18 ways that they were alleged, or that a student
19 that was alleged to have violated the drug
20 policy, but not all of the ways. And similar
21 in sexual misconduct, we would tell the
22 students that they were alleged to be in
23 violation of violating — a sexual offense, I
24 believe it was called at that time, but not

295

1 the specific conduct.
2         Q.     Was the respondent entitled to
3 see the incident report or any of the
4 documentation prior to the administrative
5 hearing?
6         A.     Yes.
7         Q.     And how did that -- was that
8 set forth in the student handbook or was
9 that -- how was that memorialized, that
10 process or procedure?
11        A.     I don't believe it was in the
12 student handbook.
13        Q.     All right. Then how did the
14 people in Community Standards know that that,
15 in fact, was the policy? Do you follow me?
16        MR. PICCERILLI:   I don't.
17        Objection to form.
18 BY MR. MIRABELLA:
19        Q.     All right. Under the old
20 system the respondent was entitled to see the
21 evidence prior to the administrative hearing,
22 correct?
23        A.     Correct.
24        Q.     All right. And was that

296

1 communicated to the respondent?
2         A.     Yes.
3         Q.     And when was that communicated
4 to the respondent?
5         A.     If they came in for what we
6 called a prehearing meeting they were told at
7 that time or if students asked we would
8 answer, but we didn't necessarily tell the
9 students.
10        Q.     All right. But if they asked
11 or it came up they would be notified, for
12 example, the way you give at a prehearing
13 meeting?
14        A.     Yes.
15        Q.     Now, after the implementation
16 of the SMP that policy changed?
17        A.     Well, right, the policy that
18 became the sexual misconduct policy.
19        Q.     I'm sorry. No. For the —
20 whether the respondent was entitled to see the
21 investigative file prior to the either
22 interview with the investigator or
23 investigator hearing changed from prior to the
24 policy, correct?

297

1       A.    Yes.
2       Q.    All right.  Why?
3       A.    I can't answer that.
4       Q.    Who changed it?
5       A.    I wasn't part of the policy
6 development.
7       Q.    How was it memorialized?
8       A.    I don't know what you mean by
9 "memorialized."
10      Q.    How did you know it changed?
11      A.    The sexual misconduct policy
12 had a policy prescribed through and we're,
13 like -- I mean, as I can't -- we are talking
14 a few years now -- we were educated on the
15 process and the process would be that the
16 investigator would [sic] share the specific
17 conduct so as to not compromise the
18 investigation.
19      Q.    Is that written down anywhere?
20      A.    Not to my knowledge.
21      Q.    And so how did you learn of it
22 for the first time?
23      A.    We had meetings to
24 operationalize that when the interim sexual

298

1 misconduct policy took effect.  It wasn't an
2 arbitrary decision of mine to just not share
3 documents.  That was part of our meetings to
4 operationalize the interim sexual misconduct
5 policy at that time.
6      Q.    Who do you recall informing you
7 of that change?
8      A.    I don't recall specifically.
9      Q.    Who -- if not specifically,
10 what level of SJU administrative personnel
11 would have been involved in that kind of a
12 change?
13      A.    The Title IX coordinator, my
14 supervisor, I am sure general counsel was part
15 of conversations.
16      Q.    And your understanding was that
17 that decision was made so as to not compromise
18 the investigation?
19      A.    In part, yes.
20      Q.    Any other part?
21      A.    Because we were not the
22 investigators holding the pre-investigative --
23 the administrator having the pre-investigation
24 meeting was not the investigator.  To share

299

1 information with those students in that moment
2 takes away from the intention of that meeting
3 being processed.  Once we start sharing
4 specific information the students then want to
5 respond and that then puts that administrator
6 who is doing the pre-investigation meeting as
7 a potential witness in the matter that they
8 have been shared information.  We treat those
9 conversations as purely process and let the
10 investigator handle the complaint, the
11 allegations, the responses, the conversations
12 with the students about what happened.  Ours
13 is a purely process conversation.
14      Q.    As part of the process
15 conversation why couldn't the students be told
16 that they are entitled to see the
17 investigative file if they schedule an
18 appointment in advance of their meeting with
19 the investigator?
20      A.    They are not told.  I am not
21 going to answer why they shouldn't be.
22 They're not.
23      Q.    Do you know --
24      A.    That's our process.  That's our

300

1 policy.  That was determined -- that was not
2 determined by me.  I am in full support of
3 that.  I think it's in compliance for what we
4 need to do for our policy and for our
5 students, but I can't speak to --
6      Q.    That's not the policy and
7 that's not an area that you -- you don't get
8 to dictate policy; is that correct?
9      A.    Not for the sexual misconduct
10 policy, correct.
11      Q.    Who does?
12      A.    There is a writing group that
13 involved faculty staff, administration,
14 probably starting in the fall of 2014, for
15 implementation of the interim sexual
16 misconduct policy in the spring of '15.
17      Q.    Was Carey Anderson part of the
18 writing group?
19      A.    I don't recall.
20      Q.    Dr. Forte -- Dr. Perry, I
21 believe, identified a professor, but I don't
22 recall the name right off the top of my head.
23 The individuals that comprised that writing
24 group, that list exists somewhere?

301

```
1          A.     I would assume so.  I don't
2    have access.  I don't know who was on that
3    writing group.
4          Q.     So when the new policy came
5    into place, the interim policy and then the
6    sexual misconduct policy, there were meetings
7    about it, how to implement it, correct?
8          A.     Sure.  Yes.
9          Q.     And at some point did you
10   become responsible for training others in your
11   office as to how to implement it?
12         A.     Yes.
13         Q.     Are there any other specific
14   policies such as the one we were talking about
15   earlier, access to the investigation
16   materials, that you learned about and that you
17   had to train people in your office about that
18   aren't memorialized elsewhere?
19              MR. PICCERILLI:  Can I hear
20         that back, please?  It was a little
21         bit long.
22              ---
23              (Whereupon, the court reporter
24         read back from the record.)
```

302

```
1              ---
2              MR. PICCERILLI:  Objection to
3         form.
4              THE WITNESS:  There is policy
5         and there is practice and so we don't
6         have in writing all of our practice,
7         but our practice is in line with what
8         we are required to do by policy.
9    BY MR. MIRABELLA:
10         Q.     Okay.
11         A.     So --
12         Q.     Let me rephrase the question.
13   All right.  Any ones that involve with respect
14   to sexual misconduct investigations?
15              MR. PICCERILLI:  Objection to
16         the form.
17              THE WITNESS:  I still don't
18         understand what you're asking.
19   BY MR. MIRABELLA:
20         Q.     Let me try -- it's not the best
21   of my questions.  During the meetings about
22   the new policy of sexual misconduct you
23   learned what the school's position was with
24   respect to the disclosure of investigation
```

303

```
1    evidence prior to a hearing or an
2    investigative interview, correct?
3          A.     Yes.
4          Q.     And were there other changes to
5    the manner in which the investigation was
6    undertaken that you learned about that you had
7    to teach your staff members?
8          A.     Yeah.  I would say all pieces
9    of the policy.  Right.  I mean, we were
10   implementing an investigative model which was
11   new and so who the investigators would be, you
12   know, what that -- those pre-investigation
13   meetings, kind of all of those pieces along
14   the process, we would -- I would be
15   responsible for ensuring that the folks
16   involved in that process would know it.
17         Q.     The manual -- is there anything
18   in your office that you utilize when you train
19   new assistants about the SMP and the
20   investigative process?
21         A.     We have the policy itself, I
22   mean, that's the foundational document for the
23   training, the checklist, the notices, and we
24   have a flow chart that's really, maybe, a
```

304

```
1    four- or five-box flow chart that does a step
2    by step about the process.
3          Q.     Do you have any internal
4    manuals that you use or refer to?
5          A.     Not for the sexual misconduct
6    policy.
7          Q.     Do you have any external
8    publications that you utilize or refer to in
9    connection with the sexual misconduct policy?
10              MR. PICCERILLI:  Objection to
11         form.
12              THE WITNESS:  Not for the
13         sexual misconduct policy.
14   BY MR. MIRABELLA:
15         Q.     I want to ask you some
16   questions about the pre-investigative meeting
17   checklist.
18         A.     Okay.
19         Q.     As you mentioned, you might --
20   strike that.  Have you ever changed it?
21         A.     Yes.
22         Q.     All right.  Is anyone besides
23   you responsible for the content of the
24   pre-investigative meeting checklist at this
```

305

1   time?
2       A.      No.
3       Q.      Has anyone besides you been
4   responsible for any changes to it?
5       A.      No.
6       Q.      The initial checklist, did you
7   draft that or was that something provided to
8   you?
9       A.      I drafted that.
10      Q.      And I think you answered as to
11  the notice letter, but maybe you did to the
12  checklist too. Have there been any changes to
13  it over the years?
14      A.      Yes, there has been changes. I
15  don't know when those changes have occurred.
16      Q.      Off the top of your head?
17      A.      Right.
18      Q.      Has there been more than one
19  change?
20      A.      Yes.
21      Q.      If you decide as director of
22  Community Standards to change that checklist
23  do you have to have interdepartmental review
24  or interschool review of your changes?

306

1       A.      No.
2       Q.      And do you keep copies of the
3   old checklist for reference so that you can
4   sort of continue to see how the document
5   evolves?
6       A.      It's my intention to do that.
7   To be honest, there may have been times where
8   a change has been made and I haven't or have
9   forgotten to memorialize a previous version,
10  but it's our intention to have previous
11  copies.
12      Q.      Did you change the checklist
13  after the Powell complaint was filed?
14      MR. PICCERILLI:   Asked and
15  answered.
16      THE WITNESS:   I can't recall.
17  BY MR. MIRABELLA:
18      Q.      Oh. Was that the answer? All
19  right.
20      MR. MIRABELLA:   So 5 and 6 is
21  what we are going to mark next.
22      _ _ _
23      (Whereupon, Exhibits Bordak-5
24  and Bordak-6 were marked for purposes

307

1       of identification.)
2       _ _ _
3   BY MR. MIRABELLA:
4       Q.      Mr. Bordak, why don't you take
5   a moment to look at both documents. I am
6   going to retrieve, unless you need them, those
7   records. Thank you. Have you had a chance to
8   look at it?
9       MS. SCHIMELFENIG:   Is there a
10  question pending?
11      MR. MIRABELLA:   Has he had a
12  chance to look at the document?
13      MS. SCHIMELFENIG:   I'm asking
14  because I need to take a break. Is
15  there a question pending?
16      MR. MIRABELLA:   We are not
17  breaking now. You can step out if you
18  need to, but we are really tight on
19  time.
20      MS. SCHIMELFENIG:   I need to
21  talk to —
22      MR. MIRABELLA:   This is not
23  going into my time.
24      MS. SCHIMELFENIG:   I need to

308

1       talk to my outside counsel. Entirely
2   appropriate. Thank you.
3       MR. MIRABELLA:   It's not
4   inappropriate, but I get the time
5   back.
6       THE VIDEOGRAPHER:   Off the
7   record, 10:06.
8       _ _ _
9       (Off the record)
10      _ _ _
11      MR. PICCERILLI:   We are back.
12      THE VIDEOGRAPHER:   On the
13  record, 10:07.
14  BY MR. MIRABELLA:
15      Q.      Mr. Bordak, have you had a
16  chance to look at 5 and 6?
17      A.      Yes.
18      Q.      All right. Just identify for
19  the record what each document is.
20      A.      Document 5 is the
21  pre-investigation meeting checklist completed
22  by Doe and an email sent by Emily Forte to Doe
23  attaching an electronic copy of the completed
24  document. And Number 6 is a pre-investigation

309

1  meeting document for a previous matter under
2  the interim sexual misconduct policy.
3       Q.      Comparing the documents, first
4  off, one is a checklist for the interim policy
5  and one is the checklist for the subsequent
6  sexual misconduct policy, correct?
7       A.      Yes.
8       Q.      All right.  So not all the
9  paragraphs line up in terms of the checklist.
10 You would agree with me that there were
11 changes to the checklist made after the matter
12 dated March 16 of 2015, correct?
13      A.      Yes.
14      MR. PICCERILLI:   That is the
15 date of the signatures on --
16      MR. MIRABELLA:   Yes.
17      MR. PICCERILLI:   -- Bordak-6?
18 Okay.
19 BY MR. MIRABELLA:
20      Q.      I want to direct your attention
21 to the Paragraph 11 on Exhibit-6.  Do you see
22 that?
23      A.      Yes.
24      Q.      All right.  And does that

310

1  roughly correspond to Paragraph 13 on the John
2  Doe checklist?
3       A.      Roughly.  I mean, there's a lot
4  more within Paragraph 11 on Document 6 that it
5  looks like was made into separate items within
6  Document 5.
7       Q.      All right.  Is there
8  anything --
9       MR. PICCERILLI:   Hold on a
10 second.  I think Document -- Item
11 Number 13 goes onto the next page.
12      THE WITNESS:   You're right.
13 BY MR. MIRABELLA:
14      Q.      So back to Exhibit-5, Paragraph
15 11, second page.  Do you see the first
16 paragraph -- I'm sorry -- the second
17 paragraph, "If during the course of the
18 investigation"?
19      A.      Yes.
20      Q.      Was that paragraph added after
21 the Powell complaint was filed?
22      A.      I'm sorry.  Can you repeat that
23 question?
24      Q.      Sure.  So these were two

311

1  checklists?
2       A.      Yes.
3       Q.      On Exhibit-5, the one used in
4  the Doe case, on Page 3 of 4, the second
5  paragraph, do you see that?
6       A.      "If during the course"?
7       Q.      Right.  Is there anything like
8  that set forth in either Paragraph 11 of
9  Exhibit-6 or anywhere else in Exhibit-6 or was
10 that added, if you know, after the Powell
11 complaint?
12      A.      I don't know if it was added
13 after the Powell complaint or after the
14 institution of the sexual misconduct policy.
15      Q.      Is there anything in --
16      A.      The interim sexual misconduct
17 policy.
18      Q.      Got it.  But you might be able
19 to confirm or verify that by reference to
20 earlier checklists?
21      A.      Perhaps, yes.
22      Q.      All right.  Do you recall
23 making -- now having these two documents in
24 front of you, the Powell checklist, the Doe

