# EXHIBIT D

CONFIDENTIAL

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                       -  -  -
 3
 4   JOHN DOE                    :
             Plaintiff,          :
 5                               :
             -vs-                :
 6                               :
     SAINT JOSEPH's UNIVERSITY:
 7      and                      :
     JANE ROE                    :
 8         Defendants      : NO. 18-2044
 9                    -   -   -
                 Thursday, July 19, 2018
10                    -   -   -
11              C O N F I D E N T I A L
12                    -   -   -
13         Oral deposition of KIERSTEN WHITE,
     Ed.D., was taken at Montgomery McCracken
14   Walker & Rhoads, LLP, 1735 Market Street,
     Philadelphia, Pennsylvania, commencing at 8:10
15   a.m., before Debra J. Veneziale, Professional
     Court Reporter and Notary Public; in and for
16   the Commonwealth of Pennsylvania.
17
18
19
20                     *  *  *
21
22
              VERITEXT LEGAL SOLUTIONS
23              MID-ATLANTIC REGION
            1801 Market Street - Suite 1800
24          Philadelphia, Pennsylvania  19103
```

CONFIDENTIAL

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | LAW OFFICES OF JOHN MIRABELLA |
|  | BY:  JOHN MIRABELLA, ESQUIRE |
| 3 | john@mirabellalawfirm.com |
|  | 1600 Market Street, Suite 1810 |
| 4 | Philadelphia, Pennsylvania 19103 |
|  | Phone: (215) 422-4991 |
| 5 | Co-Counsel for Plaintiff |
| 6 |  |
| 7 | MONTGOMERY McCRACKEN |
|  | BY:  ALBERT L. PICCERILLI, ESQUIRE |
| 8 | apiccerilli@mmwr.com |
|  | 1735 Market Street |
| 9 | Philadelphia, Pennsylvania 19103 |
|  | Phone: (215) 772-7535 |
| 10 | Representing the Defendant, |
|  | Saint Joseph's University |
| 11 |  |
| 12 | SAINT JOSEPH'S UNIVERSITY |
|  | Office of the General Counsel |
| 13 | BY:  MARIANNE SCHIMELFENIG, ESQUIRE |
|  | mschimel@sju.edu |
| 14 | 5600 City Avenue |
|  | Philadelphia, Pennsylvania 19131-1395 |
| 15 | Phone: (610) 660-3145 |
|  | Representing Saint Joseph's University |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 4 |
|---|---|
| 1 | I N D E X |
| 2 | - - - |
| 3 | WITNESS |
| 4 |  |
| 5 | KIERSTEN WHITE, Ed.D. |
| 6 |  |
| 7 | EXAMINATION            PAGE |
| 8 | BY MR. MIRABELLA            5 |
| 9 |  |
| 10 |  |
| 11 | - - - |
| 12 | E X H I B I T S |
| 13 | - - - |
| 14 |  |
| 15 | NUMBER      DESCRIPTION      PAGE MARKED |
| 16 | White-1   Break the Silence Document   77 |
| 17 | White-2   Article from The Hawk       117 |
| 18 | White-3   List of Respondents in Sexual |
| 19 |           Misconduct              124 |
| 20 | White-4   Dear Colleague Letter and Q&A 139 |
| 21 | White-5   Appeal Packet            183 |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 3 |
|---|---|
| 1 | MINTZER SAROWITZ ZERIS LEDVA & MEYERS, |
|  | LLP |
| 2 | BY:  SUSAN R. ENGLE, ESQUIRE |
|  | sengle@DefenseCounsel.com |
| 3 | BY:  RICHARD E. CHESNYE, JR., ESQUIRE |
|  | rchesney@defensecounsel.com |
| 4 | 1500 Market Street, Suite 4100 |
|  | Centre Square West Tower |
| 5 | Philadelphia, Pennsylvania 19102 |
|  | Phone: (215) 735-7000 |
| 6 | Representing the Defendant, |
|  | Jane Roe |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 5 |
|---|---|
| 1 | - - - |
| 2 | KIERSTEN WHITE, Ed.D., after |
| 3 | having been first duly sworn, was |
| 4 | examined and testified as follows: |
| 5 | - - - |
| 6 | THE COURT REPORTER:  Usual |
| 7 | stipulations? |
| 8 | MR. PICCERILLI:  Usual |
| 9 | stipulations; all objections except to the |
| 10 | form of the question are reserved until the |
| 11 | time of trial.  We do not waive certification, |
| 12 | and the witness reserves the right to read and |
| 13 | sign. |
| 14 | - - - |
| 15 | EXAMINATION |
| 16 | - - - |
| 17 | BY MR. MIRABELLA: |
| 18 | Q.    Dr. White, we were just |
| 19 | introduced.  My name is John Mirabella, I |
| 20 | represent John Doe in this action against |
| 21 | Saint Joseph's University, along with my |
| 22 | Co-Counsel, Ed Schwabenland, who is not here |
| 23 | with me today. |
| 24 | I'm going to be conducting your |

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1 deposition. I asked for your deposition in
2 connection with your role in formulating the
3 Sexual Misconduct Policy at Saint Joe's
4 University that came to effect in 2015 and in
5 connection with your role with respect to a
6 grant application submitted by Saint Joe's to
7 the Office of Violence Against Women, the
8 Justice Department, and some related issues.
9        I also asked for your
10 deposition in connection with your role in
11 policies and procedures as to the
12 investigation and adjudication of sexual
13 misconduct claims against students and
14 nonstudents. Finally, I'm sure I'll cover
15 some other areas that come up with some other
16 testimony and also with respect to your role
17 in John Doe's appeal.
18        For purposes of the deposition,
19 are you aware of who John Doe actually is?
20    A.    Yes.
21    Q.    So the use of John Doe will
22 not -- you will be able to answer the
23 questions. Same with respect to the
24 Complainant, Jane Roe?

Page 7

1    A.    Correct.
2    Q.    All right. The practice has
3 been if anybody slips up, witness or
4 questioner, even though the transcript is
5 confidential, we'll try to stop and point it
6 out and correct it to get it off the
7 transcript.
8        Same with respect to the
9 investigation of other cases, if any of the
10 questions call for discussions of other
11 investigations, cases and what not, please
12 know in advance I don't want you to identify a
13 student. And if I do want a student's
14 identity your Counsel will let you know if
15 it's appropriate and I'll specifically ask.
16        There may come up some
17 questions about a sports team in which there
18 were allegations of misconduct that were
19 handled through the Community Standards Office
20 and under the Sexual Misconduct Policy, if I
21 refer to as the sports team rather than
22 anything more than that, do you know generally
23 what I'm referring to?
24    A.    Yes.

Page 8

1        MR. PICCERILLI: Let me just
2 let the witness know exactly what we're doing.
3            - - -
4        (Whereupon, a discussion was held off
5 the record.)
6            - - -
7 BY MR. MIRABELLA:
8    Q.    A deposition is a series of
9 questions and answers taken under oath. My
10 questions are transcribed, your answers are
11 transcribed. Anything you saw now may be used
12 in the trial of the case, they may be read to
13 the Jury, whole or in part. As such, don't
14 answer my questions if you're not clear of the
15 question or you're not sure what I'm asking.
16        Well, you should not guess in
17 response to questions, you should, when
18 possible, point to a reference material or
19 estimate an answer, just state that on the
20 record.
21        I will frequently, if the
22 answer is I don't know or I don't remember,
23 ask you to follow up with your best
24 recollection or your best estimate or

Page 9

1 something of that nature.
2        Also, I'm going to be asking
3 you questions in areas that have already been
4 covered by other witnesses. It's part of the
5 discovery process. And I don't want to
6 belabor your deposition, but there are some
7 areas where there's overlapping
8 responsibilities and supervisory roles. So I
9 may, you know, get back into it in some way.
10        Have you ever given a
11 deposition before?
12    A.    No.
13    Q.    Okay. In preparation for this
14 deposition, other than communications with
15 Counsel, did you have an opportunity to review
16 any of the paper records in this case?
17        By paper records I mean other
18 depositions, the complaint filed by John Doe
19 or any aspects of the Community Standards and
20 the outside investigator's investigation?
21    A.    No.
22    Q.    Have you looked at any
23 documents or done any research in connection
24 with your preparation for this deposition?

3 (Pages 6 - 9)

CONFIDENTIAL

1          MR. PICCERILLI:  Other than
2  with Counsel.
3          THE WITNESS:  No.
4          MR. MIRABELLA:  And that's with
5  the Federal Court Work Product Privilege?
6          MR. PICCERILLI:  Yes.
7  BY MR. MIRABELLA:
8      Q.    All right.  Dr. White, I don't
9  believe I've seen your Resume or C.V.  I would
10  like to ask you some general questions about
11  your education background and training.
12          Can you tell me your
13  undergraduate experience?
14      A.    I attended Saint Joe's
15  University from 1999 to 2003.  Graduated with
16  a degree in sociology.
17      Q.    And where did you receive
18  additional degrees or education?
19      A.    I attended Saint Joseph's
20  University for a Master's in Science,
21  organizational development, training in
22  organizational development from 2004 to 2006.
23          I then I attended Saint
24  Joseph's University for my Doctorate in

1  educational leadership from 2009 to 2013.
2      Q.    And did you obtain a Doctor of
3  philosophy?
4      A.    No, a Doctor of Education, Ed.d
5      Q.    And what was the focus of your
6  study for your Ph.D.?
7      A.    My dissertation focus for my
8  Ed.D was the Clery Act, ethical commitment to
9  campus safety.
10      Q.    Twice I referred to it as a
11  Ph.D.  There is no higher educational degree
12  than a Ed.D.; am I correct?
13      A.    Correct.
14      Q.    All right.  And while I was
15  thinking about how to rephrase my question I
16  didn't get your last answer.  The focus of
17  your dissertation?
18      A.    My focus was campus safety in
19  the Clery Act.
20      Q.    For someone who is not involved
21  in university life, what is the Clery Act or
22  how would you describe it?
23      A.    Clery Act is a Federal law that
24  provides guidance and regulations related to

1  campus safety.
2      Q.    Do you know how long it's been
3  in effect?
4      A.    There's been several iterations
5  of it.  I don't recall offhand the specific
6  date that it was enacted.  It started with
7  global efforts by the Clery family and moved
8  from local to state to federal.
9      Q.    In addition to your formal
10  educational background, do you have any other
11  degrees or certifications?
12      A.    No.
13      Q.    Can you describe your
14  employment experience since graduating from
15  Saint Joe's?
16      A.    Sure.  I worked at Temple
17  University from 2003 to 2004 in Student
18  Activities.  And then in 2004 I returned to
19  Saint Joseph's University as the
20  Administrative Assistant in, at the time I
21  believe it was called the Student Judicial
22  Office.  A few months later I moved on to -- I
23  was promoted to the Coordinator of Student
24  Discipline within that same office, and I

1  served in that role from about 2004 to 2007.
2          In 2007 I changed roles within
3  Saint Joseph's to the Assistant to the Vice
4  President for Student Life and was also the
5  NASPA Journal Editorial Assistant.  I held
6  that role for two years.
7          And then in 2007 to 2009 I
8  served as an Assistant to the Vice President
9  for Student Life still, and the Director of
10  Community Standards, which is our student
11  conduct office.
12          And then in 2009 I was promoted
13  to the Assistant Vice President for Student
14  Life.  That's the position that I'm currently
15  serving.
16      Q.    Initially I wrote down
17  Assistant to Vice President of Student Life in
18  2007?
19      A.    Right.
20      Q.    It's 2009; correct?
21      A.    Yes, I'm sorry, my timing is
22  off.  2007, I apologize for this, 2007 -- I've
23  held several roles at Saint Joseph's, I'm
24  sorry.  So let me just have a moment to think

CONFIDENTIAL

Page 14

1 about this.
2         In 2013 is when I was the
3 Assistant Vice President for Student Life.  So
4 I served in that role since 2013 upon
5 completion of my Doctoral degree.
6         Does the timeline make sense
7 now?  Did that fill in the gaps?
8     Q.     A little bit.  Let me go back.
9     A.     I'm so sorry.
10    Q.     No worries.  So in 2004 you
11 were the Administrator of the Office of
12 Student Judicial Discipline?
13    A.     I believe it was called
14 Judicial Affairs or Student Discipline, yes.
15    Q.     And then you state in 2004 to
16 2007 you were the Coordinator of Student
17 Discipline?
18    A.     Yes, correct.
19    Q.     Is that office, the Office of
20 Student Discipline, functionally analogous to
21 the Office of Community Standards?
22    A.     Yes.
23    Q.     And as the Coordinator of
24 Student Discipline from 2004 to 2007, what

Page 15

1 were your responsibilities?
2     A.     My main responsibility was
3 overseeing what is called our Peer Review
4 Board, which is a group of students who hear
5 cases, our low-level cases.  I also from time
6 to time would serve as a hearing officer.
7     Q.     So during the 2004 to 2007
8 period, the Office of Student -- Coordinator
9 of Student Discipline, did that office oversee
10 the investigation and adjudication of claims
11 of sexual misconduct?
12    A.     Yes.
13    Q.     And you mentioned that you both
14 oversaw the Peer Review Board and also sat as
15 a hearing officer; correct?
16    A.     Correct.
17    Q.     Before I spend a lot of time
18 on, too much time, a reasonable amount of time
19 on your role as to how that office functioned,
20 did that process change in terms of
21 adjudication of student misconduct or was that
22 pretty much the same process that was in place
23 until you became the Assistant to the Vice
24 President in 2009?

Page 16

1     A.     Can you just clarify?  Are you
2 talking specifically about all student conduct
3 processes?
4     Q.     Yes.
5     A.     So generally it remained the
6 same.  The sexual misconduct process, there
7 was a change there from the time that I was
8 Coordinator of Student Discipline to what you
9 asked in terms of my current role.
10    Q.     I'll clarify.
11        MR. PICCERILLI:  Yes, I think
12 you have the dates a little mixed up.
13 BY MR. MIRABELLA:
14    Q.     2015 Saint Joe's adopted the
15 interim Sexual Misconduct Policy; correct?
16    A.     Yes.
17    Q.     And we'll treat that as January
18 of 2015.  And before, as of December of 2014,
19 was the process in place, not identical, but
20 similar to the process that you were working
21 with when you were the Director of Student --
22 Coordinator of Student Discipline from 2004 to
23 2007?
24    A.     Specifically what process are

Page 17

1 you speaking of?
2     Q.     Oh, for Community Standards
3 violations, misconduct.
4     A.     Yes.
5     Q.     Including claims of sexual
6 misconduct?
7     A.     Yes, I believe so.
8     Q.     So there's a big change in
9 2015?
10    A.     Correct.
11    Q.     But from 2004 to the end of
12 2014, while there might have been changes, the
13 process was for the most part the same process
14 that was in place?
15    A.     Yes.
16    Q.     Okay.  Can you describe for me
17 generally then what the process was like, and
18 you don't have to go back to 2004 and 2005
19 when we talk the process that was in place in
20 2014, if a student or staff member was accused
21 of sexual misconduct?
22    A.     There would be a report, and
23 that could come from multiple sources and
24 could be reported to many entities and

5 (Pages 14 - 17)

CONFIDENTIAL

1 institutions. Really it's whoever Complainant
2 would report to or a reporter would report
3 to. It could be Public Safety. It could be a
4 Resident Assistant to whom that report is
5 made.
6          At that point there would be an
7 investigation through our Public Safety
8 Office. A Public Safety investigator in most
9 cases would question the parties involved,
10 gather information. The information would be
11 shared with the Office of Community
12 Standards. Community Standards would then
13 initiate the process.
14          If there were any alleged
15 violations of the policy by a student
16 respondent there would then be some sort of
17 prehearing meeting. We would review rules
18 pertinent to the process, answer any questions
19 about the process. There would then be a
20 hearing with the Community Standards Office,
21 could be an individual hearing officer, could
22 be a panel.
23     Q.     What were the factors that
24 influenced whether it was an individual

1 hearing officer or a panel?
2     A.     If it was internal
3 administrative decision we would look to
4 availability of the panel.
5     Q.     Was there a preference that the
6 more serious matters were handled by a panel
7 or it just depended?
8     A.     No preference.
9     Q.     All right. Going to the policy
10 that was in place, where was it memorialized,
11 in the student handbook?
12          MR. PICCERILLI: I'm sorry,
13 during what time frame?
14          MR. MIRABELLA: During the 2014
15 calendar year.
16          THE WITNESS: Yes.
17 BY MR. MIRABELLA:
18     Q.     And was there any written
19 policies about the investigation and
20 adjudication of misconduct in 2014 that was
21 not in the handbook?
22     A.     Can you rephrase that, please.
23     Q.     Did the University have any
24 written policies about the adjudication and

1 investigation of student's misconduct that was
2 not set forth in the student handbook?
3     A.     Any written polices that were
4 not in the handbook, no.
5     Q.     Did you stay involved in, I
6 couldn't tell if you did or didn't, in student
7 discipline after you -- you were the
8 Coordinator of Student Discipline from 2004 to
9 2007?
10     A.     Correct.
11     Q.     And then you became the
12 Assistant Vice President -- Assistant to the
13 Vice President in 2009; correct?
14     A.     2007 to 2009 I was the
15 Assistant to the Vice President and the NASPA
16 Journal Editorial Assistant. 2009 to 2013 I
17 was the Assistant to the Vice President for
18 Student Life and Director of Community
19 Standards. And then 2013 is when I pick up as
20 the Assistant Vice President for Student Life.
21     Q.     And the role of the Director of
22 Community Standards that you previously held
23 up to through 2013 is now held by Mr. Bordak?
24     A.     Correct.

1     Q.     All right. What's the journal
2 you refer to again?
3     A.     The NASPA Journal.
4     Q.     What's that?
5     A.     The acronym stands for National
6 Association of Student Personnel
7 Administrators.
8     Q.     And tell me a little bit about
9 the journal and your responsibilities.
10     A.     Dr. Cary Anderson was the
11 editor during that two-year term, and so with
12 the editor position came an Editorial
13 Assistant position. So I facilitated the
14 blind peer review process for the articles
15 published in the journal.
16     Q.     And what types of articles
17 would be typical for the journal?
18     A.     Anything within the realm of
19 student affairs. Student affairs is the field
20 in which I work. So anything from counseling
21 to student health, student activities, et
22 cetera.
23     Q.     Is somebody currently at the
24 school involved with the journal directly?

CONFIDENTIAL

Page 22

1    A.    Not to my knowledge.
2    Q.    Is Dr. Anderson still a member
3 of the Editorial Board?
4    A.    Not to my knowledge.
5    Q.    So he was -- was he one of many
6 editors during that time frame when you were
7 Assistant?
8    A.    He was the head editor.
9    Q.    And if you could, was that
10 something that was expected to be two years in
11 length or that was just Dr. Anderson's
12 decision as to how long he wanted to be the
13 editor, or something else?
14    A.    No, I believe that was the term
15 length.
16    Q.    Does the school still receive
17 editions of the journal?
18    A.    I believe so through
19 membership, through the NASPA membership that
20 institutions may have.  Saint Joseph's has a
21 membership.
22    Q.    And while Dr. Anderson was the
23 editor of the journal, he didn't publish any
24 pieces in the journal?

Page 23

1    A.    I don't recall.
2    Q.    Have you ever published in the
3 journal?
4    A.    No.
5    Q.    And while you were the
6 Assistant Editor, do you know if there were
7 any pieces published about sexual misconduct
8 on campus?
9    A.    I don't recall.
10    Q.    Same question as to the
11 implication of Title IX and sexual misconduct
12 on campus, do you recall anything like that?
13    MR. PICCERILLI:  In the
14 journal?
15    MR. MIRABELLA:  Yes, in the
16 journal.  Not only in the journal, in the
17 journal while she was Assistant Editor.
18    MR. PICCERILLI:  Okay, thank
19 you.
20    THE WITNESS:  I don't recall.
21 BY MR. MIRABELLA:
22    Q.    If not during the time period
23 when you were Assistant Editor, do you recall
24 any pieces -- coming across any articles

Page 24

1 within that subject matter?
2    A.    Within that journal?
3    Q.    Correct.
4    A.    I don't recall specifically.
5    Q.    Fair enough.  Would pieces of
6 that, is that subject matter something that
7 might be within the scope of that journal?
8    A.    Yes.
9    Q.    Are you published?
10    A.    No.
11    Q.    Is your dissertation
12 published?
13    A.    Can I correct that?  I
14 co-authored a chapter in a book.
15    Q.    Sure.  What's the book and what
16 was the chapter?
17    A.    I don't recall the name of the
18 book, I'm sorry.
19    Q.    So tell me what you remember
20 about it.
21    A.    It was -- my part in
22 co-authoring the chapter was from my
23 dissertation.  So it was revolving around
24 ethical commitment to campus safety.

Page 25

1    Q.    And can you flush that out for
2 me a little more?
3    A.    Sure.  So I looked at
4 institutions and participants who participated
5 in -- attendees who participated in the Clery
6 Act training and institutions that had
7 participants engaged in a particular training
8 and what their level of commitment to campus
9 safety in regards to the Clery Act was through
10 the lens of ethic of caring as my theoretical
11 framework.
12    Q.    I'm not going to spend a lot of
13 time on that, but can you just explain that a
14 little further.
15    A.    Sure.  So I was really
16 evaluating and studying people's perception of
17 campus safety and their approach to compliance
18 with the Clery Act.  So were people looking to
19 comply in a technical sense, meaning check the
20 boxes and ensure that they are compliant with
21 the Federal law, or is there a deeper moral
22 commitment to campus safety beyond the law,
23 the spirit of the law.
24    Q.    And what was your conclusion?

7 (Pages 22 - 25)

CONFIDENTIAL

1      A.      People have a desire to do what
2  is right, and sometimes it is difficult to go
3  beyond what is just sheer compliance with the
4  law because of the complexity of the law.
5      Q.      Did the dissertation touch on
6  anything about Title IX?
7      A.      I don't recall specifically.
8  It's over a 300-page dissertation.
9      Q.      Was it broken down into
10  sections, subparts, chapters?  How did you
11  organize it?
12      A.      Six chapters.
13      Q.      Is it fair to say than no
14  single chapter was dedicated or committed to
15  Title IX; correct?
16      A.      Correct.
17      Q.      And it's possible that these
18  issues came up, but the Clery Act was the
19  focus of the paper?
20      A.      Correct.
21      Q.      What do you mean by Clery Act
22  training?
23      A.      The Clery Center is a national
24  nonprofit founded by the Clerys and that

1  connected to your dissertation.
2      If not any formal publications,
3  have you produced any writings that you use in
4  training or that have been utilized by SJU or
5  other institutions in connection with the
6  Clery Act?
7      A.      No, just my dissertation and,
8  like I said, the chapter that I co-authored
9  based on my dissertation.  Otherwise, no,
10  nothing formal in terms of what's been
11  published or used.
12      Q.      What about things currently in
13  use at SJU, for example, the slideshow they
14  show freshmen on campus on sexual misconduct,
15  did you have any role in that?
16      A.      I facilitated a session.  I was
17  one of the presenters.
18      Q.      Did you have any role in
19  creating the slideshow?
20      A.      I don't believe so.
21      Q.      When were you a facilitator?
22      A.      For the last several years.  I
23  believe as long as it's been a part of the New
24  Student Orientation.

1  organization facilitates national trainings.
2  So I worked with that Center to identify
3  participants of the various Clery Center
4  trainings in terms of the participants in my
5  study.
6      Q.      Have you had Clery Center
7  training?
8      A.      I have.
9      Q.      When?
10      A.      Many times over the years.  I
11  don't know that I can recall specific dates.
12      Q.      Over two years or how is
13  it --
14      A.      There are ongoing webinars.
15  There are multi-day conferences.  It's been a
16  variety of different modes.
17      Q.      Do you do any teaching in the
18  Clery Center training?
19      A.      I have done some consulting
20  with the Clery Center.  I have facilitated
21  some trainings as well.
22      Q.      I asked you about
23  publications.  You mentioned a paper you
24  co-authored which is really part of or

1      Q.      The Clear Training Act that you
2  did periodically, do you keep a list of
3  webinars you participated in?  Is there any
4  way to sort of memorialize that?  Do you get
5  credit for that as some type of continuing
6  education?
7          MR. PICCERILLI:  Can I hear
8  that back.
9              - - -
10      (Whereupon, the court reporter read
11  back the pertinent information.)
12              - - -
13          MR. PICCERILLI:  Do you
14  understand the question?
15          THE WITNESS:  I do.  I have
16  some lists.  I don't know that it's
17  comprehensive, but I have some record of
18  various webinars that I participated in.
19  BY MR. MIRABELLA:
20      Q.      Does the record include
21  webinars that outside of the Clery Act?
22      A.      Yes.  Again, it wouldn't be
23  comprehensive, but I do have some record of
24  various trainings that I participated in.

CONFIDENTIAL

1    Q.    Are you currently the member of
2  any professional organizations?
3    A.    Yes.
4    Q.    Can you tell me what they are?
5    A.    Sure, the NASPA Association
6  that I just shared, the Association of Student
7  Conduct Administrators, ASCA.  We have an
8  institutional membership, it's not a personal
9  membership, it's an institutional membership
10  with the Clery Center.  That's all I can
11  recall.
12    Q.    Have you ever taken any
13  webinars or participated in any seminars with
14  ATIXA?
15    A.    I may have.  I don't recall
16  specifically.
17    Q.    Have you ever been a member of
18  ATIXA?
19    A.    Personally, no, I have not.
20    Q.    Have you ever been, while at
21  Saint Joe's, been aware that SJU was an
22  institutional member of ATIXA?
23    A.    I don't know that I knew that
24  specific detail, no.

1    Q.    And I'm not saying they were or
2  they weren't.  I'm just asking you if have
3  ever been?
4    A.    No, I'm not personally a member
5  of ATIXA.
6    Q.    If you have ever taken any
7  webinars through ATIXA, would they be possibly
8  on the list that you keep?
9    A.    Possibly.
10    Q.    I'm trailing off at the end of
11  my questions and then you're finishing my
12  questions with your answer before I finish the
13  question, correctly I might add, but we're
14  talking over each other a little bit for the
15  court reporter.  So if I interrupt your answer
16  tell me.  Just give me a second.  I do
17  sometimes start to pause, but I'll try to keep
18  my questions forward.
19        MR. PICCERILLI:  Let him ask
20  his full question before you answer, and he'll
21  let you give your full answer before he asks
22  the next question.
23        MR. MIRABELLA:  That's a
24  standard instruction that I didn't give at the

1  start.
2  BY MR. MIRABELLA:
3    Q.    In any event, and up 'til now I
4  think the questions have been clear.
5        Back to ATIXA for a second,
6  have you ever been asked by ATIXA to speak at
7  any of their events?
8    A.    No, I don't think so.
9    Q.    Do you have any ATIXA material
10  that you ever used for reference?
11    A.    I don't believe so.
12    Q.    Do you know if you've ever used
13  ATIXA materials for reference?
14    A.    I don't recall.
15    Q.    Have you ever been asked to --
16  tell me a little bit about the role -- tell me
17  about the consulting you've done for the Clery
18  Center.
19    A.    I worked with them on
20  consulting on their curriculum for one of
21  their trainings.  I believe they were moving
22  either to an extended training or they were
23  looking for ways to integrate more adult
24  learning in the training, and so I provided

1  some of that framework.
2        I've also consulted on other
3  Clery Center trainings that they were
4  facilitating again to specifically incorporate
5  adult learning techniques as part of my
6  Master's in education.
7    Q.    Back to the ASCA, does that
8  organization also produce any professional
9  publications or journals?
10    A.    I don't know.
11    Q.    Do you know if you ever
12  consulted any in connection with your work as
13  in student discipline?
14    A.    Can you repeat that again?
15    Q.    Sure.  Do you know if you ever
16  used any of materials in connection with your
17  work in student discipline?
18    A.    The ASCA?
19    Q.    Yes.
20    A.    I can't recall specifically.
21    Q.    Do they produce like a monthly
22  journal or anything like that?
23    A.    No, not that I'm aware of.
24    Q.    Just for context I'm going to

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1 ask you some very general questions about
2 certain areas of your responsibilities and
3 then get back to question you in more detail
4 later in the deposition, but I want to make
5 sure I allocate the correct amount of time to
6 some of these things.
7         Were you directly involved in
8 the formulation of the Sexual Misconduct
9 Policy, both the interim and the policy that's
10 in place now at Saint Joseph's University?
11     A.    The policy that is in place
12 now, yes, I served on the committee.
13     Q.    Dr. White, were you directly
14 involved in either of the two grant
15 applications that were recently done at Saint
16 Joe's to the Office of Violence Against Women
17 for a $300,000 Federal Grant and a $30,000
18 grant?
19         MR. PICCERILLI:  I think you
20 misspoke in terms of the second.  The second
21 one is a State Grant.
22         MR. MIRABELLA:  I'm confident
23 that Dr. White will correct me.
24         THE WITNESS:  Yes, that's

Page 35

1 correct.  There's one OVW Grant and there's
2 one Pennsylvania State Grant.
