# EXHIBIT E

CONFIDENTIAL

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                        - - -

3

JOHN DOE,                    :

4                            :

         Plaintiff,          :

5                            :

      vs.                    :

6                            :

ST. JOSEPH'S UNIVERSITY :

7                            :

      and                    :

8                            :

JANE ROE,                    :

9         Defendants.    :   NO. 18-2044

10                      - - -

11          MONDAY, JULY 23, 2018

12                      - - -

13              CONFIDENTIAL

14                    - - -

15          Oral deposition of ELIZABETH A.
MALLOY, ESQ., taken at the law offices of

16  Montgomery McCracken Walker & Rhoads, LLP,
1735 Market Street, 21st Floor, Philadelphia,

17  Pennsylvania, commencing at 10:11 a.m., before
Kimberly A. Wornczyk, a Registered

18  Professional Reporter, New Jersey Certified
Court Reporter (Certificate No. 30X100223500),

19  and Notary Public in and for the Commonwealth
of Pennsylvania.

20

21

                        - - -

22

            VERITEXT LEGAL SOLUTIONS

23             MID-ATLANTIC REGION

         1801 Market Street - Suite 1800

24       Philadelphia, Pennsylvania 19103

CONFIDENTIAL

Page 2

```
 1  APPEARANCES:
 2
 3        SCHWABENLAND AND RYAN, PC
          BY: EDWARD J. SCHWABENLAND, ESQUIRE
          955 Old Eagle School Road
 4        Suite 306
          Wayne, Pennsylvania 19087
 5        610-971-9200
          eschwab@sandrlaw.com
 6        Representing the Plaintiff, John Doe
 7
          LAW OFFICES OF JOHN MIRABELLA
 8        BY: JOHN MIRABELLA, ESQUIRE
          1600 Market Street
 9        Suite 1810
          Philadelphia, Pennsylvania 19103
10        215-422-4991
          john@mirabellalawfirm.com
11        Representing the Plaintiff, John Doe
12
13        MINTZER SAROWITZ ZERIS LEDVA &
          MEYERS, LLP
14        BY: SUSAN R. ENGLE, ESQUIRE
          1500 Market Street
15        Suite 4100
          Philadelphia, Pennsylvania 19102
16        215-735-7200
          sengle@defensecounsel.com
17
18
19        MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP
          BY:  JOHN M. MYERS, ESQUIRE
20        1735 Market Street
          Philadelphia, Pennsylvania 19103
21        215-772-7535
          jmyers@mmwr.com
22        Representing the Defendant, St.
          Joseph's University
23
24
```

Page 3

```
 1  ALSO PRESENT:
 2      Marianne Schimelfenig, Esquire
        (St. Joseph's University)
 3
 4      Thomas G. Wilkinson, Jr., Esquire
        (Cozen O'Connor)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              INDEX
 2              - - -
 3  WITNESS                        PAGE
 4  ELIZABETH M. MALLOY, ESQ.
 5  By Mr. Schwabenland          7, 305
 6  By Ms. Engle                 300
 7
 8
 9            EXHIBITS
10            - - -
11  NUMBER      DESCRIPTION      PAGE
12  1    Respondents in sexual misconduct   25
          (ISMP/SMP) SJU0001361-0001362
13
     2    3/5/18 letter Re: Engagement      44
14        Letter for 2018 Retainer,
          SJU001052-001055
15
     3    Orientation slide, SJU001030     123
16
     4    Orientation slide, SJU001031     123
17
     5    Summary of Findings of Fact,     132
18        Determinations of Credibility,
          Rationale and Outcome, SJU000277-
19        000299
20   6    Summary of Investigation,        132
          SJU000268-000276
21
     7    Notes with redactions, SJU000380-  132
22        000387
23   8    Copies of text messages, SJU000392  173
24
```

