## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE | : | |
| Plaintiff | : | |
| v. | : | CIVIL ACTION NO:  18-cv-2044 |
| | : | |
| SAINT JOSEPH'S UNIVERSITY | : | |
| | : | |
| And | : | |
| | : | |
| JANE ROE | : | |
| Defendants | : | |

## BRIEF OF PLAINTIFF JOHN DOE   IN OPPOSITION TO THE SUMMARY JUDGEMENT MOTION OF DEFENDANT  JANE ROE

### INTRODUCTION

This case arises from Jane Roe's false report to SJU officials of her alleged violent encounter with John Doe in the early morning hours of February 24, 2018 as a result of which SJU officials later found John Doe responsible for "sexual assault". As alleged by Roe, the two SJU students, John Doe and Jane Roe, met for the first time at a party late in the night of February 23, 2018 where they kissed and flirted before deciding to return to Doe's dorm, in the early morning hours of February 24th where they kissed more, touching one another's faces and necks – all of which was, and Roe reported was, consensual. The preceding facts are undisputed, but much of the factual recitation set forth casually in Roe's brief as "Uncontested Facts" are disputed or simply wrong. Roe's Summary Judgment Motion has multiple grounds, all of which will be addressed, but is principally constructed and dependent upon the premise that Doe's defamation claim against her is groundless because what she reported to SJU officials was true.

In support, Roe argues that paramount in the evidence that Roe's claim was true (and hence not defamatory) is that Doe has never denied it. Nothing can be further from the truth.

## II.   STATEMENT OF UNDISPUTED AND DISPUTED FACTS

### A.   UNDISPUTED FACTS

Roe admits in her Answer (Exhibit 2) to the following paragraphs of the Complaint (Exhibit 1).

4.   Defendant, Jane Roe ("Roe"), is an adult individual who is and was at all times material hereto a matriculated student at SJU and resides in Pennsylvania.

8.   At all times material hereto, Roe resided in an SJU residential hall known as "Villiger."

10.   On the evening of Friday, February 23, 2018, Doe and several of his friends attended a party in Philadelphia near the campus of LaSalle University.

11.   At that party, Doe met Roe met for the first time.

13.   Roe initially told Doe that she was not an SJU student, but later admitted that she actually was enrolled at SJU.

16.   Throughout their time together at the party, Roe continued to demonstrate romantic interest in Doe by flirting with him, kissing him and giving him her cell phone number.

17.   At some point, Doe and his friends decided to leave the party, and Roe decided to accompany Doe and his friends back to SJU's campus.

18.   Doe and Roe walked outside to get some air, where Roe noticed a man selling cocaine.

19.   Roe expressed an interest in buying cocaine and inquired about the price.

20.   Concerned for her well-being, Doe discouraged Roe from purchasing the cocaine, reminding her that she said she had been "sober" for some time and that taking cocaine would destroy her sobriety.

21.   At Doe's urging, Roe decided not to purchase cocaine at that time, and left the party with Doe and several of his friends in one of Doe's friend's car.

22.   There is no suggestion that neither Doe nor Roe was intoxicated when they left the party on LaSalle's campus.

23.   When the group arrived back on SJU's campus, rather than returning to her own dorm, Roe decided to accompany Doe to his residence hall, St. Mary's.

24.   Doe and Roe went to the kitchen in St. Mary's, drank water and kissed some more.

25.   Doe suggested that, because his roommates were asleep, he and Roe should go up to a common room on the third floor of St. Mary's. Roe agreed.

27.   Roe told Doe that her friend was sick and that she needed to go to McShane, another residential hall on campus, to help her friend.

30.   Doe escorted Roe to the front door of St. Mary's and, when he opened the door, he saw a woman who he assumed to be Roe's friend waiting outside. Roe kissed Doe goodbye, in front of her friend, then Doe watched her go over to her friend.

2

31.   Doe closed the door and texted Roe to say "Im goin to bed but u guys need anything my phone will b on I hope ur friends ok." A true and correct copy of the complete text exchange between Doe and Roe is attached hereto as Exhibit 3. Roe responded to Doe's text, saying "Thanks man." See Exhibit 3. Doe then went to bed.

33.   At no time did Roe ask Doe to stop kissing or touching her in any way.

34.   On Saturday, February 24, 2018, Doe texted Roe, "Hey." Roe did not respond to that text. See Exhibit 3.

35.   Doe and Roe have had no further communication with one another via text or otherwise. See Roe's Answer to Complaint Exhibit 2.

## B.    DISPUTED FACTS

Roe's brief in support of her Motion for Summary Judgment avoids any discussion of the defamatory statements she made about Doe when she reported the encounter with Doe to her friends (all of whom were SJU students) and then SJU officials. Roe's brief: "Initially, it is noted that in reporting the incident to the University Defendant Roe did not describe the incident as or indicated it to be a "sexual assault." Rather, *she has only described to university officials the accurate facts of what occurred*, and it was SJU that made the determination that the incident was considered to be a "sexual assault." RBISJp (emphasis added). Roe glosses over her actual statements she made about Doe, first to her friends and then on February 26, to SJU officials. Roe's statements about Doe given to two SJU officials, referred to in her brief as "accurate facts" were the following:

According to Bean, Roe told her

Exhibit 21, P156 L23-P157 L16

Q.   So you went into your office and what happened then?

A.   So we shut the door. I asked her what was going on or how she was doing or something to that effect. She kind of pulled down her shirt and showed me some bruising. I said, "What's that? Where did that come from?" or something to that effect. She said that over the weekend she had met a guy at a party. She didn't know him, but she thought he was really nice. They went back to St. Mary's, which is a residence hall, and were making out and then he started to choke her and that she was really scared and that when he left the room to get water or a drink or something like that she called -- she used her phone to call her friend to get out of the situation.

3

Exhibit 21 , P167 L8-9

Q.     Did she use the word choke her?

A.     Yes.

Roe repeated the defamatory comments to Perry in Bean's presence and named Doe as

the person who choked her. Exhibit 21, P185 L3-24

Q.     What details were shared?

A.     The same that were shared with me. It was reiterated, the details of the night in question.

Q.     I need to know, what did she say in front of you?

A.     The same thing that I have already shared with you. There was no new information that I
       heard. Everything that she shared with me she had then shared with Mary-Elaine.

Q.     Do you say anything first?

A.     I did. When Mary-Elaine's door opened I said, "Hi. We are here. I am here with a student.
       We are here for a Title IX issue." I was broad. She said, "Okay. Come on in." Then I
       think Mary-Elaine just started introducing herself as a Title IX coordinator and what her
       role was. She got a notebook out and, you know, asked questions, went through the night,
       the experience, the situation, and that went back and forth.

