## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN DOE,

                Plaintiff,

      v.

SAINT JOSEPH'S UNIVERSITY

    And

JANE ROE

              Defendants.

CIVIL ACTION NO:  18-cv-2044

## PLAINTIFF'S BRIEF IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT SAINT JOSEPH'S UNIVERSITY

## INTRODUCTION

Defendant Saint Joseph's University has moved for Summary Judgment on multiple grounds, all of which will be separately addressed below.  Defendant's Motion, for the reasons discussed below, is without merit and should be denied.

## I.    STATEMENT OF DISPUTED AND UNDISPUTED FACTS

### SJU's Disciplinary Policies and Procedures

There is no dispute that SJU receives federal funding and is therefore obliged to comply with Title IX. Title IX requires receiving federal funds to "[a]dopt and publish grievance procedures providing for the *prompt and equitable resolution of student . . . complaints*" regarding sexual misconduct.[1]  34 C.F.R. §106.8(b) (emphasis added). Title

---

[1] Both the Department of Education and Department of Justice have set forth this requirement by way of regulation. See 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. §54.135(b) (Dep't of Justice).

IX is interpreted and administratively enforced by the Office for Civil Rights ("OCR")

of the Department of Education, which periodically issues guidance on the statute should

be understood and implemented.

In 2001, the OCR promulgated regulations instructing schools to give *"[n]otice to students...of the [school's] procedure"* and provide *"[a]dequate, reliable, and impartial investigation of complaints,* including the *opportunity to present witnesses and other evidence."* ("2001 Guidance")[2] (emphasis added), Exhibit "1." The OCR determined that *"according due process to both parties involved, will lead to sound and supportable decisions."* Exhibit "1."(emphasis added).

In 2011, the OCR issued a Dear Colleague Letter on Sexual Violence, offering

schools and universities specific guidance on how to handle sexual misconduct

complaints under Title IX ("2011 DCL"), Exhibit "2." At that time, SJU did not have a

separate disciplinary procedure dedicated to sexual misconduct claims; it had been

handling allegations of sexual misconduct under what it calls the Community Standards

process ("CS process"). (Dep. C. Anderson P86, L22-P89, L6 - Exhibit "3"). The CS

process, which is laid out in detail in SJU's Student Handbook, entitles an accused

student (1) to be provided a copy of the complaint against him, (2) to know the specific

charges against him, (3) the opportunity to have an open discussion among the

participants to facilitate an understanding of the facts, (4) the opportunity to have a

hearing, (5) to present witnesses and evidence in his own defense, (6) to examine and

---

[2] The 2001 Guidance was adopted pursuant to notice-and-comment rulemaking in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance"). Available at https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf (last viewed September 18, 2016). Title IX's regulations, including the 2001 Guidance, have the force and effect of law, because they affect individual rights and obligations and were the product of notice-and-comment rulemaking.

question the witnesses and evidence against him, (7) to cross-examine his accuser, (8) confidentiality regarding the outcome, (9) the right to appeal the outcome and, (10) in the event new information revealed that the outcome was incorrect, the opportunity to reopen the investigation, which may then result in a new outcome. *See* Exhibit "4", Student Handbook, pgs. 9-19.[3]  For four years after the promulgation of the 2011 DCL, SJU continued to handle sexual misconduct claims on campus under this CS process, apparently without criticism from the OCR and, presumably, without concern that it was reaching incorrect results (Dep. E. Perry P224L1-L20 – Exhibit "5").

       In 2015, in an apparent effort to comply with the 2011 DCL,[4] SJU drafted a Sexual Misconduct Policy: Policy Regarding Sexual Assault, Sexual Harassment, Sexual Exploitation, Domestic Violence, Dating Violence, or Stalking ("SMP").[5] See Exhibit "6." The SMP contains a specific University disciplinary process for alleged violations of the policy. That disciplinary process ("SMP" process) gutted the rights of students accused of sexual misconduct in an effort to put a thumb on the scale for accusers (almost exclusively women), making it easier for them to prevail in claims of sexual misconduct against the accused (almost exclusively male).[6]  Under the SMP process, an accused student was no longer entitled to a written incident report or to notice of the specific charges against him. (Dep. W. Bordak P299, L44-LP300, L5 – Exhibit "7").  The only notice to which he was now entitled was a blanket statement that he had been accused of violating the SMP, a fifty-odd page document addressing six independent categories of

---

[3] There is no evidence to suggest that versions of the CS process were meaningfully different at the relevant time periods.

[4] In April of 2014, the OCR had also issued a "Q&A on Title IX and Sexual Violence" fleshing out and offering specific guidance as to how schools can best comply with the 2011 DCL.

[5] SJU initially adopted an Interim Sexual Misconduct Policy, an earlier iteration of the SMP in effect at the time Doe was charged with sexual misconduct. The two policies do not differ in any meaningful respect.

[6] Nationwide, and on SJU's campus, the vast majority of students accused of sexual misconduct are male.

behavior.[7] (WB P248, L13-P249, L2).  He was no longer entitled to a hearing; instead there would be an "investigation," conducted by an "independent" qualified investigator, who (SJU promised) would interview parties and witnesses and review relevant documents and other evidence. *See* SMP V(b)(1), Exhibit "6." He was no longer entitled to question his accuser or her witnesses. He was not entitled to see, or even be aware of, the evidence against him. He could be found responsible for sexual assault by a mere preponderance of the evidence. SMP V(b)(5). He was entitled to extremely limited assistance from an Advisor and an extremely limited right to appeal, after which the investigator's conclusion was final and there would be no opportunity for reconsideration, even if subsequent evidence completely exonerated the accused. SMP V(b)(2), SMP V(b)(5), SMP (V)(b)(8).

In addition to these explicit, overtly pro-accuser policies, SJU adopted a number of quiet policies which further weighted the scale in favor of the accuser, virtually guaranteeing that an accused student, especially an innocent one, would have no opportunity to defend himself against charges under the SMP. The school adopted a practice of actively *withholding* specific information about the alleged sexual misconduct from the accused student so as to "protect the integrity of the investigation."[8] Unbeknownst to students, SJU had quiet policies regarding the appeal process, as well. It was SJU's policy to provide students' appeal documents to the investigator (who would, of course, defend the outcome she had reached), the director of Community Standards

---

[7] The policy encompasses sexual assault, sexual harassment, sexual exploitation, domestic violence, dating violence and stalking.

[8] This goes a significant step beyond not being entitled to see a complaint; it leads to situations like the instant one, in which an accused student is tried and found responsible without ever knowing the specific charges against him.

(who worked with the investigator) and the Community Standards employee responsible for facilitating the investigation (who worked for the director of Community Standards) for their review.[9]  SJU asked each of these hand selected individuals to submit a written statement to the appeal board addressing the points made in the student's appeal.  SJU provided these written these statements to the appeal board, but not to the students involved.  (WB P296, L15-P300, L5).  These policies were unwritten, known to the investigators and members of the Office of Community Standards ("OCS") but unknown by – and unavailable to – accused students or their advisors.

This was the SMP in effect when Doe joined the SJU community in September of 2016. One of his initial experiences as an incoming freshman was to participate in a "Break the Silence Orientation" discussing sexual misconduct on campus.[10] The presentation was made by William Bordak, Director of the OCS, ("Bordak") to the incoming freshman class and it defined sexual assault as non-consensual sexual contact that is "*intentional* and is committed either by: force, violence, threat or intimidation . . . ." *See* SJU 1030, Exhibit "8," emphasis added.[11]  Participants were told that false reports of sexual assault are rare, occurring only 8% of the time. *See* SJU 1031, Exhibit "8." They were told that they should never blame a "victim" or ask her "why" questions, and that they should not pressure her to recount details of her allegations. *See* SJU 1048, Exhibit "8."  They were also told that the most important thing anyone can do is to "believe a victim." *See* SJU 1038, Exhibit "8." This presentation was mandatory for all

---

[9] The appellant had no commensurate right to have input or information put in front of the appeal board from his advisors or anyone else. He had no way of even knowing about SJU's policy on this.
[10] Another one of Doe's initial experiences was to register with the Office of Student Disability Services, authorizing them to release his Accommodation Plan to faculty and staff. *See* SJU 1237, Exhibit "8."
[11] The presentation also advised that students should be on the lookout for verbal and non-verbal cues regarding consent, including "freezing" the " the sudden stop of participation in intimacy." *See* SJU 1038, Exhibit "8."

incoming SJU students and was presented by, prepared by, and attended by SJU employees, including Bordak, the head of the OCS.[12]

Meanwhile, SJU employees were working hard to earn a $300,000 federal grant from the Office of Violence Against Women ("OVW"). *See* SJU application for "Grant to reduce Sexual Assault, Domestic Violence, Dating Violence & Stalking on Campus," SJU 1089-1174, Exhibit "8" The school had applied for the grant in 2016, just a year after having adopted the SMP, but was unsuccessful. In early 2017, SJU shifted its approach by "directly addressing issues of sexual assault at St. Joe's campus."[13]   In preparation for its second Grant application, SJU pulled together a sweeping coalition of organizations and individuals from both inside and outside the University to create a task force to find and support victims of sexual misconduct and to find and condemn perpetrators of sexual misconduct.  SJU entered into an External Memorandum of Understanding with Community Partners (Lower Merion Police Dept. Victim Services of Montco., Phila. Sexual Assault Response Ctr, and the Phila. D.A.) ("EMOU") creating a victim-centered coalition,[14] one goal of which was to "increase[] identification, investigation and adjudication of persons committing sexual violence on campus" *See* SJU 1056-1057, Exhibit "8."  The EMOU recognizes a "growing need for effective campus community response to reduce sexual violence on campus" and was signed by Mark Reed, President of SJU.  *See* Exhibit "8."  SJU also executed an Internal Memorandum of Understanding ("IMOU") within campus. *See* SJU 1065-1085, Exhibit

---

[12] This will prove to be significant because Bordak was one of two people who made the decision to adjudicate Doe's case under the SMP process rather than the CS process, reviewed Doe's case on appeal and submitted a letter to Doe's appeal panel urging the appeal panel to sustain the investigator's finding of "responsible."
[13] *See* Article from The Hawk Newspaper, Exhibit "12."
[14] *See* SJU 1056-1064, Exhibit "8."

"8." The IMOU drew together 21 SJU departments and programs (from academic to student life to student organizations) to create a an on-campus coalition the goal of which was – in part – to "support efforts to hold offenders accountable," "[d]evelop, strengthen, and implement campus policies, protocols, and services that *more effectively identify and respond to the crimes of Sexual Violence*" and to "[p]rovide personnel, training, technical assistance and data collection with respect to the *increased identification, investigation and adjudication of persons committing Sexual violence* on campus." *See* SJU 1065-1066, Exhibit "8." The IMOU is signed by thirty two SJU employees, including Mark Reed, Ed.D., President of SJU, Dr. Cary Anderson, Vice President for Student Life and Associate Provost ("Anderson"), Kiersten White, Ed.D., Assistant Vice President for Student Life ("White"), Dr. Mary-Elaine Perry, Assistant Vice President for Student Life and Title IX Coordinator ("Perry"), Bordak, Director of Community Standards at SJU, Marci Berney, Director of Student Outreach and Support ("Berney"), Kate Bean, Assistant Director, Wellness, Alcohol and Drug Education ("Bean"), and Emily Forte, Assistant Director of Community Standards "Forte"). Taken together, nearly the entire University is represented in the IMOU and joins in the commitment to strengthen its response to sexual assault on campus. Both the EMOU and the IMOU embrace a victim-centered, trauma-informed approach to claims of sexual assault that does not expressly address or contemplate the possibility of false accusations or help for the accused.[15]

By of 2017 both the EMOU and IMOU were executed and White, the lead author on of the successful $300,000 grant, assembled the Grant Application Package and

---

[15] This dovetails perfectly with SJU's Break the Silence presentation.

submitted it the OVW. *See* SJU 1089-1174, Exhibit "8."[16]  In the Grant Application, SJU

affirmed its commitment to "enhance victim safety; provide services for victims; support

efforts to hold offenders accountable . . . and increase awareness related to sexual assault,

domestic violence, dating violence and stalking." *See* SJU 1102, Exhibit "8 ." The

application emphasized SJU's efforts to train its employees to avoid "revictimization"

and "victim-blaming" by using "victim focused sensitivity." *See* SMP 1110-1111, Exhibit

"8." Significantly, the Grant Application expressed a belief widely held by SJU

personnel and administrators: that the scope of sexual violence is broad but difficult to

ascertain "given the underreporting of complaints" and that there is a "current and

growing need for a more effective campus response to reduce sexual violence on

campus." *See* SJU 1103, Exhibit "8;" SJU 1113, Exhibit "8."

In late August of 2017, Roe moved to SJU's campus.[17] She attended the same

Break the Silence presentation that Doe had attended and heard the same proclamations

that false reports of sexual assault are rare, that "victims" should not be blamed or

questioned and should simply be believed.  Roe, who identifies as a rape survivor, was

"triggered" by the presentation and left the room.  Outside she introduced herself to

Perry, SJU's Title IX Coordinator, and explained her past experience.[18]  (EP P303, L6-

P305, L20).

Shortly after the beginning of the 2017-2018 school year, while SJU's $300,000

grant application was pending, the OCR radically changed its expectations about how

---

[16] As part of the Grant Application, White represented to the OVW that SJU did, and would continue to comply with Title IX. *See* SJU 1096, Exhibit "8."

[17] Doe had completed a successful freshman year, a student in the Honors Program, and had returned to continue his studies as a sophomore.

[18] This will become significant because, not six months later, Perry would conduct the initial interview with Roe after she claimed to have been sexually assaulted by Doe.

8

schools should handle sexual misconduct, explicitly shifting its weight away from the previously authorized pro-accuser stance. Since its issuance, the 2011 DCL – the one on which SJU's SMP had been premised - had faced overwhelming criticism for asking universities to adopt sexual misconduct policies which were profoundly unfair to accused students. On September 22, 2017, the OCR withdrew the 2011 DCL on the grounds that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." ("2017 DCL"), Exhibit "9."  It expressly advised schools - including SJU - that sexual misconduct policies adopted under the 2011 DCL - as SJU's was - "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." *See* Exhibit "9."  Recognizing that it had "led to the deprivation of rights for many students – both accused students denied fair process and victims denied an adequate resolution of their complaints," the OCR withdrew the 2011 DCL with the intention to engage in rulemaking on the topic of sexual misconduct.  Rather than leave federally funded schools without guidance, the OCR issued a contemporaneous Q&A, instructing schools that "[i]n the interim, these questions and answers – along with the Revised Sexual Harassment Guidance previously issued by the Office for Civil Rights [the 2001 Guidance] – provide information about how OCR will assess a school's compliance with Title IX." ("2017 Q&A"), Exhibit "10."

Leaning heavily on the 2001 Guidance, the 2017 Q&A reminds universities of their obligation to "adopt and *publish*" procedures for handling sexual misconduct complaints that are "prompt and *equitable*." Exhibit "10," Question 4 (emphasis added). It defines "equitable procedures" as ones which "ensure[] the *adequate,*

*reliable, and impartial investigation* of complaints, including the opportunity to *present witnesses and other evidence.*" Exhibit "10." Question 4 (emphasis added). The OCR even identified the specifics of how to conduct an "equitable" investigation, directing schools that "[i]n every investigation conducted under the school's grievance procedures, *the burden is on the school – not on the parties – to gather sufficient evidence to reach a fair, impartial determination* as to whether sexual misconduct has occurred." Exhibit T, Question 6 (emphasis added). The Q&A instructs universities that, in order to provide an equitable investigation – as they are mandated to do under Title IX – they must ensure:

    (a)    That the investigator of the alleged conduct be "free of *actual or reasonably perceived conflicts of interest and biases*;"

    (b)    That the school's "*institutional interests* do not interfere with the impartiality of the investigation;"

    (c)    That a "*trained*" investigator "analyze *and document* the available evidence;"

    (d)    That the investigator "objectively evaluate the credibility of parties and witnesses" and "synthesize *all available evidence* – including both inculpatory *and exculpatory* evidence;"

    (e)    "Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on *equal terms*."

    (f)    "Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide *written*

*notice to the responding party* of the allegations constituting a potential violation of the school's sexual misconduct policy, *including sufficient details* and *with sufficient time* to prepare a response *before any initial interview*;"

(g)     "Sufficient details include the identities of the parties involved, the *specific section of the code of conduct* allegedly violated, the *precise conduct allegedly constituting the potential violation* and the date and location of the alleged incident;"

(h)     "Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation;"

(i)     "The investigation should result in a written report summarizing the relevant *exculpatory and inculpatory* evidence."

(j)     "The reporting and *responding parties* and appropriate officials must have *timely and equal access* to *any information* that will be used during informal and formal disciplinary meetings and hearings."

*See* Exhibit "10," Question 6 (emphasis added). The OCR further instructed that "the decision-maker(s) must offer each party the *same meaningful access* to *any information that will be used during informal and formal disciplinary meetings and hearings*." See Exhibit "10," Question 8. "The parties should have the opportunity to respond to the report *in writing in advance of the decision of responsibility*" See Exhibit "10," Question 8. Schools are cautioned that "approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially." See Exhibit "10," Question 8.

The OCE underscored the significance of the 2017 Q&A as follows:
The Department has determined that this Q&A is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007).

Exhibit "10," pg. 7.

SJU's response to the 2017 DCL and Q&A was quick. On the morning of on September 22, the day the new guidance was issued, White, who was on maternity leave at the time, exchanged emails with Perry, Anderson and Bordak expressing concern that SJU's SMP might need to be changed in light of the 2017 DCL. White told the others that "there may be some changes we need to make to our process (i.e. allowing students to read reports before a decision is made.)" *See* SJU 1979, Exhibit "8." Perry responded within the hour that she had already read the OCR documents and had "noted some items that will need our attention. I'm going to ask Bill and Emily to begin reviewing our procedures against this guidance and hope to get a meeting together on the 5th or 6th of October." *See* SJU 1980-1983, Exhibit "8."

But there would be no changes to SJU's SMP.  Right around that time, before the scheduled meeting to discuss amending SJU procedures to comply with the new OCR guidance, SJU learned that it had been awarded the long sought-after $300,000 OVW Grant, the pursuit of which it had cost so much time and energy. The Grant brought with it an obligation on SJU's part to make semi-annual reports to OVW showing "progress" on the goals identified in the Grant, i.e. an increased, more effective response to claims of sexual violence on campus.[19]

---

[19] In fact, the OVW Progress Report is a form document seeking information about whether Grant funds expended during the reporting period were effective in achieving Grant goals. There are a series of specific questions the school is expected to answer about the effectiveness of the outreach and education activities funded by the grant: "[e]xamples might include a marked increase in calls from victims/survivors of sexual

On October 2, 2018, Anderson, Bordak, Perry, Forte, and a few other SJU employees involved in the SMP disciplinary process met with Marianne Schimelfenig, Esq., General Counsel and Corporate Secretary at SJU, to discuss implementing the new OCR guidance. White attended that meeting by phone and continued to suggest that SJU "need[s] to be a bit more transparent . . . in the process." *See* SJU 1983-1986, Exhibit "8." There is no meaningful testimony about what was discussed in that meeting. SJU shielded that information from disclosure by asserting that it was privileged. We do know, however, that, as the Title IX coordinator, one of Perry's "essential duties" is to "insure [sexual violence] policies adhere to OCR guidance." See SJU 1337; SJU 1337-40, Exhibit "8." We do know that the explicit, intended effect of the 2017 DCL and Q&A was to level the level the playing field between accused and accuser, making it less easy to secure inappropriate findings of guilt. We also know that SJU had just learned it would be the recipient of a $300,000 grant in *increase* its response to sexual misconduct. And we know that no changes were made to the SMP as a result of the 2017 DCL and accompanying Q&A. (CA Dep, Page 13).

Four after the October 2, 2017 meeting, SJU conducted a training session for its Community Standards Board members ("CSB") for the 2017-2018 school year. The training session focused on implementing the SMP and emphasized a "trauma informed" approach to working with claimants.[20] *See* SJU 2009-2035, Exhibit "8." SJU advised its CSB to frame questions with empathy and compassion, being careful not to express judgment or demand responses, and to avoid asking claimants "why" questions. The

---

violence . . . ." following a school-sponsored event of some type intended to increase awareness of sexual misconduct on campus. *See* SJU 1573, Exhibit "8 ."

[20] Since, overwhelmingly, "claimants" under Title IX are women and "respondents" are men, this session really addressed how women should be treated.

training session references the 2011 DCL – the one which had been rescinded because of its deeply anti-male impact - but is silent as to the recently issued 2017 DCL and Q&A. Just a few weeks later, on November 30, 2017, SJU issued a press release telling the campus and the public that it had been awarded the three-year $300,000 grant to "bolster [its] response to sexual misconduct." *See* Exhibit "11."[21]  The University represented that the goal of the grant "is to reduce sexual assault . . . as well as strengthen the institution's response to these crimes" and promised that "University staff will submit quarterly reports to the OVW to insure the campus' progress."[22]

Sometime after the press release, in December of 2017 or January of 2018, The Hawk, SJU's University newspaper, published an article touting the award of the Grant and explaining its expected impact on the University. *See* article from The Hawk Newspaper, Exhibit "12." Perry, serving as a panelist at a Bridging the Gap event intended to encourage awareness of sexual assault, told those present that the University had applied for the Grant unsuccessfully in 2016, but "on this attempt they tried a different approach, directly addressing issues of sexual assault at St. Joe's campus." *See* Exhibit "12."  Perry expressed her belief – consonant with that of other SJU staff and administrators – that sexual assault is vastly underreported.  She said "approximately 700 women[23] at St. Joe's will have been sexually assaulted during their college career. [Perry] only gets 10-15 reports a year."  As a result of the Grant, Perry said that "[o]ur

---

[21] SJU's press release indicates that it was one of only 53 college campuses nationwide to be awarded this Grant, adding prestige to its already hefty financial significance.
[22] The Grant also sought to "enhance collaboration" among SJU, "law enforcement and survivor advocacy organizations."
[23] Once again, the constant reference to "women" as the victims of sexual misconduct by Perry and the other members of the panel reflect the broader understanding that "claimants" under the SMP are almost universally female, and the "respondents," almost universally male.

expectation is that, initially, we will have more reports of sexual misconduct because students will be aware of what it is and options they have for reporting."

The same Hawk article reported told readers that a panelist who shared the stage with Perry was a sexual assault survivor who was sharing her story in the hopes of "empower[ing] others to come forward if they have been sexually assaulted." The article quoted her as saying "a lot of us think that sexual assault has to be this really violent brutal crime to be called sexual assault or to be called rape but in reality, it's really just an unwanted sexual act, its non-consensual." Another panelist is quoted in the article as saying that the #MeToo movement is helpful, and the article points out that "the Grant comes at a time when sexual assault survivors are coming forward and speaking out about their perpetrators . . . Women are becoming more confident . . . [t]he more women we have coming forward and the more women who feel comfortable coming forward, the safer our world will be as a whole, especially for women." See Exhibit "12."

On January 31, 2018 SJU received a $30,000 Pa Governor's Grant aimed at "improv[ing] awareness, prevention, reporting and response systems regarding sexual violence." *See* SJU 1354, Exhibit "8." Perry, who is listed as the Project Director for the Grant request, says that "we know from national trends and our own campus statistics, the overwhelming majority of acts of sexual violence are perpetrated by men. Since 2014, 95% of the complaints of sexual violence at SJU involved a male respondent." *See* SJU 1356, Exhibit "8." She also says that previous efforts to engage men have been short lived, but that current faculty interest, "the national climate and grant-funded resources" could create the right moment. *See* SJU 1356, Exhibit "8." She proposes

that SJU would use Grant proceeds to engage a speaker who would explain to the men on campus "how men are socialized toward violence and how they can eliminate violence against women." See SJU 1356, Exhibit "8."

This was the hyper charged, pro-woman backdrop against which Doe was charged with and ultimately found responsible for sexual assault after kissing Roe.

**a. Doe**

On Friday, February 23, 2018, John Doe was a sophomore at SJU living in St. Mary's Hall ("St. Mary's") on campus. Doe has ADHD, and was registered with the OSDS on campus, but was a strong student and in the Honor's Program at SJU.[24]  In the more than year and a half since he had been on campus, Doe had no disciplinary history to speak of. That night, he had decided to go with several of his friends to a party in Philadelphia near LaSalle University.  At the party, Doe met a pretty freshman who told him she went to Temple. It was Jane Roe, and she went to SJU.[25] (Dep. J Roe PL22-P120, L6, Exhibit "13")

Roe approached Doe, and the two began talking. Roe seemed interested in him, flirted with him, and drank out of Doe's cup.[26]  Roe told Doe that she had graduated from a recovery high school in Utah where she had been in treatment for cocaine and heroin addiction (JR P122, L20-P123, L14); despite the fact that she was drinking, Roe assured Doe that she was now "sober."  They kissed at the party (JR P128, L4-P129, L13), and

---

[24] Doe's ADHD manifests, in part, in a slower processing speed, entitling him to extended time on tests and other accommodations.

