**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. No. 18-2044** |
| | : | |
| **ST. JOSEPH'S UNIVERSITY, et al.,** | : | |
| **Defendants.** | : | |

---

**O R D E R**

John Doe proceeds against St. Joseph's University and Jane Roe in connection with a Title IX investigation that concluded Doe had sexually assaulted Roe. Doe asserts: (1) Title IX and state statutory and common law claims against SJU; and (2) two common law claims against Roe. (Compl., Doc. No. 1); 20 U.S.C. § 1681 *et seq*. SJU filed a Counterclaim against Doe for counsel fees. (Answer & Countercl., Doc. No. 8); 42 U.S.C. § 1988(b).

SJU and Roe have each moved for summary judgment against Doe, who has moved for summary judgment on SJU's Counterclaim. (Doc. Nos. 57–59.)

I will: (1) grant summary judgment in favor of SJU and against Doe on his Title IX claim; and (2) decline to consider Doe's state law claims. I will thus dismiss Doe's remaining claims against both SJU and Roe without prejudice and deny Roe's Motion for Summary Judgment as moot. I will also dismiss SJU's Counterclaim and deny Doe's Motion for Summary Judgment as moot.

## I.    FACTUAL BACKGROUND

When deciding a motion for summary judgment, I must view the facts in favor of the nonmoving party, drawing all reasonable inferences in his or her favor. Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). When deciding cross motions for summary judgment, I must "consider each motion separately, drawing inferences against each movant in turn." Alford

v. Hartford Life Ins. Co., No. 07-4527, 2008 WL 2329101, at *3 (E.D. Pa. June 3, 2008) (citing

Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996)).  Because I will grant SJU's Motion, I will

view the facts in the light most favorable to Plaintiff and resolve all factual disputes in his favor.

Haidak v. Univ. of Mass. at Amherst, 299 F. Supp. 3d. 242, 249 (D. Mass. 2018).

Doe is a male student who enrolled at SJU in 2016.  (Pl.'s Stmt. Facts 5, Doc. No. 76.)  He

has been on leave since the University found him responsible for a single instance of sexual

misconduct that occurred during the 2017–18 academic year.  (Id. at 45.)  SJU is a Pennsylvania

university that receives federal funding.  (Id. at 1.)  Roe is a female SJU student who enrolled in

2017.  (Id. at 8.)

**A.  SJU's Code of Conduct & Sexual Misconduct Policy**

Since 2015, the University's Sexual Misconduct Policy has governed sexual assault

investigations and discipline.  (Pl.'s Stmt. Facts 3; SJU SMP, Ex. 1 to SJU's Mot. Summ. J., Doc.

No. 58-1.)  The SMP sets out the University's policy on sexual misconduct, identifies and

describes procedures and resources for students, identifies possible sanctions for violations, and

highlights educational programs and resources addressing misconduct.  (See SJU SMP 3.)

"Sexual assault" is defined in the SMP as "[h]aving sexual intercourse or sexual physical

contact with another individual by the use or threat of force or coercion, without consent, or where

the individual is incapacitated."  (Id. at 6.)  It includes "any non-consensual sexual contact,

including any improper touching of intimate body parts."  (Id. at 7.)

The SMP encourages individuals who believe they have been sexually assaulted to report

such conduct to an on-campus agency, such as the University's Title IX Coordinator.  (Id. at 16–

19.) Following a report of alleged misconduct, the Coordinator reviews the allegations with SJU's

Office of Community Standards.  (Id. at 29.)  If appropriate, SJU begins an investigation and

assigns an independent investigator to look into the allegations.  (Id. at 30.)  Both the complainant and respondent may, *inter alia*: (1) object to the investigator; (2) meet with an SJU staff member one-on-one to discuss the disciplinary process; (3) retain an advisor; and (4) seek accommodations for disabilities.  (Id. at 30–32; see also Pre-Investigation Meeting Checklist, Ex. 12 to SJU's Mot. Summ. J., Doc. No. 58-1.)

The investigator speaks with the parties and witnesses, reviews related documents and evidence, and prepares a report for the University advising whether a preponderance of the evidence shows that the alleged violation occurred.  (SJU SMP 29–31, 33.)  If the violation is found to have occurred, the accused student is deemed "responsible" for the violation.  (Id. at 33.)

Once a student is found responsible, SJU may impose sanctions, including expulsion, suspension, probation, writing assignments, and required programming.  (Id. at 34.)  Both the complainant and respondent may appeal the outcome to a panel of the University's Appeal Board, or respond to such an appeal.  (Id. at 35–38.)  Although the appealing party may review the other party's response, no additional filings are permitted.  (Id. at 37.)

SJU requires incoming undergraduate students to attend a "Break the Silence" presentation, during which students learn about the SMP and how to deal with sexual misconduct on campus. (See Presentation 1021–51, Ex. 8(c)(1) to Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J., Doc. No. 66.)

SJU implemented this SMP after the Department of Education issued a "Dear Colleague Letter" in 2011, advising schools to adopt a preponderance of the evidence standard in administering student discipline.  (See 2011 DCL, Doc. No. 64-1.)  The DOE withdrew this Letter in September 2017 because of criticism that a preponderance standard deprived "accused students . . . fair process" and "victims . . . an adequate resolution of their complaints."  (2017 DCL 2, Doc.

No. 68-1.)  While the DOE participated in rulemaking, it issued a contemporaneous "Q&A on Campus Sexual Misconduct" to "provide information about how [the Office for Civil Rights] will assess a school's compliance with Title IX."  (2017 Q&A, Doc. No. 68-2.)

## B.  Advocacy and Training

In February 2017, SJU entered into Memoranda of Understanding with the Lower Merion Police Department, Victim Services Center of Montgomery County, Inc., the Philadelphia Sexual Assault Response Center, Clery Center, the Philadelphia District Attorney's Office, SJU faculty, students, and staff

> to work together to enhance victim safety; provide services for victims; support efforts to hold offenders accountable; improve lines of communication; streamline efforts; and increase awareness—related to sexual assault, domestic violence, dating violence, and stalking.

(See Memoranda of Understanding 1056–85, Ex. 8(c)(1) to Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J., Doc. No. 66.)