312

1  checklist -- making any changes to the
2  checklist after Powell?
3       A.      Again, I don't know whether it
4  was after Powell or after the implementation
5  of the sexual misconduct policy and not the
6  interim sexual misconduct policy.  Much of
7  this language changed, but it was policy
8  language that directed the checklist.
9       Q.      When you say, "much of this
10 language changed" you are pointing to a
11 document.  Which one do you mean?
12      A.      So from Document 6 to Document
13 5 there were changes, but much of that is
14 represented in policy language changes.  We
15 went from an interim sexual misconduct policy
16 to a sexual misconduct policy and so I don't
17 know whether the changes are directly related
18 to that or a specific matter.
19      Q.      Just so I understand your
20 answer, if, for example, the second paragraph
21 of Page 3, Exhibit-5, if that, in fact, is
22 also something that was added to the sexual
23 misconduct policy that was not part of the
24 interim sexual misconduct policy, that change

313

1  might have been done in relationship to the
2  policy change, correct?
3      A.   Yes.
4      Q.   And you don't know when that
5  change took place and if it was policy driven
6  or not at the moment, correct?
7      A.   Yes.
8      Q.   All right.  For the moment, I
9  think I am finished with 5 and 6.
10                 _ _ _
11              (Whereupon, Exhibit Bordak-7
12         was marked for purposes of
13         identification.)
14                 _ _ _
15  BY MR. MIRABELLA:
16      Q.   Mr. Bordak, what's been marked
17  as Exhibit-7 is some documentation from the
18  appeal packet and it includes, I believe, more
19  than one person's response to the Doe appeal
20  in this matter.  I am primarily going to ask
21  you questions about your response.  It was
22  just easier to copy it this way.  You're, of
23  course, free to refer to whatever you want to
24  refer to as I ask you some questions.  Do you

314

1  want to read your appeal response before we
2  get into the questions and answers?  I think
3  it's a page or page and a half.
4      A.   Yes, if you don't mind, just a
5  moment.
6      Q.   No.  Absolutely.
7         MR. MIRABELLA:   Off the video,
8  please.
9         THE VIDEOGRAPHER:   Off the
10  record, 10:14.
11         MR. PICCERILLI:   While we are
12      off the video, I just want to make
13      sure you're going to attach whatever
14      is marked as an exhibit to the
15      transcript.
16         MR. MIRABELLA:   I certainly
17      hope so.
18         THE VIDEOGRAPHER:   We are on
19      the record, 10:17.
20  BY MR. MIRABELLA:
21      Q.   Mr. Bordak, off the record, do
22  you have in front of you -- what's the exhibit
23  number we are up to, 7?
24      A.   Seven.

315

1      Q.   Did you have an opportunity to
2  review your appeal response dated April 26,
3  2018?
4      A.   Yes.
5      Q.   All right.  And how many --
6  it's two pages in length or --
7      A.   Three.
8      Q.   Three pages, I guess, correct?
9      A.   Yes, three.
10         MR. PICCERILLI:   Can you ask
11      the witness to state which SJU
12      numbers?
13         MR. MIRABELLA:   This is going
14      to attached, but sure.  It's SJU584,
15      85 and 86, correct?
16         THE WITNESS:   Yes.
17         MR. PICCERILLI:   Thank you.
18  BY MR. MIRABELLA:
19      Q.   First, as a general matter,
20  what is this document and its use?
21      A.   It is, as titled, the
22  Sanctioning Officer Appeal Response.  When an
23  appeal request is submitted that is sent to
24  the sanctioning officer and the investigator

316

1  for response to the pieces raised in appeal.
2      Q.   The Community Standards office ,
3  are they always the sanctioning officer in
4  cases of sexual misconduct?
5      A.   They -- so we work with
6  professional staff members in residence life
7  that are also trained, but in that moment they
8  are acting as agents of Community Standards.
9  So it's a correct statement, that Community
10  Standards, but it's more than just me and
11  Emily.
12      Q.   How many other individuals?
13      A.   At that time, one.
14      Q.   And does the sanctioning
15  officer always do a reply to an appeal in a
16  situation where there was a finding of
17  responsibility?
18      A.   The sanctioning officer would
19  respond if asked by the vice president of
20  student life's office to respond.  So I
21  received as a sanctioning officer a copy of
22  the appeal request and complainant's response
23  to the appeal request for my response as a
24  sanctioning officer.  I didn't take it on

317

1  myself to respond.  I was prompted a response
2  through the appeal process by Kiersten White,
3  who was moderating the appeal process.
4        Q.        All right.  And — understood.
5  Who moderates -- what individual, what offices
6  share the responsibility for being an appeal
7  moderator?
8        A.        It's Dr. White and — well,
9  it's Dr. White and in her absence another
10  associate — assistant vice president, Dr.
11  John Jeffery, serve as moderators of the
12  board.
13        Q.        And what department or what --
14  Dr. White is someone you report to, correct?
15        A.        Yes.
16        Q.        And what is her title?
17        A.        Assistant vice president for
18  student life.
19        Q.        All right.  And she reports to
20  Carey Anderson?
21        A.        Correct.
22        Q.        And what's his title?
23        A.        Vice president for student
24  life.

318

1        Q.        And additional titles, but
2  okay.  So you said you were prompted for a
3  response.  Is it an invitation, a request, or
4  are you expected to respond to the appeal as
5  the sanctioning officer when so notified?  And
6  I will object to my own question.  Can you
7  tell me how -- do you have a choice?
8        MR. PICCERILLI:   Let me object
9        to his question too.
10        MR. MIRABELLA:   I am objecting
11        to my own question.
12        THE WITNESS:   I do.  There have
13        been times when — there are times,
14        scenarios where a sanctioning officer
15        could say, "I have no response."
16  BY MR. MIRABELLA:
17        Q.        Back to the better and simpler
18  part of the question.  Do you ever respond
19  when not prompted or requested?
20        A.        No.
21        Q.        And the prompt or request has
22  to come from the person serving as the
23  moderator?
24        A.        Yes.

319

1        Q.        Is there any policy provision
2  in the SMP that provides for responses to
3  appeals from the sanctioning officer?
4        A.        No.
5        Q.        Is there any policy or
6  provision in the SMP to notify the respondent
7  that others at the school may be in the
8  position to file responses to his appeal
9  beside the complainant?
10        A.        Not as written in the policy.
11  It does speak about additional documentation,
12  but not explicitly.
13        Q.        Are they -- as a matter of
14  policy are the respondents told that others
15  may be responding to the appeal?
16        A.        If the respondent participates
17  in a meeting or requests to learn more about
18  the appeals process we would share all of
19  those particulars, but we don't share all of
20  the particulars about the appeals process
21  because many students might not be interested
22  in knowing about the appeals process.
23        Q.        The document -- the SMP
24  provisions about the appeal are set forth very

320

1  explicitly in the SMP, correct, about the
2  process for the respondent and the complainant
3  and the time period?
4        A.        Yes.
5        Q.        Who else is -- may be requested
6  by the moderator, if not by name by title or
7  role, to respond to the appeal?
8        A.        The sanctioning officer and the
9  investigator.  Because this response is not a
10  support of an outcome, it's a response to
11  things raised through the appeal, and so the
12  only person that could answer a question about
13  X is the sanctioning officer.  So it makes
14  sense and is our process to ask the
15  sanctioning officer to respond to X and that's
16  what this document is.  There is questions
17  about and assertions that the Office of
18  Community Standards did X, so I was asked to
19  respond to those pieces about what was
20  purported that the Office of Community
21  Standards did.  So this isn't an advocacy of
22  an outcome but a response to items raised in
23  an appeal.
24        Q.        Since the sexual misconduct or

1  interim sexual misconduct policy has been in
2  place has any appeal resulted in a finding of
3  non-responsibility?
4         A.     I don't know the specifics of
5  all the appeals.
6         Q.     Has any appeal, to your
7  knowledge, ever reversed a finding?
8         A.     I can't get -- I don't know
9  specifics. I mean, truly, I have been doing
10  this over a decade, I don't know.
11        Q.     But the SMP policy in the
12  StarRez system show, you know, roughly 40
13  cases involving sexual misconduct. Are you
14  aware of any of those ever being reversed on
15  appeal?
16        A.     I don't remember specifics.
17        Q.     Is that something -- so there
18  might be, there might not be?
19        A.     Yes.
20        Q.     You simply have no recollection
21  due to the volume of cases?
22        A.     Yes.
23        Q.     And can that be searched easily
24  through the StarRez system?

1         A.     Yes.
2         Q.     In this appeal -- before I get
3  into more details with your response I want to
4  ask you some other questions about the other
5  documents. So the next page or the first page
6  is St. Joe's 0583. I'm sorry. That's the
7  second page. That appears to be the
8  complainant's response to the appeal, correct?
9         A.     Yes.
10        Q.     All right. The second response
11  is, as we discussed, is yours. It's three
12  pages in length, correct?
13        A.     Yes.
14        Q.     And then there is a response
15  from Emily Forte?
16        A.     Yes.
17        Q.     And I think I understand or I
18  know the answer, but, still, why is the
19  pre-investigative meeting person providing a
20  response?
21        A.     So that determination of the
22  ask for the response was made by Dr. White.
23  My understanding, as Emily's supervisor and
24  director of Community Standards, was that

1  there was pieces of the appeal that Emily and
2  Emily alone could respond to.
3         Q.     And then the last one is the
4  response of the investigator, correct?
5         A.     Yes.
6         Q.     And so I have it as a general
7  matter, then, there are not any other
8  individuals who would, to your knowledge, be
9  asked by a moderator to file a response to an
10  appeal? The sanctioning officer, the
11  investigator, the pre-investigation meeting,
12  and the complainant would comprise, generally
13  speaking, all the individuals who might be
14  asked to respond?
15               MR. PICCERILLI:   Can I hear
16        that question back, please?
17                      - - -
18               (Whereupon, the court reporter
19        read back from the record.)
20                      - - -
21               MR. PICCERILLI:   Objection to
22        form.
23               THE WITNESS:   To my knowledge,
24        and my understanding, I am -- but

1         keeping in mind I am not in charge of
2         the appeal process. So Dr. White
3         would be in a better position to
4         respond to when there's a request for
5         information.
6  BY MR. MIRABELLA:
7         Q.     And can you tell in the StarRez
8  system under -- for the investigations under
9  the SMP that have -- how many have been
10  appealed and how many have not been appealed?
11        A.     Yes.
12        Q.     Is the practice of inviting
13  responses to the appeal, which is done by the
14  assistant vice president -- and if you already
15  answered this, I'm sorry -- memorialized
16  anywhere or set forth anywhere in the SMP
17  policy or elsewhere?
18        A.     No.
19        Q.     Do you know what guidance,
20  written guidance, if any, the assistant vice
21  president -- I'm sorry -- the moderator has
22  available to them to determine who should or
23  should not be invited to provide a response to
24  an appeal?

325

1      A.      Not that I can answer.
2      Q.      And is that practice of
3 inviting responses to an appeal been in place
4 since the institution of the interim sexual
5 misconduct policy?
6      A.      Yes.
7      Q.      Was that practice in place
8 prior to the institution of the sexual
9 misconduct policy?
10      A.      Yes.
11      Q.      Can you describe a little bit
12 how it would have worked prior to the interim
13 SMP?
14      A.      The same way that it works now
15 without the investigator. And this is the
16 same for appeals that are non-SMP. If a
17 student in their appeal submission request
18 brings up something about process or something
19 about bias or something that only one person,
20 the hearing officer, is in the position to
21 respond to they are asked to respond. So it
22 would be the same, same, minus the
23 investigator.
24      Q.      Prior to the SMP were the

326

1 students advised that others would have an
2 opportunity other than those who were
3 identified in the policy to respond to the
4 appeal?
5      A.      No.
6      Q.      The StarRez system started
7 roughly in 2011?
8      A.      Yes.
9      Q.      Can you search the system for
10 the result of sexual misconduct violations and
11 results that go back beyond 2015?
12      A.      Yes.
13      Q.      Would that be difficult to
14 search?
15      A.      No.
16      Q.      Can the system be searched,
17 under the StarRez system back to 2011, for
18 situations involving assault but not sexual
19 misconduct?
20      A.      Yes.
21      Q.      Do you know if prior to 2015
22 there were ever any findings of sexual
23 misconduct responsible against a female
24 respondent?

327

1      A.      I can't off the top of my head
2 without referencing documents.
3      Q.      Is that a cumbersome search to
4 undertake?
5      A.      No.
6      Q.      Prior to 2015 do you know if
7 there were ever any appeals that result — in
8 a sexual misconduct case involving a reversal?
9      A.      Again, without reference to
10 documents I can't answer.
11      Q.      Are you aware of any criticism
12 of the handling of sexual misconduct cases
13 prior to the institution — under the old
14 system?
15          MR. PICCERILLI:   Prior to the
16          interim sexual —
17 BY MR. MIRABELLA:
18      Q.      Before 2015.
19      A.      Yes.
20      Q.      Okay. Specific ones or just
21 generally?
22      A.      Community Standards is a
23 difficult office, many criticize — there are
24 criticisms about our processes.