3 BY MR. MIRABELLA:
4     Q.    With respect to those grant
5 applications, were you involved in either?
6     A.    Yes, I was.
7     Q.    And were you principally
8 responsible for the OVW Grant application?
9     A.    I was, I was the lead author.
10     Q.    And who was the lead author on
11 the State Grant?
12     A.    Dr. Perry.
13     Q.    Who do you report to at SJU?
14     A.    Dr. Perry and Cary Anderson.
15     Q.    And who reports directly to
16 you?
17     A.    Bill Bordak, Dr. Greg Nicholas,
18 who is the Counseling Center Director, Ms.
19 Marci Berney who is the Director of Student
20 Outreach and Support, Laura Hertz who is the
21 Director of the Student Health Center, and
22 Carla Castro who is our Information System
23 Manager.
24     Q.    Carla Castro, who is the

Page 36

1 Information System Manager, does the StarRez
2 system fall under that umbrella?
3     A.    Information systems is any of
4 the information technology related to the
5 division, and so I guess I would ask for
6 clarification with what you mean to fall under
7 that umbrella.
8     Q.    Does she have any role in data
9 entry or use of the StarRez system?
10     A.    No.  She oversees projects at a
11 high level -- information technology projects
12 at a high level.
13     Q.    The appeal process that's in
14 place now, when there's findings I guess in
15 claims of sexual misconduct, did you have any
16 role in the formulation of that policy?
17     A.    The current policy that's in
18 place, yes, I served on the committee.
19     Q.    I want to go back to 2014 and
20 the process that was in place.  As of 2014,
21 what was your -- how directly or indirectly
22 were you involved in Community Standards and
23 student discipline?
24     A.    In 2014 I was the Assistant

Page 37

1 Vice President for Student Life and so I
2 supervised the Director of Community
3 Standards.
4     Q.    And as the supervisor of the
5 Director of Community Standards what role, if
6 any, did you have to play with respect to
7 student misconduct cases?
8     A.    Specifically I facilitated the
9 appeal process, and by way of my supervisory
10 role to Community Standards would oversee the
11 Community Standards Office and its
12 involvement.
13     Q.    As I understand it from
14 testimony from Mr. Bordak, the StarRez system
15 came into effect around 2011?
16     A.    I can't recall the specific
17 dates.
18     Q.    Do you have any recollection of
19 it being in place earlier than that?
20     A.    I don't remember.
21     Q.    What's your interface, if any,
22 with the Title IX Coordinator?
23         MR. PICCERILLI:  Objection to
24 form.

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1 BY MR. MIRABELLA:
2     Q.     You can still answer.
3     A.     Regarding the process, the
4 sexual misconduct process?  If you could
5 provide a little bit more detail to what
6 you're asking me.
7     Q.     Yes, sure.  Do you periodically
8 work with the Title IX Coordinator in any
9 aspect of your role?
10     A.     Periodically, yes.
11     Q.     But the Title IX Coordinator
12 does not report to you?
13     A.     No.
14     Q.     Have you ever been a Title IX
15 Coordinator?
16     A.     No.
17     Q.     What's the Behavioral
18 Intervention Team?
19     A.     It's a team that comes together
20 when there are potential incidents that
21 someone from the University community feels
22 there may be a concern, that needs to be
23 inter -- when there needs to be an
24 intervention.

Page 39

1     Q.     So it could include claims of
2 misconduct?
3     A.     It could.
4     Q.     Could it include claims of
5 substance abuse?
6     A.     It could.
7     Q.     And could it include concerns
8 over mental health?
9     A.     Yes.
10     Q.     How is the process triggered?
11     A.     Again, there may be a report
12 from someone at the University formally or
13 informally.  Someone at the University may
14 learn of something that sounds concerning.
15 It's organic in that way.  And typically,
16 Marci Bernie, who is Director of Student
17 Outreach and Support would convene the group
18 if deemed necessary based on the information
19 that's provided.
20     Q.     And the Office of Student
21 Outreach and Support, generally what's the
22 focus for student life from that office?
23     A.     It's a three-prong office.
24 There's case management, so working with

Page 40

1 individual students, supporting them while
2 they're students, sometimes while they're away
3 in terms of re-entry or time away from the
4 institution if it's for a mental health
5 concern or something like that.  Then we have
6 Wellness, Alcohol and Drug Education Program.
7 And then there's also this Sexual Misconduct
8 Prevention Specialist that was recently hired
9 as part of the OVW Grant.
10     Q.     And the Sexual Misconduct
11 Specialist, who is that?
12     A.     Chris Morrin.
13         MS. ENGLE:  Can we go off the
14 record.
15         - - -
16     (Whereupon, a short break was taken at
17 this time)
18         - - -
19     (Mr. Chesney entered)
20 BY MR. MIRABELLA:
21     Q.     What do you know generally of
22 Mr. Morrin's background?
23     A.     I know that he previously held
24 a similar position, grant position years ago,

Page 41

1 and I believe it was at St. Lawrence
2 University.
3     Q.     Were you involved in his
4 retention?
5     A.     I was.
6     Q.     Do you know if he has any
7 certifications with respect to Title IX or to
8 student misconduct education?
9     A.     I don't recall.
10     Q.     How did the school go about
11 finding somebody for that role?
12     A.     There was an open search.
13     Q.     And did -- I assume there were
14 other candidates?
15     A.     Yes.
16     Q.     And you were involved in the
17 selection process as well then?
18     A.     Yes.
19     Q.     And at some point you saw his
20 Resume or C.V.?
21     A.     Yes.
22     Q.     Is that role going to stay in
23 place after the grant money is expended?
24     A.     I don't have specific

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1 information about that.
2    Q.    Was Mr. Morrin retained for a
3 period of time, like for a year, or do you
4 know anything about that?
5    A.    It's a grant-funded position
6 currently.  So the grant funding is for three
7 years.
8    Q.    It's for three years?
9    A.    Yes.
10    Q.    And what are Mr. Morrin's
11 day-to-day responsibilities?
12    A.    Overseeing the requirements of
13 the grant.
14    Q.    Am I correct you were the
15 person responsible for reporting on behalf of
16 the OVW grant?
17    A.    Can you clarify that?
18    Q.    Sure.  The school SJU has to
19 submit biannual reports to the Office of
20 Violence Against Women; correct?
21    A.    I believe so, yes.
22    Q.    Are you the person at the
23 school responsible for -- ultimately
24 responsible for SJU providing those reports?

Page 43

1    A.    No, I'm not.
2    Q.    Have you ever been?
3    A.    No.
4    Q.    Who did the first report?
5    A.    Marci Berney.
6    Q.    And will Mr. Morrin be involved
7 in doing the report or would that be Marci
8 Berney?
9    A.    I believe it will be Chris
10 Morrin moving forward.  Chris reports to
11 Marci.  So I'm not sure of the exact details
12 of their day-to-day responsibilities regarding
13 that.
14    Q.    Are you familiar with any of
15 discussions or questions about problems or
16 concerns with the school method of
17 investigating claims of sexual misconduct
18 during the period before the change, 2011 to
19 2014?
20    A.    Can you repeat that?
21    Q.    Sure.  Let me try it a
22 different way.
23          MR. PICCERILLI:  Do you want
24 her to read it back?

Page 44

1          MR. MIRABELLA:  No, it was a
2 bad question.  Let me ask it a different
3 away.
4          THE WITNESS:  Thank you.
5 BY MR. MIRABELLA:
6    Q.    You were involved in student
7 discipline basically from 2004 until the
8 present time at one level or another; correct?
9    A.    Yes.
10    Q.    From 2004 until 2014, are you
11 aware of the school being criticized for its
12 manner of investigating claims of sexual
13 misconduct?
14    A.    I don't believe so.
15    Q.    But there came a point in time
16 sometime in 2013 and 2014 when the school went
17 through a process of examining its
18 investigative model for student misconduct
19 involving sexual misconduct?
20    A.    Correct.
21    Q.    Do you know what prompted that
22 interest, that reflection or that review?
23    A.    I don't recall my specific
24 involvement with that change in particular

Page 45

1 from the model that we had in 2014 to the
2 interim policy.
3    Q.    Correct.  I was asking really
4 more do you recall what prompted or what were
5 the motivating factors and issues that
6 prompted the school to reexamine and then
7 change the policy?
8    A.    Part of our ongoing work always
9 is learning and evaluating any new guidance or
10 policies that come out, best practices and
11 that kind of thing.  And so that was I believe
12 around the time of one of the Dear Colleague
13 Letters.
14    Q.    Do you have any recollection of
15 a finding of responsibility against a female
16 for sexual misconduct before 2015?
17    A.    I don't recall.
18    Q.    Am I correct that before the
19 new policy on sexual misconduct in 2015 that
20 the Complainant and the Respondent were
21 provided access to the evidentiary record,
22 evidence, prior to an administrative hearing
23 or a hearing board meeting?
24          MR. PICCERILLI:  Objection to

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1 form.
2          THE WITNESS:  Yes.
3 BY MR. MIRABELLA:
4     Q.     And after the new Sexual
5 Misconduct Policy was put in place, did that
6 policy change?
7     A.     The entire policy was revised,
8 yes.
9     Q.     Now, let's see, I don't want to
10 get apples and oranges mixed up.  As I
11 understand it, and you can correct me if I'm
12 wrong, prior to 2015 the policy of providing
13 the Complainant and the Respondent access to
14 the evidence prior to the hearing or
15 administrative panel was not written down
16 anywhere, but it was the practice of the
17 University; is that correct?
18          MR. PICCERILLI:  Objection to
19 form.  You can answer.
20          THE WITNESS:  I don't recall.
21 BY MR. MIRABELLA:
22     Q.     So you don't recall if it was
23 written down or not?
24     A.     Correct.

Page 47

1     Q.     All right.  After the new
2 policy was put into place in 2015 with respect
3 to providing access to the evidence or records
4 to the Complainant and Respondent prior to a
5 hearing or meeting with an investigator the
6 policy was changed?
7          MR. PICCERILLI:  Objection to
8 form.
9          THE WITNESS:  One more time.
10 BY MR. MIRABELLA:
11     Q.     After the new interim SMP
12 policy came into effect, the practice of
13 providing the Complainant and Respondent
14 access to the evidence and records prior to a
15 hearing board or an interview with an
16 investigator changed as compared to the
17 practice before?
18     A.     So just to clarify, I guess
19 from my perspective, with the language, so the
20 investigation -- the word investigation is
21 used in both before and after.  But the
22 meaning of it is different.
23     Q.     Sure.  So I think I can clarify
24 that.

Page 48

1     A.     Okay.
2     Q.     So before 2015 for serious
3 matters students were either at an
4 administrative hearing officer or a Board
5 heard their case; correct?
6     A.     Yes.
7     Q.     And the hearing of the case was
8 generally referred to as a hearing; correct?
9     A.     Correct.
10     Q.     And the Complainant and the
11 Respondent before 2015 were provided access to
12 the evidence, proof and investigation prior to
13 the hearing?
14     A.     Yes.
15     Q.     Now, with the change in 2015
16 from having a traditional hearing to having an
17 investigator who did interviews and functioned
18 as a hearing, is that what you were referring
19 to earlier?
20     A.     Yes.
21     Q.     So after the policy changed in
22 2015, am I correct that students were no
23 longer provided access to the records,
24 evidence and proof, Complainant and

Page 49

1 Respondent, in advance of meeting with the
2 investigator since -- for the quote, unquote
3 hearing that the investigator conducted?
4          MR. PICCERILLI:  Objection to
5 form.
6          THE WITNESS:  Yes, because we
7 don't have all the information that we had in
8 the previous model.  And so in the previous
9 model there was an investigation through
10 Public Safety, information was collected.
11 Students involved in the process were not
12 privy to those documents during that Public
13 Safety investigation, but prior to the
14 hearing.
15          Whereas in the investigator
16 model the information is being collected
17 during the meeting and investigation with the
18 investigator as well as involvement from the
19 parties involved.  So we don't have all the
20 information at the time of the investigation
21 to share with the students involved.
22 BY MR. MIRABELLA:
23     Q.     And even if there's a report
24 generated, even if there are materials that

13 (Pages 46 - 49)

CONFIDENTIAL

1 are available, the school's policy is not to
2 give the students, Respondent or Complainant,
3 access to those materials prior to the meeting
4 with the investigator?
5      A.    Correct, to preserve the
6 integrity of the investigation.
7      Q.    And what's your definition
8 of -- what do you mean by integrity of the
9 investigation?
10      A.    At that point information is
11 still being collected and so information is
12 not shared, detailed information is not shared
13 with the party involved prior to the
14 collection of information.
15      Q.    And the only information that
16 is shared is that which is set forth in the
17 Notice of Process Letter?
18      A.    Yes.
19           MR. PICCERILLI: Excuse me, for
20 clarification, you mean before the
21 investigation?
22           MR. MIRABELLA: No. I mean
23 before the Respondent or Complainant meet with
24 the investigator.

1           MR. PICCERILLI: Right, that's
2 what I meant to say.
3 BY MR. MIRABELLA:
4      Q.    Are either the Complainant or
5 Respondent entitled to see and to respond to
6 the findings of the investigator before
7 there's a formal finding or outcome?
8      A.    Can you rephrase that?
9      Q.    Sure. As the Complainant and
10 Respondent, so I'm referring to both of them,
11 are either or both entitled to see the
12 investigator's findings before there's a final
13 outcome?
14      A.    See the findings before, no.
15      Q.    Are either the Complainant or
16 Respondent entitled to respond to the
17 investigator's findings in writing before
18 there's an outcome?
19      A.    I'm not sure of the details of
20 which the investigation, any response that is
21 allowed during the investigation. So if there
22 is opportunity to respond to allegations
23 within the investigation itself I'm not -- I
24 don't have those details.

1      Q.    No. I mean not during the
2 investigation itself, but does the
3 investigator present findings in writing to
4 the Complainant or Respondent giving them an
5 opportunity to respond?
6      A.    Does the investigator do that,
7 I do not know exactly what she does.
8      Q.    Does the SMP require the
9 investigator to do that?
10      A.    No.
11      Q.    Dr. White, have you ever
12 personally been involved in issues with a
13 claim of misconduct either as an Administrator
14 or as a student?
15           MR. PICCERILLI: Objection to
16 form.
17 BY MR. MIRABELLA:
18      Q.    You can still answer.
19      A.    Can you ask it again?
20      Q.    I'd like to ask it generally
21 because I don't want to get too specific.
22           But I just want to know, as a
23 student or a graduate student or as an
24 Administrator at Saint Joe's University, have

1 you ever been a Complainant or a Respondent?
2           MR. PICCERILLI: Objection to
3 that question. What's the relevance of that
4 question?
5           MR. MIRABELLA: The relevance
6 of the question, depending upon the witness'
7 personal experience, it may impact -- it may
8 go to bias.
9           MR. PICCERILLI: Well, basis as
10 to what? She was involved in the appeal.
11 Basis as to what?
12           MR. MIRABELLA: You asked me
13 for the relevance and I told you the
14 relevance. I don't intend to go into
15 details. It's part of my standard questions.
16           MR. PICCERILLI: You don't have
17 to answer that question if you feel it's too
18 personal that you don't want to. If you want
19 to answer you may.
20           THE WITNESS: Are you speaking
21 specifically about sexual misconduct?
22 BY MR. MIRABELLA:
23      Q.    I was speaking more generally,
24 but given the sensitive area, whatever is more

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1 likely to provoke an answer.  So I'll do it
2 generally or I can limit it to that.
3       A.      I have never been involved as a
4 Complainant or Respondent in anything related
5 to sexual misconduct.
6       Q.      Currently what are your
7 responsibilities on a day-to-day basis?
8       A.      It depends on the day.  I don't
9 know that I could describe a typical day.  As
10 I mentioned, I oversee five areas.  In
11 addition to overseeing those areas, I also
12 coordinate the strategy planning assessment
13 efforts for the Division of Student Life as
14 well as serve as staff -- staffing the Student
15 Life Committee on the Board of Trustees.
16           So it's hard to describe a
17 typical day, but many meetings about many
18 different things.  I serve on various
19 University committees ranging from
20 Commencement to Community Engagement to
21 Behavioral Intervention Team.  It's quite
22 varied depending on the day and time of year.
23 I don't know if that answers your question,
24 but...

Page 55

1       Q.      Tell me a little bit more about
2 your involvement on the committee in
3 connection with the formulation of the Sexual
4 Misconduct Policy.
5       A.      I served on the committee.
6 There was a committee that came together.
7       Q.      And do you know who else was on
8 the committee, how often they met and who was
9 the lead, if there were, authors of the policy
10 that is in place now?
11       A.      The lead of the committee was
12 Dr. Cary Anderson and Dr. Josephine Shih, who
13 is a faculty member, a psychologist at Saint
14 Joe's University.  Other members of the
15 committee include, but I don't know that I can
16 recall them all, Dr. Perry, there was at least
17 one student, a Sister, Dr. Betsy Lenaghan, Dr.
18 Raquel Bergen.  I believe Sharon Eisenmann who
19 is our Vice President for Human Resources was
20 on the committee.  I don't know if there are
21 others that I'm not thinking about, but those
22 are ones that I can recall being on the
23 committee.
24       Q.      Was the committee solely on the

Page 56

1 issue of sexual misconduct or was it broader
2 than that?
3       A.      I believe the committee was
4 looking at the Sexual Misconduct Policy as
5 well as the Policy Prohibiting Discrimination,
6 harassment and retaliation, I believe.  I
7 believe that the committee was looking at both
8 of those.
9       Q.      Was it looking at anything else
10 that had been within the rubric of student
11 misconduct?
12       A.      No.
13       Q.      Did the committee circulate
14 drafts or hear speakers or have hearings?
15 What was the work of the committee?
16       A.      It was a working committee.  So
17 several meetings, I believe, I can't recall
18 the specific amount of meetings, came together
19 for discussions.  I do recall Liz Malloy, the
20 lead investigator, came in to speak with the
21 committee.  Yes, various -- not subcommittees,
22 not as formal as subcommittees, but there was
23 some delegation of tasks that happened, and
24 that's all I can remember at the time.

Page 57

1       Q.      Besides Liz Malloy, do you
2 remember any other individuals from outside
3 groups coming in and speaking?
4       A.      I don't recall.
5       Q.      At that point in time, had
6 Elizabeth Malloy done any work for the Office
7 of Community Standards before coming in to
8 speak to the committee?
9       A.      I don't recall.
10       Q.      Do you recall having met her
11 any other time before then?
12       A.      Into the committee?
13       Q.      Before meeting her when she
14 spoke at the committee, do you recall working
15 with her before that?
16       A.      I recall meeting her before
17 that.  I don't recall if it was within the
18 Community Standards process or not.
19       Q.      Were there any issues of
20 misconduct, student or otherwise, for which
21 Saint Joseph's University retained or utilized
22 outside investigators prior to January of
23 2015?
24       A.      For student misconduct, not

CONFIDENTIAL

Page 58

1 that I'm aware of.
2    Q.    And what about for staff or
3 administrative misconduct?
4    A.    I don't know that I would have
5 the answer to that.
6    Q.    Do you remember, other than Ms.
7 Malloy, perhaps members of her -- other
8 members of her firm coming to speak to the
9 committee?
10    A.    I don't recall.
11    Q.    Do you remember what Ms. Malloy
12 spoke about?
13    A.    I believe it was generally the
14 practice of the investigation and what that
15 looked liked in terms of informing the
16 committee of that, but I can't recall the
17 specifics.
18    Q.    And so there was talk of
19 changing the investigative and adjudication
20 process for sexual misconduct; correct?
21    A.    Can you repeat that?
22    Q.    Sure.  The committee was
23 thinking about and considering and discussing
24 changing the practice for investigation and

Page 59

1 adjudication of sexual misconduct claims?
2         MR. PICCERILLI:  Objection.
3         THE WITNESS:  I don't know that
4 I understand your question.
5         MR. PICCERILLI:  It misstates
6 her testimony.
7 BY MR. MIRABELLA:
8    Q.    Well, was the committee
9 considering changing the investigative process
10 for claims of sexual misconduct, looking at
11 it?
12    A.    From what was in place with the
13 interim model?
14    Q.    From what was in place in 2014?
15    A.    So the committee that I am
16 referring to is the committee that was in
17 place after the interim Sexual Misconduct
18 Policy was put in place.  So I'm not sure if I
19 understand.
20    Q.    So your question -- my
21 questions, your answers were based on your
22 belief that I was asking you about the
23 committee in place after the interim policy?
24    A.    Correct.

Page 60

1    Q.    All right.  Let's go back to
2 2013 and 2014 at Saint Joseph's University.
3 At that point in time were you involved in any
4 committee looking at, examining or changing
5 the school's policy for the investigation of
6 sexual misconduct?
7    A.    This is what I mentioned
8 earlier.  I don't recall my specific
9 involvement from what was in place from 2013
10 for 2014 to the interim in January of 2015.
11    Q.    And when Ms. Malloy came and
12 spoke, was it during the time period the
13 interim policy was in place?
14    A.    Yes.
15    Q.    And had Ms. Malloy already done
16 investigations for the University when she
17 came and spoke?
18    A.    I don't recall.
19    Q.    Who at the University was
20 ultimately responsible for selecting Ms.
21 Malloy or members of her firm to perform
22 outside investigations?
23    A.    I don't know if I know that.
24 I'm not responsible for that.

Page 61

1    Q.    Do you know if Dr. Anderson is?
2    A.    I do not know.
3    Q.    Do you know if not that, who
4 would be responsible for reviewing the quality
5 and thoroughness of her investigations?
6         MR. PICCERILLI:  I'm sorry, may
7 I hear that again.  Can you read it back.
8              - - -
9         (Whereupon, the court reporter read
10 back the pertinent information.)
11              - - -
12         THE WITNESS:  It's not my
13 responsibility.  I do not know.
14 BY MR. MIRABELLA:
15    Q.    Do you know if that would fall
16 within Dr. Anderson's purview?
17    A.    I can't say for sure.
18    Q.    I'm going to ask you some more
19 questions about that.  I just want to do it in
20 an efficient way.
21    A.    Okay.
22    Q.    As the Director of Community
23 Standards, or anyone else that reports to you,
24 responsible for reviewing the thoroughness and

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1 quality of the investigations performed by Ms.
2 Malloy?
3      A.     I would imagine that, and she
4 does not report --
5           MR. PICCERILLI:  No guess.
6 Whatever you know.
7           THE WITNESS:  The Title IX
8 Coordinator, Dr. Mary-Elaine Perry, is the one
9 who is in main contact with Liz Malloy in the
10 instances that I'm aware of.
11 BY MR. MIRABELLA:
12      Q.     And when you -- all right.
13           And is it your understanding
14 that -- do you have an understanding whether
15 Dr. Perry communicates with Ms. Malloy or the
16 other outside investigators during the course
17 of an investigation?
18      A.     I do not know that.
19      Q.     And what are the instances in
20 which you are aware in which Dr. Perry was in
21 contact with or communicating with Ms. Malloy?
22      A.     If there are -- I recall an
23 instance there was checking in on the timeline
24 of an investigation, for example.

Page 63

1      Q.     Are you familiar with the
2 timeline?
3      A.     Yes, I am.
4      Q.     What's been your sort of
5 education or professional experience with
6 Title IX as it pertains to the student
7 discipline?
8      A.     Any webinars, various
9 trainings, meeting with colleagues,
10 conversations with colleagues.
11      Q.     Oh, I wanted to ask you, go
12 back to another question.  Did you present
13 at -- I take it you do professional
14 presentations from time to time?
15      A.     Correct.
16      Q.     Do you do them on a regular
17 basis?
18      A.     How would you describe
19 regular?
20      Q.     Couple times a year?
21      A.     Not necessarily.
22      Q.     Did you present at an ATIXA
23 event called the "Intersections in Compliance:
24 Exploring Title IX and the Clery Act" in 2014?

Page 64

1      A.     I may have.
2      Q.     Are you -- and does that
3 refresh your recollection if you ever
4 presented an ATIXA event one way or the other?
5      A.     Not specifically, no.  There
6 are sometimes events that are cosponsored.  I
7 don't recall specific ATIXA events, but
8 sometimes there are trainings and other
9 institutes that are cosponsored among
10 different organizations.
11      Q.     And if I forget to ask -- well,
12 can you make available to your attorney,
13 whether your attorney discloses it is a
14 different issue, the list of your professional
15 webinars that you assembled, that I understand
16 is not complete?
17      A.     Yes.
18      Q.     What is the Jesuit Association
19 for Student Personnel?
20      A.     That's another one that we're a
21 member of.  I apologize for missing that
22 earlier, but that is the Jesuit Association of
23 Student Personnel Administrators.
24      Q.     And what's your role there, if

Page 65

1 any?
2      A.     So I'm a member.  The
3 institution is one of 28 Jesuit institutions
4 in the U.S.  Saint Joseph's University I
5 mean.  So by way of that I am a member.  I
6 served as a Program Committee Member for the
7 JASPA five-year institute in 2015 at the
8 University of San Francisco.  And I am
9 currently serving as the Co-Chair of the
10 five-year summer institute for JASPA in 2020
11 at Loyola, Chicago.
12      Q.     And what type of events will be
13 at the summer institute?
14      A.     We're still in the planning
15 phases of that.
16      Q.     Let me ask the question a
17 different way.  Using your experience with the
18 2015, what types of presentations and
19 education or seminars do you expect will be
20 available?
21      A.     Again, it is within the field
22 of student affairs.  So a pretty broad array
23 of topics to include the various functional
24 affairs within student affairs embedded within

17 (Pages 62 - 65)

CONFIDENTIAL

1 the mission of Jesuit institutions.
2     Q.     In the 2015 summer institute,
3 was there any presentations or workshops on
4 Title IX or student sexual misconduct?
5     A.     I don't recall specifically.
6     Q.     Did you teach any?
7     A.     I don't believe so.
8     Q.     Do you periodically review the
9 Dear Colleague Letters and the Q&A that are
10 issued by the Office for Civil Rights of the
11 Department of Education?
12    A.     Yes.
13    Q.     Do you retain copies of those
14 in your office?
15    A.     All of them?  I'm not sure that
16 I have all of them.
17    Q.     Sure.  And I was just trying to
18 get a sense for how closely you work with
19 them.
20          Let me ask kind of a related
21 question.  What reference materials do you
22 keep in your office in terms of Title IX,
23 Clery Act or that type of subject matter?
24          MR. PICCERILLI:  Can we break

1 it down.
2          MR. MIRABELLA:  Sure.  The
3 witness can describe any way she's comfortable
4 saying what reference materials she keeps
5 handy or from time to time refers to.
6          THE WITNESS:  It varies quite
7 honestly depending upon what I believe is
8 probably readily available, publicly
9 available, and what I may need to retain my
10 own copy of for one reason or another.  Many
11 of the information -- much of the information
12 that you just described is readily available,
13 in my opinion.
14 BY MR. MIRABELLA:
15    Q.     Do you have any textbooks or
16 particular publications that you use more
17 often than others?
18    A.     No.
19    Q.     What's your understanding of
20 the significance of the Dear Colleague and Q&A
21 materials when they're issued for school
22 administrators?
23    A.     They are subregulatory
24 guidance, so we review those items.  We take

1 them for what they are, subregulatory
2 guidance.
3     Q.     And what's your understanding
4 or definition of subregulatory?
5     A.     It's not the law.
6     Q.     At Saint Joseph's has anyone
7 provided you training with respect to the
8 areas of student discipline when you first
9 assumed your role back in 2003, 2004?
10    A.     Can you repeat that again.
11    Q.     Sure.  Did you get any training
12 in-house at Saint Joe's in connection with
13 your role as Student Discipline when you first
14 came to Saint Joe's?
15    A.     Yes.
16    Q.     And who was that from or how
17 was that done or both?
18    A.     Dr. Nancy Komada, one of my
19 supervisors at the time.  Dr. Linda Lelii was
20 the Vice President of Student Life at the
21 time.  There was another colleague, Dr. Lynn
22 Ortale, who I believe was an Associate Vice
23 President for Student Life at the time.
24    Q.     I'm jumping around a little

1 bit.  Back to the interim policy on sexual
2 misconduct and the committee.
3          So tell me, that committee was
4 involved in transitioning from the interim
5 policy to what I'll call the final policy that
6 was in place in 2015, non-interim policy?
7     A.     Can you repeat that?
8     Q.     Sure.  In January of 2015 there
9 was an interim SMP policy; correct?
10    A.     For students only.
11    Q.     And then there was a final SMP
12 policy that came into effect I believe in June
13 of 2015 or sometime thereafter?
14    A.     Yes, I believe so.
15    Q.     And tell me what your
16 committee's focus was on in connection with
17 that transition.
18    A.     It was to look at a university
19 wide policy for sexual misconduct.
20    Q.     So the interim SMP only applied
21 to students?
22    A.     Correct.
23    Q.     And did same hold for the
24 policy against discrimination?

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1     A.     I don't recall specifically.
2     Q.     During your time when you were
3 directly involved in student discipline, and I
4 know that spans from 2004 to 2013?