Page 5

```
 1            - - -
 2          EXHIBITS
 3            - - -
 4  NUMBER      DESCRIPTION      PAGE
 5   9    Response of Investigator,        216
          SJU000917
 6
 7  10    Letter to the Vice President for   217
          Student Life, SJU000320-000323
 8
 9  11    9/22/17 Dear Colleague, P157-158   253
10  12    9/17 Q&A on Campus Sexual        253
          Misconduct
11
12  13    Letter to Office of Community    308
          Standards, SJU000324
13
14
15
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1       DEPOSITION SUPPORT INDEX
2                - - -
3  INSTRUCTION NOT TO ANSWER:
4  Page      Line
5  277        4
6  307        9
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS:
9  Page    Line   Description
10  62      12    Investigation records
11
12
13  STIPULATIONS:
14  Page      Line
15   7         1
16
17  QUESTIONS MARKED:
18  Page      Line
19   (None)
20
21
22
23
24

Page 7

1              (It is agreed by and among
2        counsel for the respective parties
3        that the sealing, filing are hereby
4        waived, and that all objections,
5        except as to the form of the question,
6        be reserved until the time of trial.)
7                    - - -
8              ELIZABETH A. MALLOY, ESQUIRE,
9        having been duly sworn, was examined
10       and testified under oath as follows:
11                  _ _ _
12             EXAMINATION
13                  _ _ _
14  BY MR. SCHWABENLAND:
15       Q.    Could you please state your
16  full name for the record?
17       A.    Elizabeth Ann Malloy.
18       Q.    Ms. Malloy, we met before.  We
19  met downstairs in the lobby today, but let me
20  state for the record, I am Ed Schwabenland.  I
21  represent the plaintiff in this case.  I
22  should state that this deposition, like all
23  the other depositions, as well as the exhibits
24  that are being used are subject to an

Page 8

1  agreement of counsel that all of that is to be
2  kept confidential and the Court has approved
3  that agreement by issuing an order to that
4  effect.  So I need to have the deposition
5  reflect that it should be confidential on it.
6  I should also state that I'll be referring to
7  the plaintiff, who was a respondent in the
8  case, as John Doe and the individual
9  defendant, the female who was the complainant
10  in the case, as Jane Roe.  Just for purposes,
11  you don't have to say who they are, but do we
12  have an understanding that you know the real
13  identity of those individuals?
14       A.    Yes.
15       Q.    Okay.
16       A.    And do you prefer me to try to
17  use John and Jane to the best of my ability?
18       Q.    What we have been doing is
19  this, if you slip and call them by name, we'll
20  just have the transcript changed to reflect
21  Jane Roe and John Doe.  So don't worry about
22  it.  We'll proceed accordingly.
23              I know you're a member of the
24  bar, but have you given deposition before?

Page 9

1       A.    I have.
2       Q.    Have you ever given depositions
3  with regard to anything to do with Title IX or
4  your handling of Title IX or investigations
5  into student complaints?
6       A.    I have not.
7       Q.    Okay.  I know you know these
8  ground rules, but let me just state for the
9  record if I may.  If I ask a question that
10  doesn't make sense, which I have that habit of
11  doing sometimes, let me know and I'll rephrase
12  the question.  Fair enough?
13       A.    Yes.
14       Q.    I only want you to answer the
15  question if you assumed you understood it and
16  if you answer the question I assume that
17  you're answering truthfully to the best of
18  your ability; is that fair?
19       A.    Yes.
20       Q.    Also, I am going to ask you to
21  do the very thing you've been doing, waiting
22  for me to get done making a statement, asking
23  a question, and you respond verbally to that.
24  So if one person talks at a time and there's

3 (Pages 6 - 9)

CONFIDENTIAL

1  verbal responses it makes this young lady's
2  life a lot easier.  Okay?
3       A.   I will do my best.
4       Q.   Finally, I have a lot of ground
5  to cover.  I understand there's no time
6  restrictions today.  So we are going to get
7  done today, if that's okay with you?
8       A.   Yes.
9       Q.   Okay.  But if you want to take
10  a break, feel free to exercise any of those
11  options.  Okay?
12       A.   Yes.
13       Q.   One last thing, and I'm not
14  sure --
15            MR. SCHWABENLAND:  John, maybe
16  you can help me.  Do you represent Ms.
17  Malloy?
18            MR. MYERS:  I do.
19            MR. SCHWABENLAND:  Okay.  So I
20  don't have to give instructions that
21  she's a witness and she has certain
22  rights?
23            MR. MYERS:  That's correct.
24  And also, Tom Wilkinson from Cozen is

1       here as her law firm's counsel.
2            MR. SCHWABENLAND:  Okay.
3  Thanks, Mr. Wilkinson.
4            MR. MYERS:  It's a bit of a
5  joint representation.
6            MR. SCHWABENLAND:  Very good.
7  BY MR. SCHWABENLAND:
8       Q.   Let me ask you about your
9  background, if I may.  Where did you grow up?
10       A.   Drexel Hill, Pennsylvania.
11       Q.   And where did you go to high
12  school?
13       A.   Archbishop Prendergast.
14       Q.   When did you graduate?
15       A.   1977.
16       Q.   I know you did your
17  undergraduate work at American University --
18       A.   Catholic University.
19       Q.   Catholic University.  I'm
20  sorry.  And that's in Washington, D.C.?
21       A.   Yes.
22       Q.   When did you graduate?
23       A.   1981.
24       Q.   With what degree?

1       A.   Bachelor of arts in
2  international affairs.
3       Q.   I know you graduated with some
4  type of honors.  What did you graduate with?
5       A.   I really don't recall.  It was
6  some sort of Cum Laude and Phi Beta Kappa.
7       Q.   Fair enough.  What did you do
8  after graduation from Catholic University?
9       A.   I worked at the State
10  Department in Washington, D.C. until my
11  parents died and then I came back to
12  Philadelphia to raise my brother and sisters.
13       Q.   And, I'm sorry, to raise
14  your --
15       A.   Brother and sisters.  Brother,
16  singular, and sisters.
17       Q.   When did you come back to the
18  Philadelphia area?
19       A.   The fall of --
20       Q.   I know you graduated from
21  Villanova in 1986.
22       A.   Right.
23       Q.   So when did you start
24  Villanova?

1       A.   Three years before.  I finished
2  law school in three years.
3       Q.   Okay.
4       A.   My father died in September of
5  '81, my mother died in November of '82, so in
6  that time frame, probably closer to the summer
7  of '82.
8       Q.   While you went to Villanova did
9  you work at all?
10       A.   No.
11       Q.   So you were a full-time student
12  in law school?
13       A.   Yes.
14       Q.   And I know you graduated with
15  some honors from law school in 1986.  Do you
16  know what it was?  I have it written down, Cum
17  Laude.
18       A.   That sounds correct.  I don't
19  have a recollection.
20       Q.   You have a resumé on the
21  website, I would imagine?
22       A.   A bio.
23       Q.   A bio.  Okay.  While you went
24  to law school did you do anything to intern

CONFIDENTIAL

Page 14

1 anyplace for public defender's office,
2 prosecutor's office, anything like that?
3       A.    No.  May I correct a previous
4 answer?
5       Q.    Sure.
6       A.    I believe you asked if I worked
7 during law school.  When classes were in
8 session I went to school full-time and took
9 care of my family.  I did have summer jobs.
10       Q.    I didn't ask you this:  Are you
11 married or single?
12       A.    I am single.
13       Q.    And I don't want to know your
14 address, but what area do you live in?
15       A.    Montgomery County.
16       Q.    Okay.  I forgot to ask you
17 about how many siblings you had.
18       A.    I have three sisters and a
19 brother.
20       Q.    And do any of them reside with
21 you now?
22       A.    Yes.
23       Q.    And who resides with you?  You
24 don't have to name them.

Page 15

1       A.    My younger sister and her
2 family.
3       Q.    During the summer when you were
4 at Villanova Law School you said you worked.
5 What type of work?  Was it legal related or
6 other than that?
7       A.    It was legal.
8       Q.    Okay.  And what did you do?
9       A.    The first summer, between my
10 first and second year, I believe the employer
11 was the American Law Institute.  We wrote the
12 little blurbs for the restatements.  My second
13 summer I was a summer associate at Morgan
14 Lewis & Bockius.
15       Q.    And when you said you wrote the
16 little blurb for the restatement, I take it
17 it's several sections that you worked on?
18       A.    They gave us cases to read and
19 we summarized them.  It probably was numerous
20 sections.
21       Q.    Restatement of what?
22       A.    I have no idea.
23       Q.    Fair enough.  Morgan Lewis &
24 Bockius, when you did a summer intern I am

Page 16

1 sure you were exposed to a number of things,
2 but did you work in any specific department?
3       A.    No.
4       Q.    Okay.  And so what type of
5 things did you handle?
6       A.    Research memos on a number of
7 miscellaneous issues.
8       Q.    Fair enough.  Did you do any
9 research or memos on sexual assault, sexual
10 harassment, or Title IX violations?
11       A.    I don't believe so.
12       Q.    Okay.  And after graduation
13 from law school until 1986 where did you go?
14       A.    I was an associate at Morgan
15 Lewis.
16       Q.    How long did you stay at Morgan
17 Lewis?
18       A.    Until January of 1991.
19       Q.    And so did you start there,
20 what, in 1986, after you studied for the bar?
21       A.    Yes, probably Labor Day 1986.
22       Q.    And while you were at Morgan
23 Lewis & Bockius what did you do there?
24       A.    I was an associate in the labor

Page 17

1 and employment section.
2       Q.    Did you represent the employer,
3 the employee, or both?
4       A.    The employer.
5       Q.    While you were at Morgan Lewis
6 & Bockius did you do any work on sexual
7 misconduct in the higher education field or
8 Title IX violations?
9       A.    I do not believe so.
10       Q.    Okay.  While you were with
11 Morgan Lewis & Bockius did you try any cases?
12       A.    I co-chaired one trial.
13       Q.    And the nature of that trial,
14 was that an employment issue?
15       A.    It was a restrictive covenant.
16       Q.    And I take it the employer was
17 seeking -- you represented the employer then?
18       A.    Yes.
19       Q.    And I take it the employer was
20 seeking to enforce a restricted covenant?
21       A.    I think it was the opposite.
22 The employer, our client, had hired somebody
23 and wanted to find the restrictive covenant
24 not valid, is my best recollection.

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1    Q.    That's fine.  How did it turn
2  out for you?
3    A.    We won.
4    Q.    Any other trials that you can
5  recall?
6    A.    From Morgan Lewis?
7    Q.    Yes.
8    A.    Not that I recall.
9    Q.    Fair enough.  So you left in
10 around January 1991, I take it to go someplace
11 else?
12   A.    Yes.  I went to Klett Rooney
13 Lieber & Schorling in Pittsburgh.
14   Q.    Could you stay that again?
15   A.    The firm had change names a
16 couple of times, but I believe at that point
17 it was Klett Rooney Lieber & Schorling.
18   Q.    And that's in Pittsburgh?
19   A.    Yes.
20   Q.    Okay.  And how long did you
21 stay there?
22   A.    Some point in 2001, I believe
23 the summer of 2001.
24   Q.    All right.  So for

Page 19

1  approximately ten years or a little bit more?
2    A.    Yes.  Wait.  Let me correct
3  that.
4    Q.    I am not going to hold you to
5  the exact time.
6    A.    Klett opened a Philadelphia
7  office and I moved from Pittsburgh to
8  Philadelphia.  I believe I was in Pittsburgh
9  four or five years.  That's my best
10 recollection.
11   Q.    And you continued with Klett in
12 the Philadelphia office, right?
13   A.    Yes.
14   Q.    Until sometime in 2001?
15   A.    No, that's incorrect.  2006.
16   Q.    2006.  Okay.  While with Klett,
17 whether in Pittsburgh or here, were you
18 assigned to a specific department or what?
19   A.    Labor and employment.
20   Q.    While with Klett up until 2006
21 did you handle any matters on behalf of
22 universities or colleges concerning claims of
23 sexual misconduct by students or Title IX
24 violations?

Page 20

1    A.    I don't believe so.
2    Q.    Okay.  Give me a general
3  overview of what you mean by labor and
4  employment issues that you were focusing on?
5    A.    So the firms I was at had broad
6  labor and employment practices.  So we would
7  represent employers in collective bargaining
8  negotiations, labor arbitrations, employment
9  matters between agencies and court, general
10 labor and employment counseling, OSHA, things
11 like that, issues that employers would have.
12   Q.    Did you always represent the
13 employer?
14   A.    Always.
15   Q.    While you were in that section
16 did you handle any cases involving claims of
17 sexual misconduct in the employment realm?
18   A.    When I was at Klett?
19   Q.    Yes.
20   A.    I don't believe so.
21   Q.    Okay.  Did you try any cases
22 while you were at Klett?
23   A.    Yes.
24   Q.    And can you tell me the nature

Page 21

1  of the cases that you tried?  I take it was
2  always labor and employment?
3    A.    Yes.  I am not going to
4  remember all the details.  I think there were
5  age discrimination cases, gender
6  discrimination cases.
7    Q.    Can you approximate for me how
8  many trials you actually tried while at Klett
9  or would that be difficult for you to do?
10   A.    It would be difficult for me to
11 do.
12   Q.    Okay.  You were with Klett for
13 approximately 15 years, if my math is correct?
14   A.    Yes.
15   Q.    And so would you at least have
16 tried a case once every year or that would
17 vary also?
18   A.    It would vary.
19   Q.    Of the cases that you tried
20 that you can remember, did you ever try any
21 cases involving claims of sexual misconduct
22 brought by anybody?
23   A.    No.
24   Q.    You left Klett in 2006 to go

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1 where?
2     A.    Klett merged with Buchanan
3 Ingersoll and it became Buchanan Ingersoll &
4 Rooney.
5     Q.    And so you continued on, then,
6 with Buchanan Ingersoll?
7     A.    That's correct.
8     Q.    In the labor and employment
9 department?
10    A.    Yes.
11    Q.    And how long did you stay with
12 Buchanan Ingersoll?
13    A.    Until May of 2017.
14    Q.    And then you joined your
15 present firm?
16    A.    That's correct.
17    Q.    And your present firm for the
18 record is?
19    A.    Cozen O'Connor.
20    Q.    While with Buchanan
21 Ingersoll -- I may have asked you this -- did
22 you continue in the labor and employment
23 section?
24    A.    Yes, I did.

Page 23

1     Q.    By this time were you a partner
2 then?
3     A.    I became a shareholder while I
4 was at Klett and then that continued when we
5 merged with Buchanan.
6     Q.    Did you oversee the labor and
7 employment section?  By that I mean, were you
8 the head of that section or were you one of
9 the attorneys in that section that was
10 overseen by somebody else?
11    A.    I was never a chair on the
12 section.
13    Q.    Okay.  While with Buchanan
14 Ingersoll did you -- I asked you this for
15 Klett -- but did you try cases?
16    A.    Yes.
17    Q.    Okay.  And would that again be
18 cases involving labor and employment issues?
19    A.    Yes.
20    Q.    And would that always be on
21 behalf of the employer?
22    A.    Yes.
23    Q.    Okay.  Would any of those cases
24 that you can remember -- I understand you

Page 24

1 don't have a list of names here -- but would
2 any of those cases have entailed claims of
3 sexual misconduct brought by an employee
4 against somebody else of the employer or the
5 employer itself?
6     A.    Not that I recall.
7     Q.    Did you handle while with
8 Buchanan Ingersoll any Title IX violations?  I
9 will leave it one at a time.  Claims of Title
10 IX violation?
11    A.    That went to trial?
12    Q.    Well, no, just claims, period.
13    A.    While I was at Buchanan I was
14 doing Title IX investigations for St. Joe's.
15    Q.    When did you start to do Title
16 IX investigation?
17    A.    I do not recall.  My estimate
18 would be six or seven years ago.
19    Q.    Okay.  Bear with me one second,
20 if you would.  When we take a break I am going
21 to ask that we make copies of this, but for
22 purposes of going through your credentials
23 here I will -- when we do make copies of this
24 we are going to mark this as Exhibit-A.

Page 25

1          MR. MYERS:  Why don't you just
2     mark that and we'll make copies with
3     the sticker on it.
4          _ _ _
5          (Whereupon, Exhibit Malloy-1
6     was marked for purposes of
7     identification.)
8          _ _ _
9          MR. SCHWABENLAND:  It's
10    Malloy-1.
11 BY MR. SCHWABENLAND:
12    Q.    Ms. Malloy, while you're
13 looking that over, if I can state, that was
14 produced by the university and at the bottom
15 there are Bates stamp numbers and if you just
16 read that off on the bottom right.
17         MR. MYERS:  1361.
18         MR. SCHWABENLAND:  And then the
19    second one is 1362, a two-page
20    document.
21 BY MR. SCHWABENLAND:
22    Q.    That shows roughly 29 cases on
23 there, starting with, I believe, a January of
24 2015 claim on the first page there and it goes

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1 to 2018.  Then I believe that the university,
2 with my thanks, placed on there your initials,
3 "EM," on any cases that you handled during the
4 investigation.  So some of those 29 cases,
5 some of those were handled by somebody else, I
6 take it.  Is that your understanding?
7     A.    I can't make an understanding
8 from the document, obviously.
9     Q.    Fair enough.
10     A.    But I have worked with another
11 person or two at my firm.
12     Q.    Okay.
13     A.    So yes, I would not do them
14 all.
15     Q.    Okay.  But the only reason I
16 show that to you now is that at least those
17 two documents are for a claim in January of
18 2015; am I correct, at the top there?
19     A.    Yes.
20     Q.    Okay.  But you believe that you
21 started to do investigation into sexual
22 misconduct claims earlier than that, right?
23     A.    I thought it was longer.  I
24 don't have a firm recollection of that.

Page 27

1     Q.    Okay.  Well, we'll make an
2 inquiry to see if there were any other cases
3 before you.  I will represent to you that the
4 sexual misconduct policy became effective at
5 St. Joe's university as of June 2015 and
6 during the 2015 period before that starting in
7 January there was an interim sexual misconduct
8 policy in place, but before that they didn't
9 have a separate sexual misconduct policy.  The
10 only reason I throw that out to you, do you
11 believe that you were involved in any
12 investigations on behalf of the university
13 into claims of sexual misconduct prior to
14 2015?
15     A.    I have no firm recollection of
16 that.  It just seems to me that I did it for
17 more than three years, but I have no firm
18 recollection of that.
19     Q.    Okay.  Thank you.  You can put
20 that down or aside.  We'll get to that later.
21 But you believe while with Buchanan Ingersoll
22 you were doing investigative work on sexual
23 misconduct claims for St. Joe's University?
24     A.    Yes.

Page 28

1     Q.    And at least, you were doing
2 that in 2015 if not beforehand, right?
3     A.    Correct.
4     Q.    Okay.  And you continued to do
5 that until you left Buchanan Ingersoll?
6     A.    Yes.
7     Q.    And did you continue to do that
8 since joining Cozen O'Connor?
9     A.    Yes.
10     Q.    While at Buchanan Ingersoll,
11 other than doing investigative work for St.
12 Joe's University involving Title IX violations
13 or sexual misconduct, did you do any such
14 investigation on behalf of any other teaching
15 institution or university or college?
16     A.    Yes.
17     Q.    And what other institutions
18 have you done work for?
19     A.    I don't feel like I can
20 disclose client names.
21     Q.    Oh.  Okay.  How many were
22 there?
23     A.    One.
24     Q.    Okay.  And is that in the

Page 29

1 Philadelphia area?
2     A.    Yes.
3     Q.    And when did you start to do
4 investigation for that one teaching
5 institution?
6     A.    It's hard for me to put it in
7 any time frame.  I would estimate three to
8 four years ago.
9     Q.    Okay.  So was that before or
10 after you began with St. Joe's University?
11     A.    I believe it was after.
12     Q.    After.  Okay.  And have you
13 continued to do investigative work
14 periodically for that teaching institution?
15     A.    I have not been asked to do
16 anything else.
17     Q.    If you can approximate for me,
18 when was the last time that you did any
19 investigative work into Title IX violations or
20 claims of sexual misconduct for that other
21 teaching institution?
22     A.    When was the last time I did
23 it?
24     Q.    Yes.

8 (Pages 26 - 29)

CONFIDENTIAL

1     A.   I only did one and, my best
2 estimate, it was three to four years ago.
3     Q.   Okay.
4     A.   May I ask a clarification?
5     Q.   Sure.
6     A.   So I understood your question
7 to be Title IX, sexual misconduct.
8     Q.   Yes.
9     A.   Title IX also applies to
10 employees in an area that would not
11 necessarily be sexual misconduct.
12     Q.   Okay.
13     A.   And I represented one other
14 teaching institution -- not represented. I
15 did an investigation for one other teaching
16 institution. It was a claim by a faculty
17 member against a faculty member. It was not
18 misconduct, but I wanted to make sure I
19 understood your question.
20     Q.   Is that another institution
21 other than the one you said you did work for
22 and then St. Joe's?
23     A.   It is.
24     Q.   How many investigations did you

1 do for that teaching institution, that one?
2     A.   Just one.
3     Q.   And when about did you do that?
4     A.   It was while I was leaving
5 Buchanan to come to Cozen. So it was spring,
6 summer of 2017.
7     Q.   Okay. And the nature of that
8 claim was one employee of the school?
9     A.   Yes.
10     Q.   Was that a faculty member --
11     A.   Yes.
12     Q.   -- was making a claim against
13 another faculty member?
14     A.   Yes. It had to do with tenure
15 proceedings, I believe.
16     Q.   Okay.
17     A.   Promotion and tenure.
18     Q.   Okay. And was the nature of
19 that claim in the nature of harassment or
20 hostile work environment or what, if you can
21 recall?
22     A.   It was gender and race.
23     Q.   Discrimination?
24     A.   Yes. I would not characterize

1 it as hostile work environment. It was
2 somebody who was claiming they should have
3 been promoted.
4     Q.   But for that one that you did,
5 that teaching institution, that didn't involve
6 a claim of sexual misconduct, right?
7     A.   The latter one, the 2017 one,
8 did not.
9     Q.   Okay. And how about the other
10 one that you identified that you did one
11 investigation for?
12     A.   The earlier one I would
13 characterize as sexual misconduct.
14     Q.   And would that be a student
15 claim against another student or --
16     A.   Yes.
17     Q.   Okay. Was that the first
18 investigation you did in the nature of higher
19 education and claims of sexual misconduct or
20 had you --
21     A.   Other than St. Joe's?
22     Q.   Yes.
23     A.   I believe it was the first
24 other than St. Joe's. I had started the St.

1 Joe's ones earlier.
2     Q.   Okay. While at Buchanan
3 Ingersoll -- I will finish up that and get to
4 your present firm -- I take it you continued
5 in the labor and employment section?
6     A.   Yes.
7     Q.   And did you handle any claims
8 of sexual misconduct against an employer or
9 representative of the employer?
10     A.   I'm sure I handled sexual
11 harassment claims.
12     Q.   Okay.
13     A.   I'm not sure if you're making a
14 distinction between harassment and misconduct.
15     Q.   Unless the sexual harassment is
16 in the nature of seeking favors or sexual
17 gratification, that's what I am referring to.
18     MR. MYERS: Could you restate
19     the question, because I don't
20     understand it at this point.
21     MR. SCHWABENLAND: Sure.
22 BY MR. SCHWABENLAND:
23     Q.   You just raised a good point.
24 You handled sexual harassment claims. There's

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1 also sexual misconduct claims where one
2 employee might accuse another employee, such
3 as a supervisor, of trying to gain sexual
4 favors, right?  That's what I am referring to.
5 While you were with Buchanan Ingersoll did you
6 handle any of those claims, if you can
7 remember?
8     A.    Not that I recall.  I believe
9 they were strictly what I would call sort of
10 hostile work environment claims.
11    Q.    Okay.  Then when you joined
12 Cozen O'Connor, you're a partner there?
13    A.    Member.
14    Q.    Member.  Okay.  I am not sure
15 how they have their firm set up.  But are you
16 in the labor and employment section?
17    A.    Yes, I am.
18    Q.    Do you continue to represent
19 only employers?
20    A.    Yes.
21    Q.    And you have continued to do
22 periodic investigation for St. Joe's
23 University up until the present?
24    A.    Yes.

Page 35

1     Q.    And would all those
2 investigations have involved some type of
3 claims of sexual misconduct?
4     A.    Under the sexual misconduct
5 policy?
6     Q.    Yes.
7     A.    Yes.
8     Q.    But you interact with a number
9 of people at St. Joe's University; is that
10 correct?
11    A.    Yes.
12    Q.    By "interaction," I mean you
13 have contacts with them.  And one of those
14 contacts would be the section called Community
15 Standards; is that correct?
16    A.    Yes.
17    Q.    And Mr. Bodak [sic] heads up
18 that section; is that your understanding?
19    A.    Bordak, yes.
20    Q.    Bordak.  And the reason I say
21 that, at least since 2015 there's a separate
22 policy for the handling of sexual misconduct
23 claims as opposed to nonsexual misconduct
24 claims; is that your understanding?

Page 36

1     A.    I believe so.  So the sexual
2 misconduct policy refers to -- I believe it's
3 called non-discrimination, harassment,
4 anti-retaliation policy.  So those two
5 policies can apply to any given situation.
6     Q.    Okay.  But the reason I raise
7 this now is, did you do any investigation for
8 St. Joe's or have you done any investigation
9 for St. Joe's when there are claims of
10 nonsexual violations?
11    A.    I have, but they would not be
12 regarding students.
13    Q.    So they would be regarding a
14 faculty member or employees of the university?
15    A.    Yes.
16    Q.    Okay.  How many can you recall
17 doing?  Is this an infrequent thing?
18    A.    My best recollection is maybe
19 two a year.
20    Q.    Okay.
21    A.    Two to three a year, and not
22 every year.
23    Q.    And would this be even before
24 they formed the sexual misconduct policy in

Page 37

1 2015?
2     A.    That doesn't mean anything to
3 me, so it's hard for me to judge.  So is your
4 question is it before 2015?
5     Q.    Yes, ma'am.
6     A.    I believe so.
7     Q.    Okay.  And are you able to
8 estimate how far it has gone back other than
9 what you've already said?  I think you said
10 six or seven years.
11    A.    That's my best estimate.
12    Q.    Okay.  Would there be any
13 way -- not now, but when you get back to your
14 office -- of checking what work you may have
15 done before 2015 on behalf of St. Joe's
16 University?
17    A.    There is not, because I'm no
18 longer at Buchanan, so I don't have access to
19 that.
20    Q.    Oh.  Okay.  I started to ask
21 you the questions about if you performed any
22 investigations of any claims that were
23 nonsexual in nature and you said there have
24 when they involve employees of the university

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1 or staff members, right?
2     A.    Correct.
3     Q.    What would be the nature of
4 those claims, then?  Would that be tenure
5 again or some type of harassment or anything
6 like that, or discrimination?
7     A.    There's been various ones.  I
8 don't believe any of them have been sexual
9 harassment.
10     Q.    And have any of them, to your
11 knowledge, been Title IX violation claims?
12     A.    Well, Title IX does apply to
13 employees.
14     Q.    That's right.
15     A.    There may have been.  This is
16 generally.
17     Q.    Sure.
18     A.    They've generally been an
19 employee who doesn't get along with their boss
20 or doesn't see eye to eye with their boss and
21 may have been disciplined, for example.
22     Q.    Or, I take it, tenure issues?
23     A.    I've not done a tenure one for
24 St. Joe's.

Page 39

1     Q.    Okay.
2     A.    So, to answer your question, if
3 an employee claims they have some problem with
4 their boss and it's on account of gender, my
5 opinion would be, in the big picture that
6 could be Title IX.
7     Q.    Okay.  Looking at Exhibit-1
8 there, do you believe that there are
9 additional investigations you have done during
10 that time period of January 2015 to the
11 present, 2018, involving claims by employees
12 or staff members of the university of some
13 type of nonsexual impropriety?
14     A.    Yes.
15     Q.    And since joining Cozen
16 O'Connor, and that would be in 2017, would you
17 be able to determine what other cases you've
18 handled on behalf of St. Joe's University to
19 investigate?
20     A.    I believe so.
21     Q.    Okay.  Now, when you handle
22 those nonsexual claims --
23     A.    Let me maybe clarify your
24 question.

Page 40

1     Q.    Go ahead.
2     A.    It looks like this sheet was
3 based on the sexual misconduct policy.
4     Q.    That's my understanding.
5     A.    So my other investigations
6 would be based on the nondiscrimination,
7 harassment policy.
8     Q.    Okay.  And in those type of
9 cases were you asked by Community Standards to
10 do the initial investigation?
11     A.    There's been a change in their
12 process.  I would typically have not been
13 asked by Community Standards.  I would be
14 asked by human resources.  The human resources
15 person resigned recently.
16     Q.    Who is that?
17     A.    Nancy DuBois was her name.  And
18 I believe on an interim basis, until that
19 position is filled, Mary-Elaine Perry has
20 taken over that role.
21     Q.    And it's my understanding that
22 Ms. Perry is the Title IX coordinator?
23     A.    Yes.
24     Q.    And it's my understanding, if

Page 41

1 you know, that Ms. Perry, Dr. Perry is --
2 plans to leave the university?
3     A.    I've not heard that.
4     Q.    Okay.  You don't know anything
5 about her being an interim Title IX
6 coordinator at present?
7     A.    I always thought she was the
8 Title IX coordinator.  I've never heard
9 interim.
10     Q.    Dr. Perry was already deposed
11 here.  It's my understanding she's the vice
12 president and in addition to that she was
13 assigned to be the Title IX coordinator.  Is
14 that your understanding?
15     A.    That's my understanding.
16     Q.    And in addition to that she has
17 also assumed the interim role as head of HR?
18     A.    No.  I believe -- and this
19 happened relatively recently and I think it's
20 just to fill in until this other person is
21 replaced -- she was asked to handle being the
22 coordinator with investigators -- and I am not
23 the only one -- investigators on faculty/staff
24 complaints, non-student complaints.

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1    Q.    Okay.  But any faculty/staff
2  complaints are handled through HR, right?
3    A.    Correct.
4    Q.    And not through community
5  service [sic]?
6    A.    That is correct.
7    Q.    And tell me the procedure.  Are
8  you the investigator and decision maker in
9  that or are you the investigator who issues a
10 report and it goes to a hearing officer?
11   A.    There's multiple investigators,
12 so I am not at all the only one, but I issue a
13 report with findings and conclusions and
14 provide that to the university.
15   Q.    Okay.
16   A.    I don't believe there's a
17 hearing.
18   Q.    And I take it that would be in
19 accordance with the employee handbook, then?
20   A.    Policy.
21   Q.    Policy.  Okay.  I am jumping
22 ahead here.  It's my understanding that you,
23 Cozen O'Connor, presently has an engagement
24 letter for 2018 with St. Joe's University,

Page 43

1  right?
2    A.    Correct.
3    Q.    Did you have any engagement
4  letter with St. Joe's University before?
5    A.    Yes.
6    Q.    Okay.  And so was there an
7  engagement letter each year with St. Joe's
8  University?
9    A.    I believe so.
10   Q.    Are you familiar with the
11 engagement letter in place?
12   A.    Yes.
13   Q.    The present engagement letter,
14 as I understand it, this is for 2018, and a
15 letter was issued in March of 2018 but made
16 effective for all of 2018.  Is that your
17 understanding?
18   A.    I don't recall.
19   Q.    Okay.  Let me hand it to you.
20 We are not going to make in an exhibit, but I
21 am going to identify this as SJU Bates stamp
22 1052 up through 1055.  Let me hand it to you.
23 I am going to have some questions, but I'll
24 just let you look it over.

Page 44

1        MR. MYERS:  If you're going to
2  have questions about the document, I
3  would like it to be marked.
4        MR. SCHWABENLAND:  Okay.  Then
5  mark it.
6              _  _  _
7        (Whereupon, Exhibit Malloy-2
8  was marked for purposes of
9  identification.)
10             _  _  _
11 BY MR. SCHWABENLAND:
12   Q.    Are you familiar with that?
13   A.    I am.
14   Q.    For the purposes of the record,
15 it's marked as Exhibit-2.  Am I correct that
16 that was submitted by you on behalf of your
17 employer, Cozen O'Connor, to the university on
18 March 5th, 2018 and it was submitted to Carey
19 Anderson, the vice president, care of Marianne
20 Schimelfenig, as general counsel.  Did I read
21 that correctly?
22   A.    Yes.
23   Q.    And, essentially, am I correct
24 that it's for the period from January 1, 2018

Page 45

1  through December 31, 2018?  It's on the bottom
2  on the first page.
3    A.    Correct.
4    Q.    And, again, if I understand
5  correctly, Cozen O'Connor is placed on a
6  retainer of $5,750 a month; is that correct?
7    A.    Yes.
8    Q.    And plus there are expenses
9  that you may incur doing what you need to do,
10 right?
11   A.    Yes.
12   Q.    And in accordance with that
13 agreement that would cover any investigation
14 performed by you in the area of sexual
15 misconduct claims up to 11?
16   A.    Yes.
17   Q.    Okay.  And then what happens if
18 there's more than 11?
19   A.    The agreement says if there is
20 more than 11, investigations will be outside
21 of the retainer and billed at some agreed-upon
22 rate.
23   Q.    So that's later to be
24 determined?

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1      A.    Correct.
2      Q.    In looking at the Exhibit-1
3  there, at least from 2015 to 2018, I don't
4  believe that any of those -- the number of
5  claims exceeded 11 any given year, either by
6  the ones you did -- and that would include the
7  ones you did along with what others may have
8  done?
9      A.    Correct.
10     Q.    So if you are on a monthly
11 retainer, that comes up to about $69,000 per
12 year that the firm is retained by the
13 university; is that correct?
14     A.    I didn't do the math, but that
15 sounds close.
16     Q.    I did.  Take my word for it.
17 If there are less than 11, then whatever that
18 number is you'll do and you still get the
19 total amount of $5,750 per month for 12
20 months, right?
21     A.    Yes.  And then the letter says
22 that the university would be given a credit
23 the following year if there's fewer.
24     Q.    A credit.  Okay.  So if I

Page 47

1  understand correctly, you are now paid a flat
2  fee for each -- in 2018 a flat fee for each
3  investigation or case you handled?
4      A.    That's not correct.  We are
5  paid a flat fee per month.
6      Q.    Per month.  But that per month
7  would cover up to 11 cases, right?
8      A.    Correct.
9      Q.    And so if there's six cases you
10 would handle then you would get a fee of at
11 least six times $5,750, right?
12     A.    I don't understand your
13 question.
14     Q.    If you handle a case you don't
15 get more than the monthly retainer, right?
16     A.    Correct.  We get the monthly
17 retainer every month.
18     Q.    And in 2018 have you continued
19 to get a monthly retainer every month?
20     A.    Yes.
21     Q.    Now, you said it's carried over
22 if you don't get 11?
23     A.    Correct.
24     Q.    So what do you mean, carried

Page 48

1  over?  Explain that to me.
2      A.    If we would have 10
3  investigations, not 11, then in the following
4  year retainer the university would get a
5  credit.  They all get worked out on a
6  year-to-year basis, but next year might be 12
7  investigations for the same flat rate.
8      Q.    But how about, again, if
9  there's only six cases?
10     A.    I guess that would need to be
11 determined.  But the agreement says if there
12 are fewer than 11 the firm agrees to give a
13 credit the following year.
14     Q.    Okay.  So the credit means that
15 you would add on the number of cases for that
16 same agreed-upon monthly fee?
17     A.    Correct.
18     Q.    Okay.
19     A.    But I would say if there were
20 only six, for example, we might refund money.
21 We would have to deal with it on a
22 case-by-case basis.
23     Q.    If my calculations are correct,
24 on Exhibit-2, in 2015 there were six cases of

Page 49

1  sexual misconduct claims that you handled and
2  three others were handled by somebody else for
3  a total of nine.  Go ahead and take a look at
4  it.  I should warn you, there is a number out
5  of date sequence there, but it's 2015.
6      A.    I see it down here.  So I am
7  counting nine for 2015.
8      Q.    And I'll finish this up while
9  you've got it.  In 2016 I believe it shows
10 that there were eight cases of sexual
11 misconduct claims investigated by you for that
12 year.
13     A.    That's what the document shows.
14     Q.    And in 2017 there were four
15 sexual misconduct claims handled by you and
16 three others were handled by somebody else or
17 one or more other people, so for a total of
18 seven, it should be?
19     A.    I am counting eight for 2017.
20     Q.    We'll go with your thing.  And
21 in 2018 how many have there been by you and
22 the others?
23     A.    According to this document
24 there is three for me for 2018 and one by

CONFIDENTIAL

Page 50

1 somebody else.
2      Q.    So there's four.  Okay.  To
3 your knowledge, has there been an engagement
4 letter issued for each year, 2015, 2016, 2017,
5 2018?
6      A.    I believe so.
7      Q.    Okay.  And has the monthly fee
8 increased or been the same, if you know?
9      A.    I believe it's decreased.
10      Q.    Decreased.  Okay.  Do you know
11 what it was last year?
12      A.    I don't have an exact number,
13 but I believe it was $6,000.  It was a little
14 bit higher than the 5,750.
15      Q.    Do you know if it has decreased
16 each year from 2015 to 2018, if you know?
17      A.    I don't know that for sure.
18      Q.    I will follow through with one
19 other thing.  Do you know if it increased at
20 all from 2015 to 2016 or 2017?
21      A.    I do not believe that it has
22 increased.
23      Q.    Okay.  Now, am I correct that
24 the engagement letter only refers to your

Page 51

1 handling -- by you I mean your firm's handling
2 of sexual misconduct claims?
3      A.    Yes.
4      Q.    And so is there a separate
5 engagement letter if you handle investigations
6 for nonsexual claims, such as HR asking you to
7 do that?
8      A.    I believe so.
9      Q.    And is that a flat fee, monthly
10 retainer?
11      A.    It is not.  I'm sorry to
12 interrupt you.
13      Q.    That's okay.  You didn't.  Is
14 that by the hour, then?
15      A.    Yes.
16      Q.    And your fee for that
17 investigation, I take it for those types of
18 cases there in all likelihood would be more
19 time spent for your investigation?
20      A.    It really depends.
21      Q.    Okay.  Your hourly fee for
22 those investigations as of this year, what is
23 it?
24      A.    I believe it's $400 an hour.

Page 52

1      Q.    Okay.  And each case would be
2 billed separately and submitted to what, HR?
3      A.    Yes.
4      Q.    Your yearly engagement letters
5 for 2015, 2016, 2017, that would reflect,
6 whatever it was, a flat monthly fee going to
7 the firm by the university, right?
8      A.    Yes.  It would be similar up to
9 a certain number of investigations.
10      Q.    Okay.  But do you know if the
11 cases, for instance, 2018, the payments there
12 on a monthly basis would include coverage for
13 investigations of up to 11 cases, right?
14      A.    Correct.
15      Q.    Do you know if the same number
16 of cases were in effect for previous
17 engagement letters?
18      A.    The number has definitely come
19 down.  I don't know if it has come down every
20 single year.
21      Q.    Okay.
22            MR. MYERS:  In the next ten
23      minutes I would like a five-minute
24      break, since we have been at this for

Page 53

1 an hour.
2            MR. SCHWABENLAND:  Why don't we
3      take a five-minute break.
4            MR. MYERS:  It's your call.
5            MR. SCHWABENLAND:  Okay.  Thank
6      you.
7                  _  _  _
8            (Whereupon, a recess was held
9      from 11:00 a.m. to 11:07 a.m.)
10                  _  _  _
11 BY MR. SCHWABENLAND:
12      Q.    Do you believe that your firm,
13 Cozen O'Connor, would have any other
14 engagement letters with the university other
15 than the March 5th, 2018 one that's marked
16 Exhibit-2?
17      A.    I don't believe so.
18      Q.    Okay.
19      A.    When we came from Buchanan we
20 took some stuff with us, but, like, 25 people
21 moved at the same time, so we weren't able to
22 take extra stuff.
23      Q.    When you were with Buchanan you
24 definitely started to do work for St. Joe's

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1  University, right?
2      A.    Correct.
3      Q.    Okay.  And were other
4  individuals doing work for St. Joe's
5  University in the nature of investigating
6  sexual misconduct claims or policies?
7      A.    At Buchanan?
8      Q.    Yes.
9      A.    Yes.
10     Q.    And were they doing it before
11 you started?
12     A.    No.
13     Q.    And so were you the primary
14 person when you were at Buchanan Ingersoll to
15 do the investigative work for St. Joe's
16 University on sexual misconduct claims?
17     A.    I would agree with that, yes.
18     Q.    And I take it that the other
19 attorneys that did investigation on sexual
20 misconduct claims at the University of St.
21 Joe's, they were also employed by Buchanan
22 Ingersoll?
23     A.    Yes.
24     Q.    And when you left to go to

Page 55

1  Cozen O'Connor did those attorneys go with
2  you?
3      A.    They did not.
4      Q.    Okay.  Did they continue to do
5  any work, to your knowledge, after you left
6  Buchanan Ingersoll?
7      A.    Not that I am aware of.
8      Q.    And since joining Cozen
9  O'Connor I take it that there is, what, one or
10 two other attorneys if you're not available
11 who would do the investigation?
12     A.    Yes.
13     Q.    And do you assign the person
14 who is to do the investigation?
15     A.    Bill Bordak can call whoever he
16 chooses.  I believe he generally calls me and
17 then we try to figure out based on
18 availability and schedules who would be the
19 best person.
20     Q.    Okay.  Do you know if there are
21 any other attorneys in other firms who perform
22 investigative work now for St. Joe's
23 University on sexual misconduct claims other
24 than your firm?

Page 56

1      A.    I am not aware of anybody.
2      Q.    How about when you were at
3  Buchanan Ingersoll, same question?
4      A.    I would not be aware of anyone
5  else.
6      Q.    Okay.  When you were with
7  Buchanan Ingersoll, did that firm represent
8  St. Joe's University, to your knowledge?
9      A.    No.
10     Q.    And other than you doing
11 investigations, either appointment by HR or
12 staff-related claims, whether Title IX or
13 nonsexual claims, or doing sexual misconduct
14 claims by students -- I just forgot my