Q.     And she was taking notes as to what Ms. Roe had to say?

A.     Yes, she was.

Q.     These were handwritten notes that you could determine?

A.     Yes.

Q.     Did you offer any information to Dr. Perry while that conversation is going on between
       Dr. Perry and Ms. Roe?

A.     Well, at one point in the conversation Mary-Elaine asked if she wanted to give a name,
       therefore, and explained what that meant. She said, "It could just be this and this is a
       report. If you share the name, then we can move further with an investigation."

Q.     So share the name of the person that she is complaining about?

A.     Exactly. As to that point it had not been shared. So the student agreed to that. After that --
       your question was what did I contribute to the conversation. I was silent almost the whole

4

time, other than after that, when I knew it was an actual report and investigation was going to happen, I asked the student if she had taken any pictures of the bruises and she said no and I suggested that she did.

The above facts are undisputed – Bean's testimony is unchallenged.  It must be noted that what Roe reported as quoted, supra, is false. This will be proven based upon her own photographs, deposition testimony, and expert testimony. However, that will be addressed in detail later and the proof of which is not necessary to establish the moving party is not entitled to the relief south here. But by avoiding the record evidence of what Roe said about Doe on February 26, she can advance the false argument that Doe has never denied it.

> "Doe has never outright denied these facts as Roe has stated them. In particular, he has not definitively denied squeezing Roe's neck. In the course of SJU's investigation, Doe told investigator Elizabeth Malloy that he merely "didn't remember doing that", but he has never denied that it occurred."

As will be explained below, that assertion repeated by Roe throughout her brief is simply not true. As a legal argument in support of Roe's motion it is misleading, whether it is deliberately misleading or simply uninformed is not clear but what is clear is that it is wrong.

Roe principally relies on Doe's response to Malloy's incomplete and misleading description of Roe's allegations against him, to support of her position that Doe has never denied it occurred. As noted above and quoted below, Doe has denied it repeatedly. But it is critical to resurrect the backdrop of Malloy's interview with Doe on March 9, 2018, to fully understand Doe's reticence to say anything disparaging about Roe in his meeting with Malloy when for the first time he hears the factual allegations of Roe's charges albeit whitewashed by Malloy and incomplete. Doe knew nothing about the specific claim or even type of sexual misconduct that had been asserted against him (this is undisputed). Before the March 9th, meeting he had been told only that an SMP complaint had been filed against him, the name of the person, the date,

and that if true it violated one of the six prohibited types of sexual misconduct in SJU's 50-page SMP. As to the actual factual allegations, Forte told him only that it did not involve sex but that he had been "rough" with Roe After being summoned to a PIM meeting conducted by Forte on March 5th, he was given no further information about the type of sexual misconduct or the actual allegations.  At the meeting he was given a long check list with no additional information about the allegations or the specific charges.  Virtually insuring he would remain in the dark about Roe's actual allegations, before Doe's Pre-Investigation Meeting ("PIM"), Forte notified him that a contact restriction had been put in place between him and Roe.  A contact restriction included both *direct and indirect forms of communication. These contact restrictions include but are not limited to: personal interaction, contact with personal property, electronic correspondence (computer, telephone, text messages, e-mail, Facebook, etc.), contact initiated by any third parties* on your behalf or at your request, and all forms of retaliation.  These restrictions apply both on and off campus. See SJU 644, Exhibit 8.

What Forte did tell him was that it might be helpful for him to prepare a note about what he remembered of the evening in advance of meeting with the investigator.  Still perplexed Doe, with the little information he had about the charges (it was not anything sexual but he was a little rough) and reasonably but perhaps naively assuming Roe was a rational individual who would not  cavalierly make false charges against another student, he went over every detail of their encounter he could remember  and wrote in his note:

Doe details in the above note of his recollection of his 15 minutes with Roe before meeting with the investigator in which he apologizes for a "playful push toward the chair", speculates whether he was "holding her in some way that felt forceful or aggressive" or maybe upset her when he had kissed her on the stairs, delaying her from meeting her friend.  It is

abundantly clear that Doe has absolutely no idea what Roe's actual charges are against him. When he meets with Malloy on March 9, Malloy does little change that. Instead, Malloy discloses to Doe an incomplete and whitewashed version what Roe alleged against him. When Malloy met with Doe, she had the Complaint prepared by Perry and Roe's "photos' neither of which she shared with Doe. Instead, she thought it would be best for her investigation to disclose to Doe only the following:

Schwabenland:     And you told him that the claim was that -- the claim by Ms. Roe was that he squeezed her neck, right?

Malloy:     Yes.

Schwabenland:     Did you tell him that Ms. Roe was claiming that she felt he wanted to harm her?

Malloy:     I don't think so.

Engle:     Objection.

Schwabenland:     Did you tell him that Ms. Roe was claiming he choked her to the extent that she couldn't breathe?


Malloy:     I told him that she said -- that she said that it hurt and that she was scared and that's why she texted her friend. I don't think I said "couldn't breathe."

Schwabenland:     Okay. So you didn't mention anything that she was claiming he choked her or that she couldn't breathe because of that?

Malloy:     I told you what I told him.

Schwabenland:     And it doesn't include those two statements?

Malloy:              I didn't use the word "choked."

Schwabenland:        Did you use the words that because of whatever she complained about she

                     could not breathe?

Malloy:              No.

Exhibit 16, Malloy, P265, L4, P266, L7

Q.    And you told him that the claim was that -- the claim by Ms. Roe was that he squeezed
      her neck, right?

A.    Yes.

Q.    Did you tell him that Ms. Roe was claiming that she felt he wanted to harm her?

A.    I don't think so.

Q.    Did you tell him that Ms. Roe was claiming he choked her to the extent that she couldn't
      breathe?

A.    I told him that she said -- that she said that it hurt and that she was scared and that's why
      she texted her friend. I don't think I said "couldn't breathe."

Q.    Okay. So you didn't mention anything that she was claiming he choked her or that she
      couldn't breathe because of that?