[25] Roe admitted that she lied about going to SJU. See SJU  332-379, Exhibit "8." But it was the first of many mistruths Roe was to tell, all of which are disputed by Doe, posing numerous material questions of fact which make Summary Judgment inappropriate.

[26] Despite her claims to have been "sober" for two years, Roe had "chugged a couple of beers" when she arrived at the party, and Roe was aware that there was alcohol in Doe's drink when she drank it. *See* SJU 345-351, Exhibit "8." There has never been a suggestion that either Roe or Doe were inebriated.

Roe texted Doe her cell phone number. *See* SJU 371, Exhibit "8." None of these facts are disputed.

At some point, Doe and Roe walked outside to get some air.  Roe noticed a man selling cocaine, and she asked about the price. See SJU 332-379, Exhibit "8."  At 1:31 a.m. on the morning of February 24, Roe texted her friends, "R" and "NF", saying "Guys there's coke he Here I want it." *See* SJU 372, Exhibit "8."  Roe's friends asked "WHERE" to which Roe responded "Outside meet me? In the back."[27]  Meanwhile, Doe noticed Roe's interest in the cocaine, and immediately tried to talk her out of buying it, reminding her that she had been "sober" for two years, and that she would regret throwing that away.  Roe would later say that this made Doe a "nice guy" and, at his prompting, she chose not to buy cocaine that night.[28]  *See* SJU 332-379, Exhibit "8." Instead, she and Doe decided to leave the party and return to SJU with Doe and his friends in Doe's friend's car.[29]  *See* SJU 332-379, Exhibit "8."

When Doe and Roe arrived back at Doe's dorm, St. Mary's, they went to the kitchen for water (Roe claims she needed to "sober up a little")[30] before heading up to a small common room on the third floor. See SJU 332-379, Exhibit "8."  Upstairs at St. Mary's, the two kissed more, their hands on each other's faces, arms and necks.  All of the kissing, both parties agree, was consensual. But it was at this point, while they were

---

[27] Roe provided different texts and different statements to different people at different times. The text exchange Roe provided to Malloy shortly after their "investigation" meeting left out a text in which Roe tells friends, referring to the cocaine: "IRK if I can do this's I." *See* P 12, Exhibit "14."

[28] Perry's notes show that when Roe reported the incident to Perry, she told Perry that Doe "didn't let her do coke." *See* SJU 1344, Exhibit "8." However, when Perry prepared the Complaint against Doe, she left this exculpatory detail out, reporting instead that Roe "did not want to be near that as she has been clean for almost two years." *See* SJU 335, Exhibit "8."

[29] Oddly, Roe claims that Doe was flirting with other girls in the car on the ride back to SJU. Doe disputes that.

[30] Again, there is no allegation that either Roe or Doe were drunk.

kissing in the upstairs room at St. Mary's, that Doe's and Roe's stories diverge diametrically.[31]

Doe says that he and Roe were kissing in the upstairs room in St. Mary's when Doe left to go to the bathroom. When he returned, Roe was looking at her phone and, he believes, had been texting her friends. Doe and Roe kissed some more, before Roe got a phone call from a friend. Roe told Doe that her friend was sick and that she needed to go to McShane, another residential hall on campus, to help her. Doe walked Roe downstairs and gave Roe his sweatshirt, thinking she might be cold outside. When he opened the front door, Doe saw the young woman he assumed to be Roe's friend waiting outside. Before leaving, Roe turned back to kiss Doe goodbye. Roe and her friend then left together a little after 2:30 a.m.  Doe texted Roe , "I'm goin to bed but u guys need anything my phone will b on I hope ur friends ok." *See* SJU 371, Exhibit "8." Roe texted back, "Thanks man." See SJU 371, Exhibit "8." Doe had never met Roe before that night and has never met her since.

**b. Roe**

Roe estimates (and text messages bear out) that she and Doe were in St. Mary's for approximately fifteen minutes.[32] But her accounts of what happened during that fifteen minutes are very different from Doe's.[33] Roe's versions of what happened that night

---

[31] Doe's and Roe's vastly divergent stories present a matter of credibility which is deeply connected to Doe's erroneous outcome claim against SJU, there again making summary judgment inappropriate.

[32] At 2:10 a.m., while they were in the car, Roe texted her friend R, telling her that she would probably stay over at Doe's and asking R if she was mad at her. See R 49-51, Exhibit "14." By 2:30 a.m. Roe had texted her friends that she "miss[ed] Francis," and her friends agreed to meet her outside St. Mary's.

[33] They are also different from one another. Roe told this story at least four different times, and it varied each time. She told it to Perry when she reported the incident. Perry's notes from her initial meeting with Roe are attached as Exhibit " ." She told it to Malloy during the investigation. Malloy's notes of her "investigation" meeting with Roe is attached hereto as Exhibit "8" P380-388. She wrote it to the appeal board. A copy of Roe's appeal letter is attached hereto as Exhibit "8" SJU P550-552. And she told it in a two-part deposition, a transcript of which is attached as Exhibit "13."

have changed several times throughout the course of the investigation and throughout the course of this litigation. In each version of the story, Roe admits that she and Doe were kissing, and that the kissing and accompanying touching of her face and neck were consensual. In February, when she initially filed her complaint against Doe with SJU's Title IX Coordinator, Roe told Perry that Doe had squeezed her neck so hard that she couldn't breathe so she had not said anything to him.[34] When Roe met with the investigator in March, that at some point Doe suddenly "sat on top of her and put his hand around her neck," that "he was still kissing her while he was squeezing her neck," and that she said "what the fuck" and Doe pulled away. *See* SJU 332-379, Exhibit "8." When she was deposed, she was back to her original story, that she did not say anything to Doe because he had squeezed her neck so hard that she couldn't breathe, and she claims she was paralyzed with fear. (JR P177, L20-P180, L17).

In her initial report to Perry, Roe claims that when Doe squeezed her neck, she had a "flashback" to an abusive ex-boyfriend, "SM."[35] Roe told Perry that SM would "pin her down like this and say things like – if you do anything I'll hurt you and hurt your friends." *See* SJU 335. In March she told Malloy that SM would "squeeze her neck." *See* SJU 332-379, Exhibit "8." In her depositions, Roe first said that SM raped her every Friday and Saturday nights for four months in high school, but that he did *not* physically hold her down; he just threatened her. (J.R. P54). At other times, she said he would hold

---

[34] Roe told Perry that Doe had his "hand" around her throat, that she couldn't breathe and was paralyzed with fear from past abuse. *See* SJU 1344, 335, Exhibit "8."

[35] Plaintiff is not identifying Roe's allegedly abusive ex-boyfriend by name because she claims that he raped her every Friday and Saturday night for four months during her sophomore year of high school. Roe claims she went to the police at some point, but the police refused to bring charges against EM because "the DA said that it wasn't bad enough, we're both minors, and they're not going to prosecute." *See* Roe. Dep. 47. Plaintiff has been unable to verify any of Roe's allegations against SM and will avoid using his full name in this document in the event Roe's claims against SM, like her claims against Doe, are untrue.

her shoulders down. (J.R. P56).   Another time she said that, although he never physically hurt her, Roe claims SM had her followed at school.  (J.R. P58).  In the second half of her deposition, Roe testified that he when he raped her he would choke her (JR P273, L3-5).

Roe told Perry that when Doe pulled away from her, his "eyes changed" and he was not the "same guy I went with." *See* SJU 1344. By the time she told Malloy the story, Doe was still kissing her while he was choking her and that, when he pulled away his eyes were "so scary." *See* SJU 332-379.[36]

According to Roe, after he choked her, Doe left the room:

Q.      Well, how did it end then?

A.      He got up for some reason and when he backed away he just, I don't know how
        to describe his look, but like -- and then he said -- I don't remember what he went
        off to do. At one point he said he went to the bathroom.  At one point he said he
        went to get a computer. So I don't know what he was doing. But that was when I
        texted my friends and was like, "I have to get out of here."

Q.      Let's stick with this, if we can. So up until to the time he backed away you gave
        him no notice that he was doing something that was not pleasing to you?

MS. ENGLE: Objection; asked answered. And you can answer it again.

THE WITNESS: No.

Roe Page 180, L19-P181, L11

At that point and Roe, who had allegedly just suffered what she claims to have been a terrifying attack in which she "flashed back" to an abusive ex-boyfriend, texted her friends R and NF: "I miss Francis." *See* P72-73, Exhibit "14."

---

[36] It is worth noting that, even if true, having "scary eyes" does not violate any section of SJU's disciplinary codes.

Francis is not the name of Roe's abusive ex-boyfriend; it is the name of a boy Roe

had recently been spending time with before their relationship soured.[37]  The following

text exchange ensued among Roe and her friends, R and N shortly before 2:30 a.m.:

| | |
|---|---|
| Roe: | I miss Francis |
| Rowan: | Want to call? |
| | Leave then |
| | Its okay I'll meet u |
| | He will understand[38] |
| Roe: | can you call me |
| | Says "N"'s really drunk |
| NF: | HAHAGAGA YEAH |
| | Wantmetocneet u outside st mary's |
| | Im back in mcshain I can meet u [Roe] |
| Roe: | Can you call me |

*See* P72-73, Exhibit "14."  NF then texts Roe saying she will meet her outside, to which

Roe responds, "Act drunk please." *See* P57, 72-73, Exhibit "14."[39]  When Doe came back

into the room, Roe said thought he "may have been expecting something more, like

something sexual." See SJU 332-379, Exhibit "8."

Doe and Roe agree Roe never told Doe that he had choked her, that he had hurt

her, or that she was uncomfortable in any way.  They both agree that, instead, when he

came back into the room, Roe said her friend was sick and needed her.  They both agree

that Doe walked her to the front door of St. Mary's, where Roe's friend was waiting.

There is no suggestion that he was at all hesitant about walking Roe out.  In fact, Roe told

Malloy that Doe gave her his sweatshirt out of concern that she might be cold.  *See* SJU

332-379.  By the time she told her story in her appeal letter to SJU, and again at her

---

[37] The Complaint which Perry drafted based on Roe's statements to her suggests that "Francis" was a "safe word," intended to tell Roe's friends that she needed help. *See* SJU 335, Exhibit " ." Later Roe would contradict Perry's Complaint, saying that "Francis" was not a "safe word," and that she and her friends did not have a "safe word" until sometime after this alleged incident.

[38] The "he" referred to is Doe.

[39] Roe told Malloy that she called her friends while Doe was out of the room. See SJU 332-379, Exhibit "8." Phone records show that her friends actually called her in response to her "I miss Francis" text."

deposition, Roe' characterization of Doe's conduct had become more menacing.  Now

she claimed that Doe forced her to take his sweatshirt over her objection.  Nonetheless,

Roe admits that *she* kissed *Doe* goodnight at the door of St. Mary's in plain view of both

Roe's friend and surveillance cameras.  After Roe left, at 2:39 a.m. Doe texted Roe "Im

goin to bed but u guys need anything my phone will b on I hope ur friends ok." Roe

responded "Thanks man."

The next day, Roe spent time with her friends and called SJU's Public Safety

("PSafe") several times for rides to and from CVS. *See* P35-36, Exhibit "14."  She never

mentioned anything to PSafe about having been sexually assaulted. Neither she nor any

of her friends discussed what the terrifying sexual assault she claims to have endured the

night before. Neither she nor anyone else noticed any bruises, redness, swelling or

irritation on her neck.

Late Saturday evening, Roe and her friends met in Roe's dorm room before going

to a party at Sig Pi.  Roe had "Smirnoff Raspberry" in her room and she and her friends

agreed to have "long pregame," (Exhibit "14" - P62) during which her friends took a

series of photos, some of which clearly show Roe's fully exposed neck and twenty hours

after Doe allegedly "choked" Roe to the point where she could not breathe or speak, the

photos show no bruising, no redness, no swelling, no injury of any kind to Roe's neck.



Exhibit "14," P1.

Roe and her friends went to the parties and all drank excessively. Roe testified

that while she was "buzzed," she fell down the stairs at Sigma Pi on Saturday night,

injuring herself to the point that she needed an x-ray later that week.[40] By 3:00 a.m.,

Roe's friend NF was so intoxicated that Roe had to accompany her to the hospital. *See*

P76, P69, Exhibit "14." While there, JG, another friend texts Roe about Roe's friend R:

JG texts Roe:

| | |
|---|---|
| Jenny G: | R is freaking out |
| | Like panic attack in the bathroom |
| | She won't let me help her (P36) |
| Jenny G: | This brought up her fear of you choking her on |
| | Halloween |
| | Idk what to do |

---

[40] Roe would never mention this detail to Perry. She never told Malloy, who, to be fair, did not ask. She never mentioned it to the Appeal Board. It was only in August, 2018, in her second deposition, that Roe provided pictures of her uninjured neck and identified them as having been taken on Saturday evening, February 23, 2018, nearly twenty hours after Doe allegedly choked her. ed

> Shes so upset and locked herself in the bathroom
> She said that she was so afraid of you and that you
> had a choice and you chose to choke her and that's
> why she pushed you down the stairs because she
> was afraid of you
> She blames you and [another friend] for her getting
> in trouble with pub safety because she remembers
> that all she wanted to do was go to her bed

*See* P35-37, Exhibit "14."

The next day, Sunday, February 25, 2018, Roe helped NF craft a lie to tell her

parents so they would not suspect that she had been hospitalized for excessive drinking.

*See* P66, Exhibit "14". It was on Sunday, nearly two days after Doe had allegedly

choked her, just one day after she been drinking heavily (against school policy for an

underaged student), had fallen down the steps "buzzed," had accompanied her even more

intoxicated underage friend, NF, to the ER, had helped NF make up a lie to hide the fact

that she had been so intoxicated and had learned that another friend, R, was afraid of and

upset with her, Roe's friend first spotted bruises on her neck.[41]  *See* SJU 332-379, Exhibit

"8."

On Monday, February 26, 2018, Roe told first Bean, then Perry, that Doe had

sexually assaulted her. She left out the rest of what had happened on Saturday and

Sunday. That began the disciplinary process against Doe.

By that point, Roe had extensive experience with SJU's disciplinary process. She

had only been on SJU's campus for six months, but she had already had at least one

---

[41] Roe's claims that these bruises had been on her neck since Friday, but had gone unnoticed by her - because she does not look at her own neck- and by anyone else – because her long hair makes it impossible for anyone else to see her neck – are undermined by every photograph she has produced. Her neck is visible in each one, and the ones taken late Saturday evening – before she fell down the stairs - plainly show that her neck was not bruised, irritated, swollen or injured in any way. See P1-3, Exhibit "14."

hospitalization for alcohol poisoning, S*ee* SJU 2037-2045, Exhibit "8." She had already switched roommates and then suitemates. She had already been accused of selling drugs, been cited and fined by the police for smoking marijuana and been placed on disciplinary probation. *See* SJU 2046-2063, Exhibit "8." Each time Roe found herself in trouble, she did two things: she immediately informed the individuals investigating her that she had been in rehab for substance abuse;[42] and she expressed her deep concern about what impact a disciplinary infraction would have on her scholarship, her prospects, and her ability to remain at SJU.[43]

In December, 2017, Roe had had a disciplinary meeting with Forte regarding her alcohol violation and allegations that she had been selling drugs.[44] Forte thanked Roe "for sharing part of [her] personal story" and advised her that, as to the allegations of selling drugs, Forte was "taking [her] at [her] word that [she was] not involved in this serious violation of the University drug policy. If you are found responsible for selling, distributing, or sharing any drugs in the future, your ability to remain a SJU student will be impacted." *See* SJU 2056.

---

[42] This appears to be an attempt to solicit sympathy. After her hospitalization, SJU insisted Roe write a Reflection Paper in which she explained that she "just got out of rehab four months ago" and had "had 18 months and 24 days of sobriety, and it was my first [relapse] since I left rehab. "See SJU 244-245. When she was cited for smoking marijuana, Roe "was open with the officers about her previous drug addiction to heroin and her interactions with the police when she was younger." SJU 2053. When her room was searched after an accusation that she was selling drugs (no drugs were found) Roe said that she understood the "that she understood the search process because she had done that before in rehab." SJU 2061.

[43] After her hospitalization, Roe, who was and still is underage, was concerned that she would get a citation and that her parents were going to be mad at her. See SJU 2037-2045, Exhibit " ." When she was cited for smoking marijuana, the RAM on duty said Roe was "really upset about what this meant for their future. Roe asked me questions on if this would affect her McNulty scholarship and asked if this would be on her record and what that meant." SJU 2051. She had similar questions for the police when they showed up to issue a citation. *See* SJU 2052. When she was cited for an alcohol violation, Roe asked "about how this information may impact her scholarships or joining student organizations" "expressed concern about her parents finding out about these incidents and asked if there was any way that could be avoided." SJU 2061

[44] Text messages suggest that rather than engaging thoughtfully in the disciplinary process, Roe was exchanging lighthearted texting her friends about plans for the evening *during* her disciplinary meeting with Forte. Exhibit "14" – P46.

When she reported Doe for sexual assault on Monday, February 26, 2018, Roe was a girl with a lot of struggles and a lot to lose.[45] A s she had said in her September, 2017 Reflection paper, "I have too much at stake, both in my life in general and at St. Joseph's, to spend my weekends getting trashed and putting my life in danger." See SJU 2037-2045, Exhibit "8."

### c. SJU's "investigation" of the incident

On Monday, February 26, Roe reported her "sexual assault," first to Bean, with whom Roe worked, then to Perry, showing Bean her bruises. Perry, of course, knew the school had recently been awarded a $300,000 grant to increase the University's response to allegations of sexual misconduct, believed that sexual assault on campus was widely underreported, had openly expressed her hope and expectation that reports of sexual misconduct would pick up, and, only weeks before, had been notified the University had been awarded a second, $30,000 grant earmarked – at her request – to engage a speaker to tell male students "how men are socialized toward violence and how they can eliminate violence against women." See SJU 1356, Exhibit "8." Against this background, it is unsurprising that Perry unquestioningly adopted Roe's story as true.

Perry interviewed Roe and determined that this was a sexual assault.[46] She took handwritten notes of her meeting with Roe, and prepared a Complaint against Doe, thereby initiating a new SMP investigation. *See* SJU 1344, 335, Exhibit "8." Perry

---

[45] When Roe was in trouble, she did something else as well; she tried to shifted blame. In a Reflection Paper SJU asked her to write after her drug and alcohol hospitalization, Roe swore off drugs and vowed to take a break from drinking, but also suggested that the "guy she came to the party with" had "left [her]; he didn't want to get in trouble," and "when it came down to my safety or his reputation, he chose his reputation." See SJU 2044-2045, Exhibit "8."

[46] Pictures of Roe's neck would later establish that Roe's bruises did not match Roe's story, a fact that neither Perry nor, later, Malloy inquired into.

asked Roe if she had taken pictures of the bruises, and Roe said no.[47]  Perry asked Roe

to take pictures, which Roe subsequently did. Copies of those photos were ultimately

provided to Malloy and were kept in SJU's investigation file, but they were of poor

quality and difficult to decipher.  During the course of this litigation, Roe produced the

actual photographs taken on her phone as opposed to copies.  These photos clearly show

what must have been visible to the naked eye when Roe showed her bruises to Bean and

Perry: some bruising low on the front of Roe's neck, near the collar bone, as well as a

thin line of a bruise encircling the back of her neck, as if a necklace had been yanked

from her.  (See Exhibit 15, Photo Roe 7)  Significantly, Roe testified that she was not

wearing a necklace the night of her encounter with Doe; pictures show that she was

wearing a necklace the following night, when she drunkenly fell down the stairs at a frat

party.

Roe did not offer any information about what else she had done over the

weekend, and Perry did not ask. Perry had met Roe at one of SJU's Break the Silence

presentations, where Roe had told her that she had been sexually assaulted in the past.

Perry knew that Roe had been "triggered" by the presentation, and that she was now

complaining of a "flashback."  But Perry asked no questions.  (EP P314, L6-P327, L2).

Instead, she did what the Break the Silence presentation advises students to do, what

Roe knew others were expected to do, and what the investigator, Malloy, would

ultimately do; she just believed the victim.

Perry's Complaint, which started the investigatory process, essentially tracked the

story Roe told her with two notable exceptions: Perry's notes indicate that Roe told her

---

[47] Notice this conflicts with Roe's story that her friend had taken pictures on Sunday at the CVS parking lot.

Doe had stopped her from using cocaine that night. Perry left that exculpatory detail out of her prepared Complaint. (EP P311, L23-P312, L6; P324, L22-P325, L13). And there is no suggestion that either Roe or Doe were intoxicated that night. Perry stated in the Complaint that Doe had given Roe alcohol, intimating that that was somehow relevant to what Roe claims to have happened between them. See SJU 1344, SJU 335, Exhibit "8."

Without having done any investigation or having asked any questions, Perry decided that Roe's allegations constituted a sexual assault, as opposed to a physical assault, and should be processed under the SMP.[48] Later that same day, Perry emailed a copy of her drafted Complaint to Bordak, suggesting that Roe might be more comfortable if Forte (the OCS employee who had recently "taken Roe's word for it" that she wasn't selling drugs) was involved. *See* SJU 624, Exhibit "8." Then she emailed her complaint to Martin Havira, the head of public safety at SJU telling him that, although the party was off-campus, the "inappropriate activity was on our campus."[49] The Complaint, and the accompanying email had no qualifying language, no indication that it was stating anything other than established facts. Havira read them that way, too. Ten days later, before Malloy had even met with Doe, before her "investigation" had even begun, Havira prepared an Incident Report, apparently for SJU's database, stating that, on February 26, 2018, "SJU student Roe [identified by name and residence] was sexually assaulted by

---

[48] This is significant for several reasons, not the least of which is that Perry claimed this was "sexual" because kissing was involved. Yet, as will be discussed in further detail later, just a few months later, when a male claimant alleged that a female SJU employee had kissed him, Perry decided that claim should *not* be handled under the SMP, but rather under a different SJU policy which afforded the woman significantly more rights during the investigation. Perry's reasoning was that the kissing in that instance was *not* "sexual." Plaintiff submits this as evidence of gender bias and selective enforcement.

[49] Notice, this assumes, and communicates to Havira, that Roe's story actually happened.

Doe [identified by name and residence]." *See* SJU 166-168, Exhibit "8."[50]  This Incident Report announced Doe – by name - as guilty before the investigation had even begun.  It is unclear how many people this report was disseminated to, but, at a minimum Perry and Anderson received a copy. Neither did anything to correct Havira's conclusory statement (again, before the investigation had even begun) that Doe was guilty.

The day after Roe made her Complaint to Perry, Bordak reached out to Malloy to "investigate" it. Malloy, an employment lawyer at Cozen O'Connor, has handled SJU's Title IX investigations since its SMP was first adopted in 2015 (Dep. E. Malloy P82, L8-84L7 – Exhibit 16).  At least with regard to Title IX investigations, SJU is her only client (E.M. P28, L10-P29, L10).  Malloy has no particular training in conducting Title IX investigations (E.M. P67, L3-P73,L13), no specific accreditations (E.M. P74, L1-3), and belongs to no professional organizations dedicated to understanding Title IX (E.M. P73, L22-24).  Before being retained by SJU, Malloy had never conducted a Title IX investigation (E.M. P83, L23-P84, L7) and since that time she has only investigated one case at a school other than SJU (E.M. P28, L10-P30, L2).[51]  Malloy testified that her chief qualification in evaluating the credibility of witnesses during the investigation of title IX complaints is walking around the world for 59 years (E.M. P298L15-19).  On March 6, 2018, Schimelfenig signed a retainer agreement with Malloy obligating SJU to pay Malloy's firm $70,000 this year, plus expenses, to investigate up to 11 complaints, regardless of how much time she invests in each one. *See* SJU 1052-1055, Exhibit "8."

---

[50] Perry's Complaint was imbedded in the report so that anyone with access to it would know the specifics of Roe's story. This is particularly disturbing in light of the fact that Doe, the accused, was never told the specifics of the charges against him until he read Perry's Complaint at his appeal.

[51] Malloy represents on her firm bio that she "devotes a substantial part of her practice to serving as a neutral, non-privileged investigator of workplace and student complaints."

Malloy testified that she was aware of both the 2017 DCL, Q&A and SJU's $300,000 grant. (E.M. P252).