In November 2017, SJU received a $300,000 grant from the Department of Justice's Office of Violence Against Women to reduce on-campus sexual assault, domestic/dating violence, and stalking, and to document SJU's progress in these efforts.  (See Ex. 11 to Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J., Doc. No. 68-3.)  SJU's student newspaper published an article about the grant.  (See SJU Hawk Article, Doc. No. 68-4.)  The University's Title IX Coordinator, Dr. Mary-Elaine Perry, was quoted in the article, stating that she initially expected to see more reports of sexual misconduct because of the grant.  (Id.)

In January 2018, SJU received a $30,000 state grant to "improve awareness, prevention, reporting and response systems regarding sexual violence."  (See SJU State Grant Application 1353–60, Ex. 8(c)(2) to Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J., Doc. No. 67.)  In applying for

this grant, Perry proposed using some of the grant funds to bring a guest speaker to campus "[t]o raise student awareness of violence against women as a men's issue." (Id. at 1356.)

### C.  Complaint against Doe

On February 23, 2018, Doe and Roe met at an off-campus party. (Pl.'s Stmt. Facts 16; SJU's Stmt. Facts 4–5; see also Summ. Compl., Ex. 2 to SJU's Mot. Summ. J., Doc. No. 58-1.) They flirted, kissed, exchanged cell phone numbers, and left the party together with some of Doe's friends. (Pl.'s Stmt. Facts 17; see also Summ. Compl.) Returning to SJU, they went to a common room in Doe's residence hall and began kissing with "their hands on each other's faces, arms[,] and necks." (Pl.'s Stmt. Facts 18; see also Summ. Compl.) At one point, Doe briefly left the room. (Id.) When he returned, Roe received a text and told Doe that she had to leave to help a sick friend. (Pl.'s Stmt. Facts 18, 22; see also Summ. Compl.) Doe walked her out of the building, the two kissed, and Roe left with a friend. (Pl.'s Stmt. Facts 18.)

According to Roe, while the two were kissing, Doe squeezed her neck hard enough to frighten her and leave bruises. (Pl.'s Stmt. Facts 19–20; SJU's Stmt. Facts 3.)

On February 26, 2018, Roe mentioned this incident to Katie Bean (Assistant Director in SJU's Office of Student Outreach and Support), with whom Roe worked part-time. (Pl.'s Stmt. Facts 25–26; SJU's Stmt. Facts 3.) Bean asked Roe if she wanted to report the incident to Dr. Perry. (Bean Dep. 157:1–158:8, Doc. No. 69-2.) After meeting with Bean and Perry, Roe filed a sexual misconduct complaint against Doe. (Pl.'s Stmt. Facts 26–28; SJU's Stmt. Facts 4.) Perry drafted the complaint for Roe and forwarded it to William Bordak (Director of SJU's Office of Community Standards), thus initiating an investigation into the allegations against Doe. (Pl.'s Stmt. Facts 27; SJU Stmt. Facts 5–6.) Perry's summary of Roe's complaint stated, *inter alia*, that "[Doe] put his hand on [Roe's] throat and began squeezing her neck" while they were kissing, and

that "[Roe] felt that she could not breathe."  (See Summ. Compl.)  Roe told Perry, *inter alia*, that "she froze and had something of a flashback," because "she had been abused in the past by a former boyfriend."  (Id.)

On March 8, 2018, Public Safety prepared an incident report (based on Roe's Complaint) stating that Doe "sexually assaulted" Roe.  (Pub. Safety Report 167–68, Ex. 8(a) to Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J., Doc. No. 65.)

**D.  The Investigation**

The University appointed as investigator Elizabeth Malloy, a local attorney who had done over a dozen Title IX investigations for SJU.  (Pl.'s Stmt. Facts 29; SJU's Stmt. Facts 6; see also Malloy Retainer 1052–55, Ex. 8(c)(1) to Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J.; Ex. 22 to SJU's Mot. Summ. J., Doc. No. 58-4.)  Neither Doe nor Roe objected to Malloy's appointment.  (SJU's Stmt. Facts 8; Doe Dep. 21:4–24:12, Doc. No. 69-5.)

On March 1, 2018, Elizabeth Forte (Assistant Director of SJU's Office of Community Standards) notified Doe that Roe had filed an SMP complaint against him.  (Pl.'s Stmt. Facts 30; SJU's Stmt. Facts 6.)  He received a Notice of Process Letter advising him of the complainant and date of the alleged incident.  (Ex. 10 to SJU's Mot. Summ. J., Doc. No. 58-1.)  On March 5, 2018, SJU announced a contact restriction between Doe and Roe.  (Contact Restriction 644–45, Ex. 8(b) to Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J., Doc. No. 65-1.)

On March 6, 2018, Doe and Forte had a pre-investigation meeting, at which he received a checklist summarizing SJU's disciplinary process and his rights.  (Pl.'s Stmt. Facts 33; SJU Stmt. Facts 7; see also Pre-Investigation Meeting Checklist.)  Forte did not give Doe a copy of Roe's complaint, the written charges against him, or otherwise elaborate on Roe's allegations beyond stating that Doe was "rough" with Roe.  (Pl.'s Stmt. Facts 34; SJU's Stmt. Facts 6; see also Bordak

Dep. 354:20–23, Doc. No. 64-6 ("The Office of Community Standards does not share the details of the complaint with the respondent prior to or during the pre-investigation meeting."); White Dep. 49:23–50:18, Doc. No. 69-3 (noting that such information is not shared "to preserve the integrity of the investigation.").)  Although Doe suffers from ADHD, he did not request or receive a disability accommodation during the disciplinary proceedings.  (Pl.'s Stmt. Facts 30–31, SJU's Stmt. Facts 8; see also Doe Dep. 33:9–12.)

Malloy then investigated Roe's allegations.  (Pl.'s Stmt. Facts 35–39; SJU's Stmt. Facts 9–12.)  Before Doe met with Malloy, he texted her everything he could remember about the night of the incident.  (See Ex. 14 to SJU's Mot. Summ. J. at D, Doc. No. 58-3.)  Doe stated, inter alia, "I wonder if I was holding her in some way that felt forceful or aggressive because, although that was not my intent, it clearly made [Roe] uncomfortable."  (Id.)