328

1      Q.      I don't remember if I recall
2 this from your testimony or somebody else's.
3 Somebody complained about a potential conflict
4 of interest with the role of an adviser or a
5 hearing officer being an adviser to a student.
6 Was that your —
7      A.      Yes. I shared that last week.
8      Q.      Mr. Bordak, if the Community
9 Standards office gets an anonymous complaint
10 of sexual misconduct does it get a StarRez
11 number?
12      A.      Depends on how it's reported.
13      Q.      Can you explain?
14      A.      If it's -- basically, if it's
15 reported to Dr. Perry as the Title IX
16 coordinator exclusively, it may not get a
17 StarRez number. It may not be put in our
18 system, because there is no grievance
19 procedures or disciplinary process to address
20 it. If the anonymous complaint goes to an RA
21 the RA is compelled to report that through our
22 system, which then creates a StarRez number.
23      Q.      Is there a way for an anonymous
24 complaint to be sent directly to the Office of

329

1   Community Standards about sexual misconduct?
2       A.      Yeah.
3       Q.      Okay.  And if that happens does
4   it create a StarRez number?
5       A.      It would.
6       Q.      All right.  What if the
7   anonymous complaint does not identify or the
8   respondent cannot be identified in the
9   anonymous complaint?
10      A.      We would still create a report
11  without any individuals attached to it by
12  name.
13      Q.      I don't know if you can answer
14  this simply or not.  When you are entering
15  into the database information about Community
16  Standards violation complaints, are there
17  broad -- any broad categories that the StarRez
18  system uses in terms of sexual misconduct,
19  alcohol or things of that nature that get
20  tagged a certain way?
21      A.      I don't know -- I don't know
22  what you mean.
23      Q.      I'm not sure I know what I mean
24  either.  Let me go on to -- I am not sure if I

330

1   can better clarify that question.  So when
2   you're entering something in the StarRez
3   system certain drop-down boxes appear at the
4   beginning?
5       A.      Yes.
6       Q.      What type of information is
7   prompted from the initial -- when you are
8   initially entering the data, just so I have a
9   better understanding of how it works?
10      A.      So we have -- I think there is
11  three, three or four folders that you
12  essentially click and drop down.  The sexual
13  misconduct policy is in a folder called "All
14  Other Violations."  The ones that we do
15  subcategories for are alcohol, drug, and
16  weapon, because we need to identify specific
17  crimes for Clery reporting for those
18  instances.
19      Q.      Okay.  I asked you earlier
20  questions about Jane Roe and other issues
21  or -- either complaints or violations or
22  claims in Community Standards, correct?
23      A.      Yes.
24      Q.      All right.  Were you directly

331

1   involved in any of those?
2       A.      In my role as director I was
3   involved in terms of director of the office,
4   but I was not directly involved in the
5   complaint or process.
6       Q.      Other than being involved as
7   director of the office and -- what office does
8   she work in at SJU, Katie Bean's office?
9       A.      I'm sorry?
10      Q.      I'm sorry.  Jane Roe's office,
11  she works for Katie Bean, correct -- or she
12  worked in Katie Bean's office?
13      A.      Correct.
14      Q.      What is that office called?
15      A.      Student Outreach and Support.
16      Q.      And where is that office
17  physically located?
18      A.      In Campion Student Center.
19      Q.      And Campion Student Center is
20  large, correct?
21      A.      It is.
22      Q.      Where is your office located?
23      A.      In 243.
24      Q.      Of Campion Student Center?

332

1       A.      In Campion Student Center.
2       Q.      Is the Student Outreach office
3   in the same floor?
4       A.      Yes.  It's right around the
5   corner.
6       Q.      Did you ever meet or interview
7   her or speak with her prior -- let's say
8   prior to the -- I don't know if you did with
9   Jane Doe, but -- with John Doe -- prior to the
10  complaint involving John Doe?
11      A.      Casually as a worker in the
12  office, but there's 20 or so workers in the
13  building.  And so I knew her as somebody who,
14  I would go into the Student Outreach office
15  and say, "Is Katie in?" but not any prolonged
16  conversation, certainly not anything in-depth.
17      Q.      Did you ever speak to her
18  directly about any of the other Community
19  Standards issues that we discussed earlier?
20      A.      Not that I recall.
21      Q.      Did you know anything about her
22  background or history whatsoever prior to the
23  John Doe complaint being filed?
24      A.      I did.

333

1    Q.    And how did you come to learn
2  it?
3    A.    As the director of Community
4  Standards I am aware of all of the incidents.
5  Even if I am not directly the administrative
6  hearing officer for it, it's conduct that's
7  alleged on campus and so I know about it.
8    Q.    Thank you.  I was trying to go
9  in a different direction with the question.
10  Did you know anything about her history, as
11  reported in her deposition already, of either
12  drug use or an abusive ex-boyfriend, things
13  that occurred prior to her arrival at SJU,
14  prior to this complaint being filed in the
15  John Doe case?
16    MR. CHESNEY:   Object to form.
17    THE WITNESS:   As I recall, I
18    knew about the substance piece because
19    that came up through the previous
20    marijuana matter that we discussed.  I
21    don't know that I knew about the
22    previous ex-boyfriend.  If I did, it
23    was, like, a fleeting FYI, as sort of
24    something that happened, but it wasn't

334

1  something that I recalled.
2    MR. MIRABELLA:   I am going to
3    follow up, but we need to change the
4    DVD.
5    THE VIDEOGRAPHER:   This
6    completes DVD number one of the
7    recorded deposition of William Bordak
8    for day two.  We are now going off the
9    record at 10:36.

10                  _ _ _
11    (Off the record)

12                  _ _ _
13    THE VIDEOGRAPHER:   This is DVD
14    number two of the recorded deposition
15    of William Bordak for day two.  We are
16    now on the record at 10:42.
17  BY MR. MIRABELLA:
18    Q.    So, then, the source of the
19  information about her substance abuse history
20  would have been through documentation, not
21  through an interview or conversations with
22  her?
23    A.    Yes.
24    Q.    Were any of the sources from

335

1  something other than documents, perhaps from
2  any of your colleagues?
3    A.    Well, it could have been, yes.
4    Q.    Do you know one way or the
5  other?
6    A.    I don't.
7    Q.    And I didn't mean to suggest
8  somebody was sharing confidential information
9  that shouldn't have been.  I just meant in the
10  normal course of your business was there
11  anybody who might have been communicating with
12  Community Standards about those issues?
13    A.    Right, and I appreciate the
14  clarification.  It would have been within
15  educational need to know that I talked with a
16  colleague about a student who has a
17  preexisting concern, that now there is a
18  conduct concern and so it would have just been
19  out of course, to do what is best for the
20  student and connect dots and offer resources.
21    Q.    Did you ever -- strike that.
22  Where does Marci Bermey work?
23    A.    The same office as Katie Bean.
24    Q.    I promise, we will get to your

336

1  appeal letter in a second.  The appeal
2  decision makers, can you just describe for me
3  how that group is assembled?  I don't mean for
4  the appeal.  I mean, who is eligible, what
5  training do they have, and what offices do
6  they work in?
7    A.    The appeal panel is drawn from
8  a board that exists called the Community
9  Standards board.  It's a dual functioning
10  board, where they can be a hearing board as
11  well as an appeal panel.  I worked on the
12  recruitment of those individuals.  The faculty
13  are appointed by faculty senate.  The
14  administrators on the board are appointed by
15  vice president for student life associate
16  provost.  The student members on the board are
17  drawn from -- undergraduate student members
18  are drawn from another board that we have
19  called the peer review board, which means that
20  they're well trained in our process, more than
21  another student might be, and so it's -- and a
22  graduate student that's selected by myself.
23  The -- it's an 11-person board.
24    Q.    And is the turnover every year

337

1   or how does it works?
2        A.      Faculty, staff, and
3   administration are on two-year appointments.
4   Students are on one-year appointment.  Just
5   with graduation it's easier to have the
6   students on a yearly term.
7        Q.      And when are they trained or
8   how does the training take place?
9        A.      It's ongoing training.  We
10  train at the beginning of every academic year,
11  so early September, on process, any changes to
12  the student handbook, any policy revisions
13  that might have taken place over a summer, and
14  then there is ongoing training through the
15  fall semester on other items that would make
16  them better prepared for their service on the
17  board.
18       Q.      The 11 members that make up the
19  board, is it always the same categories, like,
20  two students, two faculty?  How did that work?
21       A.      Yes.  There is always -- there
22  is always a set number of faculty, set number
23  of staff administrators, and set number of
24  students.

338

1        Q.      And what is your understanding
2   of how they are selected for each appeal?
3        A.      There is a general request for
4   availability.  I mean, the primary
5   consideration is availability and so there is
6   a first ask for availability and then those
7   names of the panel members are shared with the
8   students if the students had any objections to
9   share.
10       Q.      Are the names of the
11  complainant and respondent shared with the
12  community board members -- Community Standards
13  board members?
14       A.      Once an appeal panel is
15  selected, the three to hear the appeal is
16  selected, the names are shared.  The names are
17  not shared on the initial ask to all 11
18  members.
19       Q.      Is there any reason why the
20  names are shared once a panel is selected?  Is
21  that to make certain that there is no
22  conflicts?
23       A.      Yes.
24       Q.      You talked about the ongoing

339

1   training.  Is there any documentation in your
2   office that you use to train them with?
3        A.      Yes.
4        Q.      And can you briefly identify
5   what's used?
6        A.      We use -- kind of the first
7   step of the training is the policy and so the
8   policy is a big training document and on the
9   policy, that flow chart I referenced earlier.
10  Keeping in mind that this appeal panel would
11  serve for nonsexual misconduct policy cases as
12  well, the student handbook serves as a
13  training document.  And for the follow-up
14  trainings we have materials that are provided
15  by the Title IX coordinator that serve as more
16  specific Title IX related considerations.
17       Q.      So when you earlier said the
18  policy, you mean the SMP policy?
19       A.      Yes.
20       Q.      The flow chart, the policy, the
21  student handbook.  From your office are any
22  other written materials provided for training?
23       A.      We create a PowerPoint from
24  information within the student handbook and

340

1   typical training materials.
2        Q.      Is there anything in the
3   PowerPoint that's not from the student
4   handbook?
5        A.      Yes.
6        Q.      What types of — how long is
7   the PowerPoint?
8        A.      It's lengthy.  It's meant to be
9   kind of multipart, we won't get through the
10  whole PowerPoint during this training kind of
11  thing.  And keeping in mind that the board,
12  their specific trainings are on appeals and
13  their specific trainings are on being a
14  hearing board member.  In terms of the appeal,
15  there is a PowerPoint that basically takes the
16  appeal process into a PowerPoint.  It's easier
17  to digest, it's easier for us to present the
18  material, and there might be some other
19  elements that are not direct from the
20  handbook.
21       Q.      I understand you said it's
22  lengthy.  Are we talking, is it like
23  the PowerPoint— in terms of length, 50 pages
24  or how would it print out?

341

```
1         A.      I would be guessing, but 20, 30
2  slides.
3         Q.      Are any of the slides just
4  related to appeal of sexual misconduct cases?
5         A.      I can't recall with
6  specificity.
7         Q.      Is any section of the
8  PowerPoint just related or directed to the
9  appeal of sexual misconduct violations?
10        A.      I can't recall with specificity
11 on that.
12        Q.      All right.  Who created the
13 PowerPoint teaching tool?
14        A.      There is a lot of tools.  It
15 would have been created by me or Dr. Perry or
16 Marci Bermey, in Student Outreach and Support
17 who had other materials around Title IX
18 considerations.
19        Q.      I know you are not the Title IX
20 coordinator, but what is your understanding of
21 what documents or types of documents the Title
22 IX coordinator would provide to the Community
23 Standards board members as it relates to
24 sexual misconduct?
```

342

```
1         A.      I don't recall with specifics.
2         Q.      Do you know if there are any?
3         A.      Yeah.
4         Q.      All right.  How difficult would
5  it be to identify those documents?
6         A.      Not difficult.
7         Q.      All right.  Is it reasonable --
8  or maybe it isn't, actually.  Do you know all
9  the members of the Community Standards board ?
10        A.      Yes.
11        Q.      Do you know them because they
12 are on the Community Standards board or
13 because you work at the same university?  I am
14 trying to get a sense for their interaction
15 with your office and your personal knowledge
16 of them.
17        A.      I would say I know them in both
18 capacities.  It's a small campus.  I pride
19 myself in getting to know faculty and getting
20 to know people outside of my office.  So, you
21 know, I know them because they're on the
22 board, but I also know them because I try to
23 get to know people on campus.
24        Q.      All right.  Back to your appeal
```

343

```
1  letter -- appeal reply -- excuse me --
2  response.
3                 MR. PICCERILLI:   This is
4         Bordak-7 again, correct?
5                 MR. MIRABELLA:   I believe so.
6                 THE WITNESS:   Yes.
7  BY MR. MIRABELLA:
8         Q.      I direct your attention to --
9  we are on the first page.  We are looking
10 at -- I am looking under Paragraph 1,
11 "Regarding Appeal."  Do you see that?
12        A.      Yes.
13        Q.      Are there any restrictions or
14 limitations on what you can address in your
15 appeal reply when you prepare it?
16        A.      I have to answer the questions.
17 I mean, I am responding to the appeal of the
18 student and so --
19        Q.      Sure.
20        A.      -- that's my limit.
21        Q.      Correct.  So if you had a
22 conversation with Dr. Perry and you wanted to
23 comment on it, even though it was Dr. Perry's
24 words you could comment on that in your
```

344

```
1  letter?
2         A.      I could.
3         Q.      And in this letter, the second
4  sentence under paragraph one, can you read
5  that into the record?
6         A.      "Upon initial review by the
7  Title IX coordinator and the director of
8  Community Standards it was determined that the
9  conduct alleged would constitute a violation
10 of the St. Joseph's University sexual
11 misconduct policy, policy regarding sexual
12 assault, sexual harassment, sexual
13 exploitation, domestic violence, dating
14 violence, or stalking."
15        Q.      So am I correct -- and correct
16 me if I'm wrong -- you are indicating in that
17 sentence in response to the claim that the
18 complaint did not fit the definition of sexual
19 assault that you believed -- that it was your
20 opinion that it did?
21        A.      Yes.
22        Q.      And you also were indicating
23 that it was the opinion the Title IX
24 coordinator, who was Dr. Mary-Elaine Perry,
```

345

1   that it did as well?
2          A.      Yes.
3          Q.      And then you go on to also
4   indicate that it's the opinion of the
5   investigator, correct?
6          A.      Yes.
7          Q.      What was your basis for
8   concluding that it was the opinion -- never
9   mind.  I see your basis.  You comment on the
10  investigator's report, correct?
11         A.      Yes.
12         Q.      And I think you already told me
13  you didn't have any conversations with
14  Ms. Malloy about her investigation in this
15  matter, correct?
16         A.      Right.
17         Q.      My understanding from Dr.
18  Perry's testimony is that as the Title IX
19  coordinator she's supposed to stay out of the
20  disciplinary process.  Is that your
21  understanding?
22         A.      I don't know what -- "stay out
23  of" is kind of a loaded --
24         Q.      Sure.