5     A.     Currently.
6     Q.     All right.  Let me try to
7 bracket this a little differently.  Have the
8 number of claims of sexual misconduct been --
9 that have been reported have they been
10 relatively steady, have they changed, have you
11 noticed any trends?
12    A.     I don't know that I can comment
13 on that right now without reviewing
14 information around that.
15    Q.     You became the Assistant to the
16 Vice President in 2013?
17    A.     To the Vice President in 2007.
18 Assistant Vice President in 2013.
19    Q.     Since becoming Assistant Vice
20 President in 2014 to the present time, have
21 you been aware of any changes in the frequency
22 of reporting of claims of sexual misconduct?
23    A.     Again, without that information
24 I don't know that I can comment on that.

Page 71

1     Q.     Who is responsible for the
2 investigation of claims of sexual misconduct
3 under the -- at the school if it involves a
4 Respondent that is not a student?
5     A.     I believe there's a difference
6 between faculty and staff, depending upon the
7 status of the Respondent, whether it's faculty
8 or staff.
9     Q.     And this is not an area you are
10 directly involved in; correct?
11    A.     Correct.
12    Q.     So if the potential Respondent
13 is either a staff member or faculty member,
14 that takes it outside of your purview;
15 correct?
16    A.     That's correct.
17    Q.     Okay.  Do you know what
18 department would handle that?
19    A.     Human Resources.
20    Q.     And do you know currently who
21 is the Director of -- or who in Human
22 Resources would be responsible for that?
23    A.     I don't know specifically.  The
24 Vice President for Human Resources is Sharon

Page 72

1 Eisenmann.
2     Q.     Who currently is the Title IX
3 Coordinator at Saint Joseph's?
4     A.     Dr. Mary-Elaine Perry.
5     Q.     But she's the Interim
6 Coordinator?
7     A.     Correct.
8     Q.     Why is she the Interim
9 Coordinator and not the Coordinator, if you
10 know?
11    A.     There were reductions, staff
12 reductions at the University, position
13 eliminations as of June 1, 2018.  I don't know
14 if I know the details of her specific
15 situation regarding her interim role.
16    Q.     Were there any other staff
17 reductions in that time frame in connection
18 with the people that report to you or your
19 office?
20    A.     So as of June 1, 2018 three of
21 the offices that I described reporting to me
22 currently were not reporting to me.  So
23 Counseling, Student Health and Student
24 Outreach and Support did not report to me

Page 73

1 prior to June 1st.
2     Q.     And do you know to whom they
3 reported?
4     A.     Dr. Mary-Elaine Perry.
5     Q.     And do you have an
6 understanding as to which office or in which
7 hierarchy of administration the next Title IX
8 Coordinator will be placed and will function?
9          THE COURT REPORTER:  Can you
10 repeat that.
11 BY MR. MIRABELLA:
12    Q.     Do you know what the plan is
13 going forward with respect to the next Title IX
14 Coordinator, are you aware in what office that
15 person will function?
16    A.     I do not know that
17 information.
18    Q.     As it stood previously, did Dr.
19 Perry, as the Title IX Coordinator title, fall
20 underneath the office of Dr. Anderson?
21    A.     Yes.
22    Q.     With respect to the SMP, and
23 you may have already answered this, what
24 particular areas would your committee discuss

19 (Pages 70 - 73)

CONFIDENTIAL

1  with respect to any changes, to the best of
2  your recollection?
3       A.      It was really looking at
4  creating and establishing the University wide
5  policy.  So in terms of specific areas, I
6  can't recall right now if there was a specific
7  area.
8       Q.      And the SMP was revised I
9  believe in 2017?
10      A.      I don't recall specifically.
11      Q.      Have you had any involvement in
12  the revisions or writing the revisions?
13      A.      Typically, yes, I would be in
14  some way consulted.  I'm not responsible for
15  the actual revisions to the policy, but I
16  would be consulted on those.
17      Q.      And sitting here today, you
18  have no recollection of any specific changes?
19      A.      Specifically I cannot say for
20  sure, no.
21      Q.      I would like to ask you some
22  questions about the slideshow, "Breaking the
23  Silence" presentation.
24      A.      Okay.

1       Q.      As understand it, you were the
2  facilitator of that program?
3       A.      Yes.
4       Q.      What does that mean?
5       A.      I was a presenter.
6       Q.      And you've been doing that for
7  a number of years?
8       A.      Yes.
9       Q.      How is it presented to the
10 students generally?  I mean, they're put in a
11 room and a slideshow is turned on.  Is there a
12 moderator?  What's the method for introducing
13 students to the information in the
14 presentation?
15      A.      Small groups, so smaller
16 groups.  We have a couple hundred students
17 attend our orientation session.  So we break
18 those couple hundred students into smaller
19 groups with their orientation leader, and
20 there's one presenter who is, I like to use
21 the word facilitate, the presentation because
22 it's interactive.  But yes, there's a
23 slideshow.
24      Q.      And where did the content for

1  the slideshow come from?
2       A.      Marci Berney is directly
3  responsible for the creation of the
4  PowerPoint.
5       Q.      Do you see the PowerPoint?
6       A.      Yes.
7       Q.      And you're the facilitator, but
8  are you in the room as it's played out for the
9  students?
10      A.      Yes, I'm the one that is
11 presenting and facilitating the session for a
12 small group of students.
13      Q.      In the slideshow -- strike
14 that.  Let me try another way.
15              In "Break the Silence"
16 slideshow it says that sexual assault occurs
17 when the act is intentional and committed by
18 force, violence, threat or intimidation,
19 ignoring the objection of another person.
20              I don't want to read the whole
21 thing since it's such a long definition.
22              Do you agree with definition?
23 I'll finish it if you want.
24              MR. PICCERILLI:  I'm going to

1  just object to the extent that you're reading
2  and not showing the witness the slide.  It's
3  hard for her to remember I would think.
4               MR. MIRABELLA:  Off the
5  record.
6                     - - -
7       (Whereupon, a discussion was held off
8  the record.)
9                     - - -
10      (Whereupon, Exhibit White-1 was marked
11 for identification.)
12                    - - -
13 BY MR. MIRABELLA:
14      Q.      Dr. White, I'm going to ask you
15 some questions about some of the definitions I
16 started on.  My prior question I started
17 reading was part of the definition.  I don't
18 know if that was the best way to go about it.
19 You're free to take a minute to review it.
20              For the record, this was
21 produced as SJU1019 through 1051.  And when
22 you're ready let me know.  I'm going to ask
23 you some questions about the definition,
24 particularly as pertaining to sexual assault.

Page 78

1    A.    Okay.
2    Q.    Do you have the Definition page
3  in front of you?
4    A.    I believe so.
5    Q.    Can you read the number into
6  the record or can you tell me what the number
7  is?
8    A.    Are you referring to the number
9  on the bottom right (indicating)?
10    Q.    Yes.
11    A.    SJU001030.
12    Q.    So just for context, this is a
13  printout of the slideshow that's shown during
14  orientation; correct?
15    A.    It appears to be, yes.
16    Q.    And this page is a printout
17  from that slideshow.  I don't know if it's one
18  slide or not, but I'm assuming that's what is,
19  and it starts with:  Sexual Assault is Defined
20  As at the top of the page; correct?
21    A.    Correct.
22    Q.    And this is what is shown to
23  the students at orientation; correct?
24    A.    Correct.

Page 79

1    Q.    And then it goes on and gives
2  definitions of sexual assault, which I started
3  reading and your Counsel objected, I agreed
4  with the objection, so now we're looking at
5  the definition on the slideshow.
6        Have you had a chance to --
7  you've done this presentation, you've seen
8  this definition before; correct?
9    A.    Yes.
10    Q.    Do you agree that that's an
11  accurate definition of sexual assault?
12    A.    Yes.
13    Q.    All right.  I'm going to ask
14  you some other questions about some of the
15  information in the slideshow.  Some might be
16  would you agree with it, some might be other
17  questions.
18        On Page 00129 there's a slide
19  entitled Sexual Assault = Sexual Harassment,
20  and it's talking about a definition.  Can you
21  explain what's meant to be conveyed there, if
22  you know?
23        MR. PICCERILLI:  SJU1029?
24        THE WITNESS:  Yes, this slide

Page 80

1  follows the previous slide 1028 where there
2  are scenarios that are posed to the group of
3  students and then they're asked to reflect on
4  whether or not they feel this is harassment.
5        So we move from harassment into
6  sexual assault as it being a form of sexual
7  harassment.
8        I'm sorry, can you repeat what
9  your specific question was?
10  BY MR. MIRABELLA:
11    Q.    Sure.  I was asking you what
12  was the intent as the facilitator of the
13  information to be conveyed to the students,
14  and I think that was what you just answered?
15    A.    Yes.
16    Q.    Bear with me just a second.  I
17  want to ask you some questions about the slide
18  pertaining to consent.  I have to find it.
19        And I take it there is a slide
20  that talks about the issue of consent;
21  correct?
22    A.    Yes.
23    Q.    Do you have that in front of
24  you?

Page 81

1    A.    I have 1035 as one.  There's
2  also 1036, 1037, 1038.
3    Q.    All right.  1036 I think is
4  blacked out.  Is that like -- do you know
5  what is normally there or how that's --
6    A.    Yes, I believe because of the
7  white box up top with the Consent, It's Simple
8  as Tea, it's a video.  So that may be why.
9    Q.    And what's Tea an acronym for?
10    A.    No, it's tea, like a cup of hot
11  tea.
12    Q.    And can you explain how that's
13  used to teach students?
14    A.    Yes, it's a simple version, I
15  can't recall how long the video is, a rather
16  short video, depicting stick figures and a cup
17  of tea and creating a humorous, but not too --
18  not humorous in terms of being insensitive to
19  the topic, but it's a humorous way to convey
20  consent regarding somebody's desire,
21  willingness, consent to drink a cup of tea.
22    Q.    And that's used as a metaphor
23  for consent involving romantic or sexual
24  activity?

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1  A.  Correct.
2  Q.  Is it your belief that,
3 generally speaking, claims of sexual
4 misconduct are underreported by the victims?
5  A.  That's the national research.
6  Q.  Do you believe that is true?
7  A.  I believe that the national
8 research is sound, yes.
9  Q.  And do you believe that that
10 also holds on SJU's campus at least during the
11 current time frame?
12  A.  I don't know what I don't know.
13  Q.  In the consent 1038 checklist,
14 do you see Verbal and Non-Verbal?
15  A.  Yes.
16  Q.  Briefly, tell me a little bit
17 about the non-verbal cues. I'm going to take
18 you through each one. What's that mean to
19 convey?
20  A.  So you would like to take me
21 through each one?
22  Q.  Yes. So first off, what is
23 meant by Non-verbal Cues?
24  A.  Lack of consent without their

Page 83

1 being a verbal indication of lack of consent.
2  Q.  So there are situations in
3 which consent could be verbal and situations
4 where it could be non-verbal; correct?
5  A.  Yes.
6  Q.  And if consent is non-verbal,
7 it can be changed by either verbally or
8 non-verbally; correct?
9  A.  Can you repeat that.
10  Q.  Sure. If there's romantic or
11 sexual activity and it was consensual, the
12 consent was non-verbal, the person who gave
13 the non-verbal consent could withdraw it
14 either with a verbal or a non-verbal cue?
15  A.  Can you repeat that one more
16 time? I'm sorry.
17  Q.  Sure.
18  A.  Or break it down for me if
19 you're able to do that.
20  Q.  Sure. Can consent once given
21 be withdrawn?
22  A.  Yes.
23  Q.  And it can be withdrawn
24 verbally; correct?

Page 84

1  A.  Yes.
2  Q.  And can consent be withdrawn
3 non-verbally?
4  A.  Yes.
5  Q.  Can you describe how students
6 are taught to withdraw non-verbally?
7  A.  I'll give the example of
8 someone passes out.
9  Q.  And if you can just flesh that
10 out a little more, although I think I
11 understand what you mean.
12  A.  Sure. If there is a situation
13 where a student is intoxicated and they may
14 verbally consent or non-verbally consent and
15 then they pass out from intoxication, they are
16 not in the position to be able to consent at
17 that point.
18  Q.  So the passing out serves as a
19 non-verbal withdrawal of consent?
20  A.  Correct.
21  Q.  There's some other things
22 described, mentioned, and these are obviously
23 in this slide by way of examples.
24  For the record it's 1038.

Page 85

1 Pushing away, what's meant by that?
2  A.  I don't know that I can
3 describe exactly what each of these things
4 would mean. But what we share with students
5 is that there's a definition of consent in our
6 policy. This presentation is not to take away
7 any information within that policy regarding
8 the definition of consent. It's not to --
9  Q.  I'm just asking some questions
10 about the non-verbal cues that are shown to
11 the students and discussed at orientation.
12  A.  Right.
13  Q.  And I want to get into that in
14 a little further detail. So some examples
15 listed here are, you already talked about
16 passing out; correct?
17  A.  Yes, I did.
18  Q.  All right. And then one is
19 freezing, sudden stop of participation. Is
20 there any further discussion about that?
21  A.  No.
22  Q.  And what is meant to convey
23 here as an example of a non-verbal cue?
24  A.  When an individual freezes.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    Q.    And in that instance, if an
2  individual freezes, that should be something
3  that your partner looks at as a withdrawal of
4  consent?
5    A.    It may be.
6    Q.    When there are non-verbal cues,
7  is the partner supposed to read them -- strike
8  that.
9          What's the responsibility of
10  the partner as he's talking to students to
11  read non-verbal cues?
12    A.    The responsibility of the party
13  is to know whether or not there is consent
14  present at all times.
15    Q.    And when there's a withdrawal
16  of consent to stop; correct?
17    A.    Same, yes.
18    Q.    If there's a withdrawal of
19  consent and the party stops in a reasonable
20  period of time, can that still be a violation
21  of sexual misconduct?
22    A.    It would depend upon the
23  circumstances.  That's exactly what the
24  process is for, to determine that.  It's a bit

Page 87

1  more hypothetical.
2    Q.    They're all pretty hypothetical
3  to be fair.
4    A.    Yes.
5    Q.    But there's a subjective
6  element to it and I'm trying to probe what the
7  students are told during the orientation
8  program in terms of responsibility of the
9  person giving or withdrawing consent and the
10  responsibility of the person who needs to
11  determine if consent is present.
12          So the non-verbal cues are
13  meant to sensitive the students that the
14  absence of a verbal cue does not mean that
15  there is consent, among other things?
16    A.    Correct.
17    A.    But there should be either a
18  verbal or non-verbal cue, that the Respondent
19  isn't expected to be a mind reader; correct?
20    A.    I'm not sure what you mean by
21  mind reader.
22    Q.    What does the term "cue" mean?
23    A.    An indication.
24    Q.    And it's an indication that in

Page 88

1  the absence of a cue there would be no
2  indication?
3          MR. PICCERILLI:  Objection to
4  form.  You can answer the question.
5          THE WITNESS:  I present to the
6  students that it is their responsibility to
7  ensure that consent is present during all
8  stages of intimacy.
9  BY MR. MIRABELLA:
10    Q.    During the orientation are the
11  students -- strike that.
12          During the slideshow is the
13  presentation -- is the subject of whether the
14  people who complain of being victims of sexual
15  assault should be believed?  Is that
16  specifically addressed?
17    A.    In the presentation you asked?
18    Q.    Yes.
19    A.    Can I take a moment to look at
20  it?
21    Q.    We'll take a two-minute.
22    A.    Are we breaking?
23    Q.    You're entitled to a break
24  whenever you want one.  We can take a break so

Page 89

1  you can look through the slideshow.
2                - - -
3          (Whereupon, a short break was taken at
4  this time.)
5                - - -
6  BY MR. MIRABELLA:
7    Q.    We were talking about the slide
8  and I asked you some questions and we took a
9  break so you could look at the rest of the
10  slide.  Can you respond to that question more
11  directly?
12    A.    Yes.
13    Q.    So is there anything in the
14  slide about that issue?
15    A.    Slide Number 1048.
16          MR. PICCERILLI:  So the witness
17  was referring to SJU1048.
18  BY MR. MIRABELLA:
19    Q.    And what is germane to my
20  question?
21    A.    So the first bullet states:
22  Believe!  The most important thing to do is to
23  believe a victim.  The slide when I present
24  is -- well, first of all, it's presented to

23 (Pages 86 - 89)

1 the students and a big part of the
2 presentation is stressing the importance of
3 bystander intervention, effective bystander
4 intervention, as well as how to help friends.
5           And again, the entire
6 presentation is focused on not just sexual
7 assault, but also dating violence and stalking
8 as well.  So we speak with students about how
9 to help a friend who may be in need in one of
10 these situations.
11     Q.    The language that says:
12 Believe!  The most important thing to do is
13 believe a victim, do you believe that's
14 accurate?
15     A.    In terms of the context with
16 providing information to students with how to
17 help their friends, yes.
18     Q.    Do you believe it's important
19 also as it pertains to school administrators
20 and faculty?
21     A.    No.
22     Q.    What's a mandatory reporter?
23     A.    Under Title IX there's a
24 requirement that individuals on campus report

1 incidents relating to Title IX.  Actually, If
2 I could just correct you, it's responsible
3 employee actually.  It's different from
4 mandatory reporter.  I believe there's a
5 different definition for mandatory reporter.
6 That's not we refer to on Saint Joseph
7 University's campus.  So I was referring
8 responsible employee.
9     Q.    You've heard the term mandatory
10 reporter?
11     A.    I have.
12     Q.    Do you know how it fits in or
13 what's the definition of it?
14     A.    I don't know specifically
15 relating to that specific definition portion.
16     Q.    Are you a responsible reporter?
17     A.    I am, I'm a responsible
18 employee.
19     Q.    Can you tell me a little more
20 about that, what that means?
21     A.    I'm responsible for reporting
22 if there are -- if any information comes to my
23 attention regarding Title IX.
24     Q.    Doesn't every employee have

1 that responsibility?
2     A.    At Saint Joseph's University,
3 yes, without -- with some exception in terms
4 of confidentiality.
5     Q.    I guess I'm trying to get a
6 sense for this particular designation.
7           Is it used then for every
8 employee of the school is a responsible
9 employee and should be considered a
10 responsible employee with some limited
11 exceptions?
12     A.    Yes, and there's information
13 about that this I know for sure in the Annual
14 Security Report and the policy.  So you can
15 refer to that.
16     Q.    And what are the students told,
17 if anything, about what a responsible employee
18 is?
19     A.    Are you referring to this
20 PowerPoint presentation?
21     Q.    Sure.  During the PowerPoint
22 presentation is that subject addressed?
23     A.    Can I take a minute and look?
24     Q.    Of course.

1     A.    So on slide 1049.
2           MR. PICCERILLI:  That's SJU
3 Number 1049.
4           THE WITNESS:  So on slide 1049
5 there are -- there's information about Options
6 and Procedures, and responsible employee is
7 referred to in Items A, C and D.
8 BY MR. MIRABELLA:
9     Q.    And is the term defined on that
10 slide or no?
11     A.    It is not.  It refers to
12 details for each reporting option and it
13 refers to a website.
14     Q.    As a responsible employee, are
15 you provided any specific training, or do you
16 sign a document or a contract confirming that
17 you're familiar with the process of being a
18 responsible employee?
19     A.    I recall a training, an online
20 training that I participated in as an employee
21 of the University.  I can't recall the
22 specifics around the information related to
23 responsible employee or if I had any sort of
24 electronic signature associated with that

24 (Pages 90 - 93)

CONFIDENTIAL

1 online training.
2      Q.      Who is currently the Director,
3 if there is one, of the Rape Education and
4 Prevention Program?
5      A.      I don't know if it would -- I
6 don't know if the official title is Director,
7 but there is an advisor of the Rape Education
8 and Prevention Program, and that's Dr. Raquel
9 Bergen.
10      Q.      It's my understanding that
11 Katie Bean works in the Office of Outreach and
12 Support?
13      A.      Outreach and Support, yes.
14      Q.      And then does she work with or
15 under Marci Berney?
16      A.      Yes, she reports to Marci
17 Berney.  Yes.
18      Q.      And I know it's not your
19 office, but are you familiar with the Campus
20 Climate Survey?
21      A.      I'm familiar with the survey,
22 yes.
23      Q.      What is it a survey about?
24      A.      I engage in the survey as a

1 respondent in the survey.  I had nothing to do
2 with the design of the survey or
3 implementation of the survey.
4      Q.      Correct, but what were the
5 types of questions asked about on the survey?
6      A.      I believe questions about, I
7 want to say general climate questions.
8      Q.      Since I haven't the slightest
9 idea what that refers to, if you can just tell
10 me.
11      A.      It's pretty broad.  It's
12 related to feelings about your involvement in
13 decision making at the University, parking at
14 the University, diversity issues, inclusion
15 and diversity issues on campus.
16      Q.      Did it also have questions, if
17 you recall, in areas involving physical
18 security or safety?
19      A.      I don't recall.
20      Q.      When did do -- are they done
21 every year?
22      A.      Not to my knowledge.
23          MR. PICCERILLI:  You mean are
24 the surveys conducted every year?

1          MR. MIRABELLA:  Correct.
2          THE WITNESS:  Not to my
3 knowledge.
4 BY MR. MIRABELLA:
5      Q.      Does Ms. Berney's office
6 tabulate the data they receive from the
7 surveys, do you know?
8      A.      I do not know.  But as far as I
9 am concerned and what I do know, I
10 participated in one as an employee a year or
11 so ago, and that was not out of Student
12 Outreach and Support.
13      Q.      The link on slide 1051,
14 that's -- I guess is that just for taking a
15 test to determine how much content the
16 participant retained?
17      A.      Yes, you'll see on slide
18 SJU001010 there's a pre test and a post test.
19 So as soon as the students come to the session
20 they're asked to open their phones, take a
21 quick pre test and upon conclusion of the
22 session take out their phones again and take a
23 post test.
24      Q.      One of the slides references a

1 false reporting rate of eight percent for
2 claims of sexual misconduct.
3          MR. PICCERILLI:  Do you want to
4 find the slide?
5          MR. MIRABELLA:  Sure.
6          THE WITNESS:  1031.
7          MR. PICCERILLI:  SJU 1031.
8 BY MR. MIRABELLA:
9      Q.      Do you know any of the sources
10 of information for that statistic?
11      A.      I'm sorry, can you --
12      Q.      Sure.  Do you know where that
13 comes from?  There's a FBI reference here, but
14 do you know anything about the Uniform Crime
15 Report or anything like that?
16      A.      Nothing beyond what's presented
17 here, no.
18      Q.      Do you have a belief or
19 understanding as to the frequency of false
20 reporting consistent or inconsistent with the
21 eight percent referenced here?
22      A.      Again, I would answer similar
23 to how I answered the other question.  This is
24 research that I would believe is sound

25 (Pages 94 - 97)

CONFIDENTIAL

1 research.
2      Q.      And do you know when that
3 research was done?
4      A.      I do not.
5      Q.      Is there any talk during the
6 slideshow or orientation about students
7 reporting misconduct other than issues
8 involving harassment or sexual misconduct?
9      A.      Yes, as I mentioned, it's also
10 regarding dating violence and stalking within
11 sexual misconduct, yes.
12      Q.      To your knowledge, as the
13 Assistant Vice President of Student Life, are
14 there any presentations given to the students
15 that talk about the need to report substance
16 abuse or excessive alcohol use, things of that
17 nature, which I believe falls outside of this
18 selection, well, generally speaking, it
19 doesn't involve sexual misconduct, outside of
20 the slideshow?
21      A.      There is another session during
22 New Student Orientation dedicated to alcohol
23 and drug.
24      Q.      And how is that session

1 conducted, just briefly?
2      A.      I did not present that session
3 this year. I don't recall if I presented it
4 last year as well.
5      Q.      Is it done for all freshmen?
6      A.      During New Student Orientation,
7 yes.
8      Q.      Do they use a slideshow?
9      A.      I don't know specifically. I
10 was not involved with that.
11      Q.      Who was involved with that?
12      A.      Katie Bean facilitated that
13 session.
14      Q.      And do you know one way or the
15 other if there's anything talked about during
16 that session regarding the responsibility to
17 intervene or to report as it pertains to other
18 students?
19      A.      I do not know.
20      Q.      SJU has on it website a "You
21 Are Not Alone" platform or section or dropdown
22 box or link. Do you have any familiarity with
23 that?
24      A.      No.

1      Q.      Tell me a little bit about the
2 2017 grant application for the grant directed
3 to the Office of Violence against Women and
4 your role in putting together the
5 application.
6      A.      So I was the lead author. I
7 worked with a small team to apply for the
8 grant early January or early 2017. We
9 applied, we were awarded the grant. We
10 received notification late September of 2017.
11      Q.      When did you start working on
12 the grant application?
13      A.      I can't recall the specific
14 date, but the solicitation for it comes out
15 maybe about six weeks or so before the
16 deadline.
17      Q.      And what do you mean by
18 solicitation?
19      A.      When the Office on Violence
20 Against Women actually published that there
21 was going to be a grant and was accepting
22 applications and what the requirements were.
23      Q.      And do you know how many grants
24 there were?

1      A.      I do not know that offhand.
2      Q.      Did you know if SJU applied for
3 that grant or a similar grant from the Office
4 of Violence Against Women before?
5      A.      Yes, I was the lead author the
6 previous year applying for the same grant,
7 and we were not awarded it.
8      Q.      And had you applied for it any
9 other years?
10      A.      I did not, no.
11      Q.      When you were speaking to other
12 members of the SJU community, how would you
13 describe the purpose of applying for the
14 grant, the reasons behind it?
15      A.      When you say -- what do you
16 mean by -- you mean people at the University?
17      Q.      Oh, not someone on your team,
18 but somebody who wants to know the process,
19 how would you explain why you were working on
20 the grant application?
21          MR. PICCERILLI: Objection to
22 form.
23          THE WITNESS: Looking for
24 funding to support our effort related to

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1 sexual misconduct.
2 BY MR. MIRABELLA:
3    Q.    This application was in 2017.
4 You described one in 2016 that did not result
5 in a grant.  Had you done an application
6 before then?
7         MR. PICCERILLI:  For this
8 particular grant?
9         MR. MIRABELLA: Yes.
10        THE WITNESS:  No.
11 BY MR. MIRABELLA:
12    Q.    Do you know if this particular
13 grant was even available before then?
14    A.    I do not know.
15    Q.    Had you applied for other
16 similar grants before 2016?
17    A.    No.
18    Q.    And when say for our work, in
19 terms of the purpose of applying for the
20 grant, can you be more specific?
21    A.    Primarily looking at prevention
22 and education related to sexual misconduct.
23    Q.    I asked you some questions
24 earlier, I want to circle back, we might have

Page 103

1 been talking about apples or oranges.
2         So there was a grant
3 application done in 2016 for funding in
4 connection with the prevention and education
5 pertaining to sexual misconduct on campus;
6 correct?
7    A.    Correct.
8    Q.    And the purpose of the
9 application was to obtain funding to increase
10 prevention and education on the campus?
11    A.    I did not say increase.
12    Q.    Okay, I'm sorry.  The purpose
13 of the application was to secure funding?
14    A.    Correct.
15    Q.    And the funding was expected to
16 be used for activities related to the
17 prevention and education as pertaining to
18 sexual misconduct?
19    A.    Correct.
20    Q.    And I go back to had there been
21 increase in the reports, for instance, of
22 sexual misconduct in 2014 or 2015 that played
23 into the decision to seek the grant?
24    A.    Not that I can recall, no.

Page 104

1    Q.    Do you know what changed --
2 strike that.
3         What was the primary difference
4 between the 2016 and the 2017 application?
5         When I say primary difference,
6 if not primary, what ways were the
7 applications handled differently?
8    A.    I don't remember all the
9 specifics.  I recall there being interest in
10 having, and this was feedback from OVW, I
11 believe, to secure an MOU, a Memorandum of
12 Understanding, with our local DA, District
13 Attorney's Office.  Also some formatting,
14 quite honestly, formatting of the application
15 itself, being a bit more organized.  They were
16 two substantive changes that I recall from
17 2016 to the 2017 application.
18    Q.    Did the 2016 application
19 include both external and internal Memorandum
20 of Understanding?
21    A.    Yes, that was a requirement.
22    Q.    And so the addition of the
23 Memorandum of Understanding from the DA's
24 Office was just one additional external

Page 105

1 Memorandum of Understanding?
2    A.    Correct.
3    Q.    Who did the leg work in
4 connection with putting together of the
5 Memorandum of Understanding?
6         MR. PICCERILLI:  Objection to
7 form.
8         THE WITNESS:  What do you mean
9 by leg work?
10 BY MR. MIRABELLA:
11    Q.    Sure.  Those Memorandum seemed
12 to have been the result of meetings between
13 SJU and groups on the SJU campus or outside
14 the SJU campus about goals and campus safety.
15        Did any one person have
16 responsibility for going forward with creating
17 and executing on the Memorandum of
18 Understanding that you had in the grant
19 application?
20    Q.    I spearheaded much of the
21 effort.  There were not significant meetings
22 for the most part, if at all.  We had really
23 good relationships in place already with the
24 individuals that were listed on the MOU.