15 question.
16         MR. MYERS:  I was going to
17     object.  You saved me.
18 BY MR. SCHWABENLAND:
19     Q.    Let me go back to Buchanan
20 Ingersoll, if I may.  When you were at
21 Buchanan Ingersoll -- and I think I just asked
22 you this -- did that firm, to your knowledge,
23 represent St. Joe's University for any reason?
24         MR. MYERS:  Other than?

Page 57

1          MR. SCHWABENLAND:  Other than
2      your investigation.
3          MR. MYERS:  Other than through
4      Elizabeth Malloy?
5          MR. SCHWABENLAND:  Yes.
6          THE WITNESS:  Not that I am
7      aware of.
8  BY MR. SCHWABENLAND:
9      Q.    Same question, while you're at
10 Buchanan Ingersoll, did anyone, to your
11 knowledge, represent any individuals who were
12 associated with St. Joe's University?
13     A.    Not that I am aware of.
14     Q.    Did you ever represent any
15 individuals who were associated with St. Joe's
16 University?
17     A.    No.
18     Q.    And since joining Cozen
19 O'Connor do you know if that firm does any
20 other work for St. Joe's University?
21     A.    It does not.
22     Q.    Since joining Cozen O'Connor
23 have you represented the school for any other
24 reason?

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1    A.    No.
2    Q.    Have you represented any other
3    individuals associated with the school?
4    A.    No.
5    Q.    And I take it both while you
6    were at Buchanan Ingersoll and presently at
7    Cozen O'Connor you don't handle any labor or
8    employment issues on behalf of St. Joe's
9    University?
10   A.    That's correct.
11   Q.    How did you come to be
12   contacted about representing St. Joe's by
13   handling investigation of claims?
14   A.    Ms. Schimelfenig called me at
15   some point.
16   Q.    And had you known her?
17         MR. MYERS:  Ed, you said
18         "represented St. Joe's" and I don't
19         think you meant that.  I think you
20         meant retained by St. Joe's, but I
21         just would like the record to be
22         clear.
23         MR. SCHWABENLAND:  So you want
24         me to rephrase that?

Page 59

1          MR. MYERS:  If you would.
2          MR. SCHWABENLAND:  Okay.
3    BY MR. SCHWABENLAND:
4    Q.    Put in the word retain and you
5    said Ms. Schimelfenig contacted you?
6    A.    Correct.
7    Q.    Had you known her before that?
8    A.    I did not.
9    Q.    And, again, you wouldn't know
10   when this was, would you?
11   A.    I do not.
12   Q.    And what did she say?  What did
13   she ask you?
14   A.    I believe she said that there
15   was a need for an investigation, it was a
16   nonsexual misconduct claim, and that she had
17   received my name from somebody, as I recall,
18   and is that something I would be willing and
19   available to do.
20   Q.    Okay.  Do you know who she
21   received your name from?
22   A.    I do not.
23   Q.    So did you go and were you
24   interviewed by anybody at St. Joe's?

Page 60

1    A.    I believe so.
2    Q.    Okay.  And who were you
3    interviewed by?
4    A.    I don't recall the individual's
5    name.  It was the provost.  It was a
6    gentleman.
7    Q.    Okay.  Did you have a meeting
8    with the provost and other people or just the
9    provost?
10   A.    I sort of recall there being
11   two people there, but I don't know who the
12   other person was.
13   Q.    How about Ms. Schimelfenig, was
14   she there?
15   A.    I don't believe so.
16         MR. SCHWABENLAND:  Off the
17         record.
18            - - -
19         (Off the record)
20            - - -
21   BY MR. SCHWABENLAND:
22   Q.    And so what did you discuss?
23   A.    We discussed my academic
24   background, I think, for the most part.

Page 61

1    Q.    What was your academic
2    background as of that time, whenever you were
3    talking?
4    A.    Archbishop Prendergast High
5    School, Catholic University of America,
6    Villanova.
7    Q.    How about the training that you
8    had, anything?
9    A.    We may have.  I don't remember
10   that meeting in a lot of detail.
11   Q.    Did they ask you any questions
12   about training that you had to conduct the
13   investigations, anything like that?
14   A.    I don't remember.
15   Q.    How soon after that did you
16   begin to do work for them?
17   A.    My recollection is within a
18   couple of weeks.
19   Q.    Okay.  So I take it you
20   initially spoke about your fee for services?
21   A.    Probably.
22   Q.    When you first started was that
23   on an hourly basis?
24   A.    Yes.

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1    Q.    And, again, this would involve
2  an investigation into a nonsexual matter
3  involving faculty?
4    A.    Yes.  It was under the
5  nondiscrimination policy.
6    Q.    Okay.  And so you did that one
7  investigation.  How soon did you get any other
8  investigations?
9    A.    I don't recall.  As I think I
10  said earlier, there's probably been one to
11  three a year, two to three a year.
12        MR. SCHWABENLAND:  Just for the
13        record, I am going to ask you -- and I
14        will send you a letter -- the
15        university produce records concerning
16        the other investigations, if they do
17        exist.
18        MR. MYERS:  You go ahead and
19        ask.  You're beyond the discovery
20        period.  We will take it up and we
21        will make a decision.
22        MR. SCHWABENLAND:  Thank you.
23  BY MR. SCHWABENLAND:
24    Q.    Let's go to your meeting with

Page 63

1  the provost.  You believe there was one
2  meeting before you began the assignment?
3    A.    Yes.
4    Q.    And was that the only meeting
5  you had?  I said the meeting with the provost.
6  Did you meet with anybody else concerning you
7  undertaking to review or investigate claims?
8    A.    No, I do not believe so, just
9  one meeting.
10    Q.    Okay.  So other than talking
11  about your educational background and who you
12  are with and perhaps a fee for services, was
13  there any discussion concerning your training
14  or anything?
15    A.    There may have been.  I don't
16  remember much about that meeting.
17    Q.    Okay.  Do you know how you came
18  to be selected to perform investigations
19  concerning sexual misconduct claims by
20  students involving Title IX violations?
21    A.    Ms. Schimelfenig called me.
22    Q.    Is this after you got a call
23  from her and you met with the provost?
24    A.    Well after.

Page 64

1    Q.    Well after?  Okay.  And what do
2  you recall of the discussion?
3    A.    I believe she said that they
4  were changing the process at the university,
5  that investigations may have been done
6  internally with some public safety involvement
7  and that she was involved with Community
8  Standards and outside counsel to change the
9  process.
10    Q.    Okay.  And did she get into
11  what that process would look like?
12    A.    I don't believe it was on that
13  phone call, but eventually I did learn what
14  the process would look like.
15    Q.    Up until that time were you
16  aware of what the process had formerly been at
17  St. Joe's University?
18    A.    I had not been involved in any
19  sexual misconduct investigations prior to when
20  we started doing them.  I learned through the
21  process of being retained a little bit about
22  it, but I would have no first-hand knowledge.
23    Q.    Okay.  Again, I'll represent to
24  you that the sexual misconduct policy became

Page 65

1  effective as of June 2015 and the interim was
2  in place effective as of January of 2015.
3  Were you involved with formulating that
4  policy?
5    A.    No.
6    Q.    Were you involved in advising
7  the university as to any aspects concerning
8  Title IX?
9    A.    No.
10    Q.    Had you taken any courses as of
11  that time involving any Title IX continuing
12  legal education courses in that field?
13    A.    Yes.
14    Q.    And when did you first take
15  courses involving Title IX issues?
16    A.    Probably over the last 10 to 12
17  years.
18    Q.    And --
19    A.    I am an employment lawyer and
20  Title IX is an employment statute.
21    Q.    Okay.  And have you presented
22  matters over the last ten years involving
23  Title IX employment issues?
24    A.    Presented training?

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1    Q.    Yes.
2    A.    No.
3    Q.    Have you presented any issues
4  or discussions?  Have you spoken with any
5  legal groups or anything concerning that?
6    A.    On any topic?  On what topic?
7    Q.    On employment Title IX
8  violations?
9    A.    I mean, I speak a lot on
10 employment issues.  I don't recall anything
11 specifically on Title IX.
12   Q.    Okay.  By the way, you are an
13 attorney in good standing in the Commonwealth
14 of Pennsylvania; is that correct?
15   A.    I am.
16   Q.    Okay.  And are you admitted to
17 any other states?
18   A.    No.
19   Q.    And are you admitted to federal
20 practice?
21   A.    Yes.
22   Q.    As an attorney in good standing
23 you have an obligation, as we all do, to take
24 continuing legal education courses; is that

Page 67

1  correct?
2    A.    Yes.
3    Q.    Have you taken any continuing
4  legal education courses concerning
5  investigation into sexual misconduct claims by
6  students involving Title IX violations?
7    A.    Is your question limited to for
8  CLE credit?
9    Q.    No.  Well, I will limit it to
10 CLE credit then I will expand.
11   A.    I have taken courses, I don't
12 believe for CLE credit.
13   Q.    Okay.  And when have you taken
14 these courses and who put them on?
15   A.    I am not going to have a
16 recollection of that.  I have done a number of
17 them over the years.
18   Q.    Do you know what organizations
19 have put it on?
20   A.    I do specifically recall one by
21 Villanova University Law School.  That was an
22 all-day seminar there, that's why I remember
23 that one.
24   Q.    What was the seminar about?

Page 68

1    A.    Title IX.
2    Q.    Okay.  And when was that?
3    A.    Within the last three years, I
4  believe.
5    Q.    And that was an all-day seminar
6  on Title IX?
7    A.    Yes.
8    Q.    Involving all aspects of Title
9  IX?
10   A.    Yes.
11   Q.    Is this where you choose to go
12 to different sessions or it's --
13   A.    No.  I think it was just one
14 day.  You had to sit through whatever they
15 were presenting.  I don't believe there were
16 any break-out groups, if that's what you're
17 referring to.
18   Q.    Were there any presentations
19 done that you can recall concerning the
20 handling of claims of sexual misconduct,
21 claims raised by students in a university
22 setting, how they should be handled?
23   A.    I don't remember anything that
24 specifically.

Page 69

1    Q.    Okay.  Was there any discussion
2  that you can recall, at Villanova when you
3  attended, of any Dear Colleague Letters?
4    A.    There may have been.  I don't
5  remember.
6    Q.    Are you familiar with Dear
7  Colleague Letters?
8    A.    I am.
9    Q.    Are you familiar with Q&As that
10 accompanied Dear Colleague Letters?
11   A.    Yes.
12   Q.    Do you know when the last Dear
13 Colleague Letter and Q&A came out?
14   A.    It was last fall, 2017.
15   Q.    Okay.  And so that would be
16 2017?
17   A.    Yes.
18   Q.    And do you know when the
19 previous one was, if you know?
20   A.    I believe it was 2011.
21   Q.    Okay.  When did you first
22 become acquainted with Dear Colleague Letters?
23   A.    I don't know.
24   Q.    What I'm trying to figure out

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1  is, let's assume there was a 2011 one, did you
2  become acquainted with a Dear Colleague Letter
3  close to the time that it came out or later on
4  did you become acquainted with it?
5      A.   It would be close to the time
6  it came out.
7      Q.   Okay.  And so what was your
8  purpose for becoming acquainted with that?
9      A.   I am a labor and employment
10 lawyer and I try to read as much new material
11 on anything that touches any aspect of my
12 practice as I can.
13     Q.   Okay.  And your conversation
14 with Ms. Schimelfenig about perhaps
15 investigating sexual misconduct claims by
16 students, that conversation was well before, I
17 guess, the Dear Colleague Letter in 2017?
18     A.   Yes.
19     Q.   Would it have been shortly
20 before the sexual misconduct policy became
21 effective at St. Joe's University in the year
22 2015?
23     A.   I believe so.  I've told you
24 before, that date doesn't necessarily mean

Page 71

1  anything to me, but it would be before the
2  revised sexual misconduct policy came out.
3      Q.   Okay.  You mentioned Villanova
4  University had a presentation about Title IX.
5  Can you recall any other organizations?
6      A.   I read the information almost
7  every year that comes out from the NACUA,
8  National Association of College and University
9  Attorneys, and I have attended a couple
10 webinars, is probably the proper word for
11 that.
12     Q.   A webinar is where you sit in
13 your office and take a web course?
14     A.   Right.
15     Q.   Okay.
16     A.   The Villanova one was in
17 person.
18     Q.   NACUA, do you recall when you
19 first took a course with them?
20     A.   I don't recall the first time.
21     Q.   Would it have been before you
22 became an investigator?
23     A.   Yes.
24     Q.   Do you recall if it was while

Page 72

1  you were with Buchanan Ingersoll?
2      A.   Probably.
3      Q.   Do you have a list of these
4  courses that you would have taken?
5      A.   I do not.
6      Q.   So there is no way of telling
7  what courses you have taken?
8      A.   Correct.
9      Q.   How about training, have you
10 received any training as an investigator?
11     A.   Well, I probably would use
12 "courses" and "training" the same.  I have
13 been to webinars and seminars that address
14 investigations.
15     Q.   And, again, can you identify
16 any?
17     A.   NACUA, I believe that there
18 were a few by law firms.
19     Q.   A few by?
20     A.   By law firms.
21     Q.   Okay.  Do you recall what law
22 firms?
23     A.   I do not.
24     Q.   Okay.  How about, there's an

Page 73

1  organization called ATIXA, A-T-I-X-A, are you
2  familiar with that?
3      A.   I am not.  If you tell me what
4  it stands for I might be, but I am not
5  familiar with the acronym.
6      Q.   Association of Title IX
7  Administrators.  That's A, association, T is
8  for title, IX is Roman numeral for nine, and
9  then A is the administrators.
10     A.   I've heard of them.
11     Q.   But you have not taken any
12 courses with them?
13     A.   I don't believe so.
14     Q.   And have you gotten any of
15 their literature?
16     A.   I read a lot of stuff.  I am
17 not recalling anything in particular from
18 them.
19     Q.   Do you belong to any
20 associations that focus on Title IX?
21     A.   No.
22     Q.   Have you ever been a member of
23 any association that focuses on Title IX?
24     A.   No.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    Q.    Do you hold any certifications
2  to be a Title IX investigator?
3    A.    No.
4    Q.    When you began to do work for
5  St. Joe's University that involved acting as
6  an investigator of sexual misconduct claims or
7  Title IX violations raised by students did you
8  get a copy of the student handbook?
9    A.    I don't remember that.  I was
10  given copies of the policy.
11    Q.    Of the sexual misconduct
12  policy?
13    A.    Yes.
14    Q.    Did you do any investigation of
15  sexual misconduct claims raised by students at
16  St. Joe's University before seeing the sexual
17  misconduct policy or it became effective?
18    A.    Or the interim version of it?
19    Q.    Yes, 2015.
20    A.    I am not remembering the time
21  frame, but I would have seen a copy of the
22  policy.
23    Q.    Okay.  Were you asked to
24  comment on that policy at all?

Page 75

1    A.    I was not.
2    Q.    So you provided no advice to
3  the university about the wording of the policy
4  or the procedures to be followed?
5    A.    That's correct.
6    Q.    When you were contacted by Ms.
7  Schimelfenig about perhaps doing investigative
8  work into claims of sexual misconduct raised
9  by students did you have any further
10  discussion with her about your experience or
11  your background or your training?
12    A.    I'm sure we did.  I don't
13  specifically recall those conversations.
14    Q.    You don't recall anything as
15  you sit here?
16    A.    Right.
17    Q.    Do you recall her asking you,
18  "Have you done any such investigations
19  before?"
20    A.    I don't recall the
21  conversation.
22    Q.    Did you have to go and meet
23  with anybody else?  I know you said you met
24  with the provost on that other type of claim.

Page 76

1  Did you have to go and meet with anybody else
2  about the sexual misconduct policies before
3  acting as an investigator?
4    A.    I believe it was after I was
5  already or being retained to be the
6  investigator, there was a meeting with a large
7  number of people to talk about the process
8  going forward.
9    Q.    Okay.  Who did you meet with?
10  Do you recall?
11    A.    It was a big group of people.
12  I believe all the Community Standards people
13  were there, public safety, athletics, all of
14  the Title IX people, there's multiple ones,
15  Residence Life.  Outside counsel was there.
16  Ms. Schimelfenig was.  That's all I recall.
17  It was a relatively big meeting.
18    Q.    Who was outside counsel?
19    A.    I do not know.  I believe it
20  was Saul Ewing.  I do not know the gentleman's
21  name.
22    Q.    Have you since had any
23  communication with this gentleman?
24    A.    I have never talked to him

Page 77

1  other than at that meeting.
2    Q.    Okay.  Would this have been
3  around the time period of the Dear Colleague
4  Letter that came out in September of 2017?
5    A.    It was well before.
6    Q.    Would this have been around the
7  time period in 2015 when the sexual misconduct
8  policy became effective?
9    A.    It was at the point when the
10  process for investigating complaints was
11  changing.
12    Q.    Okay.  And so you say Community
13  Standards.  I take it Mr. Bordak was present?
14    A.    Yes.
15    Q.    And was Ms. Forte present or --
16  she may not have been working at the time
17  there?  I am not sure.
18    A.    I think it was her predecessor.
19    Q.    Okay.  Public safety, do you
20  recall who that was?
21    A.    No.
22    Q.    Athletics, do you recall who
23  represented athletics?
24    A.    I think there were two people.

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1 Renee Shields, I believe is her name, and she
2 was the primary Title IX contact in athletics.
3 I know she was there.
4     Q.    And do you know, does she work
5 with the athletic department?
6     A.    Yes.
7     Q.    And do you still communicate
8 with her?
9     A.    No.
10     Q.    And you said somebody was there
11 from Title IX. I know Dr. Perry is a Title IX
12 person.
13     A.    It was Dr. Perry and I believe,
14 if you refer to the policy there is maybe two
15 other people with maybe deputy titles, deputy
16 Title IX. My recollection is they were all
17 there.
18     Q.    Okay. And was there an agenda
19 written out?
20     A.    Not that I know of. There may
21 have been. I didn't do it.
22     Q.    Were you meeting all these
23 people for the first time or a lot of these
24 people for the first time?

Page 79

1     A.    Yes.
2     Q.    What do you recall being
3 discussed at this, in terms of what plans to
4 put into effect about once a claim is made,
5 what does the school do?
6     A.    The policy had already changed
7 or was going to be announced that it was
8 changing and Ms. Schimelfenig did a
9 presentation on that. The rest of it was
10 details, you know, who calls who, who would be
11 involved, who could support the investigators
12 if necessary. I remember something came up of
13 if we would need video or something like that,
14 right, there would be a contact in the police
15 department to call. My best description of
16 the meeting would be it was -- after Ms.
17 Schimelfenig did a presentation a lot of it
18 was the details. What would Residence Life
19 do, for example, if a complaint was made to
20 them directly.
21     Q.    You mentioned the video. Are
22 you talking about surveillance cameras or
23 things like that?
24     A.    The school has a lot of

Page 80

1 cameras, yes.
2     Q.    So it was discussed that that
3 was available should whoever is doing the
4 investigation feel it necessary?
5     A.    Yes. It was the role of the
6 people at this meeting to learn about the
7 changes in the policy and what everybody's
8 role, if any, would be.
9     Q.    So what major policy changes
10 did they have?
11     A.    I don't know because I wasn't
12 involved before.
13     Q.    Okay. What was your
14 understanding as to what role you were going
15 to have?
16     A.    My understanding was that
17 myself or one of my colleagues would be the
18 investigator under the new policy and prior to
19 that it had been done internally.
20     Q.    Prior to that did you have any
21 understanding as to whether or not an initial
22 investigation was done before it was submitted
23 to a hearing officer?
24     A.    I don't understand your

Page 81

1 question.
2         MR. MYERS: Me either.
3 BY MR. SCHWABENLAND:
4     Q.    Prior to being told that the
5 matter would be investigated by you as an
6 outside person, right, was it your
7 understanding that there had been internal
8 investigations carried out by public safety
9 and then the matter referred to a hearing
10 officer?
11     A.    Before the time we were
12 retained to do outside investigations?
13     Q.    Yes.
14     A.    I think I've heard that from
15 time to time.
16     Q.    Have you ever looked at the
17 handbook that was in effect before the sexual
18 misconduct policy became effective?
19     A.    No.
20     Q.    Since you became an
21 investigator and since they have a separate
22 sexual misconduct policy, have you ever looked
23 at the employee student handbook to look at
24 how they handle nonsexual claims raised by

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1 students?
2        MS. ENGLE:  Objection.
3        MR. MYERS:  You said "employee
4 student handbook."
5        MR. SCHWABENLAND:  Thank you.
6 Let me change that.  Thank you.
7 BY MR. SCHWABENLAND:
8     Q.    Since becoming an investigator
9 under the sexual misconduct policy, both the
10 interim, which became effective January of
11 2015, and the subsequent one becoming
12 effective in June of 2015, have you ever
13 looked at the student handbook to evaluate how
14 nonsexual claims raised by students against
15 others are handled?
16     A.    I have not.
17     Q.    Is it your understanding that
18 that's handled through Community Standards?
19     A.    Yes.
20     Q.    And is it your understanding
21 that, at least orally, hearing that that's
22 handled by the matter being submitted to a
23 hearing officer, one or more?
24     A.    I think I've heard that over

Page 83

1 the years.
2     Q.    But you never had a chance to
3 evaluate that or to look at it?
4     A.    Correct.
5     Q.    Okay.  I'll go a little bit
6 further.  The sexual misconduct policy was
7 revised in 2017.  Did you play any part in the
8 revision of that?
9     A.    No.
10     Q.    Are you familiar with the fact
11 that it was revised in or about 2017?
12     A.    I believe so.
13     Q.    Okay.  And then let me get back
14 to, at this meeting what was your
15 understanding as to how you were to conduct
16 your role?  What were you to do?
17     A.    There was no discussion of
18 that.
19     Q.    Okay.  Had --
20     A.    Other than what I have already
21 told you, the logistics of how we would get
22 the complaints, et cetera.
23     Q.    By the time you had this
24 meeting had you conducted any investigations

Page 84

1 under a sexual misconduct claim?
2     A.    That's where I'm sort of hazy
3 on the dates.  I don't believe that I did any
4 sexual misconduct -- I mean, I can tell you
5 for a fact, I did not do any sexual misconduct
6 investigations until the format was changed to
7 have us as the investigators.
8     Q.    Okay.  What was the format that
9 you followed, then, when you started to do the
10 investigation?
11     A.    I followed the policy and the
12 university gave me the headings, for lack of a
13 better word, of what the report should
14 contain.
15     Q.    Okay.  When you said the
16 university gave me the heading?
17     A.    You know what I mean, number
18 one is complaint, number two is documents
19 reviewed.
20     Q.    Policy?
21     A.    Yes.
22     Q.    Okay.  Was that in writing that
23 the university gave it to you --
24     A.    I don't think so.

Page 85

1     Q.    -- as to how it should be
2 formatted?
3     A.    I don't believe so.
4     Q.    So who told you how it should
5 be formatted, how they wanted it?
6     A.    I don't remember.
7     Q.    All right.
8     A.    I believe it was from somebody
9 in the Community Standards office, but I don't
10 remember.
11     Q.    Okay.  Did you ever see a
12 manual that's maintained at the Community
13 Standards office concerning the investigation
14 and handling of claims?
15     A.    No.
16     Q.    Other than telling you the
17 format of the headings on your report -- and
18 that would include things such as claim, when
19 it was made, how it came about, and then the
20 policy and then how you carried out your
21 investigation, who you reviewed, and who you
22 interviewed and then your findings of fact and
23 conclusions, which would include an assessment
24 of credibility, did I give it generally?

22 (Pages 82 - 85)

CONFIDENTIAL

1    A.    And summary of investigation, I
2 believe is one of the headings.
3        Q.    That's the format you were
4 referring to?
5        A.    Yes.
6        Q.    And other than that were you
7 given any other guidelines by the university?
8        A.    I wouldn't call them
9 guidelines.  I was told students have an
10 obligation to cooperate in an investigation,
11 for example, you know, little things like
12 that.  If I needed student telephone numbers
13 or emails, that Community Standards would give
14 them to me, sort of logistical things.
15        Q.    I take it when you begin your
16 investigation -- this is generically and I am
17 sticking with sexual misconduct claims.  When
18 you begin your investigation you receive from
19 the university a copy of the incident report?
20        A.    Yes.
21        Q.    And --
22        A.    If there is one.
23        Q.    If there is one.  And would you
24 receive a copy of the pre-investigative

1 statement signed by both the claimant and the
2 respondent?
3        A.    Yes.
4        Q.    Would you receive a notice
5 letter of the charges against the respondent?
6        A.    I don't know what you're
7 referring to.
8        Q.    Okay.  A letter has to go out
9 to a respondent saying "You are charged with"
10 whatever, right?
11        MR. MYERS:  Is that a question
12        or are you telling her what's in the
13        thing that she said she doesn't know?
14        MR. SCHWABENLAND:  That's a
15        question.
16        THE WITNESS:  I don't know.
17 BY MR. SCHWABENLAND:
18        Q.    Okay.
19        A.    I'm not involved in it until it
20 is on my plate for an investigation.
21        Q.    No. I understand.  But when
22 it's on your plate for an investigation do you
23 receive a copy of -- I'll call it the charge
24 letter?

1        A.    No.
2        Q.    So would the only way you would
3 be aware of what the charges are against the
4 individual would be based upon what, the
5 incident report?
6        A.    It can be in various formats.
7 It's typically -- I call it a complaint.
8 Sounds like you're calling it an incident
9 report.  But sometimes it can come in as an
10 email from Residence Life, for example.  If
11 something is reported to them in the middle of
12 the night, I get that.  I get that -- I call
13 it complaint.
14        Q.    Okay.
15        A.    It could start at public
16 safety.  You know, I get that.
17        Q.    So I understand there is
18 certain sources from the university, multiple
19 sources that the complaint can come in to you,
20 right?
21        A.    To Community Standards or Title
22 IX.
23        Q.    Community Standards.  I will
24 take, for example, our case -- we'll get to

1 our case -- involving John Doe and Jane Roe,
2 that came in through Dr. Perry's report about
3 her meeting with Jane Roe; is that your
4 understanding?
5        A.    Yes, sir.
6        Q.    Okay.  And I should ask you
7 this -- I am digressing here one second.  What
8 records have you reviewed in preparation for
9 this deposition?
10        A.    I have reviewed my file, which
11 is the long report, the short report, my
12 notes, text message from John, text messages
13 from Jane, the complaint, so, you know, my
14 file, my reports, my appendix, my handwritten
15 notes.
16        Q.    Okay.  The complaint, then,
17 would be the one authored by Dr. Perry; is
18 this correct?
19        A.    Yes.
20        Q.    Do you know if you received any
21 incident report from public safety in this
22 case?
23        A.    I did not.
24        Q.    So when the report comes in to

23 (Pages 86 - 89)

Page 90

1  you, whatever it is, a claim -- I'll call it
2  the complaint.  When the complaint comes in to
3  you from whatever source, your job, then, is
4  to what?
5      A.   Conduct the investigation.
6      Q.   And how do you go about doing
7  that?
8      A.   Generally, I get from Community
9  Standards contact information for the
10  complainant and the respondent.
11     Q.   Okay.
12     A.   I generally reach out to them
13  both by email.  I generally interview the
14  complainant first and then I go from there.
15     Q.   And am I correct that you may
16  also interview the respondent on the same day
17  or you may see the respondent at another day?
18     A.   It totally depends on their
19  schedules, but, yes.
20     Q.   At least by the time you reach
21  out to them you have a copy of whatever the
22  complaint is?
23     A.   Correct.
24     Q.   And do you give them a copy of

Page 91

1  that complaint?
2      A.   Generally -- no, I would never
3  give it to them to keep.
4      Q.   Would you allow them to look at
5  it?
6      A.   I sometimes do.
7      Q.   In our case did you allow the
8  complainant, who is Jane Roe, to look at the
9  complaint?
10     A.   I don't remember.
11     Q.   If she had asked to look at it
12  would you have allowed her to look at it?
13     A.   Yes.  Dr. Perry shows it to
14  them.
15     Q.   Dr. Perry?
16     A.   Yes.
17     Q.   And how do you know that?
18     A.   She has told that to me on
19  numerous occasions.
20     Q.   Did Dr. Perry tell you that she
21  showed it to them in this case specifically?
22     A.   Not that I remember.
23     Q.   But your understanding is that
24  Dr. Perry shows each of them a copy of the

Page 92

1  complaint?
2      A.   Yes.
3      Q.   And is that written down
4  anyplace?
5      A.   I don't -- not that I know of.
6      Q.   Do you recall in this case, you
7  know, the one we are here about, showing the
8  complaint to John Doe?
9      A.   I do not recall doing that.
10     Q.   And is there some reason why
11  you didn't show it to him in this case?
12     A.   I told him what the complaint
13  said.  My recollection of not showing it to
14  him is because it was a specific charge.
15  Sometimes I get very long complaints, very
16  long emails from Residence Life with a lot of
17  details in them.
18     Q.   When you say it was a specific
19  charge, what was the specific charge?
20     A.   The charge was that they had
21  mutually engaged in some kissing and that then
22  the complainant charged him with squeezing her
23  neck to the point where she was afraid and
24  texted one of her friends to come get her.

Page 93

1      Q.   Okay.  And when you met with
2  him you told him about that?
3      A.   Yes.
4      Q.   Did you tell him about that
5  specific charge before you met with him?
6      A.   No.
7      Q.   I know you sent emails about
8  availability and stuff.  Did you speak with
9  him over the telephone at all beforehand?
10     A.   I don't believe so.  I know
11  they were leaving on spring break.  I do not
12  recall speaking with John or Jane.
13     Q.   Do you recall if John had asked
14  you by text or email beforehand if he should
15  review or if he should bring anything with him
16  in preparation?
17     A.   I think he may have emailed me
18  what should he do to prepare for the meeting,
19  something like that.
20     Q.   What did you respond?
21     A.   I think I told him to bring any
22  notes or texts that he wanted to share with
23  me.
24     Q.   Up until the time you actually

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 met with him had your emails told him what he
2 potentially violated?
3     A.    No.
4     Q.    So was it your understanding he
5 was coming in cold as to what the specifics of
6 the allegations were?
7     A.    He had already met with
8 Community Standards, because I don't get it
9 until those pre-investigation meetings are
10 done.
11     Q.    I know, but what did you expect
12 Community Standards to tell him?
13     A.    I am not involved in that
14 process.  My understanding was they are told
15 about the complaint.
16     Q.    What about the complaint?
17     A.    The allegations.
18     Q.    The specifics, that there was
19 mutually agreed upon kissing and that at some
20 point he squeezed her neck?
21     A.    I am not involved in those
22 meetings.  I don't know.
23     Q.    I don't mean to be
24 argumentative, but I am just -- do you have

Page 95

1 any idea as to what John Doe was told about
2 anything to do with the complaint?
3     A.    I wasn't at that meeting.  I
4 know when I told him what the allegations were
5 he said that he was told by Community
6 Standards that he had been too rough with her.
7 I remember that being his answer.  I don't
8 know what he was told, though.
9     Q.    Do you know who he met with at
10 Community Standards?
11     A.    The forms would show that.  I
12 don't recall.
13     Q.    I'll represent to you he met
14 with Emily Forte.  But would you have received
15 a copy of the checklist that's done at the
16 meeting with Community Standards?
17     A.    I usually do.
18     Q.    And that would be both the
19 checklist for the complainant and the
20 respondent?
21     A.    Yes.
22     Q.    Did you have any
23 understanding -- I am talking about this case.
24 Did you have any understanding as to what

Page 96

1 Community Standards would do if either party
2 asked to review a copy of the complaint?
3     A.    I do not know.
4     Q.    And do you have any knowledge
5 as to whether or not John Doe asked Community
6 Standards at the pre-investigative meeting to
7 see a copy of the complaint?
8     A.    I don't know one way or the
9 other.
10     Q.    Was there any reason that
11 you're aware of not to disclose that if a
12 student asks for that?
13         MR. MYERS:  Objection.  Do you
14     mean disclose what's in the complaint
15     or show the complaint?
16         MR. SCHWABENLAND:  To allow him
17     to review the complaint.
18         THE WITNESS:  I don't know.
19 BY MR. SCHWABENLAND:
20     Q.    Did you ever have conversations
21 with Community Standards, anybody there, or
22 Dr. Perry or Dr. Anderson or anybody at the
23 university about what you should show a
24 complainant or a respondent when you do your

Page 97

1 investigation at the time of the meeting?
2     A.    No.
3     Q.    So is that primarily up to you
4 to decide how you were to handle that?
5     A.    Yes.
6     Q.    Had you ever made a
7 recommendation to the university that certain
8 protocols should be in place as to what to
9 allow a complainant or respondent to see
10 before the meeting or during the meeting?
11     A.    No.
12     Q.    I am digressing backwards here.
13 Are you familiar with the Harris case, Harris
14 versus St. Joe's University?
15     A.    I don't believe so.  If that's
16 one I investigated, if you tell me more about
17 it, but the name doesn't ring a bell to me at
18 all.
19     Q.    Are you familiar with the case
20 law on the Harris case, the case law -- the
21 opinion that was issued by the Court?
22     A.    No.
23     Q.    How about, are you familiar
24 with the Powell case versus St. Joe's

25 (Pages 94 - 97)

CONFIDENTIAL

1 University?

2  A.  I know a little bit about that.

3  Q.  What do you know?

4  A.  I know that one of my

5 colleagues at Buchanan was the investigator

6 and that Mr. Powell brought a pro se

7 complaint, which I probably read. I don't

8 remember the details.

9  Q.  Okay. Other than that do you

10 know anything else?

11  A.  No. I was not the

12 investigator. I think it was a stalking case.

13 I never read the report or anything.

14  Q.  Let me ask you about the case

15 involving -- there is two Jane Does, Jane Doe

16 1 and Jane Doe 2 -- involving the girls'

17 softball team. Are you familiar with those

18 claims and the investigation?

19  A.  The investigations I did, yes.

20  Q.  Yes. Okay. So what

21 investigations did you do?

22  A.  This was a while ago. I don't

23 remember all the details. It had a lot to it

24 that didn't involve me, is my recollection.

1 But two female softball players made a number

2 of allegations against the university and

3 other members of the softball team. Some of

4 them potentially involved sexual misconduct

5 and I was asked to investigate that. I

6 believe there was some other process going on

7 around the same time with nonsexual misconduct

8 allegations.

9  Q.  And that was handled by

10 Community Standards?

11  A.  As far as I know. I don't know

12 who else might have been involved.

13  Q.  Did you ever speak with Mr.

14 Bordak about his handling of it?

15  A.  No.

16  Q.  Do you know what findings were

17 made by Community Standards against the

18 softball team?

19  A.  My investigation or the rest of

20 Community Standards?

21  Q.  The Community Standards.

22  MR. MYERS: He's asking what

23  you know about, not your

24  investigation.

1  THE WITNESS: Right. The only

2  thing I remember is I sort of remember

3  seeing something in the paper. I did

4  not learn anything from St. Joe's. I

5  sort of remember seeing something in

6  the paper that there were charges

7  substantiated or something like that.

8 BY MR. SCHWABENLAND:

9  Q.  Did you learn that the team was

10 suspended for the rest of the 2015 season?

11  A.  That may have been what I saw

12 in the paper.

13  Q.  Did you know that they were

14 placed on disciplinary probation through

15 May 31, 2016?

16  MR. MYERS: Are you asking for

17  her personal knowledge or are you

18  asking her to remember what she read

19  in the newspaper?

20 BY MR. SCHWABENLAND:

21  Q.  Anything, either personal

22 knowledge or knowledge you gleaned from the

23 paper.

24  A.  I did not speak to anybody at

1 the university about it. I don't remember

2 hearing what you just said.

3  Q.  Community Standards was

4 handling the nonsexual aspects of the claim

5 raised by these two students, right?

6  A.  Yes.

7  Q.  And that would include

8 harassment or hazing issues?

9  A.  That's my understanding, that

10 they were hazing-type allegations.

11  Q.  When you began your

12 investigation, because a certain aspect was

13 assigned to investigate possible sexual

14 misconduct violations, right?

15  A.  Yes.

16  Q.  When that was assigned by

17 you --

18  A.  Assigned to me.

19  Q.  Assigned to you. Thank you.

20 When that was assigned to you, who assigned

21 it? Do you know? Was it Dr. Perry? Was it

22 Mr. Bordak or --

23  A.  My best recollection is that it

24 was Bill Bordak.

CONFIDENTIAL

Page 102

1    Q.    And did you have a discussion
2 as to the plan, that at least he represented
3 he was going to handle this aspect and you
4 would handle the sexual misconduct aspect?
5    A.    I don't remember that. I knew
6 my task was to handle the sexual misconduct
7 investigation, because I investigate under the
8 sexual misconduct policy. And, to be fair, I
9 knew that there were other allegations as
10 well. I did not have a discussion with Mr.
11 Bordak as to what happened to the other stuff.
12    Q.    Do you know what the nature of
13 the sexual allegations were that you handled?
14    A.    I have not looked at this
15 report since I concluded it. I do remember
16 there were a couple, maybe two or three, and
17 the one that I remember was at some sort of, I
18 don't know -- party is probably the wrong
19 word -- but at something at an off-campus
20 house the two complainants alleged that they
21 were asked to demonstrate sexual positions
22 that were listed in Cosmopolitan magazine, or
23 maybe that all of them -- all of them were
24 asked to do that. That's the one I remember.

Page 103

1 I do believe there was at least one sexual
2 connotation that I was investigating.
3    Q.    Did you meet with the two
4 complainants?
5    A.    I did not.
6    Q.    Is there some reason why you
7 did not?
8    A.    I tried to meet with them.
9 They had counsel, who I talked to a couple of
10 times, and he did not make his clients
11 available to be interviewed.
12    Q.    And did you know what the
13 allegations by the complainants were at the
14 time?
15    A.    There was a complaint, like, a
16 drafted Eastern District of Pennsylvania
17 complaint, that I saw. I don't know when I
18 saw it whether it was, like, a courtesy copy
19 or it had actually been filed, but I was
20 working off something that looked like a
21 lawsuit complaint.
22    Q.    So did you meet with the
23 respondents, I will call them?
24    A.    I believe I met with everybody

Page 104

1 on the team -- I did my best to meet everybody
2 on the team other than the two complainants.
3    Q.    At least in the complaint --
4    A.    Can I supplement a prior
5 answer?
6    Q.    Sure.
7    A.    There had been a loss -- public
8 safety investigation, some part of it started
9 at public safety and public safety had
10 interviewed, I believe, both complainants. I
11 had public safety's notes as well.
12    Q.    The allegations, at least in
13 the complaint, would you agree with me that
14 some of these allegations were sexual in
15 nature?
16    A.    Yes. I think they were the
17 ones I was investigating.
18    Q.    The claim was sexual assault,
19 right?
20    A.    I don't remember that.
21    Q.    One of the allegations was that
22 the complainants were claiming that students
23 were touching their bare buttocks. Do you
24 recall that?

Page 105

1    A.    I don't recall that. It could
2 be true. I just don't recall it.
3    Q.    I understand. Let me go
4 through the list here. The allegations
5 involve the plaintiffs were forced to hump up
6 against the wall or give lap dances. Do you
7 recall that?
8    A.    Yes.
9    Q.    Would that be sexual in nature?
10    A.    Yes.
11    Q.    I'm sorry to go through this,
12 but I have to. That they were forced to
13 give -- or that the allegation was that they
14 were compelled or forced some way to give
15 over-the-pants hand jobs?
16    A.    Yes.
17    Q.    Another allegation, to dance to
18 sexually explicit songs?
19    A.    Yes.
20    Q.    That they were forced to
21 demonstrate the coach's orgasm a certain way?
22    A.    Yes.
23    Q.    That they were forced to put
24 condoms on bananas?

27 (Pages 102 - 105)

CONFIDENTIAL

1     A.    Yes.
2     Q.    That they were to, in front of
3 others, to initiate oral sex on wine bottles?
4     A.    Yes.
5     Q.    That they were forced to or
6 compelled to answer questions about sexual
7 identity?
8     A.    I don't specifically remember
9 that.
10    Q.    Fair enough.  That they were
11 compelled to discuss sexual positions and
12 pornography?
13    A.    Yes.  That's the one I
14 remember, the Cosmopolitan magazine.
15    Q.    And some nickname was given,
16 Dirty Sanchez or something like that?
17    A.    I recall that.
18    Q.    Which is not a nice nickname, I
19 guess?
20    A.    That was the connotation, yes.
21    Q.    I know you had a difficult time
22 speaking with the complainants because they
23 already had an attorney and it was now in
24 suit; is that correct?

1     A.    I believe it was in suit in
2 some form.
3     Q.    You also weren't able to talk
4 to all the people on the softball team, right?
5     A.    I don't remember.  I know I
6 talked to a lot of people.  I very well may
7 not have talked to all of them.
8     Q.    Some of the girls were in
9 Europe or Japan at the time?