A.    I told you what I told him.

Q.    Okay. And it doesn't include those two statements?

A.    I didn't use the word "choked."

Q.    Okay. Did you use the words that because of whatever she complained about she could
      not breathe?

A.    No.

Q.    Did he admit to squeezing her neck?

A.    He said he didn't remember and didn't think that he did it when asked specifically.

      Exhibit 16, Malloy P199 L5-9

The above testimony from Malloy is what Roe is relying upon to argue that Doe's has never actually denied Roe's claim. Except Doe, as quoted above, did deny it. The exchange reveals quite clearly that Doe does deny it, and at the same time, is hesitant to say anything negative about Roe. Doe's reticence to say anything disparaging about Roe was understandable and directly sown by Malloy bizarre interview tactics which included deliberately not telling the accused the material facts of the allegations Roe had leveled against him. In Malloy's whitewashed version of Roe's complaint, as Malloy conveyed it to Doe, their kissing and touching was all consensual, but while kissing her, he squeezed her neck, it caused her pain and she was scared. Making the accusation even more confusing, Doe has no recollection of Roe asking him to stop touching or kissing her, because she never did. (Roe admits in her answer to the Complaint that she never asked him to stop kissing or touch her). As described <u>by Malloy to Doe, Doe's alleged misconduct was not knowing he squeezed Roe too tight while they were consensually kissing and touching each other which Roe admittedly did not tell him – this is not misconduct, much less sexual assault</u>. Doe did not learn of the actual allegations against him until he had already been found responsible and punished. Malloy confirms that she did not tell Doe what Roe actually said about Doe. She did not tell Doe that Roe said that Doe choked her, that he did it so hard she could not breathe or speak, that it left bruises, and that she believed he did it because he wanted to hurt her. When he finally did learn of what Roe really alleged against him, and her alleged evidence, there was no confusion or hesitancy, he stated:

**DEPOSITION OF DOE:**

Q:     Can you explain how these bruises got on her neck?

A:     No.

Q:     You are aware, are you not, that she says these bruises came from your rough treatment of her?

9

A:      Yes, I'm aware she says that.

Q:      As you sit here today, can you remember whether your actions could have been involved in this?

A:      My actions did not cause this. I don't see how that's possible.

Q:      It's not possible?

A:      I don't see how it would be possible.

Exhibit 21, JD P11-12

Q:      So there's a point in time in which Liz Malloy says to you in effect did you squeeze her neck. At that point you understood, didn't you, that she was saying you squeezed her neck?

A:      I understood that she was saying I squeezed her neck.

Q:      Yeah, okay. Did you say to her anything – or give Liz Malloy any indication that, whoa, we need to reset here and I need to think about that because I never understood that that's what I was charged with?

A:      No I didn't.

Q:      Why not?

A:      Because I didn't – I mean, I was definitely surprised by that, but I – she was – she said to me, she's like, so you had her hands on her neck? And I was like I think we did and we were kissing. And she's like, well, did you squeeze her neck? And I was like no. She was like, well, she's saying you squeezed her neck and it scared her. And I was like well I would never do anything like that. You know, I would never want to do anything like that. I would have been horrified that anyone would even be – like think I did something like that. I would have been horrified that anyone would even been – like think I did something like that.

        Exhibit  21, JD P108-09

**THE BRUISES and PHOTOGRAPHS**

Roe spent the following day (Saturday 2/24) with her three friends (RS her roommate, NF and JG) ordered takeout food, had a "pregame" at Roe's room drinking alcoholic beverages and then went to a party at Sigma Pi, where according to Roe's testimony, she drank "a lot". Roe testified that while at Sigma Pi, she herself fell down the stairs badly enough that she needed an x-ray later that week.  By 3:00 a.m., Roe's friend NF was so intoxicated that Roe, RS and JG took her to Lankenau Hospital.  See Exhibit 14,p 69.76.  Roe's fall at Sigma Pi, the night *after* she was allegedly choked by Doe, and the fact that she required medical treatment for it, had not been disclosed to SJU when she reported her allegations against Doe, or to Malloy in her subsequent investigation, or in her Answers to Interrogatories, or in her the first part of her deposition (July 6th), this information came out on September 6, 2018.  Within hours of Roe's fall down the stairs at Sigma Pi, while still at Lankenau Hospital, the following text exchange ensued:

| | |
|---|---|
| Jenny G: | R is freaking out |
| | Like panic attack in the bathroom |
| | She won't let me help her |
| Jenny G: | This brought up her fear of you choking her on Halloween |
| | Idk what to do |
| | She's so upset and locked herself in the bathroom |
| | She said that she was so afraid of you and that you had a choice and you chose to choke her and that's why she pushed you down the stairs because she was afraid of you |

….

Exhibit 14 (p36-37). Sunday evening, two days after her encounter with Doe and the day after her fall down the stairs at Sigma Pi, Roe's roommate, the same one Roe choked on Halloween, the same one who pushed Roe down the stairs, pointed out to Roe there were bruises on her neck.

Monday afternoon, February 26, 2018, Roe told her story of Doe sitting on top of her while they were kissing and then choking her so severely she could not breath or speak, first to

Bean to whom she also showed her bruises and again to SJU's Title IX Officer, Mary Elaine Perry.  But she omitted the events of Saturday night, the part about the heavy drinking, and trip to the ER, quarrel with her friend, accusations that she choked her roommate, getting buzzed and falling down the steps at Sigma Pi, and her injuries for which she later sought medical treatment. When Bean asked Roe if she had photos of the bruises, Roe said no. But Roe did have photos of her neck the day after she was with Doe.  She failed to mention she had such photos to Bean, Perry or Malloy, and not surprisingly conveniently failed to mention they did not show any bruises,

Attached is the supplemental expert report of Robert Sing D.O., who opined:

*It is apparent that upon reviewing the color photographs R1–3, and in particular photograph R1, there is no evidence of bruising, redness, irritation, abrasion on her neck - nothing.  These photographs were taken, according to Roe, approximately 19–20 hours after the choking incident in question with John Doe. To a reasonable degree of medical certainty, the bruises would have been present within hours of the inciting traumatic incident*. Jane Roe testified that no one, including a roommate or anyone else that day, saw the anterior neck bruises.  In looking at photographs R1 - 3, the low neckline of her halter top with her hair being  pushed back clearly exposes and displays the antero-lateral parts of her neck, not only to her roommate also in the pictures, but also to herself when she was dressing/fixing herself in front of her mirror in preparation for the pictures.

Jane Roe testified in her deposition (part ll) that she had sustained a fall down slippery steps at a Sigma Pi fraternity party while she was admittedly "buzzed", during the night  of 2/24/2018 into the early morning hours of 2/25/2018.  (During that evening, one of her roommates was taken to the hospital for "alcohol poisoning" while at the Sigma Pi party.)  Jane Roe also testified that she presented to an undisclosed urgent care center approximately two days later on 2/27/2018 where she was told she had a "bone bruise" to the wrist.