On March 1, 2018, Forte notified Doe that he had been charged with a violation of the SMP (Dep. EF P160, L18-22). She testified that Doe was shocked (as they usually are) and upset (EF P160, L18-P161, L21). She asked that Doe come in to her office to conduct a Pre-Investigation Meeting. The only additional information Forte gave Doe about the complaint against him was the name of the accuser – Roe – and the fact that it was not "sexual." (Dep. E. Forte P161, L22-163, L22 – Exhibit 17). Bean would later sum up SJU's attitude about why additional information was not given to men accused of sexual misconduct: well they were there so they already know it (Dep. K. Bean 203, L4-205, L23 – Exhibit 18).

The next day, Doe emailed Forte asking to postpone their meeting because he had a midterm for which he received extra time. *See* SJU 633, Exhibit "8." This should have alerted Forte that perhaps Doe had a learning difficulty that should be accommodated, but it did not. Bordak testified that it is SJU's policy to insist that the learning-disabled student himself must reach out to the OSDS to inquire about what accommodations he might be entitled to under the circumstances. Bear in mind, the accused, learning-disabled student is not entitled to know the circumstances. Unless he has been through the process before, he has no way of knowing what documents he is entitled to see, or whether the SMP process would even implicate his particular learning difference. SJU has only 119 students registered with its OSDS. *See* SJU 1103-1122, Exhibit "8." It would have been a simple matter to reach out to the OSDS to ensure that an accused student was afforded all the accommodations and support to which he is entitled. But

Bordak testified that SJU does not do that.  Interestingly, though, when Doe filed his appeal, knowing now that he would have to review whatever evidence was in the investigative file, he did reach out to the OSDS.  OSDS told him that he was entitled to extended time and a note taker, which he conveyed to Bordak (SJU 508).  Despite his testimony that he never reaches out to the OSDS (WB P51, L6-15), that that is entirely up to the student, Bordak did reach out to the OSDS, without involving Doe, and concluded that Doe was *not* entitled to a notetaker (SJU 509).  As a result, Doe was ultimately not provided this accommodation in his appeal, nor any other accommodation throughout the course of SJU's investigation.

SJU's refusal to meaningfully address Doe's learning difference is particularly egregious when viewed in light of SJU's policies under the SMP.  Accused students are repeatedly told that they are expected to handle their defense alone, without help, and certainly without the assistance of an attorney.[52]  SJU policy and practice dictate that the school and the complainant know the specifics of the allegations against the accused, but he does not and will not unless and until an investigator decides, in her discretion, to reveal that information to him.[53]  For a student like Doe, who struggles with a slower processing speed and has difficulties with focus, this creates a disastrous scenario.  Over the course of this investigation,  Doe went from predominantly A's and B's in the Honor's Program to failing nearly half his classes.  His difficulties with focus were on full display during Malloy's "investigation."   She testified that she had difficulty keeping

---

[52] This admonition to handle things alone is likely to resonate deeply with and enhance the sense of shame a student a student accused of sexual assault would already be feeling. This would be especially true of a wrongfully accused student, since he would have no way of knowing, let alone explaining, what the specific charges against him are.

[53] In this case, Malloy chose not to reveal the specifics of Roe's allegations against Doe. But if she had, it would have been during the "hearing;" he would have been sandbagged and unable to seek or get any accommodations necessary at that point.

him focused (EM P197, L4-24).   Malloy did not interpret any of these things as symptoms of ADHD.  How could she?  No one at SJU had told her.  So, in addition to hampering Doe's ability to defend himself against Roe's claims, SJU's failure to accommodate Doe's documented learning difference hampered Malloy's ability to conduct a fair and accurate investigation.

Shortly before Doe's Pre-Investigation Meeting ("PIM"), Forte notified him that a contact restriction had been put in place between him and Roe. When she filed her initial complaint, Roe had specifically told Perry that she did *not* feel a contact restriction was necessary. *See* SJU 624, Exhibit "8."  After her PIM with Forte, though, Roe had changed her mind, deciding that now a contact restriction *was* necessary. *See* SJU 332, Exhibit "8."  On March 5, 2018, Doe was notified that a contact restriction included

> both direct and indirect forms of communication. These contact restrictions include but are not limited to: personal interaction, contact with personal property, electronic correspondence (computer, telephone, text messages, e-mail, Facebook, etc.), contact initiated by any third parties on your behalf or at your request, and all forms of retaliation. These restrictions apply both on and off campus.

*See* SJU 644, Exhibit "8."  When Doe asked why these restrictions had been put in place – he and Roe did not know one another and had not seen or spoken to one another since the alleged incident - Forte said that "[t]he contact restriction was a decision made by the university in light of the allegations that were submitted." *See* SJU 647, Exhibit "8."

On March 6, 2018, Forte conducted a PIM with Doe. Doe asked when he would be provided with a copy of the Complaint (EF P176, L3-8) so that he could know what, exactly, Roe had accused him of doing.  As discussed previously, SJU does not disclose many of the policies it employs under the SMP process, including the fact that an accused student is not entitled to know the specific charges against him, nor is he entitled to know

about any evidence or witnesses in the case (Dep. K. White 143L11-P153, L5,P155, L22-P155, L6 – Exhibit 19).[54] But Forte did not tell Doe that. Instead, she told Doe that he would be shown a copy of Roe's Complaint at his "investigation meeting" with Malloy (EF P177, L15-P178, L24). She also did not tell Doe that the "investigation meeting" was actually a hearing at which his guilt would be decided, and certainly the term "investigation meeting" belies that fact (EF P362, L6-P364, L14). Rather than provide Doe with any information about the charges against him, Forte suggested that Doe make notes about what he remembered of his time with Roe, which he later did.

SJU's policy is that, after the University has conducted PIMs with both the accused and the accuser, the entire matter is turned over to the investigator for adjudication. After the PIM, at which Doe was told nothing about the charges against him other than that he had been accused of "being rough" with Roe (EF P355, L17-P356, L5),[55] Doe had no ability or right under SJU's policies to learn anything further from SJU about what Roe claimed he did. Now that a contact restriction was in place, he was denied the opportunity of getting information from other sources as well. He could not speak to Roe or any of her friends, under penalty of further disciplinary action on the part of the University. He could not even identify Roe's friends by name – at least one of whom had seen Roe kiss Doe goodbye outside of his dorm that night – to give that information to the investigator. He had no way of learning what Roe might have said about the what he did immediately afterward, what she might have texted her friends, or

---

[54] Of course, Roe had full access to all of that information before, during and after the investigation. In fact, she selected which bits of evidence and witnesses she would provide to the school. The school then accepted her story, supported by her hand-selected evidence, without question.

[55] It is important to remember that Forte promised Doe that he would be told the exact claims against him at the investigation.

what she might have done the rest of the weekend.  He had no way of knowing that Roe had an extensive disciplinary history at SJU showing that she had an ongoing substance abuse problem.  He was unaware of SJU's amnesty policy for students reporting sexual misconduct and had no way of knowing that Roe might have needed amnesty.[56]  Failing that, Doe was left to assumptions about Roe's allegations, her motivations and her recollection.  And he assumed the best – that *something* must have happened that night to make her uncomfortable, even though he had no idea what.

At Forte's suggestion, Doe prepared a note detailing what he remembered about his time with Roe. *See* SJU 375-378, Exhibit "8."  This note speaks volumes about how little Doe knew about the charges against him going into his "investigation" with Malloy. In an effort to figure out what the basis of her allegations was, Doe mistakenly identifies, and apologizes for, three separate interactions, none of which involves Roe's neck and none of which is the basis of Roe's sexual misconduct complaint.  First, he speculates that his playful push toward the chair is the source of Roe's complaint.[57]  It was not. Then he wonders if  he was "holding her in some way that felt forceful or aggressive."[58]  He was not.  Finally, he intimates that maybe she was upset because he had kissed her on the stairs, delaying her from meeting her friend.[59]  She was not. Doe never mentions anything about squeezing Roe's neck, or even about touching Roe's neck.  Reading Doe's note, two things are obvious: the first is that Doe is very anxious to figure out what Roe could

---

[56] When asked whether SJU students actually read all of the Handbook, Roe testified, "I did."(JRP P24, L6-9)
[57] In light of the fact that Roe filed a complaint against him, Doe says that "it has become clear to me since that this was inappropriate." *See* SJU 376, Exhibit "8."
[58] Doe specifically says it is not his intent to be forceful or aggressive, but, again, in light of the fact that Roe had since charged him with sexual misconduct, "it clearly made her uncomfortable." *See* SJU 376, Exhibit "8."
[59] Doe says he "was sorry for doing that" because he knew she had to go meet her friend. *See* SJU 376, Exhibit "8."

be upset about and to apologize for it.  The second is that Doe has absolutely no idea what the charges against him are.  This should have set off alarm bells for Malloy, an experienced attorney well acquainted with the bedrock right of an accused to know the charges and evidence against him, well aware that withholding such information undermines the validity and accuracy of her investigation.  This should have prompted Malloy to exercise the discretion SJU had delegated to her to show Doe Roe's Complaint, Roe's text messages; photos of Roe's bruises.  It did not.

On March 8, 2018,[60] Malloy emailed Doe asking to meet with him on March 19, 2018.  Doe confirmed their meeting, and asked Malloy "if there is anything he should do to prepare for this meeting."  *See* SJU 404-406, Exhibit "8."   Malloy emails Doe two times after March 8th, each time ignoring his question.  On Sunday, March 18th, Doe again emails Malloy asking her if there is anything he should bring or do to prepared for their meeting.  Malloy did not respond until Monday, March 19th, less than four hours before the hearing, telling Doe that "if [he has] any documents or text messages or emails that may relate to the complaint, I would like to see them."  *See* Exhibit "20."  Of course, it was not until after Doe had already been found responsible for assaulting Roe that he first saw the Complaint, or even knew the specifics of the charge against him, so this was not just an untimely request, it was an impossible one.

On March 19 2018, Malloy met with first Roe then Doe.  She did not ask Doe what, if any, information or evidence he had been given about Roe's charges.[61]  It is

---

[60] Ironically, on the very same day that Malloy sent Doe an email to schedule his hearing, Havira, SJU's head of public safety, sent an email to SJU's database, Perry, Anderson, and possible others, stating that Doe (identified by name) *had* sexually assaulted Roe (also identified by name). *See* SJU 166-168, Exhibit "8 ." Even before the hearing, Doe's guilt was assumed.

[61] Nor is there any evidence to suggest that Malloy asked Perry or Bordak whether Doe had been shown a copy of the Complaint Perry had prepared on Roe's behalf.

clear, however, that prior to and during the investigation, Roe knew exactly what was in her Complaint, had access to photographs of her bruised neck, text messages between herself and her friends. She knew the names of potential witnesses and the people with whom she had discussed this alleged incident. She knew her own medical history, her own disciplinary history, and what medications she had taken over the course of the weekend of February 23rd. She knew that she had gone out for a night of heavy drinking the day after her encounter with Doe and that she had drunkenly slipped down the stairs, sustaining injuries which would send her to an Urgent Care a few days later. She knew there were pictures of her taken approximately twenty hours after Doe had allegedly choked her; pictures, it turned out, that clearly showed Roe's perfectly unblemished neck.[62] There is no evidence that Roe actively concealed any of this information from Perry or Malloy. She did not have to. They did not ask for it.

In fact, Malloy, like Perry, seemed not to have questioned Roe at all. For example, Roe told Malloy that when she first met Doe she lied about going to SJU. Malloy seems never to have asked why. Roe told Malloy that she had a history of drug addiction and had attended a recovery high school, but was now sober. Yet she was drinking that night and was tempted to buy cocaine. Rather than inquire into this troubling discrepancy, Malloy recharacterized Roe as a "recovered drug user."[63] Roe said that she went to the bathroom after her encounter with the drug dealer to compose herself. When she came out, she announced to her friends that she had not bought any drugs. Roe accused Doe, who she had just met, of "flirting" with other girls in the car,

---

[62] Those exculpatory pictures might even have been on Roe's phone during her interview with Malloy.
[63] It is widely known that there is no such thing as a "recovered" drug abuser; recovery is a life-long process.

but stated that she did not care about that.  She they were only at Doe's dorm for about fifteen minutes, that they went upstairs and were kissing and that Doe, unaccountably, "sat on top of her and put his hand around her throat and squeezed her neck."[64]  She said "he was still kissing her while he was squeezing her neck," and when she said "what the fuck," he immediately pulled away.  She said that she saw his eyes and they were "so scary" and that she had a flashback to an abusive ex-boyfriend who used to squeeze her neck.  Roe told Malloy that Doe left the room, and she called one of her friends and that Doe gave her his sweatshirt before Roe and her friend left.  Roe told Malloy that two days later, her friend noticed bruises on her neck.  Roe told Malloy she thought Doe did this on purpose, "to hurt her because she felt he was choking her."  *See* SJU 332-388, Exhibit "8."

A more critical listener would have asked probing questions about this improbable story, like the names of any friends she had discussed this incident with, why she lied about what school she attended, how she said "what the fuck" when she was being choked, whether she felt dizzy or passed out from being choked, when and whether she felt any pain in her neck, and when she first noticed bruises on her neck.  Someone interested in the truth would have a lot of questions about Roe's "flashback," and why Roe thought Doe, who she had only known for one evening, who had no reason to want to hurt her, who she had only been alone with for 15 minutes, who up until that moment had seemed like a nice guy, would suddenly want to hurt her.  A truly independent

---

[64] Doe is certain that he never sat on top of her. Had he been told this detail he would have adamantly denied it.

investigator would have wanted to know why Roe said she texted her friends to help her, when in fact she texted them that she "miss[ed] Francis."[65]

Malloy's "interview" with Doe, which was immediately after her meeting with Roe, was even more troubling.  She could tell from Doe's note and his comments at the hearing that he had no idea what Roe had accused him of doing, yet she chose not to enlighten him.  Malloy told Doe only that Roe said he squeezed her neck and that scared her.[66]  Malloy never used the word "choked." (EM P265, L4-P266, L7) Doe says she never told him Roe had bruises.[67]  She never showed him any pictures.  She never showed him the Complaint (EM P263, L4-P264, L1).  Without that information, Doe still had no idea what Roe was accusing him of (Dep. J. Doe P71, L15-P72, L2 – Exhibit 21).  She might have been saying he bumped into her.  Doe responded that he didn't want to call Roe a liar, but he did not remember doing that and does not think he did that (EM P199, L5-9).  Inexplicably, Malloy seemed to find this statement to be some sort of confession.

Without further investigation,[68] Malloy found Doe responsible for squeezing Roe's neck while they were kissing and determined that to be a "sexual assault."  Her logic is contorted and difficult to follow. She finds both Doe and Roe to be credible and says that "[Doe] does not specifically recall squeezing Roe's neck, but he does not deny it

---

[65] Malloy had Roe's text messages, if not during the meeting, shortly thereafter. Malloy also has the right to have as many meetings as she deems appropriate with claimants and respondents, so she could certainly have followed up with Roe. Malloy chose not to. She went on vacation.

[66] Of course, the SMP does not address "scaring" someone, nor does it prohibit them from having a "scary look" in their eyes.

[67] Malloy claims she did tell Doe there were bruises, but represents in her appeal letter that the bruises were irrelevant to her outcome.

[68] Doe said that he thought Roe's friend had seen Roe turn back to kiss him goodnight when he walked her to the front door of St. Mary's, a fact Roe admitted to in her deposition. This conduct should certainly have raised questions about Roe's credibility, particularly in a he said/she said situation.

and says they both had their hands on each other's neck area. He agrees that he did not obtain Roe's consent to touch her neck." This conclusion flatly contradicts Malloy's own rationale, in which she says consent to kissing also understandably includes consent to having Doe's hands on Roe's neck, meaning that Doe did not *need* independent consent to touch Roe's neck. It also flatly misstates Doe's testimony. Malloy's own findings illustrate that Doe *does* deny squeezing Roe's neck(SJU00350). And even if he had not, or had not done so with the vigor Malloy apparently wanted, how could he have? He did not know Roe was claiming he choked her. He did not see pictures or know about bruises. That would be like being accused of accidentally stepping on someone's toe in a crowd and vehemently denying it had happened.

As will be discussed in greater detail below, Malloy's conclusion also misreads and contorts the SMP's definition of sexual assault. The SMP defines "sexual assault" in relevant part, to be non-consensual contact with an "intimate body part," examples of which are provided in the policy. Malloy concedes, as she must, that the neck is not an intimate body part, a term which is. Nonetheless, Malloy finds that "because Roe's complaint is that Doe squeezed her neck, to the point where it left bruises, I find that this is a singular, separate act which required her consent." *See* SJU 355-359, Exhibit "8."

When Doe learned that Malloy had found him responsible for sexual assault, he was shocked. He told his parents, who he had been too embarrassed to tell before this point,[69] and prepared his appeal. *See* SJU 478-482, Exhibit "8." As is permitted under the SMP, Roe filed a response to Doe's appeal, claiming that Doe had sexually assaulted

---

[69] Not knowing the charges and evidence against him, Doe was sure that this was some sort of misunderstanding and that once he met with Malloy, he would be able to clear everything up.

her, had "choked [her] to the point she couldn't even breathe"[70] leaving her "paralyzed from fear, which led [her] to not say anything to him;[71] instead, [she] texted [her] friends because I knew they would help me get out of the situation before anything else happened."[72]  At a loss to explain Roe's bruises – which Doe only first learned about in his post-conviction review of the evidence against him - Doe had made a point in his appeal that Roe might have been on medications which could have caused her to bruise easily.  Roe responded that she was on prescription medications, "but none of them can cause easy bruising."  She claimed she "looked up the side effects on the list they hand out with the prescription."  Subsequent discovery in this litigation revealed that Roe was on Lexapro when the alleged incident with Doe occurred (JR P66, L20-P67, L21).  Increased bruising *is* a common side effect of Lexapro.  *See* Report of Robert Sing, M.D., Exhibit "22."  Alcohol consumption can also increase bruising.  So can falling down stairs, but, as always, Roe fails to mention this incident to the Appeal Board.

When Doe learned that Roe had filed a response to his appeal, he contacted the OCS to schedule a time to review Roe's appeal letter.  By this time, Doe had an attorney,[73] and knew enough to reach out to OSDS to secure his accommodations before coming in to SJU to review the file which would go to the Appeal Board.  On Wednesday, April 25, 2018, White, who was "facilitating" Doe's appeal, advised him that she was postponing his document review documents until Doe had an opportunity to speak with Dr. Mecke at the OSDS.  White did not tell Doe that she had not postponed

---

[70] This is a detail which is not mentioned in Malloy's notes from her interview with Roe.
[71] This contradicts Roe's story to Malloy, in which she said, "what the fuck."
[72] This seems to be referring to the "I miss Francis" text, which says, not that she needed help, but rather that she missed an ex-boyfriend.
[73] Under the SMP, Doe's attorney would not be permitted to review any documents, evidence or complaint in the file.

the actual Appeal Board meeting. On Monday, April 30, 2018, in the middle of preparation for final exams and papers at SJU and before Doe had had an opportunity to review Roe's appeal, Doe received an email from the Office of Student Life at SJU informing him that "[b]ased on a review of all available information pertaining directly to the appeal, the appeals panel affirms the outcome reached by the Investigator, which means all sanctions imposed as a result of the outcome also remain in place. The matter is concluded. No other appeal is permitted. Please see your original outcome letter for more information."

Doe pursued his right to see Roe's response to his appeal anyway, and told Bordak that, pursuant to his conversations with Dr. Mecke, Director of OSDS, he was entitled to have extended time for this document review as well as a note taker. That same day, Bordak, who testified in his deposition that he never spoke with the OSDS about student accommodations, emailed Doe saying that he had spoken to Mecke and determined that Doe is "not granted a note taker accommodation for the review of documents."

On Wednesday, May 2, 2018, Doe and his attorney (acting as an Advisor pursuant to SJU's SMP) [74] went to SJU expecting to review Roe's response to Doe's appeal and the documents generated during the investigation. Doe was, once again, shocked to see that, unbeknownst to him, White, the "facilitator" of Doe's appeal, had provided copies of his appeal letter and Roe's response to Malloy, Bordak and Forte and had actively solicited responses from them to be provided to the Appeal Board. In fact, she

---

[74] Pursuant to SJU's SMP, Doe's Advisor was not permitted any access to the records or evidence generated during the course of the Investigation or appeal, once again effectively denying Doe any meaningful assistance from his Advisor.

specifically scheduled the Appeal Board meeting around the timing of Malloy's, Bordak's and Forte's responses. *See* SJU 596-489, Exhibit "8." It will shock no one to learn that Malloy, Bordak and Forte all urged the Appeal Board to uphold Malloy's finding of "responsible."

The Appeal Board consisted of one SJU student and two SJU administrators, both involved in information technology. It is only natural that they would lean on the representations made by perceived "experts" on SJU's SMP. Bordak, the Director of the OCS told the Appeal Board that Doe's conduct met the definition of "sexual assault" because both he and Perry said it did; Malloy agreed. Bordak also assured the Appeal Board that the process is "equitable, fundamentally fair, and included equal protections for both the respondent and complainant."[75] As to his documented learning disability, WB did not deny that Doe was expected to handle his investigation and appeal alone, without help. *See* SJU 584-586, Exhibit "8." Similarly, Forte told the Appeal Board that her office is not aware of students' documented learning disabilities, and that Doe did not tell her he had such a disability. She also pointed out to the Appeal Board members that Malloy is an attorney, and that she serves as an investigator for the University in cases of sexual misconduct, implicitly underscoring what Malloy had to say. *See* SJU 587-588, Exhibit "8."

Malloy's letter to the Appeal Board, though, is the most disturbing. As a practicing attorney, one who both Bordak and Forte had intimated was an expert in sexual misconduct cases, the members of the Appeal Board were likely to give her

---

[75] Bordak admitted to the Appeal Board that "Office of Community Standards does not share the details of a complaint with the respondent prior to or during the Pre-Investigation Meeting" and directed them to Malloy regarding any information "shared or not shared during the investigation process."

thoughts disproportionate weight.  Of course, Malloy defended her conclusion that Doe had committed sexual assault.  She also claimed that she had "clearly informed Doe that Roe's allegation was that he squeezed her neck, and that she did not consent to that, although she consented to the kissing."  She admitted that she "did not show Doe the photographs.  His position that because he did not see the photographs and therefore did not know the charges against him is false.  I told Doe that the charge was the he squeezed her neck without consent."  Later, in her deposition, Malloy would claim that she *had* told Doe about the bruises, a position Doe vehemently denies.  She never said that to the Appeal Panel.  Instead, in direct contradiction of her own conclusions and rational in the Outcome Letter, Malloy told the Appeal Board that "the fact that Roe had a bruise on her neck was not the deciding factor." [76]  As to the fact that Doe claimed, and Malloy found, that Doe never had any intent to hurt Roe, Malloy assured the Appeal Panel that "the Policy does not require an intent to hurt the Complainant.  The act itself, without consent, violated the Policy."  See SJU 589, Exhibit "8." [77]

Malloy's shifting justifications and Bordak's and Forte's implicit instruction to the Appeal Board that they should just follow Malloy's lead is not simply inappropriate; it offers SJU a second, third and fourth bite of the apple, to persuade the Appeal Board that Doe committed sexual assault, opportunities denied to Doe.  As will be discussed in greater depth at a later point in this brief, the SMP, which is incorporated into the contract

---

[76] In her "Outcome and Rationale," Malloy had specifically found that "because [Roe's] complaint is that [Doe] squeezed her neck, *to the point where it left bruises*, I find that this is a singular, separate act which required her consent." See SJU Exhibit "8" __.)

[77] It is particularly troubling that Malloy, an attorney, was permitted to express her opinion about the interpretation of the SMP when one considers the fact that Doe, a college sophomore, distraught over the allegations against him, was repeatedly told that must handle this *himself*, that he must prepare the appeal *himself*, without the assistance of an attorney or anyone else.

between Doe and the University, provides that the Complainant and/or Respondent may appeal the investigators Outcome and that no additional responses are accepted as appeal documentation. See SMP V(b)(8). It makes no provision for SJU employees, or SJU's attorney, to submit statements, evidence, explanations, testimony or any other documents to be considered as part of an appeal under the SMP. Appealing students are certainly not given that right, and no student reading the SMP would expect it to be afforded to the University. Plaintiff submits that by permitting certain SJU employees to submit evidence and arguments to the Appeal Board of the Office of Student Life in support of Roe and against Doe, SJU violated the provisions of its own SMP.

After his wrongful conviction, Doe was put on academic probation and his record was marred with a notation of "sexual assault." SJU denied him the right to go on a long-awaited, pre-paid trip to Ireland.[78] His grades dropped precipitously. He is no longer in the Honors Program and has failed two classes. His ADHD symptoms have been exacerbated. He suffers from anxiety and depression, for which he has been forced to seek medical and psychological help. He has had to take a leave of absence from SJU, stalling his academic career. He feels alienated from friends and family due both his constant worry and concern about his situation and to the fact that he cannot discuss it openly with them. If SJU wrongful procured and wrongfully decided notation of "sexual assault" is not removed from Doe's record, he will suffer even more.