On March 19, 2018, Malloy interviewed Doe and Roe separately.  (Pl.'s Stmt. Facts 35–39; SJU's Stmt. Facts 9–12.)  While interviewing Doe, Malloy explained Roe's allegation that Doe squeezed her neck while they were kissing and that it scared her.  (Pl.'s Stmt. Facts 38; SJU's Stmt. Facts 10.)  Doe responded that he took responsibility, stating that although he did not recall squeezing Roe's neck, he did not want to call her a liar.  (Pl.'s Stmt. Facts 39; SJU's Stmt. Facts 10; see also Malloy's Notes 7, Ex. 15 to SJU's Mot. Summ. J., Doc. No. 58-3 (quoting Doe: "I don't remember squeezing [Roe's] neck.  She didn't say [she was] uncomfortable.  I take full respons[ibility].  I take this as a learning opportunity.  I didn't realize she was leaving [because] of this."); Doe Dep. 79:9–12 (Q: "Do you remember telling [Malloy that you took full responsibility]?"; A: "Yes.").)

In addition to interviewing Doe and Roe, Malloy reviewed the University's SMP, photographs of Roe's bruises, text messages, and notes provided by Doe and Roe.  (See Summ.

Investigation 3, Doc. No. 58-2; see also Ex. 14 to SJU's Mot. Summ. J., Doc. No. 58-3.)  Doe

disputes the scope and sufficiency of this investigation.  (See, e.g., Pl.'s Stmt. Facts 22–26, 36–

39.)  Doe charges that Malloy did not tell him about Roe's bruises and offers alternative

explanations for these injuries that Malloy did not consider.  (Id.; see also Doe Dep. 72:6–9; 74:15–

75:6.)

On April 3, 2018, Malloy prepared a report for SJU, finding Doe responsible for sexual

assault by a preponderance of the evidence because it was more likely than not that he squeezed

Roe's neck without her consent.  (See generally Summ. Investigation.)  Malloy found that Doe's

conduct fell within the SMP's definition of sexual assault because it occurred while Doe and Roe

were kissing.  (Id. at 8.)  Malloy found that although Roe consented to kissing, she did not consent

to Doe's squeezing her neck.  (Id. at 8–9.)  Because Roe alleged that Doe "squeezed her neck, to

the point where it left bruises," this was "a singular, separate act which required [Roe's] consent."

(Id. at 9.)

Upon receiving Malloy's report, the University put Doe on one year of disciplinary

probation, and required him to write a paper and review online materials addressing sexual assault.

(Ex. 23 to SJU's Mot. Summ. J., Doc. No. 58-4.)  The University also did not allow Doe to go on

his English class trip to Ireland.  (See Ex. 17 to SJU's Mot. Summ. J., Doc. No. 58-4.)

On April 18, 2018, Doe filed an appeal with the Office of Student Life.  (See Ex. 18 to

SJU's Mot. Summ. J., Doc. No. 58-4.)  Roe, Malloy, Bordak, and Forte responded to his appeal.

(See Ex. 20 to SJU's Mot. Summ. J., Doc. No. 58-4; see also Bordak Dep. 315:22–316:1 ("When

an appeal request is submitted that is sent to the sanctioning officer and the investigator for

response to the pieces raised in the appeal.").)  A short time later, Doe asked to review Roe's

response and requested accommodation for his ADHD, including extra time and a note taker.  (See

Email 211, Ex. 8(b) to Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J.)   On April 30, 2018, SJU

denied Doe's appeal before he reviewed Roe's response to his appeal.  (Ex. 21 to SJU's Mot.

Summ. J., Doc. No. 58-4.)

## II.   PROCEDURAL HISTORY

On May 15, 2018, Doe filed the instant action against SJU and Roe, alleging violations of

Title IX and state law.  (Doc. No. 1.)  Doe also filed a Motion for Temporary Restraining Order,

asking me to order the University to allow Doe to attend his class trip to Ireland.  (Doc. No. 2.)

On May 16, 2018, I denied Doe's Motion and issued a Case Management Order.  (Doc. Nos. 5,

7.)  On May 18, 2018, SJU filed a Counterclaim against Doe for counsel fees.  (Doc. No. 8.)

On July 30, 2018—after discovery was closed—SJU and Roe each moved for summary

judgment.  (Doc. Nos. 20, 22.)  On August 1, 2018, Doe asked me to reopen discovery.  (Doc. No.

24.)   On August 3, 2018, I denied SJU and Roe's Motions without prejudice and reopened

discovery as to both SJU and Roe until August 15, 2018.  (Doc. No. 24.)  On August 6, 2018, I

received a letter from Roe asking me to reconsider my August 3, 2018 Order insofar as I ordered

her to produce her disciplinary records, phone records, and mental health records.  (Doc. No. 27.)

On August 8, 2018, I granted Roe's request in part, vacated my August 3, 2018 Order insofar as it

concerned her mental health records, and ordered her to produce those records for *in camera*

review.  (Doc. No. 29.)

I then referred the Parties to Magistrate Judge Timothy Rice for settlement discussions.

(Doc. Nos. 35–41.)  The Parties were unable to reach a settlement.  (Id.)  Doe asked to reopen

discovery yet again.  (Doc. No. 33.)  I allowed Doe to complete his deposition of Roe, but

otherwise denied his request to reopen discovery.  (Doc. No. 42.)  On September 4, 2018, I sealed

Roe's mental health records, disclosing only that they confirmed Roe's deposition testimony that

before she attended SJU she had been diagnosed with Post-Traumatic Stress Disorder.  (Doc. No. 43.)

On September 24, 2018, the University and Roe renewed their Motions for Summary Judgment.  (Doc. Nos. 58, 59.)  The same day, Doe moved for summary judgment on SJU's Counterclaim for counsel fees.  (Doc. No. 57.)  All Motions have been fully briefed.  (Doc. Nos. 60–63, 76, 77, 79, 80–82, 84.)

Doe brings six claims against SJU: (1) breach of contract; (2) Title IX; (3) intentional infliction of emotional distress; (4) negligent infliction of emotional distress; (5) unfair trade practices; and (6) defamation.  (Compl. ¶¶ 193–381.)  He brings two claims against Roe: (7) defamation; and (8) intentional interference with contractual relations.  (Id. at ¶¶ 382–407.)