346

1          A.      Ultimately, she's responsible
2   for the university's compliance under Title IX
3   and so she does have an interest in ensuring
4   the disciplinary process proceeds
5   appropriately and so in that sense she is in
6   the process, but she's not in the day-to-day
7   weeds of the operations of the disciplinary
8   process.
9          Q.      She doesn't serve as a hearing
10  coordinator -- I mean of a hearing board
11  member, correct?
12         A.      Right.
13         Q.      And she doesn't respond to
14  appeals, correct?
15         A.      Right.
16         Q.      And she doesn't do the
17  investigations and didn't do -- strike that.
18  She didn't do the investigations under the
19  old -- before the SMP, correct?
20         A.      Correct.
21         Q.      And am I correct in assuming
22  that your reference to Dr. Perry's opinion
23  about this was included because you felt it
24  was relevant and appropriate to allude to the

347

1   Title IX coordinator's opinion about the
2   definition?
3          A.      I do, because in the appeal it
4   was raised that, quote, someone in the office
5   of Community Standards made that decision and
6   so I thought it was appropriate to say that by
7   policy it was the Title IX coordinator in
8   consultation with Community Standards about
9   the process and the complaint.
10         Q.      And in that same section, next
11  paragraph, "The breadth of conduct," do you
12  see that?
13         A.      Yes.
14         Q.      Can you read that into the
15  record?  I just want to ask you some questions
16  about it.
17         A.      "The breadth of conduct that is
18  prohibited under the policy was discussed
19  with," redacted, "during his pre-investigation
20  meeting (Appeal Packet, Page 46) on March 6,
21  2018."
22         Q.      And then right beneath that,
23  what appears to be -- is that something that
24  was embedded from the pre-investigation

348

1   meeting checklist?
2          A.      Yes.
3          Q.      And is that a reference to what
4   you're talking about in terms of the breadth
5   of the conduct?
6          A.      Yes.
7          Q.      And what is the breadth of
8   conduct, then, that was referred to?
9          A.      That sexual misconduct can
10  include sexual assault, sexual harassment,
11  domestic violence, dating violence, sexual
12  exploitation, stalking, retaliation, and
13  intimidation.
14         Q.      Why did you believe it was
15  appropriate to investigate this matter as a
16  sexual assault and under the sexual misconduct
17  policy?
18         A.      I don't want to mis-cite the
19  definitions in the sexual misconduct policy,
20  but there is a place regarding nonconsensual
21  sexual contact and it was my estimation that
22  the complaint as alleged should be
23  investigated as potentially nonconsensual
24  sexual contact.

349

1  Q.    And what about the contact was
2  sexual, as far as your understanding of it as
3  alleged?
4  A.    It was in the context of a
5  kissing, sexual encounter. It wasn't -- you
6  know, the same conduct taken outside of that
7  kissing would have made it maybe look
8  differently, but within the context of kissing
9  I absolutely saw it as potentially conduct
10  that was nonconsensual sexual contact.
11  Q.    Did the complainant indicate
12  that the squeezing -- that she believed that
13  squeezing her neck was sexual or sexually
14  aimed?
15  A.    I don't know her specific
16  language, but as I looked at it and I looked
17  at it with Dr. Perry and the definitions in
18  the policy and we determined it to be.
19  Q.    There have been Community
20  Standards violation claims that you and Dr.
21  Perry didn't agree or had a difficult time
22  deciding if they should go under the SMP or
23  not?
24  A.    I would -- not that we have

350

1  disagreed on. I would say -- I would change
2  the word "disagreement" -- or "difficult," I
3  think you said. Some of these are more
4  complex and so they require more of a
5  conversation and looking at the policy
6  definitions.
7  Q.    Is there a general presumption
8  that if it's a close call it goes under the
9  SMP?
10  A.    Yes, but there also has to be
11  conduct implicated under the policy. We are
12  not going to always err on the side of, "Well,
13  we will send it to an investigation," but it
14  has to reach a threshold of conduct that could
15  implicate the policy.
16  Q.    If the conclusion in this case
17  was that the squeezing of the neck was not
18  part of an intimate or sexual act, would it
19  have been investigated under the Community
20  Standards general provisions, outside of the
21  SMP?
22  A.    It's hard to talk in
23  hypothetical, but if it was outside of a
24  sexual encounter I don't see it as initiating

351

1  the sexual misconduct policy.
2  Q.    I understand. If the
3  allegation was that they were talking and the
4  squeezing of the neck occurred but there was
5  no kissing, what policy or policies might that
6  have implicated, if any, under the Office of
7  Community Standards?
8  A.    We certainly have policies and
9  expectations around physical contact, abuse,
10  threatening, endangering others that it could
11  be addressed under.
12  Q.    Would it still have been sent
13  to an outside investigator?
14  A.    No.
15  Q.    Would the -- what's dating
16  violence?
17  A.    I don't -- I'm not going to
18  misspeak the policy. There's a definition in
19  the policy I can reference.
20  Q.    I guess my question is: Do you
21  believe that the conduct as alleged had fallen
22  under the definition of dating violence?
23  A.    Again, without looking at the
24  document -- I don't want to misspeak -- but my

352

1  understanding is dating violence speaks to a
2  preexisting social relationship that I don't
3  believe was present in this matter.
4  Q.    Directing your attention down
5  to paragraph two -- oh, I'm sorry. I forgot
6  to ask you: Are there any limitations on
7  which members of the Community Standards board
8  hear appeals involving cases involving sexual
9  misconduct?
10  A.    No.
11  Q.    All right. Let's move to the
12  next page.
13  MR. PICCERILLI:  585?
14  MR. MIRABELLA:  Yes. Thank
15  you.
16  BY MR. MIRABELLA:
17  Q.    All right. The first full
18  paragraph, can you just read that into the
19  record?
20  A.    Yes. Redacted, "expressed in
21  his appeal that the 'entire process is biased
22  against the accused and in favor of the
23  accuser. I was not allowed to know the
24  details of the claims against me until after I

353

1  was convicted ...'  The process administered
2  was equitable, fundamentally fair, and
3  included equal protections for both the
4  respondent and complainant."
5         Q.        What do you mean by the term
6  "equitable"?
7         A.        At every step in the process,
8  at every engagement with the one student we
9  engaged with the other.  Both students were
10 invited to a pre-investigation meeting.  Both
11 students were invited to share with the
12 investigator, both in the moment and in the
13 time following if they had additional
14 information to share.  Both students were
15 shared the outcome on the same timeline.  So
16 that equitable and equal protections is — are
17 similar.
18        Q.        Was the respondent told that if
19 they want the matter can be referred to law
20 enforcement?
21        A.        Yes.
22        Q.        So the respondent can say, "I
23 don't want to" — "I think this should go to
24 the DA's office" or whatever, not just the

354

1  complainant?
2         A.        Yes.
3         Q.        So the complainant in this case
4  provided certain evidence in the statement,
5  correct?
6         A.        I can't recall specifically.
7         Q.        And you have some training
8  under Title IX, correct?
9         A.        Yes.
10        Q.        And Title IX requires that the
11 investigations be equitable, correct?
12        A.        Yes.
13        Q.        And Title IX also requires that
14 the investigations are fundamentally fair,
15 correct?
16        A.        As I understand it.  I am not
17 sure the exact language that's used.
18        Q.        All right.  The next paragraph
19 says -- can you read that into the record?
20        A.        Yes.  "The Office of Community
21 Standards does not share the details of the
22 complaint with the respondent prior to or
23 during the pre-investigation meeting.  The
24 investigator is better positioned to respond

355

1  to points raised by" redacted "in his appeal
2  regarding the information shared or not shared
3  during the investigation process.  I am unable
4  to respond to these points."
5         Q.        And this is an area you and I
6  have always discussed earlier in the
7  deposition, correct?
8         A.        Yes.
9         Q.        I just want to make sure I am
10 clear on one thing.  Your sentence says the
11 Office of Community Standards — it speaks
12 about prior to or during the pre-investigation
13 meeting that the details are not shared,
14 correct?
15        A.        Correct.
16        Q.        Is it also correct that the
17 details are not shared after the
18 pre-investigation meeting and before the
19 respondent meets with the investigator?
20        A.        Not by the Office of Community
21 Standards.
22        Q.        And the only other source of
23 sharing of that information, if not from
24 Community Standards, would be the

356

1  investigator, correct?
2         A.        Yes.
3         Q.        How long does it take you to
4  prepare a reply like this to an appeal?
5         A.        Couple hours.
6         Q.        And how long does the appeal
7  panel have access to the information they are
8  being asked to decide on?
9         A.        It varies.  At least a few
10 days.
11        Q.        Are they provided with, if you
12 know, the documentation necessary to review
13 for the appeal or is it made available to them
14 online?
15        A.        We use — it's made available
16 to them online in a password-protected form,
17 given the secure nature of the documents,
18 protected nature of the documents.  We also
19 have a printed copy of the documents available
20 during the meeting.
21        Q.        During the actual meeting, when
22 the panel comes together?
23        A.        Yes.
24        Q.        You don't serve as a moderator,

357

```
 1    though, correct?
 2          A.    No.
 3          Q.    Has anyone internally at SJU
 4    ever expressed concern about the appeal
 5    responses being done without notice to the
 6    respondent?
 7          A.    No.
 8          Q.    Do you believe that having the
 9    procedure in place that St. Joe's has for the
10    appeal reply, as we have discussed, that the
11    moderator invites, in any way interferes with
12    an equitable investigation?
13          A.    No.
14          Q.    Has anyone ever raised or
15    talked about changing the process so that the
16    respondent would have an opportunity to
17    respond to the investigator's initial findings
18    before an outcome or a finding of
19    responsibility?
20              MR. PICCERILLI:   Can you repeat
21          that, please?
22              - - -
23              (Whereupon, the court reporter
24          read back from the record.)
```

358

```
 1              - - -
 2              THE WITNESS:   Yes.
 3    BY MR. MIRABELLA:
 4          Q.    When was that raised and by
 5    who?
 6          A.    I recall a privileged
 7    conversation at the invitation of general
 8    counsel to discuss the Q&A in fall of 2017.
 9          Q.    And was anything changed?
10          A.    In terms of?
11          Q.    To change the process so that
12    the respondent would have an opportunity to
13    respond to the investigator's report before an
14    outcome or before it's considered the
15    findings.
16          A.    No.
17          Q.    Do you know why?
18              MR. PICCERILLI:   Wait a minute.
19              MR. MIRABELLA:   Outside of
20          what I -- is there an objection to
21          privilege?
22              MR. PICCERILLI:   Yes, there's
23          an objection on privilege grounds.
24
```

359

```
 1    BY MR. MIRABELLA:
 2          Q.    Outside of what you may have
 3    learned through privilege grounds, do you know
 4    why?
 5          A.    No.
 6          Q.    Do you believe that having the
 7    respondent -- giving the respondent an
 8    opportunity to reply in writing to the
 9    investigator's preliminary findings before
10    there is an outcome or a finding of
11    responsibility would be in any way undermining
12    of the process?
13          A.    No.
14          Q.    Do you believe that it would be
15    beneficial for the investigator in coming to
16    her findings and conclusions and reaching a
17    just outcome?
18              MR. PICCERILLI:   Read that
19          back, please.
20              MR. MIRABELLA:   Do you want me
21          to just rephrase it?   It was too long.
22    BY MR. MIRABELLA:
23          Q.    Do you think it would be a good
24    thing --
```

360

```
 1              MR. PICCERILLI:   Excuse me, if
 2          I may.   If you can just keep your
 3          voice up a little bit, because
 4          sometimes it's hard to hear you.
 5              MR. MIRABELLA:   Really?
 6              MR. PICCERILLI:   Yes.
 7    BY MR. MIRABELLA:
 8          Q.    That question got kind of long
 9    and sideways.   Let me try it again.   Do you
10    believe that -- do you believe or have an
11    opinion as to whether giving the respondent an
12    opportunity to respond to preliminary findings
13    before there is an outcome or a finding of
14    responsibility would be a good thing for the
15    investigative process?
16          A.    You know, I am not the
17    investigator and so I am hesitant to answer in
18    terms of the impact something might have on
19    the investigation.
20          Q.    The conversation that came up,
21    the privileged one, that was before the
22    incident with John Doe, correct?
23          A.    Yes.
24          Q.    And that, I think you
```

361

1    referenced, maybe the Dear Colleague Letter?
2         A.    Yes.
3         Q.    I want to go back to — maybe
4    not. Bear with me here. As part of the
5    sexual misconduct policy investigation is the
6    respondent advised in writing at any point
7    that the meeting with the investigator is, in
8    fact, the equivalent of a hearing?
9         A.    We don't use that language, but
10   in the explanation of what the investigation
11   is we are covering all aspects, that would
12   also have been covered in a hearing. We don't
13   call it a hearing, but it is through its
14   nature a hearing.
15        Q.    What is your understanding --
16   and this is not your direct responsibility,
17   just your understanding as the director of
18   Community Standards as to why Mr. Anderson
19   would -- reviews all the appeals initially, at
20   least for sexual misconduct cases?
21        A.    I can't answer.
22        Q.    Are you aware that he reviews
23   them?
24        A.    I don't know. Like, truly,

362

1    once the matter is concluded at Community
2    Standards it moves to appeal and I respond
3    when asked -- if asked to respond.
4         Q.    In this instance, respondent
5    first was able to get academic -- first was
6    able to arrange with his adviser an
7    opportunity to see the investigative file
8    after the appeal was concluded. Are the
9    respondents notified after the fact, after the
10   outcome of the appeal that there were other
11   individuals who provided responses to the
12   appeal?
13        A.    No.
14        Q.    Mr. Bordak, have you attended
15   any webinars or participated in webinars or
16   seminars or presentations by outside groups --
17        A.    Yes.
18        Q.    — or firms —
19        MR. PICCERILLI:   Hold on a
20   second.
21        THE WITNESS:   I thought he
22   paused.
23   BY MR. MIRABELLA:
24        Q.    Fair enough — involving Title

363

1    IX?
2         A.    Yes.
3         Q.    All right. Can you identify
4    the significant ones? And I don't --
5    significance -- I mean the ones that
6    involved -- that either you got materials at
7    or that you found helpful or maybe you
8    traveled to?
9         A.    Not recently, that I can recall
10   with specificity.
11        Q.    Any in 2018?
12        A.    In February there was a
13   conference that I know I attended. I don't
14   know whether they were specific to that. I
15   get emails every day from the Association of
16   Student Conduct Administration that is kind of
17   conversation about it. So it's not that I am
18   not ever engaging in learning or research on
19   Title IX.
20        Q.    And your responsibilities in
21   the Office of Community Standards are broader
22   than Title IX, correct?
23        A.    Yes.
24        Q.    Have you ever attended any of

364

1    the ATIXA presentations?
2         A.    No.
3         Q.    Do you have any of the ATIXA
4    reference materials or publications in your
5    office?
6         A.    Not that I regularly reference.
7    They may be in a binder on the bookshelf
8    somewhere that I have gotten over the years.
9    So I can't say yes or no.
10        Q.    Fair enough.
11        A.    But it's not desk side that I
12   reference.
13        Q.    This came up and didn't get
14   fully flushed out. What materials do you have
15   in your office about Title IX -- I don't mean
16   today, I mean as of April 30 and before of
17   2018 -- that you might reference from time to
18   time?
19        A.    Not that I reference. I mean,
20   I have a binder and a folder of copies of Dear
21   Colleague Letters or resolution agreements
22   that were read for informational purposes or a
23   privileged setting, but not something that I
24   reference regularly.