27 (Pages 102 - 105)

CONFIDENTIAL

1     Q.     And were those relationships in
2 place even going back to 2016?
3     A.     What specific relations?  There
4 were many relationships through those MOUs.
5     Q.     Sure.  I assume many of the
6 internal and external MOUs were used in 2016
7 and 2017?
8     A.     Yes.
9     Q.     And so they had to be renewed
10 or they had to be updated, but they weren't
11 created from scratch?
12     A.     Correct.
13     Q.     And you mentioned external
14 memorandum with the DA's office that was used
15 in 2017?
16     A.     Correct.
17     Q.     By the way, was that Philly or
18 Montgomery County?
19     A.     Philly.
20     Q.     And when you say you
21 spearheaded any of the Memorandums, can you
22 tell me how you went about doing that?
23     A.     Sure.  When I was saying that
24 we had relationships in place it was even

1 prior to the 2016 application.  So in many
2 ways this was formalizing our already existing
3 relationships with many of our internal and
4 external partners.
5          In most instances there were
6 individuals that I knew and had maybe even
7 previously worked with in some capacity.  So
8 calls were made and we had a discussion around
9 the objective of the grant and whether or not
10 they would be willing to be a partner on
11 our -- what would be a newly created
12 coordinated community response team if we were
13 to receive the grant.
14     Q.     Were you a signatory to any of
15 the Memoranda?
16     A.     Yes.
17     Q.     Some, all, which one?
18     A.     Definitely the internal.  I
19 can't recall if I was the signatory on the
20 external or not.
21     Q.     I'm going to hand you, but not
22 mark as an exhibit, SJU 1089 through 1174.
23 The top sheet of the document says Grant
24 Application Package.  I'm going to ask you

1 some questions about it.
2     A.     Okay.
3     Q.     Am I correct this is a grant
4 application for the grant applied for in
5 connection with the Office of Violence Against
6 women that SJU was awarded?
7     A.     Yes.
8     Q.     I want you to take a minute to
9 look through it and I'm going to ask you some
10 questions about it.
11     A.     (Witness reviews document.)
12     Q.     Have you had a chance to review
13 that?
14     A.     Briefly, yes.
15     Q.     Dr. White, my first question
16 is:  Is this what appears to be the grant
17 application we were discussing?
18     A.     The 2017 grant application,
19 yes.
20     Q.     Where, if you were asked, would
21 you say best captures the purpose of seeking
22 the grant in the application?  Is it in the
23 grant application itself, is it in the
24 Memorandum of Understanding or is it in a

1 number of different places?
2     A.     I think it's the collective
3 application as a whole.
4     Q.     So let me direct your attention
5 to one of the Memorandums of Understanding,
6 SJU 1151.  Are you with me?
7     A.     Yes, I am.
8     Q.     In the first paragraph about
9 halfway down it says:  The MOU formalizes?
10     A.     Yes.
11     Q.     Can you read that into the
12 record so I can ask you some questions.  Just
13 read it right to the end of the paragraph.
14     A.     Okay:  The MOA formalizes the
15 commitment of a task force to work together to
16 enhance victim safety, provides services for
17 victims, support efforts to hold offenders
18 accountable, improve lines of communication,
19 streamline efforts and increase awareness
20 related to sexual assault, domestic violence,
21 dating violence and stalking (sexual
22 violence).  All the partners have agreed that
23 by joining this MOU they will work in
24 coordination as well as individually to affirm

CONFIDENTIAL

Page 110

1 that, one, sexual violence is a group of
2 serious offenses that will not be tolerated,
3 and two, holistic professional and
4 individualized services are available to
5 victims through a comprehensive coordinated
6 community approach.
7        Q.      All right.  So in the beginning
8 of the sentence where it says:  The MOA
9 formalizes the commitment of a task force to
10 work together to enhance victim safety, I
11 assume the term victim safety refers to
12 somebody who has already been victimized?
13       A.      Correct, different than a
14 Complainant going through the process in terms
15 of -- yes.
16       Q.      I'm sorry, say that again.
17       A.      Different than how I would
18 define Complainant in terms of somebody going
19 through the process who has been reported to
20 have been involved in a situation.  I see the
21 distinction between those two terms.
22       Q.      And what would be an example of
23 a somebody who is a victim, but not going
24 through the process?

Page 111

1        A.      From my lens in terms of my
2 work with student conduct, the Complainant --
3 or the Respondent and Complainant is used
4 because there's not yet been a decision on
5 whether or not the individual is responsible
6 for the conduct that's being alleged.
7        Q.      Understood.  The next clause is
8 provides services for victims; correct?
9        A.      Yes.
10       Q.      And generally speaking, what is
11 meant by that?
12       A.      Support services.  Yes, I would
13 say support services.
14       Q.      And then the next section:
15 Support efforts to hold offenders
16 accountable.  Do you see that?
17       A.      Yes.
18       Q.      What is meant by that?
19       A.      So training in terms of the
20 process, that kind of thing.
21       Q.      As of February 23, 2017, do you
22 believe that the plan, current plan in place
23 to hold offenders accountable was inadequate
24 or was not functioning well?

Page 112

1        A.      No.
2        Q.      Do you believe that -- well, in
3 what respect would the grant money as is set
4 forth here through your lens be used to help
5 hold -- to support efforts to hold offenders
6 accountable?
7        A.      Again, I would point to Lines
8 of Communication, .6 here.
9        Q.      Anything else come to mind?
10       A.      I'm just looking through here.
11 No, not at this time.
12       Q.      So this was one of multiple --
13 am I correct that that's one of the multiple
14 Memorandums of Understanding that were used to
15 support the grant?
16       A.      There were two MOAs used.
17       Q.      One is internal and one is
18 external?
19       A.      Correct.
20       Q.      I misunderstood your earlier
21 answer, but there was also an external
22 Memorandum of Understanding in 2016, but the
23 Philadelphia DA was not a signatory; is that
24 correct?

Page 113

1        A.      Correct.
2        Q.      Did you believe as part of the
3 application process that there was a growing
4 need on the SJU Campus to respond effectively
5 to claims of sexual assault?
6        A.      Can you repeat that.
7        Q.      Sure.  Did you believe as part
8 of your application and part of preparing the
9 MOUs that there was a growing need to respond
10 effectively to claims of sexual assault on the
11 SJU campus?
12       A.      No, I would not say that there
13 was necessarily a growing need to do so.
14       Q.      Were there monthly meetings
15 mandated under the Memorandum of Understanding
16 to respond effectively to claims of sexual
17 assault?
18       A.      Are you referring to what was
19 submitted as part of the application or what
20 is in practice currently?
21       Q.      Was part of the application.  I
22 believe it's 1074.  Well, actually it starts
23 at 1089.  Bear with me.  I don't believe you
24 have 1074 in front of you.  It wasn't a trick

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1 question.
2     A.   Oh, no, sorry, I was looking at
3 1174. No, I do not.
4     Q.   So I asked you a question and
5 you asked me it clarify about existing policy
6 for the grant application. So I'll give you
7 what's been marked as SJU 1074. You'll
8 welcome to see what's before it or what's
9 after it, and it talks about the Campus
10 Anti Violence Coalition and the Campus Anti
11 violence Task Force.
12     A.   Thank you.
13     Q.   And my question was about
14 monthly meetings, and this was part of the
15 Memorandum of Understanding that was submitted
16 with the grant application.
17          MR. PICCERILLI:  Take a minute
18 to read it.
19          THE WITNESS:  And this is not a
20 part of this?
21 BY MR. MIRABELLA:
22     Q.   No, it is. It is not part of
23 the pages that I handed you, but I believe
24 it's a Memorandum of Understanding that was

Page 115

1 part of the grant application.
2     Doctor, what page do you have,
3 the separate page pulled out?
4     A.   That's where I looking for this
5 context. It seems like it is 1139.
6     Q.   My first question is: Was that
7 something that was intended as information as
8 to what Saint Joe's was going to do with the
9 grant application funds or something that was
10 already in place, or neither?
11     A.   Can I have a moment to look at
12 this?
13     Q.   Oh, yes.
14     A.   (Witness reviews document.)
15 Can you repeat the question.
16     Q.   Oh, sure. The monthly
17 meetings, was that already taking place or is
18 that something that SJU was making part of its
19 application as a new feature if it received
20 the grant?
21     A.   So I think -- so the monthly
22 meetings were not taking place because the
23 Campus Anti Violence Coalition was not
24 formulated yet in a formal capacity. That was

Page 116

1 the purpose, one of the purposes of the grant
2 was to form this.
3          So if I may just offer that the
4 application projected and assumed that certain
5 things may be part of what the grant funding
6 would go to, and then there was another
7 process that took place in terms of finalizing
8 that, finalizing a budget and that type of
9 thing.
10          So looking at this now from
11 where we are on this end of things I will say
12 that some of this is different, even including
13 the name of what we proposed as a coalition.
14     Q.   And as part of the grant
15 application, has SJU affirmed that it will
16 comply with certain Federal statutes including
17 Title IX and others?
18     A.   Correct.
19     Q.   Was it ever your expectation
20 that if SJU received the grant and implemented
21 the measures it described in the grant
22 application that there would be an increase in
23 the amount of reports of sexual misconduct?
24     A.   I don't recall.

Page 117

1     Q.   I want to ask you some
2 questions about something that was published
3 in The Hawk attributed to Dr. Perry, not to
4 you. We'll mark this as Exhibit 2.
5          - - -
6          (Whereupon, Exhibit White-2 was marked
7 for identification.)
8          - - -
9 BY MR. MIRABELLA:
10     Q.   Dr. White, what's The Hawk
11 Newspaper?
12     A.   It's the student newspaper on
13 campus.
14     Q.   And I apologize, the copying is
15 getting -- the Xerox is getting a little
16 thin. Can you read the article written or see
17 the article written by Charley Rekstis
18 beginning on what's marked as page 2 of 9?
19     A.   Yes, I cannot read the words
20 within the picture.
21     Q.   Neither can I. I'm not going
22 to ask you about the words in the picture.
23          It's an article talking about
24 the OVW grant we are discussing now; is that

CONFIDENTIAL

1 correct?
2     A.    Yes.
3     Q.    Is the individual you
4 identified earlier the Prevention Specialist
5 referred to by Dr. Perry in the last
6 paragraph, first sentence?
7         MR. PICCERILLI:  Are you on
8 Page 2 of 9?
9         MR. MIRABELLA:  Yes.
10        THE WITNESS:  Yes.
11 BY MR. MIRABELLA:
12    Q.    Who was that again?
13    A.    Christopher Morrin.
14    Q.    All right.  I'm going to turn
15 your attention to the next page and ask you
16 some questions about the information reported
17 in the article.
18        The first paragraph:  The
19 university applied unsuccessfully for this
20 grant last year, that's correct?
21    A.    Correct.
22    Q.    It says:  However, on this
23 attempt they tried a different approach,
24 directly addressing issues of sexual assault

1 on Saint Joe's campus.
2         Do you know, number one, what's
3 meant by that and, number two, if that's
4 accurate?
5     A.    I do not know what's meant by
6 that.
7     Q.    That deletes the question to
8 number two, okay.
9         Do you agree Dr. Perry quoted,
10 at least in the article:  We applied for this
11 grant to support our efforts to keep our
12 students safe and to educate our community.
13        Do you agree with that as
14 motivation for applying for the grant?
15    A.    Yes.
16    Q.    And the article goes on to say
17 without quotes:  The grant will be used to
18 educate students so they have a deeper
19 understanding and better opportunities for
20 raising awareness of sexual assault.
21        Do you agree with that as well?
22    A.    That's part of it.
23    Q.    Okay.  And then Dr. Perry is
24 quoted again:  The ultimate goal of all this

1 work is to prevent sexual misconduct from
2 occurring at the campus.
3         Do you agree with that?
4     A.    I don't know what she's
5 referring to in terms of all of this work.
6     Q.    The talk is about the grant
7 funds and about how they will be utilized, I
8 believe.
9         But do you agree that the goal
10 of obtaining the grant funds was to enhance
11 the work of preventing sexual misconduct?
12    A.    It was to support our efforts,
13 as I mentioned before.
14    Q.    You have to finish the
15 sentence, support our efforts in?
16    A.    Toward the work of sexual
17 misconduct, prevention and education on
18 campus.
19    Q.    And then Dr. Perry is quoted as
20 saying:  Our expectation is that initially we
21 will have more reports of sexual misconduct
22 because students will be aware of what it is
23 and options they have for reporting.
24        Do you agree with that?

1     A.    Where are you at?  I'm sorry.
2     Q.    Sure.  I would say the fourth
3 paragraph, the last sentence.
4     A.    Okay.
5     Q.    The last sentence of a quote
6 from -- another quote from Dr. Perry.
7         I guess -- I'll read you the
8 whole quote:  The more students understand
9 what it is, how it happens and how each of us
10 can play a part to prevent it, the safer our
11 campus will be.
12        Do you agree with that?
13    A.    Again, this is hard, this is
14 difficult for me because there are pronouns in
15 here, what it is, how it happens.
16    Q.    Sexual misconduct.
17        MR. PICCERILLI:  Well, you're
18 asking her to assume what you have just
19 indicated what "it" was.  So I object to the
20 form of the question.
21        MR. MIRABELLA:  Sure.
22 BY MR. MIRABELLA:
23    Q.    Reading from the paragraph
24 above it and the next paragraph starting

31 (Pages 118 - 121)

CONFIDENTIAL

1 with: The ultimate goal, I can ask you the
2 same question and put it into context.
3     A.    And I question the first
4 sentence as well, to be honest, in terms of
5 all of this work. So it's hard to read into
6 somebody's quote when there's not very
7 descriptive language being used.
8     Q.    Did you have any reason to
9 believe that there would be an increase in
10 reports of sexual misconduct after the grant
11 funds were obtained and efforts and measures
12 and education was put into place as described
13 in the grant?
14     A.    Specifically because of the
15 grant, no, not necessarily.
16     Q.    And then Dr. Perry is quoted
17 again as saying: That approximately 700 women
18 at Saint Joe's will have been sexually
19 assaulted during their college career. She
20 only gets 10 to 15 reports a year.
21         Is that consistent with the
22 numbers you've seen with your involvement in
23 student discipline?
24     A.    I don't feel like I could

1 comment on that right now without having
2 information in front of me.
3     Q.    And this article apparently was
4 done following a panel event involving I guess
5 Dr. Bergen who was at the time the Rape
6 Education and Prevention Program person, and
7 Dr. Perry, and there are students listed as
8 well who I won't name.
9         Were you involved in that
10 panel?
11     A.    I don't believe so.
12     Q.    And then there's reference to
13 something said by a student, who I won't name,
14 I'm going to ask you, she's quoted --
15         MR. PICCERILLI: What page are
16 you on?
17         MR. MIRABELLA: I'm sorry, Page
18 4 of 9, toward the top of the page.
19 BY MR. MIRABELLA:
20     Q.    The quote is: I think that a
21 lot of us think that sexual assault has to be
22 this really violent brutal crime to be called
23 sexual assault or to be called rape, but in
24 reality it's really just an unwanted sexual

1 act, it's not consensual.
2         Do you believe that's an
3 accurate description of sexual assault?
4         MR. PICCERILLI: Objection to
5 form.
6         THE WITNESS: Not in its
7 entirety, no.
8 BY MR. MIRABELLA:
9     Q.    And what is it that's omitted
10 that it's not in its entirety?
11     A.    I would refer to the policy
12 definition that we have that I don't have in
13 front of me right now.
14     Q.    Do you know or do you recall,
15 did you have any part in the drafting of the
16 definition of sexual assault in the interim
17 policy or the SMP?
18     A.    I don't recall.
19             - - -
20     (Whereupon, Exhibit White-3 was marked
21 for identification.)
22             - - -
23 BY MR. MIRABELLA:
24     Q.    Dr. White, this is a

1 compilation of some printouts that were
2 provided in discovery. There's 1331, 1332 and
3 then I guess flipped upside down is 1333 and
4 1334 and then 1361, I'm assuming 1362.
5 They're not stapled together with any
6 particular method in mind or order.
7         I'm going to ask some questions
8 about one of the printouts, and I guess that
9 would be the 1361 and 1362. That happens to
10 have been the most recent.
11         If you look on the second to
12 the next page, Doctor, on the side you can see
13 the Bates label number?
14     A.    Yes, I have the right pages.
15     Q.    Are you familiar with this type
16 a report?
17     A.    With this exact form, I do not
18 recall, no.
19     Q.    Are you familiar enough to say
20 this appears to be something from the StarRez
21 system?
22     A.    Yes.
23     Q.    And it's difficult to read, but
24 on the first page at the bottom of the list it

CONFIDENTIAL

Page 126

1 says Printed Saturday July 7, 2018, 7:00 p.m.
2 by W Bordak?
3      A.    Correct.
4      Q.    Do you know if that means the
5 user ID to get into the system or the person
6 who printed it was W Bordak?
7      A.    I can't say that for sure.
8      Q.    Have you ever printed a report
9 out?
10     A.    Yes.
11     Q.    Does it show up -- does it have
12 any identifier on it to show you're the one
13 that printed it?
14     A.    I don't know.
15     Q.    Do you have an understanding
16 whether this constitutes all of the claims of
17 sexual misconduct that were investigated
18 and/or reported to the Office of Community
19 Standards?
20          MR. PICCERILLI:  Objection to
21 form.
22          THE WITNESS:  I do not know.  I
23 don't know what went into the design of this
24 report.

Page 127

1 BY MR. MIRABELLA:
2      Q.    Does the Office of community
3 Standards maintain records on claims of sexual
4 misconduct?
5      A.    Yes.
6      Q.    Does any other office maintain
7 records on claims of sexual misconduct?
8      A.    I believe so.
9      Q.    And the other office is the
10 Title IX Coordinator?
11     A.    That's the one that I'm
12 thinking of, yes.
13     Q.    Are you aware of any other
14 office?
15     A.    I'm not aware.
16     Q.    And what's your understanding
17 as to whether -- what records are kept in the
18 Title IX Office verses what records are kept
19 in the Community Standards Office or are they
20 duplicative?
21     A.    I don't know that I know
22 everything because I don't know what I don't
23 know in terms of at least the Title IX.  So I
24 do understand that there may be reports that

Page 128

1 are shared with the Title IX Coordinator and
2 for one reason or another are not shared with
3 the Community Standards Office.
4      Q.    Do you know what any of those
5 one reasons or another is?
6      A.    There could be a non-student
7 Respondent, for example.
8      Q.    Are there any other examples
9 that come to mind?
10     A.    Non -- well, similarly, I'm
11 thinking non-SJU affiliated Respondent and
12 faculty or staff member Respondent.
13     Q.    If it's a SJU student
14 Respondent, but occurs off campus, is that
15 always shared with Community Standards?
16     A.    Yes.
17     Q.    Are all claims of sexual
18 misconduct reported to the Office of Community
19 Standards communicated to the Office of Campus
20 Safety?
21     A.    Can you repeat that again?
22     Q.    Sure.  Are all claims of sexual
23 misconduct reported to the Office of Community
24 Standards reported to the Office of Campus

Page 129

1 Safety --
2      A.    Public Safety.
3      Q.    Public Safety as well?
4      A.    I believe so.
5      Q.    Are all claims of sexual
6 misconduct reported to the Office of Community
7 Standards that occurred on campus affiliated
8 events reported under the Clery Act?
9      A.    Can you repeat that one more
10 time?
11     Q.    Sure.  Are all claims of sexual
12 misconduct that are reported to the Office of
13 Community Standards reported under the Clery
14 Act?
15     A.    No.
16     Q.    Under what circumstances are
17 sexual misconduct claims not reported under
18 the Clery Act?
19     A.    So this is, you know, by
20 definition of the Clery Act, how the law is
21 defined.  There are geographic locations, for
22 example, for which one would not be
23 reported -- would not be Clery reportable.
24     Q.    Are there any other

33 (Pages 126 - 129)

CONFIDENTIAL

1 distinguishable factors other than the claim
2 of sexual misconduct?
3     A.     Definition, the crime
4 definition.
5     Q.     And what do you mean by that?
6     A.     There are Clery crime
7 definitions. So the Clery Act defines which
8 crime category under which definition and
9 which locations are Clery reportable.
10     Q.     And are the Clery crime
11 definitions of sexual assault different than
12 the Sexual Misconduct Policy definitions?
13     A.     I would have to look at that to
14 see. I don't know if I know that offhand.
15     Q.     What are the general categories
16 under Clery?
17     A.     In terms of what?
18     Q.     Claims for sexual misconduct.
19     A.     Can you repeat that?
20     Q.     Sure. I was going back to
21 something I thought you said in your answer,
22 which is Clery has its own definitions and
23 categories of sexual assault or sexual
24 misconduct; correct?

1     A.     I don't know if it's their own
2 definitions, but they are defined under the
3 Clery Act. There are crimes defined within
4 the Clery Act, and so by virtue of them being
5 defined and by the location is what
6 constitutes something being Clery reportable
7 or not.
8     Q.     Who at the University is
9 responsible for determining whether something
10 is reportable or not?
11     A.     The Office of Public Safety.
12     Q.     Do you ever get involved in
13 consulting or discussing when something is
14 reportable under the Clery Act with that
15 office?
16     A.     No, I'm not a part of those
17 conversations.
18     Q.     Given the description that was
19 provided as to what's reportable, what are the
20 geographical limitations or considerations for
21 the Clery Act as pertaining to the school?
22     A.     As it pertains to the school
23 specifically?
24     Q.     Sure. So if a claim of sexual

1 misconduct occurs on campus, is it reportable
2 under the Clery Act?
3     A.     If it occurs on campus you
4 said?
5     Q.     Yes.
6     A.     Yes, as defined by the Clery
7 Act definition on campus. There are very
8 specific Clery geography definitions.
9     Q.     And if it occurs off campus it
10 would depend on a particular definition of
11 that location as applied to the Clery Act?
12     A.     Correct.
13     Q.     Is it reasonable to conclude
14 that most years there's less Clery Act
15 reported sexual misconduct cases than there
16 are reported to the Office of Community
17 Standards?
18     A.     Can you say that again?
19     Q.     Sure. It seems to me that not
20 every case that's reported to Community
21 Standards is going to be reported under the
22 Clery Act; correct?
23     A.     Correct, depending upon the
24 geography, the location, yes, in the category.

1     Q.     Are there any cases that are
2 reported under the Clery Act that would not be
3 reported to the Office of Community Standards
4 or the Title IX Coordinator Office?
5     A.     I cannot speak for the Title IX
6 Coordinator's Office, but for the Office of
7 Community Standards it's the same as I just
8 mentioned, that we do not see all reports
9 related to Title IX. So Clery is bigger than
10 students.
11     Q.     Correct. But as to students,
12 anything that's reported under Clery should
13 either by part of the inventory of reports in
14 the Community Standards Office or the Title IX
15 Coordinator's Office?
16     A.     I believe so.
17         MR. MIRABELLA: Let's take a
18 short break.
19         - - -
20     (Whereupon, a short break was taken at
21 this time.)
22         - - -
23 BY MR. MIRABELLA:
24     Q.     Are you involved in the, if

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1 there is one, search for a new Title IX
2 Coordinator?
3     A.    Not that I'm aware of, no.
4     Q.    Have you had any other
5 interactions with Elizabeth Malloy other than
6 what you already described?
7     A.    No.
8     Q.    How often are the grant
9 payments made?
10    A.    What do you mean?
11    Q.    Sure.  It's a $300,000 grant;
12 correct?
13    A.    Yes.
14    Q.    And I believe it's for three
15 years?
16    A.    Yes.
17    Q.    Does that SJU receive money
18 annually, biannually or something else?
19    A.    I do not know.  We work with
20 our Office of Research Services and they
21 manage, I believe, most of the physical end of
22 the budget.
23    Q.    As I asked you earlier, you
24 don't prepare the progress reports for the

Page 135

1 grant, that's done by Ms. Berney?
2     A.    Yes.
3     Q.    Have you reviewed progress
4 reports that she submitted?
5     A.    I was asked to secure it
6 yesterday.  That's the first time I saw it.
7     Q.    Since receiving the grant, are
8 you aware of any changes at SJU in terms of
9 the Sexual Misconduct Policy in terms of its
10 education, orientation programs or anything
11 done that's been a departure from what the
12 practice has been in the past?
13    A.    No.
14    Q.    What was the purpose of the
15 $30,000 State grant?
16    A.    I was not the lead author on
17 that, although I did work with Dr. Perry on
18 it.  We, again, looked to secure funding to
19 support our efforts around education,
20 prevention, education and an IT solution.
21    Q.    And does that pertain to claims
22 of sexual misconduct or campus safety or
23 something else?
24    A.    Sexual misconduct, yes.

Page 136

1     Q.    And what was the IT solution
2 proposed?
3     A.    It was an additional module
4 added to StarRez.
5     Q.    And the module would enable the
6 school to provide -- input additional
7 information or track additional information or
8 something else?
9     A.    I can't say exactly what it
10 would do different than what is being done now
11 because I don't manage those records
12 currently.
13    Q.    And do you know what the school
14 is required to do to show whether it's making
15 progress on either grant or with the grant
16 fund?
17    A.    I don't know specifically.
18    Q.    And would that be Ms. Berney?
19    A.    Yes.
20    Q.    You're not a Deputy Title IX
21 Coordinator, are you?
22    A.    I am not.
23    Q.    Are there any penalties if the
24 school fails -- are you aware of any

Page 137

1 penalties, not just at SJU, anywhere, if an
2 institution does not report under Clery?
3     A.    Of any institution, yes.  The
4 Department of Ed enforces the Clery Act.
5     Q.    And do you know what its
6 enforcement tools are?
7     A.    I do not know specifically.
8     Q.    Who, if anyone, was involved in
9 familiarizing Ms. Malloy about the school's
10 Sexual Misconduct Policy?
11    A.    I don't know if I have that
12 information.
13    Q.    Did you do it?
14    A.    I can't recall if there were
15 any conversations that I was a part of for
16 that.
17    Q.    Your recollection when she
18 spoke about the investigation, was it about
19 the investigator model, at a committee
20 meeting?
21         MR. PICCERILLI:  Objection to
22 form.
23         THE WITNESS:  The committee
24 meeting pertaining to the policy?

35 (Pages 134 - 137)

Page 138

1 BY MIRABELLA:
2    Q.   Yes.
3    A.   I'm sorry, can you repeat?
4 What's your question again?
5    Q.   Sure.  What did Ms. Malloy
6 speak about?
7    A.   I can't recall specifically
8 what it was about.
9    Q.   Did Ms. Malloy provide any
10 handouts or literature?
11   A.   I don't recall.
12   Q.   I asked some questions earlier
13 about the Q&A and the Dear Colleague Letters.
14 You're familiar with those as I believe you
15 referred to them as subregulatory; is that
16 correct?
17   A.   Yes.
18   Q.   Okay.  Did you have --
19        MR. PICCERILLI:  I think her
20 testimony was subregulatory guidance.
21        THE WITNESS:  Yes.
22        MR. MIRABELLA:  Okay.  I'm sure
23 that's correct.
24        Can we mark the Dear Colleague

Page 139

1 Letter and the Q&A of September 2017
2 collectively as 4.
3        - - -
4        (Whereupon, Exhibit White-4 was marked
5 for identification.)
6        - - -
7 BY MR. MIRABELLA:
8    Q.   Have you had a chance to take a
9 quick look at them?
10   A.   Quick look.
11   Q.   Have you seen them before?
12   A.   Yes.
13   Q.   For somebody not involved in
14 higher education, can you describe what is a
15 Dear Colleague Letter from the Department of
16 Education, Office for Civil Rights?
17   A.   I don't know if I can describe
18 that exactly.  I don't know that I know the
19 best way to define that.  It's a governmental
20 document.
21   Q.   Sure.  It's a letter from the
22 Department of Education; correct?
23   A.   Yes.
24   Q.   And it's addressed Dear

Page 140

1 Colleague.  Do you know that Dear Colleague is
2 meant to refer to educators?
3    A.   No, I do not know that.
4    Q.   Did you receive a copy of the
5 letter?
6    A.   I don't know how I received it,
7 but I recall reading it.
8    Q.   Somehow it got to your desk?
9    A.   Yes.
10   Q.   So you may have been one of the
11 colleagues or it may have sent to somebody
12 else, but it was a letter published by the
13 Department of Education; correct?
14   A.   Yes.
15   Q.   And it's the Office for Civil
16 Rights; correct?
17   A.   Yes.
18   Q.   And it starts with talking
19 about prior letters and guidance that were
20 being withdrawn.  Do you see that?
21   A.   Yes.
22   Q.   So I'm going to ask you some
23 questions.  If you need to read the particular
24 passage just let me know.

Page 141

1    A.   Okay.
2    Q.   At the beginning of the letter
3 it talks about Dear Colleague Letters
4 previously issued in 2011 and the Q&A issued
5 in 2014.