10    A.    Yes.
11    Q.    And they couldn't speak by
12 phone but offered to communicate by email?
13    A.    I don't remember that.
14    Q.    Okay.  But there's some
15 indication that you didn't want to handle it
16 by email.  So you didn't talk to them.  Do you
17 recall that?
18    A.    I don't recall.
19    Q.    Do you recall having an
20 aversion to getting any type of email from any
21 of the people that you wanted to talk to?
22    A.    It has been my experience that
23 students forward lots of emails.  So my
24 preference is not to conduct investigations

1 through email.
2     Q.    Did you make a finding at least
3 that some of the allegations were true, that
4 they did have their buttocks touched, bare
5 buttocks?
6     A.    I don't remember.  If you
7 showed me the report I can recall that.  I
8 know I did address the allegations.
9     Q.    But if that were true that
10 would be sexual assault, would it not?
11        MR. MYERS:  I object to the
12    form of the question.  You can answer
13    the question.
14        THE WITNESS:  I don't know.  If
15    you show me the report, I can comment
16    on it.
17 BY MR. SCHWABENLAND:
18    Q.    I will get it out.  I am not
19 going to do it now, because I have to go
20 through some things here.  I want to go
21 through one other thing and then get back to
22 our case, if I may.
23    A.    Okay.
24        MR. MYERS:  It's 12:20.  What

1 is your plan for lunch?
2        MR. SCHWABENLAND:  Take 30
3    minutes.  Is that okay?
4        MR. MYERS:  Whatever you want.
5    Whenever you want.
6        MR. SCHWABENLAND:  Well, let's
7    do it now.  Is that okay?
8        THE WITNESS:  Sure.
9            _ _ _
10       (Whereupon, a lunch recess was
11    held from 12:16 p.m. to 12:50 p.m.)
12           _ _ _
13 BY MR. SCHWABENLAND:
14    Q.    Welcome back from lunch.
15    A.    Thank you, sir.
16    Q.    I am going to jump around and
17 then get back to this case.  You mentioned Dr.
18 Perry has told you that she shows or allows
19 the parties, complainant, respondent to see
20 the complaint; is that correct?
21    A.    Yes, but I've also heard it
22 from students.  So if I have shown a copy of
23 the complaint to students they say, "Oh, yes,
24 I've seen that."  And at least once I've seen

28 (Pages 106 - 109)

CONFIDENTIAL

1  a complaint where the student, like, corrected
2  things in handwriting, so when I got it it had
3  extra comments on it.  So from all those
4  reasons I'm aware that Dr. Perry let's the
5  student see the complaint.
6        Q.     So there have been cases  where
7  you, as the investigator, when you're meeting
8  with the student for the first time would show
9  a complaint to them and they can comment?
10       A.     Yes.  I believe I told you
11 that.  Yes.
12       Q.     And under what circumstances
13 would you do that?
14       A.     Usually if it is a long, long
15 complaint with a lot of elements to it.
16       Q.     I'm sorry.  You did say that.
17       A.     Yes.  I often use that as sort
18 of a format for our discussion.
19       Q.     Any other reason to show it to
20 them?
21       A.     Not that I can think of.
22       Q.     Okay.  But Dr. Perry has told
23 you on more than one occasion that she too has
24 allowed students to review the complaint?

1        A.     That's my recollection, yes.
2        Q.     And that would be at a time
3  before the meeting with you, the investigator,
4  right?
5        A.     Yes.
6        Q.     Would you agree that if that's
7  done, that is, the student have an opportunity
8  to see a copy of the complaint beforehand,
9  that gives them a better understanding as to
10 what they are charged with before actually
11 meeting with you?
12       A.     No.  I think you're
13 misunderstanding me.  I meant that Dr. Perry
14 has shown the complainant the complaint,
15 because the complainants have told me that
16 they have seen it before or that they made
17 corrections to it.  So my testimony goes to
18 the complainant seeing the complaint, not the
19 respondent.
20       Q.     So has Dr. Perry ever said she
21 has shown the respondent the copy of the
22 complaint?
23       A.     Not to me.
24       Q.     So has Community Standards

1  indicated to you that they have shown the
2  respondent a copy of the complaint?
3        A.     I've never had that discussion
4  with them one way or the other.
5        Q.     So is it your understanding
6  that the respondent really never sees the
7  complaint?
8        A.     I don't know.
9        Q.     Well, do you know of any case
10 that you've handled where the respondent had
11 the ability to review the complaint prior to
12 meeting with you, the investigator?
13       A.     I don't know.  I'm not aware of
14 any, but I don't know.
15       Q.     Did you ever raise the fact
16 that the complainant has the ability to review
17 the complaint before actually meeting with you
18 and the respondent doesn't have the ability to
19 review the complaint?
20       A.     I don't know if that's true,
21 but I've never raised it with Community
22 Standards.
23       Q.     Dr. Perry is the Title IX
24 coordinator, right?

1        A.     Yes.
2        Q.     And what is your understanding
3  as to what a Title IX coordinator does?
4        A.     I think she's universally
5  regarded as the point person, although not
6  solely, for Title IX complaints.  I believe
7  she does some education on campus about the
8  policy and in at least some circumstances she
9  meets with a complainant to determine whether
10 the allegations are something that could or
11 should be investigated under the sexual
12 misconduct policy and things like that.
13       Q.     Okay.
14       A.     I am sure she does things that
15 I don't know of.
16       Q.     Do you play any role as to
17 whether or not a complaint should be placed in
18 the sexual misconduct policy or a nonsexual
19 Community Standards?
20       A.     I do not.  Once it's on my
21 plate it is a sexual misconduct investigation.
22       Q.     Would it be fair to say that
23 you haven't seen anything in writing involving
24 a protocol as to whether a respondent should

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1  have access to reviewing the complaint before
2  actually meeting with you and the
3  investigator?
4       A.    Correct.  I've never seen
5  anything.
6       Q.    And that's never been a subject
7  of discussion by you or when you're at a
8  meeting with anybody at St. Joe's?
9       A.    Correct.
10      Q.    Ms. Forte, do you know Ms.
11 Forte?
12      A.    Yes.
13      Q.    And she was deposed and she
14 indicated that when she met with John Doe in
15 this case he asked her to see a copy of the
16 complaint and she said, "No.  That copy will
17 be provided to you when you meet with Ms.
18 Malloy."  That's what she testified to in her
19 deposition.  She indicated that Ms. Malloy
20 routinely shows a copy of the complaint to the
21 respondents.  Is that true or not?
22           MR. MYERS:  Object to the form
23      of the question.
24           MS. SCHIMELFENIG:  And I know

Page 115

1      John wasn't at the depo.  I was at
2      Emily's depo and I am not exactly sure
3      that's exactly what she said.
4           MR. MYERS:  So if you are going
5      to question her about a question at
6      the deposition, I think, in fairness
7      to the deponent, you need to show her
8      the question and answer or at least
9      show me the question and answer.
10          MR. SCHWABENLAND:  I don't want
11      to waste time with getting all this
12      stuff out.
13          MR. MYERS:  Okay.  I am not
14      sure it's a waste of time, but it's
15      your call.
16 BY MR. SCHWABENLAND:
17      Q.    I am representing to you that's
18 what she said.  All I'm asking you is:  Do you
19 routinely show respondents a copy of the
20 complaint?
21      A.    I think I've answered that a
22 couple of times.  I wouldn't say routinely,
23 but I do.
24      Q.    In the list of cases in

Page 116

1  Exhibit-2 -- I'm sorry.  Is that Exhibit-1 or
2  2?
3       A.    One.
4       Q.    In Exhibit-1, can you point to
5  any case where you actually showed the
6  respondent a copy of the complaint?
7       A.    I have no idea what these
8  complaints are.
9       Q.    If you showed a respondent a
10 copy of the complaint would your summary then
11 so reflect?
12      A.    I don't know.  Not necessarily.
13      Q.    Can you estimate for me how
14 many times you have shown a respondent in a
15 sexual misconduct policy case at St. Joe's
16 University a copy of the complaint?
17      A.    I have no idea.
18      Q.    Would it be more than five or
19 less than five?
20      A.    I have no idea.  Let me
21 rephrase that.  It's probably more than five,
22 but I have no ability to put any parameters on
23 it.
24      Q.    More than ten, less than ten?

Page 117

1       A.    I don't know.
2       Q.    And why do you say probably
3  more than five?
4       A.    Five just sounds like a small
5  number.
6       Q.    Okay.
7       A.    And many of these complaints
8  are very complicated, that come with long
9  emails from Residence Life and stuff like
10 that.  I go back to whether it's something
11 finite that I can explain to somebody or
12 whether they need to see all the details.
13      Q.    Jumping back a second here.  Up
14 to the present you've had no training in law
15 enforcement; is that correct?
16      A.    Yes, that is correct.
17      Q.    You have had no training as a
18 prosecutor or defense attorney in a criminal
19 case?
20      A.    That's correct.
21      Q.    Have you ever represented
22 anybody in a criminal case?
23      A.    Not that I know of.  I mean,
24 I've never represented anybody in a criminal

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1  case.
2      Q.    Have you ever represented
3  anybody in a Civil Rights case?
4      A.    Like a plaintiff? I mean, all
5  employment law is Civil Rights and I've always
6  represented the employer.
7      Q.    Okay.  Over the last five
8  years, have you published any articles on
9  Title IX violations involving sexual
10 misconduct claims in a university or college
11 setting?
12     A.    No.
13     Q.    Have you done any presentations
14 for the same subject matter over the last so
15 many years?
16     A.    No.
17     Q.    Do you consider yourself an
18 expert in the area of Title IX violations
19 involving sexual misconduct claims in a
20 college or university setting?
21     A.    Yes.  I consider myself a
22 well-informed practitioner in that area.
23     Q.    And the basis of that is what?
24     A.    My training, education, and

Page 119

1  experience.
2      Q.    Okay.  But what training
3  specifically in that area are you referring
4  to?  I know you said you went to Villanova and
5  you took -- for a seminar that day and you
6  took a web -- what is it called?
7      A.    Webinars, plural.
8      Q.    At various times throughout the
9  years, right?  And you also mentioned a group
10 that gave a presentation.  What is the name of
11 that group again?  It starts with an N?
12     A.    I read heavily materials in
13 this area and I had told you that I read the
14 course materials from NACUA, National
15 Association of College and University
16 Attorneys.  I read the Dear Colleague Letters.
17 Like every lawyer, I keep up on areas of law
18 in which I practice.
19     Q.    Other than the coursework and
20 NACUA and the Dear Colleague Letter do you
21 read any other materials?
22     A.    Yes.
23     Q.    What do you read?
24     A.    I get emails and materials

Page 120

1  regularly.
2      Q.    But you don't read anything
3  from ATIXA?
4      A.    I do not.
5      Q.    Is there some reason why you
6  don't?
7      A.    I can't attribute any reason to
8  that.  I don't know.
9      Q.    Have you heard others mention
10 that ATIXA provides good, solid guidelines for
11 Title IX issues involving sexual misconduct
12 cases or claims in the university setting?
13     A.    I have not heard that.
14     Q.    Do you know any other attorneys
15 that have taken courses with ATIXA?
16     A.    Not that I am aware of.
17     Q.    So, again, you mentioned that
18 NACUA -- what is that again?
19     A.    NACUA.
20     Q.    And are you a member of that
21 organization?
22     A.    I am not.
23     Q.    And so how often do you receive
24 material from them?

Page 121

1      A.    Every year.
2      Q.    And is that once a year?  Do
3  they put it out monthly?  What do they do?
4      A.    It's at least once a year and
5  can be more frequently.
6      Q.    Any other coursework other than
7  that?
8      A.    Not that I can think of
9  specifically.
10     Q.    When you started to act as an
11 investigator at St. Joe's University, did you
12 review any material, any educational material
13 that's presented to students, so you know what
14 it is, involving Title IX or sexual misconduct
15 violations?
16     A.    Not that I recall.
17     Q.    Have you ever heard a case
18 Breaking the Silence?
19     A.    No.
20     Q.    I'm sorry.  Not the case.  Have
21 you ever heard the presentation by the
22 university about Breaking the Silence?
23     A.    No.
24     Q.    Do you know any educational

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1 material that is shown to students?
2     A.    I know they do education. I've
3 never seen any of it.
4     Q.    And you haven't done any
5 presentation yourself to students?
6     A.    Correct.
7     Q.    By the way, in that Exhibit-1
8 it shows that you investigated two females and
9 found them not responsible. Are those the two
10 females that were involved in softball, in the
11 girls' softball team?
12     A.    I don't know.
13     Q.    Have you investigated --
14     A.    They could be. I just don't
15 know.
16     Q.    I understand. Have you
17 investigated any other females that you can
18 recall?
19     A.    Female respondent?
20     Q.    Respondent.
21     A.    Not that I recall off the top
22 of my head.
23     Q.    Have you ever found a female
24 responsible, a female respondent?

Page 123

1     A.    In sexual misconduct
2 complaints?
3     Q.    Yes.
4     A.    I think I told you, I don't
5 have any specific recollection of
6 investigating with a female respondent. It's
7 possible.
8     Q.    Okay. Let me show you what's
9 been produced by St. Joe's University, 1030.
10 I will represent to you, that's a slide from
11 the presentation of Breaking the Silence
12 that's presented to the students -- the
13 freshmen.
14         MR. MYERS: Are you going to
15     mark this as 3? You're going to mark
16     it as 3?
17         MR. SCHWABENLAND: You want it
18     marked?
19         MR. MYERS: If you're
20     questioning the witness about it, I
21     want it marked, yes.
22         MR. SCHWABENLAND: Okay. Mark
23     it.
24         _ _ _

Page 124

1         (Whereupon, Exhibits Malloy-3
2     and 4 were marked for purposes of
3     identification.)
4         _ _ _
5 BY MR. SCHWABENLAND:
6     Q.    Let me ask you to look at
7 Exhibit-3, which is Bates stamped 1030. It
8 defines, at least what's presented to
9 students, "Sexual assault is defined as" and
10 it is saying "Sexual contact without consent
11 occurs when the act is intentional and is
12 committed either by:" and then four different
13 bullet points. The first bullet point:
14 Force, violence, threat or intimidation; the
15 second, ignoring the objections of the other
16 person; third, causing another's intoxication
17 or impairment through the use of drugs or
18 alcohol; four, taking advantage of another
19 person's incapacitation, state of
20 intimidation, helplessness or other inability
21 to consent. First of all, did I read that
22 correctly?
23     A.    I wasn't following you that
24 closely, so I can't answer that question.

Page 125

1     Q.    Okay. Do you agree with that
2 definition?
3         MR. MYERS: I object to the
4     form of the question. You're asking
5     her about a slide that she says she
6     never saw. If you --
7         MR. SCHWABENLAND: I am showing
8     it to her now.
9 BY MR. SCHWABENLAND:
10     Q.    Do you agree with that
11 definition?
12         MR. MYERS: Let me finish. If
13     you represent to her that this is
14     verbatim from the sexual misconduct
15     policy, that's one thing. If it is
16     anything else, I object to the form of
17     the question.
18 BY MR. SCHWABENLAND:
19     Q.    Can you answer my question?
20     A.    I cannot answer your question
21 without comparing it to the policy. I've
22 never seen this slide before and I apply the
23 definition of consent from the policy, which I
24 think is much longer than this.

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1    Q.    Okay. I'll get to that. Look
2    at the next one, Exhibit-4, 1031. There is a
3    question at the top saying, "Myth or Fact,
4    False reports of rape or sexual assault are
5    common and happen often." And underneath
6    there it's cited in red letters, "Myth" and
7    then it goes on to state, "False reports of
8    sexual assault are rare, occurring only
9    8 percent of the time, according to the FBI."
10   It's a cite to the Federal Bureau of
11   Investigation Uniform Crimes Reports,
12   Washington, D.C. Do you agree with that
13   statement?
14   A.    I have no ability to agree with
15   it or disagree. I've never read the uniform
16   crime reports. I don't know.
17   Q.    Have you ever read any reports
18   about false reporting by claimants, how often
19   that has occurred or is suspected of
20   occurring?
21   A.    I don't recall that.
22   Q.    When you interview a claimant
23   do you take what they say at face value or do
24   you anticipate that they may be falsely

Page 127

1    reporting something?
2    A.    I conduct my investigation
3    based on all of the information, the
4    complainant's side of the story is part of it,
5    and then I make credibility decisions and
6    apply the university's policy.
7    Q.    Okay. But, to your knowledge,
8    have you read any materials up to the present
9    about issues of false reporting by claimants?
10   A.    I can't answer that. I very
11   well may have. There is nothing sticking in
12   my mind on that.
13   Q.    Let's get to this case, if we
14   could. Do you have a copy of your summary?
15   A.    I do not.
16   MR. SCHWABENLAND: John, could
17   you get --
18   MR. MYERS: John, me?
19   MR. SCHWABENLAND: Yes. You
20   produced these records. Could you
21   show her a copy -- here, I will give
22   you a number.
23   MR. MIRABELLA: I have got an
24   extra copy. Just bear with me.

Page 128

1                - - -
2    (Off the record)
3                - - -
4    MR. MYERS: If you are going to
5    question in detail on each we are
6    going to need multiple copies, that
7    is, I am going to need one to be able
8    to follow along.
9    MR. SCHWABENLAND: I'm sorry.
10   Say that again.
11   MR. MYERS: Do you have more
12   than one copy of the things that
13   you're about to question her about in
14   detail?
15   MR. SCHWABENLAND: I don't.
16   That's why I said to Al that we need
17   to do it at my office so we can make
18   copies.
19   MR. MYERS: But we are not at
20   your office. So give me the things
21   and I will get them copied.
22   MR. SCHWABENLAND: Okay.
23                - - -
24   (Whereupon, a recess was held

Page 129

1    from 1:15 p.m. to 1:21 p.m.)
2                - - -
3    BY MR. SCHWABENLAND:
4    Q.    That Exhibit-1, the ones that
5    don't have your names on them, do you know
6    what other attorneys from your office handle
7    the investigation on behalf of St. Joe's?
8    A.    At Cozen it would be Andrew
9    Rolfes.
10   Q.    Andrew?
11   A.    Rolfes, R-O-L-F-E-S.
12   Q.    So only one other person?
13   A.    At Cozen. At Buchanan it was
14   Andrew Shapren and Andrew Rolfes. So it would
15   be either one of those.
16   Q.    Okay. Did Robert Hawkins ever
17   handle anything?
18   A.    No.
19   Q.    Is Robert Hawkins in your firm
20   now?
21   A.    Yes.
22   Q.    Do you know if Robert Hawkins
23   ever represented anybody from St. Joe's
24   University?

33 (Pages 126 - 129)

Page 130

1    MR. MYERS:  Within some time
2  frame, Ed, or ever?  Are you really
3  asking ever?
4    MR. SCHWABENLAND:  Either
5  Buchanan Ingersoll or now.
6    THE WITNESS:  Not that I know
7  of.  I know he's a St. Joe's
8  University grad.  Hold on a second.
9  Let me just think.  He's a labor
10  lawyer, not an employment lawyer, so I
11  never assigned him or worked with him
12  on any investigations.  I believe --
13  this is a really distant memory.  I
14  believe he wrote a letter to -- it had
15  something to do with Ms. Schimelfenig
16  getting admitted to the Pennsylvania
17  Bar.
18  BY MR. SCHWABENLAND:
19    Q.    Okay.
20    A.    And I believe he might have
21  written a letter, something like that.  I
22  don't recall any specifics.
23    Q.    But you weren't involved in
24  that?

Page 131

1    A.    I was not involved.
2    Q.    So Mr. Hawkins may have
3  represented Ms. Schimelfenig at one point?
4    A.    Maybe.
5    Q.    Okay.
6    A.    It could have been a reference
7  letter.  Like, I don't have a recollection of
8  it.
9    Q.    Okay.  In this present case
10  it's my understanding you got the assignment
11  to do the investigation from Community
12  Standards?
13    A.    Correct.
14    Q.    And then you would contact both
15  individuals for a good time to meet; is that
16  correct?
17    A.    Yes.
18    Q.    It is my understanding that
19  there was spring break coming up; is that
20  correct?
21    A.    Yes.
22    Q.    And that you were then leaving
23  on vacation from March 22nd to March 30th; is
24  that correct?

Page 132

1    A.    Yes.
2    Q.    And you determined you couldn't
3  meet prior to spring break, right?
4    A.    Right.  I think we only had,
5  like, a day or two before they left for spring
6  break.
7    Q.    And so you met on March 19th
8  with both individuals?
9    A.    I know I met with them the same
10  day.  The date I can't recall off the top of
11  my head.
12    Q.    And you would have met with,
13  according to your custom, the complainant
14  first?
15    A.    Yes.
16    Q.    Okay.  We need to get the
17  copies.
18    A.    Okay.
19        _ _ _
20    (Whereupon, a recess was held
21    from 1:25 p.m. to 1:30 p.m.)
22        _ _ _
23    (Whereupon, Exhibits Malloy-5,
24    6, and 7 were marked for purposes of

Page 133

1    identification.)
2        _ _ _
3    MR. SCHWABENLAND:  Let's go
4  back on the record.
5  BY MR. SCHWABENLAND:
6    Q.    I marked as Exhibit-5, "Summary
7  of Findings of Fact, Determination of
8  Credibility, Rationale and Outcome" and
9  attached to that are the Exhibits A through D.
10  And the second thing is Exhibit-6, I have
11  marked "Summary of Investigation, Complaint
12  By" and it's redacted, but the complaint by
13  Jane Roe against John Doe.  That's marked as
14  Exhibit-6.  That's also SJU Bates stamp number
15  268 to 276.  I should go back.  Exhibit-5 was
16  Bates stamp number 277 to 299.  Finally,
17  Exhibit-7 is a copy of handwritten notes,
18  Bates stamp 380 to 387.  Having said that, let
19  me just go back.  Did you author each of these
20  exhibits?
21    A.    Yes.
22    Q.    First of all, what is the
23  difference between Exhibit-5 -- and I'm not
24  talking about the attachment to the exhibits,

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1 A through D. What's the difference between
2 Summary of Findings of Facts, Determination of
3 Credibility, Rationale and Outcome, and the
4 Summary of the Investigation, complaint by
5 Jane Roe against John Doe marked as Exhibit-6?
6 If I could, I will tell you what I see in
7 there if you --
8      A.   You want me to answer your
9 question?
10     Q.   Sure.
11     A.   Exhibit-6 has a summary of
12 investigation that summarizes interviews.
13 Exhibit-5 does not have that section.
14     Q.   Okay. But, except for not
15 having that section, Exhibit-5 goes from
16 documents reviewed as Roman numeral 4 to Roman
17 numeral 5, findings of fact; is that correct?
18     MR. MYERS:  What page?
19     MR. SCHWABENLAND:  Bates stamp
20 279.
21     THE WITNESS:  Yes, you're
22 correct.
23 BY MR. SCHWABENLAND:
24     Q.   Okay. So Exhibit-6 has after

Page 135

1 Document Reviewed, Roman numeral 4, a new
2 Roman numeral 5, Summary of Investigation, and
3 you have A and B in there, interview with the
4 two parties; is that correct?
5      A.   Correct.
6      Q.   And then you go to findings of
7 fact and other matters; is that correct?
8      A.   Yes.
9      Q.   Why do you issue -- you can do
10 whatever you want -- but why did you issue two
11 separate documents?
12     A.   I always do this. This was
13 part of the sort of format that I was told to
14 use from the beginning. I personally call one
15 the long report, and the short report. Number
16 6 being the long report. I don't exactly know
17 why. My big picture is that they show the
18 short report to the complainant and the
19 respondent, but I don't know that for sure.
20 But I create a short report. That is
21 everything in the long report except the
22 summary of interviews.
23     Q.   Okay.
24     A.   Just since you're asking

Page 136

1 questions about this, these exhibits that are
2 attached to 5, I would not do that. I give my
3 exhibits as a separate, like, appendix. So I
4 would not have them stapled to a report.
5      Q.   Okay. So the exhibits which
6 are Bates stamped, starting with A, 283, to
7 all the way through D, 299, the exhibits would
8 be separate from the report?
9      A.   Right. If you look at page 282
10 it says, "Appendix," and I just create that as
11 a separate document.
12     Q.   Okay. And the appendix
13 indicates that you had the complaint as A;
14 photographs, B, texts from Ms. Jane Roe, and
15 notes from Mr. John Doe. Did I read that
16 correctly?
17     A.   Correct.
18     Q.   Okay. Would you resubmit those
19 four exhibits, though, to Community Standards
20 when you issued your summary of findings of
21 fact?
22     A.   Yes. When I'm done an
23 investigation I give Community Standards the
24 long report, the short report, the appendix,

Page 137

1 my handwritten notes, which you have, and any
2 emails that I have regarding the investigation
3 on the matter.
4      Q.   Do you keep a copy of these for
5 your own file?
6      A.   Yes.
7      Q.   And that's kept by you and
8 maintained confidential for the protection of
9 the students, right?
10     A.   Yes.
11     Q.   Let me go, if we can, to
12 Exhibit-5 and that first document attached as
13 Exhibit-A, SJU Bates stamp 284.
14     A.   Okay.
15     Q.   That's the complaint that was
16 authored by Dr. Perry; is that correct?
17     A.   Yes.
18     Q.   And are these all the documents
19 that you received in preparation for your
20 deposition, by "these," Exhibits 5, 6, and 7?
21     A.   I don't know what you mean,
22 received for purposes of my deposition.
23     Q.   I'm sorry. Reviewed.
24     A.   I reviewed my own file, which

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1  includes this.
2      Q.    Does your file also include
3  emails back and forth?  I am trying to set
4  things up?
5      A.    Yes, but I did not review them.
6      Q.    Okay.
7      A.    My file is everything I give to
8  the university, because that's all I have.  I
9  turn over everything I have.
10     Q.    Okay.  In the emails to both
11 the claimant and the respondent I note that
12 there is an informality by you to them.  You
13 refer to yourself as "Liz;" is that correct?
14     A.    I would not agree that there is
15 an informality, but I do refer to myself as
16 Liz and I would typically call them by their
17 first names.
18     Q.    Okay.  Again, let's go to
19 Exhibit-5, Bates stamp 284, Dr. Perry's
20 complaint.  Was that the only information you
21 had about the actual occurrence?
22     A.    Yes.
23     Q.    Is it your understanding that
24 Dr. Perry is forming this complaint, I will

Page 139

1  call it, based upon her interview with Jane
2  Roe?
3      A.    I would disagree with your
4  characterization of forming the complaint, but
5  it's my understanding that Dr. Perry meets
6  with --
7      Q.    Jane Roe?
8      A.    Jane.  I was stumbling for
9  that, Jane.  And based on that meeting typed
10 up this report.  Dr. Perry usually puts her
11 name at the bottom and did not at this point.
12 I do remember reaching out to Bill Bordak to
13 make sure that I knew what this was and he
14 said yes, this was hers.
15     Q.    So it's a report of a meeting
16 that Dr. Perry had with Jane Roe?
17     A.    Yes.
18     Q.    Okay.  And I'm just referring
19 to this as, this is the complaint you were
20 referring to, right?
21     A.    Yes.
22     Q.    Okay.  And it talks about they
23 are meeting on Monday, February 26th and that
24 Jane Roe came to see Dr. Perry with Katie

Page 140

1  Bean, assistant director for WADE.  Do you
2  know who Katie Bean is?
3      A.    I do not.
4      Q.    Dr. Perry report said Jane Roe
5  told her -- well, I will say what's in here.
6  "Jane Roe told me that she and a few friends
7  went to a party at LaSalle on Friday night.
8  She could not give an exact location, just
9  that it was a LaSalle party.  She met a guy
10 who was very nice and he asked her if she went
11 to LaSalle and she said no -- St. Joe's and he
12 said the same."  I am not sure that's
13 accurate, but that's what is in there, right?
14     A.    Correct.
15     Q.    Okay.  "They talked for a while
16 and he talked with her friends as well.  He
17 was very nice to Jane Roe and her friends.
18 She told her friends she would catch up with
19 them later and began hanging out with him.
20 They went outside to get some air and there
21 were people doing cocaine in the alley.  She
22 said she did not want to be near that, as she
23 had been clean for almost two years.  He
24 understood that she had some drug issues by

Page 141

1  the fact that she went to recovery high
2  school.  She said that he gave her some
3  alcohol -- liquor 34 (she thinks) and Gatorade
4  in a Gatorade bottle."  Did I read that
5  paragraph correctly?
6      A.    Yes.
7      Q.    The second paragraph then goes
8  on to talk about what happened according to
9  Jane Roe when they returned to St. Mary's.  Am
10 I correct there?
11     A.    Yes.
12     Q.    Okay.  And is it your
13 understanding that St. Mary's is where John
14 Doe dormed?
15     A.    Yes.
16     Q.    Dr. Perry reports, "They
17 returned to SJU with a friend of his and began
18 making out in a 'weird' little room on the
19 third floor of St. Mary's.  He lives in St.
20 Mary's but his roommates -- his roommate was
21 sleeping.  They began making out, which was
22 fine, then somehow he put his hand on her
23 throat and began squeezing her neck.  She felt
24 that she could not breathe.  At that point she

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1 froze and she had something of a flashback.
2 (She shared with me that she had been abused
3 in the past by a former boyfriend and that he
4 would, say, pin her down like this and say
5 things like -- If you do anything I'll hurt
6 you and hurt your friends.) When he was doing
7 this, Jane Roe reported that he had very
8 different eyes. 'He was not the same boy I
9 went with.' At a point he stopped to go get
10 some water. At that time, Jane Roe text her
11 safe word to her friends and two of them
12 called her. One student was next door in
13 McShain, so she went to be with her. When he
14 returned she was on the phone and told him she
15 had to go because her friend had called, and
16 she left St. Mary's." Did I read that
17 somewhat correctly?
18     A.   Yes.
19     Q.   And so that's what you had
20 going with? That's the only information you
21 had at the time?
22     A.   Yes.
23     Q.   So did you show this to the
24 complainant when she appeared?

Page 143

1     A.   I don't remember.
2     Q.   You may have, you may not have?
3     A.   Correct.
4     Q.   But you definitely agree that
5 you didn't show this to John Doe?
6     A.   That's my recollection, yes.
7     Q.   And so let's go to your
8 complaint attached as Exhibit -- I'll tell you
9 what, since Exhibit-6 is a more comprehensive
10 report, where you put in there the interviews
11 of the two, we'll use Exhibit-6 for the most
12 part.
13     A.   Okay.
14     Q.   But I might make reference back
15 to Exhibits A through D that are attached to
16 Exhibit-5, recognizing that you didn't attach
17 those to Exhibit-5, right?
18     A.   I understand.
19     Q.   In the summary of the
20 investigation you list, number one, the
21 complaint and I take it this is the format you
22 were told to use?
23     A.   Correct.
24     Q.   And so you identify how the

Page 144

1 complaint was made and that it happened on --
2 I'm paraphrasing this -- it happened on
3 February 26, 2018 when a complaint was made to
4 Dr. Mary-Elaine Perry, the Title IX
5 coordinator; is that correct?
6     A.   Yes.
7     Q.   And we just read her report
8 that you were given; is that correct?
9     A.   Yes.
10     Q.   Then you summarize the
11 complaint that on February 23rd, 2018, SJU
12 student John Doe put his hand on her throat
13 and began squeezing her neck. And then you
14 have in parentheses, "That's a complaint,"
15 right?
16     A.   Yes.
17     Q.   Next paragraph, "A
18 pre-investigation meeting with," I assume
19 that's Jane Roe, "was held on March 5, 2018
20 and a pre-investigation meeting with John Doe
21 was held on March 6, 2018." The matter was
22 turned over to you, being the investigator on
23 March 6; is that correct?
24     A.   Yes.

Page 145

1     Q.   So then you identify the
2 policy. Now, you have the sexual misconduct
3 policy. You indicate that "The complaint
4 potentially implicates the St. Joseph's
5 University sexual misconduct policy: Policy
6 regarding sexual assault, sexual harassment,
7 sexual exploitation, domestic violence, dating
8 violence or stalking" and then you have in
9 parentheses, "Sexual misconduct policy," end
10 of parentheses. Did I read that correctly?
11     A.   Yes.
12     Q.   Then you go on to state what
13 the definition of sexual assault is; is that
14 correct?
15     A.   Yes.
16     Q.   Now, was it your understanding
17 that at least the allegations were possible
18 sexual assault by John Doe?
19     A.   Yes.
20     Q.   The sexual assault charge was a
21 specific charge against him; is that correct?
22     A.   Yes. The allegations, yes.
23     Q.   The allegations. Okay. But, I
24 mean, if I understand correctly, you didn't

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1  put in there any definitions for sexual
2  harassment, sexual exploitation, domestic
3  violence, dating violence, or stalking,
4  correct?
5      A.    Right.
6      Q.    So you are focusing on sexual
7  assault?
8      A.    Yes.
9      Q.    That's the charge?
10     A.    Yes.
11     Q.    In your role as investigator
12 did you acquaint yourself with the crimes code
13 in the Commonwealth of Pennsylvania pertaining
14 to sexual assault?
15     A.    I have in reviewing the policy
16 read the definitions that are linked to
17 various definitions.  Some of the -- you know,
18 some of the definitions say as incorporated or
19 set forth in the crimes code.  So I have read
20 those sections.
21     Q.    So what would be the elements
22 in the crimes code of sexual assault, if you
23 know?
24     A.    I can't answer that off the top

Page 147

1  of my head.
2      Q.    How about, have you also
3  acquainted yourself or caused yourself to be
4  acquainted with any charge of sexual assault
5  which may exist in the federal crimes code?
6      A.    I don't believe so.
7      Q.    Okay.  And so when you're
8  defining the policy you're going straight to
9  the definition in the sexual misconduct policy
10 itself of the school, right?
11     A.    Yes.
12     Q.    It says, "In relevant part the
13 sexual misconduct policy prohibits sexual
14 assault.  The policy defines sexual assault as
15 'having sexual intercourse or sexual physical
16 contact with another individual by the use of
17 threat or force or coercion, without consent,
18 or where the individual is incapacitated.'
19 The policy also provides that sexual assault
20 includes nonconsensual sexual contact which is
21 defined as follows."  And then "For purposes
22 of this policy, sexual assault also includes
23 nonconsensual sexual contact.  Nonconsensual
24 sexual contact means any sexual touching with

Page 148

1  any object by a person upon another person
2  without consent or forcing any person to touch
3  you or the individual in a sexual manner.  It
4  is defined as engaging in any sexual contact
5  other than intercourse with another person
6  without that person's consent and/or
7  cognizance.  It includes any nonconsensual
8  sexual contact, including any improper
9  touching of intimate body parts.  It also
10 includes the nonconsensual removal of
11 another's clothing, indecent contact (i.e.,
12 the unwanted touching of intimate body parts,
13 including, but not limited to, genitals,
14 buttocks, groin, or breasts) or causing
15 another to have indecent contact with those
16 intimate body parts."  And then you cite
17 sexual misconduct policy Section
18 D(1)(a)(i)(ii).  Now, that's that definition
19 you cited for sexual assault, right?
20     A.    Yes.
21     Q.    Okay.  And then you go on to
22 define consent as part of the policy
23 guidelines that you're focusing on; is that
24 correct?

Page 149

1      A.    Yes.
2      Q.    And you indicate on there what
3  consent is.  "Consent means words or actions
4  that reasonably demonstrate to another a
5  knowing and voluntary agreement to engage in
6  mutually agreed upon sexual activity."  Then
7  it goes down, small A, "Consent is active, not
8  passive.  B, an affirmative statement or
9  action does not constitute consent if it is
10 given by a person who is unable to make a
11 reasonable judgment concerning the nature or
12 harmfulness of the activity because:" and then
13 it goes down four separate things in small
14 Roman numerals, the first one, incapacitation,
15 second one, unconsciousness, third one, mental
16 disability or incapacitation, the fourth one,
17 if the consent is a product of threat or
18 coercion.  C, "In whatever way consent is
19 communicated it must be mutually
20 understandable.  D, Silence, in and of itself,
21 or the absence of resistance cannot be
22 interpreted as consent.  E, It's a
23 responsibility of the initiator of sexual
24 contact to make sure that they understand

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1 fully what the person with whom they are
2 involved wants and does not want sexually. F,
3 Consent to one form of sexual activity does
4 not imply consent to another form of sexual
5 activity. G, Consent to engage in sexual
6 activity with one person does not imply
7 consent to engage in sexual activity with
8 another. H, A previous relationship or a
9 prior consent does not imply consent to future
10 sexual acts. I, Consent can be withdrawn
11 through actions or words at any time." And
12 you cite to the sexual misconduct policy on
13 the definition of consent, which is Section
14 D(5). So did I read that policy correctly?
15     A.     I believe so.
16     Q.     Okay. So you are focusing on
17 two things. One is the definition of sexual
18 assault; is that correct?
19     A.     Yes.
20     Q.     And the other one is consent;
21 is that correct?
22     A.     Yes. I think they were the two
23 issues.
24     Q.     Okay. And then you list that

Page 151

1 you interviewed the following witnesses. Can
2 we agree, even though it's redacted, that you
3 interviewed two witnesses, Jane Roe and John
4 Doe?
5     A.     Correct.
6     Q.     And you also indicate the
7 documents you reviewed. And that's what we
8 noted earlier; is that correct?
9     A.     I don't remember noting it
10 earlier, but my report makes reference to
11 these four documents.
12     Q.     Four documents?
13     A.     Yes, I agree, the appendix
14 documents, yes, sir.
15     Q.     Then you go on to do a summary
16 of the investigation and the interviews that
17 you had with each person; is that correct?
18     A.     Yes.
19     Q.     Okay. I'm going back in the
20 policy here. I want to focus on something
21 here. The definition of sexual assault, this
22 does not involve sexual intercourse, right?
23     A.     This complaint does not involve
24 sexual intercourse, yes, correct.

Page 152

1     Q.     But it does involve, according
2 to you, a possibility of sexual physical
3 contact with Jane Roe?
4     A.     Sexual touching.
5     Q.     Sexual touching. Then it says,
6 "Having sexual intercourse or sexual physical
7 contact with another individual by use of
8 threat or force or coercion." I will stop
9 there. We are not dealing with threat or
10 coercion, are we?
11     A.     No.
12     Q.     So I take it you're saying we
13 are dealing here with force; is that correct?
14     A.     Yes.
15     Q.     And is force defined anyplace?
16     A.     You're taking a definition, a
17 little part of the definition here, and you
18 have to look at the whole thing. So the
19 following sentence also says "The policy also
20 provides that sexual assault includes."
21     A.     Oh. Okay. But as to this
22 definition at the very beginning, "Sexual
23 physical contact with another individual by,"
24 one of three things, threat or force or

Page 153

1 coercion. All I am asking is: Are you
2 focusing on force with regard to your
3 findings?
4     A.     I am focusing on not having
5 consent.
6     Q.     So there wasn't really any
7 force used, then?
8     A.     Well, I believe there was force
9 used.
10     Q.     Because there is two things.
11 It's "Contact with another by the use of
12 threat or force or coercion without consent or
13 where the individual is incapacitated." I
14 read that right?
15     A.     Yes. That's only one sentence
16 of the definition, but you read that.
17     Q.     But there is three elements
18 there. I will work backwards. Or where the
19 individual is incapacitated, we are not
20 dealing with that, right?
21     A.     Right.
22     Q.     Without consent, that's an
23 issue in your mind as possibly, right?
24     A.     Right.

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1    Q.    So out of the three, "by the
2  use of threat or force or coercion," are you
3  focusing on the force issue?
4    A.    Yes, but I still think you're
5  taking one part of the definition out of
6  context.
7    Q.    Let's go down there. "The
8  policy also provides that sexual assault
9  includes nonconsensual sexual contact, which
10  is defined as follows:  Nonconsensual sexual
11  contact means any sexual touching with any
12  object by a person upon another person without
13  consent or forcing any person to touch you or
14  the individual in a sexual manner.  It is
15  defined as engaging in any sexual contact
16  other than intercourse with another person
17  without the person's consent and/or
18  cognizance.  It includes any nonconsensual
19  sexual contact, including any improper
20  touching of intimate body parts.  It also
21  includes the nonconsensual removal of
22  another's clothes, indecent contact, i.e., the
23  unwanted touching of an intimate body part,
24  included but not limited to genitals,

Page 155

1  buttocks, groin, or breasts or causing another
2  to have indecent contact with those intimate
3  body parts."  Did I read that correctly?
4    A.    I believe so.
5    Q.    Okay.  So let's go back and see
6  what we can focus on here, because this case
7  does not involve some touching of intimate
8  body parts, right?
9    A.    Well, you've seen my analysis
10  on that.
11    Q.    Okay.  But does it involve the
12  touching of intimate body parts?
13    A.    Not in and of itself.
14    Q.    Were any intimate body parts
15  touched?
16    A.    No.
17    Q.    You hesitated, not in and of
18  itself?
19    A.    Yes.  You're sort of taking
20  sound bites, though.
21    Q.    I am trying to break down the
22  elements here to see what it is not about and
23  what we are focusing on.  Okay?  It does not
24  include the nonconsensual removal of another's

Page 156

1  clothes, does it?
2    A.    No.
3    Q.    At the very beginning of that
4  paragraph that we quoted, "Nonconsensual
5  sexual contact means any sexual touching with
6  any object by a person upon another person
7  without consent."
8    A.    Correct.
9    Q.    Okay.  So one of the things you
10  had to determine in your analysis was was
11  there sexual contact?
12    A.    Correct.
13    Q.    And then you have to determine
14  was it with or without consent?
15    A.    Yes.
16    Q.    Okay.  And then that sentence
17  also goes on to say, "or forcing any person to