*After review of these photographs and taking into consideration her deposition transcripts with emphasis on the most recent 9/7/2018 testimony, the bruises on her neck seen on photographs R4-8 were (1) not caused by any aggressive manner or choking maneuver by John Doe in the early morning hours of 2/24/2018 and (2) that something else happened to Roe after the R1 photo and before the R4-8 photos. There are absolutely no bruises on her neck on photographs taken approximately 20 hours after the incident*. The fact that no

one saw the neck bruises until after her fall down the steps at the Sigma Pi party when she was "buzzed", even with full anterior neck visual exposure in the R1 - 3 photographs, and the fact that even she did not see the anterior neck bruising until after the Sigma Pi fall down steps incident, indicates that the trauma significant enough to cause the bruising about her anterior neck occurred during or after the Sigma Pi party.

EXHIBIT 22.

But Bean and Perry accepted Roe's story without question, decided that this was sexual assault, and that it should be "investigated" under SJU's Sexual Misconduct Policy ("SMP"). Perry immediately drafted an email to campus security, omitting any information favorable to Doe, presenting Roe's claims as fact. Shortly thereafter, before the "investigation" had even begun, the head of campus security send an email to an SJU database, Perry and Cary Anderson, Vice President and Associate Provost at SJU (and possibly others), stating, without equivocation that Doe had sexually assaulted Roe on the night in question.

## III.   ARGUMENT

### THE FACTS FAIL TO SUPPORT ANY BASIS FOR SUMMARY JUDGMENT AND THEREFORE MUST BE DENIED.

#### A.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may only be granted where the moving party shows that there is no genuine dispute of any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). The burden on a motion for summary judgment is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005).

Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 322, 325; Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. [*6] Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007).

If the movant meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed. R. Civ. P. 56(e); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex, 477 U.S. at 323-25. The nonmoving party can meet this burden by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. Celotex, 477 U.S. at 324. While a nonmoving party may not rely on mere allegations in a complaint to create a genuine factual dispute at the summary-judgment stage, where, as here, the complaint is verified, the court treats specific, factual allegations in the complaint that are based on personal knowledge as if they were made in an affidavit or declaration. See Parkell v. Danberg, 833 F.3d 313, 320 n.2 (3d Cir. 2016) ("Because [statements in verified complaint and other court filings] were signed under penalty of perjury in accordance with 28 U.S.C. § 1746, we consider them as equivalent to statements in an affidavit."); Reese v. Sparks, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit in opposition to a motion for summary judgment); Boomer v. Lewis, No. 3:06-CV-0850, 2009 U.S. Dist. LEXIS 82679, 2009 WL 2900778, at *14 (M.D. Pa. Sept. 9,

14

2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge."), aff'd, Boomer v. Lewis, 541 F. App'x 186, 193 (3d Cir. 2013).

The summary judgment inquiry asks whether there is a need for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (citing decisions); Liberty Lobby, 477 U.S. at 248-49; 142 F.3d 639, 643 n.3 (3d Cir. 1998). A dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will precludes the entry of summary judgment. Liberty Lobby, 477 U.S. at 248.

A defendant who moves for summary judgment is not required to refute every essential [*8] element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. Celotex, 477 U.S. at 322-23. If the evidence the non-movant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. Liberty Lobby, 477 U.S. at 249. The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of

[every challenged] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F. App'x 353, 354 (3d Cir.2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir.2002)). But the Court must still view the facts in the light most favorable to Doe, Watson, 478 F.3d at 147 and as such any conflict in the testimonial evidence must be resolved in his favor. Thompson v. Wagner, 631 F.Supp.2d 664, 678 (W.D.Pa. 2008).

## B.    **THE FACTS SUPPORT A CLAIM OF DEFAMATION AGAINST ROE**

### 1.    **DEFAMATORY STATEMENTS OF ROE**

In his Complaint Doe alleged:

391.    Roe's defamatory and false communications included, without limitation, the following:

(a)    On February 25, 2018, Roe told a friend who had noticed a mark on her neck that Doe had intentionally made that mark, that he had hurt her, sat on top of her and intentionally squeezed her neck and frightened her;

(b)    In so doing, Roe induced her friend to conclude that Doe had committed a sexual assault against Roe;

(c)    Thereafter, Roe reported Doe's alleged conduct to Perry, who determined that it was, in fact, an allegation of "Sexual Assault" against Doe;

(d)    Roe allowed and/or encouraged Perry to believe that Doe had committed sexual assault against her;

(e)     Thereafter, Roe told Malloy, who SJU had retained to investigate Roe's claims of

sexual assault, that Doe sat on top of Roe and intentionally squeezed her neck,

tried to choke her and intentionally frightened her;

(f)     Roe sent a letter to the appeal panel stating that Doe had committed sexual assault

against her by squeezing her neck and frightening her; and

...

Plaintiff Complaint (Exhibit "A") paragraph 391

In a defamation action, a plaintiff need not plead the precise defamatory statements,

the exact words need not be stated, the complaint must only specify the substance of the spoken

words; the purport of the spoken words is necessary." _Itri v. Lewis_, 281 Pa. Super. 521, 422 A.2d

591, 592-93 (Pa. Super. Ct. 1980). This requirement allows the court to determine "whether

particular words are capable of a defamatory construction." Id. at 593.  The deposition testimony

of record cited below squarely supports the allegations in the Complaint and includes at least 10

defamatory statements.

1 -     Roe to RS 2/24/18, (JRP191, Line 24 – P192 L8)

Q.      Did you talk at all with R...?

A.      Yes, I told her what happened as soon as I got back.

Q.      And what did you tell her?

A.      I told her everything was fine one minute and the next thing I know his hand is
        around my neck and he's choking me and I couldn't breathe and it was the scariest
        moment of my life.

2 -     Roe to RS 2/25/18 (P206, Line 23 – P207, Line 10)

A.      On Sunday I had my hair in a bun and Rowan and I had gone to CVS, I don't know what
        for, and when we were in the Uber – or not the Uber, the Saint Joe shuttle back she was
        like, "What the hell is on your neck?"  And I was like, "What are you talking about"

What's on my neck?"  She's like, "There's bruises all over."  I was like, "Are you kidding me, like what?"

And so when I got back to my room and looked and I was like of, my God, there are bruises on my neck.

3 -   Roe to JG 2/26 - P209, Line 3–Line 17 (Jenny)

Q.     In the shuttle bus going back from the CVS, what did you do after that, after Rowan called your attention?

A.     I talked to my friend Jenny about it, because I was like, "Oh, my God, dude, this happened on Friday night.  Like I'm sorry I didn't tell you, but now like there's bruises on my neck and I don't know what to do."

Q.     And what did Jenny suggest?

A.     She suggested – what did she suggest? I don't think she suggested anything.  I think she was just kind of shocked and was like, "if you need anything I'm here."