## II.    LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[78] Adding insult to injury, SJU has refused to refund him the money for this trip.

law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.* In considering a motion for summary judgment, the court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. Both parties must support their factual positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Chiarello v. Trans Union*, LLC, 2018 U.S.

Dist. LEXIS 168743, *6-7 (E.D. Pa. 2018), quoting *Anderson*, 477 U.S. at 251-52. In

making that determination, the Court "may not make credibility determinations or weigh

the evidence, and we must draw all reasonable inferences in favor of the non-

moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct.

2097, 147 L. Ed. 2d 105 (2000); *Armour v. County of Beaver, PA*, 271 F.3d 417, 420 (3d

Cir. 2001). Our function is to determine whether there is a genuine issue for trial, and we

may not prevent a case from reaching a jury simply because we favor one of several

reasonable views of the evidence." *LaLoup v. United States*, 92 F. Supp. 3d 340, 344,

2015 U.S. Dist. LEXIS 35576, *7-8 (E.D. Pa. March 20, 2015) citing *Abraham v. Raso*,

183 F.3d 279, 287 (3d Cir. 1999).

## III.   LEGAL DISCUSSION

### A.   Title IX: Statute and Guidance

Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any

education program or activity receiving Federal financial assistance." 20 U.S.C. §

1681(a).  It is well established that Title IX obligates a school prevent and address sexual

misconduct on campus. However, "it is equally well established 'that Title IX bars the

imposition of university discipline where gender is a motivating factor in the decision to

discipline.'" *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 184-185, 2016 U.S. Dist. LEXIS

21027, *14-15 (D.R.I. February 22, 2016)(quoting *Yusuf*, 35 F.3d at 715).

The statute is unusually brief; it falls to the Department of Education's Office of

Civil Rights ("OCR") to interpret and enforce Title IX. To that end, OCR periodically

issues guidance documents and "Dear Colleague Letters" to educational institutions

instructing them about how to comply with and implement the statute. OCR does not

stand alone in its authority enforce Title IX and its guidance documents; the statute is

also enforceable through a private right of action for damages and injunctive relief. *Doe*

*v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (citing *Yusuf v. Vassar Coll.*, 35 F.3d

709, 714-15 (2d Cir. 1994)).

   In 2001, the OCR issued a guidance document entitled "Revised Sexual

Harassment Guidance: harassment of Students by School Employees, Other Students, or

Third Parties" ("2001 Guidance")[79] Exhibit " ." The 2001 Guidance emphasized schools'

obligation to provide "prompt and equitable" resolution of sexual misconduct claims on

campus. It specifically obliged schools to provide "[n]otice to students . . .of the

[school's] procedures" in resolving Title IX claims, as well as "adequate, reliable, and

impartial investigation of complaints, including the opportunity to present witnesses and

other evidence." It reminded schools that "according due process to both parties involved

will lead to sound and supportable decisions."  Exhibit " ," at 22.

   In 2011, OCR issued a Dear Colleague Letter ("2011 DCL"), supplementing the

2001 Guidance.[80] By this letter, OCR "sought to lower or remove perceived barriers

faced by students reporting sexual assault, which naturally led to (i) the removal of

certain procedural protection for alleged assailants, and (ii) increased rates of conviction

for alleged assailants based on lower burdens of proof." *Doe v. Marymount Univ.*, 297 F.

Supp. 3d 573, 582-583, 2018 U.S. Dist. LEXIS 43164, *15-16 (E.D. Va. March 14,

---

[79] As will be discussed in greater detail below, the 2001 Guidance was the product of notice-and-comment rulemaking, giving it the force and effect of law. The guidance can be found at https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf.
[80] The OCR identified the 2011 DCL as a "'significant guidance document,'" which "does not add requirements to applicable law, but provides information and examples to inform recipients about how [the DOE Office of Civil Rights] evaluates whether covered entities are complying with their legal obligations." (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. at n.1.)

2018). Faced with the threat of losing federal funding, many universities changed their

sexual assault policies to favor accusers of sexual misconduct, almost exclusively female,

at the expense of students accused of sexual assault, students who are almost invariably

male. *Id.* In the years since, the 2011 DCL faced widespread criticism that it had

improperly pressured schools to abandon concerns about fundamental fairness and adopt

procedures that "lack[ed] the most basic elements of fairness and due process, are

overwhelmingly stacked against the accused, and are in no way required by Title IX law

or regulation."[81] As one court noted,

> [U]niversities across the United States have adopted procedural and substantive
> policies intended to make it easier for victims of sexual assault to make and prove
> their claims and for the schools to adopt punitive measures in response. That
> process has been substantially spurred by the [2011] "Dear Colleague" letter. The
> goal of reducing sexual assault, and providing appropriate discipline for
> offenders, is certainly laudable. Whether the elimination of basic procedural
> protections—and the substantially increased risk that innocent students will be
> punished—is a fair price to achieve that goal is another question altogether.

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016)

On September 22, 2017, in response to that overwhelming criticism, the OCR

issued a new Dear Colleague Letter ("2017 DCL"), withdrawing its well-intentioned but

deeply flawed 2011 DCL, and reiterating the principles of fundamental fairness mandated

by Title IX and the 2001 Guidance. Exhibit " ." Its express intent in withdrawing the

2011 DCL was to immediately initiate a notice-and-comment process in order develop

new fundamentally fair guidance. Rather than leave schools without interim guidance, or

---

[81] 2017 DCL, attached hereto as Exhibit " ", and sources cited in Ftnts. 1 and 2; *see also Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1072 (S.D. Ohio 2017) ("There is little doubt that universities around the country have felt pressure to tighten the investigation and punishments in sexual misconduct cases because this is a very sensitive issue."); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 U.S. Dist. LEXIS 102426, 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015)(The 2011 Dear Colleague Letter "provided guidance as to how schools should conduct sexual misconduct investigations and warned them that if they did not adequately address sexual assault on campus, then they could face loss of federal funding, investigation by the OCR, and referral to the Department of Justice for civil or criminal action.").

- even worse – allow them to continue to implement the pro-accuser/anti-accused policies adopted under the now-rescinded 2011 DCL, OCR directed schools to a contemporaneously issued Q&A on Campus Sexual Misconduct ("2017 Q&A"). OCR stated that it would immediately begin the rule-making process, instructing schools that "[i]n the interim, these questions and answers – along with the *Revised Sexual Harassment Guidance* previously issued [the 2001 Guidance] provide information on how OCR will assess a school's compliance with Title IX." Exhibits " " and " ."

The 2017 Q&A gives schools specific, concrete, readily-implemented instructions on what a school must do to comply with Title IX now that the 2011 DCL is withdrawn:

(a) It should use an investigator who is "free of *actual or reasonably perceived conflicts of interest and biases*;"

(b) It should ensure that its own "*institutional interests* do not interfere with the impartiality of the investigation;"

(c) It should have a trained investigator "analyze *and document* the available evidence;"

(d) It should ensure that the investigator "objectively evaluate[s] the credibility of parties and witnesses" and "synthesize *all available evidence* – including both inculpatory *and exculpatory* evidence;"

(e) "Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide *written notice to the responding party* of the allegations constituting a potential violation of the school's sexual misconduct policy, *including sufficient*

*details* and *with sufficient time* to prepare a response *before any initial interview*;"

(f)      "Sufficient details include the identities of the parties involved, the *specific section of the code of conduct* allegedly violated, the *precise conduct allegedly constituting the potential violation* and the date and location of the alleged incident;"

(g)      "Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation;"

(h)      "The investigation should result in a written report summarizing the relevant *exculpatory and inculpatory* evidence."

(i)      "The reporting and *responding parties* and appropriate officials must have *timely and equal access* to *any information* that will be used during informal and formal disciplinary meetings and hearings."

See Exhibit "10."

As of the writing of this brief, the 2017 Q&A remains in effect.

The 2011 DCL had heavily tilted the scale in favor of female accusers and against accused men. That not only ignited public anger and academic condemnation,[82] it also

---

[82] See *Doe v. Brown Univ.,* 166 F. Supp. 3d 177, 180, 2016 U.S. Dist. LEXIS 21027, *2-3 (D.R.I. February 22, 2016), citing Max Kutner, The Other Side of the College Sexual Assault Crisis, Newsweek (Dec. 10, 2015, 5:33 a.m.), http://www.newsweek.com/2015/12/18/other-side-sexual-assault-crisis-403285.html?rel=most_read2 ; Charles M. Sevilla, Campus Sexual Assault Allegations, Adjudications, and Title IX, The National Association of Criminal Defense Lawyers: Champion, Nov. 2015, at 16-20; 28 Members of the Harvard Law School Faculty, Opinion, Rethink Harvard's Sexual Harassment Policy, The Boston Globe (Oct. 15, 2014), https://www.bostonglobe.com/opinion /2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html ; Vanessa Grigoriadis, Meet the College Women Who Are Starting a Revolution Against Campus Sexual Assault, New York Magazine (Sept. 21, 2014, 9:00 p.m.), http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html ; Stephen Henrick, A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses [**3] , 40 N. Ky. L. Rev. 49 (2013).

unleashed a spate of lawsuits under Title IX by male students who had been subjected to

biased, unfair disciplinary procedures as a result of which they were wrongfully found

responsible for sexual misconduct.[83] Courts have analyzed the Title IX claims arising

from these disciplinary hearings under four theories of liability: "erroneous outcome,"

"selective enforcement," "deliberate indifference," and "archaic assumptions." *Doe v.*

*Case Western Reserve Univ.,* 2017 U.S. Dist. LEXIS 142002, 2017 WL 3840418 (N.D.

Ohio September 1, 2017), and cases cited therein.  In this case, John Doe's claims are

rooted in the "erroneous outcome" and "selective enforcement" theories.[84]

  **a.**  **Erroneous Outcome**

   **1. Elements of an Erroneous Outcome Claim**

   In an "erroneous outcome" case, "the claim is that the plaintiff was innocent and

wrongly found to have committed an offense." *Doe v. Brown Univ.,* 166 F. Supp. 3d 177,

185, 2016 U.S. Dist. LEXIS 21027, *15-16 (D.R.I. February 22, 2016) quoting *Yusuf,* 35

F.3d at 715.[85] To establish liability under this theory, the plaintiff must first show

"particular facts sufficient to cast some articulable doubt on the accuracy of the outcome

of the disciplinary proceeding." Id. Once the plaintiff has established doubt concerning

the accuracy of the proceeding, they must next identify "particular circumstances

---

[83] *See, e.g.* Doe v. Amherst Coll., 238 F. Supp. 3d 195, 222, 2017 U.S. Dist. LEXIS 28327, *57-58, 2017 WL 776410 (D. Mass. February 28, 2017), and cases cited therein.

[84] SJU's motion for Summary Judgment advises the Court that "under Title IX the issue here is whether the judgments by and on behalf of SJU were fair . . . AND whether those judgments were free of gender bias." SJU Motion, pg. 1. This is a complete misstatement of the law. Conceptually, "fairness" is an element of Plaintiff's breach of contract claim. A lack of fairness is not part of at Title IX claim. Rather, Title IX claims proceed on specific theories of liability – here "erroneous outcome" and "selective enforcement" – each of which has factual components.

[85] Every case that Plaintiff has found applied the *Yusuf* analysis to decide the viability of an "erroneous outcome" claim. Though the vast majority of those cases have done so at the at the Motion to Dismiss stage and were concerned only with the sufficiency of the allegations rather than the sufficiency of the evidence, they are nonetheless valuable guidance.

suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* (citations omitted).[86] The *Yusuf* court noted that "[s]uch allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*, *Harris I*, 2014 U.S. Dist. LEXIS 65452, 2014 WL 1910242, at *4; *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 823, 2017 U.S. Dist. LEXIS 148086, *48, 2017 WL 4049033 (E.D. Pa. September 13, 2017).

In this case, there is ample evidence that Doe was wrongfully found responsible following a deeply flawed disciplinary proceeding which was infused with gender bias.

### 2.   Flaws in SJU's investigation lead to an erroneous finding of guilt.

It is important to note at the outset that in order to prevail in his Title IX erroneous outcome claim, Plaintiff is not expected to prove that he is innocent of Roe's charges;[87] he need only supply evidence of "articulable doubt" as to the outcome of SJU's investigation. *See Doe v. Brown Univ., supra.*  This is not a high bar;[88] it can be met in a number of ways including: "(i) pointing to procedural flaws in the investigatory and adjudicative processes, (ii) noting inconsistencies or errors in the adjudicator's oral or written findings, or (iii) challenging the overall sufficiency and reliability of the evidence." *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584-585, 2018 U.S. Dist.

---

[86] In its Summary Judgment Motion SJU insists that "Plaintiff must show that gender bias <u>caused</u> the procedural defect and <u>led</u> to the improper finding of responsibility" (emphasis in original). This misstates the law. Plaintiffs need not, and as a practical matter, could not, show that gender bias (of which biased individuals may not even be aware) was the one and only cause of a particular procedural defect. Rather, courts have consistently held that the gender bias need only be "*a motivating factor in the erroneous finding.*" Plaintiff has done that here.

[87] SJU argues that Doe "must prove his innocence as to the charge against him in order to prevail on an erroneous outcome claim." SJU Motion for Summary Judgment, pg. 12. Once again, this misstates the law, which quite clearly asks plaintiff to show "articulable doubt" as to the outcome.

[88] *Doe v. Miami Univ.*, 882 F.3d 579, 593, 2018 U.S. App. LEXIS 3075, *24, 2018 WL 797451 (6th Cir. Ohio February 9, 2018)

LEXIS 43164, *18-20 (E.D. Va. March 14, 2018). Examples of procedural irregularities found to have undermined the legitimacy of a school's determination of guilt include:

- The investigator's failure to provide accused with initial statement of the accuser to the college; [89]

- Unresolved inconsistencies in statements by the accuser;[90]

- Statements by the accuser which are contradicted by other evidence in the case left uninvestigated;[91]

- Denying the accused the opportunity to identify and interview potential witnesses and to gather exculpatory evidence;[92]

- significant facts either not brought to the adjudicator's attention or ignored by the adjudicator;[93]

- The investigator's failure to seek out contemporaneous text messages sent by the accuser; [94]

- The failure to review and preserve electronic and other evidence;[95]

- The failure to record any interviews;[96]

---

[89] *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 222-223, 2017 U.S. Dist. LEXIS 28327, *59, 2017 WL 776410 (D. Mass. February 28, 2017)

[90] *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584-585, 2018 U.S. Dist. LEXIS 43164, *20 (E.D. Va. March 14, 2018); *Doe v. Miami Univ.*, 882 F.3d 579, 593, 2018 U.S. App. LEXIS 3075, *24, 2018 WL 797451 (6th Cir. Ohio February 9, 2018)

[91] *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584-585, 2018 U.S. Dist. LEXIS 43164, *20 (E.D. Va. March 14, 2018)(evidence that the accuser was "happy and giddy" following an allegedly violent encounter, ignored by the investigator, undermined the validity of the investigation).)

[92] *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584-585, 2018 U.S. Dist. LEXIS 43164, *19 (E.D. Va. March 14, 2018)

[93] *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584-585, 2018 U.S. Dist. LEXIS 43164, *18-20 (E.D. Va. March 14, 2018)

[94] *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 222-223, 2017 U.S. Dist. LEXIS 28327, *58, 2017 WL 776410 (D. Mass. February 28, 2017)

[95] *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 396, 2017 U.S. Dist. LEXIS 153838, 2017 WL 4174933 (W.D.N.Y. September 20, 2017).

[96] *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 396, 2017 U.S. Dist. LEXIS 153838, 2017 WL 4174933 (W.D.N.Y. September 20, 2017)

-   Interviewing the accuser before reviewing evidence or conducting an independent investigation;[97]

-   The failure to obtain documentation supporting the accuser's claim of injuries;[98]

-   The failure to conduct follow-up interviews to resolve inconsistencies between witnesses' statements;[99]

-   The failure to seek out and interview witnesses potentially favorable to the accused; [100]

-   Reaching conclusions contrary to the weight of the evidence;[101]

-   Unexplained discrepancies in the adjudicator's finding of fact;[102]

-   Use of an erroneous definition from the school's misconduct policy;[103]

-   Manipulation of the investigatory report such that certain exculpatory material was either left out of the report or was never investigated.[104]

These types of procedural deficiencies, standing alone, can be sufficient to cast doubt on the accuracy of the outcome of Doe's Title IX hearing. *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584-585, 2018 U.S. Dist. LEXIS 43164, *19 (E.D. Va. March 14, 2018)

---

[97] *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 396, 2017 U.S. Dist. LEXIS 153838, 2017 WL 4174933 (W.D.N.Y. September 20, 2017)

[98] *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 396, 2017 U.S. Dist. LEXIS 153838, 2017 WL 4174933 (W.D.N.Y. September 20, 2017)

[99] *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 396, 2017 U.S. Dist. LEXIS 153838, 2017 WL 4174933 (W.D.N.Y. September 20, 2017)

[100] *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 396, 2017 U.S. Dist. LEXIS 153838, 2017 WL 4174933 (W.D.N.Y. September 20, 2017); *Doe v. Columbia Univ.*, 831 F.3d 46, 56-57, 2016 U.S. App. LEXIS 13773, *32-33 (2d Cir. N.Y. July 29, 2016)

[101] *Doe v. Columbia Univ.*, 831 F.3d 46, 58-59, 2016 U.S. App. LEXIS 13773, *56-57 (2d Cir. N.Y. July 29, 2016)

[102] *Doe v. Miami Univ.*, 882 F.3d 579, 593, 2018 U.S. App. LEXIS 3075, *24, 2018 WL 797451 (6th Cir. Ohio February 9, 2018)

[103] *Doe v. Miami Univ.*, 882 F.3d 579, 593, 2018 U.S. App. LEXIS 3075, *24, 2018 WL 797451 (6th Cir. Ohio February 9, 2018)

[104] *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584-585, 2018 U.S. Dist. LEXIS 43164, *19 (E.D. Va. March 14, 2018)

("Although many of these procedural deficiencies may appear insignificant in isolation, taken together they warrant concern that Doe was denied a full and fair hearing.") But a plaintiff may also meet the first prong of the erroneous outcome test by challenging the sufficiency of the evidence used to find him guilty of sexual assault. *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584-585, 2018 U.S. Dist. LEXIS 43164, *19 (E.D. Va. March 14, 2018). Here, Plaintiff submits that both the procedural deficiencies splattered throughout Doe's investigation, and the paucity of the evidence against him – including the readily available exculpatory photographs which the investigator never even inquired about - cast articulable doubt on the outcome of SJU's investigation. *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 185, 2016 U.S. Dist. LEXIS 21027, *16-17 (D.R.I. February 22, 2016)(allegations that school had ignored exculpatory evidence, including the victim's own testimony . . . that she had in fact articulated consent" sufficient to show procedural inadequacies under erroneous outcome theory).

There is ample evidence of "articulable doubt" in this case. SJU's "investigation" of Roe's claim that Doe inexplicably "choked" her while they were kissing is so riddled with procedural flaws, factual inconsistencies, and twisted interpretations of SJU's own SMP, it would have been shocking if it *had* come to a correct outcome.

As discussed in detail in the Facts section of this brief, SJU never advised Doe of the specific claims against him, never showed him the complaint against him, never showed him pictures of the bruises Roe claims to have sustained – literally - at his hand. Malloy never asked to see those pictures, never questioned any witnesses and never sought any other evidence. She did not inquire into the inconsistencies in Roe's statements nor explore the nature of Roe's alleged flashback. When presented with text

messages contemporaneous with the alleged assault utterly inconsistent with Roe's story, she did not investigate why Roe - who had allegedly just suffered a horrible assault, a traumatic flashback to an abusive ex-boyfriend, and claimed to have texted her friends for help – told them she "miss[ed] Francis" instead. We now know that subsequent pictures prove Doe could not have committed the alleged assault against Roe and that Roe had significant reason to recast the cause of her injuries. Malloy did not have that evidence in front of her, but not because it was not available; because she did not ask.

The standard for showing "articulable doubt" as to the outcome of SJU's investigation is not high, and has clearly been met. The 6th Circuit recently found that "the unresolved inconsistency in Jane's statement, the unexplained discrepancy in the hearing panel's finding of fact, and the alleged use of an erroneous definition of consent create "some articulable doubt" as to the accuracy of the decision." *Doe v. Miami Univ.*, 882 F.3d 579, 593, 2018 U.S. App. LEXIS 3075, *24, 2018 WL 797451 (6th Cir. Ohio February 9, 2018). The evidence in this case shows all three – unexplained inconsistencies in Roe's statements, inconsistent findings of fact and incorrect readings of the SMP – and more. Plaintiff contends that the evidence actually proves Doe's innocence, but, at a minimum, it solidly casts "articulable doubt" on SJU's conclusion that Doe had sexually assaulted Roe.

SJU's "investigation" of the claims against Doe gave him no opportunity to defend himself, virtually guaranteeing his conviction. This is exactly the type of wrong courts have sought to redress in erroneous outcome cases.

> [I]nstitutions of higher education must avoid depriving students accused of sexual assault of the investigative and adjudicative tools necessary to clear their names even when there are no due process requirements. A student adjudicated guilty of sexual assault by a college or university experiences significant direct and collateral

consequences, consequences that are not unlike a criminal conviction. It follows that colleges and universities should treat sexual assault investigations and adjudications with a degree of caution commensurate with the serious consequences that accompany an adjudication of guilt in a sexual assault case. If colleges and university do not treat sexual assault investigations and adjudications with the seriousness they deserve, the institutions may well run afoul of Title IX.

*Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584, 2018 U.S. Dist. LEXIS 43164, *19,

ftnt. 17 (E.D. Va. March 14, 2018)

### 3. **The evidence establishes that gender bias was a motivating factor behind SJU's erroneous conclusion that Doe was guilty.**

In addition to casting significant doubt on SJU's determination of Doe's guilt,

SJU's policy decisions, its employees' statements, behavior, and assumptions, and its

agents' representations and decisions show that "gender bias was a motivating factor

behind [that] erroneous finding." *Doe v. Brown Univ., supra.* The *Yusuf* Court stated that

evidence of gender bias might include such things as "statements by members of the

disciplinary tribunal, statements by pertinent university officials, or patterns of decision-

making that also tend to show the influence of gender." *Yusuf,* 35 F.3d at 715. Plaintiff

need not show *both* inculpatory statements and biased patterns of decision making; either,

without the other, could establish gender bias.[105] And courts considering the question

have not found the indicia identified in *Yusuf* to be an exhaustive list. Gender bias can be

evidenced in the statements and behavior of one significant decision maker,[106] or it can

---

[105] *See, e.g. Saravanan v. Drexel Univ.,* 2017 U.S. Dist. LEXIS 193925, *10, 2017 WL 5659821 (E.D. Pa. November 24, 2017) (plaintiff need not point to arguably inculpatory statements by a university representative to establish gender bias).

[106] *See Doe v. Columbia Univ.,* 831 F.3d 46, 58-59, 2016 U.S. App. LEXIS 13773, (2d Cir. N.Y. July 29, 2016), and cases cited therein, for the proposition that an institution will be found biased, even in the absence of illegitimate bias on the part of the ultimate decision-maker, where "a biased person endowed with institutional influence 'played a meaningful role in the process.'" *Doe,* *32-33, quoting *Holcomb v. Iona Coll.,* 521 F.3d 130, 143 (2d Cir. 2008); *see also Staub v. Proctor Hosp.,* 562 U.S. 411, 422, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011

be suffused throughout the school setting. It can be found in one significant piece of evidence[107] or it can manifest in a patchwork of gender-infused statements, beliefs and decisions that ultimately cover a school's disciplinary proceedings with a blanket of bias.

Evidence of gender bias is by its nature situational, fact specific and sometimes subtle. Courts generally look to specific examples[108] of University statements and decisions which, when viewed in light of one another, show the influence of gender. Examples include:

- Disciplinary procedures which operate to favor complainants, who are almost always female, and disfavor the respondents, who are almost always male;[109]

- Evidence that a school's disciplinary policies and procedures in sexual misconduct cases grew out of a concern about being charged with Title IX violations by females;[110]

- Gender biased comments by University employees and representatives;[111]

---

[107] In *Doe v. Marymount,* for example, plaintiff alleged that the adjudicator in his case had made gender-biased comments and decisions in *other* sexual misconduct cases at the University. The court found this evidence "particularly probative. If [the adjudicator] possessed the outdated and discriminatory views of gender and sexuality . . . these views would have naturally infected the outcome of Doe's Title IX disciplinary proceedings. Therefore, this allegation *alone* is sufficient to satisfy Doe's burden to plead a fact that creates an inference of gender discrimination in Marymount's disciplinary proceedings." *Doe v. Marymount Univ.,* 297 F. Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164, *23-24 (E.D. Va. March 14, 2018)(emphasis added).