Although SJU seeks dismissal of all Doe's claims, I will address only its contentions respecting Doe's Title IX claim.  The University argues that "there is no evidence of gender bias or discrimination by SJU or its independent investigator."  (SJU's Mot. Summ. J. 2, Doc. No. 58.)  I agree with SJU.  There is no record evidence from which a reasonable juror could find a causal link between his disciplinary proceedings and gender bias.  In these circumstances, I will grant SJU's Motion for Summary Judgment against Doe on his Title IX claim and decline to consider his state law claims against SJU and Roe.

### III.    LEGAL STANDARD

Upon motion of any party, summary judgment is warranted "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party must initially show the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is material only if it could affect the result of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  The district court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh, 418 F.3d at 267.  If the court then determines that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.  See Celotex, 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

Summary judgment is appropriate where the moving party shows that there is an absence of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325.  Where a moving party identifies an absence of necessary evidence, the non-moving party "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Grp. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).

## IV.    TITLE IX CLAIMS

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The statute "bars the imposition of university discipline where gender is a motivating factor" and is "enforceable through a private right of action for damages and injunctive relief."  Doe v. Colgate Univ., No. 17-3594, 2019 WL 190515, at *5 (2d Cir. Jan. 15, 2019) (summary order) (quotation omitted); Doe v. Columbia Univ., 831 F.3d 46, 53 (2d Cir. 2016) (quotation omitted).

The Third Circuit has not directly addressed the application of Title IX to university disciplinary processes.  Most courts rely on the Second Circuit's analytical framework in *Yusuf v. Vassar College*, 35 F. 3d 709, 714–16 (2d Cir. 1994).  See Colgate Univ., 2019 WL 190515 at *1, *5–9; Doe v. Valencia Coll., 903 F.3d 1220, 1236–37 (11th Cir. 2018); Doe v. Trs. of Boston Coll., 892 F.3d 67, 89–94 (1st Cir. 2018); Plummer v. Univ. of Houston, 860 F.3d 767, 777–78

(5th Cir. 2017); Mallory v. Ohio Univ., 76 F. App'x 634, 638–41 (6th Cir. 2003); see also Doe v. Univ. of the Sciences, No. 19-358, 2019 WL 632022, at *4–6 (E.D. Pa. Feb. 14, 2019); Doe v. Trs. of the Univ. of Pa., 270 F. Supp. 3d 799, 822–26 (E.D. Pa. 2017); Harris v. St. Joseph's Univ., No. 13-3937, 2014 WL 12618076, at *2 n.3 (E.D. Pa. Nov. 26, 2014).  Under this framework,

> the Court's role . . . is neither to advocate for best practices or policies nor to retry disciplinary proceedings . . . . [T]he sole questions before the Court are whether when [the university disciplined Doe] for sexually assaulting a fellow student, it discriminated against him based on his gender in violation of Title IX, or otherwise violated a provision of state law.

Yu v. Vassar Coll., 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015).

Title IX challenges to disciplinary proceedings generally advance one of the following theories: (1) erroneous outcome; (2) selective enforcement; (3) deliberate indifference; and (4) archaic assumptions.  Mallory, 76 F. App'x at 638–39; Yusuf, 35 F.3d at 715.  Doe proceeds under "erroneous outcome" and "selective enforcement" theories.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 51.)

## A. Erroneous Outcome

Doe must "show both that he was 'innocent and wrongly found to have committed an offense' and that there is 'a causal connection between the flawed outcome and gender bias.'" Valencia Coll., 903 F.3d at 1236 (citing Yusuf, 35 F.3d at 715).  To survive summary judgment, he must offer evidence (1) that would "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and (2) show that "gender bias was a motivating factor behind the erroneous finding."  Yusuf, 35 F.3d at 715; Trs. of Boston Coll., 892 F.3d at 91.

In attacking SJU's disciplinary proceedings, Doe generates more heat than light and effectively asks me to retry these proceedings.  But see Yu, 97 F. Supp. 3d at 461 ("[T]he Court's role . . . is [not] to retry the disciplinary proceedings.").  I will nonetheless assume, *arguendo*, that he has cast some articulable doubt on the outcome of those proceedings.  Doe has not shown,

however, that gender bias "was a motivating factor behind" that outcome.  See <u>Yusuf</u>, 35 F.3d at 715; <u>Trs. of Boston Coll.</u>, 892 F.3d at 91.

Doe "cannot merely rest on superficial assertions of discrimination, but must establish that 'particular circumstances suggest[] that bias was a motivating factor.'" <u>Trs. of Boston College</u>, 892 F.3d at 91 (citation omitted); <u>see also</u> <u>Haidak</u>, 299 F. Supp. 3d. at 269 (plaintiff must produce "evidence in the form of a statement or anything else that suggested that gender-based bias played any part in the disciplinary process"); <u>Doe v. Colgate Univ.</u>, No. 15-1069, 2017 WL 4990629, at *11, <u>aff'd</u> 2019 WL 190515 ("[P]laintiff must provide evidence indicating that 'gender [was] a motivating factor in the decision to discipline.'" (citation omitted)).  Such evidence may include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." <u>Yusuf</u>, 35 F.3d at 715.

Doe argues that "SJU's policy decisions, its employees' statements, behavior, and assumptions, and its agents' representations and decisions show that gender bias was a motivating factor" in his disciplinary proceedings.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 58.)  In support, he offers the following: (1) the University ignored DOE Guidance recommending stronger procedural safeguards for accused students; (2) SJU was under pressure to punish students accused of sexual misconduct; (3) the University's training and educational materials on sexual assault were biased; (4) SJU employees and counsel made statements manifesting deep-seated bias against accused men; (5) Title IX Coordinator Perry was biased against him; (6) Investigator Malloy was biased against him; (7) SJU conducted its investigation in a one-sided manner; and (8) the University has treated women charged with sexual misconduct more favorably than men.  (<u>Id.</u> at 62–81.)  Doe argues that at the Rule 12 stage, numerous courts have found similar allegations

sufficient to create an inference of gender bias.  (Id. at 58–62.)  At summary judgment, however, allegations alone are insufficient.  Cf. Rossley v. Drake Univ., 342 F. Supp. 3d 904, 927–28 (S.D. Iowa 2018) (even where "the allegations [are] sufficient to raise an inference of gender bias at the motion to dismiss stage . . . '[d]iscovery may reveal that the alleged patterns of gender-based decision-making do not, in fact, exist'" (quoting Doe v. Miami Univ., 882 F.3d 579, 594 (6th Cir. 2018).)