365

1        Q.    Any other authorities, authors,
2  speakers in connection with Title IX that you
3  recall being helpful or informative that you
4  have used or watched?
5        A.    Not that I can recall.
6        Q.    You mentioned you took — one
7  of your graduate classes was with Dr.
8  Anderson?
9        A.    Yes.
10       Q.    And there was some discussion
11  of the Title IX in that class?
12       A.    Yes.
13       Q.    The class covered more than
14  simply Title IX, correct?
15       A.    Yes.
16       Q.    I'm sorry.  I don't remember
17  the answer.  Was there any handouts in
18  connection with the Title IX materials?
19       A.    There were not handouts.  There
20  were electronically available PowerPoints that
21  may have had a slide or two on Title IX.  I
22  can't be certain.
23       Q.    And what about the coursebook,
24  anything on Title IX, if there was a

366

1  coursebook?
2       A.    Yes.
3       Q.    What was the name of the
4  coursebook?
5       MR. PICCERILLI:   I'm sorry.
6      What is the — hold on a second.  What
7      is the question that you're answering,
8      whether there was a coursebook or was
9      it whether or not there was Title
10     IX —
11       MR. MIRABELLA:   Al, don't
12      worry. I'm going to ask him.
13  BY MR. MIRABELLA:
14       Q.    Was there a coursebook?
15       A.    Yes.
16       Q.    Did it have anything on Title
17  IX?
18       A.    Yes.
19       MR. PICCERILLI:   Thank you.
20  BY MR. MIRABELLA:
21       Q.    Can you name the coursebook or
22  identify it in some way that will allow me to
23  find it?
24       A.    Yeah.  I mean, I still own it.

367

1  It cost money.  I'm keeping it.  So I do know
2  the name.
3       Q.    Can you tell me?
4       A.    No.  I could find the name.
5       Q.    Would you do me a favor and
6  provide — would you provide the information
7  as to the title of the coursebook to your
8  counsel and also the edition or the copyright
9  edition, so the fifth or the sixth or
10  whatever?
11       A.    Yes.
12       Q.    Thank you.  Is this appeal
13  letter similar in scope — and I understand
14  based on your earlier testimony that when you
15  do the appeal reply its content's driven by
16  issues to implicate your responsibilities in
17  the Office of Community Standards, correct?
18       A.    Yes.
19       Q.    So the scope of the letter
20  would change depending upon what's raised in
21  the appeal?
22       A.    Yes.
23       Q.    As a general matter, is this
24  consistent with the type of letters that you

368

1  prepare in appeal responses?
2       A.    Yes.
3       Q.    Can you just refresh my
4  recollection about your testimony?  Are there
5  ever pre-investigation investigations done in
6  connection with complaints involving sexual
7  misconduct under the new sexual misconduct
8  policy?
9       A.    Can you repeat that?  I don't
10  understand your question.
11       MR. PICCERILLI:   Objection to
12      the form.
13  BY MR. MIRABELLA:
14       Q.    You don't understand my
15  question?  Sure.  In a situation where Dr.
16  Perry receives a complaint that implicates
17  sexual misconduct are there circumstances
18  where your office or the office of — school
19  safety office does an investigation prior to
20  initiating — prior to referring it out to an
21  investigator?
22       A.    Yes.
23       Q.    All right.  What circumstances
24  might prompt that?  And I apologize.  I think

369

1  some of this was covered and I think I know
2  the answers to some of it.
3         A.      In an instance where the
4  complaint is unclear, because maybe the
5  complainant shared with not Dr. Perry but with
6  an RA, and maybe in that moment it's not quite
7  clear what their complaint is, our public
8  safety investigator or, frankly, somebody else
9  in residence life might follow up with a
10 complainant together or Dr. Perry might follow
11 up with the complainant to get more
12 information. We don't really call that an
13 investigation. It's more of a collection of
14 information to determine the procedural route
15 and so in instances where it's not clear and
16 we would benefit from more information.
17        Q.      What if the complainant can't
18 identify with specificity the respondent? And
19 I don't mean, like, has no idea. I mean,
20 like, provides some details, but it can't --
21 it's not perfectly clear that it involves a
22 specific respondent that can be identified by
23 the complainant?
24        A.      There are times when we've gone

370

1  to the outside investigator to investigate
2  those matters when we were -- when the
3  complainant was and, thereby, we were
4  confident that it was likely a student, the
5  investigator would do that investigation, even
6  if at the end of the investigation it was
7  still unable to determine the name or identity
8  of the respondent.
9         Q.      What information is the
10 investigator entitled to other than what is
11 provided directly to the investigator by the
12 witnesses and by your office?
13        A.      They are entitled to what they
14 need and so we really leave it up to them
15 to -- within the scope of their investigation
16 if they find something relevant and wanted
17 that information, they have the ability to
18 request it, and that could be card swipe
19 histories on campus. I know they have asked
20 for a variety of things related, but it's up
21 to them to determine.
22        Q.      To your knowledge, since the
23 SMP has come into effect, the interim SMP, has
24 an investigator asked for any surveillance --

371

1  not surveillance -- video footage of campus
2  security?
3         A.      I can't recall.
4         Q.      What about card swipes?
5         A.      I can't recall with
6  specificity.
7         Q.      Since you've been in the Office
8  of Community Standards do you recall any of
9  the investigations involving sexual misconduct
10 implicating security cameras?
11        A.      I don't know what you mean by
12 "implicating security cameras."
13        Q.      Somebody wanted to see security
14 camera footage of the outside of a building.
15        A.      I can't recall.
16        Q.      Back to some of my earlier
17 questions. If there was security camera
18 footage relevant to the investigation that was
19 requested in a particular investigation, under
20 the StarRez system could you determine that?
21        A.      No.
22        Q.      But you believe if you brought
23 up the whole case you would see that there was
24 a reference to video footage?

372

1         A.      Yes. If within the
2  investigative report there was mention of a
3  video footage, then, yes.
4         Q.      But there is no box in the
5  StarRez system for that type of evidence that
6  gets checked?
7         A.      Right.
8         Q.      Is the complainant ever advised
9  orally that the advisers, any advisers or
10 support person they engage cannot be a
11 witness?
12        A.      Yes.
13        Q.      How is that process handled in
14 general?
15        A.      During the conversation about
16 the advisers during the pre-investigation
17 meeting and it's listed in the policy as a
18 condition of advisers. So during the
19 conversation about advisers that's touched
20 upon.
21        Q.      What about the -- there is --
22 what kind -- strike that. Certain individuals
23 at the school in the Student Outreach Office
24 have specific training to serve as support

373

1  people?
2           A.      Yes.
3           Q.      What is that called and what
4  type of training do they have, to the extent
5  you're familiar with it?
6           A.      I don't know exactly what they
7  are called.  My understanding is that the
8  Student Outreach and Support trains folks
9  across the university as staff members that
10  will reach out to students to ensure that we
11  are being equitable and that we are providing
12  support and resources to both students
13  involved and so if somebody is needed to reach
14  out to the student, really just to avail
15  themselves as a support resource.  It's not a
16  procedural resource.
17          Q.      Understood.
18                  MR. MIRABELLA:   Off the record
19  for a second.
20                  THE VIDEOGRAPHER:   Off the
21  record, 11:23.
22                      _ _ _
23                  (Off the record)
24                      _ _ _

374

1                  THE VIDEOGRAPHER:   We are on
2          the record, 11:32.
3  BY MR. MIRABELLA:
4          Q.      Mr. Bordak, I am going to hand
5  you a couple of pages from the sexual
6  misconduct policy.  It's SJU1180 and 1181.  I
7  want to direct your attention to the
8  definition of sexual assault, specifically,
9  the definition that you were discussing
10  involving nonconsensual sexual conduct.  I
11  think that's Subpart I.  Can you look at that
12  for a moment?  It starts at the bottom of the
13  page and goes onto the next page.  I am going
14  to ask you just to read the first portion from
15  the bottom, the ii at the bottom of the first
16  page and top of the first page into the
17  record, to frame the questions.
18          A.      The entire paragraph here --
19          Q.      No.
20          A.      -- of ii?
21          Q.      Just start and go a sentence at
22  a time.  I don't think we need to read the
23  whole thing, but you can decide that.
24          A.      "For purposes of this policy

375

1  sexual assault also includes nonconsensual
2  sexual contact.  Nonconsensual sexual contact
3  means any sexual touching with any object by a
4  person upon another person without consent or
5  forcing any person to touch you or the
6  individual in a sexual manner.  It is defined
7  as engaging in any sexual contact other than
8  intercourse with another person without that
9  person's consent and/or cognizance.  It
10  includes any nonconsensual sexual contact,
11  including any improper touching of intimate
12  body parts.  It also includes the
13  nonconsensual removal of another's clothing,
14  indecent contact, i.e., the unwanted touching
15  of intimate body parts, including but not
16  limited to genital, buttocks, groin, or
17  breasts or causing another to have indecent
18  contact with those intimate body parts."
19          Q.      Can you zero in on the portion
20  of the definition that you believe is
21  applicable to the allegations of Ms. Roe
22  against Mr. Doe?
23          A.      Where it says "It includes any
24  nonconsensual sexual contact, including any

376

1  improper touching of intimate body parts."
2          Q.      Was it your belief that the
3  touching of Roe's neck was an intimate body
4  part?
5          A.      It was my belief that it was
6  enough of a complaint and suggestion that it
7  was to go to an investigation for the
8  investigator to determine.  So I was not
9  determining the consensual nature.  I was not
10  determining the specifics of sexual contact or
11  intimate body part.  But it was suggested that
12  it was in the complaint enough for there to be
13  an investigation.
14          Q.      There was nothing in
15  the complaint -- strike that.  The complaint
16  did indicate that the touching part, not the
17  application of the force, but that the
18  touching part was consensual, correct?
19          A.      I don't recall specifically.
20          Q.      Assume for purposes of moving
21  this along that there was no indication that
22  it was not consensual that, in fact, the
23  investigator found that it was consensual, the
24  touching.  What part of the complaint did you

377

1  feel triggered the sexual misconduct policy?
2  I guess, to be fair to you, you said based on
3  the complaint, correct?
4       A.   Yes.
5       Q.   And the complaint included an
6  allegation that John Doe had his hand on Jane
7  Roe's neck while they were kissing, correct?
8       A.   Yes.
9       Q.   And is that generally the part
10 of the complaint you're referring to?
11      A.   Yes, but without the full
12 complaint in front of me I don't know if
13 that's exhaustively it.
14      Q.   The full complaint, you're
15 referring to Dr. Perry's complaint that she
16 sent to your office?
17      A.   Yes.
18      Q.   The initial complaint which is
19 Page 3, this is SJU document 0335, and I
20 believe that's what you are referring to as
21 the initial complaint?
22      A.   Yes.
23      Q.   All right.  Can you tell me
24 what in the initial complaint you relied on to

378

1  reach your own conclusion that this implicated
2  the sexual misconduct policy definition of
3  sexual assault?
4       A.   "They began making out, which
5  was fine, then somehow he put his hand on her
6  throat and began squeezing her neck."
7       Q.   And what is that -- how did you
8  interpret that under the definition?
9       A.   I interpreted the making out
10 being a context under which sexual contact can
11 occur.  The definition in the policy says it
12 includes but not -- "unwanted touching of
13 intimate body parts, including but not limited
14 to, genitals, buttocks, groin, or breasts."  I
15 saw in my read that neck could potentially be
16 included as an intimate body part given the
17 context of making out in a sexual situation.
18      Q.   Could the back of somebody's
19 shoulder be an intimate body part under
20 similar circumstances?
21      A.   Potentially, yes.
22      Q.   So if the allegations were that
23 Jane Roe had her -- hypothetically, there is
24 no allegation -- had her fingernails on the

379

1  back of John Doe's shoulder and while they
2  were making out applied force and, you know,
3  broke skin, that could potentially implicate a
4  sexual misconduct violation?
5            MR. CHESNEY:  Object to form.
6            MR. MIRABELLA:  There's no
7       suggestion that happened here.
8            MR. PICCERILLI:  Let me object
9       to the form too.  You can answer.
10           THE WITNESS:  Yes.  Yes.  Given
11      the facts as you presented, yes.
12 BY MR. MIRABELLA:
13      Q.   All right.  Mr. Bordak, I know
14 this has come up at some of the depositions,
15 but it's still not perfectly clear to me.  Who
16 was responsible for hiring and overseeing
17 Ms. Malloy's involvement in the investigation?
18      A.   I was not part of the --
19           MR. PICCERILLI:  Objection.
20 BY MR. MIRABELLA:
21      Q.   At St. Joe's, at SJU.
22           MR. PICCERILLI:  Overseeing the
23      investigation or -- is that what you
24      meant to say?