6        Am I am correct early on you
7 testified that some of those things, these
8 documents, or those referred to, were
9 something the school looked at and considered
10 as part of the process of changing its policy
11 for the investigation and adjudication of
12 sexual misconduct?
13   A.   In 2015?  Published in 2015,
14 yes.
15   Q.   And this letter of September
16 22, 2017 was sent out from the Department of
17 Education specifically advising schools that
18 those particular pieces of guidance were being
19 withdrawn; correct?
20   A.   That's what it states, yes.
21   Q.   Did you understand it to mean
22 anything different than that?
23   A.   I read it for what it is at
24 face value.  I'm reading what you're reading

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1 in terms of what it says the purpose is, yes.
2      Q.    And the letter goes on to
3 describe, at least in part, the thinking or
4 reasoning behind why those two pieces of
5 guidance were withdrawn; correct?
6           MR. PICCERILLI:  You can take a
7 moment.
8           THE WITNESS:  I may want to
9 read that. (Witness reviews document.)
10 Repeat the question, please.
11 BY MR. MIRABELLA:
12      Q.    Does the letter address the
13 reason for withdrawing the guidance?
14      A.    I read that it's stating what
15 the 2011 Dear Colleague Letter did --
16      Q.    So if you want I can ask it
17 another way.  Do you want me to rephrase the
18 question?
19      A.    Please.
20      Q.    All right.  At the bottom of
21 the letter the Department of Education states
22 that:  The 2011 and 2014 guidance documents
23 may have been well-intentioned, but those
24 documents have led to the deprivation of

Page 143

1 rights for many students, both accused
2 students denied fair process and victims
3 denied an adequate resolution.
4           Do you see where I read that?
5      A.    Yes.
6      Q.    Do you agree with that?
7      A.    My lens is coming out from
8 Saint Joseph's University's policy and process
9 that we instituted, and I do believe that
10 process is fair.
11      Q.    And the process that you
12 instituted that we talked about earlier are
13 which the Respondent is not provided access or
14 an opportunity to review the evidence or
15 records in an investigation against him until
16 after there's been a finding; am I correct?
17           MR. PICCERILLI:  Objection to
18 form.
19           THE WITNESS:  So this is an
20 ongoing collection and iterative process of
21 the investigation.
22 BY MR. MIRABELLA:
23      Q.    Well, to your knowledge, is the
24 outside investigator required by policy or

Page 144

1 practice to provide to the Respondent the
2 evidence, the statements in the investigation
3 of an alleged misconduct against him prior to
4 her interviewing or him interviewing the
5 Respondent?
6      A.    It's my understanding that the
7 information is thorough in what is provided to
8 the parties involved during that
9 investigation.  That's the expectation of my
10 understanding that that is happening during
11 the investigation.
12      Q.    What do you define as thorough?
13      A.    The investigator is the one who
14 has that information and is evaluating,
15 synthesizing, collecting that information.
16      Q.    And what's your understanding
17 in this case of what information was provided
18 to the Respondent prior to meeting with the
19 investigator?
20      A.    Prior to meeting with the
21 investigator was the Letter.
22      Q.    The Notice of Process Letter?
23      A.    The Notice Letter as well as a
24 pre-investigation meeting.

Page 145

1      Q.    Correct.  Those are the two
2 documents provided in writing to the
3 Respondent prior to meeting the investigator;
4 correct?
5      A.    Yes.
6      Q.    And the Notice of Process
7 Letter has the date, time and the identity of
8 the Complainant; correct?
9      A.    I would have to see that.
10      Q.    Can you accept my
11 representation that that information is in the
12 Notice of Process Letter?
13      A.    I believe that it is.
14      Q.    And it also indicates that
15 there's an alleged violation of the Sexual
16 Misconduct Policy and it lists all six
17 categories?
18      A.    Again, I would need to see the
19 letter to be able to answer that.
20      Q.    So those two letters, the
21 Notice of Process and Pre-investigation
22 Checklist, have been produced, identified.
23           Are there any other documents
24 or any other information provided in writing

CONFIDENTIAL

Page 146

1 to the Respondent prior to meeting with the
2 investigator?
3     A.     Are you talking about in
4 general or in this particular case?
5     Q.     That the school expects as part
6 of its disciplinary program for a fair and
7 equitable investigation?
8     A.     Typically there is some sort of
9 communication in terms of resources and
10 support made available to the students
11 involved in the process as well.
12     Q.     Anything else about the actual
13 allegations against the Respondent?
14     A.     Not to my knowledge, no.
15     Q.     And is it your expectation that
16 at the time of the meeting with the
17 investigator the Respondent is shown either
18 the Incident Report or the written complaint
19 as asserted against them?
20     A.     No. It's my expectation that
21 the investigator is proceeding in a thorough
22 way throughout that investigation.
23     Q.     Thorough for who, the school or
24 the Respondent?

Page 147

1     A.     Thorough in terms of the
2 process and the expectation set forth.
3     Q.     Does thorough include
4 disclosing the actual allegation against the
5 Respondent prior to the interview by your
6 definition?
7     A.     That is the information that is
8 included in the Notice Letter.
9     Q.     And that, in your opinion, is
10 adequate for an equitable investigation;
11 correct?
12     A.     I did not say that.
13     Q.     Well, is it or is it not?
14     A.     Can you repeat the question?
15     Q.     Sure. In your opinion, is the
16 information provided to the Respondent in the
17 Notice Letter adequate for an equitable
18 investigation if that's all that's provided to
19 him or her prior to meeting with the
20 investigator?
21     A.     There's more to the
22 investigation than just that Notice Letter.
23 So in terms of what's an equitable
24 investigation is it's more than the Notice

Page 148

1 Letter. It's also the investigation itself.
2     Q.     So I want to isolate that. I
3 want to talk about what information is
4 provided either directly to the Respondent or
5 that the Respondent is provided access to
6 prior to the first meeting with the
7 investigator.
8     A.     Right.
9         MR. PICCERILLI: Objection;
10 asked and answered.
11 BY MR. MIRABELLA:
12     Q.     So is there any other written
13 information that's provided other than the
14 Checklist and the Notice Letter?
15     A.     As I said, there may be some
16 communication. It could be in the form of
17 various support and resources as well.
18     Q.     But nothing further in writing
19 about the allegations against the Respondent?
20     A.     Correct.
21     Q.     Not a copy of the Incident
22 Report; correct?
23     A.     Correct.
24     Q.     Not a copy of the

Page 149

1 investigator's report; correct?
2         MR. PICCERILLI: Objection. Go
3 ahead, you can answer.
4         THE WITNESS: Some of that
5 didn't exist yet.
6 BY MR. MIRABELLA:
7     Q.     Not a copy of the report taken
8 by the Title IX Coordinator, first report;
9 correct?
10     A.     Correct.
11     Q.     And the identification of the
12 violations refers to the entire section of the
13 Sexual Misconduct Policy, not the specific
14 provisions in question; correct?
15     A.     I'd like to see the letter to
16 be able to answer.
17     Q.     All right. Dr. White, it might
18 be easier I think for some of these questions,
19 I'm going to give you SJU 331, the last page
20 is 730. The reason I'm doing it in this
21 fashion is the top of it has an Index prepared
22 I believe by Mr. Bordak of the Incident
23 documents. I think it will allow you to get
24 in and out of some of these.

38 (Pages 146 - 149)

CONFIDENTIAL

1    A.    Thank you.
2          MR. PICCERILLI:  So those
3    numbers were 331 to 730, John?
4          MR. MIRABELLA:  Correct.  The
5    entire rubberbanded set of records is 331 to
6    741.  I don't think we're going to get
7    much -- well, we'll see.  But in any event,
8    the cover sheet is the documents, Re:
9    Incident Occurrence February 23rd.
10   BY MR. MIRABELLA:
11        Q.    We're talking about the
12   information -- about the allegations of
13   misconduct that's provided in the Notice of
14   Process Letter to the Respondent, what is or
15   isn't included in that letter.
16        Dr. White, I believe there's a
17   hand numbering system at the bottom as well
18   that follows the Cover Sheet.
19        A.    Yes, thank you.
20        Q.    Okay, I have it.
21        Q.    So take a moment to review
22   that, but also state on the record what page
23   you're looking at.
24        A.    000439.

1          MR. PICCERILLI:  SJU.
2          THE WITNESS:  Yes.
3    BY MR. MIRABELLA:
4          Q.    All right.  Do you have in
5    front of you what I've been referring to as
6    the Notice of Process Letter?
7          A.    Yes.
8          Q.    I was asking you some questions
9    about what information is set forth in the
10   letter; correct?
11         A.    Yes.
12         Q.    Okay.  As to the allegations
13   against the Respondent, am I correct that the
14   only factual information is the name of the
15   Complainant, the date of the event and the
16   location of the event?
17         A.    Yes, that information is
18   contained within the letter.  Yes.
19         Q.    And there are no further
20   details as to the specific facts or
21   allegations against the Respondent other than
22   it implicates the Sexual Misconduct Policy?
23         A.    Correct.
24         Q.    And as to the provisions of the

1    Sexual Misconduct Policy it identifies the
2    entire policy; correct?
3          A.    Correct.
4          Q.    It doesn't say it's retaliation
5    or discrimination or harassment, it just says
6    the whole policy?
7          A.    Correct.
8          Q.    All right.  The other piece of
9    information that's provided to the Respondent
10   is the Checklist that's given to the
11   Respondent either prior to or at the
12   pre-investigation meeting; correct?
13         A.    Yes, that's correct.
14         Q.    And you're welcome to review
15   it, but would you agree with me that there's
16   no additional information set forth on the
17   Checklist as to the specific provisions of the
18   Sexual Misconduct Policy that may or may not
19   have been violated and as to the factual
20   allegations of the complaint?
21         A.    Correct.
22         Q.    And is it the policy of Saint
23   Joseph's University that that is adequate
24   information about the complaint to be provided

1    to the Respondent prior to meeting with the
2    investigator?
3          A.    Yes, because at that time we
4    may not have all the information which is the
5    investigation is for.
6          Q.    Is the policy of Saint Joe's
7    University that the investigator will show to
8    the Respondent the actual allegations that
9    were provided in writing as part of the
10   investigation file when she meets with the
11   Respondent?
12         A.    I'm not aware of the mode of
13   sharing information, but the expectation is
14   that it is thorough in terms of information
15   that is shared.
16         Q.    Okay.  And to be thorough, that
17   would be adequate information to inform the
18   Respondent as to the actual -- as to the
19   allegations of misconduct asserted against
20   them?
21         MR. PICCERILLI:  Objection to
22   form.
23         THE WITNESS:  Can you repeat
24   that?

CONFIDENTIAL

1 BY MR. MIRABELLA:
2      Q.     What do you mean by thorough in
3 terms of what's shared with the Respondent?
4      A.     I shared already, collection of
5 information, synthesizing that information,
6 evaluating that information in terms of -- now
7 you're asking for my definition of thorough.
8      Q.     Only as it pertains to what the
9 school expects the investigator to disclose to
10 the Respondent prior to conducting the
11 interview.
12     A.     Again, the interview and
13 investigation is an ongoing process where that
14 information is still being collected.
15     Q.     I understand that, but there is
16 an Incident Report by the time of the meeting
17 with the investigator; correct?
18     A.     There's usually some report.  I
19 don't know exactly if it's called an Incident
20 Report, depending on what the source of the
21 information is.
22     Q.     At minimum there's an initial
23 complaint; correct?
24     A.     Yes.

1      Q.     In that event, those documents
2 are not shared, they're not expected by the
3 school to be shared with the Respondent prior
4 to meeting with the investigator?
5      A.     Correct, to preserve the
6 integrity of that investigation.
7      Q.     And in this instance, what
8 information would you have expected the
9 investigator to share about the allegations at
10 any point in the process before finding
11 responsibility?
12     A.     I don't know that I can speak
13 to the specifics of that for this instance.
14     Q.     Well, what you would have
15 expected or what the investigator actually
16 shared?  Strike that.
17            I'm trying to get a better
18 understanding of your answer that you would
19 expect the investigator to be thorough in
20 sharing information about the allegations with
21 the Respondent, is what that means, right?
22     A.     Right.
23     Q.     All right.  Is the appeal part
24 of that document set that Mr. Bordak put

1 together?  Let me just find it.
2            I direct your attention to the
3 Appeal Packet.
4            MR. PICCERILLI:  Do you have a
5 page number for us, John?
6            MR. MIRABELLA:  Yes, I think
7 it's 589.
8            THE WITNESS:  Okay, thank you.
9 BY MR. MIRABELLA:
10     Q.     This is the appeal submitted by
11 Elizabeth Malloy; correct?
12     A.     Yes.
13     Q.     And what we're trying to drill
14 down to the bottom of is what constitutes a
15 thorough sharing of information with the
16 Respondent.  And I asked to direct your
17 attention to this letter.
18            Does Ms. Malloy address in this
19 letter the extent of the information she
20 shared with the Respondent?
21     A.     The second paragraph mentions
22 what Ms. Malloy informed the Complainant and
23 Respondent of.
24     Q.     Can you read that into the

1 record.
2      A.     Sure:  I clearly informed Mr.
3 Redacted and Ms. Redacted, allegation was that
4 he squeezed her neck and that she did not
5 consent to that, although she consented to the
6 kissing.
7      Q.     And my question to you is:  Is
8 that a thorough sharing of the information
9 with the Respondent based on your definition
10 of thorough?
11     A.     I would not assume that this
12 was the only information that Ms. Malloy
13 shared is one sentence.
14     Q.     What would you assume?
15            MR. PICCERILLI:  Objection.
16 You're asking for a guess.
17            MR. MIRABELLA:  She can still
18 answer.
19            MR. PICCERILLI:  No, she can't
20 answer.  You're asking for a guess.
21            MR. MIRABELLA:  It's not a
22 guess, actually.  She's very familiar with the
23 process.  She reads these documents all the
24 time.

CONFIDENTIAL

1  BY MR. MIRABELLA:
2       Q.      Would it be your assumption
3  that more information than that was shared
4  with the Respondent?
5            MR. MIRABELLA:  Objection to
6  form.  You can still answer.
7            THE WITNESS:  That's the
8  investigator process. I'm not familiar with
9  what Liz did with the students throughout the
10  investigation.
11  BY MR. MIRABELLA:
12       Q.      My question to you is:  If
13  that's the only information supplied, would
14  that be adequate to be a thorough
15  investigation?
16       A.      I don't know the circumstances,
17  all the circumstances of the incident to
18  determine -- to be the one to determine if
19  that was thorough or not.
20       Q.      When you handled the appeal,
21  did you read through the appeal replies?
22       A.      What do you mean by appeal
23  replies?
24       Q.      The documents collected in

1  response to the appeal filed by the
2  Respondent?
3       A.      Yes.
4       Q.      So at some point in time you
5  read through all these?
6       A.      All of these what?
7       Q.      All of these replies to the
8  appeal filed by the Respondent?
9       A.      Yes.
10       Q.      So your answer today is you
11  still don't know if that's a thorough sharing
12  of the information to Respondent?
13            MR. PICCERILLI:  Objection.
14  She didn't testify about that.
15            THE WITNESS:  I was not
16  involved -- I do not have particulars of the
17  incident in terms of what was happening
18  throughout the investigation or what was being
19  shared throughout the investigation.
20            Additionally, the preservation
21  of the integrity of that investigation is
22  something that is also important.
23  BY MR. MIRABELLA:
24       Q.      At the expense of the

1  Respondent not understanding the allegations
2  against him?
3       A.      I did not say that.
4       Q.      But is that a possibility?
5            MR. PICCERILLI:  Objection.
6  BY MR. MIRABELLA:
7       Q.      Either this case -- what's the
8  benefit?  Why is the integrity of the
9  investigation so important?
10       A.      We realize that we may not
11  institutionally have all the information on
12  the onset of the complaint.
13       Q.      Isn't the integrity of the
14  investigation supposed to be to ensure or help
15  improve the chances that the investigation
16  will result in accurate findings and outcomes?
17       A.      And fair process I would add.
18       Q.      So in this case, do you believe
19  the process that was afforded was fair and
20  equitable?
21       A.      I do.
22       Q.      So Roe made the complaint to
23  the Title IX Officer, so she knew what the
24  allegations were in her Complaint; correct?

1       A.      I'm sorry, can you repeat that?
2       Q.      Row gave a statement to the
3  Title IX Officer, so Roe knew what the
4  allegations were that she stated to the Title
5  IX Officer; correct?
6       A.      I don't know what she stated to
7  the Title IX Officer.
8       Q.      Can you agree with me that if
9  she gave a statement to the Title IX Officer
10  she knows what she said in the statement?
11       A.      Who is she?
12       Q.      Roe.  If Roe gives a complaint
13  to the Title IX Officer about an incident, she
14  at least knows what she told the Title IX
15  Officer about the incident; correct?
16       A.      I would have to assume that.
17       Q.      And Doe is never shared that
18  information prior to the outcome?
19            MR. PICCERILLI:  Objection.
20  BY MR. MIRABELLA:
21       Q.      In this case and generally;
22  correct?
23            MR. PICCERILLI:  Objection.
24  That was not her testimony.

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1 BY MR. MIRABELLA:
2       Q.     I'll tell you that in this case
3 Doe was not shared access to or shown that
4 statement. So Roe knew what she said, Doe did
5 not know what she said. Can you agree with me
6 about that aspect of it?
7             MR. PICCERILLI: Objection.
8 You're asking her to accept your assumption or
9 your representation, which she does not have
10 to at this deposition.
11            MR. MIRABELLA: Actually, she
12 can answer the question, agree or disagree.
13            Strike the question and answer.
14 BY MR. MIRABELLA:
15      Q.     I'm trying to go through what's
16 an equitable investigation. And we're
17 starting with the initial complaint which is
18 provided by the Complainant and not given to
19 the Respondent. Would you agree with that?
20            MR. PICCERILLI: What's the
21 question?
22 BY MR. PICCERILLI:
23      Q.     Can we agree that the initial
24 complaint as a general -- as the practice, as

Page 163

1 a general matter is provided by the Respondent
2 is not disclosed to the Complainant prior to
3 the meeting with the investigator?
4       A.     I think you have that backward,
5 the Respondent and the Complainant.
6       Q.     I'm sorry. The Complainant
7 gives the initial complaint, she is then known
8 to the complaint, but it's not shared with the
9 Respondent prior to the meeting with the
10 investigator. Can you agree with that?
11      A.     The information that is shared
12 with the Respondent would have been enclosed
13 within the Notice Letter as well as the
14 Pre-investigation Checklist prior to meeting
15 with the investigator. That is the
16 information that was shared.
17      Q.     The only information. So that
18 he doesn't have access to the complaint;
19 correct?
20            MR. PICCERILLI: Objection to
21 the form of the question. Objection; asked
22 and answered a thousand times at this point.
23 BY MR. MIRABELLA:
24      Q.     If the Complainant provides

Page 164

1 photographs to the investigator, are those
2 shown to the Respondent prior to the meeting?
3       A.     Again, I answered what is shown
4 to the Respondent prior to the investigation.
5       Q.     So the statement of the
6 Complainant and any evidence provided by the
7 Complainant is not provided to the Respondent
8 prior to meeting with the investigator;
9 correct?
10            MR. PICCERILLI: Objection;
11 asked and answered.
12 BY MR. MIRABELLA:
13      Q.     Am I correct?
14            MR. PICCERILLI: You can
15 answer.
16            THE WITNESS: Yes, the same as
17 what I said. Yes.
18 BY MR. MIRABELLA:
19      Q.     And it's your position that
20 constitutes -- as part of that process
21 constitutes an equitable investigation?
22      A.     As I mentioned before,
23 equitable in terms of the entire --
24 equitability to me is considered within the

Page 165

1 entire process.
2       Q.     All right. So let's turn to
3 the Q&A, September of 2017, specifically What
4 constitutes an "equitable" investigation?
5 It's in the Q&A and it's part of Exhibit 4.
6             I direct your attention to Page
7 3, Question 6. Do you see the question?
8       A.     I do, yes.
9       Q.     So it's framed -- this is a
10 Q&A. It's framed as part of the guidance
11 issued by the Department of Education: Quote,
12 What constitutes an "equitable"
13 investigation? And then the answer starts on
14 Page 4. This is the Page 4 to Question number
15 6. Are you with me so far?
16      A.     Yes, I am.
17      Q.     Okay. Paragraph 4, and your
18 attorney is free to ask you questions about
19 any other part of this, but I'm trying to save
20 time and talk about the issues in this case.
21            In the beginning, the first
22 sentence in Paragraph 4, it talks about what a
23 school should provide to a responding party.
24            Do you see that, the first

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1 sentence?
2          MR. PICCERILLI:  The first
3 sentence of which paragraph?  I'm sorry.
4          MR. MIRABELLA:  Paragraph 4,
5 Page 4, Answer to Question.
6          THE WITNESS:  Paragraph 4, Page
7 4, okay.
8 BY MR. MIRABELLA:
9      Q.     It says:  Once it decides to
10 open an investigation that may lead to
11 disciplinary action against the responding
12 party, a school should provide written notice
13 to the responding party of the allegations
14 constituting a potential violation of the
15 school's Sexual Misconduct Policy, including
16 sufficient details and with sufficient time to
17 prepare a response before any initial
18 interview.  Sufficient details include the
19 identities of parties involved, the specific
20 section of the code of conduct allegedly
21 violated, the precise conduct allegedly
22 constituting the potential violation, and the
23 date and location of the incident.
24          My question to you is:  In this

Page 167

1 case was Doe provided the details, sufficient
2 details of the specific section of the code,
3 the precise conduct allegedly constituting the
4 potential violation?
5      A.     The specific section of the
6 code, yes, we have an entire Community
7 Standards code of conduct.  So the specific
8 section of the code.
9      Q.     My question was --
10          MR. PICCERILLI:  She's not
11 finished her answer.
12          MR. MIRABELLA:  Oh, sure.
13          MR. PICCERILLI:  Go ahead,
14 finish your answer.
15          THE WITNESS:  The identities of
16 the parties involved, yes.  The date and
17 location of the alleged incident, yes as well.
18 BY MR. MIRABELLA:
19      Q.     You said the specific section
20 of the code.  The code is referred to as a
21 Sexual Misconduct Policy, isn't it?
22      A.     Correct, but we have a much
23 larger student code of conduct in which the
24 Sexual Misconduct Policy is embedded within

Page 168

1 that.
2      Q.     But it's called a policy, not a
3 code?
4      A.     Correct.
5          MR. PICCERILLI:  Objection;
6 you're argumentative.
7 BY MR. MIRABELLA:
8      Q.     So the policy covers six
9 different types of sexual misconduct, doesn't
10 it?
11      A.     I would have to look at it
12 offhand to know the specific number.
13      Q.     It's 53 pages roughly in
14 length.
15          MR. MIRABELLA:  For the record,
16 that's 1175 through 1226.
17          MR. PICCERILLI:  SJU as the
18 prefix.
19 BY MR. MIRABELLA:
20      Q.     So is that the Sexual
21 Misconduct Policy?
22      A.     Yes.
23      Q.     And that's what's provided in
24 the Notice of Process Letter to the

Page 169

1 Respondent?
2      A.     I believe so, yes.
3      Q.     Does that include the six
4 different categories of sexual misconduct?
5      A.     Yes.
6      Q.     All right.  But the Respondent
7 is not told which category is at issue or
8 categories, simply told the policy at issue?
9      A.     When are you talking about?
10      Q.     In the Notice of Process
11 Letter.
12      A.     Correct.
13      Q.     And is it your opinion that
14 that is sufficient, that is the specific
15 section of the code of conduct allegedly
16 violated such as to comply with the guidance
17 issued by the Office for Civil Rights of the
18 Department of Education in 2017?
19          MR. PICCERILLI:  Objection to
20 form.  You can answer.
21          THE WITNESS:  It's much more
22 precise than just general violation of the
23 Community Standards of the University.
24 BY MR. MIRABELLA:

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1   Q.   Well, I mean, it's much more
2   precise than saying it's a general violation
3   than saying it's a violation of sexual
4   misconduct; correct?
5   A.   Correct.
6   Q.   It doesn't say what kind of
7   sexual misconduct?
8   A.   Correct.
9   Q.   The section of the code or the
10   policy, however you want to describe it, is
11   over 54 pages in length; correct?
12   A.   Yes.
13   Q.   And the specific factual
14   allegations of the alleged conduct which
15   constitutes the violation are not set forth in
16   the Notice Letter. So how is the student to
17   determine what section applies to him in the
18   Sexual Misconduct Policy as a Respondent?
19       MR. PICCERILLI:  Can I hear the
20   question back.
21           - - -
22   (Whereupon, the court reporter back the
23   pertinent information.)
24           - - -

Page 171

1       THE WITNESS:  Again, this is a
2   part of the investigation and the conversation
3   that happens within the investigation.
4   BY MR. MIRABELLA:
5   Q.   I don't understand that answer.
6   A.   That information, more
7   specificity is provided throughout the
8   investigation.
9   Q.   By who?
10   A.   The investigator.
11   Q.   Is it supposed to be provided
12   by anyone else or is it just the investigator?
13   A.   Again, we wouldn't share that
14   information up front to preserve the integrity
15   of the investigation.
16   Q.   We being SJU.  So SJU relies on
17   the investigator to disclose the information
18   as to the specific allegations?
19   A.   So let me clarify, we being the
20   Office of Community Standards.
21   Q.   So he or she does not share the
22   information with the Respondent before he or
23   she meets with an investigator?
24   A.   For the student process, for

Page 172

1   the student responding process, no.
2   Q.   Going on in the same paragraph
3   in the Q&A:  Each party should receive written
4   notice in advance of any interview or hearing
5   with sufficient time to prepare for meaningful
6   participation.
7       We've already identified what
8   is written in the Notice.  Did that happen in
9   this case?
10       MR. PICCERILLI:  Objection to
11   form.
12   BY MR. MIRABELLA:
13   Q.   You can answer.
14   A.   I'm just reading above where it
15   references written notice.
16   Q.   Sure.
17   A.   Again, I believe I just
18   answered this.  The written notice is our
19   Notice Letter that we refer to.
20   Q.   And you believe that that's
21   adequate information for the Respondent for an
22   equitable investigation; correct?
23   A.   I did not say that.  Again, I
24   think there's more to equitable than just this

Page 173

1   notice piece.  It's the entire process, and
2   the investigation is another opportunity
3   because it is an ongoing process, that some of
4   that information may be shared during the
5   investigation.
6   Q.   Now, that sentence goes on to
7   state:  The written notice should be shared in
8   advance of any interview or hearing with
9   sufficient time to prepare for meaningful
10   participation.
11       In this case nothing was shared
12   about specific factual allegations prior to
13   meeting with the investigator; correct?
14       MR. PICCERILLI:  Objection.
15   That's not her testimony.
16   BY MR. MIRABELLA:
17   Q.   What's your understanding of
18   what that means?  Is it your position that SJU
19   complies with it?
20   A.   Yes, I shared that the written
21   notice does provide information.  Our Notice
22   Letter provides information regarding the
23   violation of the policy, the specific
24   violation of student code of conduct, date and

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1  location and name of the Complainant.
2      Q.      Okay.  The last sentence of the
3  paragraph talks about, quote:  The reporting
4  and responding parties and appropriate
5  officials must have timely and equal access to
6  any information and equal access to any
7  information that will be used during informal
8  and formal disciplinary meetings and hearings.
9          In this case do you believe
10 that the Respondent and the complaining party
11 had timely and equal access to the information
12 that was used in formal and informal
13 disciplinary meetings and hearings?
14     A.      I can speak to what I was
15 directly involved with with the appeal
16 process, and yes, I can confirm that that is
17 true.
18     Q.      I didn't understand as part of
19 the appeal is concerned.
20     A.      That's where I had direct
21 involvement with the process, so in terms of
22 having timely and equal access to information.
23     Q.      And we've been through, and we
24 can go back through it, the Complainant knows

Page 175

1  what the Complainant said to the Title IX
2  Officer when the complaint was made, so she
3  has access to that information, but the
4  Respondent does not?
5          MR. PICCERILLI:  Objection;
6  asked and answered.
7  BY MR. MIRABELLA:
8      Q.      Am I correct?
9      A.      I do not know specifically the
10 mode of relaying information that is happening
11 throughout the investigation.  So I cannot say
12 the Respondent did not have information that
13 the Complainant had.
14     Q.      Do any --
15         MS. SCHIMELFENIG:  I would like
16 to take a break, please, to talk with Al.
17            - - -
18 (Whereupon, a discussion was held off
19 the record.)
20            - - -
21 MR. MIRABELLA:
22     Q.      The next page of the Q&A,
23 Question, What procedures should a school
24 follow to adjudicate a finding of

Page 176

1  responsibility for sexual misconduct?
2          Do you see the question?
3      A.      Yes.
4      Q.      The second paragraph --
5          MR. PICCERILLI:  The second
6  paragraph under Answer or --
7          MR. MIRABELLA:  Yes, second
8  paragraph under Answer.
9  BY MR. MIRABELLA:
10     Q.      We already kind of covered the
11 first sentence.