18  touch you or the individual in a sexual
19  manner."  So that doesn't apply here, right?
20    A.    Right.
21    Q.    Okay.  If there was consent
22  given, then one of your purposes of your
23  analysis would be going back to the definition
24  of consent, whether or not that consent was

Page 157

1  later withdrawn?
2    A.    Yes.
3    Q.    Who has the responsibility to
4  prove the case?  I know it's a preponderance
5  of the --
6    A.    Nobody.  The standard is a
7  preponderance of the evidence and it's the
8  university's obligation to investigate the
9  complaint.
10    Q.    Doesn't the university have
11  an -- I am throwing this out to you.  Doesn't
12  the university have an obligation to prove
13  lack of consent or elements -- let me ask you
14  a different way.  Doesn't the university have
15  the obligation to prove the elements showing
16  sexual assault?
17    MS. ENGLE:  Object to form.
18    MR. MYERS:  Object to the form
19  of the question.  Are you asking this
20  witness the standard by which she
21  evaluates the evidence and the rules
22  by which she does something or are you
23  asking a broader question about
24  whether there are other people or

40 (Pages 154 - 157)

CONFIDENTIAL

1    other aspects of St. Joe's that do
2    things? I honestly don't understand
3    your question.
4  BY MR. SCHWABENLAND:
5        Q.    Can you answer my question?
6            MR. MYERS: No, you are not
7    going to answer, because I don't
8    understand it. I am asking you to
9    rephrase it.
10  BY MR. SCHWABENLAND:
11        Q.    According to you, you have a
12    preponderance of the evidence, and so does
13    the -- who has the burden to show either that
14    sexual assault occurred or sexual assault
15    didn't occur?
16        A.    I don't think I can answer that
17    in the hypothetical way that you have
18    propounded the question. I think in general
19    it is the university's obligation to
20    investigate these complaints. For example, if
21    there was a complainant who didn't really
22    remember very much based on her knowledge, you
23    can't hold that against her, right, you can't
24    say, "You don't remember anything, so you

1    don't meet your burden," because it's not the
2    complainant's burden --
3        Q.    She would have been
4    incapacitated --
5            MR. MYERS: Please don't
6    interrupt.
7            THE WITNESS: I understand
8    incapacitated. That is unable to
9    consent. But there are people who
10    don't remember things, for example.
11    So the best I can answer your question
12    is, I understand it is the
13    university's obligation to fairly
14    investigate complaints by a
15    preponderance of the evidence. It's
16    not solely saying that that is the
17    complainant's burden.
18  BY MR. SCHWABENLAND:
19        Q.    Do you recall in the Dear
20    Colleague Letter of 2017 reference to the fact
21    that the university has a burden of proving?
22        A.    That's what I was just trying
23    to explain.
24        Q.    Okay.

1        A.    But not because of the Dear
2    Colleague Letter, but if you use the example I
3    gave you.
4        Q.    Okay. We will come back to the
5    elements in a second. You have Dr. Perry's
6    report concerning the statements made by
7    Ms. Roe to her and then you have a chance to
8    meet with her?
9        A.    Yes.
10        Q.    At that point she was -- this
11    is on Page 3 of your report, which is Bates
12    stamped 270. I hope I am doing this
13    accurately.
14            MR. MYERS: We are there.
15    What's the question?
16  BY MR. SCHWABENLAND:
17        Q.    Did you get to that?
18        A.    Yes. Is there a question
19    pending?
20        Q.    No.
21        A.    I am looking at 270.
22        Q.    Okay. Do you remember her?
23        A.    Generally.
24        Q.    Do you remember what she looked

1    like, anything?
2        A.    I thought she was slender with
3    long brown hair.
4        Q.    When you first meet with her
5    what did you say to her?
6        A.    I tell the complainant and the
7    respondent the same thing. I tell them who I
8    am. I tell them I am an employment lawyer
9    with Cozen, my role in this case is not to be
10    a lawyer but to be an investigator and that I
11    will do an investigation. I make findings of
12    what happened, I tell them, I make
13    determinations of who is telling the truth,
14    and my role is only to determine whether the
15    policy is violated, and that my report goes to
16    Community Standards and anything after that is
17    handled by Community Standards and Community
18    Standards will be in touch with them.
19        Q.    Do you tell them what Community
20    Standards will do after they get your report?
21        A.    Not specifically. You know, I
22    don't think I specifically do, no. I tell
23    them, "When I am done I give my report to
24    Community Standards and then they handle

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1 anything afterwards." I think I probably say
2 from time to time, including whether any
3 discipline is issued or any actions taken on
4 my report.
5    Q.   Okay.
6    A.   I tell them --
7    Q.   Did you say that in this case?
8       MR. MYERS:  Please let her
9    finish the answer.
10       MR. SCHWABENLAND:  I am just
11    following up from that.
12       MR. MYERS:  You interrupted
13    her, Ed.
14       THE WITNESS:  I think you told
15    me what do I say.  Then I usually try
16    to talk to them about, what is your
17    major, why did you come to St. Joe's,
18    what do you want to do when you
19    graduate.  I do try to have some
20    personal conversation.  Then I say,
21    "Let's go through the complaint.  I
22    want to ask you what happened."
23 BY MR. SCHWABENLAND:
24    Q.   When you said sometimes I tell

Page 163

1 them what Community Standards may do or
2 sanctions, did you tell them that in this
3 case?
4    A.   I don't remember.
5    Q.   Okay.  So then you --
6    A.   I do remember telling them
7 everything else I said, though, this is who I
8 am, this is what I do, this is what I decide,
9 and then you're going to hear from Community
10 Standards.
11    Q.   Okay.  Did you tell the
12 complainant that you have the report of
13 Ms. Perry, whether or not you showed it to her
14 or not?
15    A.   I think so.
16    Q.   Okay.  And did she comment on
17 that at all?
18    A.   No.
19    Q.   And so let's go through this,
20 if I could.  During this meeting she had
21 another student with her who acted as her
22 adviser; is that correct?
23    A.   She did.
24    Q.   And the student was, what, a

Page 164

1 friend?
2    A.   I didn't ask.  I believe so.  I
3 do confirm with them that they're a student.
4    Q.   Did the student participate in
5 any discussion or is she -- I take it it was a
6 female student?
7    A.   Yes.
8    Q.   Did this student participate in
9 any discussion?
10    A.   No.
11    Q.   And so it then says -- at least
12 you then start to go, summary of what she
13 says, "On February 23rd, 2018 Jane Roe" -- let
14 me just call her Roe -- "attended a party at a
15 frat house at LaSalle University (she is
16 childhood friends with one of the frat
17 members).  She arrived shortly before
18 11:00 p.m. accompanied by her friends, St.
19 Joe's University students," and then it looks
20 like several people are identified; is that
21 correct?
22    A.   I believe that's true.
23    Q.   Do you know how many friends
24 went with her?

Page 165

1    A.   I could review my notes.  I am
2 thinking two or three.
3    Q.   Okay.  If it is in your
4 notes --
5    A.   Well, they are all redacted
6 too.  It appears to be -- I am looking at
7 Exhibit-7 -- that there are three lines
8 redacted, so there were three other names, but
9 I don't know that.
10    Q.   "She did not have any alcohol
11 before arriving at the party.  Roe chugged 'a
12 couple of beers' after she arrived at the
13 party.  She was dancing with her friends."
14 Did I read that correctly?
15    A.   Yes.
16    Q.   Why did you put in there
17 "chugged"?  Did she say that?
18    A.   That's what she told me.
19    Q.   And the next paragraph, it then
20 goes, "Roe ran into Doe while she was holding
21 a girlfriend's hand to make her way to the
22 bathroom (She did not know Doe)  She rammed
23 into him when she later made her way to a keg.
24 Doe said, 'I am so sorry' -- do you know who

42 (Pages 162 - 165)

CONFIDENTIAL

1 said "I am so sorry"? I think it's Roe. I
2 think I misstated that. After the sentence
3 ending in K --
4      A.    I believe it's the female.
5      Q.    Okay. I misstated that. I
6 apologize. "Roe say, 'I am so sorry.' He
7 said, 'It's okay. I'm' -- then he stated his
8 name and he introduced himself. "Doe then
9 asked if she went to school here, meaning
10 LaSalle. She said she went to Temple." Then
11 it goes on. You wrote, "He said she 'lied
12 about Temple' and that she goes to St. Joe's
13 too."
14      A.    It should be she, she said that
15 she lied.
16      Q.    So she first said that she went
17 to Temple. Is it your understanding when Doe
18 said, "Well, I go to St. Joe's," she then
19 said, "Well, I lied. I go to St. Joe's too"?
20      A.    Yes.
21      Q.    "They began talking. He gave
22 her a Gatorade bottle which contained liquor
23 43 (he told her what was in it). Doe also
24 talked with her friends and was 'really cool

1 with them'." Is that how Roe described it?
2      A.    Yes.
3      Q.    "Roe thought Doe seemed like a
4 nice guy." So as of that time she's relating
5 that she meets this guy, he seems nice, and
6 they are interacting together, right?
7      A.    Yes.
8      Q.    The next paragraph, "They went
9 outside because the room was hot. There was a
10 drug dealer selling cocaine. Roe, who is a
11 recovering drug user, asked the man what price
12 was because she wanted it. Doe told her not
13 to do it, that she would regret it. Roe had
14 shared with Doe that she previously had a drug
15 addition and had attended a recovery high
16 school. Her friend from LaSalle told the drug
17 dealer to leave." Did I read that correctly?
18      A.    Yes.
19      Q.    So is Ms. Roe saying that she
20 was interested in buying cocaine and that
21 Mr. Doe talked her out of it?
22           MS. ENGLE: Objection.
23           THE WITNESS: In general, yes.
24

1 BY MR. SCHWABENLAND:
2      Q.    It then goes on to say, "when
3 inside." I take it you're referring to both
4 of them?
5      A.    Correct.
6      Q.    "She went to the bathroom to
7 compose herself after the encounter with the
8 drug dealer. Her friend and Doe then rejoined
9 her. She told them all that she did not buy
10 drugs and Doe told her not to. Roe thinks
11 that made him a decent guy." Did I read that
12 correctly?
13      A.    Yes.
14      Q.    And so up until that point they
15 are getting to know one another and she thinks
16 he's an okay guy and she's spending some time
17 with him, right?
18           MS. ENGLE: Objection.
19           THE WITNESS: Yes.
20 BY MR. SCHWABENLAND:
21      Q.    Then it goes on to say that "We
22 are kissing at the party." I take it you mean
23 Doe and Roe?
24      A.    Yes.

1      Q.    "She consented to this and had
2 no complaints about it." Then you have down,
3 I take it you mean "Doe asked her if she
4 wanted to come back to St. Mary's. Roe said
5 yes and offered to call an Uber. Doe had come
6 to the party with a friend, so they left in
7 the friend's car. She text her friend, said
8 she was leaving. Roe said that Doe was
9 'flirting' with other girls in the car but she
10 did not care. She was sitting on Doe's lap in
11 the car." And so far I've read that
12 correctly?
13      A.    Yes.
14      Q.    So as of that point they are
15 kissing. Did you inquire as to how they are
16 kissing?
17      A.    I don't believe so.
18      Q.    Did you inquire if they were
19 touching each other's face or neck?
20      A.    I do not believe so.
21      Q.    But from your interview of
22 Ms. Roe is Roe giving her consent so far to
23 her contact with Doe?
24      A.    Yes.

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1    Q.    And as of that point she's
2  thinking he's a "decent guy"?
3         MS. ENGLE:  Objection.
4         THE WITNESS:  That's what she
5  told me.
6  BY MR. SCHWABENLAND:
7    Q.    When Ms. Doe indicated that she
8  was asked to go back to St. Mary's by Doe was
9  it your understanding that she consented, she
10 was in agreement to do that?
11   A.    Yes.
12   Q.    Did she get into any discussion
13 about him flirting with the other girls or why
14 is she bringing it up?
15   A.    No.  Only what I have written
16 here.
17   Q.    I am going back.  She indicated
18 that she and her girlfriends arrived at
19 approximately 11:00 p.m.; is that correct?
20   A.    I don't know.
21   Q.    Go back.  Page 3, at the
22 beginning of it, that second paragraph, "She
23 arrived shortly before 11:00 p.m. accompanied
24 by her friends."  That's Bates stamp 270.

Page 171

1    A.    That's arriving at the party.
2    Q.    That's what I meant.
3    A.    All right.  I thought you meant
4  to the dorm.
5    Q.    No.  I apologize.  I meant she
6  arrived at the party with her friends at about
7  11:00.
8    A.    Correct.  Yes.
9    Q.    Did she indicate how long they
10 had been there prior to leaving?
11   A.    I don't remember.
12   Q.    Did you try to inquire as to
13 timing at all?
14   A.    Yes.  I don't remember off the
15 top of my head, but she showed me the texts to
16 her friends, which I think are at, like, 2:30
17 in the morning, something like that, when she
18 leaves St. Mary's.
19   Q.    Okay.
20        MR. MYERS:  If you want to look
21 at the texts, you can.
22 BY MR. SCHWABENLAND:
23   Q.    The text to her friend at St.
24 Mary's, it says 2:33.

Page 172

1    A.    2:33, right, Page 290.
2    Q.    But my question is:  Did she
3  indicate when she left LaSalle with Doe?
4    A.    I don't remember that.
5    Q.    At least you know that she had
6  her friends there and Doe had his friend there
7  who drove, right?
8    A.    Right.
9    Q.    And do you know that, according
10 to her statement, they had other girls in the
11 car that they were going to drop off?
12   A.    I know she said -- or he said
13 they were dropping off the LaSalle students.
14   Q.    Okay.
15   A.    I don't know whose friends they
16 were.  Somebody was dropped off.
17   Q.    And you don't know where they
18 were going to be dropped off?
19   A.    Right.
20   Q.    But if they were LaSalle
21 students it would be someplace close by?
22   A.    You would think, but you don't
23 know.
24   Q.    Do you know how long it took

Page 173

1  them to get back to St. Joe's University?
2    A.    I do not.
3                _ _ _
4         (Whereupon, Exhibit Malloy-8
5         was marked for purposes of
6         identification.)
7                _ _ _
8  BY MR. SCHWABENLAND:
9    Q.    I am showing you what's been
10 marked as Exhibit-8.  It's a copy of a text
11 message and it's a text message from Roe to
12 her friends saying -- what's the time on that?
13   A.    1:31.
14   Q.    Okay.  At 1:31 she indicates
15 she is outside, there is a drug dealer selling
16 coke and she wants some, right?
17   A.    Right.
18   Q.    Okay.
19   A.    It's the same as 293.
20   Q.    Okay.  And so at least by 1:31
21 she's outside and that's when Doe, according
22 to Roe, talks her out of buying the coke,
23 right?
24   A.    Yes.

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1    Q.    So --
2    A.    I am not sure I can agree with
3 that. Okay?
4    Q.    Okay.
5    A.    The text is timed 1:31, "Guys,
6 there is coke here." That does not mean that
7 she already didn't talk to the guy and went
8 inside. So I don't know if this is
9 contemporaneous with her talking to the coke
10 guy or not. I just don't know.
11    Q.    Well, at least there is
12 something going on about the coke. Can I see
13 that? And her exact words, "Guys, there's
14 coke here. I want it." So at least that's
15 when she is still at LaSalle, right?
16    A.    At the party, yes, seems to be.
17    Q.    So what you're saying is that
18 she may still not be outside, she may be back
19 in and texting that?
20    A.    Correct.
21    Q.    Was it your understanding there
22 were a lot of people there at the party?
23    A.    Yes.
24    Q.    So, nevertheless, when she goes

Page 175

1 back inside she goes to the bathroom and then
2 reunites with her friends and Doe; is that
3 correct?
4    A.    That's what she told me, yes.
5    Q.    So we are now into it being
6 after 1:30 a.m., right?
7    A.    Yes.
8    Q.    Did you ask her any questions
9 about, "What time did you leave?" or "How long
10 did it take you to get back to St. Joe's?" or
11 anything about timing? I didn't see anything
12 in your handwritten notes. Go ahead and take
13 a look.
14    A.    I don't remember. I have the
15 clear impression that they were only on St.
16 Joe's campus for a very short period of time.
17 I don't know if that's an impression I put
18 together from talking to both of them. But I
19 would agree with you, there is nothing in my
20 handwritten notes on that.
21    Q.    I will represent to you that
22 later on you put in there that they were in
23 St. Mary's about 15 minutes. Does that ring a
24 bell?

Page 176

1    A.    I'd have to see it.
2    Q.    Go ahead.
3    A.    What page are you on? Yes, I
4 see, at the bottom of Page 272. Yes.
5    Q.    Roe estimated that they were in
6 the little room at St. Mary's for 15 minutes?
7    A.    Yes.
8    Q.    Okay. That's her estimation,
9 but did you ask her what time did they get
10 back to St. Mary's?
11    A.    I don't recall doing that.
12    Q.    Did you ask for any
13 surveillance tapes or swipe card monitoring
14 things to find out when they got back?
15    A.    I did not.
16    Q.    Is there some reason why you
17 didn't?
18    A.    I didn't think the complaint
19 turned on when they got back.
20    Q.    Well, the complaint may turn on
21 timing or how long they were alone together,
22 don't you think?
23        MS. ENGLE: Object to form.
24        THE WITNESS: She said they

Page 177

1    were back for 15 minutes.
2 BY MR. SCHWABENLAND:
3    Q.    I understand, but that could be
4 right or wrong.
5        MS. ENGLE: Objection.
6        THE WITNESS: My own opinion is
7    I did not think the complaint turned
8    on when they got back.
9 BY MR. SCHWABENLAND:
10    Q.    So am I correct that you didn't
11 ask to -- inquire of her any about what time
12 they left or arrived back at St. Mary's?
13        MS. ENGLE: Objection. Asked
14    and answered.
15        THE WITNESS: I don't remember
16    doing so, although I do have the firm
17    impression they were only back at St.
18    Mary's for a small period of time.
19 BY MR. SCHWABENLAND:
20    Q.    Okay. From your discussions
21 with Ms. Roe did you seek to interview her
22 friends, either those she was at the party
23 with or anybody who came to meet her after she
24 left St. Mary's?

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1     A.    I did not. I would typically
2  interview the complainant and then the
3  respondent next and then make a decision based
4  on whether anybody else needed to be
5  interviewed.
6     Q.    Did you consider interviewing
7  her girlfriends?
8     A.    I don't know if "considered" is
9  the right word. I did not feel that there was
10 the need to interview anybody else, because, I
11 believe -- only Jane and John were in the room
12 together and there were no other witnesses to
13 that and he agreed that when he came back to
14 the room after leaving for a short period of
15 time that she was on the phone and quickly
16 left afterwards.
17    Q.    Okay. But in terms of finding
18 out before they left LaSalle, did you consider
19 asking her friends how they appeared, were
20 they enjoying themselves kissing, were they
21 hugging each other? Did you think that would
22 be helpful in figuring out what happened that
23 night?
24    A.    I did not.

Page 179

1           MS. ENGLE: Objection to form.
2           MR. MYERS: I would ask you to
3     clarify the question as to whether --
4     are you asking whether she thought
5     interviewing the friends would be
6     helpful on the question of whether
7     they were kissing and enjoying
8     themselves at LaSalle or some other
9     question?
10          MR. SCHWABENLAND: I asked her.
11    She answered me. So you can rephrase
12    anything you want, but let me --
13          MR. MYERS: You can leave it in
14    the ridiculous, ambiguous state you
15    left it. It's fine with me. I'm not
16    worried about the record. I'd ask you
17    to try to be a little more precise,
18    Ed.
19 BY MR. SCHWABENLAND:
20    Q.    Let me go to that last
21 paragraph that I read. That's Page 4, which
22 is Bates stamped 271. Other than saying they
23 were kissing at the party -- and you're
24 referring to what Roe is telling you about Doe

Page 180

1  and Roe kissing at the party, right?
2     A.    Yes.
3     Q.    Did you inquire any more as to
4  how often they would kiss, whether they would
5  hold each other, what was going on, was one
6  caressing the neck or the head, anything like
7  that?
8     A.    I did not.
9     Q.    Was it your knowledge that
10 Ms. Roe left on her own free will to go back
11 to St. Mary's with Mr. Doe?
12    A.    Yes.
13    Q.    Now, go to the next page.
14          MR. MYERS: 272?
15          MR. SCHWABENLAND: 272.
16 BY MR. SCHWABENLAND:
17    Q.    "After arriving at St. Mary's
18 they went to the kitchen for water. Roe said
19 she needed to sober up a little." Did she
20 explain any more than what --
21    A.    No.
22    Q.    Did she say what she meant by
23 that?
24    A.    No.

Page 181

1     Q.    Did you inquire of that?
2     A.    I don't recall doing so.
3     Q.    Okay. "Doe said his roommate
4  was asleep but they could go to the third
5  floor. After arriving at a small room, Doe
6  closed the door. Ms. Roe does not know if he
7  locked it. There were two chairs and two
8  small couches without arms. They were
9  kissing, which Roe said she consented to and
10 was fine with. Then Doe sat on top of her and
11 put his hand around her throat and squeezed
12 her neck. He was still kissing her while he
13 was squeezing her neck. Doe [sic]
14 believes she said, 'What the fuck'."
15    A.    No. I think that's Roe.
16    Q.    Did I say Doe? I'm sorry.
17 Thank you. "Roe believes she said, 'What the
18 fuck'. He pulled away. Doe said she saw his
19 eyes and he looked 'so scary'."
20    A.    I believe that's Roe.
21    Q.    I apologize. Let me read that
22 again.
23    A.    Jane and John are easier.
24    Q.    Okay. Let do it that way. "He

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1  pulled away.  Jane said she saw his eyes and
2  he looked 'so scary'.  John moved away from
3  her and left the room (the lights in the room
4  were on).  Roe said this reminded her of a
5  previous abusive boyfriend who would squeeze
6  her neck."  Did I read that paragraph -- after
7  you were nice enough to correct me, did I read
8  that correctly then?
9      A.   I believe so.
10     Q.   Okay.  So let's get to the
11 point here.  At a certain point when they
12 returned to St. Mary's they go in the kitchen
13 for water.  That's on a different floor; is
14 that your understanding or you don't know?
15     A.   I assumed it was on a different
16 floor and the little room was upstairs.
17     Q.   There is no reference to
18 whether or not they were kissing while in the
19 kitchen.  Did you ask her that at all?
20     A.   I don't believe so.  She didn't
21 tell me that.
22     Q.   They go in, up to the third
23 floor, and they both sit down on two chairs;
24 is that correct?

Page 183

1      A.   Yes.
2      Q.   Okay.  And up until that point
3  the kissing was consented to and she said that
4  was fine?
5      A.   Yes.
6      Q.   Okay.  There's no mention on
7  here about if they had their hands on each
8  other's neck or head while they were kissing.
9  Did you inquire as to that?
10     A.   I don't believe I asked Jane,
11 but I asked John.
12     Q.   Okay.  And what did John say?
13     A.   I believe he says yes, they
14 were touching each other's necks and throats.
15     Q.   Why didn't you ask Jane?
16     A.   I don't -- I don't know.
17     Q.   Okay.  Then she says that "John
18 sat on top of her and put his hand around her
19 throat and squeezed her neck."  Now, when she
20 said that did you ask what she meant by
21 sitting on top of her?
22     A.   Yes.  She said he moved over
23 and, like, sat on her lap.
24     Q.   Is he sitting sideways and

Page 184

1  kissing her?  Is he straddling her?  Do you
2  recall?
3      A.   I don't recall.
4      Q.   But, nevertheless, he is
5  sitting on her lap?
6      A.   Right.  I specifically remember
7  saying, "What do you mean, sitting on your
8  lap?"
9      Q.   And up until that point they
10 had been kissing and caressing each other,
11 right?
12     A.   Yes.
13     Q.   And then she mentioned that he
14 took his one hand and put it at her neck?
15     A.   Yes.
16     Q.   Had his hand been on her neck
17 while they were kissing?
18     A.   If you remember what I told you
19 a minute ago, I didn't ask her that, but he
20 told me, yes.
21     Q.   Did you accept that in your
22 analysis?
23     A.   Yes.
24     Q.   And so up until that point of

Page 185

1  the squeeze was it your understanding that she
2  had given her consent to him to kiss her and
3  to both engage in touching each other's face
4  and neck?
5      A.   She gave her consent to
6  kissing, which as my analysis says, to some
7  extent includes touching your face and neck
8  area.
9      Q.   All I am asking is, was it your
10 understanding in your analysis that as of that
11 time, until the squeeze, the consent had been
12 given for him to have his hand on her neck and
13 head while kissing?
14     A.   Yes, as my analysis explains.
15     Q.   Okay.  Now, she said that he
16 squeezed her neck.  Did she demonstrate to you
17 how he squeezed with the one hand?
18     A.   I believe she did.  She
19 demonstrated by putting her hand on her neck.
20     Q.   So she took, what, a thumb on
21 one side of the neck and fingers on the other
22 side of the neck?
23     A.   Yes.  As I recall, yes.
24     Q.   And at what point did she say

47 (Pages 182 - 185)

CONFIDENTIAL

1  the words, "What the F"?
2      A.    While he was squeezing her.
3      Q.    Immediately when he squeezed
4  her?
5      A.    She said it so he would stop.
6      Q.    Pardon me?
7      A.    She said it so he would stop.
8      Q.    I understand that, but, if you
9  know, as soon as he started to squeeze her did
10  she say that so he would stop or did she allow
11  it to keep going for several minutes?
12      A.    I don't know.  I certainly got
13  the impression that it was immediately,
14  because it hurt.
15      Q.    So at that point she's calling
16  his attention to the fact that he is doing
17  something that she doesn't like?
18      A.    Yes.
19      Q.    And he stops right away?
20      A.    Yes.
21      Q.    She then says he pulled away
22  and was that immediate too, after she said,
23  "What the F"?
24      A.    Yes.

1      Q.    And then she said, "She saw his
2  eyes and he looked 'so scary'."  And "so
3  scary" is in quotes.  Did she say how long she
4  saw his eyes?
5      A.    No.
6      Q.    But she then indicates that he
7  left the room for some reason and that when he
8  squeezed her neck and looked at his eyes she
9  was -- it reminded her of a previous abusive
10  boyfriend who would squeeze her neck?
11      A.    Yes.
12      Q.    Did she say why he left the
13  room, if you know?
14      A.    She did not.
15      Q.    Did you ask her any questions
16  about the previous report issued by Dr. Perry
17  and, more specifically, it says -- this is at
18  Bates stamp 284, where she said she felt she
19  couldn't breathe and at that point she froze
20  and had something of an flashback regarding
21  her old boyfriend.  But there is no indication
22  that she said "What the F" or alerted him that
23  she did not like what he was doing at that
24  point?

1      A.    You're referring to Page 284?
2      Q.    284, yes.
3      A.    It says what it says.
4      Q.    Okay.  But did you review that
5  with her, about, "Well, you didn't say" -- if
6  you know, "You didn't say that you said
7  anything like 'What the F'"?
8      A.    I did not.
9      Q.    Okay.  Did you ask her any
10  questions about her boyfriend?
11      A.    No.
12      Q.    The reason I say that is that
13  she claims that whatever he was doing to the
14  throat triggered her memory of this boyfriend,
15  right?
16          MS. ENGLE:  Object to the form.
17          MR. MYERS:  Objection to the
18      form.  She wasn't at the deposition.
19      She can't possibly know what was
20      explained at Jane Roe's deposition.
21      So I'm not going to let her answer
22      that question.  If you want to
23      rephrase it, you can.
24

1  BY MR. SCHWABENLAND:
2      Q.    I am asking if you asked her
3  here.  She basically says that it reminded her
4  of a previous abusive boyfriend who would
5  squeeze her neck.
6      A.    That's what she told me and I
7  did not inquire into the boyfriend further.
8      Q.    But why didn't you -- aren't
9  you?  And the reason I ask that is, aren't you
10  dealing with trying to figure out, is this an
11  overreaction or a misperception of something
12  because of a past experience?
13      A.    I am focusing on whether the
14  conduct happened and whether it violated the
15  policy.
16      Q.    So in focusing on whether the
17  conduct happened you are interviewing Ms. Roe,
18  so it's important to know what her perception
19  is at the time; is that correct?
20      A.    It's important to know what
21  happened and whether it violated the policy.
22      Q.    But if --
23      A.    I took the boyfriend thing as
24  that's why it scared her so much.

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1    Q.    Okay.
2    A.    Not that it went to whether it
3  happened or not.  That's the way that she
4  presented it to me, "This reminded me of."
5    Q.    Okay.  Are you done?
6    A.    Yes.
7    Q.    Okay.  So you did not inquire
8  any more about how the boyfriend may have
9  abused her in the past?
10    A.    Correct.
11    Q.    You just took what she said at
12  face value?
13    A.    I take nothing at face value.
14  I recorded in the part of this paper that we
15  are talking about what she told me.
16    Q.    I understand.  But you're not
17  probing into that any further, right?
18    A.    I did not ask her any further,
19  correct.
20    Q.    And so did you ask her any
21  questions about her medical background?
22    A.    No.
23    Q.    Now, she indicated that she had
24  been clean for about two years but had been

Page 191

1  addicted to drugs, right?
2    A.    I think that's what the Perry
3  complaint says.
4    Q.    Okay.  But did you ask her any
5  other questions about that?
6    A.    No.
7    Q.    Did you ask her if she had been
8  taking any drugs, even marijuana or anything?
9    A.    No.
10    Q.    You did ask her if she had
11  anything to drink that night before getting to
12  the party and she said no, but she had a
13  couple of beers that she chugged when she got
14  there, right?
15    A.    I don't recall whether I asked
16  her that or she told me that, but I did know
17  that.
18    Q.    So now we have a situation
19  where she has an ex-boyfriend that she thought
20  abused her, who would squeeze her neck and you
21  have Doe with his hand on her neck at a
22  certain point.  So the question you have to
23  determine, is she actually being squeezed or
24  is she overreacting; isn't that one of the

Page 192

1  possibilities?
2        MS. ENGLE:  Objection.
3        THE WITNESS:  I have to
4  determine what happened.
5  BY MR. SCHWABENLAND:
6    Q.    I understand that, but you
7  determine by asking questions, right?  You're
8  an investigator?
9    A.    I am an investigator.
10    Q.    Okay.  So did you ask her any
11  more questions about her boyfriend?
12    A.    I did not.
13    Q.    I will represent to you that
14  Ms. Roe has indicated that she has -- had been
15  diagnosed with PTSD because of a previous
16  relationship with a boyfriend over a six-month
17  period where he did certain things to her.
18  Did she mention she had PTSD?
19    A.    No.
20    Q.    Would you agree with me that
21  that would be relevant to a determination
22  whether or not she is misperceiving things?
23    A.    I did not view it as such.  I
24  did not know it and I did not view it as such.

Page 193

1    Q.    It then goes on in the next
2  paragraph that Jane -- I am going to say Roe
3  and Doe -- "Roe texted her friends.  Doe came
4  back to the room while she was texting.  Roe
5  thought that he may have been expecting more,
6  like something sexual.  Roe text" -- and I
7  guess what's redacted is one of her
8  girlfriends -- "to act like she needed her.
9  So that girlfriend called" -- I'm sorry.
10  There is a bunch of redaction.  Redaction,
11  "Called," somebody redacted, redacted, "text,"
12  redacted, "who called her back."  Then, "Roe
13  said, No, I am okay.  "Her friend," that's
14  redacted, "said Do you want me to come?  Roe
15  replied, Yes."  Roe left and Roe met her
16  outside.  Doe gave her his sweatshirt and said
17  she might be cold.  Doe text her at 2:39 a.m.
18  that he was going to bed but would leave his
19  phone on and he hoped her friend was okay.  He
20  text, Hey, to her the next day, which she
21  ignored."  Then at the very end, "Roe
22  estimated that they were in the little room at
23  St. Mary's for 15 minutes."  Is that the
24  extent of your interview with Ms. Roe?

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1    A.    It is.
2    Q.    Did you consider any further
3  follow-up?
4    A.    I just wanted to make one
5  correction.  I think when you were reading you
6  said that Roe met her outside and I think that
7  redaction has to do with her friend, a friend
8  met her outside.
9        MS. ENGLE:  Also, there are two
10       more paragraphs on the next page that
11       have to do with the Roe interview.
12       MR. SCHWABENLAND:  Okay.  Thank
13       you.
14  BY MR. SCHWABENLAND:
15    Q.    It continues, the interview,
16  "On Sunday," it says, I would imagine Roe and
17  somebody else, I take it one of her
18  girlfriends, at least or more, "were at CVS in
19  the parking lot.  Ms." somebody redacted
20  "noticed bruises on Ms. Roe's neck.  She took
21  photographs, which Roe gave to the
22  investigator."  She gave you photographs,
23  right?
24    A.    Yes.

Page 195

1    Q.    And then you put in there, "I,"
2  meaning you, "asked Roe why she thought that
3  Doe squeezed her neck.  She said she did not
4  view it as pleasurable.  She did not ask for
5  it and did not consent to it.  She thinks he
6  did it to hurt her, because she felt he was
7  choking her."  Did I read that correctly?
8    A.    Yes.
9    Q.    Okay.  But am I correct that
10  you later found that Doe did not intend to
11  cause her any harm?
12    A.    Yes.  Physical harm, yes.
13    Q.    And that's the extent of your
14  interview with Ms. Roe?
15    A.    Yes.
16    Q.    Okay.  You then go on to
17  interview Doe on that same day.  By the way,
18  do you know how long the interview lasted of
19  Ms. Roe?
20    A.    I don't.  I would estimate
21  about an hour.
22    Q.    Okay.  And how about Mr. Doe,
23  same estimation?
24    A.    Yes.

Page 196

1    Q.    And so the interview with
2  Mr. Doe, again, you would have said the same
3  thing that you said to Ms. Roe?
4    A.    As an introduction, yes.
5    Q.    And so you have down, "Doe
6  first met Roe at a party at LaSalle on
7  February 23, 2018, bumped into each other,
8  introduced, and began a conversation.  They
9  were kissing," which who said initiated it?
10  Is it Doe or Roe?
11    A.    I don't know.  You have to look
12  at an unredacted one, unless I can tell from
13  my notes.
14    Q.    But they were kissing, which
15  either he or she initiated, and dancing,
16  correct?
17    A.    Correct.
18    Q.    "Roe said she wanted to see St.
19  Mary's and they returned to campus."  I take
20  it Roe and Doe "began kissing again in the
21  kitchen at St. Mary's.  They went to a room on
22  the third floor and were kissing.  Doe said he
23  had his hands on Roe's neck area while he
24  kissed her face and she, likewise, touched

Page 197

1  Doe's neck area while she kissed him."  So
2  that's your conversation with him?
3    A.    So far, yes.
4    Q.    Okay.  "Doe said he does not
5  remember squeezing her neck area and does not
6  think he did it (He continuously told me that
7  if Roe said he did so he would not say that
8  she was lying).  I tried to keep him focused
9  on what he actually independently remembered
10  about the evening.  He said he is shocked by
11  the complaint, considers himself a respectful
12  person and wants to learn from this
13  experience."  Now, is it clear that Doe said
14  to you he did not recall or remember ever
15  squeezing her neck area and does not think he
16  did that?
17    A.    When I specifically asked him
18  that.  So he was overwhelmingly, "I am not
19  going to call her a liar.  If she said I did
20  it, I did it.  I am going to take
21  responsibility.  I am going to learn from
22  this," continuously said things like that.
23  And I said, "I want you to focus on what you
24  recall specifically happening."

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

1    Q.    Okay.
2    A.    When I said, "Do you recall" or
3  "Did you squeeze her neck area," he said he
4  didn't remember and does not think that he did
5  that.
6    Q.    Okay.  So he denied it, at
7  least when you had him focus on that, right?
8        MS. ENGLE:  Object to the form.
9        MR. MYERS:  Object to the form
10  of the question.
11  BY MR. SCHWABENLAND:
12    Q.    Did he deny it?
13    A.    I would not consider that a
14  denial in the context of the whole interview.
15    Q.    I understand.  But you didn't
16  perceive that as him trying to be a gentleman
17  and he was trying to figure out why for some
18  reason is she claiming she felt uncomfortable?
19        MS. ENGLE:  Object to the form.
20        THE WITNESS:  I did not
21  perceive it as that.
22  BY MR. SCHWABENLAND:
23    Q.    So did you perceive that as an
24  admission?

Page 199

1    A.    You have to read the whole
2  thing.  You can't just take a sentence out of
3  context.  But he did not deny squeezing her
4  neck.
5    Q.    Did he admit to squeezing her
6  neck?
7    A.    He said he didn't remember and
8  didn't think that he did it when asked
9  specifically.
10    Q.    Is that an admission or a
11  denial?
12    A.    I think it's vague.
13    Q.    So you can't tell one way or
14  the other?
15        MS. ENGLE:  Objection.
16        THE WITNESS:  If you are just
17  focusing on that question.  In the
18  context of the rest of the
19  interview --
20  BY MR. SCHWABENLAND:
21    Q.    Okay.
22    A.    In the context of the rest of
23  the interview I did not view that as a denial.
24    Q.    So in the context of the rest

Page 200

1  of the interview did you view that as an
2  admission?
3        MS. ENGLE:  Objection.  Asked
4    and answered.
5        THE WITNESS:  I don't think I
6    viewed it as an admission, but I
7    didn't view it as denial, because he
8    also told me --
9  BY MR. SCHWABENLAND:
10    Q.    What is the other option, then?
11        MS. SCHIMELFENIG:  Wait.  She
12    was speaking.
13        MR. SCHWABENLAND:  Excuse me.
14  BY MR. SCHWABENLAND:
15    Q.    What is the other option?
16        MR. MYERS:  No.  Excuse me.
17    Read back the question, read back the
18    answer, and then you get to finish
19    your answer.
20
21        _ _ _
22        (Whereupon, the court reporter
22    read back from the record.)
23
24        _ _ _
24        THE WITNESS:  So my answer is,

Page 201

1    you have to look at the totality of
2    the interview.  He said he wouldn't
3    call her a liar, it was a learning
4    experience, he was going to learn from
5    it, that people have told him that he
6    is too strong, when I told him that
7    she said it hurt her and that she had
8    bruises, and that his text messages
9    with which he gave me said that he
10    wondered if she thought he was too
11    aggressive or too forceful.  So I put
12    all of that together.
13  BY MR. SCHWABENLAND:
14    Q.    The text message he gave you
15    was his statement?
16    A.    I don't know if it was a
17  statement.  He told me that he wrote it up
18  after he met with whoever he met, Emily,
19  whoever he met with in Community Standards.
20    Q.    Okay.  And he brought that with
21  him?
22    A.    I view a statement as something
23  more formal and signed.  But they were his
24  notes that he wanted me to have.

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1      Q.     So in his notes did you
2  recognize that he was questioning why on Earth
3  she was feeling uncomfortable?
4      A.     I don't know.  "I wonder if I
5  was holding her in some way that felt forceful
6  or aggressive, because, although that was not
7  my intent, it clearly made her uncomfortable,"
8  so that's what it reads.
9      Q.     Because he had been told by
10  Emily Forte that it involves something to do
11  with some roughness on his part, right?
12      A.     Right.  But he says "forceful
13  or aggressive."
14      Q.     I understand.  But in terms of
15  trying to figure out what he was thinking did
16  you take into consideration that his statement
17  was such that he even considered, "Well, maybe
18  I pushed her into the chair or pushed her
19  hip," right?
20      A.     I was looking at all of it.
21      Q.     Okay.  Was he respectful during
22  your meeting?
23      A.     Yes.
24      Q.     Let's go back to the statement.

Page 203

1  "Doe left the room to get his laptop so the
2  two of them could watch a movie.  When he
3  returned Roe was on the phone.  She said she
4  needed to leave because a friend was sick.
5  According to Doe, Roe did not seem
6  uncomfortable.  He walked her down to the
7  lawn.  She turned around and kissed him and
8  said good-bye and left with a female."  Does
9  that conclude your notes of the interview of
10  Doe?
11      A.     It concludes the summary that's
12  typewritten here.  My notes are fuller than
13  that and then, you know, there is other
14  information that wasn't necessarily written
15  down.  But you read the document, I believe.
16      Q.     When you say your notes, you're
17  talking about your handwritten notes?
18      A.     Yes.
19      Q.     And what else is in the notes
20  there?
21      A.     Well, we'd have the compare it
22  line by line, right?  So the document that we
23  are reviewing, Exhibit-6, is a summary of the
24  interview.

Page 204

1      Q.     Okay.  In your handwritten
2  notes, starting at 384 is your notes of --
3  you're interviewing him, right?
4      A.     Yes.
5      Q.     He relates that he is a
6  sophomore?
7      A.     Yes.  And the introductory part
8  that I told you about that I did is not
9  written down here.
10      Q.     The two met at LaSalle, right?
11      A.     That's what it says.
12      Q.     He actually bumped into her and
13  then they had a conversation and then they
14  found themselves kissing, right?
15      A.     Yes.
16      Q.     What is the next word?
17      A.     He said that she was vaping an
18  electronic cigarette and was blowing smoke
19  into his mouth.
20      Q.     So that was the vapor thing?
21      A.     Yes.
22      Q.     "They kissed, talked and
23  danced," is that what he said?
24      A.     Yes.

Page 205

1      Q.     And then what's the next line,
2  "I was" what?
3      A.     "Telling her about St. Mary's."
4      Q.     And then the next thing, "She
5  said she wanted to see it, the car" and then
6  somebody's name, I guess that's his buddy,
7  "was driving"?
8      A.     I believe so.
9      Q.     Okay.  "Dropped off LaSalle's
10  kids first.  Dropped us at St. Mary's.
11  Kissing in the kitchen."  They go to the
12  kitchen, right?
13      A.     Correct.
14      Q.     "He doesn't want to make
15  someone make uncomfortable"?
16      A.     "Don't want to put someone,
17  make uncomfortable."
18      Q.     He says, "I've thought about
19  it."  Thought about what, this idea, what he
20  could possibly have done?  It's your notes
21  so --
22      A.     I don't know.  He said he
23  thought about it.  I thought that to be the
24  allegations against him.

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