4 -   Roe to Bean 2/27/18 P211, Line 1-9 (Bean)

Q.     And so tell me what happens after you went to class.  Did you go to work?

A.     Yes, I go to work and Katie was like, "How was your weekend?" and I said, "Well, this happened", and I told her what happened.  and then she was like, "I'm a mandated reporter, we have to report his."  And so then we went over to Ms. Perry's office and reported it.

According to Bean, Roe told her he tried to choke her (Exhibit 18)P156L23-P157L16 P167L8-9

Q.     So you went into your office and what happened then?

A.     So we shut the door. I asked her what was going on or how she was doing or something to that effect. She kind of pulled down her shirt and showed me some bruising. I said, "What's that? Where did that come from?" or something to that effect. She said that over the weekend she had met a guy at a party. She didn't know him, but she thought he was really nice. They went back to St. Mary's, which is a residence hall, and were making out and then he started to choke her and that she was really scared and that when he left the room to get water or a drink or something like that she called -- she used her phone to call her friend to get out of the situation. That's when I told her that I am a

Q.     Did she use the word choke her?

18

A.      Yes.

And named Doe as the person who choked her
P178-179

A.      Yes.

Q.      Do you say anything first?

A.      I did. When Mary-Elaine's door opened I said, "Hi. We are here. I am here with a student.
We are here for a Title IX issue." I was broad. She said, "Okay. Come on in." Then I
think Mary-Elaine just started introducing herself as a Title IX coordinator and what her
role was. She got a notebook out and, you know, asked questions, went through the night,
the experience, the situation, and that went back and forth.

Q.      And she was taking notes as to what Ms. Roe had to say?

A.      Yes, she was.

Q.      These were handwritten notes that you could determine?
A.      Yes.

Q.      Did you offer any information to Dr. Perry while that conversation is going on between
Dr. Perry and Ms. Roe?

A.      Well, at one point in the conversation Mary-Elaine asked if she wanted to give a name,
therefore, and explained what that meant. She said, "It could just be this and this is a
report. If you share the name, then we can move further with an investigation."

Q.      So share the name of the person that she is complaining about?

A.      Exactly. As to that point it had not been shared. So the student agreed to that. After that --
your question was what did I contribute to the conversation. I was silent almost the whole
time, other than after that, when I knew it was an actual report and investigation was
going to happen, I asked the student if she had taken any pictures of the bruises and she
said no and I suggested that she did.

Q.      And were these pictures taken where, in the office?

A.      No. I believe they were taken -- well, I didn't witness any being taken. She didn't do it
there or in that moment.

5 -     2/27/18 Roe to Perry (P211, Line 12-20)

Q.      Now, did you know Mrs., Perry?

19

A.     I met her once at orientation.

Q.     Now, what did you tell Ms. Perry?

A.     I told her that I went home with a guy on Friday night and like everything seemed fine at first, but then like the next thing I knew his hand was around my neck and I couldn't breathe and now there's like bruises on my neck, and I don't know what to do about it.

5 -    P224, Line 22-P225, Line 23 (continued from 211)

Q.     Your memory is much more important than mine.

A.     Like whatever day it happened, I told her like I went to a party at LaSalle with my friends and everything was fine.  And that I actually met John Doe because I had run into him twice before, because my friends and I were hold hands and we were all trying to stay together, and I just pumped into him.  Then the second time I stopped and I was like, Hey, I am so sorry for running into you twice already.  And he was like, that's totally fine, don't worry about it.  Then we had a conversation and then we ended up leaving together.
We went back to Saint Mary's.
Like everything was fine at first.  We got some water in the kitchen.  Then it got weird because we went up to this room on the third floor, it was like mad tiny and it was just kind of creepy.  And then like a few minutes after we got up there is when he started choking me.

Q.     Did you explain all of this to Dr. Perry?

A.     Yes.

5 -    P232, Line 19 – P233, Line 22 (Perry) (continued from 224) (sexually assaulted)

Q.     The question was:  Did you tell Dr. Perry that you had been sexually assaulted?

A.     I told her what happened.  I don't believe I said this was sexual assault.

Q.     Okay.  Did you ever tell Dr. Perry that you were sexually assaulted by John Doe?

A.     I don't remember.

1 -    P238, Line 15 – P239, Line 2 (continued from p192 Rowan)

Q.     What did you do whenever you got back to your dorm?  What did you do?

A.    I told my roommate what happened.

Q.    Who is the roommate?

A.    Rowan Sullivan.

Q.    What did you tell Rowan Sullivan?

A.    I told her that we were making out and one minute everything was fine, then the next he had his hands around my throat and was choking me and I didn't know what happened.

Roe repeated the defamatory comments to Perry in Bean's presence
Exhibit 18 (P185L3-24).

6 -    P242, Line 13-20 (Jenny and Nuria)

Q.    Did you tell anybody else after you told Rowan?

A.    I told my friend Jenny and Nuria the next day.

Q.    Okay.  So Jenny and Nuria, you told them the next day.  How did you tell them?

A.    In person.

7 -    P261-2, Line 11 – P262, Line 1 (choking _____ to Nuria)

Q.    Do you know if you did send any text to Nuria about what happened in John Doe's room?

A.    I'm assuming you did because you asked the question.

Q.    Do you know if you did?

A.    You wrote:  "Yeah, I'm with Rowan now.  He just kept choking me and shit, but I don't trust him so I didn't like it."
Does that sound familiar?

A.    it seems vaguely familiar from when I was pulling them.

Q.    now, "He just kept choking me and shit", what do you mean by that?

A.    He just kept choking me.

8 -     Roe stated in her Appeal Reply, Exhibit 10, SJU 239, Line 1 :"the next thing he had his hands around my throat and …"

9 -     P290, other people/sexual assault

Q.      Okay.  In this document did you allege you were sexually assaulted by John Doe?

A.      Yes.
(Dep JR Exhibit 13).

## 2.    DEFAMATION LAW OF PENNSYLVANIA

"Defamation, of which libel, slander, and invasion of privacy are methods, is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements." *Joseph v. Scranton Times L.P.*, 2008 PA Super 217, 959 A.2d 322, 334 (Pa. Super. Ct. 2008) (citing *Zartman v. Lehigh County Humane Soc'y*, 333 Pa. Super. 245, 482 A.2d 266, 268 (Pa. Super. Ct. 1984)).  Under the common law, malice was essential to every action for defamation. But under present law, malice is not an essential element of the tort of defamation. The elements of malice and intent need only be proven in cases involving a public figure plaintiff. Melvin v. Doe, 575 Pa. 264, 836 A.2d 42, 2003 Pa. LEXIS 2162, 32 Media L. Rep. 1599 Melvin, 575 Pa. at 271, citing New York Times, 376 U.S. at 270-271.