[108] Vague, conclusory allegations of gender bias are insufficient to support a Title IX claim. *Collick v. William Paterson Univ.,* 2016 U.S. Dist. LEXIS 160359 (D.N.J. November 17, 2016).

[109] *Doe v. Marymount Univ.,* 297 F. Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164, *23-28 (E.D. Va. March 14, 2018); *see also Harris v. St. Joseph's Univ.,* No. 13-3937, 2014 U.S. Dist. LEXIS 194438, 2014 WL 12618076, at *2 n.3 (E.D. Pa. Nov. 26, 2014).

[110] *Harris v. St. Joseph's Univ.,* No. 13-3937, 2014 U.S. Dist. LEXIS 194438, 2014 WL 12618076, at *2 n.3 (E.D. Pa. Nov. 26, 2014)

[111] *Doe v. Marymount Univ.,* 297 F. Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164, *23-24 (E.D. Va. March 14, 2018)

- Gender biased comments and/or decisions made in other sexual misconduct cases at the University;[112]

- Evidence that only the male participant is disciplined for participating in the same acts.[113]

- Evidence that school procedures, such as no-contact orders, operated to hamper accused student's ability to identify potential witnesses in his defense;[114]

- Evidence that school personnel felt pressure to handle sexual misconduct claims in a certain way;[115]

- Training materials encouraging school employees to believe the accuser and presume the accused student's guilt;[116]

- Statements by the school's Title IX coordinator tending to demonstrate a belief that males accused of sexual misconduct are responsible;[117]

- Evidence that the school failed to recognize or address accuser's potential motive to make a false allegation;[118]

---

[112] *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164, *23-24 (E.D. Va. March 14, 2018)

[113] *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, *20-21, 2017 WL 3840418 (N.D. Ohio September 1, 2017)

[114] *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164, *23-28 (E.D. Va. March 14, 2018)

[115] See *Doe v. Columbia Univ.*, 831 F.3d 46, 56-57, 2016 U.S. App. LEXIS 13773 (2d Cir. N.Y. July 29, 2016)(allegations that school faced public pressure to show that it took seriously complaints of female students alleging sexual assault stated ample grounds for gender bias)

[116] *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 823-824, 2017 U.S. Dist. LEXIS 148086, *49-51, 2017 WL 4049033 (E.D. Pa. September 13, 2017) (Training materials encouraging school employees to believe the accuser and presume the accused's guilt, combined with possible pro-complainant bias on the part of University officials set forth sufficient circumstances suggesting inherent and impermissible gender bias to support a plausible claim that Defendant violated Title IX under an erroneous outcome theory.); see also *Saravanan v. Drexel Univ.*, 2017 U.S. Dist. LEXIS 193925, *9, 2017 WL 5659821 (E.D. Pa. November 24, 2017)

[117] *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, *18-19, 2017 WL 3840418 (N.D. Ohio September 1, 2017)(Title IX coordinator had written a doctoral dissertation in which she claimed an epidemic in higher education regarding the sexual risk taking of college students, in particular women)

[118] *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, *18-19, 2017 WL 3840418 (N.D. Ohio September 1, 2017) (allegation that school "failed to recognize or address Jane Doe's potential motive

- Evidence that significant University personnel manipulated the record in such a way as to show a presumption of guilt;[119]

- Evidence that the school accepted the accuser's allegations at face value, notwithstanding inconsistent statements and contradictory evidence;[120]

- Evidence that investigators ignored evidence tending to diminish accuser's credibility;[121]

- Evidence that investigators ignored evidence tending to exculpate the accused;[122]

- Statements by university employees that accusers generally are telling the truth;[123]

- Evidence of gender bias on the part of one person at the University who was either a decision maker or exercised influence over the record and evidence presented to the decision maker;[124]

---

of reporting a false allegation against Plaintiff in order to obtain a Title IX academic accommodation to permit her to withdraw at the end of the semester from a class she was failing" sufficient to aver gender bias); *See Neal v. Colo. State University-Pueblo*, 2017 U.S. Dist. LEXIS 22196, *25-33, 2017 WL 633045 (D. Colo. February 16, 2017) (university's failure to consider physical or documentary evidence, motivation of one party not to be disciplined, failure to question certain witnesses before completing the investigation, combined with evidence that the university's enforcement of 2011 DCL has become "gender-skewed" against men, are more than adequate to plead gender bias.)

[119] *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, *18-19, 2017 WL 3840418 (N.D. Ohio September 1, 2017)(allegation that Title IX coordinator manipulated the record – adding accusations that plaintiff objectified Doe and wanted to control her - evidenced a presumption of guilt and was sufficient to aver gender bias)

[120] *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, *18-19, 2017 WL 3840418 (N.D. Ohio September 1, 2017)(allegation that school accepted accuser's allegations at face value – notwithstanding inconsistent statements and contradictory evidence, showed a presumption that the accused was guilty and were sufficient to aver gender bias).

[121] *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, *18-19, 2017 WL 3840418 (N.D. Ohio September 1, 2017)(allegations that the investigator intentionally overlooked any evidence tending to diminish Jane Doe's credibility and/or exculpate Plaintiff sufficient to aver gender bias).

[122] *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, *18-19, 2017 WL 3840418 (N.D. Ohio September 1, 2017)(allegations that the investigator intentionally overlooked any evidence tending to diminish Jane Doe's credibility and/or exculpate Plaintiff sufficient to aver gender bias).

[123] *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164, *23-28 (E.D. Va. March 14, 2018)(statements by university employees that accusers generally are telling the truth, if proven, could evidence gender bias)

[124] *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, *20-21, 2017 WL 3840418 (N.D. Ohio September 1, 2017)(evidence that Title IX Coordinator/investigator was gender biased could show bias on the part of the University because "while she was not the decision maker in this instance, she exercised enormous influence over the record and evidence presented to the decision maker."

- Statements by University employees that the school had adopted a pro-claimant policy out of concern about Title IX charges brought by female students;[125]

- Evidence that University personnel accepted accuser's unsupported claims without exploring the testimony of the accused student's exculpatory witnesses;[126]

- Evidence that the Plaintiff's adjudicator had made gender biased statements in other sexual misconduct investigations;[127]

- Investigator's failure to review and preserve electronic evidence;[128]

- Investigator's failure to conduct follow-up interviews to resolve inconsistencies between witnesses' statements;[129]

- Evidence that the school treated male students as "guilty, until proven innocent."[130]

*See Neal v. Colo. State University-Pueblo*, 2017 U.S. Dist. LEXIS 22196, *25-33, 2017 WL 633045 (D. Colo. February 16, 2017) (university's failure to consider physical or documentary evidence, motivation of one party not to be disciplined, failure to question certain witnesses before completing the investigation, combined with evidence that the

---

[125] *Harris v. St. Joseph's Univ.*, Civ. A. No. 13-3937, 2014 U.S. Dist. LEXIS 194438, 2014 WL 12618076, at *2 n.3 (E.D. Pa. Nov. 26, 2014) ("Harris II") (citation omitted)(allegations that University professor had said school had "adopted a policy favoring female accusers as [the university] was concerned about Title IX charges by female students" could be evidence of gender bias)

[126] *Doe v. Columbia Univ.*, 831 F.3d 46, 57, 2016 U.S. App. LEXIS 13773, *27 (2d Cir. N.Y. July 29, 2016)( "The alleged fact that [the Title IX Coordinator], and the panel and the Dean, chose to accept an unsupported accusatory version over Plaintiff's, and declined even to explore the testimony of Plaintiff's witnesses, if true, gives plausible support to the proposition that they were motivated by bias in discharging their responsibilities to fairly investigate and adjudicate the dispute.")

[127] *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585-586, 2018 U.S. Dist. LEXIS 43164, *22-23 (E.D. Va. March 14, 2018)(allegations that adjudicator in Plaintiff's disciplinary proceeding made gender biased comments in a subsequent sexual misconduct, if true, was sufficient in and of itself to prove gender bias)

[128] *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 402, 2017 U.S. Dist. LEXIS 153838, *37-38, 2017 WL 4174933 (W.D.N.Y. September 20, 2017) (investigator's failure to review or preserve electronic evidence or conduct follow-up interviews to resolve inconsistencies between witnesses' statements, coupled with other allegations, were indicia of bias).

[129] *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 402, 2017 U.S. Dist. LEXIS 153838, *37-38, 2017 WL 4174933 (W.D.N.Y. September 20, 2017) (investigator's failure to review or preserve electronic evidence or conduct follow-up interviews to resolve inconsistencies between witnesses' statements, coupled with other allegations, were indicia of bias).

[130] *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 189-190, 2016 U.S. Dist. LEXIS 21027, *26-28 (D.R.I. February 22, 2016)

university's enforcement of 2011 DCL has become "gender-skewed" against men, are more than adequate to plead gender bias.)

> **A.     SJU's failure to adjust handling of sexual misconduct claims in light of the 2017 DCL and Q&A is evidence of gender bias.**

SJU and its employees blithely dismiss the 2017 Guidance and 2017 Q&A as "sub-regulatory guidance" unworthy of deference. The University's position on this point not only contradicts the law, it also contradicts the position SJU itself took before the court in *Harris v. SJU*, 2:13-cv-03937.

Both the 2017 DCL and Q&A state that "[t]he Department has determined that this letter is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Geg. 3432 (Jan. 25, 2007). This letter does not add requirements to applicable law." *See* 2017 DCL, Q&A. As such, they are entitled to deference from the Court. See *Doe v. Univ. of Massachusetts-Amherst*, No. 14-30143-MGM, 2015 U.S. Dist. LEXIS 91995, 2015 WL 4306521, at *7 and n.3 (D. Mass. July 14, 2015) (court must accord "appreciable deference" to DOE's interpretation expressed in a Dear Colleague Letter of what actions schools are to take in response to allegations of sexual violence in order to comply with Title IX (quoting *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993))); *Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 92-93 (D. Conn. 2010) (deferring to DOE's interpretation of its own regulation as expressed in a Dear Colleague Letter). The degree of deference owed "is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards . . . under Title IX." *Cohen v. Brown University*, 991 F.2d 888, 895 (1st Cir. 1993) (*Cohen II*). See also *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002)(according deference to

1979 Policy Interpretation);" *see also Mayerova v. E. Mich. Univ.*, 2018 U.S. Dist. LEXIS 166281, *11 (E.D. Mich., Sept. 27, 2018)(according the agency's interpretation of Title IX deference under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)).

   SJU made this exact argument – that OCR guidance was entitled to the highest level of deference - in *Harris.* There, defending itself against a claim of anti-male bias, SJU argued the 2011 DCL was entitled to Chevron level deference, arguing that procedures it had adopted were endorsed by the 2011 DCL "are not only not violative of the law and applicable regulations, they are mandated by them." *See Harris*, Motion to Dismiss, pg. 6, ftnt. 2.

   Since then, the OCR has rescinded the 2011 DCL for the express reason that it led to incorrect, unfair, gender-biased disciplinary proceedings. But SJU chose not to abandon the policies it had adopted under the 2011 DCL, knowing that they were gender-biased. The 2017 Guidance and Q&A told SJU exactly what it needed to do to comply with Title IX. SJU chose not to do it. It cannot now come to this Court with the claim that the 2017 Guidance and Q&A are meaningless. So, when the OCR issued guidance making it easier for SJU to find men responsible for sexual assault, SJU argued before the court that such guidance was mandatory and had the force of law. But now, when the OCR has issued guidance expressly intended to level the playing field for accused men, SJU ignores it, suggesting that it is unworthy of consideration. Both the 2011 Guidance and the 2017 Guidance which rescinded it were deemed "significant guidance documents" by the OCR. SJU's wholesale adoption of one and wholesale rejection of the other can have little explanation *other* than gender bias. *Doe v. Marymount Univ.*, 297 F.

Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164, *23-28 (E.D. Va. March 14, 2018)(allegation that Defendant designed its disciplinary procedures to favor female complainants and disfavor the respondents, who are almost always male, if proven, sufficient to evidence gender bias); see also *Doe v. Univ. of Penn.*, No. 16-5088, 270 F. Supp. 3d 799, 2017 U.S. Dist. LEXIS 148086, 2017 WL 4049033, at *15 (E.D.Pa. Sept. 13, 2017) (quoting *Yusuf*, 35 F.3d at 715); *Harris v. St. Joseph's Univ.*, No. 13-3937, 2014 U.S. Dist. LEXIS 194438, 2014 WL 12618076, at *2 n.3 (E.D. Pa. Nov. 26, 2014)(citation omitted)(complaint claiming a university "adopted a policy favoring female accusers" because the university "was concerned about Title IX charges by female students" sufficiently pled gender bias); *Doe v. Brown Univ.,* 166 F. Supp. 3d 177, 189-190, 2016 U.S. Dist. LEXIS 21027, *26-28 (D.R.I. February 22, 2016)(a fact-finding process in cases of sexual assault that operates under the assumption that it's always the "boy's fault" could evidence gender bias).

This refusal to follow the 2017 Guidance and adopt procedural safeguards laid out in great detail in the 2017 Q&A is itself evidence of gender bias.

**B.     SJU's award of a $300,000 Grant from the OVW, with its concomitant obligation to evidence "progress" in handling sexual misconduct claims, is evidence of gender bias.**

Evidence of bias alone is insufficient; the bias must connect to gender in order to support a claim under Title IX. *Doe v. Columbia Univ.,* 831 F.3d 46, 56-57, 2016 U.S. App. LEXIS 13773 (2d Cir. N.Y. July 29, 2016). Plaintiff need not produce *admissions* on the point of the University that it was gender biased. *Saravanan v. Drexel Univ.,* 2017 U.S. Dist. LEXIS 193925, *9, 2017 WL 5659821 (E.D. Pa. November 24, 2017). Such

evidence of bias can be found where the school is under some sort of pressure such that the university's decision-makers and investigator might be motivated to favor the accusing female over the accused males. *See Doe v. Columbia Univ.*, 831 F.3d 46, 56-57, 2016 U.S. App. LEXIS 13773 (2d Cir. N.Y. July 29, 2016)(allegations that school faced public pressure to show that it took seriously complaints of female students alleging sexual assault stated ample grounds for gender bias).

In this case, SJU had just been awarded an $300,000 federal grant directed, in part, to identifying and responding to claims of sexual misconduct. The grant obligated SJU to make semiannual progress reports to the OVW. One indicia of "progress" would be an increase in claims of sexual assault on campus. Perry herself stated told the Hawk that she expected to see an initial increase in sexual assault claims as a result of this grant, and openly expressed her regret that she saw too few claims of sexual assault in the Title IX office, given her belief that it is wildly under-reported on SJU's campus. Plaintiff submits that SJU's $300,000 grant, together with its reporting obligations, placed pressure on the University decision makers to favor female accusers over accused men.

### C.     The training and educational materials SJU prepared and published are evidence of gender bias.

Courts have repeatedly held that "[t]raining materials encouraging school employees to believe the accuser and presume the accused's guilt, combined with possible pro-complainant bias on the part of University officials set forth sufficient circumstances suggesting inherent and impermissible gender bias to support a plausible claim that Defendant violated Title IX under an erroneous outcome theory." *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 823-824, 2017 U.S. Dist. LEXIS 148086, *49-51, 2017 WL 4049033 (E.D. Pa. September 13, 2017); accord *Saravanan v. Drexel Univ.*,

2017 U.S. Dist. LEXIS 193925, *9, 2017 WL 5659821 (E.D. Pa. November 24, 2017);

*Doe v. Marymount Univ.,* 297 F. Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164,

*23-28 (E.D. Va. March 14, 2018)(allegations that Defendant's training materials for

university employees who are involved in disciplinary proceedings encourage the

employees to believe the accuser and presume the accused's guilt, if proven, could

evidence gender bias).

     SJU's training materials are rife with gender bias. SJU's Break the Silence

presentation advised trainees that false reports of sexual assault "are rare, occurring only

8% of the time." *See* SJU 1031. Nearly every deposed SJU employee agreed with that

statement as well as the claim that sexual assault is significantly underreported on SJU's

campus. Accusers were referenced as "victims" and "survivors" even before a

determination of responsibility had been made, and trainees were encouraged to approach

them as such. *See* SJU 1048. They were told never to blame a "victim" or ask her "why

questions." *See* SJU 1048. They were told not to press "victims" for details of her

allegations. *See* SJU 1048. They were instructed that "the most important thing to do is

believe a victim." *See* SJU 1048.  This last admonition was to have particularly powerful

impact on Doe's case, since it is exactly what SJU, Bean, Perry, and Malloy did.

     The Break the Silence presentation is powerful evidence of gender bias in three

respects. First it was mandatory training for incoming SJU students, creating a gender

biased culture on campus. Second, it was presented and attended by members of SJU's

CS and Title IX offices, thereby regularly influencing their perspectives. And finally, it

was prepared and presented by members of SJU's CS, making it a statement on behalf of

the University evidencing its belief that accusers are automatically victims and must be believed. SJU's conduct in this case put that belief into action.

### D.    Statements by various SJU employees is evidence of gender bias.

In addition to the gender biased representations and instructions presented in SJU's training materials, various other statements of SJU employees and counsel manifest deep-seated presumptions that women are innocent victims, to be believed when possible and given every advantage in prosecuting violent, sexually aggressive men. Bordak, for example, explained to Doe's mother that he was found responsible for sexual assault because of his "really really aggressive kissing." This was *not* the basis of Malloy's determination; she found the kissing to be consensual and there is absolutely no mention of its being aggressive. Rather, it gives a hint of Bordak's assumptions and mindset.

In another example, Bean came straight out and articulated the rationale lurking behind SJU's refusal to inform accused men of the specific accusations against them. When questioned about what, if any, notice accused students should be afforded of the specific charge against them, Bean said accused students do not need notice of the specific charges against them.

| Schwabenland: | So what is the respondent entitled to review in order to prepare for any meeting or hearing, if you know? |
| --- | --- |
| Bean: | I mean, their memory. They were there. They can share what happened. |

(K.Bean. Dep. 206, lines 6-10)(Exhibit "18"); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164, *23-28 (E.D. Va. March 14,

2018)(statements by university employees that accusers generally are telling the truth, if proven, could evidence gender bias); *see also Harris v. St. Joseph's Univ.*, Civ. A. No. 13-3937, 2014 U.S. Dist. LEXIS 194438, 2014 WL 12618076, at *2 n.3 (E.D. Pa. Nov. 26, 2014) ("Harris II") (citation omitted). Bean articulates what the University believes: accused men do not need notice; they already know what they did.

SJU's bias is apparent, even during the course of this litigation. For example, when Plaintiff was forced to initiate litigation against SJU to clear his name, his counsel asked SJU to voluntarily agree to proceed using pseudonyms for both students in order to protect their privacy. Schimelfenig, SJU's counsel and corporate secretary, agreed to offer that protection SJU's the female student, Roe, but refused to extend that same courtesy to its male student, Doe.

Even SJU's Motion for Summary Judgment reveals its inherent gender bias. For example, it represents that Doe "chose" not to produce any witnesses or "suggest further inquiry" in his hearing with Malloy. SJU Motion for Summary Judgment, pg. 6.[131]  This assumes that it was *Doe's* responsibility, rather than Malloy's or SJU's to "provide additional materials or witnesses or suggest further inquiry."  In other words, SJU has shifted the burden of proof – which, under Title IX falls to the *school* – to Doe.[132]

In an even more blatant display of gender bias, SJU challenges Doe's repeated assertions that nothing happened when he was with Roe by saying that "even at the time of his deposition he had no explanation for how the bruises appeared on Jane's neck." SJU Motion for Summary Judgment, pg. 9. This clearly betrays SJU's gender biased

---

[131] Doe did, in fact, identify at least one witness, Roe's friend who witnessed Roe kiss Doe goodnight.
[132] This evinces gender bias, as opposed to anti-Doe bias, because it is the standard SJU apparently applied to all SMP respondents, universally male. SJU repeatedly asserts that it handled Doe's case as it does any other SMP claim.

presumption that it was *Doe's job* to "explain the bruises on Roe's neck." First, it was

not. It was *the school's* responsibility to gather enough evidence to determine whether

Roe's claims were true, which it did not do. Second, there is no way Doe *could* possibly

explain the bruises on Roe's neck unless he had caused them, which he did not. Third,

Doe did not even *know* there were bruises on Roe's neck when he was apparently being

asked to explain them. These ridiculous assertions are particularly outrageous at this

stage of the game, when we *know* that whatever bruises Roe had on her neck when she

reported this alleged incident were not caused by Doe. Pictures taken twenty odd hours

later show her neck was completely perfect.[133] Dr. Sing prepared a report saying that, had

she been "choked" as described, there would certainly have been evidence or trauma

twenty hours later. Exhibit "22".And the pictures themselves refute Roe's story. She

claims Doe "choked" her and points to bruises on the front of her neck as proof. Yet a

thin line of bruising extends around the back of Roe's neck, as if a necklace had been

yanked from her (Exhibit 15, Roe 7 at deposition). The pictures when reproduced  from

the actual jpeg images are completely inconsistent with her claims against Doe. Roe

herself cannot explain them (JR p322). Yet SJU still insists that Doe – who has no way of

knowing what caused Roe's bruises – must explain them, while Roe – who *can* explain

them and who failed to tell SJU or Malloy that she had become very intoxicated and

fallen down the stairs the night after her encounter with Doe – need not.

     SJU even goes so far as to state its own, and Malloy's gender bias. In its Motion,

says that Doe's responses – to charges he had not been told – were not "response[s] that

---

[133] These pictures, by the way, were already taken and were likely sitting on Roe's phone when she reported her complaints to Bean and Perry. They were readily available to Malloy during the "investigation." Had any one of them simply asked if there were any pictures taken over the ensuing weekend, they would have known from the outset that Roe's story was not credible. But they did not ask.

caused Malloy to doubt the veracity of what Jane had told her." Again, SJU's gender bias

is so pervasive and deeply imbedded that it admits that it believed Roe's story without

question and expected Doe to give them reason to doubt it. *Doe v. Marymount Univ.*, 297

F. Supp. 3d 573, 586-587, 2018 U.S. Dist. LEXIS 43164, *23-28 (E.D. Va. March 14,

2018)(university's crediting accuser's purportedly implausible allegations over the

accounts of plaintiff, if proven, could show gender bias).

    The statements and bedrock assumptions in SJU's Motion align perfectly with

other evidence of gender bias on the part of SJU employees.

        **E.**       **The statements and conduct of Dr. Perry, a significant
decision-maker in Doe's case, is evidence of gender bias.**

    The evidence shows that SJU's disciplinary process is rife with pro-accuser, anti-

male gender bias. But even if the entire process was not infected with that bias, bias on

the part of one individual could be sufficient to establish a Title IX claim if that

individual either acted as a significant decision-maker or "exercised enormous influence

over the record and evidence presented to the decision maker." In *Case Western*, for

example, the court allowed a Title IX case to proceed when plaintiff had alleged that one

person – the Title IX Coordinator/investigator - was gender biased. The court reasoned

that "these allegations at least give rise to the possibility that Ms. Milliken had a bias

against men in these types of situations, and while she was not the decision maker in this

instance, she exercised enormous influence over the record and evidence presented to the

decision maker." *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002,

*20-21, 2017 WL 3840418 (N.D. Ohio September 1, 2017).*Doe v. Trs. of the Univ. of

Pa.,* 270 F. Supp. 3d 799, 823-824, 2017 U.S. Dist. LEXIS 148086, *49-51, 2017 WL

4049033 (E.D. Pa. September 13, 2017) (Inculpatory statements by a representative of the University are compelling evidence of bias.)

Case Western is particularly instructive here. In that case, the Title IX coordinator had written a doctoral dissertation in which she claimed an epidemic in higher education regarding the sexual risk taking of college students, in particular women. Plaintiff argued that this statement demonstrated an inherent belief on the part of the Title IX coordinator that males accused of sexual misconduct are always responsible, a theory she perpetuated on campus. In this case, Perry made statements to the Hawk demonstrating her belief that sexual assault is significantly underreported on campus and she hopped to see more reports in the wake of the $300,000 grant. She is also identified as the Project Director on a $30,000 state grant aimed, in part, at improving SJU's "response systems regarding sexual violence." See SJU 1354. The specific goal of this grant application is to engage men. Perry proposes to use those grant proceeds to engage a speaker who would explain to the men on campus "how men are socialized toward violence and how they can eliminate violence against women." See SJU 1354. This is powerful evidence of gender bias on Perry's part -that men are violent and responsible for sexual assault - which directly influenced Doe's case.