### *The University Declines to Implement Department of Education Guidance*

Doe argues that SJU "failed" to update its SMP after the DOE issued updated guidance identifying stronger procedural safeguards for Title IX disciplinary proceedings.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 62–65 (citing 2017 DCL; 2017 Q&A).)  Doe believes that this shows gender bias because SJU ignored "guidance expressly intended to level the playing field for accused men."  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J., 64.)  Yet, the record shows that the University's SMP and the DOE Guidance that Doe urges are both facially gender neutral.  (See generally SJU SMP; 2011 DCL; 2017 DCL; 2017 Q&A).  Doe's preference for the DOE's newly recommended procedures is not evidence of gender bias.  Cf. Neal v. Colo. State Univ.-Pueblo, No. 16-873, 2017 WL 633045, at *11 (D. Colo. Feb. 6, 2017) ("[T]he 2011 [DOE Dear Colleague Letter] in itself would not support the necessary causal connection between Plaintiff's erroneous outcome and gender bias." (citations omitted)).

To the extent Doe argues that male respondents consistently have been found responsible under SJU's gender-neutral SMP, the record contradicts him: undisputed evidence shows that only half the male students charged under its SMP between 2015–2018 have been deemed responsible.  (See Ex. 22 to SJU's Mot. Summ. J.)  No reasonable juror could thus find that SJU's purported failure to update its gender-neutral SMP showed that gender bias motivated Doe's disciplinary

proceedings.

***Pressure on SJU to Punish Men***

Doe argues that SJU's $300,000 federal grant to address sexual misconduct "placed pressure on [SJU] decision makers to favor female accusers over accused men."  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 65–66); Columbia Univ., 831 F.3d at 57–58 (evidence that university was pressured to punish male students after it received "severe[] critici[cism] . . for toleration of sexual assault of female students" could demonstrate gender bias).  In support, Doe cites: (1) SJU's obligation to report its "progress" using the grant to reduce sexual misconduct (such as increases in calls from victims/survivors); and (2) Perry's comment in SJU's student newspaper that she believed assault claims were underreported and initially expected to "have more reports of sexual misconduct [in connection with the federal grant] because students will be aware of what it is and options they have for reporting."  (See Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 65–66; see also SJU Hawk Article.)

This is not evidence that the DOJ grant "pressured" the University to discipline *male* students.  See Trs. of Boston Coll., 892 F.3d at 92–93.  SJU's encouraging all students, regardless of their gender, to report sexual misconduct and offering support to complainants is not discriminatory.  Assuming, *arguendo*, that the grant created an incentive to investigate sexual assault allegations more vigorously, this does not show that SJU wanted to find men responsible *because* they are men.  Cf. Doe v. Univ. of Colo., 255 F. Supp. 3d 1064, 1078 (D. Colo. May 26, 2017) ("[P]ressure from the federal government to investigate sexual assault allegations more aggressively . . . says nothing about [gender bias].").  Accordingly, no reasonable juror could find that the University's receipt of the DOJ grant to address sexual assault claims makes out gender bias.

### Educational and Training Materials

Doe argues that because SJU's training materials on sexual misconduct are "rife with gender bias," they necessarily influenced his disciplinary proceedings.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 66–67); cf. Trs. of the Univ. of Pa., 270 F. Supp. 3d at 823–24 (at Rule 12 stage, "allegations regarding training materials and possible pro-complainant bias on the part of University officials set forth sufficient circumstances suggesting . . . gender bias to support a plausible [Title IX] claim").  Once again, Doe offers no evidentiary support.

Doe points to the University's required "Break the Silence Presentation" for incoming students, which was prepared, presented, and attended by SJU's Title IX staff.  (See Presentation 1021–51.)  Doe notes that the Presentation: (1) provides that false reports of sexual misconduct are rare; (2) refers to accusers as "victims" and "survivors"; and (3) instructs trainees to "believe . . . victim[s]."  (See id.)  Doe also notes that SJU entered Memoranda of Understanding to, *inter alia*, "support efforts to hold offenders accountable."  (See Memoranda of Understanding 1056–84.)

Once again, this does not show that gender bias motivated Doe's disciplinary proceedings. The challenged materials consistently use gender-neutral language.  The "Break the Silence Presentation" provides that "[b]oth men and women can be victims or perpetrators of sexual assault," and that SJU "does not tolerate Sexual Misconduct by any member of the Saint Joseph's community, regardless of sexual orientation or gender identity."  (See Presentation 1025, 1034.) To the extent these materials include sexual abuse statistics or use gendered language, pronouns, or examples, there is no evidence that these references "reflect[] anything more than the statistical reality that most respondents are male and most complainants are women."  Colgate Univ., 2019 WL 190515, at *6.  There is also no evidence that SJU's decision to call complainants of any

16

gender "victims" or "survivors" reflects gender bias, "rather than a desire to be sensitive."   Id.

To the extent the materials are "victim-centered" or reflect "trauma-based" training, courts have repeatedly ruled that this is not evidence of gender bias.  See id. at *8 ("[S]upport for sexual assault victims and awareness [does not] demonstrate gender bias against men."); Rossley, 342 F. Supp. 3d at 927–28  (citing cases); see also Bleiler v. Coll. of the Holy Cross, No. 11-11541, 2013 WL 4714340, at *12 (D. Mass. Aug. 26, 2013) ("[B]ias . . . toward the rights of reporting complainants . . . is not the same as . . . bias or discrimination against male students.")

Once again, no reasonable juror could find that these materials are evidence of gender bias affecting Doe's disciplinary proceedings.

***Employee Statements***

Doe next argues that both SJU personnel and its present counsel have made statements and acted in ways evincing "deep-seated presumptions that women are innocent victims, to be believed when possible and given every advantage in prosecuting violent, sexually aggressive men."  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 67–70).  Again, Doe offers no supporting evidence.