380

1            MR. MIRABELLA:  Want me to
2       break it down?
3            MR. PICCERILLI:  Sure.
4  BY MR. MIRABELLA:
5       Q.   First off, when there has been
6  an investigation triggered under the sexual
7  misconduct policy who at SJU does Ms. Malloy
8  report to?
9       A.   "Report to" is -- I don't know
10 what you mean by "report to."  For purposes
11 of -- so let me answer this way:  For purposes
12 of the process and a pending investigation,
13 she works directly with me, but I would not
14 say that Liz reports to me.
15      Q.   And if there was an
16 interruption or an issue with the completion
17 of an investigation who at SJU would take
18 responsibility for interfacing with the
19 investigator or the investigator's firm?
20      A.   I don't understand your
21 question.
22      Q.   Sure.  If for some reason,
23 hypothetically, Ms. Malloy started but didn't
24 complete an investigation who at SJU would

381

1    follow up to make certain it got completed?
2        A.    Potentially me, potentially Dr.
3    Perry, as Title IX coordinator.
4        Q.    Who selected, if you know, at
5    SJU Ms. Malloy to perform the investigations?
6        A.    I do not know who selected.
7        Q.    Do you know what her
8    qualifications are?
9        A.    I don't.  I have a copy of her
10   resumé or itemized, but I have no reason to
11   doubt her qualifications, as she's been — the
12   institution has selected her and supported her
13   in the role.
14       Q.    Were you ever asked to assess
15   her qualifications?
16       A.    No.
17       Q.    Or review her resumé or CV
18   prior to her initiating an investigation?
19       A.    No.
20       Q.    Do you know if she's certified
21   as a Title IX investigator?
22       A.    I don't know if that
23   certification exists, so no.
24       Q.    And if it exists, do you know

382

1    if she has it?
2        A.    No.
3            MR. PICCERILLI:   Objection.
4    BY MR. MIRABELLA:
5        Q.    Have you ever heard her speak
6    or give a presentation?
7        A.    No.
8        Q.    Have your met her in person?
9        A.    Yes.
10       Q.    And how often and how long have
11   you known her?
12       A.    I have known her since we
13   started the investigations.  I didn't know her
14   prior to.  And I see her in person when she
15   comes to campus to interview students.  She
16   stops in our office to get a key to the
17   conference room across the hall and often
18   stops in and says hello.
19       Q.    Does she share the progress of
20   an investigation with you during the
21   investigation?
22       A.    Timeline, yes, but not any
23   depth.  She might say, "I anticipate another
24   week" and that's helpful for us to just

383

1    anticipate timing.
2        Q.    All right.  And do you know
3    what the department or what position, whether
4    it be the vice president of student life or
5    someone else, who was responsible for
6    retaining her firm as the outside
7    investigators?
8        A.    I don't know.
9        Q.    Do you know if any other firms
10   or individuals have been retained — I
11   understand Ms. Malloy has changed firms.  Let
12   me ask that a different way.  Are you aware of
13   any other — investigators from any other law
14   firms performing investigations?
15       A.    No.
16       Q.    And have you worked with any of
17   the other investigators at her firm?
18       A.    Yes.
19       Q.    And do you know who they are?
20       A.    Yes.
21       Q.    Can you name them?
22       A.    Andrew Shapren was an
23   investigator, Rose Isard was an investigator,
24   and Andrew Rolfes was an investigator.

384

1        Q.    And have any of those
2    individuals performed investigations in the
3    last two years?
4        A.    Yes.
5        Q.    Who decides which investigator
6    performs which investigation?
7        A.    Ms. Malloy.
8        Q.    Is she considered the point
9    person at her firm for the outside
10   investigators?
11           MR. PICCERILLI:   Objection.
12   BY MR. MIRABELLA:
13       Q.    Or is there a different title?
14           MR. PICCERILLI:   Objection.
15   BY MR. MIRABELLA:
16       Q.    Is she the lead investigator,
17   that's what I want to know?
18           MR. PICCERILLI:   Objection.
19           THE WITNESS:   She is my main
20       liaison.  So I don't know — I feel
21       uncomfortable giving her a title like
22       lead or liaison.  She's the one who I
23       contact and she looks at her
24       availability and the availabilities of

385

1      other investigators as well as
2      conflicts with -- potential conflicts
3      with students and makes the
4      determination on who will be the
5      investigator.
6  BY MR. MIRABELLA:
7      Q.      Have there been any since the
8  SMP has taken place conflicts with students
9  since -- that you're aware?
10     A.      Yes.
11     Q.      Do you know how many times it's
12 happened?
13     A.      There was once.
14     Q.      Was the conflict that the
15 investigator or the student knew each other or
16 something else?
17     A.      The investigator had been an
18 investigator in a matter that involved the
19 student before. So let me clarify. There may
20 have been more than one, as I'm talking.
21     Q.      I was asking you by memory.
22     A.      Yeah.
23     Q.      Sure.
24     A.      But those have come to our

386

1  attention, as we have done this for a few
2  years, the investigator might know some of the
3  parties involved and we have avoided assigning
4  them the investigation.
5      Q.      How did Malloy become familiar
6  with and knowledgeable about the SJU
7  procedures?
8              MR. PICCERILLI:   Objection.
9  BY MR. MIRABELLA:
10     Q.      What is your understanding --
11             MR. PICCERILLI:   Basis.
12 BY MR. MIRABELLA:
13     Q.      What is your understanding of
14 how Malloy was introduced to SJU's process?
15     A.      I don't have an understanding
16 or recollection.
17     Q.      Have you ever served in that
18 role?
19     A.      I have met with Liz on
20 occasion, with Dr. Perry, to talk through,
21 kind of, the procedures and the policy, but I
22 wasn't -- I don't recall being a part of the
23 initial training. Again, this is a few years
24 ago. I can't remember.

387

1      Q.      I was going to say. The
2  meeting you do remember, when was that, toward
3  the beginning of the new process or more
4  recently?
5      A.      So I know we had a meeting in,
6  I think, last summer and it was typical, sort
7  of "Let's talk about the year." That's the
8  last time I recall having quote, unquote
9  training conversation.
10     Q.      Do you recall what subjects
11 were covered at that meeting?
12     A.      I can't recall with specifics.
13     Q.      Were there any discussions, if
14 not specifically generally, about changing the
15 process in any way?
16     A.      Not that I can recall.
17     Q.      Was Ms. Malloy involved as the
18 investigator for the sports team?
19     A.      Yes.
20     Q.      That investigation ended up in
21 both an SMP model and a Community Standards
22 model, correct?
23     A.      Yes.
24     Q.      Has that ever happened before?

388

1      A.      Yes.
2      Q.      How often, do you know?
3      A.      Not often.
4              MR. PICCERILLI:   Hold on one
5  second. Let's go off the video,
6  please.
7              THE VIDEOGRAPHER:   Off the
8  record, 11:44.
9                  _ _ _
10             (Off the record)
11                 _ _ _
12             THE VIDEOGRAPHER:   We are on
13 the record, 11:46.
14 BY MR. MIRABELLA:
15     Q.      Mr. Bordak, was Ms. Malloy the
16 investigator in the situation involving one of
17 SJU's sports teams?
18     A.      Yes.
19     Q.      And I asked you about dual --
20 in situations where there was a process under
21 the SMP and through Community Standards and
22 you said there has been other occasions,
23 correct?
24     A.      Yes.

389

1        Q.        Were the other occasions before
2   or after -- had to be after the SMP was
3   instituted, correct?
4        A.        Yes.
5        Q.        And you mentioned at least one
6   and you said there could have been others.
7   You're not sure?
8        A.        Yes.
9        Q.        Can that be checked in the
10  StarRez system?
11       A.        Yes.
12       Q.        In this instance you were
13  directly involved in the Community Standards
14  violations investigations?
15       A.        Yes.
16       Q.        And what was your involvement?
17  I know there has been some testimony.  I want
18  to try to move this along.
19       A.        My involvement was the
20  administrative hearing officer for the conduct
21  that was in the complaint that did not meet
22  the definition of conduct prohibited by the
23  SMP.  So I was not -- we were not looking at
24  the same conduct.  I was looking at the

390

1   nonsexual misconduct policy complaints.
2        Q.        And there was both claims
3   asserted -- investigated against the team as a
4   whole, correct?
5        A.        Yes.
6        Q.        And against at least two
7   individuals on the team?
8        A.        Yes.
9        Q.        And in that process were the
10  two individuals provided with written notice
11  of the violations and claims asserted against
12  them that were not part of the SMP?
13       MR. PICCERILLI:    You mean the
14       claims were not SMP claims?
15  BY MR. MIRABELLA:
16       Q.        The non-SMP part of the claims
17  that fell within their purview.
18       A.        They were given notice of the
19  violations of the code that they are alleged
20  to have violated.
21       Q.        How were they provided that?
22       A.        In written notice.
23       Q.        Did that written notice include
24  the specific factual allegations?

391

1        A.        No.
2        Q.        Did it include the specific
3   provisions of the Community Standards conduct
4   code?
5        A.        Yes.
6        Q.        Were they advised that they are
7   entitled to access to evidence of the
8   violation [sic] of those claims against them
9   prior to any hearing?
10       A.        I can't recall specifically,
11  but it would have been our process to do that,
12  yes.
13       Q.        And did hearings take place in
14  connection with those claims?
15       A.        Yes.
16       Q.        Do you know how many?
17       A.        I don't recall.
18       Q.        Were you the hearing officer
19  for all the hearings?
20       A.        Yes.
21       Q.        How are the hearings
22  memorialized or documented when they occur?
23       A.        We don't have a transcript.
24  They are not recorded and so the documents and

392

1   the student's file is the memorializing of the
2   hearing.
3        Q.        All right.  And is it
4   reasonable to conclude there were at least two
5   hearings?
6        A.        Yes.
7        Q.        And do you know if there was
8   any witnesses who provided testimony other
9   than the respondents?
10       A.        As I recall, yes.
11       Q.        All right.  And am I correct
12  that, as to the individual students, there was
13  a finding of not responsibility for both of
14  them?
15       A.        I can't recall specifics.
16       Q.        But that can be determined?
17       A.        Yes.
18       Q.        And that would be in StarRez?
19       A.        Yes.
20       Q.        Do you recall anything about
21  the other situation involving a dual process,
22  where there was SMP and non-SMP violations?
23       A.        Yes.
24       Q.        Without identifying the student

393

1 involved can you describe the specifics or a
2 little more about the case?
3        A.      Yes. There was two matters
4 that I recall now. One was a sexual
5 misconduct policy complaint by a respondent
6 who at the time was banned from campus for a
7 previous and pending matter and that
8 respondent was under the influence of drugs at
9 the time and so we addressed — I addressed
10 the drug policy and the violation of that ban
11 separate from the sexual misconduct complaint
12 that was investigated.
13        Q.      That's after 2015, or January?
14        A.      Yes.
15        Q.      Was that — with respect to the
16 allegations, that person for the non-SMP
17 violations received a Notice of Process
18 Letter, right?
19        A.      Yes.
20        Q.      Were the specific code
21 violations described or identified in the
22 letter?
23        A.      The violations were listed.
24        Q.      Were any of the factual

394

1 allegations listed?
2        A.      No.
3        Q.      And the same question, was that
4 individual advised or would have been advised
5 that they were entitled to see the specific
6 evidence against them prior to any
7 administrative hearing?
8        A.      Yes.
9        Q.      Do you know if that individual,
10 in fact, did review the evidence?
11        A.      I don't recall that he did.
12        Q.      In those situations where the
13 student does review the evidence prior to a
14 hearing, how is that arranged and what's the
15 process for it?
16        A.      They can contact Community
17 Standards and we can schedule a time for them
18 to review the documents.
19        Q.      Are the same limitations —
20 similar limitations placed on them in terms
21 of, can they copy the documents?
22        A.      No.
23        Q.      Can they photograph the
24 documents?

395

1        A.      No.
2        Q.      Can they take notes of their
3 review?
4        A.      Yes.
5        Q.      And can their adviser, if they
6 have one, see those documents?
7        A.      No.
8        Q.      Is anyone else entitled to see
9 those documents besides the complainant and
10 the respondent in that situation?
11        A.      And university staff who have a
12 need to see them, no.
13        Q.      It seemed as though, based on
14 the documentation produced, that Ms. Malloy's
15 investigation of the sports team athletes was
16 done individually, as separate investigations.
17 Was your investigation done the same way,
18 separately, or was your matter handled under
19 the non-SMP, separately or collectively?
20        A.      Separate hearings, but,
21 obviously, a simultaneous collection of
22 information, right, because a conversation
23 with one was about the same complaint as
24 others and so they were separate matters.