12         In this case, Dr. White, who is
13 the decision-maker being referred to in the
14 first sentence?
15     A.      Can I have a moment to read it,
16 please.
17     Q.      Sure.
18     A.      The decision-maker in this
19 sentence for us would be the investigator.
20     Q.      Do you agree that the
21 investigator must offer each party the same
22 meaningful access to any information that will
23 be used during formal and informal
24 disciplinary meetings and hearings, including

Page 177

1  the investigative report?
2      A.      Yes.
3      Q.      The next sentence says that:
4  The parties should have the opportunity to
5  respond to the report in writing in advance of
6  the decision of responsibility and/or at a
7  live hearing to decide responsibility.
8          Did that happen here?
9      A.      I believe so, yes.
10     Q.      Can you explain what you're
11 referring to?
12     A.      The parties having an
13 opportunity to respond to information during
14 what it's calling a live hearing is the
15 investigation.  So the parties' invitation to
16 participate in that investigation.
17     Q.      No, it says:  To respond to the
18 report in writing in advance of the decision
19 of responsibility.
20         Was either the Complainant or
21 the Respondent provided the opportunity to
22 respond to the report in writing in advance of
23 the investigator's report?
24         MR. PICCERILLI:  Objection.  It

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1 doesn't say investigator's report.
2          MR. MIRABELLA: Decision, I'm
3 sorry. Thank you. I agree it doesn't say
4 that.
5          THE WITNESS: Again, I'm
6 reading this as the parties should have the
7 opportunity to respond to the report in
8 writing in advance of the decision of
9 responsibility or at a live hearing. I
10 believe that they had an opportunity at the
11 live hearing.
12 BY MR. MIRABELLA:
13     Q.    I don't understand, there was
14 no hearing in this case.
15          MR. PICCERILLI: Objection.
16 That's your conclusion.
17 BY MR. MIRABELLA:
18     Q.    Hold it, your testimony is that
19 meeting with the investigator serves the
20 purpose of the hearing; correct?
21     A.    Correct, and I tried to explain
22 this earlier. It is an ongoing process of
23 collecting information and hearing from the
24 parties involved. So the same --

Page 179

1     Q.    When --
2          MR. PICCERILLI: Hold on, she's
3 not finished her answer.
4 BY MR. MIRABELLA:
5     Q.    Go ahead.
6     Q.    So the same terminology that
7 was used in the previous model is different in
8 definition from what is being used currently
9 in terms of investigation and hearing.
10          The investigation is an ongoing
11 collection of information as well as an
12 opportunity for the individuals to be heard.
13     Q.    But the report that the parties
14 are responding to, when was that provided to
15 the Complainant or the Respondent to give them
16 an opportunity to respond in writing prior to
17 the decision of the responsibility?
18     A.    That would be -- that's not a
19 question I can answer.
20     Q.    So you don't know if it
21 occurred in this place or not?
22     A.    You asked me when it occurred.
23 I do not know when it occurred.
24     Q.    Would you expect it to occur

Page 180

1 before there's a finding of responsibility or
2 not responsibility?
3     A.    I think that there would be
4 meaningful access to information.
5     Q.    That wasn't my question. Only
6 whether you believe that the school has a
7 process in which the Complainant and
8 Respondent can respond to the report of the
9 investigator, to a report in advance in
10 writing before there's a decision of
11 responsibility?
12     A.    So I am reading the rest of
13 that sentence: The parties should have the
14 opportunity to respond to the report in
15 writing in advance of the decision of
16 responsibility and/or a live hearing to decide
17 responsibility.
18     Q.    The report didn't exist at the
19 time the investigator met with the Complainant
20 or Respondent, would you agree with that?
21     A.    Can you repeat that?
22     Q.    No report existed as to a
23 finding when the investigator met with the
24 Complainant or the Respondent?

Page 181

1     A.    This does not -- I'm not
2 reading that --
3          MR. PICCERILLI: Are you asking
4 about this particular case?
5          THE WITNESS: That's not how
6 I'm reading the definition of report.
7 BY MR. MIRABELLA:
8     Q.    How are you defining report,
9 Doctor?
10     A.    Any report. There's not a
11 definition on what report is.
12     Q.    And what's your understanding
13 of what it refers to? Does it have to be
14 something in writing?
15     A.    No.
16     Q.    It does not; correct?
17     A.    Correct.
18     Q.    Okay. Was there ever a time
19 when the Sexual Misconduct Policy provided a
20 party to respond in writing to the written
21 report of the investigator before there was an
22 outcome?
23     A.    Ever a time?
24     Q.    During the institution of the

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1 SMP.
2      A.      Could you repeat that?
3      Q.      Sure.  From the interim SMP to
4 the present time, was there ever a policy or
5 process where the Complainant and the
6 Respondent were given an opportunity to
7 respond to the written report of the
8 investigator prior to an outcome of
9 responsibility or not responsibility?
10         MR. PICCERILLI:  Objection to
11 form.
12         THE WITNESS:  Can you repeat
13 that one more time?  I'm sorry.
14 BY MR. MIRABELLA:
15      Q.      Under any iteration of the SMP
16 or interim SMP, are the Respondent or the
17 Complainant ever provided an opportunity to
18 respond to the written report of the
19 investigator in writing prior to a finding or
20 an outcome meeting?
21      A.      I don't believe so, no.
22      Q.      Okay.  Let's talk a little
23 about the appeal process.
24      A.      Okay.

Page 183

1         MR. MIRABELLA:  Let's mark this
2 as 5.
3         - - -
4      (Whereupon, Exhibit White-5 was marked
5 for identification.)
6         - - -
7 BY MR. MIRABELLA:
8      Q.      Who is responsible for the
9 investigation for the initial report of sexual
10 misconduct made by students, either to the
11 Title IX Coordinator or to the Office of
12 Community Standards or to the Office of Public
13 Safety?
14      A.      Can you repeat that?
15      Q.      Sure.  Who is responsible for,
16 if there is any, an initial investigation of
17 the report?
18      A.      What do you mean by who is
19 responsible?
20      Q.      Sure.  The student reports
21 sexual misconduct to anyone.  Is anyone at the
22 University charged with doing a preliminary
23 investigation?
24      A.      Yes.  I don't know if I would

Page 184

1 call it investigation, but there's an initial
2 review if it involves a student Respondent.
3      Q.      And whose responsibility is it
4 to do the review?
5      A.      Dr. Mary-Elaine Perry in
6 consultation with Bill Bordak.
7      Q.      And what is supposed to be
8 reviewed during the initial review?
9      A.      I'd have to look at the policy
10 to be able to speak directly to that.  I'm not
11 involved in that review.
12      Q.      All right.  And that policy you
13 believe is memorialized in the Sexual
14 Misconduct Policy?
15      A.      I don't know if the details
16 are.  That's why I would I need to see the
17 Sexual Misconduct Policy if there is
18 information about that initial review.
19      Q.      All right.  If it exists and
20 it's written down, would you expect it to be
21 in the Sexual Misconduct Policy?
22      A.      Yes.
23      Q.      I have it, you can take a quick
24 peek.

Page 185

1      A.      Sure.  Okay.
2      Q.      Does anything in the policy
3 that speaks to that question?
4      A.      Yes.
5      Q.      Can you give me the page
6 citation at the bottom?
7      A.      SJU001203.
8      Q.      And can you tell me, can you
9 read into the record the section of the policy
10 you're referring to?
11      A.      Yes:  The initial review will
12 consider the nature of the report, the safety
13 of all parties and of the campus community,
14 and the Complainant's expressed preference for
15 resolution.
16      Q.      And what part of that goes to
17 the issue of -- does any part of that go to
18 issue of a preliminary investigation?
19      A.      I don't know what you mean by
20 preliminary investigation.
21      Q.      Sure.  Determining that it
22 actually happened, where it happened, who was
23 involved, whether or not the Complainant
24 appears to be credible?

47 (Pages 182 - 185)

CONFIDENTIAL

1    A.    No.  This is -- if I can just
2  cite the policy, it just states that:  For
3  every report of an alleged violation that will
4  be considered for investigation they will make
5  an initial review.   They being, I'm
6  paraphrasing:  The Title IX Coordinator or
7  Deputy Title IX Coordinator will make an
8  initial review in consultation with the office
9  and/or individual named below.  Where the
10  Respondent is a university student the Office
11  of Community Standards will consult on the
12  initial review.
13    Q.    And as Assistant Vice
14  President, do you expect that that initial
15  review include a preliminary investigation as
16  to the accuracy of the complaint?
17         MR. PICCERILLI:  Objection;
18  asked and answered.
19  BY MR. MIRABELLA:
20    Q.    You were just referring to the
21  policy; correct?
22    A.    Right, I would state that:  The
23  initial review should consider the nature of
24  the report, the safety of all parties and of

1  the campus community and the Complainant's
2  expressed preference for resolution.
3    Q.    What does it mean consider the
4  nature of the report?
5    A.    I am not the one who is
6  involved in this process.
7    Q.    Is there anyone else who is
8  responsible for doing the preliminary
9  investigation to determine the validity or
10  accuracy of any of the complaint, date, time,
11  alleged Respondent or anything like that?
12    A.    I don't believe so.
13    Q.    Before the system changed in
14  2015, if a complaint came in to Dr. Perry for
15  allegation of sexual misconduct, how was the
16  investigation triggered through the Office of
17  Public Safety?  Like what was the process?
18  Would she call Public Safety and say she had a
19  complaint?
20    A.    I don't know.
21    Q.    Were you ever involved in that?
22    A.    Between what happened between
23  Mary-Elaine and Public Safety, I don't believe
24  so.

1    Q.    Well, what was your
2  understanding of how Public Safety went about
3  investigating claims of misconduct?
4    A.    Sometimes students would
5  actually walk into the Public Safety Office,
6  and that could happen outside of any role of
7  the Title IX Coordinator on the onset.
8    Q.    Is the Complainant's background
9  or own history of disciplinary record
10  something that's considered or looked into
11  when they're making an official complaint?
12    A.    Again, I may not be the one
13  receiving that official complaint.  That may
14  be something that the Title IX Coordinator is
15  involved with, but I can't speak to that.
16    Q.    Since you've been Assistant
17  Vice President, are you aware of any
18  circumstances after that date, 2013 to the
19  present, where any female respondents have
20  been responsible for sexual misconduct?
21    A.    I don't know offhand.
22    Q.    We talked earlier about the
23  school's expectation that the investigator do
24  a thorough investigation; correct?

1    A.    Correct.
2    Q.    I think I touched on this in
3  the earlier questions and answers.  Who at the
4  school, if anyone, is responsible for
5  reviewing to make certain that the
6  investigations that are being performed by the
7  investigator are thorough?
8    A.    Right, I did answer this
9  question earlier.  I'm not -- it's not my
10  responsibility.
11    Q.    You didn't know?
12    A.    It's not my responsibility,
13  right.
14    Q.    And you don't know who that
15  is?
16    A.    I mentioned before that
17  Mary-Elaine is the main contact with the Title
18  IX Coordinator.
19    Q.    Correct, that was your answer.
20    A.    Yes.
21    Q.    Is there any policy at the
22  school as to the consideration as to which
23  disciplinary track or section a matter should
24  be investigated under, sort of in between

48 (Pages 186 - 189)

Page 190

1 either sexual misconduct, perhaps something
2 else or something outside of sexual
3 misconduct?
4        MR. PICCERILLI:  Object to the
5 form of the question.
6        THE WITNESS:  Can you repeat
7 that again.
8 BY MR. MIRABELLA:
9        Q.    Sure.  Is there any policy at
10 the school or preference with respect to how
11 cases are investigated when they involve
12 student violations if they may or may not
13 implicate sexual conduct?
14        MR. PICCERILLI:  Objection to
15 the form of the question.
16        THE WITNESS:  Can you break it
17 down a little bit.
18 BY MR. MIRABELLA:
19        Q.    He's going to object, but I'll
20 try it this way:  If it's a close call, is
21 there any policy at the school as to whether a
22 matter, an alleged misconduct would be
23 investigated under the SMP or the Community
24 Standards process?

Page 191

1        MR. PICCERILLI:  You're right,
2 I'm going to object to the form of the
3 question.  If you understand the question you
4 can answer.
5        THE WITNESS:  I don't know if i
6 fully understand.  What I'm inclined to speak
7 to is the initial review that would happen if
8 there's an alleged violation under sexual
9 misconduct.  I don't know if that answers your
10 question.
11 BY MR. MIRABELLA:
12        Q.    And that determination is made
13 during the initial review as to whether the
14 case is investigated under the Sexual
15 Misconduct Policy versus through the Community
16 Standards process?
17        A.    Yes, for every report of
18 alleged violation that will be considered for
19 investigation under this policy, being the
20 Sexual Misconduct Policy.
21        Q.    At the outset who determines
22 whether it falls under that policy or not?
23        A.    So when there is an alleged
24 report or when there's a report that comes in

Page 192

1 with allegations, that's part of the review,
2 that's part of the initial review, if there
3 are potential allegations that may fall within
4 the Sexual Misconduct Policy.
5        Q.    Back to the appeal process.  So
6 first, generally speaking, tell me about how
7 the appeal process works for Community
8 Standards violations, including typical
9 Community Standards violations and including
10 findings of responsibility under sexual
11 misconduct.
12        MR. PICCERILLI:  You're going
13 to have to break it up.
14 BY MR. MIRABELLA:
15        Q.    Actually, Dr. White, is the
16 process the same for the appeal for a student
17 found responsible under the Community
18 Standards violation as it is for a student
19 found responsible for a Sexual Misconduct
20 Policy violation?
21        A.    Yes, with the exception of
22 advisors.
23        Q.    Can you explain?
24        A.    Within the Sexual Misconduct

Page 193

1 Policy there's an opportunity to have an
2 advisor of choice, which is not the case in
3 the regular Community Standards process, the
4 non-SMP process.  Through the Community
5 Standards process students are still entitled
6 to have an advisor, but it must be somebody
7 from the University community.
8        Q.    What's the policy with respect
9 to a support person or advisor serving as a
10 witness in reporting misconduct?
11        MR. PICCERILLI:  Objection to
12 form.
13        THE WITNESS:  Can I refer to
14 the Advisor section here?
15 BY MR. MIRABELLA:
16        Q.    Yes.
17        MR. PICCERILLI:  I think you
18 said support person, so I don't know if you're
19 relating that to advisor.
20        MR. MIRABELLA:  I will
21 clarify.
22        MR. PICCERILLI:  Okay.  Why
23 don't you ask your question so she can review
24 what paragraph it is.

49 (Pages 190 - 193)

CONFIDENTIAL

BY MR. MIRABELLA:

2    Q.    To your knowledge, can a
3  student advisor serve as a witness in the
4  investigation?
5    A.    Per the policy an advisor
6  cannot serve in a different role during the
7  disciplinary process, for example, witness is
8  in parentheses here.
9    Q.    So if a student selects a
10 individual who is another student who may have
11 been a witness to the information to serve as
12 an advisor at the pre-investigation meeting
13 that student is then eliminated as a personal
14 witness?
15       MR. PICCERILLI:  Objection to
16 form.
17       THE WITNESS:  Right.  So the
18 University -- again, from the policy, the
19 University may remove or dismiss an advisor
20 who becomes disruptive or who does not abide
21 by the restrictions upon their participation
22 as determined by the person conducting the
23 meeting.
24 BY MR. MIRABELLA:

1    Q.    No, my question went back to
2  the original:  If a student selects another
3  student to be an advisor and they're also a
4  witness to some part of the event, they can no
5  longer serve as a witness with respect to the
6  complaint?
7    A.    This is where I would, again,
8  say that they would not abide by their
9  restrictions on their participation.  So that
10 the University may remove or dismiss an
11 advisor.
12    Q.    I guess I didn't ask it the
13 right way.
14       MR. PICCERILLI:  I think you
15 got the answer that you were looking for.
16       MR. MIRABELLA:  I just don't
17 understand it, so I want to try to get back to
18 it.
19 BY MR. MIRABELLA:
20    Q.    What do you understand that to
21 mean in the context of advisor who is a
22 student and they also have been a witness to
23 part or some of the event?
24    A.    Right.  So I would, again,

1  refer back to that person may not abide by the
2  restrictions on their participation, so they
3  may be removed or dismissed.
4    Q.    So I'm not -- my question
5  wasn't going to whether an advisor exceeded
6  the scope of their accepted responsibility to
7  serve as an advisor to the Complainant.
8       I'm trying to understand what
9  that does to their -- whether they can still
10 be a witness and the investigator would want
11 to talk to them?
12       MR. PICCERILLI:  Objection to
13 form; asked and answered.
14 BY MR. MIRABELLA:
15    Q.    And if your answer is I don't
16 know, I don't have that situation come up or
17 I'm not sure how that would play out, can the
18 University dismiss them as an advisor so the
19 investigator can interview them?
20    A.    I would say the same thing I've
21 been saying.  I do think it answers the
22 question in terms of that if a person does not
23 abide by the restrictions on their
24 participation the University may remove or

1  dismiss them.
2    Q.    I'm not talking about the
3  advisor's conduct.  I'm talking about the
4  advisor's role as to whether they're eligible
5  to be a witness if they do not -- if they stay
6  their role as advisor, do what they're
7  supposed to do as an advisor, have they been
8  eliminated as a potential witness?
9    A.    I think you and I have
10 different interpretations of this phrase in
11 terms of I'm not seeing that strictly as an
12 advisor's conduct.  It's their restrictions on
13 participation.
14    Q.    What's the restrictions on
15 participation?
16    A.    An advisor cannot serve in a
17 different role during the disciplinary
18 process, for example, witness.
19    Q.    Have you ever been in
20 situations where a Complainant identified an
21 advisor as someone who was also a witness to
22 the event?
23    A.    Ever in my history outside of
24 sexual misconduct?

CONFIDENTIAL

Page 198

1    Q.    Ever.
2    A.    Yes.
3    Q.    How was it handled?
4    A.    If they were already
5  participating as a witness and then opted to
6  be an advisor they were not permitted to do
7  so.
8    Q.    Not permitted to be an advisor?
9    A.    Correct.
10   Q.    Was the Complainant told about
11  the eligibility of an advisor other than what
12  you repeated in the policy?
13   A.    What is the -- I'm sorry?
14   Q.    When a Complainant makes a
15  report, are they advised or are they informed
16  that certain individuals can be an advisor,
17  but they can't be witnesses?
18   A.    So they receive the same
19  information as the Respondent, which would
20  include not only a version of the policy, a
21  copy of the policy, but also the
22  Pre-investigation Meeting Checklist.  So I
23  would like to refer to that to see if there's
24  information on there, but they are referred to

Page 199

1  the policy.  So they have the information that
2  I just shared.
3    Q.    Did you have any involvement in
4  the investigation of the allegations of
5  misconduct directed against the sports team
6  that we referenced early in the deposition?
7    A.    Did I have any involvement, was
8  that your question?
9    Q.    Yes.
10   A.    Did I have any involvement?  I
11  can't recall specific involvement, but I'm
12  familiar with it, yes.  And I was, again, in
13  the position in some capacity of overseeing
14  the process.
15   Q.    Did you sit as a hearing
16  examiner?
17   A.    No.
18   Q.    And do you recall what part of
19  the process you oversaw?
20   A.    I can't recall the date of that
21  to know what my position was at the time in
22  terms of the capacity that I was in.
23   Q.    Did you participate in any
24  decisions regarding responsibility or

Page 200

1  sanctions?
2    A.    No.
3    Q.    Did you participate in any
4  decisions regarding the manner -- excuse me,
5  which provisions of misconduct the individuals
6  of the team were investigated?
7          MR. PICCERILLI:  I'm sorry, can
8  you read that back.  I'm having difficulty
9  hearing you.
10            - - -
11     (Whereupon, the court reporter read
12  back the pertinent information.)
13            - - -
14          THE WITNESS:  Can you rephrase
15  it?
16          MR. MIRABELLA:  Sure.
17  BY MR. MIRABELLA:
18   Q.    Did you have anything to do
19  with determining whether the team or players
20  were investigated under the Sexual Misconduct
21  Policy and/or the Community Standards code or
22  both?
23   A.    I don't recall.
24   Q.    Did you have any role in

Page 201

1  determining who would be -- who was identified
2  as the Respondent individually in that case?
3    A.    I don't recall.
4    Q.    If a third party reports
5  misconduct to the Title IX Coordinator
6  involving multiple students, whose
7  responsibility is it to determine who, if any,
8  is investigated as a Respondent?
9          MR. PICCERILLI:  Objection to
10  form.
11          THE WITNESS:  I would refer
12  back to that initial review.  If you would
13  like me to repeat that I would.
14  BY MR. MIRABELLA:
15   Q.    No.  Is it possible -- or in
16  your experience, can the Office of Community
17  Standards undertake an investigation with no
18  one identified as a Respondent that involves
19  multiple students?
20          MR. PICCERILLI:  Did you say no
21  one is identified as a Respondent?
22  BY MR. MIRABELLA:
23   Q.    No one individual or body of
24  students is specifically identified as

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1 Respondent, can the Office of Community
2 Standards still undertake an investigation?
3      A.     No student or body of students
4 is identified?
5      Q.     Not because they're -- strike
6 that.
7           I guess in every investigation
8 somebody is always a Respondent with the
9 exception of a collective body like a team?
10     A.     For the student conduct
11 process -- again, this is everything in terms
12 of Title IX, but when there's a student
13 conduct process yes, we are participating in
14 that process when there is a student
15 Respondent or students or a group.
16     Q.     Back to the appeal questions
17 generally. Other than the identification of
18 advisors, there is no difference in the appeal
19 process of the SMP or the Office of Community
20 Standards violation findings; correct?
21     A.     Another aspect that's different
22 is the equal rights of the Complainant and the
23 Respondent in the sexual misconduct process
24 that is not always present within the

Page 203

1 Community Standards process.
2      Q.     And is that the opportunity for
3 the Complainant and the Respondent to appeal
4 the finding of responsibility?
5           THE COURT REPORTER:  I'm sorry,
6 can you repeat that.
7 BY MR. MIRABELLA:
8      Q.     Sure.  What do you mean by
9 that?
10     A.     It's the same rights for both.
11 So it's more than what you just described.
12 It's actually the right to appeal and
13 participate throughout that appeal process
14 just as the Cross-Appellant would.  The
15 Complainant and Respondent have the same exact
16 rights.
17     Q.     Have any findings of sexual
18 misconduct been reversed on appeal since
19 you've been moderating?
20     A.     I can't recall.
21     Q.     Were any reversed this year?
22     A.     I can't recall.
23     Q.     For reversal does it have to be
24 three to zero or it could two to one?

Page 204

1      A.     I would actually -- reversal is
2 not a word that we would use.  I would have to
3 further understand what you mean by that.
4      Q.     Sure.  A Respondent appeals the
5 findings against him or her and the Appeal
6 Panel agrees with the Respondent's objection
7 in the appeal, can be the matter be reversed
8 and set aside the findings of not
9 responsibility?
10     A.     No, that is not the outcome of
11 the Appeal Panel.
12     Q.     Can the matter be set aside and
13 re-investigated?
14     A.     Yes.
15     Q.     Have there been any cases in
16 the past calendar year in which the Appeal
17 Panel has set aside a finding and had the
18 matter re-investigated?
19     A.     I don't recall.
20     Q.     Do you know if it's happened
21 since you've been Vice President?
22     A.     My title is not Vice President.
23     Q.     Assistant Vice President.  I
24 was using that bookmark 2013.

Page 205

1      A.     That's okay.  I'm sorry, has
2 that ever happened?
3      Q.     Yes, are you aware of that
4 finding of responsibility set aside for
5 re-investigation for the Sexual Misconduct
6 Policy since you've been Assistant Vice
7 President 2013 to the present?
8      A.     Again, I would not -- I don't
9 have that offhand.  I don't have that
10 information offhand.  There's a lot of nuances
11 to what you were just describing.
12     Q.     Has a sexual misconduct finding
13 responsibility been set aside for
14 re-investigation this year?
15     A.     I can't recall.  And again, I
16 also wouldn't call it re-investigation.
17     Q.     What would you call it?
18     A.     It can be remanded to the
19 investigator or to a new investigator or the
20 outcome could be affirmed.
21     Q.     Right.  I'm talking about
22 situations -- are you aware of any situation
23 this year where the outcome is not affirmed?
24     A.     I can't recall offhand.

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1    Q.    Would you agree with me it's
2  rare?
3    A.    I would need you to describe
4  rare.
5    Q.    There's 29 findings of some
6  responsible, some not responsible cases of
7  sexual misconduct.  Do you believe there's
8  been more than one or two situations where the
9  Appeal Panel has remanded it back to the
10 investigator for a new investigation?
11       MR. PICCERILLI:  Objection;
12 asked and answered.
13       THE WITNESS:  I also don't -- I
14 can't even comment on whether all 29 that you
15 just referenced were appealed.
16 BY MR. MIRABELLA:
17   Q.    If an appeal is remanded either
18 for the investigation back to the
19 investigator, is that information set forth in
20 the StarRez system?
21   A.    Yes.
22   Q.    Is there any way to tell from
23 looking at the list that I gave you, the
24 StarRez cases, whether those cases were

Page 207

1  remanded either to a new investigator or back
2  to the original investigator and then
3  affirmed?
4    A.    No, I wouldn't be able to look
5  at that offhand and know that.
6    Q.    What are the appeal rights of
7  the Respondent?
8    A.    Can I refer to that?
9    Q.    Yes.
10       MR. PICCERILLI:  You're
11 referring --
12       THE WITNESS:  To the policy,
13 that's correct.
14       MR. PICCERILLI:  The Sexual
15 Misconduct Policy?
16       THE WITNESS:  The Sexual
17 Misconduct Policy, yes.  I'll tell you the
18 page number when I get there.  So I'm looking
19 at SJU001209.
20 BY MR. MIRABELLA:
21   Q.    Can you give me the citation
22 again?
23   A.    001209.
24       MR. PICCERILLI:  That's SJU.

Page 208

1       THE WITNESS:  Yes, SJU.
2  BY MR. MIRABELLA:
3    Q.    All right.  I was asking
4  generally what are the appeal rights of a
5  Respondent.  Is that information set forth
6  anywhere in here?
7    A.    They have the right to appeal.
8    Q.    Is that Section 8?
9    A.    Yes.
10   Q.    What are the rights -- what's
11 the Respondent's rights with respect to the
12 process or manner of an appeal?
13   A.    Can you break that down for
14 me?  Would you like --
15   Q.    Sure.  Is the Respondent
16 entitled to see the investigative file prior
17 to appealing?
18   A.    Yes.
19   Q.    And is the Respondent entitled
20 to see the response of the Complainant, if
21 any, to his or her appeal?
22   A.    Yes.
23   Q.    So during the appeal process if
24 there's a finding of responsibility, I would

Page 209

1  assume that the Respondent -- strike that.
2       If there's a finding of
3  responsibility and the Complainant does not
4  appeal it, I would assume that the Respondent,
5  that person he or she is appealing, would file
6  the first response, would file their appeal
7  first?
8       MR. PICCERILLI:  The question
9  is if the Respondent filed first --
10 BY MR. MIRABELLA:
11   Q.    If there's a finding of
12 responsibility the Complainant can also appeal
13 that?
14   A.    Correct.
15   Q.    If the Complainant is not
16 appealing it, the Respondent would then file a
17 response to the -- they have to file their
18 appeal paper?
19   A.    They have the right to do so
20 within five business days of receiving the
21 outcome.
22       MR. PICCERILLI:  We can take a
23 quick break?
24       MR. MIRABELLA:  Yes.

53 (Pages 206 - 209)

CONFIDENTIAL

1             - - -
2     (Whereupon, a short break was taken at
3  this time.)
4             - - -
5  BY MR. MIRABELLA:
6     Q.     I got to go back to the Dear
7  Colleague Letter.  There were some questions
8  earlier about the Dear Colleague Letter and
9  the guidance issued in 2017; correct?
10    A.     I'm sorry?
11    Q.     Do you remember we talked about
12 that?
13    A.     Yes.
14    Q.     Did you participate in a review
15 of the school's policy as it then existed to
16 determine if it was in compliance?
17    A.     I recall being invited to a
18 meeting by our General Counsel.
19    Q.     Any other involvement or review
20 other than that meeting?
21    A.     To be perfectly honest, I had a
22 two-week old at that point and was on
23 maternity leave.  So I don't recall
24 specifically having any conversations.  I was

1  out of the office for three months.
2     Q.     At that meeting was there a
3  handful of people, a lot of people?
4     A.     I called in.
5     Q.     Oh, you weren't physically
6  present in the meeting?
7     A.     No.
8     Q.     Correct?
9     A.     Correct, I was at home.
10    Q.     And was a decision made at that
11 meeting as to whether or not the school's
12 policy was in compliance?
13        MR. PICCERILLI:  We're going to
14 stand on our objection on the basis of the
15 attorney-client privilege because it was a
16 meeting that was conducted by Counsel, General
17 Counsel.
18        MR. MIRABELLA:  I got to ask a
19 bunch of more questions, but you can object as
20 you see appropriate, but I want to try to get
21 the parameters as to whether or not there was
22 compliance or not.  Some of these, I think,
23 could be answered generally without waiving
24 the privilege.