```
 1      Q.    "They were touching and
 2 talking;" is that correct?
 3      A.    Yes.
 4      Q.    Something "to third floor for
 5 Netflix."
 6      A.    "Up to third floor for
 7 Netflix."
 8      Q.    Okay.  What's the next word?
 9      A.    "Walked up to third floor."
10      Q.    Okay.  "I pushed her to chair,"
11 that's what he said?
12      A.    Yes.
13      Q.    And that's what he said in
14 his -- whatever he handed you as saying
15 possibly he thought pushing her in the hip?
16      A.    Was too aggressive or
17 something, yes.
18      Q.    "Maybe" what?
19      A.    "Maybe inappropriate to push
20 her.  Meant playful."
21      Q.    So he's saying, "I meant it to
22 be playful," but he is speculating, was it
23 inappropriate to push her, right?
24      A.    Yes.
```

Page 207

```
 1      Q.    But he indicated she was
 2 smiling during that?
 3      A.    That's what he said.
 4      Q.    And then he says, "I didn't
 5 pick up she was uncomfortable."  Did I read
 6 that correctly?
 7      A.    Yes.
 8      Q.    And then he says again they
 9 were kissing.  Then he says, "I" something
10 "going to get stuff, the laptop."  What's
11 that?
12      A.    He left for some reason.  I
13 said, "I was going to get stuff, laptop."
14      Q.    "I came back."  They kissed
15 again, according to him, right?
16      A.    Yes.
17      Q.    "She gets a phone call.  Said
18 friends call each other."  What is the next
19 word?
20      A.    "Friend sick, so need to help
21 her, McShain."  That's another dorm.
22      Q.    And then he kissed her as they
23 are going out, right?
24      A.    Yes.
```

Page 208