The elements of Pennsylvania defamation law are defined by statute. In order to successfully establish a claim for defamation a plaintiff has the burden of proving:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.
42 Pa. C.S. § 8343(a)

Once a plaintiff establishes these elements, the defendant has the burden of proving the

following, when relevant to the claim:

(1)     The truth of the defamatory communication.

(2)     The privileged character of the occasion on which it was published.

(3)     The character of the subject matter of defamatory comment as of public concern.
        Id. §8343(b)

A statement is deemed to be defamatory "if it tends to blacken a person's reputation or

expose him to public hatred, contempt, or ridicule, or injure him in his business or profession."

Joseph, 959 A.2d at 334 (citing *MacElree v. Phila. Newspapers, Inc.*, 544 Pa. 117, 674 A.2d

1050, 1054 (Pa. 1996)). "When communications tend to lower a person in the [**49] estimation

of the community, deter third persons from associating with him, or adversely affect his fitness

for the proper conduct of his lawful business or profession, they are deemed defamatory." Id.

(quoting *Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. Ct. 1997)). "It is not enough that the

victim of the [statements] . . . be embarrassed or annoyed, he must have suffered the kind of

harm which has grievously fractured his standing in the community of respectable society."

*Tucker v. Phila. Daily News*, 577 Pa. 598, 848 A.2d 113, 124 (Pa. 2004) (quoting *Scott-Taylor,*

*Inc. v. Stokes*, 425 Pa. 426, 229 A.2d 733, 734 (Pa. 1967)). Only statements of fact, rather than

mere expressions of opinion, are actionable under Pennsylvania law. *Moore v. Cobb-Nettleton*,

2005 PA Super 426, 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005) (citing *Elia v. Erie Ins. Exch.*,

430 Pa. Super. 384, 634 A.2d 657, 660 (Pa. Super. Ct. 1993)).   The statements alleged to be

defamatory must [**50] be viewed in context. *Baker v. Lafayette Coll.*, 516 Pa. 291, 532 A.2d

399, 402 (Pa. 1987). The Pennsylvania Supreme Court has explained that:" [W]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. Thus, we must consider the full context … the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate."

*Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 497 Pa. 460, 442 A.2d 213, 216 (Pa. 1981).

### 3.    ROE'S STATEMENTS ARE CAPABLE OF DEFAMATORY MEANING

Whether the statements at issue are capable of defamatory meaning is a question of law to be decided by the Court. *Blackwell v. Eskin*, 2007 PA Super 20, 916 A.2d 1123, 1125 (Pa. Super. Ct. 2007) (citing *Tucker*, 848 A.2d at 124). In making this legal determination, the Court must view the statement in the factual context in which it was made. See *Baker*, 532 A.2d at 402; *Agency Servs., Inc. v. Reiter*, 513 F. Supp. 586, 587-88 (E.D. Pa. 1981) (in assessing whether statements are capable of defamatory meaning "a court must weigh both the language of the communication, and the context in which the communication is made") (citing *Pierce v. Capital Cities Comm'ns, Inc.*, 576 F.2d 495, 502 (3d Cir. 1978)). The touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the [**55] average person to whom it was directed. See *Marier v. Lance, Inc.*, No. 07-4284, 2009 U.S. App. LEXIS 2713, 2009 WL 297713, at *3 (3d Cir. Feb. 9, 2009) ("In analyzing whether or not a statement is defamatory, Pennsylvania courts have held that "[t]he nature of the audience seeing or hearing the remarks is . . . a critical factor in determining whether the communication is capable of a defamatory meaning.") (Internal citation omitted). Statements "imputing a ***criminal offense***, a loathsome disease, business misconduct, or serious ***sexual misconduct*** "are recognized as slander per se and therefore as a matter of law capable of

defamatory meaning. *Chicarella v. Passant*, 343 Pa. Super. 330, 494 A.2d 1109, 1115 n.5 (Pa.

Super. Ct. 1985) (citing Restatement (Second) of Torts § 570 (1977)). Here, Roe's report to Bean

and Perry resulted in Perry opening up in an investigation for violation of the sexual misconduct

policy and charges against Doe for sexual assault. It seems reasonably clear that Perry and Bean

understood the statements of Roe as either sexual assault or assault both of which clearly

implicate a criminal offense. "A publication is defamatory if it tends to blacken a person's

reputation or expose him to public hatred, contempt or ridicule or injure him in his business or

profession." Id. at *25 (quoting *Dunlap v. Phila. Newspapers, Inc.*, 301 Pa. Super. 475, 448 A.2d

6, 10 (Pa. Super. 1982)) (citation and internal quotation marks omitted). "In order to be

actionable, the words must be untrue, unjustifiable, and injurious to the reputation of another."

Id. at *25 (quoting *Joseph v. Scranton Times L.P.*, 2008 PA Super 217, 959 A.2d 322, 334 (Pa.

Super. 2008)). The standard of injurious to Doe's reputation is easily met with the serious

charges as leveled by Roe.

### 4.    ROE'S STATEMENTS WERE OF AND CONCERNED DOE

Under Pennsylvania's defamation statute, a plaintiff must demonstrate that the

complained-of statement applies to him, i.e., whether it is "of and concerning" him. See 42 Pa.

C.S. §8343(a) (3), (5). In determining whether Plaintiff has satisfied this burden, the test to be

applied is whether the "defamatory communication may reasonably be understood as referring to

the plaintiff." *Zerpol Corp. v. DMP Corp.*, 561 F. Supp. 404, 410 (E.D. Pa. 1983) (citing *Farrell

v. Triangle Publ'ns, Inc.*, 399 Pa. 102, 159 A.2d 734 (Pa. 1960)). [**57] "It is not enough that

plaintiff understands the communication to be about him." Id. It is true, however, that under

Pennsylvania law, "a defamed party need not be specifically named in a defamatory statement in

order to recover, if she is pointed to by description or circumstances tending to identify her."

*Weinstein v. Bullick*, 827 F. Supp. 1193, 1199 (E.D. Pa. 1993) (citing *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985)); *Cosgrove Studio & [\*480] Camera Shop, Inc. v. Pane*, 408 Pa. 314, 182 A.2d 751, 753 (Pa. 1962)).  At the summary judgment stage, in a case where the plaintiff is not identified by name, the court must find that a recipient could reasonably conclude that the publication refers to the plaintiff.  *Weinstein*, 827 F. Supp. at 1199 (citing *Farrell*, 159 A.2d at 739, but here  it is undisputed that Roe named Doe to Bean and Perry (Dep of Bean P ) as her friends all of whom were SJU undergraduate students living on campus like Doe.