In Case Western, Plaintiff averred that the school's interpretation of the evidence in the disciplinary proceeding "failed to recognize or address Jane Doe's potential motive of reporting a false allegation against Plaintiff in order to obtain a Title IX academic accommodation to permit her to withdraw at the end of the semester from a class she was failing." Plaintiff also averred that the Title IX coordinator manipulated the record – adding accusations that plaintiff objectified Doe and wanted to control her - evidencing a

presumption that the accused was guilty. Plaintiff also alleges that the school's acceptance of the accuser's allegations at face value – notwithstanding inconsistent statements and contradictory evidence, shows a presumption that the accused was guilty. The plaintiff further claimed that the investigator intentionally overlooked any evidence tending to diminish Jane Doe's credibility and/or exculpate Plaintiff. The court found these allegations sufficient to survive a motion to dismiss. *Doe v. Case Western Reserve Univ.*, 2017 U.S. Dist. LEXIS 142002, \*18-19, 2017 WL 3840418 (N.D. Ohio September 1, 2017).

The same circumstances are presented here. Perry accepted Roe's claims at face value, without inquiry or investigation. She drafted a complaint on Roe's behalf in which she conspicuously omitted evidence that tended to exculpate Doe – the fact that he had talked Roe out of using cocaine that night[134] - and included a suggestion that Doe had given Roe alcohol without her knowledge, which was not true. Perry made no investigation into Roe's charges. She did not ask to see the alleged bruises or make any effort to ensure that Roe's claims were true. Instead, she immediately forwarded the slanted complaint she had prepared to the head of Public Safety at SJU, Havira, telling him, without qualification or question, that the "inappropriate activity was on our campus." Havira, correctly read Perry's complaint as a conclusion, and prepared a statement for SJU's database stating that Doe (who was identified by name) *had* sexually assaulted Roe (also identified by name). This was before Malloy's investigation into Roe's complaint – such as it was – had even *begun*. Several SJU employees were sent copies of Havira's conclusory statement, including Perry and Anderson. Neither reached

---

[134] It is clear from her notes that she was aware of this fact.

out to Havira or to one another - neither responded in any way – to clarify that Doe had not yet been found guilty; he had not yet even been *investigated*.

Perry was also the individual who determined that Roe's claims fell under the rubric of "sexual assault" rather than "assault."

Plaintiff submits that these pieces of evidence, especially taken together show that Perry had a pro-woman, anti-male bias which played a significant role in Doe's disciplinary process, including the decision to initiate it under the SMP.

### F.    The statements and conduct of Ms. Malloy, a significant decision-maker in Doe's case, is evidence of gender bias.

As discussed in great detail throughout this brief, Malloy conducted a scant, self-contradictory investigation into Roe's claim against Doe. Her behavior illustrates that she believed Roe without question, she admits that she never showed him the complaint against him, and that she never showed him pictures of bruises on Roe's neck.[135] Malloy admits that the extent of her training in handling Title IX investigations is the webinars she's viewed throughout the years, her reading and her life experience. She admits that she met with Roe and Doe, but did not meet with any other witnesses, gather any evidence or do anything else to determine who might be telling the truth in a he-said/she-said situation. She clearly presumed that "she" was telling the truth. She admits that she, herself, would want the know the specific charges against her before having to defend herself against them, but she does not believe that an accused man is entitled to that right. (Dep. Mal. 267-268). She admits that she never showed Doe Roe's text messages. Malloy's behavior, reasoning and decisions in Doe's case illustrates her pre-existing

---

[135] Malloy says she believes she told Doe about the bruises. Doe says she never mentioned this fact to him. This is a significant dispute of material fact.

belief (despite evidence to the contrary) that the accusing woman was truthful and
(despite Doe's testimony and unsought evidence to the contrary) that the accused man
was guilty. The implacability of that assumption is revealed in her deposition:

| | |
|---|---|
| Schwabenland: | In your investigation was it relevant or of some importance to you to know if Ms. Roe had a history of self-hurting or hurting herself? . . . |
| Malloy: | No. |

(EM. Dep. 287).

| | |
|---|---|
| Schwabenland: | Was it relevant to you to know what medications she was on? |
| Malloy: | No. |
| Schwabenland: | Do you know anything about if medication she was taking can cause bruises to her individually at all? |
| Malloy: | It is possible. I did not do that. |

(EM. Dep. 288).

| | |
|---|---|
| Schwabenland: | Was one of the reasons for you not to inquire of any past relationship with her boyfriend that she says abused her and choked her or squeezed her neck the fact that you didn't want to traumatize her or cause her any problems? |
| Malloy: | I don't think so. I've certainly talked to lots of students about very delicate matters. |
| Schwabenland: | But you didn't talk to her about any delicate matter involving her old boyfriend? |
| Malloy: | Correct. |
| Schwabenland: | And did you talk to her about any matter involving whether or not she was under discipline for any reason? She is now a freshman at the university. |
| Malloy: | I did not. |

(EM. Dep. 288-290)

| | |
|---|---|
| Schwabenland: | Okay. So my question to you Did you probe with her as to why she felt he was trying to hurt her? |

|  |  |
|---|---|
| Malloy: | No. |

(EM. Dep. 292).

|  |  |
|---|---|
| Schwabenland: | Let's talk about this just briefly here. Once you got the text messages and knowing that Ms. Roe was on the phone while in St. Mary's to her friends, would it have been helpful to talk to them? |
| Malloy: | I didn't believe so. |

(EM. Dep. 295).

|  |  |
|---|---|
| Schwabenland: | Well, let's get to this. In terms of this case, you didn't feel it necessary at all to seek to talk to any of her friends? |
| Malloy: | I did not. |

(EM. Dep. 296).

|  |  |
|---|---|
| Schwabenland: | Do you look for corroborating evidence? |
| Malloy: | It depends. I can, yes. |
| Schwabenland: | Do you look for the claimant's actions shortly after the incident, say, that weekend, to see if she was really traumatized? . . . |
| Malloy: | In this case, no. |

(EM. Dep. 299).

|  |  |
|---|---|
| Schwabenland: | Do you know who Ms. Roe first told about the event? |
| Malloy: | No. |

(EM. Dep. 300).

|  |  |
|---|---|
| Schwabenland: | But, again, wouldn't that be another reason for you to probe into why she froze all of a sudden or had a flashback about her ex-boyfriend? |
| Malloy: | I do not believe so. |
| Schwabenland: | And if I were to tell you that Ms. Roe has said that she was raped multiple times by her ex-boyfriend when she was a teenager that would have no bearing on whether or not she's overreacting? . . . |
| Malloy: | I don't know. I mean, that's hypothetical to me, so I don't know. |

(EM. Dep. 306).

| Schwabenland: | Okay. What sources do you use as, quote, best practice for Title IX investigations? |
| Malloy: | I don't refer to any documents that talk about best practices. |
| Schwabenland: | And why is that? |
| Malloy: | I am not even aware that there is one. |

(EM. Dep. 314)

Malloy's deposition testimony illustrates that no amount of investigation was necessary to find Doe guilty. In *Columbia*, the school argued that it had failed to interview potentially exculpatory witnesses, not out of gender bias, but because they had not witnessed the actual coercive harassment the accuser claimed to have experienced. The court dismissed this argument, stating that "it is not correct that the potential witnesses suggested by Plaintiff related exclusively to the events of the night of the sexual encounter and not to the preceding weeks. At least one was allegedly identified as a friend and potential confidante of Jane Doe's and not as a person who observed the interaction between John and Jane on the night of the encounter." *Doe v. Columbia Univ.,* 831 F.3d 46, 56, 2016 U.S. App. LEXIS 13773, *25-26, ftnt. 10 (2d Cir. N.Y. July 29, 2016). Also, in *Columbia*, the court states that "[t]he alleged fact that [the Title IX Coordinator], and the panel and the Dean, chose to accept an unsupported accusatory version over Plaintiff's, and declined even to explore the testimony of Plaintiff's witnesses, if true, gives plausible support to the proposition that they were motivated by bias in discharging their responsibilities to fairly investigate and adjudicate the dispute." *Doe v. Columbia Univ., 831 F.3d 46, 57, 2016 U.S. App. LEXIS 13773, *27 (2d Cir. N.Y.*

*July 29, 2016).* Plaintiff submits that Malloy's handling of Doe's case is infused with her own personal bias that Doe must be guilty.[136]

**(b)      Sexual Exploitation Case**

In 2016, unidentified student reported that he had seen another male student offer a female student money ($170) to touch her breast. The offer was made in a room full of the female student's friends. The female student agreed, allowed the boy to touch her breast – over her clothes – and accepted the $170. SJU charged the male student with sexual assault and sexual exploitation, while the female student was not charged. Malloy investigated the case and showed a strong pro-woman bias. The boy – who seemed to have some sort of emotional or intellectual handicap - told Malloy that he had felt pressured by the other students in the room to follow through on the offer. Malloy dismissed the boy's statements out of hand, concluding that, if anyone had felt pressured, it was the female student. This despite the fact that the female student expressly told Malloy that she did *not* feel any pressure from other students in the room; they were her good friends. Notably, the female student kept the $170.

---

[136] It is also noteworthy that after her investigation into Roe's allegations, Malloy gave a presentation on the #MeToo movement. While not a direct cause of gender bias on SJU's campus, the #MeToo movement was certainly an element swirling in the background on campus. Beginning in October, 2017, the Harvey Weinstein, Matt Lauer, Lawrence Nassar, and Bill Cosby scandals – to name just a few – were covered almost daily in the press. In December, 2017, Time magazine named "The Silence Breakers" the person of the year, and stars like Alyssa Milano, Ashley Judd and Uma Thermon encouraged women to come forward with their stories. The #MeToo movement is referenced directly in this article about SJU's grant and the movement was likely on the mind of Malloy, the investigator who conducted Doe's flawed, biased investigation: her office forwarded her findings to SJU on April 3, 2018; on April 4, 2018, Malloy was the key speaker at a Philadelphia Bar Association event entitled, "MeToo for Legal Practitioners: A Chancellor's Forum on Sexual Harassment," one in "a series of programs addressing the #MeToo movement." *See* Exhibit " ." The Third Circuit has recently recognized the influence of the #MeToo movement in *Minarsky v. Susquehanna County,* noting that "[t]his appeal comes to us in the midst of national new regarding a veritable firestorm of allegations of rampant sexual misconduct that has been closeted for years, not reported by the victims." *See Minarsky v. Susquehanna County,* No. 17-2646 (3rd Cir. July 3, 2018)(reversing and remanding District Court's dismissal of sexual harassment claim under Title VII on grounds that delay in reporting harassment seemed reasonable in light of information unearthed by #MeToo movement).

The facts of this case strongly suggest that the young woman involved manipulated the male in order to get money. At a minimum, if anyone was to have been charged, both should have been charged. The fact that only the male was charged shows bias on the part of SJU. But Malloy's own bias is on display as well. Malloy states that she recognizes the potential that the accused boy could have a claim against someone (apparently the female who charged him to touch her breast) for sexual exploitation, she goes out of her way to advise Community Standards not to pursue such a claim. In other words, Malloy decides a case that is not in front of her and comes down squarely on the side of the uncharged female student. *See* SJU 1429-1434, Exhibit "8 ."

**1.   SJU's handling of Doe's case is evidence of gender bias.**

It is important to note that one-sided manor in which SJU conducted its "investigation" of Roe's allegations against Doe is not only evidence of a dubious outcome, it is *itself* evidence of gender bias. *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 402, 2017 U.S. Dist. LEXIS 153838, *37-38, 2017 WL 4174933 (W.D.N.Y. September 20, 2017) (investigator's failure to review or preserve electronic evidence or conduct follow-up interviews to resolve inconsistencies between witnesses' statements, coupled with other allegations, were indicia of bias). *Collick v. William Paterson Univ.*, 2016 U.S. Dist. LEXIS 160359, *30-35 (D.N.J. November 17, 2016)("an allegation that the process was one-sided, irregular, and unsupported by evidence may give rise to an inference of bias.")

SJU makes much of the fact that it followed its own procedures, and so cannot be found to have acted in a gender biased way. The courts have specifically rejected this argument. *Rolph v. Hobart & William Smith Colls.,* 271 F. Supp. 3d 386, 402, 2017 U.S.

Dist. LEXIS 153838, *37-38, 2017 WL 4174933 (W.D.N.Y. September 20, 2017) (court rejects school's contention that complying with its own procedures as to both the accuser and the accused is sufficient to negate inference of gender bias). Evidence that the school treated male students as "guilty, until proven innocent," illustrated gender bias. *Doe v. Brown Univ.,* 166 F. Supp. 3d 177, 189-190, 2016 U.S. Dist. LEXIS 21027, *26-28 (D.R.I. February 22, 2016)*Doe v. Brown Univ.,* 166 F. Supp. 3d 177, 189-190, 2016 U.S. Dist. LEXIS 21027, *26-28 (D.R.I. February 22, 2016)(evidence of bias in the school's handling of other sexual misconduct could show a pattern of gender bias)

### 2. SJU's handling of other disciplinary cases under the SMP is evidence of gender bias.

Plaintiff's case against SJU appears to be somewhat unusual in that we have not one, but *two* examples of three women charged with acts of sexual misconduct who received very different treatment than Doe. One was not even subjected to the unfair, pro-accuser SMP process. Two were accorded every possible advantage and benefit of the doubt available under it. All were found "not responsible." Additionally, these cases were handled by the very individuals who handled Doe's case: Perry and Malloy. They will be discussed in great detail in the "selective enforcement" section of this brief, but Plaintiff submits that those cases evidence SJU's gender bias as well. *See Doe v. Case Western Reserve Univ.,* 2017 U.S. Dist. LEXIS 142002, *20-21, 2017 WL 3840418 (N.D. Ohio September 1, 2017)("if only the male participant is disciplined for participating in the same acts—the implication of gender bias is clear").

These are not "vague, conclusory allegations of gender bias."[137] All of the foregoing, as well as SJU's handling of the softball cases and the staff member case, are strong evidence of gender bias, even if they are illustrative of other forms of bias as well. As the Second Circuit observed:

> It is worth noting furthermore that the possible motivations mentioned by the district court as more plausible than sex discrimination, including a fear of negative publicity or of Title IX liability, are not necessarily, as the district court characterized them, lawful motivations distinct from sex bias. A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.

*Doe v. Columbia Univ.*, 831 F.3d 46, 58, 2016 U.S. App. LEXIS 13773, *29-30, ftnt 11. (2d Cir. N.Y. July 29, 2016).

### b.    Selective Enforcement

Doe also contends that SJU has violated Title IX under a theory of "selective enforcement." In a selective enforcement case, the plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Doe v. Trs. of the Univ. of Pa.,* 270 F. Supp. 3d 799, 824-825, 2017 U.S. Dist. LEXIS 148086, *51, 2017 WL 4049033 (E.D. Pa. 2017), quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). To succeed on such a claim, the male plaintiff must allege "that a female was in circumstances sufficiently similar to his own and was treated more favorably by the [educational

---

[137] Vague, conclusory allegations of gender bias are insufficient to support a Title IX claim. *Collick v. William Paterson Univ.*, 2016 U.S. Dist. LEXIS 160359 (D.N.J. November 17, 2016).

institution]," *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 824, quoting *Tafuto v. N.J. Inst. of Tech.*, Civ. A. No. 10-4521, 2011 U.S. Dist. LEXIS 81152, 2011 WL 3163240, at *2 (D.N.J. July 26, 2011) and must also allege "'particular circumstances suggesting that gender bias was a motivating factor behind the inconsistency.'" *Id.,* quoting *Harris v. St. Joseph's Univ.*, Civ. A. No. 133937, 2014 U.S. Dist. LEXIS 65452, 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014)(quoting *Scott v Worldstarhiphop, Inc.*, Civ. A. No. 10-9538, 2011 U.S. Dist. LEXIS 123273, 2011 WL 5082410, at *4(S.D.N.Y. Oct. 25, 2011). In other words, if a plaintiff can show that "'the [university's] actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings'" he will have established a "selective enforcement" claim. *Id.,* quoting *Tafuto*, 2011 U.S. Dist. LEXIS 81152, 2011 WL 3163240, at *2 (second alteration in original) (quoting *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757 (E.D. Tenn. 2009)).

Selective Enforcement claims are beset by the fact that so few women are ever charged with sexual misconduct. Indeed, at SJU, a woman has never been found responsible for violating the SMP. But this case is unusual in that Plaintiff can identify at least two cases in which women, similarly situated to Doe, were treated more favorably by SJU because they were women: the Softball case(s) and the staff member case.

## 1.    The Softball Cases

In 2015, SJU's women's' softball team was sued by two former members for sexual harassment and ultimately suspended for the balance of the season. The claims against the women on the softball team were salacious and widely publicized. Bowing to public pressure, SJU instituted sexual misconduct proceedings against two women who were seniors on the team. Malloy was the investigator. *See* SJU 1512-1525, Exhibit "8 ." The women involved were accused of multiple acts of sexual misconduct, but only one is

directly relevant here.[138] The claimants alleged that the accused had blindfolded them, then forced them to touch the accused's' bare buttocks which had been smeared in mayonnaise. Malloy found the accuser's claims to be *true*. However, without analysis, she concludes that the behavior "does not constitute indecent assault, sexual assault or sexual exploitation under the Policy. It was not indecent, it was not sexual contact, and it was not touching in a sexual manner." SJU 1522.

The women accused in the Softball cases were similarly situated to Doe. They, like Doe, were accused of non-consensual sexual contact. In pertinent part, SJU's SMP defines non-consensual sexual contact as:

> any non-consensual sexual contact, including any improper touching of intimate body parts. It also includes the non-consensual removal of another's clothing, indecent contact (i.e. the unwanted touching of intimate body parts including, but not limited to, genitals, buttocks, groin, or breasts) or causing another to have indecent contact with those intimate body parts.

*See* SMP III(d)(1)(a)(ii), Exhibit "6." The allegations against the Softball players - again, which Malloy finds to be *true* – fall solidly within the definition of non-consensual sexual contact. The accusers claim they were forced -without their consent - to touch the accused's' buttocks, which are specifically identified in the SMP as an "intimate body part." Yet Malloy finds the women "not responsible." Contrast that to Doe's case: was not alleged to have touched an "intimate body part," and Malloy conceded as much. The body part he did touch, he touched with permission. Malloy concedes that as well. But because he is alleged to have touched Roe too firmly, and to have scared her, Malloy

---

[138] Some of the other allegations involved in the case were that the accused women forced freshman students to "hump walls," give senior a woman a "lap dance" and an "over the pants hand job," dance to sexually explicit songs (which the accused students recorded), demonstrate their Coach's orgasm, put condoms on bananas, imitate oral sex on a wine bottle (which was also recorded), answer questions about their sexual identity, discuss sexual positions and pornography and dress as a male rapper, squat on top of another female freshman and simulate intercourse. Malloy found the accused women "not responsible" on all charges.

found him- a man - responsible for sexual assault. Yet neither of those types of conduct are prohibited by the SMP.[139]

Malloy's analysis, such as it is, seems to rely on the accused women's intent. She finds that these activities happened during "welcome week," and that the purpose behind them was "team bonding, freshmen getting to know each other and the other team members, and the other team members getting to know the freshmen."[140] Contrast that with Doe's case: Malloy concludes that Doe squeezed Roe's neck, but she concludes that he had no intent to hurt her. In other words, she concludes it was an accident. When Doe pointed this fact out to the Appeal Board, Malloy shot back that "the Policy does not require an intent to hurt the Complainant. The act itself, without consent, violated the Policy." *See* SJU 589, Exhibit " 8."

These cases illustrate quite clearly bias on the part of SJU and Malloy. When women were accused sexual misconduct, SJU was slow to prosecute them, and Malloy bent over backwards to find them not responsible, contorting the language of the SMP to exclude conduct which the policy expressly prohibits and graft on a defense which she alleged it does not have: benign intent. When Doe was accused of sexual misconduct she also contorted the language of the SMP, this time to *include* conduct which is not

---

[139] Doe did not squeeze Roe's neck. But even if he had, "squeezing" would more properly be considered an assault and processed under the CS process. Doe has been unable to find any SJU prohibition on scaring people.

[140] The language Malloy uses also betrays her strong pro-woman bias. She says that the accusers had the "opportunity" to imitate an orgasm, recharacterizes a lap dance as an "interpretive dance" (SJU 1518), students "could" imitate oral sex on wine bottle (SJU 1519); there was talk of sexual identity (members are gay), but "it is an accepting environment and the upperclassmen want the freshmen to feel comfortable" See SJU 1518 – 1520, Exhibit "8."

prohibited by the policy (touching a non-intimate body part too firmly) and to deny him a defense which she herself found him to have: benign intent.

### 2.    The Staff Member Case

SJU employees have testified repeatedly that Doe was charged under the SMP rather than the CS process because he was kissing Roe when the alleged squeezing happened. If kissing is involved, SJU employees have stated again and again, the SMP is implicated – unless a woman is the accused.

In May of 2018, just three months after Doe was charged with sexual misconduct, and only weeks after Malloy had advised the Appeal Board that intent was irrelevant: "[t]he act itself, without consent, violated the Policy," a female employee of SJU kissed a male student without his consent. *See* SJU 1904-1913, Exhibit "8." This time, however, Perry decided that the matter should *not* be handled under the SMP but should instead be treated as possible violation of the SJU Policy Prohibiting Discrimination, Harassment or Retaliation (PPDHR).

The facts are these: a third party reported that a female SJU employee had inappropriately kissed a male student on the lips at an end-of-year luncheon. The incident was witnessed by several students and staff members. It was a one-time event and there was no allegation that the woman involved had created any sort of hostile environment. Perry "determined, based on the complaint, that the alleged conduct might constitute, if determined to have occurred, a possible violation of the SJU Policy Prohibiting Discrimination, Harassment or Retaliation (PPDHR)." See Exhibit "23 ."

SJU's PPDHR has a process for handling complaints which is substantially similar to the CS process and expressly provides that that the accused be shown the

written complaint against her within five days of its receipt, be given an opportunity to respond to that complaint in writing, as well as the opportunity to see the accuser's response thereto. The PPDNR also offers options for resolving complaints, such as the opportunity to handle the matter informally and to pursue mediation. None of these options are available under the SMP.

However, the PPDHR clearly does not apply to the complaint filed against the woman in this case. It prohibits "unwelcome conduct of a sexual nature" when "such conduct creates a hostile environment." There was no allegation of hostile environment against the accused woman. She was accused of kissing him for approximately 25 seconds without consent. That is properly an SMP violation. Moreover, both the PPDHR and the SMP explicitly provide that "if particular conduct . . . would be prohibited by both the Sexual Misconduct Policy and this Policy, then the Sexual Misconduct Policy controls." *See* PPDNR III, Exhibit " ," SMP, I (C), Exhibit " 6."

In essence, when a woman was accused of non-consensual kissing - the very conduct which SJU says forced Doe into the SMP process – she was treated differently. In a blatant violation of both the PPDNR and the SMP, charges against her were handled under the more open, fair process afforded by the PPDNR.[141] The accused woman was found "not responsible," and the PPDHR report was filed away as "Confidential" and "NOT TO BECOME PART OF THE EMPLOYEES PERSONNEL FILE." *See* SJU 1904-1913, Exhibit "8 ," emphasis in original.

---

[141] It is important to note that by shifting the claims against this woman away from the SMP and into the PPDHR, she not only guaranteed her a more fair process, she predicted the outcome, just as she did with Doe. The standard under the SMP is consent, which this woman admittedly did not have to kiss the male student involved. The standard under the PPDHR is whether the conduct was (1)"unwelcome" and (2) part of a pattern.

These are the only two cases involving women accused of conduct prohibited by the SMP. Each of them shows that accused women, similarly situated to Doe, are subject to very different disciplinary proceedings. The charges brought against them, the interpretation of the applicable policy language, even the policies under which they were investigated show a marked bias in favor of accused women. This is particularly true given the other evidence of gender bias exhibited by SJU, Perry and Malloy, each of whom was personally involved in Doe's case and handled it quite differently.