Doe believes that the following make out gender bias: (1) Bordak's statement to Doe's mother that Doe's conduct involved "really[,] really aggressive kissing"; and (2) Bean's testimony that accused students can rely on their memory during the disciplinary process.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 67–68; Bean Dep. 206:6–10.).  These are gender-neutral statements that, contrary to Doe's argument, do not demonstrate SJU's anti-male "assumptions and mindset" and "belief" that "accused men do not need notice [because] they already know what they did." (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 67–68); cf. Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 666 (3d Cir. 2016) ("[T]he non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment."  (citation omitted)); Trs. of Boston Coll., 892 F.3d at

92–93 ("More than 'conclusory allegations, improbable inferences, and unsupported speculation' is required to defeat summary judgment." (citation omitted)).

Doe also argues that the University's actions "during the course of th[is] litigation" demonstrate that gender bias infected Doe's disciplinary proceedings.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 69–71).  In support, Doe offers: (1) SJU's initial willingness to let Roe but not Doe use a pseudonym in this case; and (2) SJU's arguments that Doe failed to produce evidence in his case or give Malloy reason to doubt Roe's veracity.  (Id.)  Once again, these actions have nothing to do with gender bias causing Doe's disciplinary proceedings.  Cf. Campbell v. Conroy, No. 13-1560, 2016 WL 3940344, at *2 (W.D. Pa. July 21, 2016) ("Bias must typically be established by alleging facts that arise outside the course of litigation." (citation omitted)).  To the extent Doe argues that "the statements and bedrock assumptions in SJU's Motion align perfectly with other evidence of gender bias on the part of SJU employees," in support he offers only his own belief.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 71.)

Again, Doe has not shown that gender bias affected his disciplinary proceedings.

### Dr. Perry

Doe next argues that Perry biased the investigation against him.  (Id. at 71–74); cf. Doe v. Case Western Reserve Univ., No. 17-414, 2017 WL 3840418, at *7 (N.D. Ohio Sept. 1, 2017) (inferring gender bias at Rule 12 stage where the plaintiff alleged, *inter alia*, that the Title IX coordinator was biased against men based on statements made in her doctoral dissertation).

Doe points first to Perry's 2017–2018 successful application for the Pennsylvania Governor's "It's On Us Grant," intended to improve SJU's responses to sexual violence.  (See SJU State Grant Application 1353–60.)  Perry explained how the University planned to use the grant money, stating:

As is common on many campuses, SJU focuses our training on awareness, bystander intervention and reporting options.  However, we know from national trends and our own campus statistics, the overwhelming majority of acts of sexual violence are perpetrated by men.  Since 2014, 95% of the complaints of sexual violence at SJU involved a male respondent.  We have previously made efforts to engage men in educating and supporting their peers around the issue of violence, but they have been short-lived.  Current faculty interest, the national climate, and grant-funded resources could create the right moment to ignite this initiative and have male students understand that it truly is "On Us."  To raise student awareness of violence against women as a men's issue, we would like to bring Jackson Katz, internationally known author and activist to campus.  Dr. Katz is engaging and powerful in his presentation of how men are socialized toward violence and how their [sic] can eliminate violence against women.  We would specifically invite male residents, fraternity members, and male student athletes, but open the event to the whole campus.  At the same time we would assess students' interest in and desire to be involved with forming a men's student organization to address these issues.

(Id. at 1356.)  Doe argues that this is "powerful evidence of gender bias on Perry's part that men are violent and responsible for sexual assault—which directly influenced Doe's case."  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 72.)  I do not agree.

Although Plaintiff obviously does not like the statistics Perry cites, he offers no evidence to challenge their accuracy or show that they reflect gender bias.  Accordingly, in discussing these statistics, Perry evinced no gender bias.  Cf. Trs. of Boston Coll., 892 F.3d at 92 ("It is unreasonable to draw [] an inference [of gender bias] from [statistics] rather than recognize that other non-biased reasons may support the gender makeup of the sexual misconduct cases at B.C."); Doe v. Columbia Coll. Chicago, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017) (no inference of bias could be drawn from "legitimate [sexual assault] preventive education programs and resources"); Doe v. Univ. of Cincinnati, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016) ("It should be a laudable goal for a university to raise awareness of its faculty and staff to sexual assault and to increase their sensitivity to the particular problems that victims of sexual violence experience in coming forward to make complaints."); Doe v. Salisbury Univ., 123 F. Supp. 3d 748, 769 (D. Md. 2015) ("Proof of [university's] sexual assault awareness programs does not, on its own, support a claim

for sex discrimination.").

Doe also refers again to Perry's comment in the University's student newspaper that she "initially expected" to see more reports of sexual misconduct in connection with SJU's federal grant. (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 72.) Yet, Doe again fails to explain why this evinces gender bias. As I have discussed, the statement is gender neutral.

Finally, Doe argues that Perry's processing of Roe's complaint evinced gender bias, citing, inter alia, Perry's: (1) alleged acceptance of Roe's claims against Doe at "face value"; (2) failure to question the nature of Roe's "flashback" and how it might have distorted her perceptions; (3) failure to look into Roe's disciplinary history; (4) omission of evidence that tended to exculpate Doe; and (5) referral of Roe's complaint to Public Safety. (Id. at 73–74; Pl.'s Reply to SJU's Sur-Reply 5–6.) Doe thus "submits that these pieces of evidence, especially [when viewed with Perry's challenged comments] show that Perry had a pro-woman, anti-male bias which played a significant role in Doe's disciplinary process." (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 74.) I disagree.

Doe fails to appreciate that the University's SMP requires the investigator, not the Title IX Coordinator, to assess the credibility of the parties and determine the outcome of the investigation. (SJU SMP 30.) Although Perry drafted Roe's initial complaint, she was not involved in Doe's investigation, the decision to discipline him, or the appeals process. (See Perry Dep. 335:2–340:23, Doc. No. 64-4.) Moreover, Doe has failed to show that any of Perry's challenged statements or actions made out anti-male bias that affected his proceedings. Doe does not identify any evidence, statistical or otherwise, to suggest that males consistently have been held responsible for SMP violations since Perry became Title IX Coordinator in 2011. (Id. at 44:21.) To the contrary, the evidence shows that between 2015–2018, only 12 of 25 males investigated for sexual misconduct violations were held responsible. (See Ex. 22 to SJU's Mot. Summ. J.) In these

circumstances, no reasonable juror could find that Perry's statements or actions make out gender bias that affected his disciplinary proceedings.