396

1        Q.      Is there any advantage to
2 whether they're channeled separately or
3 collectively to the institution in terms of
4 being thorough?
5        A.      Well, for the students. The
6 students have their own individual processes.
7 It's inappropriate to lump students together
8 in the same hearing at the same time.
9        Q.      All right. There was slide
10 shows presented to the students at the
11 beginning of the year that you're aware of
12 about sexual misconduct, through your office
13 or in conjunction with your office?
14        A.      So beginning of the year — we
15 do something in the summer during orientation.
16 Is that what you're referencing?
17        Q.      Yes.
18        A.      Okay. I just wanted to be
19 clear. Yes, I'm aware.
20        Q.      And the slide show talks about,
21 amongst other things, the definition of sexual
22 assault, correct?
23        A.      As I recall, yes.
24        Q.      Have you changed that or is the

397

1  slide show still being utilized?
2          MR. PICCERILLI:  Changed from
3  when?
4          MR. MIRABELLA:  From when
5  Mr. Doe would have seen it.
6          THE WITNESS:  I don't know.  I
7  am not responsible for that.
8  BY MR. MIRABELLA:
9      Q.      This past year did you see it
10 when it was presented?
11     A.      This summer?
12     Q.      Yes.
13     A.      No.
14     Q.      Did you see it -- have you ever
15 seen it presented?
16     A.      This summer?
17     Q.      No, or prior summers.
18     A.      Prior summers, yes.
19     Q.      Is it your belief that claims
20 of sexual assault or sexual misconduct,
21 generally speaking, are underreported?
22     A.      It is.
23     Q.      Is it your belief that that
24 holds true on the SJU campus as well?

398

1      A.      I have no reason to think that
2  a national trend wouldn't also speak to our
3  campus, no.
4      Q.      So, as to generally, you don't
5  dispute it, but you don't believe that
6  necessarily holds true on SJU's campus?
7      A.      I do think it holds true on our
8  campus.  I have no reason to think that the
9  national trend would be different on our
10 campus.
11     Q.      Did you have any involvement in
12 the grant application?
13         MR. PICCERILLI:  Which grant
14     are we referring to?
15         MR. MIRABELLA:  The $300,000
16     grant.
17         THE WITNESS:  I was not part of
18     the writing group.  I provided
19     information when requested by that
20     writing group specific to Community
21     Standards.
22 BY MR. MIRABELLA:
23     Q.      Is there any way under the
24 StarRez system to determine whether the

399

1  complainant or respondent holds any special
2  student leadership positions?
3      A.      Not all leadership positions.
4  We only record select positions within our
5  system.
6      Q.      Which ones are the ones that
7  are recorded?
8      A.      We record athletes and we
9  record Greek life, because we want to be able
10 to engage those campus partners should
11 something come up with those students.  But we
12 don't -- it's not used as a warehouse for
13 involvements across campus, so I wouldn't be
14 able to --
15     Q.      How does one fall in or outside
16 the athlete category, for example, if they are
17 on an athletic team?
18     A.      Right.
19     Q.      What about -- what are the
20 student orientation leaders referred to?  Are
21 they red shirts or something?
22     A.      Red shirts.
23     Q.      Is that information noted in
24 the StarRez system?

400

1      A.      It is, yes.
2      Q.      How is it input?
3      A.      Manual.
4      Q.      So you could run a query as to
5  whether a complainant or respondent was a red
6  shirt?
7      A.      Yes.
8      Q.      What is a red shirt?
9      A.      Orientation leaders.  They are
10 students who facilitate small groups, lead
11 small groups during our summer orientation
12 program.
13     Q.      And has that input information
14 been the case since the StarRez system
15 started?
16     A.      I can't answer that.
17     Q.      But it is as far as your
18 familiarity with it and use of it in the past
19 years, yes?
20     A.      Yes.
21     Q.      All right.  I want to ask you
22 very briefly, because we are tight on time,
23 about the Q&A that came out along with the
24 Dear Colleague Letter in 2017.

401

1      MR. MIRABELLA:  Let's go off
2  the video.
3      THE VIDEOGRAPHER:  Off the
4  video, 11:57.
5
6      (Whereupon, Exhibits Bordak-8
7  and Bordak-9 were marked for purposes
8  of identification.)
9
10     THE VIDEOGRAPHER:  We are on
11  the record, 11:58.
12  BY MR. MIRABELLA:
13     Q.     Mr. Bordak, I want to ask you
14  some questions about the Dear Colleague Letter
15  issued in 2017 marked as Exhibit-8 or -- I'm
16  sorry -- 9 and then the question and answers
17  is 8.  Let me indicate to you that -- we are a
18  little pressed for time -- and I see that the
19  Q&A has writing on it on Page 4.  If counsel
20  objects, we can try to find a clean one, but I
21  can put on the record right now that you have
22  not written on it, you have not circled it or
23  underlined it, and I would like to proceed
24  with the questioning.

402

1      MR. PICCERILLI:  I have no
2  problem with that.
3  BY MR. MIRABELLA:
4      Q.     And, just to keep things clear
5  for the record and for the exhibits, I will
6  not ask you to write on this document.  So we
7  can say right now that any of the handwritten
8  lines or anything else were not yours,
9  correct?
10     A.     Yes.
11     Q.     All right.  Other than in the
12  meeting with counsel, did you have any
13  independent knowledge of the issuance of the
14  Dear Colleague Letter which is Exhibit-9 when
15  it came out in 2017?
16     A.     Yes.
17     Q.     How were you familiar with it
18  and what is your understanding of its purpose?
19     A.     So when it came out, I am on
20  the email listservs and distribution lists and
21  professional associations that, of course,
22  shared "This is pending" and "This has been
23  released" and my recollection is shortly
24  thereafter general counsel called a privileged

403

1  meeting to discuss.  My understanding, even
2  separate from that privileged conversation, is
3  that these are guidance documents, not meant
4  to replace or purport to be law, but documents
5  that institutions can look at for guidance.
6      Q.     All right.  I am going to
7  direct -- did, in fact, you review Exhibit-9,
8  the Dear Colleague Letter, when it came out?
9      A.     I did.
10     Q.     Is there anything in the letter
11  that stood out to you as being consistent with
12  your understanding of what would constitute a
13  fair and equitable investigation?
14     A.     No.
15     Q.     Let's go to the Q&As, which is
16  Exhibit-8, specifically, Question 6, "What
17  constitutes an equitable investigation?" the
18  bottom of Page 3.  Do you see that?
19     A.     Yes.
20     Q.     I am going to ask you some
21  questions about information in the document.
22  I am going to try to do it in a way that makes
23  it easy for you to answer or disagree or
24  agree.  So the body of Page 4 is the answer

404

1  section to what is posed on Page 3, "What
2  constitutes an equitable investigation?"  I am
3  going to direct your attention to the fourth
4  full paragraph.  Do you see that?
5      A.     Yes.
6      Q.     All right.  And it talks about
7  a number of things.  Let me ask you, do you
8  agree that "For an investigation to be
9  equitable the school should provide written
10  notice to the responding party of the
11  allegations constituting a potential violation
12  of the school sexual misconduct policy,
13  including sufficient details and with
14  sufficient time to prepare a response before
15  any initial interview"?  Did I read it
16  correctly?
17     A.     You did.  What was the start of
18  your sentence?
19     Q.     Sure.  Do you agree that in an
20  equitable investigation a school should
21  provide written notice and then the remainder
22  of the sentence?
23     A.     I think it's possible to
24  provide an equitable investigation without

405

1 sharing the specifics of the conduct on the
2 onset.
3         Q.      Sure.  Did St. Joe's provide
4 John Doe written notice of the allegations
5 constituting a potential violation of the
6 school's misconduct policy and including
7 sufficient details and with sufficient time to
8 prepare a response before any initial
9 interview?
10        A.      Yes.
11        Q.      What was that written notice?
12        A.      So, I provided in the
13 pre-investigation notice a piece that was —
14 there was conduct that was alleged to have
15 taken place that would fall under the sexual
16 misconduct policy and that is an allegation
17 constituting a potential violation.  There is
18 enough details there that the complainant's
19 name is on there, the time, the location, so
20 the respondent knows what matter we are
21 talking about.  And the sufficient time to
22 prepare, the investigation isn't right away,
23 there is a time between the pre-investigation
24 notice and the investigation.

406

1         Q.      The written notice is the
2 Notice of Process Letter?
3         A.      The written notice is, yes.
4         Q.      The Notice of Process Letter?
5         A.      Yes.
6         Q.      All right.  And is it your
7 belief and position that it includes
8 sufficient details with sufficient time to the
9 respondent to prepare a response before an
10 initial interview?
11        A.      At that point in the process,
12 yes.  We do not provide exhaustive accounts of
13 what's being complained, so as not to
14 compromise the investigation.  So at that
15 point our written notice is, in my estimation
16 and in my view, does include sufficient
17 details with a sufficient amount of time to
18 prepare.
19        Q.      Now, the next sentence defines
20 and it expands on what is sufficient details
21 in the Q&A.  It says, "Sufficient details
22 include the identities of the parties" — and
23 that's in your notice letter, correct?
24        A.      Yes.

407

1         Q.      — "the specific section of the
2 code of conduct allegedly violated" — that's
3 not in your letter, correct?
4         A.      I disagree.  It is.
5         Q.      I'm sorry.  Where is it in your
6 letter, the specific —
7         A.      The specific code is the
8 violation of the sexual misconduct policy.
9 That is a code.  So if we were to send a
10 letter that says, "You're in violation of the
11 Community Standards" that would not be a
12 specific code.
13        Q.      I'm sorry.  So the specific
14 section of the code you believe is adequately
15 captured by the information in your notice
16 letter, correct?
17        A.      Yes, the section of the code of
18 conduct is, the sexual misconduct policy, as
19 opposed to the alcohol policy or the drug
20 policy or littering.  Right.  We specifically
21 say the section of the code being
22 the sexual misconduct policy.
23        Q.      I thought the sexual misconduct
24 policy was its own policy with subdivisions?

408

1         A.      The section of — the code of
2 conduct includes many policies, one of which
3 is the sexual misconduct policy.  So the
4 section of the code of conduct is the sexual
5 misconduct policy.
6         Q.      All right.  The 50 or so page
7 policy you talked about earlier?
8         A.      Is the section of the code of
9 conduct.  The code of conduct includes all of
10 our policies.
11        Q.      It goes on in the Q&A to say,
12 "The precise conduct allegedly constituting
13 the potential violation."  Was that included
14 in your notice letter?
15        A.      No.
16        Q.      Is that included in the
17 pre-investigation meeting checklist letter?
18        A.      No.
19        Q.      Is that ever provided in
20 writing to the respondent?
21        A.      No.
22        Q.      Date and location of the
23 incident, that's in the notice letter,
24 correct?

409

1      A.      Yes.
2      Q.      It goes on to state, "The
3  investigation" — and I am skipping a few
4  sentences, so follow with me, a few sentences
5  down. "The investigation should result in a
6  written report summarizing the relevant
7  exculpatory and inculpatory evidence" and then
8  it says, "The reporting and responding parties
9  and appropriate officials must have timely and
10 equal access to any information that will be
11 used during the informal and disciplinary
12 meetings and hearings." Do you see that?
13     A.      Yes.
14     Q.      Do you believe the school
15 accomplished that here?
16     A.      Yes.
17     Q.      All right. Now, the next page
18 it says, "What procedures" -- on Question 8 --
19 "should a school follow to adjudicate a
20 finding of responsibility for sexual
21 misconduct?" Do you see that?
22     A.      Yes.
23     Q.      And do you see the answer
24 section?

410

1      A.      Yes.
2      Q.      I'm going to direct your
3  attention to the second paragraph. Can you
4  read that into the record?
5      A.      "The decision makers must offer
6  each party the same meaningful access to any
7  information that will be used during informal
8  or formal disciplinary meetings and hearings,
9  including the investigation report."
10     Q.      All right. Was that done here?
11     A.      Meaningful access to the
12 information that will be used, yes.
13     Q.      Were they provided access to
14 the investigation report before —
15     A.      No.
16     Q.      They were not?
17     A.      No.
18     Q.      And then it says, the next
19 sentence, "The parties should have an
20 opportunity to respond to the report in
21 writing in advance of the decision of
22 responsibility or," I guess, "in advance to a
23 live hearing to decide responsibility." Was
24 that done here?

411

1      A.      No. And this is a guidance —
2  I feel strongly that we were compliance with
3  our obligations under Title IX. This is a
4  guidance document and when this came out I
5  recall that there were no changes that were
6  needed to our policy to be -- to remain in
7  compliance. And, in fact, the investigative
8  model is supported in these documents as
9  something that is an appropriate model.
10     Q.      In all due respect, the
11 investigative model that's used by SJU.
12     A.      I disagree with --
13     Q.      In fact, it's normally known to
14 investigators and normally the respondent has
15 an opportunity, as does the complainant, to
16 see preliminary findings and respond in
17 writing and they don't in your case, correct?
18          MR. PICCERILLI:  Hold on for a
19          second. Hold on. I am going to
20          object to that. That wasn't a
21          question. That was a speech. I am
22          objecting to any questions that you —
23          any answers that you may have given, I
24          ask that they be stricken.