1  BY MR. MIRABELLA:
2     Q.     At that meeting, which included
3  General Counsel, did General Counsel speak?
4     A.     Yes.
5     Q.     And was a decision made as a
6  result of that meeting as to whether or not --
7  by the school that the existing policy was or
8  was not in compliance?
9        MR. PICCERILLI:  Objection to
10 attorney-client privilege.
11 BY MR. MIRABELLA:
12    Q.     To your knowledge, I'm not
13 asking what the answer was, did General
14 Counsel provide a legal opinion to the members
15 of SJU who were participating as to whether or
16 not the policy was or was not in compliance?
17        MR. PICCERILLI:  Object to the
18 attorney-client privilege.
19 BY MR. MIRABELLA:
20    Q.     Do you know, you were on the
21 telephone, so you don't have a sense of how
22 many people were at the meeting?
23    A.     I don't recall.
24    Q.     Do you know if the meeting was

1  memorialized?
2     A.     I do not know.
3        MR. PICCERILLI:  You mean in a
4  writing of some sort?
5        MR. MIRABELLA:  Correct.
6        MS. SCHIMELFENIG:  Off the
7  record.
8             - - -
9     (Whereupon, a discussion was held off
10 the record.)
11            - - -
12        THE WITNESS:  I do not remember
13 or I do not know.
14 BY MR. MIRABELLA:
15    Q.     Did you know if anyone other
16 than General Counsel made a decision about
17 whether or not the existing policy complied or
18 didn't comply?
19        MR. PICCERILLI:  Objection.
20 Regarding the content of the meeting,
21 regarding during the meeting?
22        MR. MIRABELLA:  Yes.
23        MR. PICCERILLI:  Objection;
24 attorney-client privilege.

54 (Pages 210 - 213)

CONFIDENTIAL

1 BY MR. PICCERILLI:
2     Q.     Was there anything done -- did
3 you ask any questions of Counsel or Counsel's
4 legal opinion as to the new policy?
5         MR. PICCERILLI:  You can answer
6 that question.
7         THE WITNESS:  I don't recall.
8 BY MR. MIRABELLA:
9     Q.     Did you hear anyone else ask
10 questions as to Counsel's opinion as to
11 whether or not the SJU policy complied with
12 the new guidance?
13        MR. PICCERILLI:  Objection;
14 attorney-client privilege.  Actually --
15        MR. MIRABELLA:  No, not the
16 question, the answer is privileged.
17        MR. PICCERILLI:  No, no, no.
18 Going both ways are privileged.
19        MR. MIRABELLA:  I don't agree.
20 I'm trying to do this in a way to eliminate
21 further discovery.
22 BY MR. MIRABELLA:
23    Q.     Did anything change about the
24 school's implementation or use of its

1 existing -- to your knowledge, did SJU change
2 the investigation or adjudication of sexual
3 misconduct claims following that meeting?
4     A.     I can't say definitively.  I
5 was out for three months at that time, so I
6 don't know that I knew definitively.
7     Q.     Were there any written changes
8 to the policy following that meeting?
9     A.     I don't recall.
10    Q.     If they were, how could they be
11 discerned?  So there was some updates in
12 September of 2017.  I'm not saying it was or
13 wasn't in response to the meeting.
14        Is there someone who tracks the
15 policy itself, the writing of the policy?
16    A.     The review of the policy is
17 facilitated by Dr. Mary-Elaine Perry.
18    Q.     And did you participate in any
19 further review with Dr. Perry after that
20 meeting?  I know you were out on maternity, I
21 still have to ask.
22    A.     After September of 2017, yes.
23 There's a -- yes.
24    Q.     Can you describe that process?

1     A.     It's a typical process for us.
2 I believe that -- could I refer to the policy
3 in terms of the review piece?
4     Q.     Sure.
5     A.     I didn't want to misspeak.  So
6 SJU001215:  Title IX Coordinator will initiate
7 the annual review of the policy.  Additional
8 review of revisions will be conducted as
9 needed to comply with legal requirements.
10        I didn't want to misspeak about
11 that.
12    Q.     Is that annual review done by
13 Dr. Perry?
14    A.     Yes.
15    Q.     When is that done, if you
16 know?
17    A.     I don't know if there's regular
18 timelines of when that is done.
19    Q.     Are you aware of participating
20 in that annual review since the time of the
21 Dear Colleague to the present?
22    A.     Yes.
23    Q.     And what issues were under
24 review?

1     A.     I'm trying to think of any
2 specifics.  I can't recall specifics right
3 now.
4     Q.     Were there any
5 considerations --
6         MR. PICCERILLI:  Hold on, let
7 her --
8         MR. MIRABELLA:  Oh, sure.  I
9 thought she was done.
10        MR. PICCERILLI:  Are you
11 finished your answer?
12        THE WITNESS:  I'm thinking if I
13 can remember anything, and I don't know if I
14 can, but give me a moment to see if I can
15 recall.  I can't recall specifics at this
16 time, I'm sorry.
17 BY MR. MIRABELLA:
18    Q.     And was that at a meeting with
19 Dr. Perry and others?
20    A.     Yes, I recall a meeting.
21    Q.     Who was at the meeting?
22    A.     Bill Bordak was at the
23 meeting.  I believe Marci Berney was at the
24 meeting.  Chris Morrin was at the meeting.  I

CONFIDENTIAL

Page 218

1 can't recall if there were others or not.
2      Q.      Given that Chris Morrin was at
3 the meeting, can you estimate when the meeting
4 took place?  It had to be after he was
5 retained, I take it?
6      A.      Yes, yes.  I don't recall a
7 specific date of the meeting.
8      Q.      So it had to be after October
9 of 2017?
10     A.      I can't remember when Chris was
11 hired.  He wasn't hired in October.  It was
12 the Spring.
13     Q.      My question was it had to be
14 after October 2017?
15     A.      Yes, yes.
16     Q.      And when you said the Spring
17 you're thinking the Spring of 2018?
18     A.      Spring or Summer, yes.
19     Q.      So that was after the events in
20 this case with John Doe?
21     A.      I don't recall the specific
22 date.
23     Q.      Was there any consideration or
24 discussion at that meeting as to changing the

Page 219

1 investigative process or adjudicatory process
2 in connection with the SMP?
3      A.      I can't recall specifically.
4           MR. PICCERILLI:  Which policy
5 were you referring to?
6           MR. MIRABELLA:  The SMP, the
7 only one we've been talking about.
8 BY MR. MIRABELLA:
9      Q.      Was there any consideration in
10 revisiting guidance on the Dear Colleague
11 Letter in the Fall of 2017 at that meeting?
12     A.      I can't recall the specifics.
13     Q.      Did anyone write down what was
14 talked about at that meeting?  Would anyone be
15 writing down what was talked about?
16     A.      I did not.
17     Q.      Do you get involved in the
18 review of sanctions when there's an outcome of
19 responsibility?
20           MR. PICCERILLI:  Did you hear
21 that?
22 BY MR. MIRABELLA:
23     Q.      Sure.  Are you involved in the
24 sanctions for when there's an outcome of

Page 220

1 responsibility?
2      A.      What do you mean by involved?
3      Q.      Are you consulted about the
4 nature of the sanctions posed by the Sanctions
5 Officer?
6      A.      I may be consulted, yes.
7      Q.      In what circumstances have you
8 been consulted and why?
9      A.      It's been in a supervisory
10 relationship with the Office of Community
11 Standards.
12     Q.      Who is the Sanctions Officer in
13 most of the Community Standards cases?
14     A.      I don't know if I can say most,
15 but it's typically split between one -- it's
16 either the Assistant Director or Manager and
17 the Director.  There's two professional staff
18 members in the office, which is typically
19 between the two of them.
20     Q.      And at the time that was either
21 Bordak or Ms. Forte?
22     A.      Correct.
23     Q.      Who is there now instead of Ms.
24 Forte?

Page 221

1      A.      Courtney LaGanke
2      Q.      And is the practice generally
3 that whoever handles that pre-investigation
4 meeting is not the Sanctions Officer?
5      A.      Yes.
6      Q.      And why is that?
7      A.      Sometimes it's scheduling.
8 It's the availability of the particular staff
9 member during different points in the
10 process.  There may be incidents when one of
11 the two may have served in some sort of
12 on-call capacity too at the time of the
13 incident, and so to eliminate any sort of
14 perception of bias, and also really a
15 segregation of duties at that point in terms
16 of workload, distribution of workload.
17     Q.      Does Cary Anderson do the
18 initial appeal review?
19     A.      I work with him as more or less
20 the designee.  But yes, so I work closely with
21 Dr. Anderson in terms of the initial review.
22     Q.      I'm paraphrasing, but Dr.
23 Anderson testified that he gives the go-ahead
24 after an appeal is filed, after he reviews it?

56 (Pages 218 - 221)

Page 222

1    A.    Yes.
2    Q.    But in terms of the situation,
3  what factors go in to whether he gives the
4  go-ahead or not the appeal?
5    A.    I'm happy to refer to the
6  policy.
7    Q.    What's your understanding? I
8  was present for Dr. Anderson's deposition and
9  I still don't understand it.
10    A.    Sure. So typically it's one of
11  two things; either not within the time frame
12  of the appeal deadline or there are not
13  articulated grounds for an appeal, at least
14  one ground for an appeal.
15    Q.    So if it's late Dr. Anderson
16  might nix the appeal?
17    A.    Yes.
18    Q.    Does he always or does he use
19  his discretion?
20    A.    Does he always do what?
21    Q.    If the appeal is late, can it
22  still be considered or is it a matter of
23  discretion of Dr. Anderson?
24    A.    It's hard to even recall an

Page 223

1  instance in that situation to be able to
2  answer that.
3    Q.    Again, I don't know is an
4  appropriate response.
5    MR. PICCERILLI: I'm sorry,
6  what was that?
7  BY MR. MIRABELLA:
8    Q.    If an appeal is filed late,
9  does Dr. Anderson always dismiss the appeal or
10  does he use discretion on occasion as to how
11  to go forward?
12    MR. PICCERILLI: And I think
13  the witness testified that she can't recall a
14  situation where that occurred.
15    Am I right?
16    THE WITNESS: I'll say I don't
17  know, yes.
18  BY MR. MIRABELLA:
19    Q.    And do you recall a situation
20  where Dr. Anderson determined that there were
21  not articulated grounds for filing the appeal
22  and dismissed it?
23    A.    Yes.
24    Q.    And in that situation how is

Page 224

1  the -- what's the process, the student is
2  informed that they're not going to be heard?
3    A.    Yes.
4    Q.    And the student is informed
5  that the reason is that there are no grounds
6  articulated that warrant an appeal?
7    A.    Yes.
8    Q.    What are the percentages of
9  students who are found as responsible party
10  under the Sexual Misconduct Policy for filing
11  an appeal?
12    A.    I do not know offhand.
13    Q.    What are the rules with respect
14  to the preparation of an appeal by a
15  Respondent?
16    A.    Can you explain what you mean
17  by rules?
18    Q.    Sure. What guidance and what
19  instructions are the Respondents given in
20  conenction with who can prepare the appeal?
21    A.    Can I refer to the policy?
22    Q.    Sure.
23    A.    So, again, SJU001209, and it
24  states that the Complainant and/or the

Page 225

1  Respondent may appeal the outcome.
2    Q.    Can the Respondent get
3  assistance from an advisor?
4    A.    The advisor as referenced
5  earlier in the policy as someone who can
6  support the Complainant or Respondent
7  throughout the process.
8    Q.    Is there any section in the
9  policy that says that the Respondent can
10  prepare the appeal by him or herself?
11    A.    It's what I just mentioned in
12  terms of the first line: The Complainant
13  and/or the Respondent may appeal. We're
14  naming the parties involved there.
15    Q.    Is the appeal decision held
16  until the Appellant is provided an opportunity
17  to inspect the other party's response?
18    A.    No.
19    Q.    What's the document collection
20  period refer to?
21    A.    Can you point to where you're
22  at, please?
23    Q.    I thought -- you're the
24  moderator of the appeals in the Community

57 (Pages 222 - 225)

CONFIDENTIAL

1 Standards; correct?
2      A.      Correct.
3      Q.      You're not familiar with the
4 document collection period?
5      A.      I thought you were referring to
6 something specific there.
7      Q.      Is there a specific time frame
8 for the collection of documents for the appeal
9 from the Respondent?
10     A.      From the Respondent?
11     Q.      Correct.
12     A.      So for the Appellant or
13 Cross-Appellant or Non-Appellant, they both
14 have the right to appeal within five business
15 dates of the outcome.  From that point there
16 are then five additional business days for
17 which the office would schedule a meeting for
18 the Cross-Appellant or Non-Appellant to come
19 and inspect the appeal request if they desire
20 to do so.  Then they have 24 hours from that
21 point to respond to the appeal request in
22 writing if they choose to do so.  At that
23 time, after that 24 hours has expired, that is
24 the end of the appeal document collection

1 period.
2      Q.      Where is that stated in the
3 policy itself?
4      A.      I'll find it for you.  At the
5 top of SJU001211.  At the top of that page
6 it's referencing initially as number five --
7 I'm sorry, five business days to respond and
8 then the 24 hours to inspect and respond.  And
9 then following, just above letter E: The
10 Appellant shall be provided an opportunity to
11 inspect the other party's response, but no
12 additional responses are accepted as appeal
13 documentation at that point from either party.
14     Q.      Is there anything in that
15 section about additional documentation from
16 anyone at the University?
17     A.      Under letter E on the last
18 paragraph on that same page: The moderator
19 designee shall advise the panel on matters
20 such as the appeal process.  The moderator
21 designee shall also facilitate the appropriate
22 paperwork.  And it continues to the
23 appropriate paperwork there.
24         It goes on to say that: The

1 panel may also determine if they, on the next
2 page, that they can resolve the appeal without
3 a meeting or additional fact-finding and
4 whether to have such meeting or fact-finding
5 or not is within their sole discretion.
6      Q.      Does the Sexual Misconduct
7 Policy identify what the appropriate paperwork
8 is that the moderator provides to the Appeal
9 Panel?
10     A.      No.
11     Q.      Does the moderator in any way
12 inform the Complainant or Respondent of the
13 paperwork that's going to be provided to the
14 Appeal Panel?
15     A.      No, not detailed.
16     Q.      Does the moderator or anyone at
17 SJU inform the Complainant or the Respondent
18 that additional responses were solicited from
19 those involved in the disciplinary process?
20     A.      No.
21     Q.      Why is that done ex parte
22 without informing the parties?
23         MR. PICCERILLI:  Objection to
24 form; argumentative.

1 BY MR. MIRABELLA:
2      Q.      Why is that done without --
3      A.      They're informed that any
4 documentation relevant to the incident is
5 provided to the Appeal Panel.  So they do know
6 that the Appeal Panel -- and in the policy it
7 states that appropriate paperwork will be sent
8 to the Appeal Panel.
9      Q.      There's very clear and explicit
10 provisions as to what the Complainant and
11 Respondent can submit.  Do you agree there's
12 nothing in here about additional submissions?
13 Do you agree with me?
14         MR. PICCERILLI:  Objection.
15         THE WITNESS:  I would mention
16 again what I shared about facilitating
17 appropriate paperwork.
18 BY MR. MIRABELLA:
19     Q.      Is the definition of
20 appropriate paperwork set forth in the SMP?
21     A.      It is not.
22     Q.      And is the practice -- are the
23 parties informed of this process, if not in
24 writing, orally, about what additional

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1 paperwork can be submitted?
2        MR. PICCERILLI:  Objection to
3 form; asked and answered.
4        THE WITNESS:  Again, not
5 explicitly.  It's outlined that they will --
6 that the Appeal Panel receives appropriate
7 paperwork.  So it is known to the parties that
8 they receive paperwork.
9 BY MR. MIRABELLA:
10       Q.    Are appeal responses usually
11 solicited from those involved in the
12 disciplinary process during the appeal
13 process?
14       A.    Yes.
15       Q.    Is it usually the Sanction
16 Officer, investigator and the
17 pre-investigation meeting with a Community
18 Standards representative?
19       A.    Usually, yes.
20       Q.    Is it ever other individuals?
21       A.    I can't recall specifically.
22 It may be.
23       Q.    So we're in the policy.  Other
24 than the appropriate paperwork, does it give

Page 231

1 SJU the right to submit its appeal responses
2 from other members of the SJU staff?
3        A.    I would again point to the
4 appropriate paperwork timeline.
5        Q.    Why aren't -- what would be the
6 most -- strike that.
7            So if a student doesn't happen
8 to review the file after the appeal is
9 concluded, the Respondent wouldn't know if a
10 response is filed by other members of the
11 Discipline Office; correct?
12       A.    Correct.
13       Q.    Do you believe that that's a
14 fair and equitable way to handle the appeal
15 process?
16       A.    I do.  There's no further
17 documentation collected from the Respondent or
18 the Complainant at the point in the process
19 that it describes.
20       Q.    Nor are the -- strike that.
21            How much time is the Appeal
22 Panel given to review a file?
23       A.    Here, again, I can refer to the
24 timeline here for this.  I'm on Page

Page 232

1 SJU001212.  There's a time frame for the
2 Complainant and Respondent, in the second
3 paragraph:  Having an opportunity to object to
4 a member of the panel in writing, and that
5 deadline is for them to object to that at
6 least one business day, but no less than 24
7 hours before the panel meeting.
8            So we wait until that timeline
9 to then produce the records for the Appeal
10 Panel to review.  So if it's during the week
11 then it's about 24 hours.  If it just so
12 happens to be on a Monday it's a Friday.  Or
13 if for some reason the University is closed,
14 then it's not counted as a business day.
15       Q.    Is it the school's expectation
16 that the panel is drawn from the Community
17 Board, Community Service Board?
18       A.    Community Standards Board.
19       Q.    That they will have an
20 opportunity to review all the documents?
21       A.    Correct.
22       Q.    Are they given files in writing
23 or are they given access to --
24       A.    There's an electronic system

Page 233

1 that we use throughout our learning management
2 system, password protected, et cetera.  We
3 grant three individual members access and we
4 remove the access when the appeal period
5 concludes.
6        Q.    Does anyone ever check to see
7 if they actually accessed the documents?
8        A.    We also give them access -- we
9 also bring hard copies to the actual Appeal
10 Panel meeting.
11       Q.    The Appeal Panel meeting is
12 typically when a decision is recommended or
13 something like that?
14       A.    Typically, yes.
15       Q.    In this case we're looking
16 over, for example, 60 pages of documents?
17       A.    Correct.
18       Q.    Back to my question:  Does
19 anyone check to see, is there an audit trail
20 to see if the Appeal Board are actually
21 accessing the file?
22       A.    Technologically, no.  In the
23 beginning of every Appeal Panel meeting I
24 assure that -- I ask them if they had reviewed

59 (Pages 230 - 233)

CONFIDENTIAL

1 the documentation or not before we begin the
2 conversation.
3     Q.    Do you participate in teaching
4 the Appeal Board members that serve on the
5 Appeal Board?
6     A.    The training, their training?
7 Some of the training, yes, I participate in.
8     Q.    What part of the training?
9     A.    Typically the appeal portion.
10    Q.    One of the options presented to
11 the panel is to review the case from the
12 investigator; correct?  And I'm on Page 1212.
13    A.    So I would refer you to the
14 paragraph just above that paragraph, Paragraph
15 4:  They can affirm the outcome reached by the
16 investigator or they can, to the next
17 paragraph, remand the case to the investigator
18 or deemed to be appropriate to a new
19 investigator.
20    Q.    Does that have to be done three
21 to zero or two to one?
22    A.    It can be two to one, but
23 there's conversation to assure there's comfort
24 with the decision.

1     Q.    Both with respect to affirming
2 or remanding the case back to the
3 investigator?
4     A.    Any decision.
5     Q.    Can be two to one?
6     A.    Yes.
7     Q.    After the case is remanded, can
8 it be appealed again?
9     A.    No.
10    Q.    What's the purpose of having
11 the investigator respond to the appeal?
12    A.    So if there's any information
13 that they may be able to share in response to
14 the appeal request, I try to put that in front
15 of the Appeal Panel considering the timeline
16 that's in place for the Appeal Panel to render
17 a decision within five business days of that
18 appeal documentation and collection period
19 expiring.  And so I don't direct any response,
20 I merely ask if there is a response and they
21 send it to me within the time frame.
22    Q.    Does the investigator normally
23 respond?
24    A.    Normally, yes.

1     Q.    So the investigator gets to
2 respond in writing to the appeal submitted by
3 a Respondent under the SMP appeal process
4 policy; correct?
5     A.    I'm sorry?
6     Q.    So the investigator gets an
7 opportunity to respond to the appeal of a
8 Respondent in writing; correct?
9     A.    Yes.
10    Q.    Okay.  What's the purpose of
11 having a pre-investigation meeting for an
12 individual to provide a response to the
13 appeal?
14    A.    If there are any questions that
15 come up that are referred to during that
16 pre-investigation meeting it's a point in the
17 process that I then ask for that person to
18 provide any response if they would like to do
19 so.
20    Q.    Are the -- when the appeal
21 responses are solicited, what guidelines or
22 parameters do you give to them as to what
23 should or should not be considered in the
24 response?

1     A.    I don't direct any specific
2 requests to them.
3     Q.    Do they get any training as to
4 what they may or may not say in the response?
5     A.    No.
6     Q.    So they can refer to outside
7 statements, investigations, literature,
8 anything they want in response?
9     A.    They're --
10        MR. PICCERILLI:  Objection to
11 form.
12        THE WITNESS:  They are
13 responding to the request that is in front of
14 them at that time, yes.
15 BY MR. MIRABELLA:
16    Q.    But there's no limitations on
17 what they can say or consider or address?
18    A.    There's -- I will say there's
19 professional judgment and training that is
20 done for every step of the process.  And so,
21 for lack of better, it's not a free-for-all.
22    Q.    If they want to talk about
23 other individual's assessments or opinions
24 than themselves that can be included?

CONFIDENTIAL

Page 238

1          MR. PICCERILLI: Objection to
2 form.
3          THE WITNESS: Can you repeat
4 that question?
5 BY MR. MIRABELLA:
6     Q.     Sure. If they want to include
7 what others have said to them outside, hearsay
8 statement, or the opinion of another faculty
9 member, they can include that in the response
10 to the appeal?
11     A.     Again, there is -- okay, so
12 there is training in terms of professional
13 work responsibility training, and I'm thinking
14 again of the staff of Community Standards and
15 their professional judgment in knowing what
16 they should or should not include in those
17 responses.
18     Q.     So if Mr. Bordak wants to talk
19 about something that Dr. Perry told him or a
20 conclusion Dr. Perry reached, he can include
21 it in his response to the appeal?
22     A.     Using his professional judgment
23 as appropriate based on the circumstances of
24 the appeal request.

Page 239

1     Q.     Have you ever rejected or asked
2 an appeal person to change it?
3     A.     No.
4     Q.     Not change it, but there was
5 something inappropriate or something that was
6 outside of the scope?
7     A.     I don't believe so.
8     Q.     Has Dr. Anderson ever replied?
9     A.     I can't recall.
10     Q.     So the Appeal Panel is
11 either -- back to this for a moment, part of
12 the procedure process. They can either affirm
13 or remand, if they remand they can go back to
14 the same investigator or they can remand the
15 request to go for a new investigator; correct?
16     A.     Correct.
17     Q.     What's the thinking behind the
18 ability to seek out a new investigator, if
19 any?
20     A.     Again, this is part of their
21 evaluation and what they're trained to do. So
22 I can't say explicitly what's prescribed. An
23 example of that could be if they determined
24 that there was bias as an appeal ground.

Page 240

1     Q.     After it's remanded to the
2 investigator, the investigator can conduct
3 additional investigation to affirm or modify
4 the initial outcome; correct?
5     A.     Correct.
6     Q.     However, if the investigator
7 affirms their initial outcome, he then shares
8 it with the Sanctioning Officer?
9     A.     Yes.
10     Q.     And then is the -- and the
11 Appeal Panel does not -- the matter is
12 just -- cannot be appealed again and the
13 appeal process is concluded; correct?
14     A.     Correct.
15     Q.     So the Appeal Panel cannot set
16 aside a finding of responsibility; correct?
17     A.     Correct.
18          MR. PICCERILLI: You're talking
19 about remanded.
20          MR. MIRABELLA: No, any time.
21 BY MR. MIRABELLA:
22     Q.     The Appeal Panel can either
23 affirm the original findings or remand either
24 to the same investigator or a new

Page 241

1 investigator. They cannot set aside the
2 finding of responsibility, interim finding of
3 responsibility; correct?
4     A.     Correct.
5     Q.     There's no limitation on what
6 the Appeal Panel can consider as part of the
7 record report once reviewing the matter?
8     A.     Correct. In fact, on top of
9 that page, SJU001212, they can determine
10 whether any meeting or additional fact-finding
11 is necessary to resolve the appeal.
12     Q.     If new evidence comes to after
13 the appeal is concluded, what's the process
14 for it being considered?
15     A.     It's SJU001210: Should any
16 other relevant information come to the
17 attention of the University during the appeal
18 process this information may be included by
19 the University in the appeal documentation.
20     Q.     Can new information be
21 considered after the appeal process?
22     A.     Could I have a moment to look
23 through the Sexual Misconduct Policy?
24     Q.     Yes.

61 (Pages 238 - 241)

CONFIDENTIAL

1      A.      So I would point to -- okay,
2  here it is, I'm sorry.  On SJU001203, again,
3  this is the initial review, the last few
4  sentences on the page:  If deemed appropriate
5  the University process, disciplinary process
6  will then commence.  The disciplinary process
7  ends when the outcome becomes final.
8      Q.      So is there no mechanism for
9  bringing before the University in the
10  disciplinary process new evidence that's
11  discovered after the appeal outcome is final?
12          MR. PICCERILLI:  After the
13  outcome or the appeal is final?
14  BY MR. MIRABELLA:
15      Q.      Well, what does it mean by
16  outcome becomes final?  Does it mean the
17  resolution of the appeal; correct?
18      A.      Correct.
19      Q.      After the appeal is decided
20  there is no mechanism for the Respondent to
21  bring to the University's attention or have
22  considered new evidence?
23      A.      Yes.  With that said, student
24  can make reports at any time.  So I just want

1  to give you an outside of the policy.  I think
2  it's important to share that.
3      Q.      What's make a report mean?
4      A.      If the student wants to share
5  information with the University and make a
6  report about something there's not a closed
7  timeline for that.
8      Q.      Does it say that anywhere in
9  the Sexual Misconduct Policy?
10      A.      So at the bottom of SJU001197
11  and top of SJU001198 the time frame for
12  reporting:  It's best to report the alleged
13  act of sexual misconduct immediately, and if
14  at all possible, prior to the last date of
15  enrollment or employment of the Respondent.
16  Proper reporting allows evidence to be
17  preserved, witnesses to be interviewed --
18      Q.      Dr. White, may I interrupt
19  you?
20      A.      Yes.
21      Q.      You may read all that into the
22  record, but so we have it clear that your
23  answer to my question about a mechanism for
24  the University considering new evidence after

1  the appeal has been determined, you're
2  referring to Paragraph 6, Time Frame for
3  Reporting, 1197 and 1198 -- and the completion
4  on the top of 1198?
5      A.      Correct.
6      Q.      You may read it all into the
7  record, but is it fair that that's your
8  response to my question?
9      A.      Yes, you asked where it says
10  that in the Sexual Misconduct Policy that
11  reports can be made at any time.
12      Q.      Correct.  I'm asking you where
13  does it says in the Sexual Misconduct Policy
14  that new information can be brought to the
15  attention of the University after an appeal
16  has been concluded?
17      A.      Right, I shared with you that
18  the outcome is final.
19      Q.      And the answer is you cannot?
20      A.      Correct.
21      Q.      All right.  Who made the
22  decision or when was the decision made that
23  the parties would not be informed that
24  University personnel would provide a written

1  reply to the appeal?
2      Q.      Can you repeat the question?
3      Q.      Sure.  Why was the decision
4  made by the University that the parties would
5  not be informed that personnel in the
6  Community Standards Office and the
7  investigator would be providing written
8  response to their appeal?
9      A.      We share in the policy that the
10  students can inspect their record at any time,
11  and that is part of their record.
12      Q.      That wasn't my question.  Why
13  was the decision made that they would not be
14  expressly informed that written responses were
15  being provided in response to the appeal?
16      A.      There's no further
17  documentation collected at that point from the
18  Respondent.
19      Q.      That's not an answer.
20          MR. PICCERILLI:  No, it was an
21  answer.
22  BY MR. MIRABELLA:
23      Q.      So how is it in any way
24  undermining the process to notify the student

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

CONFIDENTIAL

Page 246

1 after they filed an appeal that the University
2 solicits replies that are considered by the
3 Appeal Panel?
4       A.    I, again, would point to --
5 there's a line that says the moderator can
6 facilitate appropriate paperwork.