```
 1      Q.    "Said she needed to leave."
 2 And she seemed fine at the time according to
 3 Doe, right?
 4      A.    Yes.
 5      Q.    Outside her girlfriend was
 6 waiting, or "Girl waiting," right?
 7      A.    Yes.
 8      Q.    "She," meaning Roe, "turned
 9 around and kissed Doe again and said
10 good-bye," right?
11      A.    Yes.
12      Q.    Then he says, "I text her,"
13 right?
14      A.    Right.
15      Q.    Then you go down and he states,
16 "I was confused.  I didn't realize she was
17 uncomfortable.  I consider myself respectful
18 person.  I don't remember squeezing her neck.
19 I don't think she is lying" or -- was lying or
20 is lying?
21      A.    "Is" is what I wrote.
22      Q.    "I didn't mean to make her
23 uncomfortable.  I," what, "should have" --
24      A.    "Should have made her
```

Page 209

```
 1 comfortable," I assume.  I write as fast as I
 2 can.
 3      Q.    I understand.  I am worse than
 4 you are.  "I didn't think it was both hands"?
 5      A.    That's what I wrote, yes.
 6      Q.    "It wasn't okay if I did it.
 7 Mortifying by this."  He meant to say I am
 8 mortified?
 9      A.    Mortified, probably, by this.
10      Q.    "I thought she had hands on my
11 neck," that's what he said.  "I never meant to
12 do it.  I don't recall.  So specifically I
13 would say she was not lying.  I've been told
14 strong," what, that he is strong?
15      A.    Yes.  I told him that she said
16 that it hurt her and that there were bruises
17 and he said, "I have been told I was strong."
18      Q.    "Maybe being affectionate," so
19 that's coupled with "I've been told strong,"
20 right?
21      A.    It's the next line on my notes.
22 That's all I can say.
23      Q.    So then the next thing is --
24 you have a star there -- "I don't remember
```

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1 squeezing neck."
2      A.     This is where I specifically
3 said to him, "Don't tell me about what you
4 think she said" or, you know, to try to get
5 him off this, you know, "I don't deny it.
6 Learn experience. I am not saying she's
7 lying." This is where I specifically said, "I
8 want to know what you specifically remember
9 about this" and tried to focus on that.
10      Q.     Okay.
11      A.     I didn't leave it the way it
12 was, as you can see. I tried to get him to
13 focus on that and that's when he said "I don't
14 remember squeezing her neck."
15      Q.     "Hand on neck while kissing"?
16      A.     Yes.
17      Q.     "She didn't say uncomfortable,"
18 I take it she didn't say she was
19 uncomfortable?
20      A.     Right.
21      Q.     "I take full responsibility. I
22 take this as a learning opportunity. I didn't
23 realize she was leaving because of this. She
24 went to high school in Utah, rehab." What's

Page 211

1 that, "Oh, no"?
2      A.     I asked him this. I said, "Did
3 you know that she had been a former drug
4 abuser?" He says, "Yes. She went to high
5 school in Utah, rehab." I don't know what --
6 "Okay now. Two years clean."
7      Q.     She had taken coke and heroin.
8 Then what is the next thing?
9      A.     "Coke outside," he was telling
10 me about the cocaine dealer outside who was --
11 Jane was asking how much it cost. "You will
12 regret it. One day clean." He was saying
13 that "You will regret it, because now you're
14 two years clean and if you do this tonight you
15 will only be one day clean," that's what he
16 was explaining to me.
17      Q.     Okay. It says, "I was
18 shocked."
19      A.     "I was angry about guys who are
20 not respectful. Consent to me is important.
21 I want to make it right."
22      Q.     And then what does he say?
23      A.     "I was shocked with complaint.
24 Pushing her to chair, playful. Hand on neck

Page 212

1 when kissing."
2      Q.     Okay.
3      A.     "She seemed fine."
4      Q.     Then this thing about liquor,
5 "Liquor 43 plus Gatorade to mix."
6      A.     Right.
7      Q.     "Not much. I had more to drink
8 than she did. She was fine, completely in her
9 senses."
10      A.     I was trying to discover
11 whether there was any incapacitation issue.
12 It didn't seem to be.
13      Q.     There was no indication by
14 either or him that she was in some way
15 inebriated or lacked her mental faculties?
16      A.     That is correct.
17      Q.     So is that the extent of your
18 conversation with him?
19      A.     Yes.
20         MR. SCHWABENLAND: Take a short
21 break?
22         THE WITNESS: Sure.
23              _ _ _
24         (Whereupon, a recess was held

Page 213

1 from 3:12 p.m. to 3:22 p.m.)
2              _ _ _
3 BY MR. SCHWABENLAND:
4      Q.     A couple of questions. Did you
5 show Doe any pictures?
6      A.     I did not.
7      Q.     But you had the pictures with
8 you, right?
9      A.     I did.
10      Q.     Is there some reason you didn't
11 show him the pictures?
12      A.     Based on his interview with me
13 it was my opinion that it was not necessary to
14 show him the pictures, because he said that --
15 I am not going to repeat everything I just
16 said, we have talked about all this -- that he
17 touched her in that area, didn't deny it, you
18 know, the whole thing I talked about before we
19 took the break.
20      Q.     But that touching in the area,
21 he did that with permission, right?
22      A.     Touching in the area, his text
23 notes about forceful and aggressive, I read
24 them when he was in front of me, "People have

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1 said that I am so strong. I don't deny it.
2 It's a learning experience. I am not going to
3 say she's lying," everything that we just
4 talked about.
5     Q.    So you made the determination
6 not to show him any pictures?
7     A.    Yes.
8     Q.    Did you also make --
9     A.    That it was not necessary to
10 show him any pictures.
11    Q.    Well, you ultimately made a
12 finding of responsibility against him, right?
13    A.    I did.
14    Q.    So it's not necessary for your
15 purpose, but don't you think the guy charged
16 with the offense has a right to see what the
17 evidence is against him?
18    A.    I did not feel that it was
19 necessary for my purposes of doing the
20 investigation.
21    Q.    I didn't ask you that.
22    A.    You're just arguing with me.
23    Q.    No, I am not. Did you think
24 that a person charged has a right to see what

Page 215

1 the evidence is against him?
2     A.    I don't think it's a right.
3     Q.    Do you think it's only fair and
4 reasonable to show the accused what the
5 evidence is against him?
6         MR. MYERS: Object to the form
7 of the question. If the question is
8 whether she thought it was only fair
9 to show him these pictures, you can
10 ask that, although it would be for at
11 least the third time. The broader
12 hypothetical question has no
13 conceivable relevance here, Ed, and I
14 would ask you to sort of -- we are
15 five and a half hours into this -- to
16 stick to the facts of the case.
17        MR. SCHWABENLAND: Can you read
18 back the question, please?
19        - - -
20        (Whereupon, the court reporter
21 read back from the record.)
22        - - -
23        MR. MYERS: Object to the form.
24 You can answer the question.

Page 216

1         THE WITNESS: I did not think
2 it was necessary for my investigation.
3 I told him that she said that it hurt
4 and that she had bruises and his
5 answer to that was, "People have told
6 me I'm strong."
7 BY MR. SCHWABENLAND:
8     Q.    Did you tell him that she had
9 bruises?
10    A.    Yes.
11    Q.    Did you show him where?
12    A.    I said on her neck.
13    Q.    Did you describe the bruises?
14    A.    No.
15        - - -
16        (Whereupon, Exhibit Malloy-9
17 was marked for purposes of
18 identification.)
19        - - -
20        MR. MYERS: Again, you don't
21 have copies of this, Ed?
22        MR. SCHWABENLAND: I do.
23        MS. ENGLE: What is it?
24        MR. MYERS: This is 917. This

Page 217

1 is Liz Malloy's response to the
2 investigator with respect to the
3 appeal.
4 BY MR. SCHWABENLAND:
5     Q.    Do you recognize that document?
6     A.    I do.
7     Q.    And is that your response to
8 the appeal that was taken by Doe?
9     A.    Yes, sir.
10    Q.    May I have that one second?
11 You know that Mr. Doe made a charge that you
12 you neither showed him pictures of the bruise
13 nor did you tell him that she had bruises?
14    A.    I would not know that unless
15 you showed me a copy of his appeal. I did get
16 the copy of the appeal.
17        - - -
18        (Whereupon, Exhibit Malloy-10
19 was marked for purposes of
20 identification.)
21        - - -
22 BY MR. SCHWABENLAND:
23    Q.    What's been marked as
24 Exhibit-10, that's the appeal letter. The

CONFIDENTIAL

Page 218

1 Bates stamp is 919. It begins 919 and it
2 goes --
3          MR. MYERS: No.
4          THE WITNESS: Mine says 320.
5          MR. SCHWABENLAND: Okay.
6 BY MR. SCHWABENLAND:
7     Q.   It's 320 and it ends at 323. I
8 call your attention to the second page, 321.
9     A.   You need to give me some time
10 to read this.
11    Q.   Read the --
12    A.   I'm going to read the whole
13 thing.
14    Q.   Okay.
15         MR. MYERS: All set.
16 BY MR. SCHWABENLAND:
17    Q.   Now, let me call your attention
18 to the second page there. I am going down to
19 the fourth paragraph down there. You see
20 that? It's the long one.
21    A.   Why are you calling it the
22 fourth paragraph?
23    Q.   There's one, two, three, four.
24    A.   These are printed out in

Page 219

1 different ways, so which one are you talking
2 about?
3          MR. MYERS: What is the
4 beginning of the sentence, Ed?
5          MR. SCHWABENLAND: I'm sorry.
6 BY MR. SCHWABENLAND:
7     Q.   The fourth paragraph down, one,
8 two, three, four, that one.
9     A.   Okay.
10    Q.   He in here, "I feel that this
11 entire process is biased against the accused
12 and in favor of the accuser. I was not
13 allowed to know the deals of the claims
14 against me until after I was convicted (found
15 responsible and sanctioned). Apparently, the
16 fact that Roe had some sort of bruise on her
17 neck was the deciding factor in my guilt, but
18 throughout the entire disciplinary process I
19 was never told about bruises and never showed
20 any pictures of bruises until after I was
21 convicted. I was not given a chance to gather
22 or present any evidence in my own defense
23 because I didn't even know what charges I was
24 defending myself against. Throughout Ms.

Page 220

1 Malloy's entire interview with me she never
2 clarified the charges against me or showed me
3 any picture of bruises. I think this is
4 totally wrong. Not knowing that there were
5 any bruises or pictures of bruises I continued
6 to believe throughout my interview with Ms.
7 Malloy that this was some sort of
8 misunderstanding. Ms. Malloy, though, knew
9 that there were claims of bruising and may
10 have taken any comments to mean something
11 other than what I meant. For example, when I
12 asked about having my hand on her neck I
13 didn't realize Roe was accusing me of
14 squeezing her so hard that it caused some
15 bruises. Had I known that I would have been
16 very adamant that I could not have done that
17 to her. Instead, I was hesitant to call Roe a
18 liar, even though I had a very different
19 memory. I am concerned that Ms. Malloy
20 interpreted my hesitancy to call Roe a liar as
21 some sort of admission." And you were given
22 this to comment, in part, as to what he was
23 saying, right?
24    A.   Yes.

Page 221

1     Q.   Okay. Then if you look at your
2 comment there -- and that's Exhibit what
3 again? What is the exhibit?
4     A.   Nine.
5     Q.   Thank you. Go down to the
6 third paragraph and you said, "The fact that
7 Ms. Roe had a bruise on her neck was not the
8 deciding factor." Then you go on to say,
9 "Finding of Fact Number 7 is that Mr. Doe did
10 not obtain Ms. Row's consent to squeeze her
11 neck and she did not consent to that. That is
12 stated in the rationale as well. I did not
13 show Mr. Doe the photographs. His position
14 that because he did not see the photographs
15 and, therefore, did not know the charges
16 against him is false. I told Mr. Doe that the
17 charge was that he squeezed her neck without
18 consent." Did I read that correctly, at least
19 that part of it?
20    A.   Yes.
21    Q.   I don't see in there where you
22 say "I told him that there was bruising on the
23 neck."
24    A.   I did not say that. So I get

56 (Pages 218 - 221)

Page 222

1 this appeal document. I'm not asked to
2 respond to it paragraph by paragraph, line by
3 line. I can provide whatever information I
4 want. So I was responding to the fact that he
5 did know the charges against him. He says
6 because he didn't see the pictures that he
7 didn't know the charges against him. We
8 talked about this hours ago. I specifically
9 told him when he came in to meet with me what
10 the charges against him were and I did tell
11 him that her -- not in the beginning, I didn't
12 do it in the beginning -- closer to the end of
13 the interview, where my notes say, "People
14 tell me I am too strong," I did say that she
15 said that there were bruises, that it hurt her
16 and that there were bruises.
17     Q.    Do you say in your notes, "I
18 told him that there were bruises"? Do you say
19 in your handwritten notes?
20     A.    I do not.
21     Q.    So nowhere either in your
22 handwritten notes of the interview with
23 Mr. Doe nor in your response to the appeal,
24 whatever you decide to write, is it reflected

Page 223

1 that you ever told him about the existence of
2 a bruise?
3     A.    I told him about the existence
4 of a bruise. I agree with you that it is not
5 in my -- that that question -- I don't do it
6 in question and answer format. That question
7 is not in my notes.
8     Q.    Okay.
9     A.    And Exhibit-9 is not a
10 play-by-play answer to every allegation they
11 make.
12     Q.    All I am asking, it's not in
13 there? It's not in Exhibit-9?
14     A.    Correct.
15     Q.    And it's not in your
16 handwritten notes that you ever told him about
17 the existence of a bruise?
18     A.    What I said is not. His answer
19 is.
20     Q.    Okay. Thank you. You can put
21 that one aside now. You were at the end of
22 the meeting with Mr. Doe. Did you follow
23 anything up with Ms. Roe?
24     A.    Let me finish my interview with

Page 224

1 Mr. Doe. So I told him, like -- you only
2 reviewed my notes. You didn't ask me about
3 anything else and now you're assuming that I
4 am done. I told him, like I do every student
5 I talk to, "If there's anything else you want
6 to tell me, if there's anything you think of
7 when you leave here, please reach out to me.
8 I will meet with you in person or we can do it
9 by phone." I as a matter of course do that
10 with everybody. And I also ask them, "Is
11 there anybody else you want me to talk to?
12 And if you can't think of it now, tell me
13 later." I am fully cognizant of the fact that
14 it is hard for anybody, much less students, to
15 in one meeting tell me everything that they
16 might want to tell me. So I always say that,
17 "Please reach out to me. I will come back on
18 campus or we can do it by phone."
19     Q.    So you left it up to him or Ms.
20 Roe to reach out to you?
21     A.    Yes. And if I had reasons to
22 reach out to them myself I could and I have
23 done that before.
24     Q.    So you had no reason to do any

Page 225

1 further investigation, then?
2     A.    That was my ultimate
3 conclusion, yes. I didn't make it that day.
4     Q.    Well, I mean, your meeting is
5 on the 19th; is that correct?
6     A.    Yes.
7     Q.    You went on vacation
8 March 22nd; is that correct?
9     A.    Sounds right.
10     Q.    And you returned March 30th or
11 so?
12     A.    I was gone a week.
13     Q.    Okay. And when did you dictate
14 or type up your notes?
15     A.    I don't know.
16     Q.    It's dated April 3rd.
17     A.    If I dated it April 3rd that's
18 when I finished the report. I frequently
19 write up the summaries of the interviews after
20 they are done.
21     Q.    Okay.
22     A.    That day or the next day.
23     Q.    Okay. And then you would have
24 submitted it to Community Standards that day?

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

1     A.     April 3rd, yes, the day after.
2     Q.     Did you either during your
3 interview of Ms. Roe or any follow-up -- well,
4 you had no further follow-up with Ms. Roe,
5 right?
6     A.     Yes, that is correct.
7     Q.     And you had no further
8 follow-up with Mr. Doe, right?
9     A.     Correct.
10    Q.     And so --
11    A.     I believe Jane sent me her text
12 messages, but I had no further conversation
13 with her.
14    Q.     Okay.  But you had the names of
15 Roe's [sic] buddy who drove, right?
16    A.     I think so.
17    Q.     And you had the names of what,
18 three --
19    A.     I thought that was Doe's buddy.
20    Q.     You're right.  Thank you.  You
21 had the name of Doe's buddy who drove, right?
22    A.     Yes.
23    Q.     You had the name of three of
24 Roe's girlfriends; is that correct?

Page 227

1     A.     Yes.
2     Q.     And one of them not only went
3 to LaSalle with her but also met her outside;
4 is that correct?
5     A.     I can't tell you right now
6 whether the same girl who met her outside was
7 at the party.
8     Q.     During your conversation with
9 Ms. Roe did you ever ask what she did the next
10 day?
11    A.     No.
12    Q.     Because she said she didn't
13 observe any bruises until Sunday.
14    A.     Right.
15    Q.     Did she say somebody else
16 observed the bruises on her?
17    A.     Yes.  She said she was at the
18 CVS with a friend and that she usually wears
19 her hair long and that it was Sunday, so she
20 had her hair pulled back and the friend that
21 she was with saw the bruises.
22    Q.     Did Ms. Roe indicate that she
23 saw the bruises in the mirror earlier that
24 day?

Page 228

1     A.     No.
2     Q.     So somebody else is calling her
3 attention to that?
4     A.     Yes.
5     Q.     Ms. Roe and her friends went
6 out drinking and to another party on Saturday
7 night.  Is that something that you would be
8 interested learning about?
9     A.     I made my decision based on the
10 information that I had.
11    Q.     So would it be fair to say that
12 you didn't inquire any further as to what she
13 and her friends did that Saturday?
14    A.     Correct.
15    Q.     You didn't seek to see any more
16 text messages to put a time down as to how
17 long they were exactly in that room?
18    A.     I asked her to give me all the
19 text messages she had from that evening.
20    Q.     Okay.  But in the statement to
21 you she indicated that on her way from the
22 LaSalle party to St. Mary's they were texting
23 or she was texting her friends, did she not?
24         MS. ENGLE:  Objection to form.

Page 229

1         THE WITNESS:  I don't remember
2     that.
3         MS. ENGLE:  This is before she
4     left?
5         THE WITNESS:  She says "We were
6     texting friends in car."
7 BY MR. SCHWABENLAND:
8     Q.     But you didn't get any of that?
9     A.     That could be the one you
10 showed me before, with the guy with the coke
11 here.  I don't know.
12    Q.     No.  That was before they left.
13    A.     She's not here, so I can't ask
14 her that.  I don't know.
15    Q.     After your meeting with him did
16 you speak with anybody at St. Joe's before you
17 submitted your report?
18         MR. MYERS:  About this case?
19         MR. SCHWABENLAND:  Yes.
20         THE WITNESS:  No.
21 BY MR. SCHWABENLAND:
22    Q.     Have you handled any other
23 cases similar to this at St. Joe's, where you
24 investigated a couple kissing and then

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1 somebody hurting the neck or exerting too much
2 pressure on the neck?
3     A.    Not that I remember, no.
4     Q.    So I take it this was the first
5 of its kind in the time that you were dealing
6 with St. Joe's?
7     A.    One of my colleagues, Andy
8 Rolfes, had one that had some similar
9 connotations.  I personally did not do that.
10     Q.    Do you know which one it was?
11     A.    This list has nothing on it.  I
12 can't tell you.
13     Q.    Do you know the circumstances,
14 where you say similar connotations?
15     A.    I think it was much more
16 complicated, in that it had a lot of
17 allegations, but part of it was choking,
18 squeezing the neck.
19     Q.    Okay.  And do you know what the
20 findings were in that?
21     A.    I do not.  Let me correct that.
22 I had nothing to do with the investigation, I
23 didn't read the report, but I think it was,
24 like, substantiated in part, responsible in

Page 231

1 part, but I can't be any more specific than
2 that.
3     Q.    But you are not sure about
4 that?
5     A.    Right.
6     Q.    I am looking at this response
7 of investigator to the appeal, whatever that
8 exhibit number is.  What did you mean by the
9 fact that she had a bruise on her neck was not
10 a deciding factor?  What did you mean by that,
11 if you can remember?
12     A.    It goes back to the
13 nonconsensual sexual touching.  A bruise isn't
14 a requirement or a definition in the policy of
15 nonconsensual sexual touching.
16     Q.    Okay.  Do you believe that
17 there has to be some type of intent, he has to
18 know what he's doing?
19     A.    I don't understand your
20 question.  Intent to hurt or intent to touch
21 or intent to squeeze?
22     Q.    Intent to touch in such a way
23 that he knew he didn't have permission for?
24     A.    Yes.

Page 232

1     Q.    Let me go through your findings
2 of fact, if I could.
3     A.    Let me correct that.  I am not
4 sure its intent, but there is part of the
5 element of the consent analysis.  But I did
6 specifically find I didn't think he had the
7 intent to hurt her.
8     Q.    You found he didn't have the
9 intent to harm her, right?
10     A.    Correct.
11     Q.    He has to know that he's doing
12 something without consent or permission,
13 right?
14     A.    I disagree with that.
15     Q.    Okay.  How does intent play in
16 your analysis, then?
17     A.    I don't know what your question
18 is.
19     Q.    You're familiar with crimes
20 code and --
21     A.    I mean, you don't need to
22 intend to sexually assault somebody.  You
23 don't need to intend to harm.
24     Q.    Let me ask you this:  If they

Page 233

1 were kissing and holding onto each other and
2 he accidentally tripped her and she hurt
3 herself, would that still be sexual assault?
4     A.    That is hypothetical.  Makes no
5 sense.  He accidentally tripped her and --
6     Q.    Something untoward happened
7 that she felt pressure that she didn't like
8 and at least he says, "I didn't" -- he didn't
9 see that, right?
10     A.    You've lost me.
11     Q.    Okay.  Well, let's go to your
12 findings and then I will come back to this.
13     A.    Okay.
14     Q.    In the findings of fact -- I am
15 at 274.  Number one, they met at a party,
16 right?
17     A.    Yes.
18     Q.    Number two, "At least initially
19 she said he was a decent guy, because he was
20 polite to her and her friends and encouraged
21 her not to purchase cocaine from a drug dealer
22 outside the party;" is that correct?
23     A.    That's what it says.
24     Q.    So at least your findings at

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1  that point was that he was looking out for her
2  interest and being polite?
3      A.   I wouldn't go that far, but you
4  just read the sentence.
5      Q.   Were they all positive things?
6  Would you go at least that far?
7      A.   Yes.
8      Q.   It said that they both kissed
9  at the party, which was consensual; is that
10 correct?
11     A.   Yes.
12     Q.   There's nothing on the findings
13 of fact to talk about how they were kissing or
14 caressing each other, right?
15     A.   Correct.
16     Q.   Then, number four, you have
17 down, "Doe asked Roe if she wanted to come
18 back to St. Mary's where he lived.  She said
19 yes.  She went with him in the car driven by
20 Doe's friend;" is that correct?
21     A.   Yes.
22     Q.   And so they get back to St.
23 Mary's, this is number five, "Doe told Roe
24 that his roommate was asleep but the two of

Page 235

1  them could go up to the third floor."  Number
2  six, "The two of them went to a small room on
3  the third floor of St. Mary's.  They were
4  mutually kissing, which Roe consented to."
5  And so far everything is fine, right?
6      A.   I don't know if everything is
7  fine, but --
8      Q.   Is there --
9      A.   We are reading along as I have
10 written here.
11     Q.   Up until six is there any
12 indication of sexual assault?
13     A.   No.
14     Q.   Okay.  Number seven, "Doe
15 continued to kiss Roe and put his hand around
16 her throat and squeeze her neck.  Roe
17 consented to the kissing.  Doe did not obtain
18 Roe's consent to squeeze her neck and she did
19 not consent to that."  Did I read that
20 correctly?
21     A.   Yes.
22     Q.   But there is nothing in there
23 about his hand already being on her neck?
24     A.   Correct.

Page 236

1      Q.   So at least the kissing she had
2  consented to and the touching of the neck or
3  head during that kissing process she had
4  consented to, right?
5      A.   Well, you have to read the
6  document as a whole.  I think I say that the
7  consent does not -- if you get to the
8  analysis, consent does not require, you know,
9  "Can I touch your cheek?  Can I touch your
10 ear?"
11     Q.   We'll go through that.
12     A.   Okay.  Well, you're asking me a
13 question that calls for the whole report.
14     Q.   But if he is touching her neck,
15 not squeezing her neck, if he's touching her
16 neck while he's kissing her that's all part of
17 the consent with kissing; is that correct?
18     MR. MYERS:  I object to the
19     form.  You're asking a hypothetical as
20     if it's a fact.  You can answer the
21     question.
22     THE WITNESS:  My report says
23     she did not consent to him squeezing
24     her neck.

Page 237

1  BY MR. SCHWABENLAND:
2      Q.   That's not my question.  My
3  question is, from your interview you learn
4  that they are kissing and the kissing process
5  involves them both caressing each other's neck
6  and head; is that correct?
7      A.   Yes.
8      Q.   So that's all consensual, the
9  touching of the neck, the head, and the
10 kissing is consensual so far, right?
11     A.   I think if you read the rest of
12 the report I say the definition of consent --
13 you're just arguing with me -- but the
14 definition of consent does not require
15 individual consents for "Can I touch this part
16 of your face?  Can I touch this part of your
17 face?"
18     Q.   So it's consensual?
19     A.   I can't answer that question.
20 That is my analysis at the end.
21     Q.   Okay.  Then you say on number
22 eight, "She said something like 'What the F'
23 and Doe pulled away from her.  She was
24 frightened because she in the past had been in

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

1  an abusive relationship and she thought the
2  look in Doe's eyes was scary." Is that what
3  you said?
4      A.   Yes.
5      Q.   Okay. So at the point where
6  she alerts him that at least something is
7  wrong with her by her saying "What the F," he
8  pulls immediately away and stops that, right?
9      A.   Yes.
10     Q.   In your analysis is that the
11  first time that he is realizing that she
12  doesn't like something?
13     A.   Yes.
14     Q.   Had she not said that or
15  alerted him that you shouldn't be doing
16  something or you're applying too much
17  pressure, would he have had any notice that he
18  was doing something wrong?
19     A.   No, but that's not required by
20  the policy.
21     Q.   Did you look at this as at what
22  point is consent withdrawn?
23     A.   No, because there was no
24  consent to squeezing.

Page 239

1      Q.   Well, your impression was that
2  the squeezing of the neck was very fast when
3  she said, "What the F" and he pulled away,
4  right?
5      A.   Yes. I don't know if I would
6  say very fast, but he pulled away when she
7  said "What the F."
8      Q.   Did you ever try to analyze --
9  did you ever in your discussion with her try
10  to determine what was the nature of the
11  squeeze, how much pressure he was putting on
12  her, because it was momentary? Did you ever
13  try to get into that?
14     A.   No. She said it hurt, though,
15  and it scared her.
16     Q.   Okay. So if he hurts her in
17  the process of touching her neck and now it's
18  a squeeze she's reporting, that's automatic
19  sexual assault?
20         MS. ENGLE:  Object to form.
21         MR. MYERS:  Object to the form
22     of the question. You may answer the
23     question if you can.
24         THE WITNESS:  No. You have to

Page 240

1  read my whole report.
2  BY MR. SCHWABENLAND:
3      Q.   Okay. So that is just not
4  automatic sexual assault, right?
5      A.   You have to consider all the
6  facts in my whole analysis.
7      Q.   Okay.
8      A.   None of these are based on one
9  sentence.
10     Q.   I understand. But you're
11  making findings of fact that you feel are
12  important?
13     A.   Yes.
14     Q.   Okay. You say in number nine,
15  "Doe left the room. Roe text a friend who
16  then called her. When Doe returned to the
17  room Roe was on the phone. She told him she
18  had to leave because her friend needed her.
19  Doe walked Roe outside where her friend was
20  waiting." That's something the two agreed on,
21  right.
22     A.   Yes.
23     Q.   By the way, do you know what
24  the safe word was that she text?

Page 241

1      A.   No. She used the word "safe
2  word," but it's, like, call or text your
3  friend. If you go back to my interview with
4  her, then the girl calls her, calls Roe and
5  Roe says, "I am okay." That's part of the
6  whole safe conversation. You know, you
7  wouldn't say in a situation, "Oh, my God.
8  Come get me." You say, "I'm okay" and that's
9  the code word for somebody to come pick you
10  up. She did explain all that to me.
11     Q.   There is a statement in one of
12  the texts where she refers to "I'm Ms.
13  Francis." That's F-R-A-N-C-I-S. Do you know
14  anything about that?
15     A.   No.
16     Q.   Number ten, "Later at 2:39 a.m.
17  Doe text Roe, 'I am going to bed, but you guys
18  need anything my phone will be on. I hope ur
19  friend's okay'." And Number 11, "Although I
20  find that Doe squeezed Roe's neck area and it
21  left bruises I do not find that he did it with
22  the intention to hurt," right?
23     A.   Correct.
24     Q.   And so that's where you

CONFIDENTIAL

1 disagree with Roe, Roe felt he was trying to
2 hurt her?
3      A.    Well, I asked her why she
4 thought he did it and, you know, I often ask
5 that question and people have all different
6 kinds of answers.  She thought it was to hurt
7 her and when I interviewed him I came to the
8 conclusion that he had no intention on that.
9      Q.    Then you determine of
10 credibility.  "I found both Roe and Doe to be
11 credible.  Doe does not specifically recall
12 squeezing Ms. Roe's neck, but he does not deny
13 it and says they both had their hands on each
14 other's neck area.  He agrees that he did not
15 obtain Ms. Roe's consent to touch her neck,"
16 but he did have consent to touch her neck; is
17 that correct?
18      A.    I disagree with that.  You have
19 to look at my whole analysis.  I don't think
20 that the consent -- individual consent for
21 this touch, this touch, this touch is
22 necessary.  But under the policy, in order to
23 obtain consent it is the responsibility of the
24 initiator of the sexual contact to get consent

1 from the recipient of the sexual contact in
2 words or actions that are not ambiguous.
3      Q.    Was the sexual contact the
4 squeezing of the neck or was it the kissing
5 and caressing, the touching of the neck and
6 head while the kissing was going on?
7      A.    My conclusion is it was the
8 squeezing of the neck had no consent.
9      Q.    The sexual contact was the
10 squeezing of the neck?
11      A.    The sexual contact is the
12 squeezing in the content of kissing.
13      Q.    But when you say "He agrees
14 that he did not obtain Ms. Roe's consent to
15 touch her neck" shouldn't you have put in
16 there "to squeeze her neck"?
17      A.    He didn't have consent to touch
18 her neck either.  That was my ultimate
19 conclusion, but he did not, as the initiator
20 of the sexual contact, follow the procedure to
21 get the consent of the recipient of the
22 contact in words or actions which are
23 unambiguous, that we both understand that we
24 are going to do this.  I found in the end that

1 that part didn't matter based on my analysis
2 that it was the squeeze and not the touch.
3      Q.    So let me go back.  If I
4 understand from your investigation, Doe said
5 that they were both kissing and caressing and
6 touching each other's neck and head; am I
7 correct on that?
8      A.    Yes.
9      Q.    And you did not cover that with
10 Roe, so there was no denial of that by Roe?
11      A.    I'd have to go back and look at
12 all my notes to determine what I covered.
13      Q.    Okay.  Did she comment on that
14 one way or another?  That seems pretty
15 important.
16      A.    What is your question?
17      MR. SCHWABENLAND:  Read it
18 back, if you could.
19              - - -
20      (Whereupon, the court reporter
21 read back from the record.)
22              - - -
23      MR. MYERS:  I object to the
24 form of the question.  You can answer

1 it if you can.
2      THE WITNESS:  If we go back to
3 the very beginning of what the
4 complaint is, the complaint is what
5 she believes is not consensual is the
6 squeezing.
7 BY MR. SCHWABENLAND:
8      Q.    Squeezing of the neck?
9      A.    Right.
10      Q.    I understand that.  But she
11 didn't object to him touching her neck or her
12 touching his neck, right?
13      A.    Touching, but not squeezing?
14      Q.    Yes.
15      A.    Correct.
16      Q.    I understand squeezing, but --
17      A.    Sort of have to touch to
18 squeeze, though, but I understand.
19      Q.    And if you don't squeeze you
20 can still touch the neck while you're kissing,
21 right?
22      A.    Yes.
23      Q.    So he did have consent to touch
24 her neck?

CONFIDENTIAL

Page 246

1    A.    I disagree.  That was not part
2 of her complaint so I didn't need to do an
3 analysis of that, but he did not have consent
4 to touch her neck.
5    Q.    So any touching of the neck
6 while they're at LaSalle, where they are
7 caressing the head or neck, that's without her
8 consent?
9    A.    She didn't make -- she was not
10 claiming that, so I didn't have a reason to
11 analyze that.
12    Q.    I'll represent to you that
13 Ms. Roe, who has partially been deposed, has
14 stated that up until the time that he actually
15 squeezed the neck he had permission to touch
16 her neck and touch her head and to kiss her
17 during that process.
18        MR. MYERS:  I object to the
19        form of the question.  What is the
20        question?
21 BY MR. SCHWABENLAND:
22    Q.    Does that make a difference in
23 your analysis?
24    A.    No, because her complaint is

Page 247

1 the squeezing.
2    Q.    I understand.
3    A.    So it doesn't make a difference
4 in my analysis.
5    Q.    So what you're saying is that
6 he never had consent to touch her neck at all?
7    A.    Yes.  I don't think that was
8 imperative for my analysis, as I have
9 explained to you, because she didn't make --
10 that was not part of her complaint.
11    Q.    But if he has a hand in the
12 area that he is permitted to touch, the issue
13 then becomes, is too much pressure being
14 exerted when the squeeze happened, right?  Do
15 you agree with that?
16        MS. ENGLE:  Object to the form.
17        MR. MYERS:  I object to the
18        form of the question and that you have
19        asked this question in various forms a
20        half a dozen times at this point at
21        4:10 p.m.  You can answer the
22        question.
23        THE WITNESS:  All I can say is
24        her complaint that I was investigating

Page 248

1        was that he squeezed her neck while
2        kissing her.
3 BY MR. SCHWABENLAND:
4    Q.    Let's go to the rationale.  The
5 definition of sexual assault under the policy
6 includes, "Any nonconsensual sexual contact,
7 including any improper touching of intimate
8 body parts" and you cite the section.  "While
9 a person's neck/throat area is not an intimate
10 body part, in this situation Doe squeezed
11 Roe's neck/throat while he was kissing her.
12 In this situation, therefore, under all the
13 circumstances I find that the touching is
14 sexual assault [sic]."
15    A.    Sexual contact.
16    Q.    Sexual contact.  Thank you.
17 And so the touching of the neck, squeezing it
18 is sexual contact?
19    A.    While kissing her.
20    Q.    Okay.  So the whole thing is
21 sexual contact?
22    A.    Squeezing of the neck while
23 kissing her.  If I jumped across the table and
24 squeezed your neck, that might be a criminal

Page 249

1 assault, but it would not be a sexual assault.
2 So I found it was the squeezing while kissing
3 was sexual contact.
4    Q.    "I also find that Doe did not
5 obtain consent to squeeze her neck area.
6 Ms. Roe consented to the kissing, which
7 involved Doe touching her in various ways in
8 her neck and face area.  The policy does not
9 require separate affirmative consent for each
10 action of kissing on the face (left side,
11 right side, forehead, et cetera).  Consent to
12 kissing also understandably involves some
13 contact by Doe's hand on the neck and throat
14 area."  Do you agree with that?
15    A.    Yes.
16    Q.    "However, because Roe's
17 complaint is that Doe squeezed her neck to the
18 point where it left bruises I find that this
19 is a singular, separate act which required her
20 consent.  This analysis of consent is totally
21 dependent on the circumstances presented
22 here."  Did I read that correctly?
23    A.    I wasn't following you the
24 whole time, so I can't answer that.

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

1  Obviously, the document speaks for itself.
2      Q.    So, basically, what you're
3  saying is that before the squeeze he should
4  have asked for permission to squeeze her neck?
5      MS. ENGLE:  Object to the form.
6      THE WITNESS:  That question
7      makes no sense.
8  BY MR. SCHWABENLAND:
9      Q.    You said he did not have
10  consent to squeeze her neck, right?
11      A.    Correct.
12      Q.    It says here, "I find that
13  this" -- that is the squeezing of the neck --
14  "is a singular, separate act which requires
15  her consent."  So are you saying that before
16  squeezing the neck he should have said, "By
17  the way, can I squeeze your neck"?
18      A.    Or something like that, yes.
19  Two questions back didn't make sense because
20  you had the genders reversed.
21      Q.    Going back to the first page
22  here, 268, I am going back to the sexual
23  misconduct policy definition of sexual
24  assault, which starts off -- I am going to

Page 251

1  leave out sexual intercourse, because this
2  does not involve sexual intercourse, so
3  "Having sexual physical contact with another
4  individual by the use of threat or force or
5  coercion without consent or where the
6  individual is incapacitated."  So in this case
7  here she wasn't incapacitated, right?
8      A.    Right.
9      Q.    And it has to be either with
10  the use of threat or force or coercion and
11  without consent?
12      A.    That's not true.  You're
13  reading a soundbite from the policy.  I was
14  looking at the next definition, which says,
15  "The policy also provides that sexual assault
16  includes nonconsensual sexual contact, which
17  is defined as follows" and there's no
18  requirement of force or coercion or threat.
19  There is multiple definitions in the policy.
20      Q.    There is another case that was
21  submitted where a guy goes up to a girl, puts
22  both hands up against the wall and kisses her
23  without asking for permission, and that would
24  be sexual assault because that kiss was

Page 252

1  without permission, right?
2      A.    I don't know what case you're
3  talking about.  Is that a hypothetical
4  question?
5      Q.    No.  I will see if I can find
6  it.  I can't find it.  I apologize.  In 2017
7  are you aware that the university obtained a
8  federal grant?
9      A.    Yes.
10      Q.    And did you play any part in
11  providing any information or submitting
12  paperwork for the grant?
13      A.    No.  I found out about it from
14  the student newspaper, I think.
15      Q.    And then we get back to
16  September of 2017.  There was a Dear Colleague
17  Letter and questions and answers submitted by
18  the Office of Civil Rights; is that correct?
19      A.    Yes.  I don't believe that's
20  called a Dear Colleague Letter, but I am aware
21  in September 2017 the guidance that came out.
22  I thought the old one was always called the
23  Dear Colleague Letter.  That's how people
24  referred to it, right.

Page 253

1      Q.    Okay.
2          — — —
3          (Whereupon, Exhibits Malloy-11
4          and 12 were marked for purposes of
5          identification.)
6          — — —
7  BY MR. SCHWABENLAND:
8      Q.    For the record, I've identified
9  the September 22nd, 2017 two-page letter as
10  Exhibit-11.  It's to Dear Colleague.  It's
11  from the United States Department of
12  Education, Office of Civil Rights.  Exhibit-12
13  is the Q&A that accompanied this letter, or
14  shortly thereafter, in September 2017.  Look
15  that over and let me know if you have seen
16  that.
17      A.    I have seen it before.  I would
18  need to reread it all if you are going to ask
19  me a lot of specific questions, but I have
20  seen this before.
21      Q.    I am going to ask you some
22  questions, so feel free to --
23      A.    Okay.
24      Q.    When was the last time you saw

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

1  this letter, these two documents?
2       A.    Probably about six weeks ago.
3       Q.    And what occasioned you to look
4  at that six weeks ago?
5       A.    I think I saw something that --
6  I think these say that they are going to issue
7  rule making or something like that and I saw
8  something about rule making and I just went
9  back and looked at them again.
10      Q.    Did you say "rule making"?
11      A.    I thought these ended with
12 something else was coming out, right.  These
13 are just guidance and I thought it said
14 something else was coming out and I saw a
15 reference to something else may be coming out
16 or not coming out and I just happened to go
17 back and look at them again.
18      Q.    All right.  So these are
19 guidelines, recommended guidelines?
20      A.    It's my understanding, yes.
21 Not guidelines, guidance.
22      Q.    Okay.  How do you distinguish
23 the two?
24      A.    I think guidelines are more

Page 255

1  formal than guidance.
2       Q.    And as part of --
3       A.    It says, "These guidance
4  documents."
5       Q.    Okay.  Exhibit-11 is a Dear
6  Colleague Letter; is that correct?
7       A.    Yes.
8       Q.    And the Q&As that come out, is
9  it necessary to try to comply with these
10 guidance or recommendations being made?
11      MR. MYERS:  Objection.
12      Objection to the form.  Are you asking
13      whether there were some that say see
14      with respect to the September 2017 Q&A
15      or are you asking some different
16      question?
17      MR. SCHWABENLAND:  I asked her
18      one question.
19      MR. MYERS:  Okay.  I object.
20      If you can answer it, you answer it.
21      THE WITNESS:  I do not give
22      legal advice to St. Joe's about their
23      policies.  My understanding as a
24      lawyer is that these are not mandatory

Page 256

1  in any way, they are just guidance,
2       and that various educational
3       institutions can change their policies
4       or procedures if they wish.
5  BY MR. SCHWABENLAND:
6       Q.    So --
7       A.    I gave no opinion on that to
8  anyone.
9       Q.    So institutions of higher
10 learning could either accept or reject their
11 recommendations; is that your understanding as
12 a lawyer?
13      MR. MYERS:  Objection.
14      THE WITNESS:  Yes.
15 BY MR. SCHWABENLAND:
16      Q.    So is there any benefit to
17 complying with the recommendations or
18 guidance?
19      MR. MYERS:  Object to the form
20      of the question.  You can answer if
21      you know.
22      THE WITNESS:  I can't answer
23      that.
24

Page 257

1  BY MR. SCHWABENLAND:
2       Q.    Now, you said you looked at
3  this six weeks ago.  Let me follow that up.
4  You said you thought rules were coming out.
5  What information had you received that rules
6  were coming out?
7       A.    It's just something I read.
8  But I distinctly remember when these came out
9  and I thought -- I mean, it might be in here
10 if you let me read all 25 pages.
11      Q.    Sure.
12      A.    I thought that there was going
13 to be a next step.
14      MR. MIRABELLA:  Take a break
15      while she's reading?
16      MR. SCHWABENLAND:  Sure.
17      Five-minute break and then we'll
18      finish up.
19           _ _ _
20      (Whereupon, a recess was held
21      from 4:25 p.m. to 4:30 p.m.)
22
23 BY MR. SCHWABENLAND:
24      Q.    Did you look those over?

65 (Pages 254 - 257)

CONFIDENTIAL

1    A.    I did.  So Exhibit-12 says in
2 the first paragraph, "The Department of
3 Education intends to engage in rule making on
4 the topic of schools' Title IX
5 responsibilities."  And my best recollection
6 is that I read some sort of article six weeks
7 ago about -- I don't know if it was the Trump
8 Administration in general not being able to
9 get out rule making or push agendas forward,
10 but this guidance was mentioned in it and it
11 just triggered me and I went back and read it
12 again -- or looked at it again.  I didn't read
13 it all.
14    Q.    So do you recall what caught
15 your eye on any of this or you don't know?
16    A.    No, nothing in particular.  I
17 have read it a couple of times.
18    Q.    Before six weeks ago when was
19 the last time you reviewed this for any
20 reason?
21    A.    I read it when it came out.  I
22 may have looked at it in between.
23    Q.    But do you have any
24 recollection of doing that in between?

1 schools have established procedures for
2 revolving allegations that 'lack the most
3 basic elements of fairness and due process,
4 are overwhelmingly stacked against the
5 accused, and are in no way required by Title
6 IX law or regulations'."  There's another
7 footnote.  First of all, did I read that
8 paragraph correctly?
9    A.    Yes.
10    Q.    And did you take note of that
11 when you reviewed, at least the comments that
12 were made in that paragraph?
13    A.    I am sure I took note of the
14 whole thing.
15    Q.    Did you agree or disagree with
16 that statement, especially the one, "that lack
17 the most basic elements of fairness and due
18 process, are overwhelmingly stacked against
19 the accused, and are in no way required by
20 Title IX law or regulations?"
21    A.    I have no opinion on it at all.
22    Q.    Did you ever talk with anybody
23 at the university when this letter came out
24 about recommendations?

1    A.    Not specifically, no.
2    Q.    Okay.  Let me ask you to go to
3 the Dear Colleague Letter, Exhibit-11, I
4 believe.  At the very beginning it indicates
5 that "The Department of Education is
6 withdrawing the statements of policy and
7 guidance reflected in the following documents"
8 and one is the Dear Colleague Letter of
9 April 4, 2011 and the other one is a question
10 and answer on Title IX and sexual violence
11 dated April 29, 2014.  Did I paraphrase that
12 correctly?
13    A.    Yes.
14    Q.    Okay.  This is in two pages
15 here, but I want to call your attention to the
16 paragraph -- the third paragraph down starting
17 with "Legal commentators."
18    A.    Yes.
19    Q.    It says, "Legal commentators
20 have criticized the 2011 letter and the 2014
21 questions and answers for placing 'improper
22 pressure upon universities to adopt procedures
23 that do not afford fundamental fairness'."
24 There is a footnote there.  "As a result many

1    A.    No.
2    Q.    Did you ever consider your own
3 investigative protocol that you followed on
4 behalf of the university concerning claims of
5 Title IX sexual misconduct policy violations
6 to see if you wanted to change anything as to
7 the protocol that you were following?
8        MR. MYERS:  I object to the
9     form of the question.  I don't think
10    you've accurately characterize the
11    sexual misconduct policy of St. Joe's.
12    You can answer the question if you
13    want.
14        THE WITNESS:  No, I had no
15    discussion with anybody about these.
16 BY MR. SCHWABENLAND:
17    Q.    Okay.  So let me ask you to go
18 to Exhibit-12, the question and answer or Q&A
19 on campus sexual misconduct and, more
20 specifically, let me ask you to go to Page 3
21 of that exhibit, the very end.  It's question
22 six, "What constitutes an equitable
23 investigation?"  And the answer that they put
24 out starts off by saying, "In every

66 (Pages 258 - 261)

CONFIDENTIAL

Page 262

1 investigation conducted under the school's
2 grievance procedures the burden is on the
3 school, not on the parties, to gather
4 sufficient evidence to reach a fair and
5 impartial determination as to whether sexual
6 misconduct has occurred and, if so, whether a
7 hostile environment has been created that must
8 be redressed."  Did I read that part
9 correctly?
10      A.    Yes.
11      Q.    And did you agree with that?
12      A.    I have no opinion.  It's just a
13 government document.  I mean, I have no
14 opinion on sentences in government documents.
15 I read regulations, guidance, cases for a
16 living.
17      Q.    So did you ever consider the
18 burden that the school has?
19      A.    I think we talked about this
20 before.
21      Q.    We did.
22      A.    I told you that I do personally
23 consider that it is not the complainant's