### 5.   DOE HAS SUFFERED HARM AS A RESULT OF ROE'S FALSE AND DEFAMATORY STATEMENTS

The term "special harm" is defined as "actual damages which are economic or pecuniary losses." *Klimaski v. Parexel Intern.*, 2008 U.S. Dist. LEXIS 47125, 2008 WL 2405006, \*3 (E.D. Pa. 2008) (citing *Sprague v. Am. Bar Ass'n*, 276 F. Supp.2d 365, 368-69 (E.D. Pa. 2003)).  First, there is evidence of special damages, plaintiff has already incurred expenses both in connection with the class trip to Ireland which had to be paid for in advance and for which the school has not fully reimbursed him, for the expected loss of his scholarship and for treatment with his therapist. Second, "plaintiff may succeed in a claim for defamation absent proof of special harm where the spoken words constitute slander per se." Id.  There are [\*27] four categories of words that constitute slander per se: words that impute (1) criminal offense; (2) loathsome disease; (3) business misconduct; or (4) serious sexual misconduct. Id.   Here, applying this standard, plaintiff's allegation that "each [defendant] referred to Doe as the perpetrator of a sexual assault on Roe, even though they knew the allegations were false, or with reckless indifference to the truth or falsity of said allegations," see Am. Compl. ...... would be considered slander per se.  In *Harris I*, SJU argued that the plaintiff had not suffered "special harm" as a result of the defamation. Judge Restrepo dismissed this argument on the grounds that statements claiming that

an individual had committed sexual assault are slander per se. Id. at *27. *Harris v. St. Joseph's Univ.*, 2014 U.S. Dist. LEXIS 65452, *24, 2014 WL 1910242 (E.D. Pa. 2014) ("*Harris I*"); 42 Pa. C.S. §8343(a).

"In Pennsylvania, a defendant who publishes a statement which can be considered slander per se is liable for the proven, actual harm that the publication causes." *Klimaski*, 2008 U.S. Dist. LEXIS 47125, 2008 WL 2405006, at *4. Actual damages are divided into two types: general and special. Id. General damages typically flow from defamation, such as "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." Id. (citing Sprague, 276 F. Supp.2d at 368). Plaintiff's Amended Complaint includes averments of these types of damages caused by defendants' defamatory communications. See, e.g., Pl.'s Am. Compl. ¶¶ 128-29. Thus, in *Agriss*, Pennsylvania's Superior Court [*28] found that the trial court erred in granting non-suit where the Superior Court found evidence was sufficient to show that the alleged defamatory remarks could have "impaired appellant's reputation and caused him personal humiliation and mental anguish" and that testimony "tended to show that the charge held appellant up to ridicule and speculation among fellow employees that his dismissal was imminent." *Agriss*, 483 A.2d at 467. University Defendants' motion to dismiss is denied to the extent that it argues that the claim of defamation should be dismissed as failing to allege "special harm."

Where a plaintiff asserts a claim for defamation per se, "only general damages, i.e., proof that one's reputation was actually affected by defamation or that one suffered personal humiliation, or both, must be proven; special damages, i.e., out-of-pocket expenses borne by the plaintiff due to the defamation, need not be proven." *Joseph*, 959 A.2d at 344 (citing *Brinich v. Jencka*, 2000 PA Super 209, 757 A.2d 388, 397 (Pa. Super. Ct. 2000)). [**109] Pennsylvania

recognizes that a defamation claim involving an individual's trade or profession falls into this per se category. See *Walker v. Grand Cent. Sanitation, Inc.*, 430 Pa. Super. 236, 634 A.2d 237, 241 (Pa. Super. Ct. 1993). *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 2010 U.S. Dist. LEXIS 23491 (Plaintiff assertion that she suffered personal humiliation and distress as a result of being wrongly associated with the misconduct at OWLAG including testimony concerning damage to her reputation and the attendant emotional harm sufficient to prove the required general damages). See also *Marcone*, 754 F.2d at 1080 (plaintiff's testimony that he was "frustrated, distraught, upset, and distressed" due to defamatory publication was sufficient to prove actual damages under Pennsylvania law); *Joseph*, 959 A.2d at 345 (plaintiff's testimony concerning humiliation and emotional stress resulting from defamatory statements can satisfy the requirement of compensable damages); *Wilson v. Benjamin*, 332 Pa. Super. 211, 481 A.2d 328, 333 (Pa. Super. Ct. 1984) (same). The facts supporting both special and general damages were based upon personal knowledge and are set forth in the verified complaint:

### 6.     AT ISSUE IS THE FALSEHOOD OF ROE'S STATEMENTS

Roe argues that Doe has never denied the allegation that he squeezed her neck or "tried to choke her" but this simply false.

Malloy testified:

Doe testified:

Doe's verified Complaint (Exhibit 1) specifically provides:

> 108.    Plaintiff states unequivocally that: Roe's statement that Doe flirted with other girls on the car ride back to SJU is false; Roe's statement that Doe sat on top of her is false; and Roe's statement that Doe squeezed her neck is false.
>
> 109.    Doe never, at any time squeezed Roe's neck and vehemently denies Roe's statement to the contrary.

While a nonmoving party may not rely on mere allegations in a complaint to create a genuine factual dispute at the summary-judgment stage, where, as here, the complaint is *verified*, the court treats specific, factual allegations in the complaint that are based on *personal knowledge* as if they were made in an affidavit or declaration. See *Parkell v. Danberg*, 833 F.3d 313, 320 n.2 (3d Cir. 2016) ("Because [statements in verified complaint and other court filings] were signed under penalty of perjury in accordance with 28 U.S.C. § 1746, we consider them as equivalent to statements in an affidavit.");  *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit in opposition to a motion for summary judgment); *Boomer v. Lewis*, No. 3:06-CV-0850, 2009 U.S. Dist. LEXIS 82679, 2009 WL 2900778, at *14 (M.D. Pa. Sept. 9, 2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge."), aff'd, *Boomer v. Lewis*, 541 F. App'x 186, 193 (3d Cir. 2013).