At a minimum, Plaintiff contends that these cases questions of disputed fact material enough to preclude summary judgment.[142]   When evalauating Doe's conduct, she found that since it occurred while they were kissing,  it was  "sexual". According to Perry, kissing is an intimate act (EP P345 L21-P347L10) except  it isn't when a female inniates (without consent ) a kiss upon a male student. When the genders are reversed, Perry considers the nature of the kiss, its duration,  and the intent of the person kissing the student, ( "it was just a quick peck" ) of the aggressor, person become relevant to Perry's determination as to whether the case was investigated under the PPDHR, in house, with procedural safeguards ( written notice of allegations provided in advance of interview or hearing, opportunity to repond in writing before investigation begins etc.) or referred to an outside investigator under the SMP appears to have been directly influenced by gender bias. Perry's handling of case against the female who admittedly did not have consent to kiss a male student, stands in stark contrast to her decision to

---

[142] Some courts have opined that evidence of bias might constitute a "pro-victim bias" as opposed to an anti-male/pro-woman bias. Doe v. Pa. State Univ., 2018 U.S. Dist. LEXIS 3184, *15, 2018 WL 317934 (M.D. Pa. Jan. 8, 2018)(finding anti-male as opposed to pro-victim bias on grounds that all disciplined students were male). These two cases illustrate that the bias exhibited at SJU are not "pro-victim;" they are anti-male/pro-woman. In the softball cases, both the accused and the accusers were women, yet Malloy does not exhibit a "pro-victim" bias. In the staff member case, the "victim"  is a man. Yet again, the school did not show a "pro-victim" bias; it showed a pro-woman bias.

place Doe's case in the SMP. It is also inconsistent with other SJU officials.  William

Bordak, director of Community standards, testified that kissing is enough, If there is any

unwelcome physical contact while kissing, it is enough to trigger a potential SMP

violation ( e.g.a women's nail braking skin on the shoulder while kissing WB P377L23-

P379L11).

**B.      Breach of Contract**

To state a claim for breach of contract under Pennsylvania law, a complaint must

specifically allege: "'(1) the existence of a contract, including its essential terms, (2) a

breach of a duty imposed by the contract and (3) resultant damages.'" *Doe v. Trs. of the*

*Univ. of Pa.,* 270 F. Supp. 3d 799, 810-811, 2017 U.S. Dist. LEXIS 148086, *14, 2017

WL 4049033 (E.D. Pa. Sept. 13, 2017) (citations omitted). In the educational setting, "the

relationship between a private educational institution and an enrolled student is

contractual in nature; therefore, a student can bring a cause of action against [an]

institution for breach of contract where the institution ignores or violates portions of the

written contract." *Id.*, citing *Swartley v. Hoffner,* 1999 PA Super 168, 734 A.2d 915, 919

(Pa. Super. Ct. 1999) (citations omitted). The contract between an educational institution

and a student includes any "agreement between the parties concerning disciplinary

procedures, contained within a portion of the student handbook." *Id.*, *citing Reardon v.*

*Allegheny College*, 2007 PA Super 160, 926 A.2d 477, 480 (Pa. Super. Ct. 2007) (citation

omitted).

Pennsylvania courts review student/school contracts "as we would any other

agreement between two private parties." *Doe v. Trs. of the Univ. of Pa.,* at

*15, (citing *Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418,

428 (Pa. 2001)). Private schools must substantially comply with their own procedures to avoid breach of contract. *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 392 Pa. Super. 502, 573 A.2d 575, 579 (Pa. Super. Ct. 1990) (citations omitted).

In considering a breach of contract, courts look first to interpret the terms of the contract. *Doe v. Trs. of the Univ. of Pa.,* at *15. In doing so, "[t]he paramount goal . . . is to determine the intent of the parties." Id., at *15, quoting *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quotation omitted). "The strongest objective manifestation of intent is the language of the contract." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011) (citations omitted). "When the words of a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning." *TruServ Corp. v. Morgan's Tool & Supply Co.*, 614 Pa. 549, 39 A.3d 253, 260 (Pa. 2012) (citing *LJL Transp., Inc. v. Pilot Air Freight Corp.,* 599 Pa. 546, 962 A.2d 639, 647 (Pa. 2009)). Moreover, "[t]he whole instrument must be taken together in arriving at contractual intent." *Murphy*, 777 A.2d at 429 (citation omitted). "The meaning of an unambiguous written instrument presents a question of law for resolution by the court." *Murphy*, 777 A.2d at 430 (citing *Cmty. Coll. v. Cmty. Coll., Soc'y of the Faculty*, 473 Pa. 576, 375 A.2d 1267, 1275 (Pa. 1977)).

In this case, SJU's contractual obligations to Doe are set forth in is Student Handbook, Exhibit " " and in its SMP, Exhibit " ." Plaintiff points to several specific contractual breaches that fall into five broad categories: SJU failed to adopt policies complying with Title IX, which would be free of gender bias; it failed to apply and follow its own definition of "sexual assault;" it failed to provide a fundamentally fair

investigation lead by a trained investigator; it interpreted the terms of its Appeal Process in ways which were fundamentally unfair; and it failed to appropriately and fairly accommodate Doe's known, documented learning difference.

> **1. SJU breached its contractual promise to comply with Title IX by subjecting Doe to a gender-biased, fundamentally unfair disciplinary process.**

SJU made a contractual promise to Doe that it would "uphold Title IX in all educational programs." Exhibit "4" pg. 58. It promised to employ "equal opportunity in every aspect of its operations." Exhibit "4", pg. 46. In connection with sexual misconduct investigations, it promised Doe a "prompt, fair and impartial disciplinary process (from the initial report to the final result)." *See* SMP I.V(a) Exhibit "4\6". It promised that studentswould not be discriminated against "on the basis of sex/gender . . . disability . . . [or] any other status protected by law in the administration of its educations . . . policies or programs." Exhibit " 4," pg. 46. All of these promises should be read in light of one another, and in the context of the instrument as a whole, if we are to arrive at the parties' correct contractual intent. *Murphy*, 777 A.2d at 429 (citation omitted). SJU's promise to "uphold Title IX" informs its promise to employ "equal opportunity" and avoid gender-based discrimination. As each of these contractual duties should be read together, they are discussed together.

Perhaps the most fundamental promise SJU made to Doe – at least insofar as sexual misconduct proceedings are concerned – is that it would comply with Title IX.[143] SJU's current SMP was designed to comply with the guidance OCR issued in 2011. When the OCR rescinded that guidance and replaced it with new, gender-neutral

---

[143] SJU makes this representation, not just to Doe, but to the federal government in its Grant applications. *See* SJU Grant Application Package, SJU 1089-1174, at 1096.

guidance in September of 2017, SJU refused to "uphold Title IX" pursuant to that new guidance, opting instead to continue to conform its SMP policy and practices to now-rescinded guidance. That violates SJU's promise to Doe to uphold Title IX.

This decision is particularly significant given the stated reasons behind the OCR's rescission of the 2011 DCL: it did so because it had become clear that sexual misconduct policies premised on the 2011 DCL were gender biased. To remedy that, the OCR recommended specific, easily-implemented guidance about how sexual misconduct should be handled on university campuses. The evidence clearly shows that SJU did nothing to amend its policies. It did so knowing that the policies it had adopted "do not afford fundamental fairness," "are overwhelmingly stacked against the accused and are in no way required by Title IX law or regulation." *See* 2017 DCLExhibit "9". That decision not only violates Title IX (an independent cause of action in this litigation), it also breaches SJU's contractual commitment to Doe to uphold Title IX.[144]

Specifically, the evidence shows that, in violation of the 2017 guidance:

(a) SJU hired Malloy, an attorney on retainer for the school, who was biased in favor of women. SJU was Malloy's only educational institution client. She was aware of the grant and, therefore, the school's attendant financial interests in ensuring that more students were "held accountable" for SMP violations. As is laid out in detail in other portions of this brief, Malloy exhibited personal biased in favor of women, and was, at the time she was investigating Doe, preparing a professional presentation on the #MeToo movement. Malloy was not "free of actual or reasonably perceived conflicts of interest and

---

[144] As discussed in greater detail in the Title IX section of this Brief, Plaintiff contends that SJU's decision not to follow the OCR 2017 guidance also evinces SJU's gender bias.

biases." *See* 2017 DCL and Q&A. *See* 2017 Q&A, Question 6 [145]   Exhibit "10".

(b)  SJU allowed its institutional interests to interfere with the impartiality of the investigation by allowing its own interest in acquiring and maintaining state and federal grants dictate whether it altered its SMP policy to comply with the 2017 guidance and by improperly labeling Roe's claim against Doe as "sexual misconduct" rather than "assault." *See* 2017 Q&A, Question 6.Exhibit "10". The consequence of that decision was to divert the investigation away from the CS process – which essentially places the accused and the accuser on equal footing – and force it into the parameters of the SMP – which offers no meaningful protections to the accused.

(c)  SJU employed Malloy, who undertook no formal training about how to investigate and adjudicate SMP claims and who neither sought out, analyzed nor documented the evidence available to her in Doe's investigation, as the investigator in this case. *See id.* 2017 Q&A, Question 6.

(d)  SJU allowed Malloy, without supervision or instruction, to conduct an investigation in violation of the new 2017 Guidance. She did not investigate or synthesize all available evidence and did nothing to seek out exculpatory evidence, including readily available photos of Roe's neck, taken twenty

---

[145] "One of the most basic components of fairness is an unbiased and neutral fact-finder. Accused students are entitled to have their cases decided on the merits—on the particular facts of the case, set in the proper context—and not according to the application of unfair generalizations or stereotypes or because of social or other pressures to reach a certain result." *Doe v. Brandeis Univ.*, 2016 U.S. Dist. LEXIS 43499, *110-111, 177 F. Supp. 3d 561, 608 (D. Mass. March 31, 2016).

hours after she was allegedly choked by Doe, showing that no such incident had ever taken place. *See id.* 2017 Q&A, Question 6.

(e) Both Roe and the University knew that Roe had accused Doe of "choking" her, had access to Roe's complaint and photos of her bruised neck (created at Perry's suggestion) and knew – or were readily able to learn - the identities of Roe's friends, who would have been significant witnesses on the issue of credibility. Roe and the school had the "opportunity" to know about and investigate this information. Doe was denied that "opportunity." *See id.* 2017 Q&A, Question 6.  In failing to provide Doe with the charges and evidence against him – both of which were used against him during the investigation, SJU also ignored OCR's instruction that each party to an SMP investigation be provided the "same meaningful access to any information that [would be] used during informal and formal disciplinary meetings and hearings." *See id.*2017 Q&A, Question 8.

(f) SJU did not provide Doe with written notice of the allegations against him, including sufficient details and with sufficient time to prepare a response before any initial interview. This was done purposefully, pursuant to an unwritten policy of which Doe was completely unaware.  *See id.* 2017 Q&A, Question 6.

(g) SJU did not provide Doe with the specific section of the code of conduct he allegedly violated or the precise conduct of which he was accused. Rather – and again this was done pursuant to an unwritten SJU policy – he was told

only that he had potentially violated the SMP, a fifty some page document

prohibiting six different categories of conduct. *See id.* 2017 Q&A, Question 6.

(h) SJU failed to give Doe any adequate written notice of the charges against him,

so it goes without saying that it did not give him notice "with sufficient time

to prepare for meaningful participation" in the investigation. *See id.* 2017

Q&A, Question 6.

(i) SJU did not ensure that Doe's investigation resulted in a written report

summarizing the relevant "exculpatory and inculpatory evidence." This was

likely due to that fact that Malloy neither sought nor considered exculpatory

evidence. *See id.* 2017 Q&A, Question 6.

(j) SJU did not provide Doe with "timely and equal access" to the specific

charges against him, the physical evidence against him or the identity of Roe's

friends, at least one of whom – the one who saw Roe kiss Doe goodbye –

could have been a significant witness in Doe's favor, and all of whom were

probative to the question of Roe's credibility. *See id.* 2017 Q&A, Question 6.

(k) Doe met with Malloy. Malloy found him responsible. Malloy submitted her

findings to Bordak. Bordak decided Doe's sanctions, then called Doe in for a

meeting to discuss those sanctions. Doe did not even know Malloy's findings

or determination until that meeting. All of these facts are admitted. Doe was

certainly not given "the opportunity to respond to the report in writing in

advance of the decision of responsibility." *See id.* 2017 Q&A, Question 8.

These failures constitute a breach of SJU's express contractual obligation to

uphold Title IX, and to provide "equal opportunity" to Doe and Roe.

Plaintiff submits that SJU's contractual obligations should be read together, but that does not mean that each is not an independent breach of contract. Like its promise to uphold Title IX, SJU's promise to avoid discrimination "on the basis of sex/gender" is similarly enforceable as a discrete contractual promise; the breach is established by the same evidence establishing its Erroneous Outcome case under Title IX. In *Trs. of the Univ. of Pa.*, for example, the male plaintiff alleged that the University had breached its promise to provide "a process that is . . . free of bias or prejudice." The court found that the plaintiff's allegations of gender bias under Title IX – which it held were sufficient to plead an Erroneous Outcome case under that statute – were also sufficient to sustain a breach of this portion of the University's disciplinary policy. *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 817-818, 2017 U.S. Dist. LEXIS 148086, *44, 2017 WL 4049033 (E.D. Pa. Sept. 13, 2017); Doe v. Brown Univ., 166 F. Supp. 3d 177, 196, 2016 U.S. Dist. LEXIS 21027, *46 (D.R.I. February 22, 2016)(in stating a plausible claim for breach of contract and systematic gender bias, court finds plaintiff has also stated a claim that pleaded conduct violated the covenant of good faith and fair dealing inherent in that contract).

SJU also promised Doe a "prompt, fair and impartial disciplinary process (from the initial report to the final result)." *See* SMP I.V(a). Pennsylvania courts have held that contractual promises of "fairness" do not, in and of themselves, give rise to an independent cause of action for breach of contract.[146] Rather, such promises must be

---

[146] "Under Pennsylvania law, "[e]very contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." *Kaplan v. Cablevision of PA, Inc.,* 448 Pa. Super. 306, 671 A.2d 716, 722 (Pa. Super. Ct. 1996) (quoting Restatement (Second) of Contracts § 205 (1981)). But "this obligation of good faith is tied specifically to and is not separate from the [express] duties a contract imposes on the parties." *Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 777 A.2d 418, 434 n.11 (Pa. Super. Ct. 2001).

considered "in the context of the Disciplinary Procedures as a whole and with reference

to the established understanding of 'fundamental fairness' in this Commonwealth." *Trs.*

*of the Univ. of Pa.,* 270 F. Supp. 3d at 810-811, 2017 U.S. Dist. LEXIS 148086, *18; see

also *Boehm v. University of Pennsylvania School of Veterinary Medicine,* 392 Pa. Super.

502, 509-511, 573 A.2d 575, 579-580, 1990 Pa. Super. LEXIS 878, *11-14 (Pa. Super.

Ct. April 18, 1990) (Pennsylvania courts may review rules promulgated by private

universities to ensure that they comport with "basic notions of due process and

fundamental fairness").[147]

      In Pennsylvania, "fundamental fairness" carries with it some discrete obligations

on the part of the University. It entitles a student undergoing university disciplinary

proceedings  to a "'statement of the *specific charges and grounds which* . . . would justify

[the discipline],'" "'*the names of the witnesses against him*,'" "'an oral or written *report on

the facts* to which each witness testifies,'" and an "'*opportunity to present* . . . *his own

defense* against the charges and to produce either oral testimony or written affidavits of

witnesses on his behalf.'" *Trs. of the Univ. of Pa.*, 270 F. Supp. 3d at 812-813, 2017 U.S.

Dist. LEXIS 148086, *18 (emphasis added), quoting *Boehm*, 573 A.2d at 578-

79 (additional citations omitted).[148] In the *Boehm* case:

---

[147] The Boehm court noted that other courts have followed this approach and have generally held that "disciplinary acts by private colleges or universities will be upheld *so long as the proceedings have been fundamentally fair,* and the school has not deviated substantially from the procedures established by the school." *Boehm v. University of Pennsylvania School of Veterinary Medicine*, 392 Pa. Super. 502, 509-511, 573 A.2d 575, 579-580, 1990 Pa. Super. LEXIS 878, *11-14 (Pa. Super. Ct. April 18, 1990)(emphasis added), citing *Clayton v. Trustees of Princeton University*, 608 F.Supp. 413 (D.N.J.1985) (student at a private university subjected to a disciplinary hearing for cheating has a judicially protectable  interest in ensuring that the proceedings against him are fundamentally fair); see also *State v. Schmid*, 84 N.J. 535, 423 A.2d 615 (1980), *appeal dismissed*, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982); *Napolitano v. Princeton University Trustees*, 186 N.J.Super. 548, 453 A.2d 263 (1982).
[148] A university is not obligated to provide accused students with a full hearing, but the adjudicator should be given "'an opportunity to hear both sides in considerable detail.'" *Boehm*, 573 at 579 (quoting *Dixon*, 294 F.2d at 159).

> the accused students were given notice of the charges against them and also of the
> evidence against them. They were present at and participated in a hearing which
> lasted approximately ten and one-half hours. At this hearing they were assisted by
> a faculty advisor and were permitted to cross-examine witnesses who testified
> against them and call witnesses to testify on their behalf.

*Boehm,* 573 A.2d at 582. Given those circumstances, the Pa. Superior court examined the

private school's policies and procedures for evidence of fundamental fairness, and found

it. SJU is not similarly situated.

### 2.     SJU's failure to provide Doe with adequate notice of the charges against him was fundamentally unfair.

Rather than provide the students with clear information about SJU's practices

when conducting SMP investigations, SJU implemented several unwritten polices, ones

of which the students could not be aware and ones which would ultimately play a huge

part in the integrity of any SMP investigation. Specifically, SJU advised its employees

and investigators that accused students should never be given an copy of the specific

charges against them unless and until the investigator deems it necessary. That policy

virtually assured that an accused student would be unprepared to defend himself at his

"hearing" before the investigator. The school also adopted a quiet, unwritten practice of

soliciting statements from SJU employees and the investigator to be provided to the

Appeal Board for its consideration. Plaintiff submits that these unwritten practices violate

the school's express promise to be "fair," the concepts of "fundamental fairness" which

that express promise implicates, and SJU's promise to uphold Title IX. The 2017 Q&A

admonishes schools to "adopt and *publish* grievance procedures that provide for a prompt

and equitable resolution of complaints of . . . sexual misconduct." 2017 Q&A, Question 4

(Exhibit 10, emphasis added). Certainly the 2017 guidance does not contemplate that an

equitable investigation would be conducted pursuant to unpublished procedures.

SJU's SMP is apparently silent on the question of whether an accused student is entitled to notice of the charges against him. Such a policy violates SJU's own contractual promise to conduct a "prompt, fair and impartial disciplinary process (from the initial report to the final result)." *See* SMP I.V(a) Exhibit "6".This promise implicates the "fundamental fairness" embraced by Pennsylvania courts, which expects private Universities to provide the accused with a "'statement of the *specific charges and grounds which* . . . would justify [the discipline],'" "'*the names of the witnesses against him*,'" "'an oral or written *report on the facts* to which each witness testifies,'" and an "'*opportunity to present* . . . *his own defense* against the charges and to produce either oral testimony or written affidavits of witnesses on his behalf.'" See *Doe v. Trs. of the Univ. of Pa.*, at *18. That lack of fundamental fairness constitutes a breach of SJU's contract with Doe.

First, SJU did not provide Doe with a "'statement of the *specific charges and grounds which* . . . would justify [the discipline]." The "notice" SJU provided to Doe at the outset of its investigation was that he had potentially violated the SMP, which is over fifty pages long and addresses six different types of conduct. That is far from "specific charges and grounds;" it is so broad as to be meaningless.[149] When Doe aske Forte what the specific charges against him were, she said he had been "rough" with Roe, but that it was "nothing sexual." She told him that he would learn the details at the "investigation," which, unbeknownst to Doe was the hearing at which his guilt would be determined. As it turns out, the investigator did not tell Doe the exact charges against him. He first

---

[149] "There is little practical difference between a school failing to inform the accused of the charge against him or, as here, having informed him of the formal charge, refusing to provide him with the specific factual conduct alleged to have given rise to the charge. At a minimum, it the failure to provide John with notice of the specific charges against him may have substantially impaired the fairness of the proceeding." *Doe v. Brandeis Univ.*, 2016 U.S. Dist. LEXIS 43499, *99, 177 F. Supp. 3d 561, 604 (D. Mass. March 31, 2016).

97

learned that he was being accused of choking Roe *after* he was found guilty.[150] This, too, is fundamentally unfair.

Other courts have come to the same conclusion. In *Doe v. Univ. of Notre Dame,* for instance, an accused man was notified that his conduct "may be a violation of the University's policies related to sexual assault, sexual misconduct, dating and domestic violence, stalking, and/or conduct that creates a hostile environment." *Doe v. Univ. of Notre Dame,* 2017 U.S. Dist. LEXIS 69645, *28-29, 2017 WL 1836939 (N.D. Ind. May 8, 2017). Like SJU, Notre Dame had promised its students a "prompt, fair and impartial investigation and resolution of disciplinary complaints involving sexual violence, stalking and dating violence." The Court concluded that Notre Dame's "notice" breached that promise:

> This amounts to no notice at all. It doesn't tell him what he is alleged to have done wrong nor when the wrongdoing was alleged to have taken place. Instead, it is merely general language parroting the laundry list of offenses identified on the cover of the University's Red Book on sexual harassment. This so-called "notice of charges" could not be further from revealing particular policy violations implicated, much less specific allegations of John's objectionable conduct.

*Id.* at *28-29; see also *Fellheimer v. Middlebury College*, 869 F. Supp. 238 (D. Vt. 1994)(failure to advise student of each offense alleged to have been committed was "fundamentally unfair" and made it "impossible" for Fellheimer to defend himself against the charge); *Doe v. Brandeis Univ.*, 2016 U.S. Dist. LEXIS 43499, 177 F. Supp. 3d 561, 603-604 (D. Mass. March 31, 2016).

---

[150] It is especially outrageous that Malloy told Doe only that Roe claimed that he "squeezed her neck," when in fact she alleged that Doe "choked" her. A "squeeze," particularly one alleged to have happened in intimate circumstances, is most likely to have been an accident, and accidents are difficult to deny. A "choke" on the other hand, is something an accused would remember, even an accused with ADHD. Yet Malloy never used the word "choked" to Doe, then concluded that his denial was too tepid to be believed. Of course, had he ever been made aware in any way that Roe claimed he "choked" her, he would have given Malloy the vehement, powerful denial she apparently wanted. He would have adamantly denied choking Roe, because it never happened.

SJU's failure to provide Doe with meaningful notice of the charges against him breaches its promise to Doe to conduct a "fair" investigation, the "fundamental fairness" Pennsylvania imposes on private universities' disciplinary process, and its contractual promise to Doe that it would comply with Title IX.

### 3. SJU's failure to give Doe an opportunity to see or know about evidence and witnesses against him was fundamentally unfair.

A similar analysis can be applied to SJU's failure to provide Doe with access to – or even *notice* of – the evidence against him. Roe presented her complaints to Bean then Perry, pointing to bruises on her neck as evidence. Perry told Roe to take pictures of the bruises (i.e., create the evidence). She provided that evidence to Malloy, who never showed it to Doe, then concluded that Doe squeezed her neck "to the point where it left bruises." During the investigation, Doe told Malloy that Roe's friend, who's name and identity he did not know, had witnessed Roe kiss Doe goodbye. Malloy neither investigated that fact (although Roe later admitted it in the course of this investigation) nor did she give the name of that witness to Doe. Again, SJU's handling of its investigation against Doe is fundamentally unfair, and breaches its promise to Doe to conduct a "fair" investigation and to abide by the provisions of Title IX.

### 4. SJU breached its contract in failing to apply and follow the definition of "sexual assault" set forth in its SMP.

"When the words of a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning." *TruServ Corp. v. Morgan's Tool & Supply Co.*, 614 Pa. 549, 39 A.3d 253, 260 (Pa. 2012) (citing *LJL Transp., Inc. v. Pilot Air Freight*

*Corp.,* 599 Pa. 546, 962 A.2d 639, 647 (Pa. 2009)). SJU's definition of "sexual assault" is

clear and unambiguous:

> For purposes of this Policy, Sexual Assault also includes: Non-consensual
> sexual contact. Non-consensual sexual contact means any sexual touching,
> with any object, by a person upon another person without consent, or
> forcing any person to touch you or the individual in a sexual manner. It is
> defined as engaging in any sexual contact other than intercourse with
> another person without that person's consent and/or cognizance. It includes
> any non-consensual sexual contact, including any improper touching of
> intimate body parts. It also includes the non-consensual removal of
> another's clothing, indecent contact (i.e. the unwanted touching of intimate
> body parts including, but not limited to, genitals, buttocks, groin, or breasts)
> or causing another to have indecent contact with those intimate body parts.

*See* Exhibit "6" SMP III(d)(1)(a)(ii).[151]

The plain language of this section makes its scope clear: it is intended to prohibit

"non-consensual touching" of "intimate body parts" "without consent." None of those

things happened here. Doe kissed Roe, with consent. He touched her neck, with consent.

Malloy herself admitted that "a person's neck/throat area is not an 'intimate body part."