### Ms. Malloy

Doe also argues that Malloy conducted a biased investigation. (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 74–80); cf. Doe v. Marymount Univ., 297 F.Supp.3d 573, 586 (E.D. Va. 2018) (at Rule 12 stage, "any evidence of [adjudicator's] gender bias is particularly probative [because] [i]f [the adjudicator] possessed . . . outdated and discriminatory views of gender and sexuality . . . these views would have naturally infected the outcome of Doe's Title IX disciplinary proceedings.").

In support, Doe cites Malloy's failure to: (1) look into Roe's disciplinary record, personal history, medications, alcohol intake, or other activities the weekend of the incident; (2) investigate Roe's "flashback"; (3) probe inconsistencies in Roe's story; (4) show Doe the pictures of Roe's bruises; and (5) seek out and interview witnesses. (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 74–80; Pl.'s Reply SJU's Sur-Reply 7–8.) Finally, Doe cites Malloy's purported acceptance of Roe's version of events as true. (Id.)

Here again, Doe confuses his disapproval of the procedures Malloy employed with evidence of gender bias. There is simply no evidence that Malloy was biased against Doe because he is a man. To the extent Doe argues that Malloy's investigations have always resulted in male students being disciplined, Doe again ignores the record: it is undisputed that since 2015, Malloy has found only 9 of 19 male respondents charged with SMP violations responsible. (See Ex. 22 to SJU's Mot. Summ. J.)

Doe also argues that, in a separate investigation, Malloy treated the female respondent more favorably than she did Doe. In that case, a third-party reported that he had seen a male student offer a female student money to allow him to touch her breast. (See Ex. 48 to SJU's Mot. Summ.

J., Doc. No. 81-3.)  The male student was found not responsible after Malloy determined that the female student had consented to the touching.  (Id.)  Doe nevertheless charges that this case demonstrates Malloy's bias because "both [the male and female students] should have been charged," arguing that "the facts . . . strongly suggest that the young woman involved manipulated the male in order to get money."  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 78.)  It is by no means clear that Doe's description of this unfortunate event makes out a violation of the SMP.  In any event, Doe ignores that Malloy found the male student "not responsible"—thus undermining Doe's allegation that Malloy is invariably biased against male students.

Finally, Doe offers as proof of Malloy's bias her participation after the Doe investigation in a Philadelphia Bar Association CLE event entitled "MeToo for Legal Practitioners: A Chancellor's Forum on Sexual Harassment."  (Id. at 77–78, n.136).  Doe charges that this forum "was likely on the mind of Malloy" when she investigated Doe's claim.  (Id.)  Once again, there is no supporting evidence.  Malloy's participation in this CLE has nothing to do with anti-male bias or Doe's disciplinary proceedings.  Cf. Neal, 2017 WL 633045, at *10 (at Rule 12 stage, allegations of bias must "go . . . beyond the surmises of the plaintiff as to what was in the minds of others and involve provable events that in the aggregate would allow a trier of fact to find that gender affected the outcome of the disciplinary proceeding" (citation omitted)).  Indeed, Doe did not ask Malloy about this forum during her deposition and fails to identify anything that Malloy said at the event.  (See generally Malloy Dep., Doc. No. 69.)

In these circumstances, no reasonable juror could find that this evidence displays gender bias that affected Doe's disciplinary proceedings.

***Whether the Investigation was Unfair***

Doe also argues that the "one-sided man[ner] in which SJU conducted its 'investigation' of Roe's allegations against Doe is . . . *itself* evidence of gender bias." (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 79–80.) In Doe's view, the University's process was "one-sided, irregular, and unsupported by [the] evidence." (See id.); see also Collick v. William Paterson Univ., No. 16-471, 2016 WL 6824374, at *11 (D.N.J. Nov. 17, 2016) ("At the pleading stage . . . an allegation that the process was one-sided, irregular, and unsupported by evidence may give rise to an inference of bias."). Once again, Doe offers no supporting evidence and ignores contrary evidence. (See Ex. 22 to SJU's Mot. Summ. J.); cf. Rossley, 342 F. Supp. 3d at 926 ("[C]onclusory allegations of gender bias based on the procedures of the disciplinary proceedings or decisions about the weight of the evidence are insufficient to defeat a motion for summary judgment under Rule 56.").

As I have explained, nothing about the University's investigative process evinces gender bias. Moreover, Doe ignores that he did not accuse Roe of lying, and that he took "full responsibility" for his actions. (See Malloy's Notes; Doe Dep. 79:9–12.) In these circumstances, no reasonable juror could construe SJU's process itself as evidence of gender bias. Cf. Colgate, 2019 WL 190515, at *8 ("[W]hile it is plausible to infer that disciplinary evaluators were biased against the respondent if 'the evidence substantially favor[ed]' the respondent's version of events but the evaluators 'chose to accept [the complainant's] unsupported accusatory version instead,' the evidence in this proceeding did not substantially favor John Doe." (quoting Columbia Univ., 831 F.3d at 57)).

***Whether SJU Treats Female Respondents Move Favorably***

Finally, relying on two other disciplinary matters, Doe argues that SJU has treated female

students charged under the SMP more favorably than male students.  As I discuss below, the two matters are inapposite.  See infra IV.B.  Accordingly, no reasonable juror could construe them as evidence of gender bias.

**Conclusion**

In sum, Doe has confused Rule 12 pleading requirements with Rule 56 evidentiary requirements.  He has failed to identify any evidence demonstrating that gender bias motivated the outcome of his disciplinary proceedings.  I will thus enter judgment in favor of SJU and against Doe on his Title IX erroneous outcome claim.

## B. Selective Enforcement

Doe also charges that the University's decision to initiate proceedings against him and the penalty imposed were affected by Doe's gender.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 81–87); see also Plummer, 860 F.3d at 777–78 (citing Yusuf 35 F.3d at 715).  Once again, Doe offers no supporting evidence.