412

1          MR. MIRABELLA:  All right. I
2          object to any motion to strike any
3          part of the answer.
4  BY MR. MIRABELLA:
5      Q.      Was John Doe ever given the
6  photographs that were provided to Malloy prior
7  to meeting with Malloy?
8      A.      No.
9      Q.      Was John Doe ever given the
10 complaint that Perry prepared in response to
11 her interview with Roe prior to meeting with
12 Malloy?
13     A.      No.
14     Q.      Was John Doe ever given any
15 text messages or information that Roe provided
16 to Malloy when she met with her, before
17 meeting with Malloy?
18     A.      No.
19     Q.      So that's all information that
20 Roe had access to that Doe did not have access
21 to at the time of his meeting with Malloy,
22 correct?
23     A.      I mean, I can't recall all of
24 those questions prior to. If they all came

413

```
1    from Roe, then yes.  If they — that would
2    stand to reason they came from Roe.
3         Q.      Then Doe did not have access to
4    them prior to his meeting with Malloy?
5         A.      Prior to?
6         Q.      Correct.
7         A.      Yes.
8         Q.      And there is nothing in
9    Malloy's findings to indicate that she shared
10   any of that evidence or documentation with
11   Doe, correct?
12            MR. PICCERILLI:   Objection to
13        form.
14            THE WITNESS:   Again, I don't --
15        even though we just looked at, like, I
16        did read — I didn't read through for
17        specificity.
18   BY MR. MIRABELLA:
19        Q.      How about this, if she doesn't
20   say she showed it to him, would you agree,
21   then, that there is no evidence in writing
22   that she showed it to him?
23            MR. PICCERILLI:   Objection.
24        Calls for speculation.
```

414

```
1    BY MR. MIRABELLA:
2         Q.      All right.  Well, go back to
3    the exhibit.  Take a look and let me know if
4    there is any indication that Malloy shared any
5    of that information, that specific information
6    with Doe.
7         A.      Well, it's not in the
8    investigative report, but I can't speak to --
9    it would be speculative if it happened outside
10   of that report.  So I can't answer whether or
11   not she shared specific information, yes or
12   no.
13        Q.      Didn't you read her appeal
14   review?
15        A.      I am not her.  So my only
16   estimations would be based on the information
17   that she provided.  So even if I reference her
18   appeal review I would be saying, "In her
19   appeal review she says this."
20            MR. MIRABELLA:   All right.
21        Let's go off the video.  I think we're
22        about done.  I just want to take a
23        look at my notes.
24            THE VIDEOGRAPHER:   Off the
```

415

```
1        record, 12:09.
2            _  _  _
3            (Off the record)
4            _  _  _
5            THE VIDEOGRAPHER:   On the
6        record, 12:12.
7    BY MR. MIRABELLA:
8         Q.      Mr. Bordak, what resources and
9    who do you consult with to determine the
10   appropriate sanctions?
11        A.      I consult with my supervisor in
12   terms of -- ultimately, it's the sanctioning
13   officer's decision on the sanction, but there
14   is value in verbally processing a situation
15   and so I have at times talked with my
16   supervisor about those sanctions.  I've shared
17   those sanctions with the Title IX coordinator,
18   but it's not to seek permission or
19   endorsement.  Really, it's to say "Here's what
20   the sanctions are," yeah.
21        Q.      In this instance the finding
22   was responsibility for sexual assault, but the
23   sanction — one of the sanctions and the
24   principal sanction was probation, not
```

416

```
1    separation from the school, correct?
2         A.      Yes.
3         Q.      What was your reasoning behind
4    that?
5         A.      There were elements of the
6    investigative report that was — I treated --
7    so we have factors in sanctioning that are
8    outlined within the policy and one of those
9    factors and, actually, the predominant factor
10   is egregiousness of the violation.  And so
11   there were pieces of the investigative report
12   that mitigated that egregiousness for me, one
13   of which that I do recall specifically was
14   mention of the intention, that it was not the
15   intention of the respondent to engage in the
16   conduct or have the bruising resulting.  And
17   so that was really important for me.  We are
18   not trying to ruin lives.  We are not trying
19   to remove students from our campus community.
20   What we are doing is holding students
21   accountable for our shared expectations, our
22   policies, and if we can do that and hold
23   students accountable without separating from
24   the campus that's -- that's what we did here.
```

417

1         Q.      Was it your finding as part of
2 the sanctioning process that there was no
3 intention to commit the act or something else?
4         A.      There is a specific line
5 that -- I am not recalling the specific
6 wording -- within the investigative report,
7 where Ms. Malloy did indicate intention -- or
8 lack of intention and so I did treat that as a
9 mitigating factor of the egregiousness, that
10 what could have been a separation from the
11 university was not.
12         Q.      You said there's factors in the
13 policy?
14         A.      Yes.
15         Q.      What policy?
16         A.      In the sexual misconduct
17 policy.
18         Q.      Is there any other policy that
19 you consulted with in connection with the
20 sanctioning?
21         A.      No.
22         Q.      Or any other policy at the
23 school that exists that people could consult
24 with in terms of sanctioning?

418

1         A.      No.
2         Q.      Do you recall speaking to Doe's
3 mother on telephone?
4         A.      Yes.
5         Q.      Do you recall how you described
6 the incident to her?
7         A.      I don't.
8         Q.      Did you ever use the word -- do
9 you know if you used the term "rough kissing"?
10         A.      I don't recall.
11         Q.      Did you believe that what
12 occurred here was rough kissing?
13         A.      I don't know how I would
14 categorize it.
15         Q.      How many times -- you spoke to
16 Roe's [sic] mother at least once?
17         A.      Roe's mother?
18         Q.      I'm sorry.  Doe's mother.  My
19 apology.
20         A.      Doe's mother once, at least
21 once, correct.
22         Q.      And do you remember anything
23 about the conversation?
24         A.      Not with specificity.  I do

419

1 recall -- the purpose of the conversation was
2 a confirmation of parental notification.
3         Q.      Who called who, though?  I'm
4 sorry.  I interrupted your answer.
5         A.      As I recall, it was a bit of
6 phone tag over the course of an afternoon and
7 I recall calling Doe's mother later that
8 evening from home after work to ensure that
9 there was notice that night.
10         Q.      So she may have called you
11 during the day, but you are not certain?
12         A.      No, she did.  And it was phone
13 tag.  It was left messages.
14         Q.      And you don't know if you would
15 have described the incident to Doe's mother as
16 very rough kissing or rough kissing?
17         A.      I don't recall the specific
18 language used.
19         Q.      So you may have, you may not
20 have?  You just don't remember?
21         A.      Yes.
22         Q.      Did you ever raise your voice
23 to Doe's mother?
24         A.      No.

420

1         Q.      Was the conversation polite and
2 respectful --
3         A.      I think so.
4         Q.      -- on both ends?
5         A.      I think so.  I understood.
6 There was a frustration with me not being able
7 to share specific information and me not being
8 able to share the documents with Doe's mother.
9 And so I would consider it respectful on both
10 sides, but there was a palpable kind of
11 tension around the outcome.
12         Q.      And do you recall any other
13 communications either with Doe or with Doe's
14 mother about the case or the investigation?
15 I'm sorry.  I just brought in Doe.  Let me ask
16 you the question.  I withdraw that question.
17         MR. PICCERILLI:    You may.
18 BY MR. MIRABELLA:
19         Q.      When you -- you were present at
20 the outcome hearing, correct?
21         A.      Yes.
22         Q.      All right.  And what did you
23 advise Doe as to the implications of the
24 sanctions?

421

1        MR. PICCERILLI:  I just want to
2    object to the form of the question.  I
3    don't know that it's an outcome
4    hearing as such.
5        MR. MIRABELLA:  Objection
6    accepted.
7        THE WITNESS:  I don't recall
8    specifically.  We would have gone over
9    the outcome letter from start to
10   finish and provided an opportunity for
11   Doe to review the investigative
12   report.  I don't recall specific
13   conversations.  But, again, we would
14   have gone over each piece of that
15   outcome letter, including the
16   sanctions.
17   BY MR. MIRABELLA:
18       Q.      Did Doe ask about his
19   eligibility -- continuing eligibility to go
20   with his class to Ireland?
21       A.      I don't recall.
22       Q.      So he may have, he may not
23   have?  You just don't remember?
24       A.      Correct.

422

1        Q.      If it came up, do you know what
2    you might have -- what the school's policy was
3    that you might have informed him of?
4        MR. PICCERILLI:  Objection.
5        THE WITNESS:  I would have
6    advised him that the Center for
7    National Programs would be the office
8    to contact if he had concerns about
9    his traveling, that that was not a
10   decision that I made.
11   BY MR. MIRABELLA:
12       Q.      Were you involved in that
13   decision?
14       A.      Insofar as sharing the change
15   in status with International Programs, yes.
16       Q.      And just briefly, what was the
17   change in status?
18       A.      From not on disciplinary
19   probation to on disciplinary probation.
20       Q.      When that information was
21   conveyed a disciplinary report involving
22   drinking was also provided to that office,
23   correct?
24       A.      It was a full disclosure of

423

1    history.
2        Q.      Why was that relevant at that
3    time?
4        A.      We do a full disclosure of the
5    history because of the status change with the
6    student.
7        Q.      But if he's not on probation --
8    if that had been the only disciplinary issue
9    in his record he would not -- he was not on
10   probation when this happened, correct?
11       A.      Correct.
12       Q.      And so would that have affected
13   his eligibility to go on the trip?
14       A.      I felt like the full disclosure
15   was within an educational need to know to the
16   director of the Center for National Programs.
17       Q.      Did you have an opinion or a
18   feeling as to whether or not you believed, as
19   the director of Community Standards, it was
20   appropriate for him to go or not go on the
21   trip?
22       A.      I don't have an opinion on this
23   matter, on that.
24       Q.      So that office would have made

424

1    the decision and you would have been fine with
2    whatever decision they made?
3        A.      Yes.
4        MR. MIRABELLA:  No further
5    questions.
6        MR. CHESNEY:  One
7    clarification.  I believe in your last
8    questions you may have said "Roe" and
9    not "Doe" one or two times.  I just
10   want to make sure, were all the
11   questions you made about Doe -- I
12   think you said Roe's mother, at least
13   at one point.
14       MR. MIRABELLA:  Thank you for
15   mentioning that.
16   BY MR. MIRABELLA:
17       Q.      Mr. Bordak, I asked you a
18   series of questions about the end of the
19   process involving Doe's mother, Doe himself,
20   and related questions.  If I inadvertently
21   said "Roe," I meant "Doe" and I think you
22   understood that to be the case as well, right?
23       A.      Yes.
24       MR. CHESNEY:  I just wanted to

425

1  be clear.  Thank you.
2       MR. PICCERILLI:   Perfectly fine
3  by me.
4            MR. MIRABELLA:   Then we are
5  going to attach as exhibits the —
6  whatever the next sequential numbers
7  are.  The definition section of the
8  sexual misconduct policy involving
9  nonconsensual sexual contact will be
10  the next exhibit and then the final
11  exhibit will be the — I believe
12  that's the Roe -- the Perry
13  documentation of the Roe complaint and
14  that's SJU, so we are clear on the
15  record, 0335.
16       MR. PICCERILLI:   I think -- are
17  we on the video record?  I think we
18  should go off the video record.
19       THE VIDEOGRAPHER:   This
20  completes the videotape deposition of
21  William Bordak.  We are now going off
22  the record at 12:20.
23            – – –
24       (Off the video record)

426

1            – – –
2       MR. MIRABELLA:   We were just
3  identifying some of the documents that
4  were used and we are going to mark
5  them as exhibits.  Exhibit-2, which
6  was used, it's the Division of Student
7  Life Summary Report, 2016 and '17.
8  Instead of attaching the entire
9  document we are just going to attach
10  as an exhibit the cover page and Page
11  4 of that document as an exhibit.
12  With respect to the definition of
13  sexual assault contained in the SJU
14  sexual misconduct policy, that's
15  SJU001180, that was referenced, and
16  1181, it's going to be attached as
17  Bordak-10.  And the report prepared by
18  Dr. Perry from Roe is going to be
19  Bordak-11 and that's SJU0335.  I think
20  that's it.
21       MR. PICCERILLI:   Agreed.
22            – – –
23       (Whereupon, Exhibits Bordak-10
24  and Bordak-11 were marked for purposes

427

1  of identification.)
2            – – –
3       (Deposition concluded.  Time
4  noted, 12:21 p.m.)
5            – – –
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

428

1          C E R T I F I C A T E
2               - - -
3
4       I do hereby certify that I am a
5  Notary Public in good standing, that
6  the aforesaid testimony was taken
7  before me, pursuant to notice, at the
8  time and place indicated; that said
9  deponent was by me duly sworn to tell
10  the truth, the whole truth, and
11  nothing but the truth; that the
12  testimony of said deponent was
13  correctly recorded in machine
14  shorthand by me and thereafter
15  transcribed under my supervision with
16  computer-aided transcription; that the
17  deposition is a true and correct
18  record of the testimony given by the
19  witness; and that I am neither of
20  counsel nor kin to any party in said
21  action, nor interested in the outcome
22  thereof.
23       WITNESS my hand and official
24  seal this day of July 2018.

           <%signature%>

           ---------------

                   Kimberly A. Wornczyk
           Notary Public

429

430

| | | |
|---|---|---|
| 1 | --- | |
| 2 | INSTRUCTIONS TO WITNESS | |
| 3 | --- | |
| 4 | | |
| 5 | Please read your deposition over | |
| 6 | carefully and make any necessary corrections. | |
| 7 | You should state the reason in the appropriate | |
| 8 | space on the errata sheet for any corrections | |
| 9 | that are made. | |
| 10 | After doing so, please sign the | |
| 11 | errata sheet and date it. | |
| 12 | You are signing same subject to the | |
| 13 | changes you have noted on the errata sheet, | |
| 14 | which will be attached to your deposition. | |
| 15 | It is imperative that you return the | |
| 16 | original errata sheet to the deposing attorney | |
| 17 | within thirty (30) days of receipt of the | |
| 18 | deposition transcript by you.  If you fail to | |
| 19 | do so, the deposition transcript may be deemed | |
| 20 | to be accurate and may be used in court. | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

1        E R R A T A

2              ---

3  PAGE        LINE                        CHANGE

4  ___  ___        _____

5  Reason for

6  Change: ___        _____

7  ___  ___        _____

8  Reason for

9  Change: ___        _____

10  ___  ___        _____

11  Reason for

12  Change: ___        _____

13  ___  ___        _____

14  Reason for

15  Change: ___        _____

16  ___  ___        _____

17  Reason for

18  Change: ___        _____

19  ___  ___        _____

20  Reason for

21  Change:  ___        _____

22  ___  ___        _____

23  Reason for

24  Change    ___        _____

431

1              ---

2  ACKNOWLEDGMENT OF DEPONENT

3              ---

4        I, WILLIAM BORDAK, do hereby certify

5  that I have read the foregoing pages 217 to

6  427 and that the same is a correct

7  transcription of the answers given by me to

8  the questions therein propounded, except for

9  the corrections or changes in form or

10  substance, if any, noted on the attached

11  Errata Sheet.

12  _____

13  DATE

14  SIGNATURE

15

16              Subscribed and sworn to

17  before me this _____ day of _____

18  ___ , 20__.

19

20              My commission expires:

21              _____

22

23              _____

24              Notary Public