7       Q.    I understand what it says in
8 the policy. I'm trying to understand why the
9 University has chosen to withhold from the
10 students that part of the process and not
11 inform them that responses are solicited by
12 other members of the staff after they file an
13 appeal?
14           MR. PICCERILLI: Objection to
15 form.
16 BY MR. MIRABELLA:
17       Q.    Do you have an answer to that?
18       A.    I don't have an answer for
19 that.
20       Q.    Do you know Jane Roe?
21       A.    Can you be more specific?
22       Q.    I'm sorry, do you know who Jane
23 Roe is?
24       A.    Yes.

Page 247

1       Q.    All right. Did you ever meet
2 her or speak with her before February 23rd of
3 2018?
4       A.    I'd have to -- I'm not sure
5 what February 23rd is. I'm not familiar with
6 the dates.
7       Q.    Before this case?
8       A.    Before this case, no, I don't
9 believe so.
10       Q.    Did you meet or speak with her
11 after this case?
12       A.    Yes.
13       Q.    When?
14       A.    During her opportunity to
15 inspect the appeal request.
16       Q.    And who was present with you
17 when you met her?
18       A.    Her advisor.
19       Q.    Is that another student?
20       A.    Yes, it is.
21       Q.    And do you know the first name
22 of that student or initials?
23       A.    I can't remember.
24           MR. CHESNEY: Objection.

Page 248

1           THE WITNESS: I'm sorry?
2 BY MR. MIRABELLA:
3       Q.    He just objected. You can
4 still answer if you know who the advisor was?
5       A.    I can't recall her name. I
6 know it was a female student.
7       Q.    Do you know if the first name
8 is Jenny, Rowan or Nuria?
9       A.    I believe it was Rowan.
10       Q.    Do you know if Rowan -- oh,
11 there was already a finding, an outcome;
12 correct?
13       A.    Correct.
14       Q.    Did you speak with Rowan?
15       A.    No. She was an advisor.
16       Q.    Did you speak with Jane Roe?
17       A.    Yes.
18       Q.    And what did you say to her,
19 what did she say to you?
20       A.    It was her opportunity to
21 inspect the appeal request and so she did
22 that. And she asked a few questions about the
23 appeal process. I don't recall specifically
24 what it was, but it was a brief meeting.

Page 249

1 Maybe about 20 to 30 minutes.
2       Q.    Is the policy of the school
3 that the Respondent or the Complainant is
4 advised that they have to do the appeal
5 themselves?
6       A.    Like I mentioned before, we
7 named the parties in terms of the Complainant
8 and the Respondent being the ones that must
9 appeal.
10       Q.    In addition to that, are they
11 told -- is your practice to have either the
12 Community Standards Office or someone there to
13 say you have to prepare the appeal yourself?
14       A.    It's the student's right, yes.
15 It's the student's right to an appeal. It's
16 the student process.
17       Q.    Right. Can the student have an
18 attorney prepare it?
19       A.    No.
20       Q.    Does it say that anywhere in
21 the policy?
22       A.    I don't believe so, but we name
23 who has the right to appeal.
24       Q.    Can the student consult with

63 (Pages 246 - 249)

Page 250

1 anyone in connection with preparing the
2 appeal?
3      A.     We don't have any limitations
4 on that.
5      Q.     But the student can't have an
6 attorney prepare the appeal?
7      A.     The student is the one who has
8 the right to appeal.
9      Q.     And is it the school's position
10 that the student is not entitled to have an
11 attorney prepare the appeal?
12      A.     The student must be the one
13 that submits the appeal.
14      Q.     Did you have any other
15 conversations with or interactions with Jane
16 Roe?
17      A.     Not outside of the e-mail
18 communications that I had with both parties
19 about the appeal process.
20      Q.     Did Jane Roe disclose to you or
21 discuss with you any details of the complaint
22 she filed?
23      A.     No.
24      Q.     Did Jane Roe disclose or

Page 251

1 discuss with you any of the events surrounding
2 the actual complaint?
3      A.     No.
4           MR. PICCERILLI: Can we take a
5 short break?
6           MR. MIRABELLA: Sure.
7               - - -
8      (Whereupon, a short break was taken at
9 this time.)
10               - - -
11 BY MR. MIRABELLA:
12      Q.     Other than soliciting the
13 individuals we covered, do you do any
14 independent investigation to determine if
15 additional evidence or documents is suitable
16 to be submitted to the panel?
17      A.     No.
18      Q.     Is the process -- I think you
19 said this, but the process you described
20 covering the appeal is pretty much identical
21 whether it's under the SMP or not?
22      A.     There's a few variations that I
23 discussed in terms of Respondents and
24 Complainants having equal rights under the

Page 252

1 sexual misconduct process and advisor.
2      Q.     Is there any situations where a
3 Complainant has appealed an outcome of not
4 responsibility?
5      A.     A Complainant, is that what you
6 said?
7      Q.     Sure.
8      A.     I can't recall offhand.
9      Q.     If that, in fact, occurred
10 would you follow the same process you do when
11 there's been a finding of responsibility
12 appealed by the Respondent?
13      A.     Absolutely.
14      Q.     Did you consult with Bill
15 Bordak in connection with the sanctions for
16 Mr. Doe?
17      A.     I can't recall.
18      Q.     What's your understanding of a
19 student's eligibility for international study
20 if there's a finding of responsibility?
21           MR. PICCERILLI: Objection to
22 form.
23           THE WITNESS: Could you
24 maybe --

Page 253

1 BY MR. MIRABELLA:
2      Q.     Sure. If a student is involved
3 in the discipline process and there's been a
4 finding of responsibility against the student,
5 is that automatically ineligibility for
6 international study?
7           MR. PICCERILLI: Objection to
8 form.
9           THE WITNESS: No, not a finding
10 of responsibility.
11 BY MR. MIRABELLA:
12      Q.     What, if anything, impacts the
13 student's eligibility for international
14 travel?
15      A.     I can't speak specifically to
16 this. We were not involved in that. I can't
17 speak specifically. I'm not involved in that
18 communication between Community Standards and
19 the Center for International Programs.
20      Q.     Have you been involved in any
21 disciplinary actions or complaints involving
22 Jane Roe as a Respondent?
23      A.     No, I don't believe so.
24      Q.     Do you know if Jane Roe ever

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

1 had a Community Standards violation as a
2 Respondent?
3     A.    I believe so, yes.
4     Q.    Do you know how many?
5         MR. PICCERILLI: Objection.
6 She has disclosed at her deposition, Jane Roe
7 that is, that she had an alcohol issue or a
8 drug issue and we view that as -- she gave
9 that testimony on the record under oath. We
10 view that as her prior consent to discuss that
11 issue.
12         So with respect to those issues
13 you may ask questions, but I don't know that
14 there are any other issues, but if there are
15 other issues there's no prior consent to
16 disclose that information, and it is unrelated
17 to this particular incident.
18         MR. MIRABELLA: I won't know
19 until I get the answers.
20 BY MR. MIRABELLA:
21     Q.    Were you involved -- you're
22 aware that those situations existed, but you
23 weren't directly involved?
24     A.    Right, and I don't know if I

Page 255

1 recall offhand any or all of those situations,
2 yes.
3     Q.    Did you come to learn at any
4 point in time whether Jane Roe was on
5 probation for any Community Standards
6 violation?
7     A.    I don't recall that.
8     Q.    Do you know if she's on
9 probation now?
10     A.    I do not know that.
11     Q.    Do you believe it's the
12 responsibility of the investigator to do a
13 thorough investigation?
14     A.    Yes.
15     Q.    And in this case the
16 investigator spoke with the Complainant and
17 Respondent, but no other witnesses. Under the
18 circumstances do you believe that was a
19 thorough investigation?
20     A.    I don't know all the details of
21 the investigation, so I cannot weigh in on
22 that.
23     Q.    Do you know if the investigator
24 normally speaks to someone other than the

Page 256

1 Complainant and Respondent?
2         MR. PICCERILLI: Objection.
3 BY MR. MIRABELLA:
4     Q.    Of the cases you have been on
5 involved in on the appeal?
6         MR. PICCERILLI: Objection to
7 form. Can you answer the question?
8         THE WITNESS: I can't recall
9 offhand.
10 BY MR. MIRABELLA:
11     Q.    The allegations against Mr. Doe
12 was that he squeezed her neck while they were
13 kissing. Do you believe that meets the
14 definition of sexual assault of the policy?
15     A.    I was not the one who was in
16 the position of investigating and making a
17 decision on that.
18     Q.    So is the answer you don't
19 know?
20     A.    I would not answer that
21 question. I do not know.
22     Q.    Was an appeal filed in the
23 complaint -- in the matter in which the
24 athletic team was investigated?

Page 257

1     A.    I don't recall.
2     Q.    Would you have been involved in
3 2015 as the moderator?
4     A.    I may have been, but I also
5 have a period of time that I was on maternity
6 leave in 2015, so I don't recall.
7     Q.    Since you've been the Assistant
8 Vice President, have you been the moderator
9 except for when you were out on maternity
10 leave?
11     A.    Yes, or out of the office for
12 other reasons, yes.
13     Q.    Who else served as moderator?
14     A.    Dr. John Jeffrey.
15     Q.    Do you have any other knowledge
16 about Roe prior to getting ready for this
17 deposition in terms of the background or
18 history or what we already talked about?
19     A.    No.
20     Q.    Did you know Doe before the
21 incident?
22     A.    No.
23     Q.    When did you first learn about
24 the misconduct claim against Doe?

65 (Pages 254 - 257)

Page 258

1    A.    I can't recall specifically.
2 It would have preceded the pre-investigation
3 meeting.
4    Q.    If the investigator needed
5 additional information about the Complainant
6 or Respondent about anything having to do with
7 this case, who does she interface with to get
8 the information or request it?
9    A.    I'm not sure specifically.  I
10 can't answer.  I don't know who she would call
11 for information.
12    Q.    Not you?
13    A.    No.
14    Q.    Not the appeal moderator?
15    A.    No.
16    Q.    Do you recall who you learned
17 about the case from or the claim prior to the
18 appeal?
19    A.    I cannot recall.
20    Q.    Do you recall any of the
21 appeals you handled in which there were
22 similar allegations?
23        MR. PICCERILLI:  Similar
24 allegations regarding the grounds for appeal

Page 259

1 or --
2        MR. MIRABELLA:  No, regarding
3 the underlying incident.
4        THE WITNESS:  I think you have
5 to be more specific.
6 BY MR. MIRABELLA:
7    Q.    Sure.  Claims of sexual assault
8 where the Respondent and the Complainant both
9 agree there was consent to kissing, but then
10 there was an issue of consent concerning
11 additional contact?
12    A.    No, I can't recall offhand.
13 No.
14    Q.    Do you recall any other
15 situations involving sexual assault where the
16 Complainant and Respondent were both
17 clothed -- I'll withdraw that.
18        Do you know anything about why
19 there was initially a no contact restriction
20 and that changed following the
21 pre-investigation meeting?
22    A.    I do not know that.
23    Q.    Do you have any responsibility
24 to oversee the initial investigation by

Page 260

1 Malloy?
2    A.    Do I have responsibility to
3 oversee the initial investigation?
4    Q.    Not the initial, the
5 investigation.
6    A.    By way of it being part of the
7 Community Standards process and I work with
8 the Community Standards process, but it's part
9 of our Community Standards process.  I have
10 supervisory responsibility for that
11 department.  Otherwise no.
12    Q.    Right.  So in your
13 responsibilities, were you given reports from
14 Dr. Perry or anyone else about what was or
15 wasn't done in the investigation by the
16 investigator?
17    A.    No.
18    Q.    And did you review the
19 investigator's findings before there was a
20 final outcome?
21    A.    No.
22    Q.    Did you review the evidence in
23 the investigator's findings after there was a
24 final outcome?

Page 261

1    A.    A final outcome?
2    Q.    So the --
3        MR. PICCERILLI:  You mean after
4 appeal?
5 BY MR. MIRABELLA:
6    Q.    Separate and apart from your
7 work with the appeal process as a moderator,
8 did you make any independent review or
9 assessment of the investigator's findings?
10    A.    Assessment of that, no, I did
11 not.
12    Q.    Did you review it as part -- in
13 any way in connection with your supervisory
14 responsibility after the fact?
15    A.    After what fact?
16    Q.    After the appeal was
17 concluded.
18    A.    After the appeal, I mean I
19 worked facilitating the appeal process and the
20 appropriate paperwork.  So I have -- yes, I
21 have the Appeal Packet.  I have access to
22 that.
23    Q.    I understand that, but are you
24 tasked with also verifying and ensuring that

66 (Pages 258 - 261)

1 the underlying investigation was done
2 thoroughly and adequately?
3     A.    No.
4     Q.    Are you aware of any situations
5 where a Complainant identified student
6 advisors who then were ineligible to serve as
7 witnesses?
8           I mean, it's an awkward
9 question. I guess I'm trying to -- where a
10 Complainant identifies advisors, individuals
11 who normally would be witnesses to the
12 complaint?
13    A.    Ever in my --
14    Q.    Anything that jumps to mind?
15    A.    I can't recall a specific
16 incident.
17    Q.    If a Complainant makes an
18 allegation of sexual misconduct and there's
19 evidence of drinking or drug use, is the
20 Complainant provided immunity from any
21 potential claims in connection with drinking
22 or drug use; correct?
23    A.    I would refer to the amnesty
24 for students who report.

1     Q.    I said immunity, amnesty?
2     A.    Correct.
3     Q.    Does the amnesty pertain to the
4 Complainant in that situation?
5     A.    Can I refer to --
6     Q.    Sure.
7     A.    I'm looking at SJU001198.
8     Q.    Would you read it into the
9 record. Do you have it?
10    A.    Would you like me to read the
11 entire paragraph?
12    Q.    Where we at, 11 --
13    A.    1198, Number 7.
14          MR. PICCERILLI: That's SJU.
15 BY MR. MIRABELLA:
16    Q.    I'm not going to ask you to
17 read it into the record. I do want to
18 understand what you're -- how this is used and
19 what it's meant to convey to the students,
20 your understanding, through your lens.
21    A.    Sure. So students who report,
22 and if they're -- if a student reports and
23 they've involved in some sort of drinking or
24 using drugs at the time of the incident, we

1 don't want that to be a deterrent for a
2 student to report sexual misconduct. So there
3 may be amnesty there.
4           But we do go on to say that we
5 may still initiate some initial educational
6 sanctions and other things in terms of our
7 response to that, but it may not be through a
8 formal charge of the student code.
9     Q.    Did you learn anything else
10 about the investigation from other members of
11 the SJU staff, either Community Standards or
12 elsewhere, that we haven't specifically
13 discussed?
14    A.    No.
15    Q.    Emily Forte testified that she
16 informed the Respondent that he will get to
17 see the Incident Report at the time of the
18 meeting with the investigator. Is that
19 inconsistent with your understanding of the
20 practice of how cases are investigated?
21          MR. PICCERILLI: Can I have the
22 question back.
23          - - -
24          (Whereupon, the court reporter read

1 back the pertinent information.)
2           - - -
3           MR. PICCERILLI: I'm going to
4 object to the form of the question to the
5 extent that it may be inconsistent with Emily
6 Forte's testimony. You can answer.
7           THE WITNESS: I'm not aware of
8 what the pre-investigation meetings entailed
9 in terms of conversations that take place
10 during those meetings to determine whether or
11 not it's inconsistent.
12 BY MR. MIRABELLA:
13    Q.    Is the practice and policy of
14 SJU that the Respondent gets to see the
15 Incident Report, if not before, at the time of
16 meeting with the investigator?
17    A.    I'm not sure, again, what the
18 investigator does during the meeting, but we
19 do not share the investigative report prior to
20 that. There's not an investigative report at
21 that point. We don't share the report prior
22 to that per my earlier comments about the
23 integrity of the investigation.
24    Q.    So is there is an Incident

CONFIDENTIAL

1 Report or an initial complaint in writing,
2 that's not shared with the Respondent prior to
3 the meeting with the investigator; correct?
4      A.    Correct.
5      Q.    And what is shared by the
6 investigator at that meeting is not -- is
7 something determined only by the investigator?
8      A.    Correct.
9      Q.    Does the school ever use dual
10 investigators, two investigators for a
11 reported incident?
12           MR. PICCERILLI:  A Sexual
13 Misconduct Policy?
14           MR. MIRABELLA:  Yes.
15           MS. SCHIMELFENIG:  A team?
16           MR. MIRABELLA:  A team.
17           THE WITNESS:  Ever?
18 BY MR. MIRABELLA:
19      Q.    Yes, ever.
20      A.    A team of investigators, I
21 don't believe so.
22      Q.    In terms of the investigation
23 into the complaint of sexual misconduct,
24 what's your understanding as to who -- does

1 the burden fall on the school or the
2 Complainant or Respondent to conduct a
3 thorough and fair investigation?
4      A.    Can you repeat that again?
5      Q.    Sure.  Once a complaint is made
6 of sexual misconduct against a student, whose
7 responsibility -- whose burden is it to do a
8 thorough and fair investigation?
9      A.    Well, it's certainly the
10 institution's responsibility to ensure that
11 there's a thorough, impartial, fair and timely
12 process, but it's also the students involved
13 to provide the information.
14      Q.    Does the Respondent have the
15 burden of proof to provide evidence in his
16 response?
17      A.    Can you explain what you mean
18 by burden of proof?
19           MR. PICCERILLI:  That's a legal
20 term.  Objection.
21 BY MR. MIRABELLA:
22      Q.    If the Respondent chooses not
23 to participate, does that in any way change
24 the University's responsibility in terms of

1 the investigation of the incident?
2      A.    That would be part of the
3 initial review.
4      Q.    So does the University still
5 have the same burden of investigating the case
6 whether a Respondent participates or does not
7 participate?
8      A.    Can I refer to the policy?
9      Q.    Do you know the answer to that
10 without referring to the policy?
11      A.    I believe there's something in
12 the policy and I don't want to misspeak.
13      Q.    All right.  Refer to the
14 policy.
15      A.    So on SJU001199, Sexual
16 Misconduct Policy, I'm on the second
17 paragraph:  The fact that an individual
18 (complainant, reporter, respondent and/or
19 witnesses) refuses to participate in the
20 university process does not mean that the
21 disciplinary process will not take place if
22 the university deems it appropriate to move
23 forward with that process.
24      Q.    It doesn't mean the University

1 will move forward with the process, it means
2 the University may exercise --
3      A.    Correct.
4      Q.    My question was:  Who has the
5 burden of proof once a complaint has been
6 filed in connection with the allegations of
7 sexual misconduct, regardless of whether the
8 Complainant or the Respondent participates?
9      A.    What do you mean by burden of
10 proof?
11      Q.    Who does the responsibility
12 fall upon to make sure there's adequate
13 evidence to support the findings?  Would that
14 burden be as between the student, the
15 Respondent or Complainant or all three?
16           MR. PICCERILLI:  The student,
17 the Respondent or Complainant?  I'm not
18 sure --
19 BY MR. MIRABELLA:
20      Q.    I'm sorry, Respondent,
21 Complainant or University or all three or
22 none?
23      A.    I think you're talking, again,
24 about initial review in terms of evaluating

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

1 the initial information.
2    Q.    I'm not.
3    A.    So I need you to --
4    Q.    Sure.  Under Title IX there's a
5 complaint of sexual misconduct filed by a
6 Complainant student against a Respondent
7 student, who has the burden for establishing
8 that it happened or didn't happen or that
9 there's finding of not responsibility?  Where
10 does that burden rest?
11    A.    It's the investigator.
12    Q.    And the investigator is serving
13 as the proxy to the school; correct?
14        MR. PICCERILLI:  Objection to
15 form.
16 BY MR. MIRABELLA:
17    Q.    Am I correct?
18    A.    Can you explain what you mean
19 by proxy.
20    Q.    Well, the investigator is
21 retained by the school to conduct an
22 investigation; correct?
23    A.    Correct.
24    Q.    And if the school doesn't

Page 271

1 retain an investigator, where would that
2 burden fall?  Would it fall on the school?
3        MR. PICCERILLI:  Objection to
4 form.
5        MR. MIRABELLA:  I don't think
6 it's that complicated a question.
7        MR. PICCERILLI:  Well --
8 BY MR. MIRABELLA:
9    Q.    So who's the investigator
10 acting on behalf of when the investigation is
11 performed?
12    A.    The University.
13    Q.    And the burden to complete the
14 investigation, review the evidence falls on
15 the investigator who is acting on behalf of
16 the University?
17    A.    Correct.  And as I mentioned
18 before, there's also responsibility of the
19 students involved to provide the information.
20    Q.    I guess my question is:  If the
21 student chooses not to provide responsibility,
22 does that change the burden that's upon the
23 University to conduct a fair and full
24 investigation?

Page 272

1        MR. PICCERILLI:  I think you
2 misspoke there.  I think you said the student
3 decides not provide --
4        MR. MIRABELLA:  Not to
5 participate.
6        MR. PICCERILLI:  You said
7 responsibility.  But in any event, what's the
8 question?
9 BY MR. MIRABELLA:
10    Q.    If the Respondent or the
11 Complainant chooses not to participate, does
12 that change the burden upon the University to
13 conduct a thorough investigation?
14    A.    I do think my reference to the
15 initial review is relevant here.  It evaluates
16 the nature of the complaint and the desire of
17 the Complainant.  So to your point about what
18 the Complainant would like to do or not, that
19 does weigh in to the initial review.
20    Q.    Under Title IX, does the burden
21 to complete an investigation fall on the
22 University or not?
23    A.    I think I answered this.  The
24 University has the obligation to determine as

Page 273

1 well as the students to provide information.
2 The decision is made based upon the
3 information made available.
4    Q.    Do you believe that the burden
5 upon the University is any way dependent on
6 whether the students participate?
7    A.    Can you repeat that?
8    Q.    Once a complaint of sexual
9 misconduct is filed, regardless if the student
10 chooses not to participate, does that in any
11 way impact the University's obligation to a
12 thorough and fair investigation under Title
13 IX?
14    A.    Yes, I'm going to continue to
15 refer to the initial review and the factors
16 considered during the initial review for how
17 the University responds based on the
18 participation and information.
19    Q.    Doctor, I just don't think
20 that's a responsive answer, but we've been
21 around this three or four times already.
22    A.    Can I add?
23        MR. PICCERILLI:  There's no
24 question.  If you need to clarify something go

69 (Pages 270 - 273)

Page 274

```
 1  ahead.
 2          THE WITNESS:  Well, it's part
 3  of this.  So I'm on SJU0001196:  There are
 4  times when the university may not be able to
 5  honor a request for confidentiality or that no
 6  investigation into a particular incident is
 7  conducted or disciplinary action taken in
 8  order to provide a safe, nondiscriminatory
 9  environment for all members of the SJU
10  community.  And then there are individuals
11  that have been designated to evaluate requests
12  for confidentiality.
13      Q.    Is that your answer to my
14  question?
15      A.    Yes.
16      Q.    Now, may I refer you back to
17  the Question and Answer Exhibit, the guidance
18  issued in 2017, specifically Page 3 and 4, the
19  answer to Question 6.
20      Q.    Okay.  And we already discussed
21  you're familiar with that; contract?
22      A.    Yes.
23      Q.    And it's part of your job
24  responsibilities; correct?
```

Page 275

```
 1      A.    Yes.
 2      Q.    And you're familiar with the
 3  Q&A and the Dear Colleague Letters that have
 4  been issued in 2017?
 5      A.    Yes.
 6      Q.    Okay.  Would you read into the
 7  record the first full sentence of the Answer
 8  to Question 6, so the top of Page 4.
 9      A.    In every investigation
10  conducted under the school's grievance
11  procedures, the burden is on the school and
12  not on the parties to gather sufficient
13  evidence to reach a fair, impartial
14  determination as to whether sexual misconduct
15  has occurred, and if so, whether a hostile
16  environment has been created that must be
17  redressed.
18      Q.    Do you agree with that
19  statement?
20      A.    Again, I do think it's the
21  institution's responsibility, but I think that
22  there is responsibility for the students to
23  provide the information.
24      Q.    So you think it's the school's
```

Page 276

```
 1  responsibility only if the students cooperate
 2  and provide information?
 3      A.    Only if they cooperate, but
 4  based on the information available is when the
 5  investigation obviously -- that's what it's
 6  based on, the information available.
 7      Q.    And that's your interpretation
 8  of what it means when it says the burden is on
 9  the school, not on the parties, to gather
10  sufficient evidence?
11      A.    I said I agree with what is
12  said here, as well as incorporating the
13  information collected.
14      Q.    Well, you're agreeing with it,
15  but you're adding to it; correct?
16      A.    Correct.
17      Q.    Because this doesn't say
18  anything about the responsibility of the
19  parties to cooperate or to participate;
20  correct?
21          MR. PICCERILLI:  This is
22  getting argumentative.
23  BY MR. MIRABELLA:
24      Q.    Do you agree with me?
```

Page 277

```
 1      A.    Correct, and I also just added
 2  about in the policy where we note that
 3  students may not participate.
 4      Q.    Let me check my notes.  Did you
 5  speak with the investigator about the results
 6  of her investigation prior to her completing
 7  the investigation?
 8          MR. PICCERILLI:  You're talking
 9  about in this case?
10          MR. MIRABELLA:  Yes.
11          THE WITNESS:  I'm not aware.
12  BY MR. MIRABELLA:
13      Q.    Is it common practice for
14  members of the Community Standards Office or
15  people in the Title IX Office to contact and
16  discuss with the investigator the outcome of
17  an investigation before it's been concluded?
18      A.    I don't know.
19      Q.    Do you think that would be
20  appropriate?
21      A.    To discuss the outcome before
22  there is an outcome?
23      Q.    Correct.
24      A.    No.
```

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

1    Q.    You don't think that would be
2 appropriate?
3    A.    Right.
4    Q.    And why do you think that would
5 not be appropriate?
6    A.    The investigator is the one
7 that has the information, all the information.
8    Q.    And reaching out to them in
9 advance of the conclusion in an effort to
10 discuss possible outcome, gender bias or
11 gender or some other gender?
12    A.    I don't know that.  I did not
13 say that.
14    Q.    You don't think it would be
15 appropriate?
16    A.    Correct.
17        MR. MIRABELLA:  I have no
18 further questions.
19            - - -
20    (Whereupon, the deposition was
21 concluded at 1:54 p.m.)
22            - - -
23
24

Page 279

1        C E R T I F I C A T E
2    I, Debra J. Veneziale, a Court Reporter
3 and Notary Public, do hereby certify that the
4 proceedings, evidence, and objections upon the
5 deposition of KIERSTEN WHITE, Ed.D., are
6 contained fully and accurately in the
7 stenographic notes taken by me upon the
8 foregoing matter on July 19, 2018, and that
9 this is a true and correct transcript of the
10 same.
11

12       _____

13       Debra J. Veneziale
         Court Reporter
14       Notary Public
         My Commission Expires
15       July 16, 2019
16
17
18
19 (The foregoing certification of this
20 transcript does not apply to any reproduction
21 of the same by any means, unless under the
22 direct control and/or supervision of the
23 certifying shorthand reporter.)
24

Page 280

1        INSTRUCTIONS TO WITNESS
2
3    Please read your deposition over
4 carefully and make any necessary corrections.
5 You should state the reason in the appropriate
6 space on the Errata Sheet for any corrections
7 that are made.
8    After doing so, please sign the Errata
9 Sheet and date it.
10    You are signing same subject to the
11 changes you have noted on the Errata Sheet,
12 which will be attached to your deposition.
13    It is imperative that you return the
14 original Errata Sheet to the deposing attorney
15 within thirty (30) days of receipt of the
16 deposition transcript by you.  If you fail to
17 do so, the deposition transcript may be deemed
18 to be accurate and may be used in court.
19
20
21
22
23
24

Page 281

1        E R R A T A
2 - - - -
3 PAGE LINE   CHANGE
4 ---  ---  ------------------
5 Reason for Change: _____
6 ---  ---  ------------------
7 Reason for Change: _____
8 ---  ---  ------------------
9 Reason for Change: _____
10 ---  ---  ------------------
11 Reason for Change: _____
12 ---  ---  ------------------
13 Reason for Change: _____
14 ---  ---  ------------------
15 Reason for Change: _____
16 ---  ---  ------------------
17 Reason for Change: _____
18
19
20    Job No. PA2968430
21
22
23
24

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

```
1        ACKNOWLEDGMENT OF DEPONENT
2  I, _____, do hereby certify that I
3  have read the foregoing Pages __ to __ and
4  that the same is a correct transcript of the
5  answers given by me to the questions therein
6  propounded, except for the corrections or
7  changes in form or substance, if any, noted in
8  the attached Errata Sheet.
9  _____    _____
10 DATE       SIGNATURE
11
12 Subscribed and sworn to before me this
13 _____ day of _____ 2018.
14
15 My commission expires:
16         _____
17
18 _____
19 Notary Public
20
21 JOB NUMBER __   Job No. PA2968430_____
22
23
24
```

72 (Page 282)