24 burden but that it is the school's burden.

Page 263

1      Q.    It says here, going two
2 paragraphs down, "Any rights or opportunities
3 that a school makes available to one party
4 during the investigation should be made
5 available to the other party on equal terms."
6 Do you agree with that?
7      A.    I have no opinion.  I do not
8 form opinions on stuff people write.
9      Q.    Okay.  But in terms of your
10 practical application of these
11 recommendations, did you consider, "Well, if
12 the complainant gets a copy of the complaint
13 to review shouldn't the respondent have a copy
14 of that to review," not to keep but to review?
15      A.    I did not consider that.  I
16 told John what the charges were against him.
17      Q.    You told John Doe?
18      A.    Yes.
19      Q.    Okay.  So did you consider
20 allowing him to look at that complaint?
21      A.    I don't recall having a
22 consideration like that in my mind.  I
23 described to him, for all the reasons we've
24 talked about for the last seven hours, my

Page 264

1 thought process on that and what I told him.
2      Q.    If I understand correctly, John
3 Doe had indicated that at the
4 pre-investigative stage he was told that it
5 involved something to do with roughness.  Did
6 I state that correctly?
7      A.    That's what he told me.
8      Q.    Okay.  But at that point he
9 didn't know where or anything else, right?
10      A.    I don't know.
11      Q.    And --
12      A.    He wrote those text messages,
13 if you remember that text message that he sent
14 me, that he wondered if he was too forceful or
15 aggressive.
16      Q.    I understand, but at a certain
17 point -- I'm sorry.  You keep saying text
18 message.  He handed a piece of paper to you at
19 the time that you met, right?
20      A.    Yes, and it was from his phone.
21      Q.    Okay.  And that's where he
22 really speculated, "Well, maybe, I pushed her
23 into the chair"?
24      A.    I disagree.

Page 265

1      Q.    Okay.  Did he comment on that
2 in that piece of paper he gave you?
3      A.    Yes.
4      Q.    And you told him that the claim
5 was that -- the claim by Ms. Roe was that he
6 squeezed her neck, right?
7      A.    Yes.
8      Q.    Did you tell him that Ms. Roe
9 was claiming that she felt he wanted to harm
10 her?
11      A.    I don't think so.
12          MS. ENGLE:  Objection.
13 BY MR. SCHWABENLAND:
14      Q.    Did you tell him that Ms. Roe
15 was claiming he choked her to the extent that
16 she couldn't breathe?
17      A.    I told him that she said --
18 that she said that it hurt and that she was
19 scared and that's why she texted her friend.
20 I don't think I said "couldn't breathe."
21      Q.    Okay.  So you didn't mention
22 anything that she was claiming he choked her
23 or that she couldn't breathe because of that?
24      A.    I told you what I told him.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

CONFIDENTIAL

Page 266

1    Q.    Okay.  And it doesn't include
2  those two statements?
3    A.    I didn't use the word "choked."
4    Q.    Okay.  Did you use the words
5  that because of whatever she complained about
6  she could not breathe?
7    A.    No.
8    Q.    The fourth paragraph down
9  states, "Once it decides to open an
10  investigation that may lead to disciplinary
11  action against the responding party, a school
12  should provide written notice to the
13  responding party of the allegations
14  constituting a potential violation of the
15  school's sexual misconduct policy, including
16  sufficient details and with sufficient time to
17  prepare a response before any initial
18  interview."  Do you agree or disagree with
19  that?
20    A.    I have no opinion.
21    Q.    Well, would you want to see
22  that sufficient details are provided to a
23  respondent before the meeting actually takes
24  place with you?

Page 267

1    A.    I don't think that's necessary.
2    Q.    If you were the respondent
3  would you want to know what the charges are
4  against you in specificity?
5    A.    Yes.
6    Q.    And would you want to know what
7  evidence there is against you in specificity?
8    A.    Probably.
9    Q.    And you would want that
10  information before any meeting takes place
11  that could have adverse results on your stay
12  at the university; is that correct?
13    A.    Yes, but that doesn't mean it's
14  required and it doesn't mean that somebody
15  didn't have sufficient notice.
16    Q.    Well, we are talking about
17  fairness; is that correct?
18    A.    You are talking about a
19  document that's guidance, not a requirement on
20  any school.
21    Q.    But aren't they trying to give
22  these --
23    A.    I gave no legal advice.  You're
24  questioning me like I am giving legal advice

Page 268

1  on this.
2    Q.    No.  I am asking you about, you
3  have a Dear Colleague Letter, you have a Q&A,
4  and you are the investigator on a case where,
5  as I understand, there is no requirements on
6  you to either give over evidence or not give
7  over evidence; is that correct?
8    A.    Yes.
9    Q.    And so they are coming --
10    A.    But there is an appeal
11  procedure and he sees everything there, et
12  cetera, and I told him he could come back to
13  me and I'd talk to him.
14    Q.    Let me go back.  You said
15  appeal procedure.  Isn't that letting the fox
16  in the henhouse?  Isn't that a little bit too
17  late?
18    A.    I don't -- I disagree.
19    Q.    What are the two criteria?
20    A.    I am not involved in the appeal
21  procedure.
22    Q.    Okay.
23    A.    But the whole thing is a
24  process.  You are only talking about part of

Page 269

1  it.
2    Q.    I am trying to talk about the
3  steps here.  The process that you're involved
4  with is a very important process; is that
5  correct?
6    A.    Yes.
7    Q.    You are the investigator; is
8  that correct?
9    A.    Yes.
10    Q.    You make the findings of fact;
11  is that correct?
12    A.    Yes.
13    Q.    And you make the conclusions of
14  either responsible, not responsible, or
15  undetermined, right?
16    A.    Correct.
17    Q.    Have you ever found
18  undetermined on any of these investigations?
19  I didn't see any.
20    A.    I believe I have and it was
21  one -- I remember it.  It was, like, a party
22  and the female complainant didn't know who
23  assaulted her or allegedly assaulted her,
24  couldn't give me any details on it.  I could

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

1 never determine what, if anything, happened.
2 I think that was -- it's possible I said not
3 responsible, but in my mind I am saying I said
4 undetermined.
5     Q.   Okay.  So --
6     A.   There was no named respondent.
7     Q.   Okay.  So getting back to what
8 may be fair or reasonable in terms of your
9 handling of cases, is there any reason not to
10 give a respondent access to the charges
11 against him and information about what
12 evidence there is against him before the
13 actual meeting takes place with him?
14       MR. MYERS:  Object to the form
15     of the question.  You can answer the
16     question.
17       THE WITNESS:  I don't know.  I
18     mean, probably not.  But oftentimes or
19     times when you interview the
20     complainant the story is more
21     detailed, sometimes different.  So at
22     that point, before I would -- you
23     know, before it gets out of the
24     Community Standards office, whatever

Page 271

1     the written complaint is, if any, can
2     change.  But to answer your question,
3     probably not but I am not involved in
4     that process.
5 BY MR. SCHWABENLAND:
6     Q.   Well, in this case did the
7 initial complaint in the form of the report of
8 Dr. Perry change at all in terms of your
9 interview with the complainant?
10       MR. MYERS:  I object to the
11     form of the question.  It's
12     argumentative.  Ed, you are asking the
13     witness to do an oral comparison
14     between at least three documents, not
15     including the appeal.  Really,
16     you're -- the documents are the
17     documents.  The changes are the
18     changes.  What this witness has to say
19     about what's in the documents is not
20     advancing anything and it's ten to
21     five.  I would ask you to consider
22     asking a different question, please.
23     Silence means no, so you can answer
24     the question if you can.

Page 272

1       THE WITNESS:  Like most
2     situations, her explanation to me was
3     more expansive than this complaint,
4     right, because Mary-Elaine Perry
5     doesn't really talk to people for an
6     hour.  But the general allegation that
7     he squeezed her neck and it hurt did
8     not change.
9 BY MR. SCHWABENLAND:
10     Q.   So in this case there was
11 really no reason not to allow him to review
12 this complaint beforehand?
13     A.   I can't answer that.
14     Q.   Let's go back to the paragraph
15 here, that fourth paragraph down.
16     A.   I'm sorry.  I lost your page.
17 Exhibit-12?
18     Q.   Exhibit-12, Page 4.  It's the
19 fourth paragraph down.  I just finished
20 stating, "including sufficient details and
21 with sufficient time to prepare a response
22 before any initial interview."  Then it goes
23 on to state what sufficient details include.
24 "Sufficient details include the identity of

Page 273

1 the parties involved, the specific section of
2 the code of conduct allegedly violated, the
3 precise conduct allegedly constituting the
4 potential violation, and the date and location
5 of the alleged incident.  Each party shall
6 receive written notice in advance of any
7 interview or hearing with sufficient time to
8 prepare for a meaningful participation and the
9 investigation should result in a written
10 report summarizing the relevant exculpatory
11 and inculpatory evidence.  The reporting and
12 responding parties and appropriate officials
13 must have timely and equal access to any
14 information that will be used during informal
15 and formal disciplinary meetings and
16 hearings."  First of all, did I read the rest
17 of that paragraph sufficiently?
18     A.   Yes.
19     Q.   And will you agree with me that
20 this is recommending that these sufficient
21 details which they identify should be given in
22 advance of any interview or hearing with
23 sufficient time to prepare for meaningful
24 participation?

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

1    A.    No.
2    Q.    Okay.  It doesn't --
3    A.    The first of all, these are
4  guidance, not guidelines, not mandatory.  It
5  says, "The precise conduct allegedly
6  constituting the potential violation," which I
7  think is different than what you just said.
8    Q.    Which you think what?  I didn't
9  hear.
10    A.    Is different from what you just
11  said.
12    Q.    Is there any purpose in not
13  turning over, in this case the complaint,
14  pictures of bruises, and later any text
15  messages to John Doe before your interview
16  with him?
17    A.    I don't think the university
18  has all that stuff.
19    Q.    Well, they had the complaint,
20  right?
21    A.    They had the complaint.
22    Q.    Okay.  Did they have the
23  pictures?
24    A.    I don't believe so.

Page 275

1    Q.    Didn't the university get the
2  the pictures to you?
3    A.    No.  Jane gave them to me.
4    Q.    So she gave you the pictures?
5    A.    She gave me the text messages.
6  He gave me the notes, whatever you want to
7  call them.
8    Q.    So she's giving you the text
9  messages at the meeting?
10    A.    At the meeting or shortly
11  thereafter.
12    Q.    Okay.  And if you got it
13  shortly thereafter did you contact John Doe to
14  show it to him or tell him what they say so he
15  could comment on them?
16    A.    No.
17    Q.    And why not?
18    A.    He agreed when he came back in
19  the room she was on the phone with her friend
20  and said she had to leave.
21    Q.    How about all the other text
22  messages?  Don't you think he would be
23  entitled to see it?
24    A.    I have no opinion on that.

Page 276

1    Q.    Now, you said earlier, if I
2  understand correctly, "Well, he had the
3  ability to see these documents at the time of
4  the appeal."
5    A.    I don't remember what your
6  exact question was, but you were making the
7  process sound different than it is, so that
8  was my comment.
9    Q.    The process is, you get
10  assigned to investigate and then you write up
11  findings of fact, conclusions; is that
12  correct?
13    A.    Yes, sir.
14    Q.    I'm sorry?
15    A.    Yes, sir.
16    Q.    And so you are not only the
17  investigator, you're the judge and jury on
18  this case?
19        MR. MYERS:  I object to the
20      form of the question.  She is the
21      investigator under a set of rules that
22      are totally clear in the SMP, which is
23      a document which speaks for itself.
24      The judge and jury is just

Page 277

1  argumentative.
2  BY MR. SCHWABENLAND:
3    Q.    You can answer.
4        MR. MYERS:  I am not going to
5      let her answer that question.
6        MR. SCHWABENLAND:  You're
7      telling her not to answer?
8        MR. MYERS:  Yes.  Call a judge
9      right now.  Say, "Don't I get to say
10      was she judge or jury?"  Go ahead.
11        MR. SCHWABENLAND:  You're
12      getting testy, John.
13        MR. MYERS:  I am getting testy.
14  BY MR. SCHWABENLAND:
15    Q.    Well, you make the final
16  decision as to responsible or not responsible,
17  right?
18    A.    I apply the findings of fact
19  that I make to the policy and determine
20  whether the policy is violated or not.
21    Q.    And that's the final decision
22  on that, right?
23    A.    I don't know.
24    Q.    Well, have you ever been

70 (Pages 274 - 277)

Page 278

1  overturned by the university after you make
2  the findings of responsible or not
3  responsible?
4      A.    I have not been.
5      Q.    And so you submit it to the
6  university and is it your understanding that
7  it's then placed into a sanctioning stage and
8  that's handled by Mr. Bodak [sic] in Community
9  Standards?
10     A.    You keep referring to him by
11 the wrong name. It's Bordak.
12     Q.    Bordak. Thank you. It's
13 submitted to Mr. Bordak in Community
14 Standards?
15     A.    I submit my package to
16 Mr. Bordak and Dr. Perry.
17     Q.    Okay. And so if it's a finding
18 of responsible is it your understanding that
19 it's then placed into the sanctioning phase
20 and that's determined by the school, right?
21     A.    I have never been reversed by
22 the university. I assume they could if they
23 thought I was wrong.
24     Q.    I didn't ask that, ma'am. I am

Page 279

1  just asking the next step. What is your
2  understanding?
3      A.    What I just said is important
4  to the next step. Yes, after I submit my
5  report I have never been overruled or
6  overturned or even questioned about anything.
7  If it is responsible, my understanding -- and
8  I am not involved in that process -- it goes
9  to the complainant and the respondent, there
10 is an appeal process, and sanctioning comes
11 after that.
12     Q.    What goes to the complainant
13 and the respondent, the finding of responsible
14 or not responsible?
15     A.    My understanding -- and, again,
16 I am not involved. My understanding is that
17 they are allowed to come into the office and
18 they get to read the short report.
19     Q.    A short report would be what,
20 the report without your interview?
21     A.    Yes.
22     Q.    So the short report would be
23 Exhibit-5, I think?
24     A.    Five. And my understanding --

Page 280

1  but again I am not involved -- is they get to
2  see that appendix, which maybe is why that's
3  stapled to five here.
4      Q.    Do you know when they are
5  permitted to come in and review that material?
6      A.    I think there is a time frame
7  of a couple of days.
8      Q.    Isn't that after being told of
9  what the findings were against them and what
10 sanctions are being imposed, then they have a
11 right?
12     A.    I believe -- no, but I don't
13 know.
14     Q.    Have you ever participated in
15 decision making or recommendation as to what
16 appropriate sanctions there should be?
17     A.    No. I am never even told.
18     Q.    Okay. You mentioned the appeal
19 process. The appeal process comes after your
20 findings -- your investigation and your
21 findings and conclusions concerning
22 responsible; is that correct?
23     A.    Yes.
24     Q.    It comes after the sanctioning

Page 281

1  phase by the university --
2      A.    I don't know the answer to
3  that.
4      Q.    Do you know what rights of
5  appeal a student would have who is found to be
6  responsible?
7      A.    I know that is set forth in the
8  policy. I don't know what they are off the
9  top of my head.
10     Q.    Okay. Let me ask you this:
11 Based upon your review of Exhibit-11 and
12 Exhibit-12, that is the Dear Colleague Letter
13 of September 2017 and the Q&A, did you change
14 any of your procedures that you followed in
15 your investigation of sexual misconduct cases
16 on behalf of the university?
17     A.    No.
18     Q.    Did you have any discussions
19 with anybody at the university, counsel,
20 anybody in the departments or anything else
21 about the procedures to follow or what new
22 recommendations were being made?
23     A.    No.
24     Q.    You mentioned that you

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

1 participated in a meeting with a whole bunch
2 of people. I take it that was -- I think you
3 said that was well before the September '17?
4     A.    Oh, my gosh. It was before the
5 process changed for us to be investigators.
6 It was when it was moving from internal
7 investigations to outside.
8     Q.    So that either at the end of
9 2014 or 2015 when it became effective, right?
10     A.    Correct. I believe the meeting
11 was in the summer. So it was probably the
12 summer of 2014.
13     Q.    As a result of that meeting was
14 any pamphlets, manuals, documents generated
15 for everybody to follow concerning appropriate
16 protocols or the handling of an investigation?
17     A.    I don't know. And I've told
18 you this a couple of times, the dates on these
19 policies don't ring a bell to me. I don't
20 know whether the interim policy had been
21 released at that point or not, but it was
22 pretty close in time to that. But I am not
23 aware of any other documents other than the
24 policy. I guess I will say I know -- I think

Page 283

1 the students get some shortcut on the policy
2 or something. There's something that the --
3 sometimes the complainants have told me this.
4 The students get something, you know, in
5 addition to the long policy, like a pamphlet
6 or something like that.
7     Q.    Do you have any idea what that
8 is?
9     A.    A card maybe. I don't know.
10 It's something little.
11     Q.    Okay.
12     A.    Maybe it's a card, now that I
13 am focusing on it, a card for the various
14 persons they can report to or something like
15 that.
16     Q.    Okay. Different people, like
17 Title IX coordinator, disabilities group,
18 anything like that?
19     A.    I am not aware of any of that,
20 but I am not involved.
21     Q.    Have you in your investigation
22 of these cases at St. Joe's had anybody ask
23 for special accommodations because of some
24 type of disability, whether medical or

Page 284

1 physical?
2     A.    There was one of the -- it was
3 a male complainant. He had some condition on
4 the autism spectrum. I think he asked if he
5 could take notes, if I could go slowly. It
6 was something like that -- it all worked out
7 perfectly fine -- if he could take breaks. It
8 was definitely a male complainant with an
9 autism spectrum disorder.
10     Q.    A male complainant?
11     A.    Male complainant.
12     Q.    So this was a male complainant
13 who was given special accommodations?
14     A.    I wouldn't call it
15 accommodations, but he told me about his
16 condition and said -- I think he said, "Could
17 I take notes so I am sure I am responding to
18 your question?" and, you know, like, "If I
19 need to ask you to slow down." It was that
20 kind of conversation. It was easy to
21 accommodate. Your question was has anyone
22 asked for accommodations and that was it.
23     Q.    When you interview either a
24 complainant or respondent do you ever raise

Page 285

1 with them, "Well, if you need special
2 accommodations" to let you know or anything?
3     A.    No.
4     Q.    It's only if, what, the
5 disabilities part of the school notifies you
6 that some type of accommodations are
7 necessary?
8         MR. MYERS: Object to the form
9     of the question. She just responded
10     to a situation which is contrary to
11     the factual premise of your question.
12         MR. SCHWABENLAND: I think
13     you're right.
14 BY MR. SCHWABENLAND:
15     Q.    If a student raises that with
16 you, then you would try to accommodate them?
17     A.    Yes. I have been an employment
18 lawyer for 32 years. I know the obligation of
19 all kinds of institutions to accommodate. If
20 I -- so I have never raised it with a student.
21 If they raised with me I would be sensitive
22 about that. If it was something that I
23 couldn't manage, you know, this one gentleman
24 was, you know, "Can I take notes?" And "If I

72 (Pages 282 - 285)

CONFIDENTIAL

1 ask you to slow down, can you slow down?" It
2 was very easy to manage. If it was something
3 that I couldn't manage, I need an interpreter,
4 you know, it could be something well above me,
5 I would refer it back to Community Standards.
6 I know the university does have an
7 accommodation office.
8      Q.    You indicated that Ms. Roe may
9 have submitted her text to you after the
10 meeting?
11      A.    I don't remember that. I mean,
12 you would have -- you know, I gave the
13 university all my emails. So if she didn't --
14 I just don't have a recollection. I obviously
15 have them. I don't remember if she gave them
16 to me at the meeting or I asked her to send
17 them to me.
18      Q.    But I didn't see anything in
19 the handwritten notes of your interview with
20 her you referencing those text messages.
21      A.    Yes, there are. I am pretty
22 sure. It's on Page 384.
23           MR. MYERS: Exhibit-7.
24           THE WITNESS: I say, "Send me

1      text messages."
2 BY MR. SCHWABENLAND:
3      Q.    Would that be indicative of the
4 fact that she later sent them to you?
5      A.    Probably, yes.
6      Q.    Did you then have any further
7 conversation with her about these text
8 messages?
9      A.    I don't believe so.
10      Q.    And you did not submit these
11 text messages to John Doe for comment?
12      A.    Correct.
13      Q.    In your investigation was it
14 relevant or of some importance to you to know
15 if Ms. Roe had a history of self-hurting or
16 hurting herself?
17           MS. ENGLE: Objection.
18           THE WITNESS: No.
19 BY MR. SCHWABENLAND:
20      Q.    Did you review the texts that
21 she sent you to determine whether or not those
22 text messages made sense?
23      A.    I think I reviewed them. John
24 Doe, though, did not disagree with the premise

1 that she was on the phone when he came back in
2 the room and quickly said that she had to
3 leave. I mean, that's what those text
4 messages went to. You know, "I call/texted my
5 friends with my safe word" or whatever it was
6 and "She called me and said she'd meet me
7 downstairs." So he didn't disagree with that.
8      Q.    Okay. Was it relevant to you
9 to know what medications she was on?
10      A.    No.
11      Q.    Do you know anything about if
12 medication she was taking can cause bruises to
13 her individually at all?
14      A.    It is possible. I did not do
15 that.
16      Q.    Did you take the fact that she
17 had bruises just at face value, then? In
18 other words, don't you have to determine the
19 cause of that?
20      A.    My overall reaction from
21 meeting her and talking to John was that what
22 happened was so prominent that she felt the
23 need to text her friend and get out of that
24 immediately. You know, that was my

1 overwhelming thought about what happened and
2 her need to leave.
3      Q.    Would you agree that was based
4 in part upon her thinking of her old boyfriend
5 and the abuse he had shown her in the past?
6           MS. ENGLE: Objection.
7           THE WITNESS: No.
8 BY MR. SCHWABENLAND:
9      Q.    Was one of the reasons for you
10 not to inquire of any past relationship with
11 her boyfriend that she says abused her and
12 choked her or squeezed her neck the fact that
13 you didn't want to traumatize her or cause her
14 any problems?
15      A.    I don't think so. I've
16 certainly talked to lots of students about
17 very delicate matters.
18      Q.    But you didn't talk to her
19 about any delicate matter involving her old
20 boyfriend?
21      A.    Correct.
22      Q.    And did you talk to her about
23 any matter involving whether or not she was
24 under discipline for any reason? She is now a

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

1 freshman at the university.
2     A.   I did not.
3     Q.   Under the sexual misconduct
4 policy are you aware that students get, I am
5 going to use the word immunized or amnesty, if
6 they -- for their own drug or alcohol intake
7 if they are reporting sexual abuse?
8         MR. MYERS:  Object to the form
9     of the question, but you can answer.
10        THE WITNESS:  I think the
11     policy is much more nuanced than you
12     just described.
13 BY MR. SCHWABENLAND:
14     Q.   Tell me what your understanding
15 is.
16     A.   But I am aware that the
17 university does not want students to not make
18 complaints because they are afraid they will
19 get in trouble for some other policy
20 violation, you know, like, the kid's dying on
21 the couch because they don't want to call the
22 police because the kid is inebriated.  I am
23 aware that there is some consideration given
24 to that.

Page 291

1     Q.   When Ms. Roe said "What the F,"
2 did she say that -- does she definitely
3 remember saying that or did she say words to
4 the effect, "I think I may have said that," if
5 you can recall?
6     A.   I think my notes record that.
7 They don't.  It just says "What the F."  So I
8 don't remember one way or the other.
9     Q.   Did you ask Ms. Roe why she
10 thinks that Doe would suddenly want to hurt
11 her, any conversation about that?
12        MS. ENGLE:  Objection.
13        MR. MYERS:  Object to the form
14     of the question.  It assumes that she
15     said that or thought that, neither of
16     which is in the record and both of
17     which is contrary to both the written
18     and oral statements that we have been
19     going over for now six and a half
20     hours.
21        MR. SCHWABENLAND:  Apparently
22     two different records, because it is
23     in the record.  She said that.
24

Page 292

1 BY MR. SCHWABENLAND:
2     Q.   You asked Ms. Doe and Ms. Doe
3 said that she was -- she felt he was trying to
4 hurt her.  Look at your interview with her,
5 the last paragraph before you go to the
6 interview with Doe.  I will read it to you.
7     A.   Let me find it.
8     Q.   Okay.
9         MR. MYERS:  Ed, are you looking
10     at five or six?
11        THE WITNESS:  I am looking at
12     273 at the top of the page.
13 BY MR. SCHWABENLAND:
14     Q.   Yes.
15     A.   I asked her why she thought he
16 squeezed her neck.  "She said she did not view
17 it as pleasurable, she did not ask for it, and
18 she did not consent to it.  She thinks he did
19 it to hurt her, because she felt he was
20 choking her."
21     Q.   Okay.  So my question to you
22 is:  Did you probe with her as to why she felt
23 he was trying to hurt her?
24     A.   No.

Page 293

1     Q.   Who in St. Joe's, if anyone, is
2 responsible for oversight of your
3 investigation?
4     A.   I don't know.  Dr. Carey
5 Anderson is the vice president of that
6 department, so I assume he's ultimately
7 responsible for everything that happens under
8 that department, but I can't answer your
9 specific question.
10     Q.   Has Dr. Carey Anderson or
11 anybody else at St. Joe's said, "Well, we are
12 going to review each summary and see if it's
13 acceptable or get back to you on that"?
14     A.   No.
15     Q.   So, to your knowledge, does
16 anybody oversee either how you do the
17 investigation or the reports that you submit?
18     A.   I assume that they are read,
19 but I do not personally know.
20     Q.   All right.  Let me ask you
21 this:  Do you have a belief one way or another
22 as to whether or not a victim should be
23 believed?
24     A.   I do not.

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

1      Q.    So you would recognize that
2  sometimes they may not be telling the truth;
3  is that correct?
4      A.    Yes.
5      Q.    Other times they may be
6  misinterpreting something that happened?
7      A.    That's possible.
8            MR. SCHWABENLAND: Okay. I'm
9      taking a two-minute break. This will
10     be the last break and then I think I
11     will be done shortly.
12           _  _  _
13           (Whereupon, a recess was held
14     from 5:13 p.m. to 5:21 p.m.)
15           _  _  _
16  BY MR. SCHWABENLAND:
17     Q.    In your investigation of these
18  cases -- by "these cases" I mean sexual
19  misconduct cases -- on behalf of St. Joe's, do
20  you customarily only talk to the complainant
21  and the respondent or is it much more frequent
22  that you also interview other witnesses? May
23  not have witnessed the actual thing complained
24  of, but at least they had contact with the

Page 295

1  complainant and respondent.
2            MS. ENGLE: Objection to form.
3            THE WITNESS: It's such a
4      general question I can't answer it.
5      There are certainly investigations
6      where I talk to more than the
7      complainant and respondent.
8  BY MR. SCHWABENLAND:
9      Q.    But you can't say on a more
10  frequent basis which one you do?
11     A.    Depends on the allegations, so
12  I cannot answer that off the top of my head.
13     Q.    Let's talk about this just
14  briefly here. Once you got the text messages
15  and knowing that Ms. Roe was on the phone
16  while in St. Mary's to her friends, would it
17  have been helpful to talk to them?
18     A.    I didn't believe so.
19     Q.    In terms of assessing
20  credibility, is it helpful to know the actions
21  of the complainant both during the time period
22  that she's with the respondent and what she is
23  telling her friends afterwards?
24     A.    It depends on the investigation

Page 296

1  and the totality of the information that I
2  have after interviewing the complainant and
3  the respondent. It could be, but I can't
4  answer it in a hypothetical way.
5      Q.    Well, let's get to this. In
6  terms of this case, you didn't feel it
7  necessary at all to seek to talk to any of her
8  friends?
9      A.    I did not.
10     Q.    Did you ask Ms. Roe why she
11  hadn't reported this right away to the school?
12           MS. ENGLE: Objection to form.
13  BY MR. SCHWABENLAND:
14     Q.    Do you know when this was
15  reported to the school?
16     A.    February 26 and it happened on
17  February 23.
18     Q.    Okay. And this was reported
19  by -- I forgot her name.
20           MR. MIRABELLA: Katie Bean.
21  BY MR. SCHWABENLAND:
22     Q.    -- Ms. Bean, who works with the
23  plaintiff, taking her into Ms. Perry's office?
24           MS. ENGLE: Objection to form.

Page 297

1            THE WITNESS: I don't know who
2      that lady is at all.
3  BY MR. SCHWABENLAND:
4      Q.    Did you know that the
5  complainant worked in the school?
6      A.    That Ms. Roe worked at the
7  school?
8      Q.    Yes.
9      A.    I did not know that.
10     Q.    So you didn't have any
11  questions of Ms. Roe as to why she waited
12  until the afternoon of February 26th to
13  complain of this?
14     A.    I did not. It might be the
15  difference between a Friday and a Monday, too.
16  I don't know. I didn't pull out a calendar.
17           MR. MYERS: It is.
18  BY MR. SCHWABENLAND:
19     Q.    Get back to that Saturday.
20  Ms. Roe has indicated that she and her friends
21  drank liquor, a lot, and then went to a party.
22     A.    I don't know that.
23     Q.    And is that something that you
24  would like to have known if that really

75 (Pages 294 - 297)

CONFIDENTIAL

Page 298

1 happened?
2     A.   I can't answer that
3 hypothetically.
4     Q.   In terms of assessing a
5 person's credibility what factors do you
6 consider?
7     A.   I considered, in this case,
8 based on my interviews with them and the
9 information that they gave me and their
10 communication style and general instinct and
11 experience.
12    Q.   Okay.   You found both to be
13 credible; is that correct?
14    A.   Yes.
15    Q.   So your instinct and experience
16 in what?
17    A.   In being a human being for 59
18 years and having a lot of -- can't discount
19 that, right?
20    Q.   Okay.
21    A.   And having, you know, an
22 employment law background, where I talk to
23 employees and people about complaints all the
24 time.

Page 299

1     Q.   Do you look for corroborating
2 evidence?
3     A.   It depends.   I can, yes.
4     Q.   Do you look for the claimant's
5 actions shortly after the incident, say, that
6 weekend, to see if she was really traumatized?
7         MS. ENGLE:  Object to form.
8         THE WITNESS:  In this case, no.
9     It is a possibility in other cases.  I
10    told you based on the investigation.
11    So that's both what the claimant and
12    the respondent told me.
13 BY MR. SCHWABENLAND:
14    Q.   When you looked at the text
15 messages -- and I may have asked you this
16 before so I apologize -- did you suspect
17 anything was left out of those text messages?
18    A.   No.  I mean, the thing about
19 the text messages was, this was her way of
20 getting the friend to call her.
21    Q.   To come meet her outside?
22    A.   Which happened.  Yes.  I think
23 somebody called her first.
24    Q.   Okay.

Page 300

1     A.   So they are not communicating
2 information about -- substantive information.
3     Q.   Do you know when Ms. Roe took
4 the photographs?
5     A.   Sunday, she said.
6     Q.   Do you know who took them?
7     A.   Her friend.  I don't know the
8 person's name.
9     Q.   Do you know who Ms. Roe first
10 told about the event?
11    A.   No.
12        MR. SCHWABENLAND:  Off the
13    record.
14            _ _ _
15        EXAMINATION
16            _ _ _
17 BY MS. ENGLE:
18    Q.   Good afternoon, Ms. Malloy.  My
19 name is Susan Engle.  I represent the
20 individual that's been identified for purposes
21 of this litigation as Jane Roe.  I just have a
22 couple of follow-up questions.
23    A.   Sure.
24    Q.   You were asked about Ms. Roe

Page 301

1 telling you something about her saying "What
2 the fuck" when she was being choked by Mr. Doe
3 and then you were asked some follow-up
4 questions and you were directed to your
5 handwritten notes.  Do you recall that line of
6 questioning?
7     A.   Yes.
8     Q.   And you were asked something
9 along the lines of "Did she actually say that
10 or she's not sure whether or not she said
11 that?"  You indicated your notes didn't say
12 one way or the other?
13    A.   Correct.
14    Q.   Can I direct your attention to
15 Exhibit-6.  The Bates stamp page is SJU272,
16 leaving out the zeros in the middle.
17    A.   Okay.
18    Q.   In the first full paragraph
19 about two-thirds of the way down it starts as
20 redacted.  It says, Redacted, "believes she
21 said 'What the fuck.' He pulled away."  Do
22 you see where I'm referring to?
23    A.   Yes.
24    Q.   The fact that you used the term

CONFIDENTIAL

Page 302

1 "Believe she said," is that important to you
2 at all as far as that line of questioning
3 goes?
4      A.    Yes.  It would be my most
5 accurate testimony that she said believed.  I
6 often write up the summaries of investigations
7 the day of or the night of the interviews.  I
8 would not let too much time pass before doing
9 that.
10     Q.    That was going to be my next
11 question, whether or not this page, SJU272,
12 was prepared fairly contemporaneous with the
13 interview you had with Ms. Roe?
14     A.    I do the interviews on campus
15 and I live in the suburbs.  I will say my
16 usual practice is I go to the Bala Cynwyd
17 public library across the street from St.
18 Joe's and I generally work fairly late into
19 the evenings.  I actually hand write all parts
20 of the report.  So it would be my typical
21 practice to write up the summaries of
22 investigation pretty shortly thereafter, if
23 not that evening, actually.
24     Q.    When you indicate that Roe

Page 303

1 believes that she said that comment, does that
2 indicate to you that Roe told you she may or
3 may not have said it, she wasn't certain?
4      A.    Yes.  I don't think I would
5 have said "believes" if I didn't have a reason
6 for that.
7      Q.    Let me ask you this:  Did Jane
8 Roe have to say "What the fuck" or something
9 along those terms in order for this squeezing
10 of the neck to be nonconsensual, as far as
11 your investigation purposes go?
12     A.    No.
13     Q.    Am I understanding that sexual
14 misconduct policy correctly in that it is the
15 job of the initiator of sexual contact to
16 obtain consent?
17     A.    Correct.
18     Q.    It's not the job of the
19 complainant to shut it down?
20     A.    Correct.
21     Q.    You were asked a little bit
22 about making credibility determinations, which
23 I understand is part of your investigative
24 process.  When you're making credibility

Page 304

1 determinations with respect to a complainant
2 do you take into consideration whether or not
3 you think that that individual is overreacting
4 to what happened?
5      A.    Yes.
6      Q.    And what bearing would that
7 have on your findings as far as credibility
8 goes?
9      A.    It could possibly determine
10 that it didn't happen or it didn't happen in
11 the way it was explained.  That's hard to
12 answer hypothetical.
13     Q.    I understand.  Well, in the
14 actual world, when you were interviewing Jane
15 Roe did you find her to be overreacting at any
16 point in time?
17     A.    No.
18     Q.    Does Ms. Roe's past
19 relationship history have any bearing on
20 whether or not what happened to her was
21 consensual?
22     A.    No.
23     Q.    The bruises on Ms. Roe's neck,
24 do they have any bearing on whether or not

Page 305

1 this activity was consensual?
2      A.    No.
3          MS. ENGLE:  I don't have any
4 other questions.  It was nice to meet
5 you.
6          THE WITNESS:  Nice to meet you.
7          _ _ _
8          EXAMINATION
9          _ _ _
10 BY MR. SCHWABENLAND:
11     Q.    What exactly did you do to
12 determine if Ms. Roe may have been
13 overreacting?
14     A.    She did not present to me in
15 that way at all.  She presented in a very calm
16 manner.  I actually thought she was a pretty
17 tough cookie.  And I have met lots and lots
18 and lots of students who I might not say that
19 about.  She was very measured in her
20 description.  And the calling, texting the
21 girlfriends to come get her, as I explained
22 before, did substantiate in my mind her fear
23 and hurt over this situation.  Hurt meaning
24 pain.

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

1    Q.    But, again, wouldn't that be
2  another reason for you to probe into why she
3  froze all of a sudden or had a flashback about
4  her ex-boyfriend?
5    A.    I do not believe so.
6    Q.    And if I were to tell you that
7  Ms. Roe has said that she was raped multiple
8  times by her ex-boyfriend when she was a
9  teenager that would have no bearing on whether
10  or not she's overreacting?
11        MS. ENGLE:  Object to form.
12        MR. MYERS:  I object to the
13        form of the question and I object to
14        the continued use of her prior sexual
15        history of the victim here in your
16        defense, or prosecution, rather, of
17        this case.  You can answer the
18        question.
19        THE WITNESS:  I don't know.  I
20        mean, that's hypothetical to me, so I
21        don't know.
22  BY MR. SCHWABENLAND:
23    Q.    But it's hypothetical because
24  you didn't probe into that in this case here?

Page 307

1    A.    No.  It's hypothetical as
2  you're describing it.  But I did not probe
3  into that.  I told you that multiple times.
4    Q.    Do you recognize that there is
5  a difference between perhaps sexual assault
6  and one participant using a little bit too
7  much force or pressure during their getting
8  together?
9        MR. MYERS:  I object to the
10        form of the question.  You are stating
11        a principle of law which is absolutely
12        false.  The thing that you have
13        described could easily be sexual
14        assault.  The premise of the question
15        makes it a trap question and I am not
16        going to let her answer it.
17        MS. ENGLE:  Join the objection.
18  BY MR. SCHWABENLAND:
19    Q.    Do you ever evaluate in your
20  investigation whether or not there may have
21  been additional pressure used but certainly
22  not a sexual assault?
23    A.    I can't answer that.  I apply
24  the definitions in the policies to the facts

Page 308

1  before me.
2    Q.    Okay.  But have you ever made a
3  finding that there wasn't a sexual assault in
4  a situation where there was interaction?
5        MR. MYERS:  I object to the
6        form of the question.  You can answer
7        the question.
8        THE WITNESS:  I don't know and
9        that very well might turn on all of
10        the facts that would go to whether
11        there was consent or not.  I don't --
12        in that hypo that you have posed, I
13        don't remember having that situation.
14
15        (Whereupon, Exhibit Malloy-13
16        was marked for purposes of
17        identification.)
18
19  BY MR. SCHWABENLAND:
20    Q.    I will represent to you what's
21  been marked as 13 is Ms. Roe's response to
22  Mr. Doe's appeal letter.
23    A.    Okay.
24    Q.    One of the things Mr. Doe

Page 309

1  indicated in his appeal letter is that he had
2  no idea that she was uncomfortable in any way.
3  I'm paraphrasing?
4    A.    I don't necessarily agree with
5  you, but, anyway.  His appeal is five pages.
6    Q.    Pardon me?
7    A.    His appeal is five pages and
8  says a lot of stuff.
9    Q.    I understand that.  I am just
10  indicating that's one of the claims.
11    A.    Okay.
12    Q.    She states, "Even though some
13  memories of my ex-boyfriend did surface,
14  experiencing what Mr. Doe was doing was
15  petrifying to me.  I was paralyzed from fear,
16  which led me to not say anything to him.
17  Instead I text my friends, because I knew that
18  would help me get out of the situation before
19  anything else happened."  That's in that
20  fourth paragraph down.  My question to you is
21  that, in the appeal letter she indicates that
22  she never alerted Mr. Doe that anything was
23  wrong --
24        MR. MYERS:  I object to the

78 (Pages 306 - 309)

CONFIDENTIAL

Page 310

1    form.
2        MS. ENGLE:  Join.
3        MR. MYERS:  What is the
4    question?  Is the question whether
5    what you just said true or is what the
6    document says true?
7        MR. SCHWABENLAND:  Is what I
8    just said true reflected in that
9    document.
10       MR. MYERS:  I object to the
11   form of the question.  You are showing
12   this witness, who was the
13   investigator, a document created after
14   her investigation, in which she was
15   not involved.  So the document says
16   what the document says, Ed, really.
17       MR. SCHWABENLAND:  I know it
18   says it.  That's what I am saying.
19       MR. MYERS:  Well, then you
20   don't need the witness to say that the
21   document says what it says.
22   BY MR. SCHWABENLAND:
23   Q.    Does she indicate in that
24   document that she alerted Mr. Doe during that

Page 311

1    time together, that she said "What the fuck"?
2    A.    All I can tell you is, from
3    reading my notes, she said that she was
4    paralyzed, he had his hand around her throat,
5    he was squeezing her neck, she couldn't
6    breathe, she was scared, "What the fuck, what
7    the F" I have written down, and he pulls away.
8    I can't.
9    Q.    In that appeal letter is that
10   reflected in there, saying the words "What the
11   fuck"?
12       MR. MYERS:  I object to the
13   form of the question.  Is the question
14   whether the phrase "What the fuck"
15   appears in the appeal letter?
16       MR. SCHWABENLAND:  Yes.
17       MR. MYERS:  Okay.  I stipulate
18   that "What the fuck" does not appear
19   in the appeal letter.  This is not a
20   fact witness on a letter that she's
21   not part of, Ed.  Now, come on.  It's
22   quarter of.
23   BY MR. SCHWABENLAND:
24   Q.    Is there anything that

Page 312

1    indicates in that letter where the complainant
2    says she alerted in some way the respondent
3    that she didn't like something that was going
4    on?
5        MR. MYERS:  Object to the form
6    of the question.  You are asking a
7    witness not involved with the letter,
8    which was created after her
9    determination based on her interviews,
10   to now evaluate whether the letter
11   which indicates Roe pulling away,
12   whatever your phrase was, indicates
13   her displeasure with what was going
14   on.  I object to the form of the
15   question.  You have 16 minutes and I
16   am walking out the door.
17       MR. SCHWABENLAND:  Well, you're
18   using up my time.
19       MR. MYERS:  I am not using up
20   your time.
21       MR. SCHWABENLAND:  Yes, sir,
22   you are.
23       MR. MYERS:  Ask a question of a
24   witness that has personal knowledge.

Page 313

1        MR. SCHWABENLAND:  Just object
2    and let's go on.
3        THE WITNESS:  She is responding
4    to a four- or five-page complaint, so
5    I don't know what part of it she is
6    responding to.  But to try to answer
7    your question, I agree with what
8    Mr. Myers said, I --
9    BY MR. SCHWABENLAND:
10   Q.    I am sure you do.
11   A.    -- I have no knowledge of
12   anything after the time I had met with her.
13   She said she texted her friends and John says
14   that when he came back in she was on the phone
15   with somebody.
16   Q.    And she says that she did not
17   say anything to Doe, right?
18       MS. ENGLE:  Object to the form.
19       MR. MYERS:  Object to the form
20   of the question.  The letter says what
21   the letter says.  Are you asking
22   her -- again, if you're asking her to
23   read the document, which is in
24   evidence and is going to be

79 (Pages 310 - 313)

CONFIDENTIAL

Page 314

1  authenticated by other people, you are
2  not asking a factual question.  Go
3  ahead.  Answer the question if you
4  can.
5       THE WITNESS:  It says, "Which
6  led me to not say anything to him."
7  BY MR. SCHWABENLAND:
8     Q.    Okay.  What sources do you use
9  as, quote, best practice for Title IX
10 investigations?
11    A.    I don't refer to any documents
12 that talk about best practices.
13    Q.    And why is that?
14    A.    I am not even aware that there
15 is one.
16    Q.    What sources do you use for
17 reference?  Is that that NACUA?
18    A.    What do you mean by reference?
19    Q.    Well, you're an investigator.
20 Do you have any literature or documentation as
21 to how to carry out an investigation in a fair
22 and impartial way?
23    A.    I am sure that I have read
24 things over my career.  I don't have something

Page 315

1  in my desk that I pull out.
2     Q.    Do you have any such literature
3  in your office?
4     A.    Not that I can think of.
5     Q.    So, to your knowledge, do you
6  have any pamphlet, booklet, anything else that
7  talks about how to be fair and impartial as an
8  investigator?
9     A.    No.
10    Q.    Do you have anything that talks
11 about how to properly carry on an
12 investigation of sexual misconduct?
13    A.    I have told you what we have
14 talked about several times today.  I have read
15 materials and gone to seminars over the years.
16 There's lots of people who can write something
17 called "best practices," which is a lot of
18 nothing either, but there is not a document
19 that I refer to.
20       MR. SCHWABENLAND:  Okay.  Thank
21 you.
22       THE WITNESS:  Thank you.
23       (Deposition concluded.  Time
24 noted, 5:46 p.m.)

Page 316

1       C E R T I F I C A T E
2            - - -
3
4
5       I do hereby certify that I am a
   Notary Public in good standing, that
6  the aforesaid testimony was taken
   before me, pursuant to notice, at the
7  time and place indicated; that said
   deponent was by me duly sworn to tell
8  the truth, the whole truth, and
   nothing but the truth; that the
9  testimony of said deponent was
   correctly recorded in machine
10 shorthand by me and thereafter
   transcribed under my supervision with
11 computer-aided transcription; that the
   deposition is a true and correct
12 record of the testimony given by the
   witness; and that I am neither of
13 counsel nor kin to any party in said
   action, nor interested in the outcome
14 thereof.
15      WITNESS my hand and official
   seal this 26th day of July 2018.
16
17
18
19       _Kimberly A. Wornczyk_
20
21       _____
         Kimberly A. Wornczyk
22       Notary Public
23
24

Page 317

1            - - -
2       INSTRUCTIONS TO WITNESS
3            - - -
4
5       Please read your deposition over
6  carefully and make any necessary corrections.
7  You should state the reason in the appropriate
8  space on the errata sheet for any corrections
9  that are made.
10      After doing so, please sign the
11 errata sheet and date it.
12      You are signing same subject to the
13 changes you have noted on the errata sheet,
14 which will be attached to your deposition.
15      It is imperative that you return the
16 original errata sheet to the deposing attorney
17 within thirty (30) days of receipt of the
18 deposition transcript by you.  If you fail to
19 do so, the deposition transcript may be deemed
20 to be accurate and may be used in court.
21
22
23
24