For purposes of this motion, the deposition testimony cited above and averments in the verified complaint alone create material issues of fact as to Roe's truth defense. In addition, however, the record evidence developed in discovery now overwhelming refutes Roe's asserted "truth defense". Information revealed at the second half of Roe's deposition on September 7, 2018 revealed the following:

-        Undated Photographs of Roe and her roommate, R1.R2,R3, produced by Roe the night before her first deposition, that Roe referred (R1-3) as "before" photos, *were not all "before" photos, three were actually taken the night after( roughly 20 hours) Doe allegedly choked Roe and 36 hours before the photos of Roe's neck were taken at the direction of Perry (R1) clearly depict Roe's neck and shows no bruising, redness, swelling or other signs of trauma*;

- On late Saturday evening or early Sunday morning, less than four hours or so after those exculpatory pictures were taken - twenty to twenty-four hours after Doe allegedly choked Roe - Roe, inebriated, "slipped" down stairs at a Sigma Pi party, injuring herself to the point where she sought medical treatment from an Urgent Care facility on Tuesday, February 27, 2018;

- RS was with Roe at the Sigma Pi party at which those injuries were sustained;

- RS and Roe had an admitted history of violence that included Roe choking RS the previous fall, RS pushing Roe down a flight of steps, and RS locking herself in the bathroom at Lankenau Hospital the night following Doe's alleged assault because she was scared of Roe. RS also happens to be the same individual who first noticed bruises on Roe's neck on Sunday, February 25th, ten to twelve hours or so after Roe was injured at Sigma Pi;

- On Monday, February 26th, at the urging of SJU employees Dr. Mary-Elaine Perry and Katie Bean, Roe and her friends took photos of the bruises on Roe's neck for use in the Title IX investigation into Doe. RS took at least one of those photos;

- The digital versions of those February 26th photos clearly show a thin line of bruises around the sides and toward the back of Roe's neck - inconsistent with choking and inconsistent with Roe's previous testimony about Doe's alleged assault.

Plaintiff has produced the expert reports of Robert Sing. Exhibit 22.

### 7.    ROE IS NOT ENTITLED TO A CLAIM OF AN ABSOLUTE PRIVILEGE

Defendant contends that statements made regarding the alleged sexual assault "are absolutely privileged and cannot be the basis for a claim of defamation. However, as the Third Circuit has pointed out, "under Pennsylvania law government involvement is . . . a necessary

condition for according quasi-judicial status to grievance procedures." *Overall v. Univ. of Pa.*, 412 F.3d 492, 497 (3d Cir. 2005) (emph. added) "Pennsylvania cases finding quasi-judicial privilege consistently involve proceedings before federal, state, or local governmental bodies, or proceedings held pursuant to a statute or administrative regulation." Id. (emph. added). In that this case involves an entirely private grievance procedure, the privilege available in Pennsylvania for communications made during quasi-judicial proceedings does not apply. Defendants' motions to dismiss are denied with regard to plaintiff's defamation claims. This same argument was raised by SJU in *Harris v. St. Joseph's Univ.*, 2014 U.S. Dist. LEXIS 65452, 2014 WL 1910242 in nearly identical circumstances.

## C. THE FACTS SUPPORT A CLAIM OF IMPROPER INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST ROE

In *Adler Barish*, supra, the Pennsylvania Supreme Court acknowledged a well-established cause of action for intentional, improper interference [*383] with existing contractual relations. 393 A.2d at 1181-82 (citing Restatement (First) of Torts §766 and *Birl v. Philadelphia Elec. Co.*, 402 Pa. 297, 167 A.2d 472 (Pa. 1960)). See also *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466 (Pa. 1979) (considering First Restatement §766 in analyzing claim of tortuous interference with prospective contractual relations); *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (Pa. 1971) (same). "'[T]he common law has recognized an action in tort for an intentional, unprivileged interference with contractual relations. It is generally recognized that one has the right to pursue his business relations or employment free from interference on the part of other persons except where such interference [***18] is justified or constitutes an exercise of an absolute right.'" *Adler Barish*, 393 A.2d at 1182 (quoting from *Birl*, 167 A.2d at 474). The Court explained that "[s]ince Birl, we have repeatedly looked to the Restatement as authority for the elements of a cause of action for intentional interference with existing contract

31

relations." Id. at 1182 n.13.  The Court further recognized that it "constantly seeks to harmonize common law rules, principles, and doctrines with modern perceptions of societal needs and responsibilities," and since the American Law Institute, which publishes the Restatements, makes a "continuing effort to provide the judicial system orderly and accurate restatements of the common law," it is "appropriate to analyze this case in light of the approach fashioned by Restatement (Second)." Id. at 1183. The *Adler Barish* Court proceeded to quote then-Tentative Draft No. 23 of the Restatement (Second) of Torts §766, which provided that "[o]ne who intentionally and improperly interferes with the performance of a contract" is subject to liability for pecuniary loss resulting from a failure to perform the contract.  Ours is a free society where citizens may freely interact and exchange information.  Tortuous interference, as a basis for civil liability, does not operate to burden such interactions, but rather, to attach a reasonable consequence only when the defendant's intentional interference was "improper."  In *Adler Barish*, the Court looked to Section 767:

In determining whether an actor's conduct in intentionally interfering with an existing contract or a prospective contractual relation of another is improper or not, consideration is given [***20] to the following factors:

- (a)  the nature of the actor's conduct,
- (b)  the actor's motive,
- (c)  the interests of the other with which the actor's conduct interferes,
- (d)  the interests sought to be advanced by the actor,
- (e)  the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
- (f)  the proximity or remoteness of the actor's conduct to the interference, and
- (g)  the relations between the parties.

In assessing whether a defendant's conduct is proper, "consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of

the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the proximity or remoteness of the actor's conduct to the interference, and (f) the relations between the parties." *Adler Barish*, 393 A.2d at 1184.

§774A Damages

(1)    One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for

(a)    the pecuniary loss of the benefits of the contract or the prospective relation;
(b)    consequential losses for which the interference is a legal cause; and
(c)    emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference . . . .

This is consistent with *Yaindl v. Ingersoll-Rand Co.*, 422 A.2d 611 (Pa.Super. 1980), the court held that the element of intent to cause harm required only the "intention to interfere with the plaintiff's prospective contractual relation, and not malevolent spite by the defendant." 422 A.2d at 622, n.11. Accord, *Geyer v. Steinbronn*, 506 A.2d 901, 910 (Pa.Super. 1986). Doe's claim is that the alleged interference harmed his reputation, the gravamen [*436] of this tort is the lost pecuniary benefits flowing from the contract itself; other losses, such as emotional distress and loss of reputation, [***19] are consequential harms. See Restatement (Second) of Torts, [**1344] §766, Comment t. The definition of "inducement" is taken from Restatement of Torts §766, comment d (1939); accord, Restatement (Second) of Torts §766, comment g (Tent. Draft No. 14, 1969).

WHEREFORE, Plaintiff respectfully requests this Honorable Court to deny Defendant Roe's Motion for Summary Judgment.

Respectfully submitted,

Dated: October 9, 2018          BY:        */s/ John Mirabella*
                                           John Mirabella, Esquire
                                           john@mirabellalawfirm.com
                                           Law Offices of John Mirabella

1600 Market Street, Suite 1810
Philadelphia, PA  19103
(215) 422-4991