*See* Malloy's Outcome Letter. A plain reading of the SMP illustrates that, even if Roe's

allegations *had* been true – which they were not - they would not have amounted to

"Sexual Assault" as that term is defined in SJU's SMP.

SJU misinterpreted its own definition of "sexual assault" at two critical junctures

in its investigation of Doe. First, Perry determined that Doe had committed "sexual

assault" as soon as Roe reported her claims against him.[152] Yet Roe had told Perry that

the kissing, and the attendant touching of her neck, was consensual. She did not complain

---

[151] SJU's SMP also defines "Sexual Assault" as "having intercourse or sexual physical contact with
another individual by the use or threat of force or coercion, without consent or where the individual is
incapacitated." See Exhibit 6, SMP D(1)(a). No one is claiming Doe did anything that would fall within
this definition of "Sexual Assault." Rather, Doe was found responsible for non-consensual sexual contact
per this definition in the SMP.

[152] She actually communicated that to Havira the very day Roe reported it.

to Perry that there had been non-consensual touching of an intimate body part; she complained that Doe had "squeezed" her neck and "scared" her. Neither of these are prohibited by the SMP. If anything, these allegations could allege an assault, but not a sexual assault as defined in SJU's policy. By deeming the the alleged conduct "sexual assault" rather than "assault," Perry shunting the allegations against Doe into the SMP. That decision would, from the outset and by design, offer Doe virtually no procedural protections or ability to defend himself. But it did allow Perry to confirm her belief that men are "socialized to be violent," to bring another sexual misconduct claim into her (admittedly) underutilized office, and to ultimately have some evidence of "progress" to show the OVW.

Perry handed the investigation off to Malloy, who once again misconstrued the definition of "sexual assault," with disastrous effects for Doe.[153] After a gender-infused, wholly inadequate "investigation," Malloy specifically found that the "sexual contact" alleged here *was* consensual because "[c]onsent to kissing also understandably includes some contact by [Doe's] hands on the neck and throat area." She also concluded, as she must, that "a person's neck/throat area is not an 'intimate body part.'" Nonetheless, Malloy, a trained and practicing attorney, determined that Doe had committed "sexual assault" as that term is defined in the SMP.[154] In doing so, Malloy expanded the definition of "Sexual Assault" to include non-intimate body parts touched while kissing –

---

[153] Plaintiff submits that both Perry's and Malloy's "misinterpretations" are rooted in gender bias.

[154] There is no evidence that either Perry or Malloy asked Roe whether she considered the "choking" to be sexual. This is significant because, when *women* were accused of SMP violations, their opinion about whether the conduct alleged was "sexual" became relevant. When the women softball players were accused of sexual assault, Malloy determined that the alleged conduct – which fell directly within the literal definition of "sexual assault" in the SMP – was not "sexual" because the intent behind it was "team bonding." When a woman staff member was accused of sexual assault for conduct which, again, fell directly within the literal definition, Perry decided that she should not be investigated under the SMP because, when asked, the male accuser (a student) had said he did not consider the kiss to be sexual.

which is obviously not addressed in the SMP definition. She further expanded the definition to include the degree of firmness with which the accused is touched – also not part of the SMP definition.[155]  It is unclear whether Malloy considered the fact that Doe allegedly "scared" Roe to be a sexual assault. If so, obviously, she is mistaken.

SJU might have defined "sexual assault" to include "any touching that happens while kissing." It might have imposed a duty on students to obtain consent with regard to the firmness of consensual touching. But it did not. Perry, then Malloy, grafted those prohibitions onto the SMP. That is a breach of SJU's contract with Doe.

### 5. SJU failed to conduct a fundamentally fair investigation lead by an appropriately trained investigator.

In its SMP, SJU explicitly promised Doe a "prompt, fair and impartial disciplinary process (from the initial report to the final result) conducted by officials who are annually trained on the issues related to sexual assault . . . ,"[156] one that "*shall include interviews with the parties and witnesses and of any relevant documents or other evidence.*" *See* SMP IV(a); SMP V(b)(1)(Exhbit "6", emphasis added). The "fairness" of SJU's disciplinary process is discussed above. But SJU violated this contractual promise in a second way when it hired Malloy to conduct Doe's investigation. Malloy testified that she was not "trained" as an investigator. Anything she knew or learned about Title IX was *ad hoc*, irregular and not provided on an annual basis. Nor did SJU do anything to ensure that Malloy would be "annually trained on the issues related to sexual assault."

---

[155] Nor, as a practical matter, could it be. It is ludicrous to think that two students, engaged in any form of sexual contact, to obtain consent from one another for the degree of firmness with which they touch or hold one another.

[156] The term "official" is not defined in the contract, but it is obviously intended to include investigators. All of the SJU employees testified that, once a claim comes in under the SMP, it is handed over to the investigator, essentially from "initial report" to a determination responsibility.

Perhaps as a consequence of her lack of training, Malloy conducted an investigation that was so deeply flawed and so utterly incomplete as to violate SJU's promise to conduct a "fair and impartial disciplinary process."[157] SJU specifically guarantees accused students "an investigation of the allegations against the Respondent [that] . . . *shall include interviews with the parties and witnesses and of any relevant documents or other evidence.*" *See* SMP V(b)(1)(emphasis added). Malloy did not provide that to Doe.

Malloy did not seek out or interview any witnesses. She did not speak with the woman who witnessed Roe kiss Doe goodnight following his alleged assault. She did not identify or speak with Roe's friends, who were with her both immediately before and immediately after the alleged assault. She did not ask for text messages from around the time of the alleged assault.[158] When she ultimately, and by happenstance, got those text messages, they directly contradicted Roe's story. She had not texted her friends that she needed help; she had texted them that she "miss[ed] Francis." Malloy never circled back to Roe to explore this obvious inconsistency, and she never shared any of this information with Doe. Malloy did not interview "Francis." Malloy never asked Roe what else she had done that weekend, whether she had taken any medications that might have increased bruising, whether she had engaged in excessive drinking over that weekend, or even whether she had been injured in any other way around the time of the alleged assault.[159] She did not explore any motive Roe might have had to fabricate or exaggerate

---

[157] Plaintiff concedes that Malloy's investigation was prompt. In fact, he submits it was a rush to judgment.
[158] Roe testified that Malloy only asked her for the text messages she had exchanged with Doe.
[159] We now know that there are pictures of Roe, taken twenty hours after Doe' alleged attack, that show no injury whatsoever to her neck, making it impossible for the bruises to have occurred while Roe was with Doe. We also know that Roe drunkenly "slipped" down the stairs after those pictures were taken and that the bruises were *first* noticed the day after that fall. We also know that Roe knew all of this information

her story,[160] and she showed the same appalling lack of interest in or concern about Roe's "flashback." Malloy never asked Roe if her "flashback" might have impacted her interpretation of what she claimed to have experienced.[161] Malloy did not investigate the witnesses, documents or any of the evidence relevant to this case. She interviewed Roe; she interviewed Doe; she found Doe responsible. That does not comport with the promise that the investigator *shall include interviews with the parties and witnesses and of any relevant documents or other evidence.*" *See* SMP V(b)(1)(emphasis added). The contract says "shall," not "may."

*Doe v. Trs. of the Univ. of Pa.,* 270 F. Supp. 3d 799, 817-818, 2017 U.S. Dist. LEXIS 148086, *32-36, 2017 WL 4049033 (E.D. Pa. Sept. 13, 2017) is instructive regarding the University's obligation to interview witnesses and seek out documentation and evidence. There, the University had promised that it would provide "a thorough and fair investigation" which was to include "interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and other relevant evidence." *Trs. of the Univ. of Pa.,* at *34. Unlike in this case, Penn had actually interviewed witness other than the accused and the accuser, and it had reviewed documentation and evidence. Yet plaintiff complained that the investigator failed to:

    (1) interview the accused thoroughly about affirmative consent;
    (2) explore any motive the accuser might have to fabricate or exaggerate her story;

---

when she met with Bean, Perry and Malloy and did not share it with any of them. To be fair, they did not ask.
[160] We now know that Roe had an extensive disciplinary history involving allegations of bullying, alcohol and drug abuse and academic probation.
[161] Both Roe and Doe testified that, at some point while they were kissing, Roe pulled back. Both Roe and Doe testified that the minute Roe stopped kissing Doe, he stopped kissing her and moved away from her. We know that because of testimony taken in the course of this litigation; not because Malloy inquired about it.

(3) inquire about "lighthearted" messages the accuser exchanged with friends or looked into any other communications that might have shed light on the accuser's state of mind;

(4) inquire into other witnesses' memories of the night of the alleged assault;

(5) obtain and review video recordings of the plaintiff and his accuser that night; and

(6) interview the individual who accompanied the accuser to the campus Women's Center and Police Department.

*Id.,* at * 36.

The court concluded that these allegations, if proven, could establish a breach of the University's promise to conduct a "thorough" investigation that "include[d] interviews of the complainant and respondent, interviews of witnesses, and review of documentation, physical evidence, and any other relevant evidence." *Doe v. Trs. of the Univ. of Pa.,* 270 F. Supp. 3d 799, 817-818, 2017 U.S. Dist. LEXIS 148086, *32-36, 2017 WL 4049033 (E.D. Pa. Sept. 13, 2017). "Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion." *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 573, 2016 U.S. Dist. LEXIS 43499, *15 (D. Mass. March 31, 2016)(sexual misconduct "investigation" which proceeded under substantially the same policies as those adopted by SJU violated accused student's right to "basic fairness").

Malloy's inept and incomplete "investigation" of the charges against Doe also violates SJU's contractual promise to uphold Title IX. The 2017 Q&A places the "burden . . . on the school – not on the parties – to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred . . . ." *See* 2017 Q&A, Question 6. Malloy, and SJU, was obliged to seek out the appropriate witnesses and evidence. She did not do so.

**6.  SJU interpreted and applies the provisions of its SMP appeal process in a fundamentally unfair way.**

SJU promised Doe that, in responding to an appeal of the investigator's decision, "the non-appellant shall be provided an opportunity to inspect and respond to the appeal request submitted by the appellant." SMP V(8)(d). After that, "the appellant shall be provided an opportunity to inspect the other party's response. No additional responses are accepted as appeal documentation at that point from either party." SJP V(8)(d). SJU breached its promise to Doe by providing his appeal letter to two University employees and the investigator for review and comment to be presented to the Appeal Board. This was one of SJU's unwritten policies, apparently designed to ensure that it had a secret second bite at the apple in securing convictions of accused students. Students have no way of knowing about this policy. On the contrary, the contract explicitly tells them that "no additional responses are accepted as appeal documentation at that point from either party."  Like the rest of the contract, this promise should be read in the context of SJU's assurance of a "prompt, fair and impartial disciplinary process" which upheld Title IX. Significantly, the 2017 Q&A Title IX specifically instructs universities that they "ensure that institutional interests do not interfere with the impartiality of the investigation." *See* 2017 Q&A, Question 6.

A reasonable reading of the SMP would lead a student appealing from an unwarranted finding of guilt that he knew all of the documents on which the Appeal Board would base its decision. SJU's self-serving interpretation of this provision, that SJU, but not the parties, may solicit and submit whatever material it deems necessary to

uphold the investigator's decision, is fundamentally unfair and, once again, violates the

school's promises to conduct a "fair" investigation that upholds Title IX.[162]

Taken as a whole, SJU's SMP, both as written and as practiced, systematically

stripped accused students of their ability to defend themselves against charges of sexual

misconduct. Sadly, this left the innocent student – one who truly had no idea what the

claim against him might be – most vulnerable. The *Brandeis* court spoke eloquently to

this issue in finding an SMP disciplinary process virtually identical to the one SJU

adopted to be "fundamentally unfair:"

> Brandeis appears to have substantially impaired, if not eliminated, an accused
> student's right to a fair and impartial process. And it is not enough simply to say that
> such changes are appropriate because victims of sexual assault have not always
> achieved justice in the past. Whether someone is a "victim" is a conclusion to be
> reached at the end of a fair process, not an assumption to be made at the beginning.
> Each case must be decided on its own merits, according to its own facts. If a college
> student is to be marked for life as a sexual predator, it is reasonable to require that he
> be provided a fair opportunity to defend himself and an impartial arbiter to make that
> decision.

Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 573, 2016 U.S. Dist. LEXIS 43499, *15 (D.

Mass. March 31, 2016)

### 6.     SJU failed to appropriately accommodate Doe's known learning difference.

SJU promised that students would not be discriminated against "on the basis of

sex/gender . . . disability . . . [or] any other status protected by law in the administration

---

[162] SJU also offers students found "responsible" only a very limited right to appeal, which other courts
have found to be fundamentally unfair, especially in the context of the "single investigator" model. *See Doe
v. Brandeis Univ.*, 2016 U.S. Dist. LEXIS 43499, *107-108, 177 F. Supp. 3d 561, 607 (D. Mass. March 31,
2016)(Handbook permitted appeal on only four grounds: fraud, "denial of rights under this process,"
"procedural error," or "the claim of new evidence not previously available, which would have materially
affected the decision." Conspicuously absent from was ability to appeal on grounds that the investigator's
decision was not supported by the evidence, or that it was otherwise unfair, unwise, or simply wrong. The
Special Examiner, for all practical purposes, had the first and only say in determining student's guilt).

of its educations . . . policies or programs." Exhibit " ," pg. 46. SJU went to great pains to ensure that Roe was comfortable, informed, and fully able to participate in the disciplinary process. Yet SJU did absolutely nothing to ensure that Doe, a student with a known learning difference who was registered with the school's OSDS and entitled to accommodations was, in fact, accommodated. It improperly shifted the burden to Doe, reeling from the allegations, uninformed about the charges against him and uninitiated in the SMP, to anticipate what accommodations he might need in this opaque process and seek them out. In fact, when Doe did seek out accommodations, Bordak, who testified that, as a rule, he never spoke with the OSDS about students' accommodation, contacted the OSDS to ensure that Doe was not afforded a note taker, an accommodation to which he was otherwise entitled.  Plaintiff submits that this conduct operated to discriminate against Doe on the basis of his ADHD, a disability, and thereby violated the terms of SJU's agreement with Doe.

### C. The Facts Support Plaintiff's Claim for Violation of the Unfair Trade Practices and Consumer Protection Law

SJU asks this Court to dismiss Plaintiff's Unfair Trade Practices and Consumer Protection ("UTPCPL") claim on the grounds that it arises solely from Doe's breach of contract claim. 73 Pa.C.S. §201-1, et seq. Both the nature of the claims Doe has made in this case and the applicable caselaw – which SJU does not identify – show that the University is incorrect.

As a general matter, the UTCPCL prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Stat. Ann. § 201-3. It creates a private right of action for "[a]ny person who purchases or leases goods or services primarily for

personal, family or household purposes and thereby suffers any ascertainable loss of money or property" as a result of the seller's deceptive or unlawful actions. *Harris v. St. Joseph's Univ.*, 2014 U.S. Dist. LEXIS 65452, *22, 2014 WL 1910242 (E.D. Pa. May 12, 2014), quoting *Wise v. Am. Gen. Life Ins. Co.*, 2005 U.S. Dist. LEXIS 4540, 2005 WL 670697, *7 (E.D. Pa. 2005) (quoting 73 P.S. § 201-9.2(a)). "To state a claim under the UTPCPL, a plaintiff must show: (1) deceptive conduct; (2) an ascertainable loss; (3) justifiable reliance on the defendant's wrongful conduct or misrepresentations; and (4) that such reliance caused an injury." Id., at *24, 2014 WL 1910242 (E.D. Pa. May 12, 2014), quoting *Pellegrino v. State Farm Fire and Cas. Co.*, 2013 U.S. Dist. LEXIS 105511, 2013 WL 3878591, *8 (E.D. Pa. 2013)(citing *Caroselli, Sr. v. Allstate Prop. & Cas. Ins. Co.*, 2010 U.S. Dist. LEXIS 83515, 2010 WL 3239356, *7 (E.D. Pa. 2010)). The Pennsylvania Supreme Court has set forth the following test to determine if a claim is barred by the gist of the action doctrine:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Id.* at 68 (internal citations omitted).

In this case, Plaintiff has alleged six counts against SJU, only one of which sounds in contract. The balance of Plaintiff's claims includes the violation of Title IX, Negligent Infliction of Emotional Distress, Intentional Infliction of Emotional Distress, Defamation and, of course, violation of UTPCPL. SJU had a duty independent of its contract with Doe to avoid defaming him and inflicting emotional distress on him, either

intentionally or negligently. SJU's duty to comply with Title IX does not arise from its contract with Doe;[163] the statute is enforceable through an implied right of action regardless of the terms of Doe's contract with SJU. *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714-15 (2d Cir. 1994)).

And Doe's Title IX, intentional and negligent infliction of emotional distress and defamation claims are backed by substantial evidence. SJU's interactions with Doe, especially when seen in the context of its failure to follow Title IX guidance, its financial incentive to induce more men to be charged with and found responsible for sexual misconduct, the statements made and attitudes expressed by its employees and the disparate treatment it accords to men and women accused of sexual misconduct all evince gender bias. SJU has labeled Doe a sexual predator, through its statements and the mark of "sexual assault" on his record. SJU's handling of Roe's allegations against Doe – its failure to investigate the charges before instituting them, its refusal to advise Doe of what they are, its failure to ensure that any witnesses were spoken to or any exculpatory evidence sought, and its failure to show Doe any evidence, just to name a few – are outrageous and have been horribly damaging to Doe, his reputation and his future. The facts of this case show that SJU violated duties it owed to Doe independent of their contract, making the gist of the action doctrine inapplicable.

For the same reasons, neither is Doe's UTPCPL claim barred by the economic loss doctrine. The economic loss doctrine bars a plaintiff from recovering tort damages for economic losses stemming solely from a breach of contract. *Dixon v. Northwestern Mut.*, 146 A.3d 780, 788-790, 2016 Pa. Super. LEXIS 471, *23, 2016 PA Super 186 (Pa.

---

[163] Although SJU represented to Doe that it would comply with Title IX, it did not.

Super. Ct. August 25, 2016). The doctrine prohibits claims if: (1) they arise solely from a

contract between the parties; (2) the duties allegedly breached were created by and

grounded in the contract; (3) the liability stems from a contract; or (4) the tort claim

essentially duplicates a breach of contract claim or the success of a tort claim relies on the

terms of a contract. *Id.,* citing *McGuckin v. Allstate Fire & Cas. Ins. Co.*, 118 F. Supp. 3d

716, 720 (E.D. Pa. 2015) (quoting *Pesotine v. Liberty Mut. Grp., Inc.*, Civ. A. No. 14-

784, 2014 U.S. Dist. LEXIS 118178, 2014 WL 4215535, at *4 (M.D. Pa. Aug. 25,

2014).[164]

    Doe's claims against SJU do not arise "solely" from their contract, the duties SJU

breached are rooted in federal and tort law in addition to claims for breach of contract,

SJU's liability does not stem solely from the contract and the success of Plaintiff's Title

IX and tort claims do not rely on the terms of a contract. *See, e.g., Harris v. St. Joseph's

Univ.*, 2014 U.S. Dist. LEXIS 65452, *22-24, 2014 WL 1910242 (E.D. Pa. May 12,

2014)(allegations that defendant, SJU, had not adequately trained sexual misconduct

investigators as promised, did not provide a fair and impartial sexual misconduct hearing

as promised, did not provide notice and fair process of allegations as promised, and

misrepresented its compliance with Title IX sufficient to state UTPCPL claim).

    In order to state a claim for defamation under Pennsylvania law, a plaintiff must

establish: (1) the defamatory character of the communication; (2) its publication by the

---

[164] As a matter of law, Pennsylvania courts have specifically held that the economic loss doctrine does not apply to claims arising under the UTPCPL. *Knight v. Springfield Hyundai*, 2013 PA Super 309, 81 A.3d 940 (Pa. Super. Ct. 2013); Dixon v. Northwestern Mut., 146 A.3d 780, 788-790, 2016 Pa. Super. LEXIS 471, *23, 2016 PA Super 186 (Pa. Super. Ct. August 25, 2016). For a discussion of a federal court's right to follow Pennsylvania law as opposed to Third Circuit predictions about that law, see Lovelace v. Nationwide Mut. Ins. Co., 2018 U.S. Dist. LEXIS 135113, *5-11, 2018 WL 3818911 (E.D. Pa. August 10, 2018)

defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of the defamatory meaning; (5) the understanding by the recipient that the statement refers to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a constitutionally privileged occasion. *Harris v. St. Joseph's Univ.,* 2014 U.S. Dist. LEXIS 65452, *24, 2014 WL 1910242 (E.D. Pa. 2014) ("Harris I"); 42 Pa. C.S. § 8343(a). "A publication is defamatory if it tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule or injure him in his business or profession." *Id.* at *25 (quoting *Dunlap v. Phila. Newspapers, Inc.*, 301 Pa. Super. 475, 448 A.2d 6, 10 (Pa. Super. 1982)) (citation and internal quotation marks omitted). "In order to be actionable, the words must be untrue, unjustifiable, and injurious to the reputation of another." *Id.* at *25 (quoting *Joseph v. Scranton Times L.P.*, 2008 PA Super 217, 959 A.2d 322, 334 (Pa. Super. 2008)). "In general, publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." *Id.*, at *26, citing *Agriss v. Roadway Exp., Inc.*, 334 Pa. Super. 295, 483 A.2d 456, 463 (Pa. Super. 1984). SJU argues, as it argued in *Harris I*, that Doe's Defamation claim fails because (1) there has been no publication of the defamatory remarks and (2) the communications about Doe having been found responsible for sexual assault are true. Judge Restrepo found both arguments unpersuasive.

SJU cannot deny that their defamatory statements against Doe were published. Perry communicated to Havira – and then Havira communicated to several SJU employees, including Anderson – that Doe had sexually assaulted Roe *before* the investigation into Roe's allegations had even taken place ( Dep. M. Havira p84-87 Exhibit 24. SJU informed multiple employees that Doe committed sexual assault and a

notation to that effect has been placed on his record. In this case, as in *Harris I*, SJU

argues that it "took pains" to keep the matter confidential, only sharing the allegations of

sexual misconduct with its own employees. Judge Restrepo appropriately dismissed this

argument on the grounds that "publication of defamatory matter is its communication

intentionally or by a negligent act to *one other than the person defamed*." *Agriss v.

Roadway Exp., Inc.*, 334 Pa. Super. 295, 483 A.2d 456, 463 (Pa. Super. 1984)(emphasis

added).

Next SJU argues, as it argued in *Harris I*, that its representations about Doe are

true; that SJU only represented that Doe had been *alleged* to have committed sexual

assault, and that allegation had, in fact, been made. Yet the evidence in this case directly

contradicts SJU's argument. Perry informed Havira that Doe had committed sexual

assault and that "the inappropriate activity happened on our campus." Havira

subsequently published a statement saying that the activity had occurred. *See* SJU 168-

168, 172-173, Exhibit " ". Both of these communications are defamatory. Further, SJU

has now placed a notation on Doe's record – a notation which the University promises

will stay there for seven years following Doe's graduation from SJU – stating that he has

committed sexual assault.[165]

The evidence establishes SJU made, and continues to make, defamatory

comments about Doe. Once the plaintiff has established the elements of defamation, the

burden shifts to the defendant to prove that the defamatory communication was true, or

---

[165] In Harris I, SJU argued that the plaintiff had not suffered "special harm" as a result of the defamation. Judge Restrepo dismissed this argument as well on the grounds that statements claiming that an individual had committed sexual assault are slander per se. *Id.* at *27.

that it was privileged or that was a matter of public concern. 42 Pa. C.S. § 8343(b).

Plaintiff submits that the evidence shows that he did *not* sexually assault Roe, and to the

extent SJU still insists that he did, that presents genuine issues of material fact sufficient

to defeat a motion for summary judgment.

## IV.    CONCLUSION

For the reasons set forth above, plaintiff respectfully request this Court enter the

attached Proposed Order denying defendant Saint Joseph University's Motion for

Summary Judgment.

Respectfully submitted,

Dated:    October 9, 2018    BY:    */s/ John Mirabella*
   John Mirabella, Esquire
   john@mirabellalawfirm.com
   Law Offices of John Mirabella
   1600 Market Street, Suite 1810
   Philadelphia, PA  19103
   (215) 422-4991

   Edward J. Schwabenland, Esquire
   Schwabenland & Ryan
   995 Old Eagle School Road, #306
   Wayne, PA  19087
   (610) 971-9200

   Gregory A. Smith, Esquire
   The Law Office of Gregory A. Smith
   Law Offices of John Mirabella
   1600 Market Street, Suite 1810
   Philadelphia, PA  19103
   (215) 422-4100
   Attorneys for Plaintiff