Doe "must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." Mallory, 76 F. App'x at 640–41; see also Trs. of the Univ. of Pa., 270 F. Supp. 3d at 824.  At summary judgment, "the evidence in the record must be sufficient to convince a reasonable factfinder that an act of selective enforcement, or an especially severe sanction, derived from gender bias."  Haidak, 299 F. Supp. 3d at 269; see also Yu, 97 F. Supp. 3d at 480–81.

Although Doe purports to identify "two cases in which women, similarly situated to Doe, were treated more favorably by SJU [in Title IX investigations] because they were women," these matters are not factually analogous to his own.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 82–87.)  Indeed, as SJU observes, "neither [case] involved a romantic interaction."  (SJU Reply 30,

Doc. No. 81.)

Doe first cites to the University's investigation of two female students on its softball team for SMP violations in connection with sexual hazing activities.  (See Ex. 46 to SJU's Reply, Doc. No. 81-3.)  These students were found "not responsible" after investigator Malloy determined, *inter alia*, that the complainants had consented to the underlying initiation activities and were not otherwise pressured or required to participate.  (Id.)  Doe charges that this is proof of "selective enforcement" because, unlike in his case—where Malloy determined that touching Roe's neck constituted sexual contact—Malloy determined that "touching [another student's] partially bare buttocks" did not constitute sexual contact.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 82–84.) The two matters are obviously different: Doe's involving non-consensual touching during an intimate, romantic encounter; the other involving consensual (albeit juvenile) hazing activities. This is not evidence of selective enforcement.  Cf. Mallory, 76 F. App'x at 640–41 (plaintiff failed to demonstrate "selective enforcement" where "the only other evidence . . . present[ed] to support his selective enforcement claim . . . d[id] not involve sufficiently similar facts").

Doe also relies on an SJU investigation of a female employee for violating SJU's Policy Prohibiting Discrimination, Harassment, or Retaliation when she publicly kissed a male student on the lips at an end-of-year luncheon.  (Ex. 47 to SJU's Reply, Doc. No. 81-3; see also SJU SMP 7, 30.)  Another staff member (not the student) filed a complaint against the female employee. (Id.)  The female employee was found "not responsible" for sexual harassment after the student reported that he had a joking relationship with the employee, that the kiss was simply a quick peck, and that he did not think it was either sexual or harassing.  (Ex. 47 to SJU's Reply.)  Doe argues that this case demonstrates "selective enforcement" because the University chose to investigate the female employee under the PPHDR (which has stronger procedural safeguards) instead of the

SMP, even though the incident involved kissing.  (Pl.'s Am. Resp. Opp. SJU's Mot. Summ. J. 84–87.)  Plainly, this matter was not "sufficiently similar" to Doe's to make out selective enforcement. Cf. Mallory, 76 F. App'x at 640–41.

Moreover, Doe offers no evidence to suggest that the outcomes reached in the two matters were affected by gender bias.  Haidak, 299 F. Supp. 3d at 269; see also Yu, 97 F. Supp. 3d at 480–81.

In sum, Doe has failed to identify any evidence that would raise a triable issue respecting whether SJU's decision to discipline him was based on gender.  Accordingly, I will also enter judgment in favor of SJU and against Doe on his Title IX selective enforcement claim.

## V.      STATE LAW CLAIMS

Doe brings several Pennsylvania statutory and common law claims against SJU and Roe. I may decline to extend supplemental jurisdiction over a state law claim where I have dismissed all claims over which I have original jurisdiction.  28 U.S.C. § 1367.  Indeed, once the federal law claim "over which [I have] original jurisdiction is dismissed before trial, [I] *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  Hedges v. Musco, 204 F. 3d 109, 123 (3d Cir. 2000) (citation omitted) (emphasis in original).

Having dismissed Doe's sole federal claim, I find that the interests of judicial economy, convenience, fairness and comity will not be served by extending supplemental jurisdiction over the state law claims.  I thus decline to extend supplemental jurisdiction over these claims and will dismiss them without prejudice, so they may be refiled in state court.

## VI.      THE UNIVERSITY'S COUNTERCLAIM

I will deny SJU's request for counsel fees.  (Doc. No. 8.)  I have not determined that Doe's

Title IX claim is frivolous.  See 42 U.S.C. § 1988(b); Raab v. City of Ocean City, New Jersey, 833 F.3d 286 (3d Cir. 2016) (even when a defendant is a prevailing party under § 1988, "he may recover attorney's fees 'only if the District Court finds that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith'" (quoting Christianburg Garment Co. v. E.E.O.C., 434 U.S. 412, 422 (1978))); see also Barnes Found. v. Twp. of Lower Merion, 242 F.3d 151, 157–58 (3d Cir. 2001) ("[T]he standard for awarding attorney's fees to prevailing defendants is more stringent than that for awarding fees to prevailing plaintiffs."); Quiroga v. Hasbro, Inc., 934 F.2d 497, 503 (3d Cir. 1991) ("[A]ttorney's fees are not routine, but are to be only sparingly awarded.").

Even if I had determined that the Title IX claim was frivolous, I have not assessed the merits of Doe's five state law claims against the University.  Because these claims are factually intertwined with Doe's Title IX claim, it would be virtually impossible to isolate those fees SJU incurred defending against the Title IX claim alone.  See Fox v. Vice, 563 U.S. 826, 836 (2011) ("[I]f a frivolous claim occasioned the attorney's fees at issue, a court may decide that the defendant should not have to pay them.  But if the defendant would have incurred those fees anyway, to defend against non-frivolous claims, then a court has no basis for transferring the expense to the plaintiff.").

Because I am denying SJU's request for counsel fees, I will deny as moot Doe's corresponding Summary Judgment Motion.  (Doc. No. 57.)

## VII.   CONCLUSION

In conclusion, I will grant SJU's Motion for Summary Judgment against Doe on his Title IX claim and decline to extend supplemental jurisdiction over his state law claims.  I will also deny Roe's Motion for Summary Judgment without prejudice as moot.  Finally, I will deny the

27

University's request for counsel fees, dismiss its Counterclaim as moot, and deny Doe's Motion for Summary Judgment on SJU's Counterclaim as moot.  An appropriate Judgment follows.

**AND IT IS SO ORDERED**.

*/s/ Paul S. Diamond*

April 23, 2019

Paul S. Diamond, J.